# KOBRE & KIM

800 THIRD AVENUE
NEW YORK, NEW YORK 10022
WWW.KOBREKIM.COM
TEL +1 212 488 1200

August 20, 2021

**BY E-MAIL**

Avi Perry, Esq.
Elise Bernanke, Esq.
John Scanlon, Esq.
Scott Armstrong, Esq.
United States Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, NW
Washington, DC 20530

RE: *United States v. Smith, et al.*, No. 19 CR 669 (EEC) (N.D. Ill.)

Counsel:

Defendant Gregg Smith submits this letter, under Federal Rule of Criminal Procedure 16(b)(1)(C)(i), to provide a summary of the testimony that Professor Chester Spatt, Professor Daniel Fischel, Professor Ciamac Moallemi, and Mr. Raymond Keenan may provide at trial if a defense case is presented.

We reserve the right to supplement and amend these disclosures for any appropriate reason, including, without limitation, the disclosure of additional experts by the government, changes or additions to the expected testimony described in the government's expert witness disclosures, material departures from the government's expert witness disclosures during any expert witness's trial testimony, or the receipt of new evidence from the government or third parties prior to or during trial.

Chester Spatt

***Background.*** Chester Spatt is the Pamela R. and Kenneth B. Dunn Professor of Finance at Carnegie Mellon University's Tepper School of Business, a position that he has held since 2008. He also has held various teaching positions in economics and finance at Carnegie Mellon since 1979. In addition, Professor Spatt has held visiting professorships or residential appointments at other academic institutions, including Princeton University and Massachusetts Institute of Technology.

AMERICAS (NEW YORK, BUENOS AIRES, CHICAGO, DELAWARE, MIAMI, SAN FRANCISCO, SÃO PAULO, WASHINGTON DC)
ASIA-PACIFIC (HONG KONG, SEOUL, SHANGHAI), EMEA (LONDON, TEL AVIV), OFFSHORE (BVI, CAYMAN ISLANDS)

KOBRE & KIM REFERS TO KOBRE & KIM LLP, A NEW YORK LIMITED LIABILITY PARTNERSHIP.

August 20, 2021
Page 2

In addition, Professor Spatt served as the Chief Economist and Director at the Office of Economic Analysis for the U.S. Securities and Exchange Commission from 2004 to 2007, as a Visiting Scholar at the Federal Reserve Bank of New York in Fall 2010, and, from 2014 to 2017, as a member of the Advisory Committee to the Office of Financial Research for the U.S. Department of the Treasury. He is also a former member of the SEC Equity Market Structure Advisory Committee, the Federal Reserve Bank's Model Validation Council, and the NASDAQ Economic Advisory Board, of which he was chair in 2002. He is currently a Research Associate at the National Bureau of Economic Research, a member of the Systemic Risk Council, and a member of the Financial Economists Roundtable.

Professor Spatt's research concerns the application of economics and econometrics in analyzing the functioning and regulation of financial markets. He has published approximately 60 articles in leading academic journals and has served as an editor for several such journals, including the Review of Financial Studies, for which he was a member of the Founding Committee and served as the second Executive Editor. He has also been the recipient of approximately 25 grants and awards. Professor Spatt's curriculum vitae, which contains a list of his publications, grants, and awards, is attached hereto as **Appendix A**.

Professor Spatt has testified as an expert witness in other federal court proceedings. His prior experience as a testifying expert is detailed in **Appendix B**.[1] In addition to his testimony in judicial proceedings, Professor Spatt has given testimony in administrative matters and before Congress.

***Expected Testimony & Opinions.*** Professor Spatt is expected to provide expert opinions on Smith's role as a manual trader and market maker within the spot and futures markets for precious metals. In forming these opinions, Professor Spatt will rely on his analysis of electronic trading in financial markets, relevant trading data, and relevant economic literature, as well as his prior education, experience, and academic research on modern economic markets.

Professor Spatt is expected to testify that certain features of Smith's trading, including his use of scaled orders and his simultaneous placement of orders to buy ("bids") and orders to sell ("offers" or "asks") precious metals futures contracts, are consistent with Smith's former responsibilities and incentives as a market maker for transactions in gold and other precious metals. As Professor Spatt is expected to explain, competitive pressures and exchange rules contemplate that traders will provide two-way price quotes to interested buyers and sellers; one rational way to maximize the accuracy of such quotes is by "scaling"—i.e., placing limit orders for futures contracts at varying price levels to identify and access supply or demand that is not already expressed in the form of resting limit orders (an objective sometimes referred to as "price discovery"). Additionally, Professor Spatt is expected to testify that scaling is also a rational

---

[1] In addition to the testimony listed in Appendix B, Professor Spatt testified in the mid-1990s as an expert witness in a wrongful termination action, where his testimony involved the valuation of stock options issued by Merck & Co., Inc., for the purpose of calculating damages. Following a good-faith inquiry, Professor Spatt and counsel for Mr. Smith are unable to identify the case caption and docket number for this action but can confirm that it was heard in the United States District Court for the Western District of Pennsylvania.

August 20, 2021
Page 3

method of hedging the risks and capturing the benefits associated with multilevel price movements.

Professor Spatt is also expected to testify about high-frequency algorithmic traders' roles in and effects on these markets. Professor Spatt is likewise expected to testify that, due largely to rapid changes in market conditions, the vast majority of limit orders placed in modern electronic markets (including on COMEX) are canceled before execution, and a substantial percentage of those cancellations occur within five seconds after an order is placed. Professor Spatt is also expected to testify that limit orders placed on COMEX are not required to remain open for any minimum period of time.

Professor Spatt is expected to explain that these observed results are consistent with economic theory. This is because, in a trading environment characterized by high volatility and rapid price movement, frequent and repeated cancellation and replacement of orders is a rational strategy for minimizing adverse-selection risk—i.e., the risk of loss due to changes in market conditions between the time when an order is placed and the time when it is executed. Professor Spatt is likewise expected to testify that the "fill or kill" and "immediate or cancel" (also called "fill and kill") order types offered in many electronic marketplaces, including those on which Smith traded, are offered and used because they entail no risk of adverse selection.

Professor Spatt is also expected to testify that many algorithmic traders employ a strategy—sometimes referred to as "penny-jumping"—designed to minimize losses by placing orders one price level "better" (i.e., closer to the prevailing market price) than a resting visible order. This strategy creates adverse-selection risk for a trader whose resting order is "jumped," and such a trader could rationally respond to that risk by canceling his resting order.

Professor Spatt is expected to testify that, because disclosure of a trader's preferences and strategies places that trader at a disadvantage relative to other market participants, traders take steps to conceal those preferences and strategies. Steps traders may rationally take to conceal their subjective preferences include the use of features offered on some electronic exchanges, including "iceberg" orders, that are specifically designed to facilitate preference concealment. Rational traders may also seek to conceal their subjective preferences by employing mixed strategies—i.e., varying their responses to given conditions even when their subjective preferences do not vary—a phenomenon that is analyzed in game-theoretic literature and observed in a variety of other real-world contexts.

Professor Spatt is expected to testify that the availability of preference-concealment strategies prevents market participants from ascribing subjective desires to activity in the limit-order book. Professor Spatt is expected to further explain that, at the market level, this produces an equilibrium in which market participants treat resting limit orders as open offers to transact, but not as expressions of the preference, desire, or "intent" of the traders who place them.

Professor Spatt may also offer background testimony based on his research and analysis of electronic financial markets. Potential topics for such background testimony include descriptions of the categories of market participants who use financial markets; the various order types available to those market participants; reasons why market participants place visible limit orders (as opposed to orders of another type), including to attract "passive" or "reactive"

August 20, 2021
Page 4

counterparties; and circumstances under which market participants, having placed such orders, withdraw them before they are executed. Specifically, Professor Spatt may testify that market participants who place limit orders rarely plan to leave their orders open until they execute; rather, many rational traders place orders intending to cancel them on the condition that they are not executed within a limited amount of time or in the event of a material change in market conditions. In addition, many traders strategically vary the conditions under which they will cancel their limit orders to avoid revealing their subjective preferences to other market participants. Professor Spatt is therefore expected to testify that, in his opinion, the "intent" of a trader at the moment the trader places an order cannot be reliably inferred from the fact that the order is canceled nor from the speed with which the cancellation occurs. This is especially true in modern electronic markets, where resting orders can be filled within milliseconds of their appearance in the limit-order book.

Finally, Professor Spatt is expected to opine on methodological flaws in certain opinions offered by the government's economic expert, Professor Kumar Venkataraman, about "patterns" Professor Venkataraman claims to have observed in Smith's trading activity. Among other things, Professor Spatt may testify that "sequences" or "episodes" of selected and varying lengths are not legitimate units of analysis for the type of constant trading behavior in which traders like Smith engage. Professor Spatt may also testify about the ways in which Professor Venkataraman's analysis is inconsistent with a basic and universally accepted principle of economic research: the measurement of complete or randomly sampled data against a null hypothesis that is consistent with theoretical assumptions (in this case, that Smith's orders were not placed with an unconditional intent to cancel before execution) and is only rejected under predetermined statistical criteria.

<u>Daniel Fischel</u>

***Background.*** Daniel Fischel is the Lee and Brena Freeman Professor of Law and Business Emeritus at the University of Chicago Law School. Professor Fischel previously served as Dean of the University of Chicago Law School, Director of the Law and Economics Program at the University of Chicago, and Professor of Law and Business at the University of Chicago Graduate School of Business (by courtesy), the Northwestern University Law School, and the Kellogg School of Management at Northwestern University (by courtesy).

In addition to his academic appointments, Professor Fischel is the President and Chairman of Compass Lexecon, a consulting firm that specializes in the application of economics to legal and regulatory issues. He has served as a consultant or advisor on economic issues to the United States Department of Justice, the United States Securities and Exchange Commission, the National Association of Securities Dealers, the New York Stock Exchange, the Chicago Board of Trade, the Chicago Board Options Exchange, the Chicago Mercantile Exchange, the New York Mercantile Exchange, the United States Department of Labor, the Federal Deposit Insurance Corporation, the Resolution Trust Corporation, the Federal Housing Finance Agency, and the Federal Trade Commission. He is a member of the American Economic Association and the American Finance Association, a former member of the Board of Governors of the Becker Friedman Institute at the University of Chicago, a former Advisor to the Corporate Governance Project at Harvard University, a former member of the Board of Directors of the Center for the

August 20, 2021
Page 5

Study of the Economy and the State at the University of Chicago, and a former Chairman of the American Association of Law Schools' Section on Law and Economics.

Professor Fischel's research concerns the economics of corporate law and financial markets. Professor Fischel has published approximately 50 articles in leading legal and economic journals and is a coauthor, with Judge Frank Easterbrook of the United States Court of Appeals for the Seventh Circuit, of *The Economic Structure of Corporate Law* (published by Harvard University Press). Courts at all levels, including the Supreme Court of the United States, have cited Professor Fischel's scholarship. Professor Fischel's curriculum vitae, which contains a list of his publications and prior testimony, is attached hereto as **Appendix C**.

As detailed in his curriculum vitae, Professor Fischel has testified as an expert witness in many federal and state court proceedings. His prior experience as a testifying expert includes two trials involving allegations of spoofing: *U.S. Commodity Futures Trading Commission v. Oystacher, et al.*, No. 15 CR 9196 (N.D. Ill. 2016), and *United States v. Bases, et al.*, No. 18 CR 48 (JZL) (N.D. Ill. 2021).

***Expected Testimony & Opinions.*** Professor Fischel is generally expected to testify consistent with his opinions in *Bases*. A transcript of his testimony in that case is attached hereto as **Appendix D**. Professor Fischel is expected to compare the characteristics of the Large-Side Orders[2] and Small-Side Orders in the Smith Episodes with the characteristics of Gregg Smith's trading in other trading sequences. Specifically, we expect that Professor Fischel will testify about trends in Smith's broader trading activity, including:

- The characteristics of the Smith Group Orders that did and did not have a smaller order that was active at the same time on the opposite side of the market.

- The characteristics of the Smith Group Orders that are in the Smith Episodes as compared with the characteristics of the Smith Group Orders that are not in the Smith Episodes.

- The characteristics of smaller orders on the opposite side of the Smith Group Orders that are in the Smith Episodes as compared with the characteristics of the Small-Side Orders that are not in the Smith Episodes.

- Market conditions surrounding the government episodes, including market volatility and the activity of Smith and other market participants before, during, and after the episodes.

- The frequency and speed with which Smith's orders are joined at the same price level or penny-jumped by other traders.

In addition, and based on the foregoing, Professor Fischel is expected to offer opinions about flaws in Professor Venkataraman's analysis. Professor Fischel's opinions about Professor Venkataraman's analysis will also be based on his review of the Superseding Indictment and the

---

[2] This and other capitalized terms in this section have the meanings ascribed to them in the expert disclosure for Professor Kumar Venkataraman provided by the government on June 21, 2021.

August 20, 2021
Page 6

government's expert disclosures. Among other things, Professor Fischel is expected to testify that Professor Venkataraman draws unsound inferences from the "patterns" he claims to have observed in Smith's trading activity, because they were observed across a biased and nonrepresentative data sample selected by the government.[3] He is also expected to testify about Professor Venkataraman's opinion that "[m]arket participants tend to respond to the arrival of a large fully displayed resting order (or groups of orders that in the aggregate are large) by trading ahead (i.e., in the same direction) of the large order(s)." *See* Gov't Expert Disclosures at 7. Specifically, Professor Fischel is expected to explain that this opinion is inconsistent with Professor Venkataraman's published writings, which note that many market participants wait for other traders to reveal their trading interest in the form of visible limit orders, while others withdraw from the market temporarily in response to such orders. *See generally* Henrik Bessembinder, Marios Panayides, and Kumar Venkataraman, "Hidden Liquidity: An Analysis of Order Exposure Strategies in Electronic Markets," 94 *J. Fin. Econ.* 361 (2009).

Professor Fischel may also provide expert opinions on Smith's trading consistent with those disclosed above for Professor Spatt. In forming these opinions, Professor Fischel will rely on relevant data and economic literature, as well as his prior education, experience, and academic research.

Ciamac Moallemi

**Background.** Professor Ciamac Moallemi is the William von Mueffling Professor of Business at the Columbia University Graduate School of Business, where his teaching and research are conducted primarily within the school's Decision, Risk, and Operations Division. Professor Moallemi's previous positions at the Columbia University Graduate School of Business include Associate Professor of Business (with tenure), the Barbara and Meyer Feldberg Associate Professor of Business, Associate Professor, and Instructor.

In addition to his academic appointments, Professor Moallemi has served since 2014 as a Managing Member of Bourbaki LLC, a quantitative trading firm. His prior work experience also includes the design of mathematical and computational models for use in financial markets, as well as the development of algorithms for scientific data analysis.

Professor Moallemi's research focuses in part on market microstructure and quantitative and algorithmic trading. Professor Moallemi's curriculum vitae, which contains a list of his publications, is attached hereto as **Appendix E**.

Professor Moallemi has not testified as an expert witness in other proceedings.

**Expected Testimony and Opinions.** Professor Moallemi may testify, in the alternative to Professor Fischel, about relevant observations concerning the comparison data from the Smith Episodes with Smith's other trading activity. Professor Moallemi may also testify, in the

---

[3] We reserve the right to supplement or amend these disclosed opinions to the extent that the government provides additional information regarding data analyzed by Professor Venkataraman, which defense counsel have requested in letters dated July 9, 2021, and August 16, 2021, and which the government has not yet provided.

August 20, 2021
Page 7

alternative to Professor Spatt, about the roles and incentives of various types of market participants, with specific attention to regulatory and competitive constraints and the conditions under which they cancel limit orders. In the event that Professor Moallemi testifies on these topics, his testimony is expected to be consistent with the opinions disclosed above for Professors Fischel and/or Spatt.[4]

In addition, Professor Moallemi is expected to testify about the placement of trades in the spot and futures markets in order to hedge against risk associated with other commodity derivatives, including but not limited to barrier options. Professor Moallemi is also expected to testify about algorithmic trading, execution speeds, and latency in modern electronic trading platforms, as well as the effects of those phenomena on manual traders.

<u>Raymond Keenan</u>

***Background***. Raymond Keenan is a former trader specializing in precious metals and precious metals derivative products. Most recently, he was the Global Head of Precious Metals Trading at Prudential Financial. He also managed the metals trading business at Dresdner Bank and Deutsche Bank Sharps Pixley, Inc. In these roles, Mr. Keenan served a global client base of central banks and industrial metals consumers, created and managed metals products, and implemented proprietary trading strategies. In addition to his employment at various financial institutions, Mr. Keenan served as an elected Governor on the Board of Commodity Exchange Inc., which developed and operated the online COMEX platform prior to its merger with the New York Mercantile Exchange. Mr. Keenan was also a member of the committee responsible for that merger.

Mr. Keenan has testified as an expert witness in other federal court proceedings, including a prior trial involving allegations of spoofing. *See United States v. Flotron*, No. 17 CR 220 (D. Conn. 2018). Mr. Keenan's curriculum vitae is attached hereto as **Appendix F**.

***Expected Testimony & Opinions***. Mr. Keenan is expected to provide testimony regarding the responsibilities of, and strategies used by, precious metals traders like Defendant Gregg Smith. Specifically, Mr. Keenan is expected to testify that certain phenomena observed in Smith's trading activity, including the simultaneous placement of limit orders to buy ("bids") and sell ("offers" or "asks") precious metals futures contracts, the placement of limit orders at multiple price levels (often referred to as "scaling"), and the rapid cancellation and replacement of limit orders, are consistent with rational strategies employed by market makers like Smith and, therefore, these features of Smith's trading are consistent with an intent to trade and inconsistent with an intent to cancel. In forming these opinions, Mr. Keenan will rely on his extensive experience trading the products at issue, his experience supervising traders, and his review of materials produced in this case, including Smith trading data extracted from the "episodes" the government intends to present at trial, as well as other Smith trade data. To the extent that Smith sent or received electronic

---

[4] Despite the partial overlap in the opinions of Professors Spatt, Fischel, and Moallemi as disclosed herein, we recognize the need to avoid cumulative testimony. Accordingly, on each topic described in this disclosure for each of those witnesses, we expect to elicit testimony from only one of those three witnesses. We further expect to clarify for the government in advance of any defense case which witnesses may be called.

August 20, 2021
Page 8

communications that are contemporaneous with or otherwise appear to correspond to particular trading episodes, Mr. Keenan may also rely on those communications in forming his opinions.

Mr. Keenan is expected to testify about the responsibilities and incentives of market makers like Smith, including risk management, client order hedging, profitability, and applicable exchange rules. Mr. Keenan is also expected to explain the concept of execution risk—i.e., the likelihood that an open, marketable order will be executed—and the effect of order size and placement on the likelihood and speed of execution. He may also explain his understanding of the impact other market conditions, including volatility and trading volume, exert on execution risk.

Mr. Keenan may opine on technical aspects of commodity futures trading in markets operated by CME Group, including:

- types of orders allowed by CME Group exchanges, including market orders, limit orders, "iceberg" orders, "fill-or-kill" and "immediate-or-cancel" orders, and stop-loss orders);

- the speed and frequency with which various types of orders are placed and canceled;

- the mechanics and design of the COMEX order book;

- relevant phenomena in electronic markets for precious metals futures, including the prevalence of algorithmic traders, market sweeps, and "penny-jumping" or "piggy-backing" and their impacts on manual traders;

- the information communicated to other traders in the market through the placement of limit orders on CME Group exchanges;

- the inferences commonly drawn by manual traders from order activity and book depth;

- common reactions to changes in market conditions, especially increases in volatility;

- reasons why a reasonable trader may place or cancel orders; and

- placement and cancellation of orders for price discovery, obtaining information about directionality and depth (or lack thereof) of markets at that moment, determining whether institutional investors as opposed to algorithmic/opportunistic traders were the counterparties, and engaging with and trying to capture market movements.

Mr. Keenan may opine on the various factors that, in his experience, can cause fluctuations in the price of commodity futures products. He may also opine on ways in which market participants attempt to gather real-time information about these factors, which they use to make future trading decisions.

Finally, Mr. Keenan may opine on traders' general understandings of common phrases that appear in certain trial exhibits, including "bid it up," "offer it down," "working," "jobbing," and "two-way business."

August 20, 2021
Page 9

Sincerely,

  /s/ Jonathan D. Cogan

Jonathan D. Cogan
Sean S. Buckley
Matthew I. Menchel
Leanne A. Bortner
Christopher S. Cogburn

Kobre & Kim LLP
*Counsel for Defendant Gregg Smith*

Encls.

cc: All counsel of record for Defendants Jeffrey Ruffo, Michael Nowak, and Christopher Jordan

# APPENDIX A

April 2021

## VITA

**Name:**  Chester Spatt

## Current Position

Pamela R. and Kenneth B. Dunn Professor of Finance (2008–
Tepper School of Business
Carnegie Mellon University
Phone: ███████████████
**Email:** ███████████████

## Earlier Positions

Golub Distinguished Visiting Professor, Sloan School MIT and Distinguished Senior Fellow, Golub Center, MIT (2017-2019)

Chief Economist and Director, Office of Economic Analysis, U.S. Securities and Exchange Commission (2004-2007)

Mellon Bank Professor of Finance (1996–2008)
Professor of Economics and Finance (1987–1996)
Associate Professor of Economics and Finance (1984–1986)
Assistant Professor of Economics (1979–1984)
Carnegie Mellon University

Visiting Scholar (Fall 2010)
Federal Reserve Bank of New York

Scholar in Residence (Fall 2008)
Columbia Law School

Visiting Professor (May 1996)
Toulouse University

Leslie Wong Distinguished (Visiting) Professor of Finance (May 1986)
University of British Columbia

Visiting Assistant Professor of Economics (Spring 1984)
Princeton University

## Education

University of Pennsylvania (1975-1979)
    Ph.D. degree in Economics, December 1979.
    A.M. degree in Economics, December 1976.
    Honors:  Dissertation awarded the 1980 William Polk Carey Prize of the Department of Economics.
              Lawrence Robbins Prize for the top performance among first year graduate students.
              University Fellowship, 1978--1979.

Chester Spatt
Vita
Page 2

## Education Continued

Center for the Study of Organizational Innovation
  Research Fellowship, 1978–79.
  Economic Research Unit Fellowship, 1975–78.
  Dissertation:  "Three Essays in the Economics of Finance and Organization,"
      Supervisor:  Professor Stephen A. Ross (Yale University).

Yale University (1977-1978)
  Visiting student, Department of Economics.

Princeton University (1971-1975)
  A.B. degree in Economics, June 1975.
  Honors:  Magna cum laude graduate

## Research Interests

Taxation and Asset Allocation
Economics of Financial Market Regulation
Market Microstructure
Fixed-Income, Commodity and Options Valuation and Hedging

## Teaching Experience

Ph.D.
  Markets and Intermediaries
   Information and Agency Problems in Financial Economics
  Portfolio and Equilibrium Pricing Theory in Finance
  Topics in Industrial Organization
  Contract Theory
  Valuation of Interest Rate Dependent Claims

Masters
  Ethics and Regulation (Finance)
   Financial Regulation
  Real Estate
  Taxation and Financial Strategy
  Market Microstructure
  Fixed-Income Investing
  Investment Analysis
  Corporation Finance
  Strategic Rivalry
  Financial Contracts/Investment Banking

Undergraduate
  Financial Regulation in the Digital Age
   Intermediate Macroeconomics
  Industrial Organization
  Intermediate Microeconomics

Chester Spatt
Vita
Page 3

**Teaching Experience Continued**

Executive
Dynamic Wealth Planning
Capital Markets
Advanced Training Program in Economics
Program in Competitive Strategy
Program for Executives
Corporate, Municipal and Mortgage Debt

**Grants**

Principal Investigator, Wharton-TIAA Grant, "Asset Allocation, Annuitization and Retirement Investing," June 2015–September 2016.

Principal Investor of Sloan Foundation Grant, "Credit Ratings and Credit Rating Agencies: Developing a Research Network on Markets for Financial Information," August 1, 2011–December 31, 2016.

Principal Investigator of Sloan Foundation Grant, "The Industrial Organization of Credit Rating Agencies," April 1, 2009–April 30, 2011.

Co-Principal Investigator of National Science Foundation Grant SES-9905543 on "Cross-Commodity Equilibrium Pricing: Theoretical Implications and Empirical Tests of Forward and Option Prices," July 1, 1999–June 30, 2002.

Co-Principal Investigator of National Science Foundation Grant IRI 8605282 on "The Effect of Information, Transactions Costs and Uncertainty on Debt Contracts and Pricing," October 1, 1986–September 30, 1989.

Principal Investigator of National Science Foundation Grant IST 8408966 on "Information and Uncertainty in Financial Markets," October 15, 1984–March 31, 1987.

Principal Investigator of National Science Foundation Grant IST 8208575 on "Models of Information in Industrial Organization," October 1, 1982–March 31, 1985.

Principal Investigator of National Science Foundation Grant SES 8015086 on "The Economics of Price Discrimination," October 15, 1980–March 31, 1983.

Co-Principal Investigator of Teachers Insurance Annuity Association – College Retirement Equity Fund Grant on "Taxes, Estate Planning and Financial Theory: New Insights and Perspectives," 2002–2003.

Co-Principal Investigator of Teachers Insurance Annuity Association – College Retirement Equity Fund Grant on "Diversification and Capital Gains Taxes with Multiple Risky Assets," 2001–2002.

Co-Principal Investigator of Teachers Insurance Annuity Association – College Retirement Equity Fund Grant on "Optimal Asset Location and Allocation with Taxable and Tax-Deferred Investing," 2000–2001.

Co-Principal Investigator of Teachers Insurance Annuity Association - College Retirement Equity Fund Grant on "Optimal Portfolio Choice and Consumption with Capital Gains Taxes," 1999–2000.

Chester Spatt
Vita
Page 4

## **Grants Continued**

Co-Principal Investigator of Institute for Quantitative Research in Finance Grant on "Taxes, Estate Planning, and Financial Theory: New Insights and Perspectives," 2003–2006.

Co-Principal Investigator of Institute for Quantitative Research in Finance Grant on "Equilibrium Returns and Portfolio Choices Under Asymmetric Information," 1999–2003.

Co-Principal Investigator of Institute for Quantitative Research in Finance Grant on "Equilibrium Forward and Option Pricing for Commodities," 1997–1999.

Project Coordinator of North Atlantic Treaty Organization Collaborative Research Grants on "Price Formation on the Paris Bourse: Empirical and Theoretic Analysis," 1994–1996, 1996–1998 and 1997–1999.

Co-Principal Investigator of Institute for Quantitative Research in Finance Grant on "An Empirical Analysis of the Limit Order Book and the Order Flow in the Paris Bourse," 1992–1994.

Co-Principal Investigator of Carnegie Bosch Institute Grant on "The Organization of Foreign Exchange Rate Hedging," 1991–1993.

Co-Principal Investigator of Herbert V. Prochnow Educational Foundation Award on "Implications of Mortgage Refinancing for Bank Management," 1987.

Principal Investigator of Subcommittee on Monetary Research of the Social Science Research Council Award on "Analysis of Credit Markets," April 1, 1983–March 31, 1984.

## **Awards**

Recipient (with R. Dammon) of American Association of Individual Investors Award at the 1990 Western Finance Association meeting for "An Option Theoretic Approach to the Valuation of Dividend Reinvestment and Voluntary Purchase Plans."

Recipient (with B. Routledge and D. Seppi) of First Prize-Roger Murray Award for "Equilibrium Forward Curves for Commodities," as Best Paper Presented at the 1998 meetings of the Institute for Quantitative Research in Finance.

Recipient (with R. Dammon and H. Zhang) of Runnerup Award for Barclays Global Investors/Michael Brennan Best Paper Prize for Volume 14 (2001) of the Review of Financial Studies for "Optimal Consumption and Investment with Capital Gains Taxes."

Recipient (with R. Dammon and H. Zhang) for "Optimal Asset Location and Allocation with Taxable and Tax-Deferred Investing," of the 2004 Paul A. Samuelson Award from TIAA-CREF for "Outstanding Scholarly Writing on Issues Related to Lifelong Financial Security."
http://www.tiaa-crefinstitute.org/ucm/groups/content/@ap_ucm_p_tcp_docs/documents/document/tiaa02029894.pdf

Chester Spatt
Vita
Page 5

## Professional Activities

Research Associate, National Bureau of Economic Research, 2008– .

Senior Economic Advisor, Kalorama Partners, 2008– .

Member, Office of Financial Research Advisory Committee, 2014–2017.

Member, SEC Equity Market Structure Advisory Committee, 2015–2018.

Member, Federal Reserve Bank's Model Validation Council, 2012–2015.

Member, Systemic Risk Council, 2012– .

Member, Cleveland Federal Reserve's Academic Advisory Council, 2012

Member, Shadow Financial Regulatory Committee, 2007–2015.

Member, Financial Economists Roundtable, 2006– .

Fellow, TIAA-CREF Institute, 2007– .

Fellow, Columbia Program on "Law and Economics of Capital Markets," 2008– .

Executive Editor, Review of Financial Studies, 1990–1993.

Editor, Review of Financial Studies, 1987–1990.

Co-Editor, Foundations and Trends in Finance, now publishers, 2018--

Advisory Editor, Journal of Financial Markets, 2003– .

Associate Editor, Journal of Real Estate Finance and Economics, 1987–1998.

Associate Editor, Real Estate Economics (formerly Journal of the American Real Estate and Urban Economics Association), 1995– .

Associate Editor, Journal of Financial and Quantitative Analysis, 1999– .

Associate Editor, Financial Management, 1999–2005.

Member of Advisory Board for Journal of Financial Abstracts, Real Estate Section, 1996– .

Member of Economic Advisory Board, NASDAQ, 2000-2002 (Chair: 2002).

President, Society for Financial Studies, 1993–1996.

Member of Founding Committee, Society for Financial Studies.

Distinguished Speaker, Western Finance Association, June 2009

Chester Spatt
Vita
Page 6

**Professional Activities Continued**

President, Western Finance Association, 1995–1996.

Program Chairman, Western Finance Association, 1995 meetings.

President-elect, Western Finance Association, 1994–1995.

Vice President, Western Finance Association, 1993–1994.

Member of Program Committee, 1999 American Economic Association meetings.

Member of Program Committee, 1989 Econometric Society Winter meetings.

Member of Program Committee, 1985–91, 1997–1999, 2005–2008, 2010–2015.
     Western Finance Association meetings.

Member of Program Committee, European Finance Association meetings.

Member of Program Committee, Utah Winter Finance Association meetings.

Presented papers at major universities and conferences.

Discussant and Chairman at numerous professional conferences (e.g., American Finance Association,
     Econometric Society, Western Finance Association).

Referee for <u>American Economic Review</u>, <u>American Real Estate and Urban Economics Association Journal</u>,
     <u>Canada Council</u>, <u>Earhart Foundation</u>, <u>Econometrica</u>, <u>Financial Management</u>, <u>Financial Review</u>,
     <u>International Economic Review</u>, <u>Journal of Business</u>, <u>Journal of Economic Theory</u>, <u>Journal of
     Economics and Business</u>, <u>Journal of Finance</u>, <u>Journal of Financial and Quantitative Analysis</u>, <u>Journal of
     Financial Economics</u>, <u>Journal of Financial Intermediation</u>, <u>Journal of Financial Research</u>, <u>Journal of
     Industrial Economics</u>, <u>Journal of Political Economy</u>, <u>Management Science</u>, <u>Mathematics of Operations
     Research</u>, <u>National Science Foundation</u>, <u>Quarterly Journal of Economics</u>, <u>RAND (Bell) Journal of
     Economics</u>, <u>Review of Economic Studies</u>, <u>Review of Financial Studies</u>, <u>Sloan Management Review</u>,
     and <u>University of Pennsylvania Law Review</u>.

**Publications**

"Big Data in Finance," (forthcoming July 2021), *Review of Financial Studies* (with I. Goldstein and M. Ye).
     https://academic.oup.com/rfs/advance-
     article/doi/10.1093/rfs/hhab038/6210658?guestAccessKey=eb84ce0c-fdbd-49fe-ad9c-686d73aa683e

"Proxy Advisory Firms, Governance, Market Failure, and Regulation," March 2021, *Review of Corporate
     Finance Studies*, 10, 136-157.
     https://academic.oup.com/rcfs/article-abstract/10/1/136/6050869?redirectedFrom=fulltext

"Conflicts of Interest in Asset Management and Advising," 2020, *Annual Review of Financial Economics*, 12,
     217-235.

Chester Spatt
Vita
Page 7

## Publications Continued

"A Tale of Two Crises: The 2008 Mortgage Meltdown and the 2020 COVID-19 Crisis," December 2020, *Review of Asset Pricing Studies*, 10, 759-790.
https://academic-oup-com.cmu.idm.oclc.org/raps/article/10/4/759/5919084

"Going, Going, Gone? Notes on the Implications of Rock-Bottom Interest Rates," Third Quarter 2020, *Milken Institute Review*
https://www.milkenreview.org/articles/going-going-gone

"A Survey of the Microstructure of Fixed-Income Markets," 2020, *Journal of Financial and Quantitative Analysis* (with H. Bessembinder and K. Venkataraman), 55, 1-45.
https://www.sec.gov/spotlight/fixed-income-advisory-committee/survey-of-microstructure-of-fixed-income-market.pdf

"The Economics of Credit Rating Agencies," 2017, (with F. Sangiorgi), *Foundations and Trends in Finance*, now publishers, inc., Boston (120-page monograph).

"Bid-Ask Spreads, Trading Networks and the Pricing of Securitizations," 2017, *Review of Financial Studies*, (with B. Hollifield and A. Neklyudov), 30, 3048-3085.

"Opacity, Credit Rating Shopping, and Bias," 2017, *Management Science* (with F. Sangiorgi), 63, 4016-4036.

"Banks' Internal Capital Markets and Deposit Rates," 2017, *Journal of Financial and Quantitative Analysis*, (with I. Ben-David and A. Palvia), 52, 1797-1826.

"The New Realities of Market Structure and Liquidity: Where Have We Been? Where Are We Going?" in *Public Policy and Financial Economics: Papers in Honor of Professor George G. Kaufman*. Douglas Evanoff, George Kaufman and A.G. Malliaris, editors. World Scientific, 2017.

"Systemic Risk and Public Institutions: Evolving Perspectives from the Financial Crisis," chapter 8 (pages 197-214) in "*The New International Financial System: Analyzing the Cumulative Impact of Regulatory Reform*", edited by Douglas Evanoff, Andrew Haldane and George Kaufman.

"Security Market Manipulation," *Annual Review of Financial Economics*, Volume 6 (2014) pp. 405–418.

"Designing Reliable Clearing and Settlement Systems for Enhancing the Transparency and Stability of Derivatives Markets," prepared for Wharton e-book on *Strengthening the Liquidity of the Financial System*, forthcoming.

"Equity Trading in the 21st Century: An Update," *Quarterly Journal of Finance* (with J. Angel, L. Harris), 5, 2015.

"Economic Principles, Government Policy and the Market Crisis," *Perspectives on Dodd-Frank and Finance*, Chapter Two, edited by Paul Schultz, 2014, 9–24.

"Economics of Regulation," Level II Reading for Charter Financial Analyst Institute, Level II Program, 2012, Reading 16

"Taxes and Investment Choice," *Annual Review of Financial Economics* (with R. Dammon), 4, 2012, 411–429.

Chester Spatt
Vita
Page 8

## Publications Continued

"Complexity of Regulation," Harvard Business Law Review Online, 3, 2012, 1–9.
http://www.hblr.org/2012/06/complexity-of-regulation/

"Equity Trading in the 21st Century," *Quarterly Journal of Finance* (with J. Angel and L. Harris), 1, 2011, 1–53.

"Imperfect Competition in Financial Markets: An Empirical Study of Island and NASDAQ," *Management Science* (with B. Biais and C. Bisiere), 56, 2010, 2237–2250.

"Interim News and the Role of Proxy Voting Advice," December 2010 (with C. Alexander, M. Chen and D. Seppi), *Review of Financial Studies*, 23, 4419–4454.

"An Informal Perspective on the Economics and Regulation of Securities Markets," December 2010, *Annual Review of Financial Economics*, 2, 127–143.

"Equilibrium Asset Pricing and Portfolio Choice Under Asymmetric Information," *Review of Financial Studies* (with B. Biais and P. Bossaerts), 23, April 2010, 1503–1543.

"Speed and Equity Trading," chapter 6 in *Current Perspectives in Modern Equity Markets*, November 2010.

"Regulatory Conflict: Market Integrity vs. Financial Stability," *University of Pittsburgh Law Review*, 2010, 71, 625–639.

Public Expert Report for Pittsburgh City Council, "Analysis of Pittsburgh's Parking Assets"
http://apps.pittsburghpa.gov/council/Final_Report_Sept_22.pdf

Statement of the Financial Economists Roundtable "Reforming the OTC Derivatives Markets," Summer 2010, (drafting committee: C. Spatt (chair), D. Duffie, P. Kyle), *Journal of Applied Corporate Finance*, 22, 40–47.

"Markets for Financial Information," April 2010, prepared for Federal Reserve Bank of Atlanta Conference
http://www.frbatlanta.org/documents/news/conferences/10fmc_spatt.pdf

"Systemic Risks in our Global Marketplace" in *Globalization and Systemic Risk*, Douglas Evanoff, George Kaufman and David Hoelscher, editors. World Scientific Publishing Co. Pte. Ltd, New Jersey, 2009, pp. 313–330.

"Maximizing Long-Term Wealth Accumulation: It's Not Just about 'What' Investments to Make, but also 'Where' to Make Them," *Research Dialogue*, TIAA-CREF Institute, 85, September 2005, 1–12 (with R. Dammon, J. Poterba and H. Zhang)
http://www.tiaa-crefinstitute.org/ucm/groups/content/@ap_ucm_p_tcp_docs/documents/document/tiaa02029388.pdf

"The Effect of Refinancing Costs and Market Imperfections on the Optimal Call Policy and the Pricing of Debt Contracts," *Real Estate Economics*, 33, 2005, 595–617 (with K. Dunn).
http://wpweb2k.tepper.cmu.edu/spatt/refinancing.pdf

"Market Microstructure: A Survey of Microfoundations, Empirical Results, and Policy Implications," *Journal of Financial Markets*, 8, May 2005, 217–264 (with B. Biais and L. Glosten).
http://wpweb2k.tepper.cmu.edu/spatt/survey.pdf

Chester Spatt
Vita
Page 9

**Publications Continued**

"Optimal Asset Location and Allocation with Taxable and Tax-Deferred Investing," Journal of Finance 59, June 2004, 999–1038 (with R. Dammon and H. Zhang). Reprinted in *Stephen A. Ross, Mentor: Influence through the Generations*, Mark Grinblatt, editor, McGraw-Hill, 2007, 129–164. http://wpweb2.tepper.cmu.edu/spatt/location.pdf

"Capital Gains Taxes and Portfolio Rebalancing," *Research Dialogue*, TIAA-CREF Institute, 75, March 2003, 1–14 (with R. Dammon and H. Zhang). http://www.tiaa-crefinstitute.org/ucm/groups/content/@ap_ucm_p_tcp_docs/documents/document/tiaa02029394.pdf

"Optimal Consumption and Investment with Capital Gains Taxes," *Review of Financial Studies*, 14, Fall 2001, 583–616 (with R. Dammon and H. Zhang). (http://web.tepper.cmu.edu/spatt/ctax.pdf)

"Equilibrium Forward Curves for Commodities," June 2000, 55, 1297–1338, *Journal of Finance* (with B. Routledge and D. Seppi). http://sulawesi.tepper.cmu.edu/papers/Eq_forward/EquilibriumForward-JF-June-2000.pdf

"Price Discovery and Learning during the Preopening Period in the Paris Bourse," *Journal of Political Economy*, 107, December 1999, 1218–1248 (with B. Biais and P. Hillion) http://www.jstor.org/stable/10.1086/250095

"Call Options, Points, and Dominance Restrictions on Debt Contracts," *Journal of Finance*, 54, December 1999, 2317–2337 (with K. Dunn). (http://www.jstor.org/stable/797996)

"The Optimal Trading and Pricing of Securities with Asymmetric Capital Gains Taxes and Transaction Costs," *Review of Financial Studies* 9, Fall 1996, 921–952 (with R. Dammon). http://rfs.oupjournals.org/cgi/reprint/9/3/921.pdf

"An Empirical Analysis of the Limit Order Book and the Order Flow in the Paris Bourse," *Journal of Finance*, 50, December 1995, 1655–1689 (with B. Biais and P. Hillion). http://www.jstor.org/stable/2329330

"Notes on Private Information and the Organization of Securities Markets," in R. Schwartz (ed.), *Global Equity Markets: Technological, Competitive and Regulatory Challenges*, Irwin Publishing, October 1994 (with S. Srivastava).

"The Relative Pricing of High Yield Debt: The Case of RJR Nabisco Holdings Capital Corp.," *American Economic Review*, 83, December 1993, 1090–1111 (with R. Dammon and K. Dunn). http://www.jstor.org/stable/2117550

"Incentive Conflicts, Bundling Claims, and the Interaction Among Financial Claimants," *Journal of Finance*, 48, June 1993, 513–528 (with F. Sterbenz). (http://www.jstor.org/stable/2328910)

"An Option Theoretic Approach to the Valuation of Dividend Reinvestment and Voluntary Purchase Plans," *Journal of Finance*, 47, March 1992, 331–347 (with R. Dammon). http://www.jstor.org/stable/2329100

Chester Spatt
Vita
Page 10

## Publications Continued

"Pre-Play Communication, Participation Restrictions and Efficiency in Initial Public Offerings," *Review of Financial Studies*, 4, Winter 1991, 709–726 (with S. Srivastava) [reprinted in *The Theory of Corporate Finance*, edited by Michael J. Brennan, published by Edward Elgar Publishing Limited, 1996]. http://rfs.oupjournals.org/cgi/reprint/4/4/709.pdf

"An Introduction to the Market Microstructure Symposium," *Review of Financial Studies*, 4, Fall 1991, 385–388. (http://rfs.oxfordjournals.org/cgi/reprint/4/3/385.pdf)

"A Reexamination of the Value of Tax Options," *Review of Financial Studies*, 2, Fall 1989, 341–372 (with R. Dammon and K. Dunn). (http://rfs.oupjournals.org/cgi/reprint/2/3/341.pdf)

"Strategic Analyses of Takeover Bids," *Financial Markets and Incomplete Information*, Volume 2 of *Frontiers of Modern Financial Theory*, edited by S. Bhattacharya and G. Constantinides, Rowman and Littlefield Publishers: Totowa, NJ, Spring 1989, pp. 106–121.

"Warrant Exercise, Dividends, and Reinvestment Policy," *Journal of Finance*, 43, June 1988, 493–506 (with F. Sterbenz). (http://www.jstor.org/stable/2328472)

"Private Information and Incentives:  Implications for Mortgage Contract Terms and Pricing," *Journal of Real Estate Finance and Economics*, 1, April 1988, 47–60 (with K. Dunn).

"State Restrictions on Local Debt:  Their Role in Preventing Default," *Journal of Public Economics*, 29, March 1986, 199–221 (with D. Epple).

"Repeated Insurance Contracts and Learning," *RAND Journal of Economics*, 16, Autumn 1985, 356–367 (with T. Palfrey). (http://www.jstor.org/stable/2555563)

"Learning, Preemption and the Degree of Rivalry," *RAND Journal of Economics*, 16, Spring 1985, 84–92 (with F. Sterbenz). (http://www.jstor.org/stable/2555590)

"An Analysis of Mortgage Contracting:  Prepayment Penalties and the Due on Sale Clause," *Journal of Finance*, 40, March 1985, 293–308 (with K. Dunn).  (http://www.jstor.org/stable/2328061)

"A Strategic Analysis of Sinking Fund Bonds," *Journal of Financial Economics*, 13, September 1984, 399–423 (with K. Dunn).

"Imperfect Price Discrimination and Variety," *Journal of Business*, 56, April 1983, 203–216. http://www.jstor.org/stable/2352824

"Adoption Externalities as Public Goods," *Journal of Public Economics*, 20, March 1983, 231–247 (with P. Dybvig).

"Imperfect Price Discrimination and Welfare," *Review of Economic Studies*, 49, April 1982, 155–181 (with R. Chiang).  Reprinted in *Stephen A. Ross, Mentor: Influence through the Generations*, Mark Grinblatt, editor, McGraw-Hill, 2007, 99-128 (http://www.jstor.org/stable/2297268)

"Present Values and Internal Rates of Return," *Journal of Economic Theory*, 23, August 1980, 66–81 (with S. Ross and P. Dybvig).

Chester Spatt
Vita
Page 11

**Publications Continued**

"Ratings Shopping and Asset Complexity: A Theory of Ratings Inflation," July 2009, *Journal of Monetary Economics*, 56, 696–699.

"Liquidity" in *Encyclopedia of Quantitative Finance*, edited by R. Cont, John Wiley and Sons, Ltd., Chichester, UK. pp. 1062–1066. (April 12, 2010).

"Comments on List Price Signaling and Buyer Behavior in the Housing Market," *Journal of Real Estate Economics and Finance*, 9, 1994, 193–195.

"Discussion," *Journal of Finance*, 42, July 1987, 758–761 (discussion of "Effects of Capital Gains Taxation on Life Cycle Investment and Portfolio Management" by Y. Balcer and K. Judd).
http://www.jstor.org/stable/2328386

"Discussion," *Journal of Finance*, 40, July 1985, 878–880 (discussion of "Risky Debt, Investment Incentives and Reputation in a Sequential Equilibrium" by K. John and D. Nachman).
http://www.jstor.org/stable/2327813

"Control of Conflicts of Interest in Class Action Suits: A Comment," *Public Choice: Carnegie Papers on Political Economy*, 41 (1983), 177–179.

"The Objectives of Private and Public Judges: A Comment," *Public Choice: Carnegie Papers on Political Economy*, 41 (1983), 139–143.

**Keynote and Distinguished Speaker Addresses and Policy Discussions**

Distinguished (Luncheon) Speaker, Western Finance Association, "Economic Principles, Government Policy and the Market Crisis" – June 2009

"Increased Importance of Models: Disclosure, Fair Value and Accounting" presented as a discussion at the "Model Governance and Model Validation" Roundtable at University of Pennsylvania on June 1, 2007.
http://www.sec.gov/news/speech/2007/spch060107css.htm

"Challenges to the Structure and Regulation of the Financial Markets," presented as an opening address for the afternoon of the Conference of the Autorite des Marche Financiers on "Structure and Regulation of the Financial Markets" on May 14, 2007.
http://www.sec.gov/news/speech/2007/spch051407css.htm

"Shareholder Voting and Corporate Governance: Economic Perspectives" presented at the Rutgers University Conference on "Improving Corporate Governance: Markets vs. Regulation" on April 20, 2007.
http://www.sec.gov/news/speech/2007/spch042007css.htm

"Public Plan Investment and the Role of Indexing" presented as an Address to the Pennsylvania Association of Public Employee Retirement Systems Forum on April 12, 2007.
http://www.sec.gov/news/speech/2007/spch041207css.htm

"Economic Analysis and Cost-Benefit Analysis: Substitutes or Complements?" presented as a Luncheon Address at the meeting of the Society for Government Economists and the National Economists Club on March 15, 2007.
http://www.sec.gov/news/speech/2007/spch031507css.htm

Chester Spatt
Vita
Page 12

**Keynote and Distinguished Speaker Addresses and Policy Discussions Continued**

"The Economics of FIN 48: Accounting for Uncertainty in Income Taxes" presented at the Global Knowledge
   Congress Teleconference on March 8, 2007.
   http://www.sec.gov/news/speech/2007/spch030807css.htm

"Penalties and Sanctions for Securities Fraud" presented at the American Economic Association meetings on
   January 6, 2007.
   http://www.sec.gov/news/speech/2007/spch010607css.htm

"Agency, Disclosure and the Nature of Shareholdings" presented at the e-learning forum of the National
   Investor Relations Institute on December 12, 2006.
   http://www.sec.gov/news/speech/2006/spch121206css.htm

"Remarks Concerning the Pilot Analysis of Removing Pricing Restrictions on Short Sales: SEC Open
   Meeting" presented on December 4, 2006.
   http://www.sec.gov/news/speech/2006/spch120406css.htm

"Volatility, Price Discovery and Markets," prepared as a Keynote Address at the Wilton Park Conference on
   "Capital Flows and the Safety of Markets" on November 10, 2006.
   http://www.sec.gov/news/speech/2006/spch111006css.htm

"Regulatory Competition, Integration and Capital Markets," prepared as a Keynote Address for the Calgary
   Center for Research in Finance at the Haskayne School of Business at the University of Calgary on
   October 23, 2006.
   http://www.sec.gov/news/speech/2006/spch102306css.htm

"Financial Regulation: Economic Margins and 'Unintended Consequences'," prepared as a Keynote Address
   for the Washington Area Finance Conference at George Washington University on March 17, 2006.
   http://www.sec.gov/news/speech/spch031706css.htm

 "Discussion: An Overview of Bond Market Transparency," presented as a discussion at the American
   Finance Association meetings on January 6, 2006.
   http://www.sec.gov/news/speech/spch010606css.htm

"The Growth of Derivative Securities," prepared as a Keynote Address for the "Derivatives-Based
   Investments" Conference on December 8, 2005.
   http://www.sec.gov/news/speech/spch120805css.htm

 "Why Private Pensions Matter to the Public Capital Markets," organized by the Capital Markets Research
   Center of the McDonough School of Business, Georgetown University on November 16, 2005.
   http://www.sec.gov/news/speech/spch111605cs.htm

"Governance, the Board and Compensation," prepared for the Keynote Address at the Carnegie Mellon
   University - Jones Day Conference on June 9, 2005 for "Getting Back to Business: Beyond Sarbanes-
   Oxley" Conference.
   http://www.sec.gov/news/speech/spch060905css.htm

"Conflicts of Interest in Asset Management," presented at the Hedge Fund Regulation and Compliance
   Conference in New York City, May 12, 2005.
   http://www.sec.gov/news/speech/spch051205css.htm

Chester Spatt
Vita
Page 13

**Keynote and Distinguished Speaker Addresses and Policy Discussions Continued**

"Broad Themes in Market Microstructure," presented at the Market Microstructure Meeting – National
　　Bureau of Economic Research, May 6, 2005.
　　http://www.sec.gov/news/speech/spch050605css.htm

"Regulatory Issues and Economic Principles," presented at the Sixth Maryland Finance Symposium.
　　"Governance, Markets, and Financial Policy," at the University of Maryland in College Park on April 1,
　　2005.
　　http://www.sec.gov/news/speech/spch040105css.htm

"Frictions in the Bond Market," presented at the Second MTS Conference on Financial Markets:  "The
　　Organization and Performance of Fixed-Income Markets," in Vienna on December 16, 2004.
　　http://www.sec.gov/news/speech/spch121604cs.htm

"Executive Compensation and Contracting," presented at the Ohio State-Federal Reserve Bank of New York
　　– Journal of Financial Economics Conference on "Agency Problems and Conflicts of Interest in
　　Financial Intermediaries," December 3, 2004.
　　http://www.sec.gov/news/speech/spch120304cs.htm

**Working Papers**

 "The Value of Off-Exchange Data" March 2021, (with T. Ernst).

 "Creating Controversy in Proxy Voting Advice" in preparation, April 2021, (with A. Malenko, N. Malenko).

"Volume and Intermediation in Corporate Bond Markets," December 2020 (with B. Hollifield and A.
　　Neklyudov).

"Is Equity Market Exchange Structure Anti-Competitive?" December 2020.

"What should be the Regulatory Boundary between the SEC and the Federal Reserve?" unpublished
　　manuscript.

"The Role of the Employer Default Allocation in Defined-Contribution Retirement Plan Design," October
　　2018, TIAA Institute Research Dialogue No. 149.

"Target-Date Funds, Annuitization and Retirement Investing," May 2017, TIAA Institute Research Dialogue
　　No. 134.

 "A Solution to the Palm-3Com Spin-off Puzzles," February 2015 (with M. Cherkes and C. Jones).

"Retirement Investing: Analyzing the 'Roth' Conversion and Re-characterization Options," revised
　　November 2013 (with Robert Dammon and Harold Zhang).

"Measurement and Policy Formulation," revised October 2015.

"Credit-Rating Shopping, Selection and the Equilibrium Structure of Ratings," working paper, revised June
　　2009 (with Francesco Sangiorgi and Jonathan Sokobin).

Chester Spatt
Vita
Page 14

## Working Papers Continued

"The Information Content of Market-on-Close Imbalances, the Specialist and NYSE Equity Prices," working paper, revised December 2009 (with Stewart Mayhew and Tim McCormick).

"Taxes, Estate Planning and Financial Theory: New Insights and Perspectives," working paper, revised April 2007 (with R. Dammon and H. Zhang). http://wpweb2k.tepper.cmu.edu/spatt/Estate_Planning.pdf

"Executive Compensation and Contracting," working paper, March 2006.

"Diversification and Capital Gains Taxes with Multiple Risky Assets," working paper, revised August 2001 (with R. Dammon and H. Zhang). http://web.tepper.cmu.edu/spatt/multiple.pdf

"The "Spark" Spread: Cross-Commodity Equilibrium Restrictions and Electricity," presented at the American Economic Association meetings, revised May 2001 (with B. Routledge and D. Seppi).

"The Theory of Endowment Management and Dynamic Portfolio Theory," December 1999, working paper.

"Market Rules and Order Strategies in the Preopening, Opening and Trading Day," presented at the European Summer Symposium in Financial Markets at Gerzensee, July 1998.

"Do Heterogeneous Basis Values Affect Equilibrium Asset Prices?," unpublished manuscript, March 1995 (with R. Dammon).

"Asymmetric Information and the Smoothing of Dividends," presented at the Conference on Strategic Issues in Financial Contracting at Indiana University, August 1987 (with P. Kumar).

"Does It Pay to Maintain a Reputation?  Quality Incentives in Financial Markets," unpublished manuscript, revised December 1985 (with P. Dybvig).

"Credit Reputation Equilibrium and the Theory of Credit Markets," presented at the Western Finance Association meetings, revised May 1985.

"Agency and the Market for Mutual Fund Managers:  The Principle of Preference Similarity," presented at the American Finance Association meetings, December 1983 (with P. Dybvig).

"The Valuation of Warrants with Usable Bonds:  Relative Supplies and the Allocation of the Usability Premium" (with K. Dunn and S. Heston).

# APPENDIX B

**Trial Testimony**

- *Centennial Savings Bank FSB v. United States*, Civ. A. No. 3–86–1396–H. (N.D. Tex. 1988), on behalf of Defendant United States of America.

- *First Federal Savings and Loan Association of Temple vs. United States*, Civ. A. No. W–86–CA–117 (W.D. Tex. 1988), on behalf of Defendant United States of America.

**Deposition Testimony**

- *In re Initial Public Offering Securities Litigation*, Master File No. 21 MC 92 (SAS) (S.D.N.Y. 2009), on behalf of Defendant Goldman, Sachs & Co.

- *Starr International Co. v. United States*, Case No. 1:11-CV-00779 (Fed. Cl. 2014), on behalf of Plaintiff Starr International Co.

**Testimony in Other Proceedings**

- *In the Matter of Mohammed Riad and Kevin Timothy Swanson*, SEC Administrative Proceeding File No. 3-15141 (2013), on behalf of Respondents Mohammed Riad and Kevin Timothy Swanson.

# APPENDIX C

**DANIEL R. FISCHEL**                                                                 **March 2021**
Business Address:

Compass Lexecon


## PROFESSIONAL EXPERIENCE

Lee and Brena Freeman Professor of Law and Business, University of Chicago Law School (1/84 – 12/2005, chair awarded in 7/89, emeritus as of 1/1/2006); Dean of Law School (1/99 – 2/01); Visiting Professor of Law, University of Chicago Law School (7/82 - 6/83).

Professor of Law and Business, Northwestern University School of Law (1/1/2006 – 5/2011). Professor, Kellogg

School of Management (courtesy appointment, 1/1/2006 – 5/2011).

Jack N. Pritzker Distinguished Visiting Professor of Law, Northwestern University School of Law (6/02-6/03).

Professor of Law and Business, University of Chicago Graduate School of Business (7/87 - 6/90).

Director, Law and Economics Program, University of Chicago (1/84 - 6/91).

Assistant Professor of Law, Northwestern University School of Law (6/80 - 6/81); Associate Professor of Law, Northwestern University School of Law (6/81 - 6/82); promoted to full professor in 6/82.

Attorney with Levy and Erens, Chicago, Illinois (7/79 - 6/80).

Law Clerk for Associate Justice Potter Stewart of the United States Supreme Court (1978 - 1979).

Law Clerk for Judge Thomas E. Fairchild, Chief Judge of the Seventh Circuit Court of Appeals (1977 - 1978).

## CONSULTING EXPERIENCE

President and Chairman, Compass Lexecon (formerly Lexecon).

## AREAS OF SPECIALIZATION

Securities and Financial Markets, Valuation and Financial Analysis, Bankruptcy and Financial Distress Litigation, ERISA Litigation, Class Certification, Damages, Corporate Governance.

## PUBLICATIONS

Payback: The Conspiracy to Destroy Michael Milken and His Financial Revolution, Harper Business (1995).

The Economic Structure of Corporate Law, Harvard University Press (1991) (with Frank H. Easterbrook).

## ARTICLES

The Use of Trading Models to Estimate Aggregate Damages in Securities Fraud Litigation: An Update, Briefly… Perspectives on Legislation, Regulation, and Litigation, Vol. 10, No. 3 (National Legal Center for the Public Interest, 2006) (with David J. Ross and Michael A. Keable).

The Hewlett-Packard Merger: A Case Study, in The New Investor Relations, Expert Perspectives on The State Of The Art (Bloomberg Press Princeton, 2004) (with Kenneth R. Cone, Gregory J. Pelnar and David J. Ross).

Market Evidence in Corporate Law, 69 U. Chi. L. Rev. 941 (2002).

Multidisciplinary Practice, The Business Lawyer, Vol. 55, (May 2000).

Government Liability for Breach of Contract, American L. & Econ. Rev. V1 N1/2 313 (1999) (with Alan Sykes).

Lawyers and Confidentiality, 65 U. Chi. L. Rev. 1 (1998).

The Law and Economics of Vanishing Premium Life Insurance, 22 Del. J. Corp. Law 1 (1997) (with Robert S. Stillman).

Clustering and Competition in Asset Markets, 20 J. Law & Econ. 23 (1997) (with Sanford J. Grossman, Merton H. Miller, Kenneth R. Cone and David J. Ross).

Corporate Crime, 25 J. Legal Studies 319 (1996) (with Alan O. Sykes).

The Use of Trading Models to Estimate Aggregate Damages in Securities Fraud Litigation: A Proposal for Change, in Securities Class Actions: Abuses and Remedies (The National Legal Center for the Public Interest, 1994) (with David J. Ross).

Civil Rico After Reves: An Economic Commentary, 1993 Sup. Ct. Rev. 157 (with Alan O. Sykes).

Contract and Fiduciary Duty, 36 J. Law & Econ. 425 (1993) (with Frank H. Easterbrook).

Should the Law Prohibit "Manipulation" in Financial Markets?, 105 Harv. L. Rev. 503 (1991) (with David J. Ross).

Efficient Capital Markets, the Crash, and the Fraud on the Market Theory, 74 Cornell L. Rev. 907 (1989).

The Corporate Contract, 89 Colum. L. Rev. 1416 (1989) (with Frank H. Easterbrook); also published in Corporate Law and Economic Analysis (Cambridge University Press 1990) (Lucian Bebchuk ed.).

The Economics of Lender Liability, 99 Yale L. J. 131 (1989).

Should One Agency Regulate Financial Markets, in Black Monday and the Future of Financial Markets (R. Kormendi, R. Kamphuis & J. W. H. Watson, ed.) (Dow Jones-Irwin Inc., 1988).

ERISA's Fundamental Contradiction: The Exclusive Benefit Rule, 55 U. Chi. L. Rev. 1105 (1988) (with John H. Langbein).

From MITE to CTS: Takeovers, the Williams Act and the Commerce Clause, 1987 Sup. Ct. Rev. 47.

The Regulation of Banks and Bank Holding Companies, 73 Va. L. Rev. 301 (1987) (with Andrew M. Rosenfield and Robert S. Stillman).

The Regulation of Accounting: Some Economic Issues, 52 Brooklyn L. Rev. 1051 (1987).

Organized Exchanges and the Regulation of Dual Class Common Stock, 54 U. Chi. L. Rev. 119 (1987).

Comparable Worth and Discrimination in Labor Markets, 53 U. Chi. L. Rev. 891 (1986) (with Edward P. Lazear).

Comparable Worth: A Rejoinder, 53 U. Chi. L. Rev. 950 (1986) (with Edward P. Lazear).

Close Corporations and Agency Costs, 38 Stan. L. Rev. 271 (1986) (with Frank H. Easterbrook).

The Role of Liability Rules and the Derivative Suit in Corporate Law: A Theoretical and Empirical Analysis, 71 Corn. L. Rev. 261 (1986) (with Michael Bradley).

Regulatory Conflict and Entry Regulation of New Futures Contracts, 59 J. Bus. S85 (1985).

Optimal Damages in Securities Cases, 52 U. Chi. L. Rev. 611 (1985) (with Frank H. Easterbrook).The Business Judgment Rule and the Trans Union Case, 40 Bus. Law. 1437 (1985).

Insider Trading and Investment Analysts: An Economic Analysis of Dirks v. SEC, 13 Hofstra L. Rev. 127 (1984).

Limited Liability and the Corporation, 52 U. Chi. L. Rev. 89 (1985) (with Frank H. Easterbrook).

Labor Markets and Labor Law Compared with Capital Markets and Corporate Law, 51 U. Chi. L. Rev. 1061 (1984).

Customer Protection in Futures and Securities Markets, 4 J. Futures Markets 273 (1984) (with Sanford J. Grossman).

Mandatory Disclosure and the Protection of Investors, 70 Va. L. Rev. 669 (1984) (with Frank H. Easterbrook).

The Appraisal Remedy In Corporate Law, 1983 Am. Bar Found. Res. J. 875.

The Regulation of Insider Trading, 35 Stan. L. Rev. 857 (1983) (with Dennis W. Carlton).

Voting in Corporate Law, 26 J. Law & Econ. 395 (1983) (with Frank H. Easterbrook).

Auctions and Sunk Costs in Tender Offers, 35 Stan. L. Rev. 1 (1982) (with Frank H. Easterbrook).

The Corporate Governance Movement, 35 Vand. L. Rev. 1259 (1982).

Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities, 38 Bus. Law 1 (1982).

Antitrust Suits By Targets of Tender Offers, 80 Mich. L. Rev. 1155 (May 1982) (with Frank H. Easterbrook).

Corporate Control Transactions, 91 Yale L. J. 698 (1982) (with Frank H. Easterbrook).

The "Race to the Bottom" Revisited: Reflections on Recent Developments in Delaware Corporation Law, 76 Nw. Univ. L. Rev. 913 (1982).

Takeover Bids, Defensive Tactics and Shareholders' Welfare, 36 Bus. Law 1733 (1981) (with Frank H. Easterbrook).

The Law and Economics of Dividend Policy, 67 Va. L. Rev. 699 (1981).

The Proper Role of a Target's Management in Responding to a Tender Offer, 94 Harv. L. Rev. 1161 (1981) (with Frank H. Easterbrook) (awarded prize by Emory University for best paper written in law and economics for the year 1981).

Secondary Liability Under Section 10(b) of the Securities Act of 1934, 69 California L. Rev. 80 (1981).

Efficient Capital Market Theory, the Market for Corporation Control, and the Regulation of Cash Tender Offers, 57 Tex. L. Rev. 1 (1978); reprinted in K. Scott and R. Posner ed., Economic Perspectives on Corporation Law and Securities Regulation (Little Brown 1980).

Antitrust Liability for Attempts to Influence Government Action: The Basis and Limits of the Noerr-Pennington Doctrine, 45 U. Chi. L. Rev. 80 (1977).

Comment, The Demand and Standing Requirements in Stockholder Derivation Actions, 44 U. Chi. L. Rev. 168 (1977).

Comment, The Use of Government Judgments in Private Antitrust Litigation: Clayton Act Section 5(a), Collateral Estoppel, and Jury Trial, 43 U. Chi. L. Rev. 338 (1976).

**EDUCATION**

<u>University of Chicago Law School</u>, Chicago, Illinois; J.D. 1977, cum laude; Order of the Coif; Comment Editor, Vol. 44, <u>University of Chicago Law Review</u>; Approximately top 1% of the Class. Awarded Casper Platt Award for best paper written by a student of the University of Chicago Law School; awarded Jerome N. Frank Prize for excellence in legal writing while a member of the University of Chicago Law Review, 1975 - 1977. Studied law and economics with Richard Posner and other members of the faculty.

<u>Brown University</u>, Providence, Rhode Island; M.A. 1974 in American History.

<u>Cornell University</u>, Ithaca, New York; major-American History; minor-Economics; B.A. 1972

**TESTIMONY**

Testimony of Daniel R. Fischel <u>United States v. Bases</u>, In the United States District Court for The Northern District of Illinois, Case No. 1:18-CR-00048, (July 29 and 30, 2021).

Deposition of Daniel R. Fischel <u>In Re: Jeld-Wen Holdings, Inc. Securities Litigation</u>, In the United States District Court for The Eastern District of Virginia, Richmond Division, Civil Action No. 3:20-cv-00112-JAG, (February 26, 2021).

Testimony of Daniel R. Fischel <u>In Re: The Pacific Gas and Electric Company Administration of Stress Test Methodology Developed Pursuant to Public Utilities Code Section 451.2(b) and (2) Determination That $7.5 Billion of 2017 Catastrophic Wildfire Costs and Expenses Are Stress Test Costs That May Be Financed Through Issuance of Recovery Bonds Pursuant to Section 451.2(c) and Section 850 et Seq.(U39E)</u>, Before the Public Utilities Commission of the State of California, Application No. 20-04-023, (December 15, 2020).

Deposition of Daniel R. Fischel <u>In Re: Resolution Life L.P. and Resolution Life (Parallel) Partnership vs. GBIG Holdings, Inc. f/k/a Southland National Holdings, Inc.; SNH Acquisition, LLC and Greg Lindberg</u>, In the Supreme Court of the State of New York, Index No. 650575/2019, (November 24, 2020).

Deposition of Daniel R. Fischel <u>In Re: SH 130 Concession Company, LLC, Zachry Toll Road – 56 LP Cintra Texas 56 LLC et al. vs. Central Texas Highway Constructors, LLC, et al.</u>, In the United States Bankruptcy Court, Western District of Texas, Austin Division, Case No. 16-10262-TMD, Adversary No. 18-01030, (November 5, 2020).

Deposition of Daniel R. <u>Fischel In Re: Ahmed D. Hussein versus Sheldon Razin, Steven Plochocki, Quality Systems, Inc., et al.</u>, In the Superior Court of the State of California, County of Orange, Case No. 302013-00679600 CUNPCJC, (October 22, 2020).

Deposition of Daniel R. Fischel <u>In Re: Deutsche Bank National Trust Company, Solely in its Capacity as Trustee of the Harborview Mortgage Loan Trust Mortgage Loan Pass-Through Certificates, Series 2006-9</u>, In the Supreme Court of the State of New York County of New York, Index No. 654208/2018 (September 25, 2020).

Testimony of Daniel R. Fischel <u>In Re: Fairstone Financial Holdings Inc., J.C. Flowers IV L.P. and VP Canada Acquisition, L.P. vs. Duo Bank of Canada,</u> Court File No. CV-20-00641857-00CL and <u>Duo Bank of Canada vs. Fairstone Financial Holdings Inc., J.C. Flowers IV L.P. and VP Canada Acquisition, L.P.</u>, Court File No. CV-20-00643629-00CL, In the Ontario Superior Court of Justice, (September 11, 2020).

Testimony of Daniel R. Fischel <u>In Re: AB Stable VIII LLC vs. Maps Hotels and Resorts One LLC, et al.</u>, In the Court of Chancery of the State of Delaware, C. A. No. 2020-0310-JTL (August 28, 2020).

Deposition of Daniel R. Fischel <u>In Re: AB Stable VIII LLC vs. Maps Hotels and Resorts One LLC, et al.</u>, In the Court of Chancery of the State of Delaware, Case No. 2020-0130-JTL (August 14, 2020).

Deposition of Daniel R. Fischel <u>In Re: Willis Towers Watson PLC Proxy Litigation</u>, In the United States District Court for the Eastern District of Virginia, Alexandria Division, Master File No. 1:17-cv-1338-AJT-JFA (August 12, 2020).

Deposition of Daniel R. Fischel In Re: Forescout Technologies, Inc. et al. vs. Ferrari Group Holdings, LP, and Ferrari Merger Sub, Inc., et al., In the Court of Chancery of the State of Delaware, Civil Action No. 2020-0385-SG (July 13, 2020).

Deposition of Daniel R. Fischel In Re: Brigade Leveraged Capital Structures Fund Ltd. et al. vs. Kindred Healthcare, Inc., et al., In the Circuit Court of Chancery of the State of Delaware, Case No. 2018 0165 (February 5, 2020).

Testimony of Daniel R. Fischel In Re: Gannaway Entertainment, Inc. et al vs. Frankly Inc. et al., In the United States District Court, Northern District of California, San Francisco Division, Case No. 3:17-cv-04169-RS (December 17, 2019).

Deposition of Daniel R. Fischel In Re: The Official Committee of Unsecured Creditors of Allied Systems Holdings, Inc. and its affiliated debtors et al. v. Yucaipa, et al., In the U.S. Bankruptcy Court for the District of Delaware, Bankr., D. Del., Proc. Nos. 13-50530-KBO, 14-50971-KBO (December 16, 2019).

Testimony of Daniel R. Fischel In Re: Nord Anglia Education, Inc., In the Grand Court of The Cayman Islands, Financial Services Division, Cause No. FSD 235 of 2017 (IKJ). (December 6, 9, 10 and 11, 2019).

Deposition of Daniel R. Fischel In Re: Lindie L. Banks and Erica LeBlanc, individually and on behalf of all others similarly situated vs. Northern Trust Corporation and Northern Trust Company, In the United States District Court, Central District of California, Case No. 2: 16-cv-09141-JFK (JCx) (November 22, 2019).

Deposition of Daniel R. Fischel In Re: Tesla Motors, Inc. Stockholder Litigation, In the Court of Chancery of the State of Delaware, C.A. No. 12711-VCS (November 19, 2019).

Deposition of Daniel R. Fischel In Re: Melina N. Jacobs, On Behalf of Herself and All Others Similarly Situated vs. Verizon Communications, Inc., et al., In the United States District Court for the Southern District of New York, Civil Action No. 1:16-cv-01082 (August 28, 2019).

Deposition of Daniel R. Fischel In Re: American Realty Capital Properties, Inc. Litigation, In the United States District Court, Southern District of New York, Civil Action No. 1:15-mc-00040-AKH Class Action (July 25, 2019).

Deposition of Daniel R. Fischel In Rajesh M. Shah, et al vs. Zimmer Biomet Holdings, Inc., et al, In the United States District Court, Northern District of Indiana, South Bend Division, Case No. 3:16-cv-815-PPS-MGG (May 17, 2019).

Testimony of Daniel R. Fischel In Colonial Chevrolet Co., Inc., et al., Alley's of Kingsport, Inc., et al., and Union Dodge, Inc., et al. vs. The United States (Nos. 10-647C, 11-100C, and 12-900L – Consolidated), In the United States Court of Federal Claims (May 8, 2019).

Testimony of Daniel R. Fischel In Anthem, Inc. vs. Cigna Corporation, In the Court of Chancery of the State of Delaware, C.A. No. 2017-0114-JTL (March 8, 2019).

Deposition of Daniel R. Fischel In Re: Nine West holdings, Inc., et al., Debtors, United States Bankruptcy Court, Southern District of New York, Chapter 11 Case No. 18-10947 (SCC) (January 16, 2019).

Deposition of Daniel R. Fischel In Re: Sandisk LLC Securities Litigation, United States District Court, Northern District of California, San Francisco Division, Case No. 3:15-cv-01455-VC (November 16, 2018).

Deposition of Daniel R. Fischel In Re: Colonial Chevrolet Co., Inc., Alley's of Kingsport, Inc. and Union Dodge, Inc., et al vs. The United States, In the United States Court of Federal Claims, Nos. 10-647C, 11-100C and 12-900L (Consolidated) (November 15, 2018).

Testimony of Daniel R. Fischel In Re: United States of America, et al., vs. J-M Manufacturing Co., Inc., United States District Court, Central District of California – Western Division, No. CV 6-55 GW (November 5, 2018).

Deposition of Daniel R. Fischel In Re: Appraisal of Air Methods Corp., In the Court of Chancery of the State of Delaware, C.A. No.: 2017-0317-JRS (September 27 and 28, 2018).

Testimony of Daniel R. Fischel In Re: Akorn, Inc., v. Fresenius Kabi, AG, et al., In the Court of Chancery of the State of Delaware, C.A. No. 2018-0300-JTL (July 13, 2018).

Deposition of Daniel R. Fischel In Re: Starz Stockholder Litigation, In the Court of Chancery of the State of Delaware, Consolidated C.A. No. 12584-VCG (July 12, 2018).

Deposition of Daniel R. Fischel In Re: Akorn, Inc. vs. Fresenius Kabi AG, Quercus Acquisition, Inc. and Fresenius SE & Co. KGaA, In the Court of Chancery of the State of Delaware, Index No. 2018-0300 (June 30, 2018).

Deposition of Daniel R. Fischel In Re: Physiotherapy Holdings, Inc., et al., Debtors; PAH Litigation Trust v. Water Street Healthcare Partners, L.P., et al., In the United States Bankruptcy Court for the District of Delaware, Case No. 13-12965 (KG) (Jointly Administered) (June 5, 2018).

Deposition of Daniel R. Fischel In Re: Facebook, Inc. Class C Reclassification Litigation, In the Court of Chancery of the State of Delaware, Consolidated C.A. No. 12286-VCL (May 18, 2018).

Testimony of Daniel R. Fischel In Re: Dr. Alan Sacerdote, et al. vs. New York University, In the United States District Court for the Southern District of New York, Civil Action No. 1:16-cv-6284-KBF (April 24, 25 and 26).

Deposition of Daniel R. Fischel In Re: Daniel Turocy, et al. vs. El Pollo Loco Holdings, Inc., et al., In the United States District Court, Central District of California, Southern Division, Case No. 8:15-cv-01343-DOC-KES (April 12, 2018).

Deposition of Daniel R. Fischel In Re: United States of America v. AT&T Inc., Directv Group Holdings, LLC, and Time Warner Inc., In the United States District Court for the District of Columbia, Case No. 1:17-cv-02511-RJL (March 9, 2018).

Deposition of Daniel R. Fischel In Re: Dr. Alan Sacerdote, et al. vs. New York University, In the United States District Court for the Southern District of New York, Civil Action No. 1:16-cv-6284-KBF (March 1, 2018).

Testimony of Daniel R. Fischel In Re: Lehman Brothers Holdings Inc., et al., In the United States Bankruptcy Court, Southern District of New York, Chapter 11, Case No. 08-13555 (SCC) (December 4, 2017).

Deposition of Daniel R. Fischel In Re: Lehman Brothers Holdings Inc., et al., In the United States Bankruptcy Court, Southern District of New York, Chapter 11, Case No. 08-13555 (SCC) (October 17, 2017).

Testimony of Daniel R. Fischel In Re: Genon Energy, Inc., et al, Debtors, In the United States Bankruptcy Court for the Southern District of Texas Houston Division, Chapter 11, Case No. 17-33695 (DRJ) (October 6, 2017).

Deposition of Daniel R. Fischel In Re: Genon Energy, Inc., et al, Debtors, In the United States Bankruptcy Court for the Southern District of Texas Houston Division, Chapter 11, Case No. 17-33695 (DRJ) (August 25, 2017).

Deposition of Daniel R. Fischel In Re: United States ex re. Hendrix et al., vs. JM Manufacturing Company, Inc., et al., In the United States District Court, Central District of California, Case No. ED CV 06-00055-GW (July 20, 2017).

Testimony of Daniel R. Fischel In Re: Saguaro Power Co. v. Pioneer Americas LLC d/b/a Olin Chlor Alkali Products, In AAA Case No. 01-16-0005-1073 (June 30, 2017).

Testimony of Daniel R. Fischel In Re: Syngenta AG MIR 162 Corn Litigation, In the United States District Court for the District of Kansas, Master File No. 2:14-MD-02591-JWL-JPO (June 19, 2017).

Testimony of Daniel R. Fischel In Re: Motors Liquidation Company, f/k/a General Motors Corporation, et al., Debtors, United States Bankruptcy Court, Southern District of New York, Chapter 11, Case No.:09-50026 (MG) and Motors Liquidation Company Avoidance Action Trust, et al vs. JPMorgan Chase Bank, N.A., et al., United States Bankruptcy Court, Southern District of New York, Case No.: 09-00504 (MG) (May 2 and 3, 2017).

Deposition of Daniel R. Fischel In Re: Alere-Abbott Merger Litigation, In the Court of Chancery of the State of Delaware, Consolidated C.A. No. 12963-VCG (April 4, 2017).

6

Testimony of Daniel R. Fischel In Re: Appraisal of AOL Inc., In the Court of Chancery of the State of Delaware, Consol C.A. No. 11204-VCG (March 20, 2017).

Deposition of Daniel R. Fischel In Re: City of Daytona Beach Policy and Fire Pension Fund, et al vs. Examworks Group, Inc., et al., In the Court of Chancery of the State of Delaware, C.A. No. 12481-VCL (February 22, 2017).

Deposition of Daniel R. Fischel In Re: Appraisal of AOL Inc., In the Court of Chancery of the State of Delaware, Consol C.A. No. 11204-VCG (February 14 and 15, 2017).

Deposition of Daniel R. Fischel In Re: Motors Liquidation Company, f/k/a General Motors Corporation, et al., Debtors, United States Bankruptcy Court, Southern District of New York, Chapter 11, Case No.:09-50026 (MG) and Motors Liquidation Company Avoidance Action Trust, et al vs. JPMorgan Chase Bank, N.A., et al., United States Bankruptcy Court, Southern District of New York, Case No.: 09-00504 (MG) (January 31, 2017).

Deposition of Daniel R. Fischel In Re: Syngenta Litigation, In the State of Minnesota District Court, County of Hennepin Fourth Judicial District, Court File No. 27-CV-15-3785 and In Re: Syngenta AG MIR 162 Corn Litigation, In the United States District Court for the District of Kansas, Case No. 2:14-md-2591-JWL-JPO (January 20, 2017).

Testimony of Daniel R. Fischel In the Matter of Motiva Enterprises LLC vs. Bechtel Corporation, Jacobs Engineering Group, Inc. and Bechtel-Jacobs CEP Port Arthur Joint Venture, International Institute for Conflict Prevention and Resolution (October 20, 2016).

Deposition of Daniel R. Fischel in Beaver County Employees Retirement Fund, et al., vs. Cyan, Inc., et al., Superior Court of the State of California, County of San Francisco, Lead Case No. CGC-14-538355 (Consolidated with No. CGC-14-539008) (October 11, 2016).

Testimony of Daniel R. Fischel In Re: Paragon Offshore PLC, et al, Debtors, In the United States Bankruptcy Court, District of Delaware, Case No. 16-10386 (September 23, 2016).

Deposition of Daniel R. Fischel In the Matter of Motiva Enterprises LLC vs. Bechtel Corporation, Jacobs Engineering Group, Inc. and Bechtel-Jacobs CEP Port Arthur Joint Venture, International Institute for Conflict Prevention and Resolution (August 25, 2016)

Deposition of Daniel R. Fischel In Re: Syngenta AG MIR162 Corn Litigation, In the United States District Court for the District of Kansas; Case No. 2;14-MD-02591-JWL-JPO and In Re: Syngenta Litigation, In the State of Minnesota District Court, County of Hennepin, Fourth Judicial District, Case No. 27-CV-15-385 (August 11, 2016).

Deposition of Daniel R. Fischel in The Western and Southern Life Insurance Company vs. The Bank of New York Mellon, Court of Common Pleas, Hamilton County, Ohio, Case No. A 1302490 (July 27, 2016).

Testimony of Daniel R. Fischel in Herbalife, Ltd., vs. KPMG LLP, Non-Administered Arbitration of the International Institute for Conflict Prevention and Resolution, CPR Case No. 1100076998 (May 19, 2016).

Testimony of Daniel R. Fischel in iHeart Communications, Inc., f/k/a Clear Channel Communications, Inc. vs. Benefit Street Partners, et al., In the District Court of Bexar County, Texas, Cause No. 2016 CI 04006 (May 17, 2016).

Deposition of Daniel R. Fischel in iHeart Communications, Inc., f/k/a Clear Channel Communications, Inc. vs. Benefit Street Partners, et al., In the District Court of Bexar County, Texas, Cause No. 2016 CI 04006 (May 12, 2016).

Testimony of Daniel R. Fischel in U.S. Commodity Futures Trading Commission v. Igor B. Oystacher and 3 Red Trading, LLC, In the United States District Court for the Northern District of Illinois, Eastern Division, Docket No. 15 C 9196 (May 6, 2016).

Testimony of Daniel R. Fischel in Merion Capital LP and Merion Capital II, LP vs. Lender Processing Services, Inc., In the Court of Chancery of the State of Delaware, C.A. No. 9320-VCL (May 4 and 5, 2016).

Testimony of Daniel R. Fischel in <u>iHeart Communications, Inc., f/k/a Clear Channel Communications, Inc. v. Benefit Street Partners LLC, et al.</u>, In the District Court of Bexar County, Texas, 285th Judicial District, Cause No. 2016-CI 04006 (April 5, 2016).

Deposition of Daniel R. Fischel in <u>iHeart Communications, Inc., f/k/a Clear Channel Communications, Inc. v. Benefit Street Partners LLC, et al.</u>, In the District Court of Bexar County, Texas, 285th Judicial District, Cause No. 2016-CI 04006 (April 2, 2016).

Deposition of Daniel R. Fischel in <u>Herbalife Ltd. vs. KPMG LLP</u>, Non-Administered Arbitration of the International Institute for Conflict Prevention and Resolution, CPR Case No.1100076998 (March 31, 2016).

Deposition of Daniel R. Fischel in <u>U.S. Commodity Futures Trading Commission v. Igor B. Oystacher and 3 Red Trading, LLC</u>, In the United States District Court, Northern District of Illinois, Eastern Division, No. 15-cv-09196 (March 25, 2016).

Deposition of Daniel R. Fischel in <u>Merion Capital LP and Merion Capital II, LP vs. Lender Processing Services, Inc.</u>, In the Court of Chancery of the State of Delaware, C.A. No. 9320-VCL (March 15, 2016).

Deposition of Daniel R. Fischel in <u>Lawrence E. Jaffe Pension Plan, On Behalf of Itself and All Others Similarly Situated v. Household International, Inc., et al.</u>, In the United States District Court, Northern District of Illinois Eastern Division, Lead Case No. 02-C-5893 (February 24, 2016).

Deposition of Daniel R. Fischel in <u>Robert E. Morley, Jr. and REM Holdings 3, LLC vs. Square, Inc., Jack Dorsey, and James McKelvey, Jr.</u>, United States District Court for the Eastern District of Missouri, Eastern Division, Civil Action No. 14-CV-00172-SNLJ (February 19, 2016).

Testimony of Daniel R. Fischel in <u>In the Matter of the Application of U.S. Bank National Association, The Bank of New York Mellon, et al.</u>, Supreme Court of the State of New York, County of New York, Index No. 652382/2014 (January 20 and 21, 2016).

Testimony of Daniel R. Fischel in <u>Sangeeth Peruri v. Ameriprise Financial, Inc., et al</u>, American Arbitration Association Case No. 01-15-0002-3991 (December 7, 2015).

Deposition of Daniel R. Fischel <u>In the Matter of the Application of U.S. Bank National Association, The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A., et al</u>, In the Supreme Court of the State of New York, County of New York, Index No. 652382/2014 (December 3, 2015).

Testimony of Daniel R. Fischel in <u>Securities and Exchange Commission v. Arkadiy Dubovoy, et al</u>, In the United States District Court for the District of New Jersey, Civil Case No. 15-cv- 6076-MCA (October 8, 2015).

Deposition of Daniel R. Fischel in <u>Steven A. Stender, Harold Silver and Infinity Clark Street Operating, L.L.C., on behalf of themselves and all others similarly situated v. Archstone- Smith Operating Trust, et al.</u>, in the United States District Court for the District of Colorado, Case No. 07-CV-02503-WJM-MJW (July 24, 2015).

Testimony of Daniel R. Fischel <u>In Re: Determination of Royalty Rates and Terms for Ephemeral Recording and Digital Performance of Sound Recordings (Web IV)</u>, in the United States Copyright Royalty Judges, The Library of Congress, Docket No. 14-CRB-0001-WR (2016-2020) (May 21 and 22, 2015).

Deposition of Daniel R. Fischel <u>In Re: Determination of Royalty Rates and Terms for Ephemeral Recording and Digital Performance of Sound Recordings (Web IV)</u>, in the United States Copyright Royalty Judges, The Library of Congress, Docket No. 14-CRB-0001-WR (2016-2020) (April 1, 2015).

Deposition of Daniel R. Fischel in <u>MacDermid, Incorporated vs. Cookson Group, PLC, Cookson Electronics and Enthone, Inc.</u>, in the Superior Court, Judicial District of Waterbury, Docket No. UWY-CV-12-6016356-S (January 21, 2015)

Testimony of Daniel R. Fischel in the <u>Securities and Exchange Commission vs. Samuel E. Wyly and Donald R. Miller, Jr., in his capacity as the Independent Executor of the Will and Estate of Charles J. Wyly, Jr.</u>, in the United States District Court, Southern District of New York, 10 Civ. 5760 (SAS) (November 17, 2014).

Deposition of Daniel R. Fischel <u>In Re: Activision Blizzard, Inc. Stockholder Litigation</u>, In the Court of Chancery of the State of Delaware, Consolidated C.A. No. 8885-VCL (October 17, 2014).

Testimony of Daniel R. Fischel in <u>Hugh M. Caperton, Harman Development Corporation, Harman Mining Corporation, and Sovereign Coal Sales, Inc. v. A.T. Massey Coal Company, Inc.</u>, In the Circuit Court for Buchanan County, Case No. 027CL10000771-00 (May 20 and 21, 2014).

Deposition of Daniel R. Fischel in <u>Center Partners, Ltd., et al v. Urban Shopping Centers, L.P., et al.</u>, In the Circuit Court of Cook County, Illinois, County Department, Law Division, Case No. 04 L 012194 (April 24, 2014).

Deposition of Daniel R. Fischel in <u>Third Point LLC v. William F. Ruprecht, et al and Sotheby's</u>, In the Court of Chancery of the State of Delaware, C.A. No. 9469-VCP (April 19, 2014).

Deposition of Daniel R. Fischel in <u>Hugh M. Caperton, Harman Development Corporation, Harman Mining Corporation, and Sovereign Coal Sales, Inc. v. A.T. Massey Coal Company, Inc.</u>, In the Circuit Court for Buchanan County, Case No. 027CL10000771-00 (March 14, 2014).

Deposition of Daniel R. Fischel in <u>Corre Opportunities Fund, LP, Zazove Associates LLC, DJD Group LLLP, First Derivative Traders LP, and Kevan A. Fight vs. Emmis Communications Corporation</u>, United States District Court, Southern District of Indiana, Indianapolis Division, Case No. 1:12-cv-0491-SEB-TAB (October 4, 2013).

Testimony of Daniel R. Fischel <u>In the Matter of the Application of The Bank of New York Mellon, (As Trustee Under Various Pooling and Servicing Agreements and Indenture Trustee under various indentures), Petitioner, for an order, pursuant to CPLR §7701, seeking judicial instructions and approval of a proposed settlement</u>, Index No. 651786/11, Supreme Court of the State of New York, County of New York: Trial Term Part 39 (September 9 and 10, 2013).

Testimony of Daniel R. Fischel <u>In Re: September 11 Litigation</u>, Case No. 21 MC 97 (AKH), United States District Court for the Southern District of New York, (July 16, 2013).

Deposition of Daniel R. Fischel in <u>Cantor Fitzgerald & Co., et al v. American Airlines, Inc., et al</u>, Case No. 21 MC 101 (AKH), 04 CV 7318 (AKH), United States District Court, Southern District of New York (July 1, 2013).

Deposition of Daniel R. Fischel <u>In Re: Pfizer Inc. Securities Litigation</u>, Case No. 04 Civ. 9866 (RO) in The United States District Court for the Southern District of New York (June 28, 2013).

Testimony of Daniel R. Fischel in <u>William T. Esrey, Julie C. Esrey, Ronald T. LeMay and Casondra C. Lemay v. Ernst & Young LLP</u> Arbitration, Case No. 13 107 Y 02332 11 (May 29, 2013).

Deposition of Daniel R. Fischel in <u>Christine Bauer-Ramazani and Carolyn B. Duffy, on behalf of themselves and all other similarly situated v. Teachers Insurance and Annuity Association of America – College Retirement and Equities Fund (TIAA-CREF), et al</u>, in the United States District Court, District of Vermont, Docket No. 1:09-cv-190 (May 21, 2013).

Deposition of Daniel R. Fischel <u>In Re: Google Inc. Class C Shareholder Litigation</u>, In the Court of Chancery of the State of Delaware, Case No. 7469CS (May 17, 2013).

Deposition of Daniel R. Fischel <u>In the Matter of the application of The Bank of New York Mellon (as Trustee under various Pooling and Servicing Agreements and Indenture Trustee under various Indentures), et al.</u>, Supreme Court of the State of New York, County of New York, Index No. 651786/2011 (May 9, 2013).

Deposition of Daniel R. Fischel in <u>William T. Esrey, Julie C. Esrey, Ronald T. Lemay, and Casondra C. Lemay v. Ernst & Young, L.L.P.</u>, Before the American Arbitration Association, Case No. 1234 (May 7, 2013).

Deposition of Daniel R. Fischel in <u>Archer Well Company, Inc. v. GW Holdings LLC and Wexford Capital LP</u>, in the United States District Court, Southern District of New York, ECF Case No. 1 1:12-cv-06762-JSR (April 5, 2013).

Testimony of Daniel R. Fischel in <u>Meso Scale Diagnostics, LLC , Meso Scale Technologies, LLC v. Roche Diagnostics GmbH, et al.</u>, In the Court of Chancery of the State of Delaware, Civil Action No. 5589-VCP (February 27, 2013).

Deposition of Daniel R. Fischel in <u>Center Partners, Ltd. et al v. Urban Shopping Centers, L.P., et al</u>, Circuit Court of Cook County, Illinois, No. 04 L 012194 (February 6 and 7, 2013).

Deposition of Daniel R. Fischel in <u>In Re: September 11 Litigation</u>, United States District Court, Southern District of New York, Civil Action No. 21 MC 101 (AKH) (January 11, 2013).

Deposition of Daniel R. Fischel in <u>Meso Scale Diagnostics, LLC, Meso Scale Technologies, LLC v. Roche Diagnostics GmbH, et al.</u>, In the Court of Chancery of the State of Delaware, Case No: 5589-VCP (November 12, 2012).

Testimony of Daniel R. Fischel in <u>Stuart Bederman, et al. v. Archstone, f/k/a Archstone-Smith Operating Trust,</u> Arbitration before the Honorable Bruce W. Kauffman (October 17, 2012).

Deposition of Daniel R. Fischel in <u>David E. Brown, et al. v. Authentec, Inc. et al.</u>, In the Circuit Court of the Eighteenth Judicial Circuit in and for Brevard County, Florida, Civil Division, Case No. 05-2012-CA-57589 (September 18, 2012).

Deposition of Daniel R. Fischel in <u>Stuart Bederman, et al. v. Archstone, f/k/a Archstone-Smith Operating Trust,</u> Arbitration before the Honorable Bruce W. Kauffman (September 14, 2012).

Testimony of Daniel R. Fischel in <u>Tronox, Incorporated, et al., v. Kerr-McGee Corporation, et al.,</u> United States Bankruptcy Court, Southern District of New York, Adversary Proceeding No. 09-10098(ALG) (August 7, 8 and 9, 2012).

Deposition of Daniel R. Fischel <u>In re McAfee, Inc. Shareholder Litigation</u>, Superior Court of the State of California, County of Santa Clara, Lead Case No. 1:10-cv-180413 (August 2, 2012).

Testimony of Daniel R. Fischel in <u>Kraft Foods Global, Inc., v. Starbucks Corporation</u>, Arbitration Before JAMS, Arbitration No. 1340008345 (July 31, 2012).

Deposition of Daniel R. Fischel in <u>Altana Pharma AG, and Wyeth v. Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries, Ltd.</u>, In the United States District Court, District of New Jersey, Consolidated Civil Action Nos. 04-2355 (JLL)(CCC), 05-1966 (JLL)(CCC), 05-3920 (JLL)(CCC) and 05-3672 (JLL)(CCC) (June 1, 2012).

Deposition of Daniel R. Fischel in <u>Kraft Foods Global, Inc. v. Starbucks Corporation</u>, Arbitration before JAMS, Arbitration No. 1340008345 (May 15, 2012).

Deposition of Daniel R. Fischel in <u>Capital One Financial Corporation v. John A. Kanas and John Bohlsen</u>, In the United States District Court for the Eastern District of Virginia, Alexandria Division, Civil Action No. 1:11-cv-750 (LO/TRJ) (May 10, 2012).

Deposition of Daniel R. Fischel <u>In Re: Pfizer Inc. Securities Litigation</u>, In the United States District Court, Southern District of New York, Case 1:04-cv-09866-LTS-HBP (May 3, 2012).

Deposition of Daniel R. Fischel in <u>Willie R. Pittman, Susan B. Seales and Stephen T. Selzer vs. J. Coley Clark, Moneygram International, Inc., et al.</u>, In the Court of Chancery of the State of Delaware, C.A. No. 6387-VCL (April 26, 2012).

Deposition of Daniel R. Fischel in <u>Chona Allison, et al v. CRC Insurance Services, Inc.</u>, In the United States District Court for the Northern District of Illinois, Eastern Division, Case No. 10-3313 (March 14 and 15, 2012).

Deposition of Daniel R. Fischel <u>In Re: Tronox Incorporated, et al., Debtors</u>, In the United States Bankruptcy Court, Southern District of New York, Chapter 11, Case No. 09-10156 (ALG) (February 24, 2012).

Testimony of Daniel R. Fischel <u>In Re: BankAtlantic Bancorp, Inc. Litigation</u>, In the Court of Chancery of the State of Delaware, Consolidated Civil Action No. 7068-VCL (January 27 and 30, 2012).

Deposition of Daniel R. Fischel in <u>Hildene Capital Management, LLC et al v. BankAtlantic Bancorp, Inc., et al</u>, In the Court of Chancery of the State of Delaware, C.A. No. 7068- VCL (January 19, 2012).

Deposition of Daniel R. Fischel in <u>Advanced Analogic Technologies, Incorporated v. Skyworks Solutions, Inc. and Powerco Acquisition Corp.</u>, In the Court of Chancery of the State of Delaware, Arbitration No. 005-A-CS (November 18, 2011).

Testimony of Daniel R. Fischel in <u>Prudential Retirement Insurance and Annuity Company v. State Street Bank and Trust Company and State Street Global Advisors, Inc.</u>, United States District Court, Southern District of New York, Case No. 07-CV-8488 (October 13, 2011).

Deposition of Daniel R. Fischel <u>In Re: Inkeepers USA Trust, et al v. Cerberus Series Four Holdings, LLC.</u>, et al, United States Bankruptcy Court, Southern District of New York, Case No. 10-13800 (SCC) (October 5, 2011).

Deposition of Daniel R. Fischel in <u>Mary K. Jones, et al v. Pfizer, Inc., et al</u>, United States District Court, Southern District of New York, Civil Action No. 10-cv-03864 (AKH) ECF (October 4, 2011).

Testimony of Daniel R. Fischel in <u>Marina Del Rey Country Club Apartments, et al. vs. Archstone and Archstone Multifamily Series I Trust</u>, Ruby/Archstone Arbitration (August 30, 2011).

Deposition of Daniel R. Fischel in <u>Maher Terminals, LLC v. The Port Authority of New York and</u> New Jersey, Before the Federal Maritime Commission, FMC Docket No. 08-03 (August 25, 2011).

Testimony of Daniel R. Fischel in <u>Securities and Exchange Commission v. Joseph P. Nacchio, Robert S. Woodruff, Afshin Mohebbi, James J. Kozlowski and Frank T. Noyes</u>, United States District Court for the District of Colorado, Civil Action No. 05-cv-480-MSK-CBS (August 16, 2011).

Affidavit of Daniel R. Fischel in <u>Glenhill Capital LP, et al v. Porsche Automobil Holding, SE, f/k/a Dr. Ing. h.c. F. Porsche AG</u>, Supreme Court of the State of New York, County of New York, Index Number 650678/2011 (August 15, 2011).

Deposition of Daniel R. Fischel in <u>Fairfax Financial Holdings Limited and Crum & Forster Holdings Corp. v. S.A.C. Capital Management, LLC, et al.</u>, Superior Court of New Jersey, Law Division: Morris County, Docket No. MRS-L-2032-06 (July 27, 2011).

Deposition of Daniel R. Fischel <u>In Re: Lyondell Chemical Company, et al v. Leonard Blavatnik</u>, et al., United States Bankruptcy Court, Southern District of New York, Chapter 11 Case No. 09-10023 – (REG) (Jointly Administered) (July 25, 2011).

Deposition of Daniel R. Fischel <u>In Re: Constar Int'l Inc. Securities Litigation</u>, United States District Court, Eastern District of Pennsylvania, Master File No. 03cv05020 (June 28, 2011).

Affidavit of Daniel R. Fischel <u>In Re: Massey Energy Co. Derivative and Class Action Litigation</u>, in The Court of Chancery of the State of Delaware, C.A. No. 5430-VCS (May 20, 2011).

Deposition of Daniel R. Fischel in <u>Marina Del Rey Country Club, et al v. Archstone and Archstone Multifamily Series I Trust</u>, Ruby/Archstone Arbitration (May 9, 2011).

Testimony of Daniel R. Fischel in <u>The Dow Chemical Company v. Petrochemical Industries Company (K.S.C.)</u>, International Chamber of Commerce, International Court of Arbitration, ICC Case No. 16127/JEM/MLK (April 7, 2011).

Testimony of Daniel R. Fischel <u>In Re: Tribune Company, et al., Debtors</u>, In the United States Bankruptcy Court for the District of Delaware, Chapter 11, Case No. 08-13141 (KJC) (March 10, 2011).

Deposition of Daniel R. Fischel <u>In Re: Tribune Company, et al., Debtors</u>, In the United States Bankruptcy Court for the District of Delaware, Chapter 11, Case No. 08-13141 (KJC) (March 2, 2011).

Deposition of Daniel F. Fischel <u>In Re: Genetically Modified Rice Litigation</u>, In the United States District Court for the Eastern District of Missouri, Eastern Division, Case No. 4:06 MD 1811 CDP (February 15, 2011)

Deposition of Daniel R. Fischel in Riceland Food, Inc. v. Bayer Cropscience LP, et al, In the United States District Court, Eastern District of Missouri, Eastern Division, Case No. 4:09- cv-00433 CDP (January 18, 2011).

Deposition of Daniel R. Fischel In Re: Genetically-Modified Rice Litigation, In the United States District Court for the Eastern District of Missouri, Case No. 4:06-MD-1811 (November 11, 12, 2010).

Deposition of Daniel R. Fischel in Coleen Witmer, Individually, and on Behalf of All Others Similarly Situated v. Dynegy Inc., In the District Court of Harris County, Texas, 234th Judicial District (November 6, 2010).

Testimony of Daniel R. Fischel in Terra Firma (GP) 2 Investments Limited v. Citigroup Inc., United States District Court for the Southern District of New York, No. 1:09-CV-10459 (JSR) (November 2, 2010).

Testimony of Daniel R. Fischel in Terra Firma (GP) 2 Investments Limited v. Citigroup Inc., United States District Court for the Southern District of New York, No. 1:09-CV-10459 (JSR) (October 22, 2010).

Testimony of Daniel R. Fischel in Air Products and Chemicals, Inc. v. Airgas, Inc., Peter McCausland, et al, In the Court of Chancery of the State of Delaware, C.A. No. 5249-CC (October 5, 2010).

Deposition of Daniel R. Fischel in Air Products and Chemicals, Inc. v. Airgas, Inc., Peter McCausland, et al, In the Court of Chancery of the State of Delaware, C.A. No. 5249-CC (September 8, 2010).

Deposition of Daniel R. Fischel in Terra Firma (GP) 2 Investments Limited v. Citigroup Inc., United States District Court for the Southern District of New York, No. 1:09-CV-10459 (JSR) (July 28, 2010).

Deposition of Daniel R. Fischel in Citadel Investment Group, L.L.C. et al v. Mikhail Malyshev and Jace Kohlmeier, In the American Arbitration Association, Case No.AAA No. 51 166 00969 09 (July 13, 2010).

Testimony of Daniel R. Fischel In Re: United States of America v. Joseph P. Nacchio, in the United States District Court for the District of Colorado, Case No. 05-CR-00545-EWN (June 23, 2010).

Deposition of Daniel R. Fischel in Cantor Fitzgerald Securities, Cantor Fitzgerald & Co., Cantor Fitzgerald Partners v. The Port Authority of New York and New Jersey, in the Supreme Court of the State of New York, County of New York, Case No. 105447/94 (June 4, 2010).

Deposition of Daniel R. Fischel in Alaska Retirement Management Board on behalf of State of Alaska Public Employees' Retirement System and State of Alaska Teachers' Retirement System v. Mercer (US), Inc., Mercer Human Resources Consulting, Inc., and William M. Mercer, Inc., in The Superior Court for the State of Alaska, First Judicial District at Juneau, Case No. 1JU-07-974CI (April 29, 2010).

Deposition of Daniel R. Fischel In Re: ACS Shareholders Litigation, in The Court of Chancery of the State of Delaware, Consolidated Case No. 4940-VCP (April 26, 2010).

Testimony of Daniel R. Fischel in Securities and Exchange Commission v. Carl W. Jasper, in the United States District Court for the Northern District of California, San Jose Division, Case No. C-07-06122-JW (April 16, 2010).

Deposition of Daniel R. Fischel in Prudential Retirement Insurance and Annuity Company v. State Street Bank and Trust Company and State Street Global Advisors, Inc., in the United States District Court, Southern District of New York, Case No. 07 CIV 8488 (April 9, 2010).

Deposition of Daniel R. Fischel In re: Lyondell Chemical Company, et al., Debtors. Official Committee of Unsecured Creditors, on behalf of the Debtors' Estates v. Citibank, N.A., et al., in the United States Bankruptcy Court, Southern District of New York, Chapter 11 Case No. 09-10023 – (RED) (December 2, 2009).

Deposition of Daniel R. Fischel in Securities and Exchange Commission v. Carl W. Jasper, In the United States District Court, Northern District of California, San Jose Division, Case No. CV 07-6122 (HRL) (October 22, 2009).

Testimony of Daniel R. Fischel in Ventas, Inc. v. HCP, Inc., In the United States District Court of the Western District of Kentucky at Louisville, Civil Action No. 3:07-cv-00238-JGH (September 2, 2009).

Deposition of Daniel R. Fischel in Frank K. Cooper Real Estate #1, Inc., et al vs. Cendant Corporation f/k/a Hospitality Franchise Systems and Century 21 Real Estate Corporation, Superior Court of New Jersey, Law Division: Morris County, Docket No. MRS-L-377-02 (August 10, 2009).

Deposition of Daniel R. Fischel in Ventas, Inc. v. HCP, Inc., In the United States District Court of the Western District of Kentucky at Louisville, Civil Action No. 3:07-cv-00238-JGH (August 3, 2009).

Deposition of Daniel R. Fischel in U.S. Commodity Futures Trading Commission v. Amaranth Advisors, L.L.C., Amaranth Advisors (Calgary) and Brian Hunter, in the United States District Court, Southern District of New York, Case No. 07 CIV 6682 (July 8, 2009).

Declaration and Expert Surrebutal Report of Daniel R. Fischel in Ventas, Inc. v. HCP, Inc., In The United States District Court for the Western District of Kentucky at Louisville, Case No. 3:07-CV-00238-JGH (June 22, 2009).

Testimony of Daniel R. Fischel in NRG Energy, Inc. v. Exelon Corporation and Exelon Exchange Corporation, in the United States District Court, Southern District of New York, Case No. 09-CV-2448 (JGK) (DFE), (June 3, 2009).

Deposition of Daniel R. Fischel In Re: Delphi Corporation v. Appaloosa Management L.P., et al., In the United States Bankruptcy Court, Southern District of New York; Chapter 11, Case No. 05-44481(RDD) (Jointly administered), (June 2, 2009).

Deposition of Daniel R. Fischel in NRG Energy, Inc. v. Exelon Corporation and Exelon Exchange Corporation, in the United States District Court, Southern District of New York, Case No. 09-CV-2448 (JGK) (DFE), (May 31, 2009).

Deposition of Daniel R. Fischel in e-Bay Domestic Holdings, Inc. v. Craig Newmark and James Buckmaster and Craigslist, Inc., in the Court of Chancery of the State of Delaware, Case No. 3705-CC (May 29, 2009)

Testimony of Daniel R. Fischel In Re: Lawrence E. Jaffe Pension Plan, et al v. Household International, Inc., et al, in the United States District Court for the Northern District of Illinois, Eastern Division, No. 02-C-5893 (April 16, 20, 28 and 29, 2009).

Deposition of Daniel R. Fischel In Re: Rohm and Haas Company v. The Dow Chemical Company and Ramses Acquisition Corp., In the Court of Chancery of the State of Delaware, C.A. No. 4309-CC (March 4, 2009).

Deposition of Daniel R. Fischel In the Matter of Hoffman, et al. v. American Express Travel Related Services Company, Inc., et al., in the Superior Court of the State of California, in and for the County of Alameda, Case No. 2001-022881 (January 15, 2009).

Deposition of Daniel R. Fischel In Re: TyCom Ltd. Securities Litigation, in the United States District Court, District of New Hampshire, Docket No. 03-CV-1352 (September 22, 2008).

Deposition of Daniel R. Fischel In Re: Hexion Specialty Chemicals, Inc., et al v. Huntsman Corp., in the Court of Chancery of the State of Delaware, Civil Action No. 3841-VCL (September 4, 2008).

Deposition of Daniel R. Fischel In Re: Stone Energy Corp. Securities Litigation, in the United States District Court, Western District of Louisiana, Lafayette-Opelousas Division, Civil Action No. 6:05CV2088 (LEAD) (July 16, 2008).

Deposition of Daniel R. Fischel In Re: Initial Public Offering Securities Litigation, in the United States District Court, Southern District of New York, Master File No. 21 MC 92 (SAS) (April 3 and 4, 2008).

Deposition of Daniel R. Fischel In Re: Lawrence E. Jaffe Pension Plan, et al v Household International, Inc., et al, in the United States District Court for the Northern District of Illinois, Eastern Division, No. 02-C-5893 (March 21, 2008).

Deposition of Daniel R. Fischel In Re: IAC/InteractiveCorp and Barry Diller v. Liberty Media Corporation, in the Court of Chancery of the State of Delaware in and for New Castle County, Consolidated Case Number 3486-VCL (February 29, 2008).

Testimony of Daniel R. Fischel In Re: Immunicon Corporation v. Veridex LLC, before the American Arbitration Association (Commercial Arbitration Rules), Case Number 50 180T 00192 07 (January 17, 2008).

Deposition of Daniel R. Fischel In Re: Unitedglobalcom Shareholders Litigation, in the Court of Chancery of the State of Delaware in and for New Castle County, Consolidated C.A. No. 1012-N (November 19, 2007).

Deposition of Daniel R. Fischel In Re: Cendant Corporation Litigation, in the United States District Court for the District of New Jersey, Master File No. 98-1664 (WHW) (November 15, 2007).

Deposition of Daniel R. Fischel In Re: Cendant Corporation Litigation, in the United States District Court for the District of New Jersey, Master File No. 98-1664 (WHW) (October 16, 2007).

Deposition of Daniel R. Fischel In Re: Schering-Plough Corporation Securities Litigation, in the United States District Court for the District of New Jersey, Master File No. 01-CV-0829 (KSH/RJH) (October 12, 2007).

Deposition of Daniel R. Fischel In Re: Carpenters Health & Welfare Fund, et al. vs. The Coca- Cola Company, in the United States District Court, Northern District of Georgia, Atlanta Division, File No. 1:00-CV-2838-WBH (Consolidated) (September 26, 2007).

Deposition of Daniel R. Fischel In Re: Parker Freeland, et al., vs. Iridium World Communications, Ltd., et al., in the United States District Court for the District of Columbia, Civil Action No. 99-1002 (August 7, 2007)

Deposition of Daniel R. Fischel In Re: Chuck Ginsburg v. Philadelphia Stock Exchange, Inc., et al., In the Court of Chancery of the State of Delaware in and for New Castle County, C.A. No. 2202-N (June 12, 2007).

Testimony of Daniel R. Fischel In Re: Holcombe T. Green and HTG Corp. v. McKesson, Inc., et al, In the Superior Court for the County of Fulton, State of Georgia, Civil Action File No. 2002-CV-48407 (June 5, 2007).

Affidavit of Daniel R. Fischel In Re: Lear Corporation Shareholders Litigation, In the Court of Chancery of the State of Delaware, Consolidated C.A. No. 2728-VCS (May 30, 2007).

Affidavit of Daniel R. Fischel In Re: Aeroflex, Inc. Shareholder Litigation, in the Supreme Court of the State of New York, County of Nassau: Commercial Division, Index No. 07-003943 (May 23, 2007).

Deposition of Daniel R. Fischel In Re: Holcombe T. Green and HTG Corp. v. McKesson, Inc., HBO & Company, Albert Bergonzi, and Jay Gilbertson, in the Superior Court for the County of Fulton, State of Georgia, Civil Action File No. 2002W48407 (May 21, 2007).

Deposition of Daniel R. Fischel In Re: Adelphia Communications Corp. v. Deloitte & Touche LLP, et al, in the Court of Common Pleas, Philadelphia County, Pennsylvania, Case No. 000598 (May 3 and 4, 2007).

Testimony of Daniel R. Fischel In Re: United States of America v. Joseph P. Nacchio, in the United States District Court for the District of Colorado, Case No. 05-CR-00545-EWN (April 9, 2007).

Deposition of Daniel R. Fischel In Re: MK Resources Company Shareholders Litigation, in the Court of Chancery for the State of Delaware in and for New Castle County, C.A. No. 1692- N (February 22, 2007).

Deposition of Daniel R. Fischel In Re: Starr International Company, Inc. v. American International Group, Inc., In the United States District Court, Southern District of New York, Case No. 05 CV 6283 (January 26, 2007).

Written testimony of Daniel R. Fischel In Re: Verizon Communications Inc. and Verizon Services Corp. v. Christopher G. Pizzirani, In the United States District Court for the Eastern District of Pennsylvania, Case No. 2:06-cv-04645-MK (November 6, 2006).

Testimony of Daniel R. Fischel In Re: Northeast Savings, F.A. v. United States of America, In the United States Claims Court, Case No. 92-550 C (November 2 and 9, 2006).

Testimony of Daniel R. Fischel In Re: United States of America v. Sanjay Kumar and Stephen Richards, United States District Court, Eastern District of New York, 04 Civ. 4104 (ILG) (October 25, 2006).

Affidavit of Daniel R. Fischel In Re: Lionel I. Brazen and Nancy Hammerslough, et al v. Tyco International Ltd., et al. In the Circuit Court of Cook County, Illinois County Department, Chancery Division, No. 02 CH 11837 (September 18, 2006).

Deposition of Daniel R. Fischel In Re: Tele-Communications, Inc. Shareholders Litigation, in the Court of Chancery of the State of Delaware in and for New Castle County, Consolidated C.A. No. 16470 (September 15, 2006).

Affidavit of Daniel R. Fischel In Re: United States of America v. Sanjay Kumar and Stephen Richards, United States District Court, Eastern District of New York, 04 Civ. 4104 (ILG) (September 8, 2006).

Deposition of Daniel R. Fischel In Re: James Gilbert v. McKesson Corporation, et al., in the State Court of Fulton County, State of Georgia, Civil Action File No. 02VS032502C (September 7, 2006).

Supplemental Declaration of Daniel R. Fischel In Re: United States of America v. Jeffrey K. Skilling, in the United States District Court, Southern District of Texas, Houston Division, Crim. No. H-04-25 (Lake, J.) (August 25, 2006).

Affidavit of Daniel R. Fischel In Re: United States of America v. Sanjay Kumar and Stephen Richards, United States District Court, Eastern District of New York, 04 Civ. 4104 (ILG) (August 22, 2006).

Declaration of Daniel R. Fischel In Re: United States of America v. Jeffrey K. Skilling, in the United States District Court, Southern District of Texas, Houston Division, Crim. No. H-04- 25 (Lake, J.) (August 3, 2006).

Deposition of Daniel R. Fischel In Re: Enron Corporation Securities Litigation, in the United States District Court, Southern District of Texas, Houston Division, Case Number: H-01- 3624 (May 24, 2006).

Testimony of Daniel R. Fischel In Re: Guidant Corporation Shareholders Derivative Litigation, in the United States District Court, Southern District of Indiana, Indianapolis Division, Master Derivative Docket No. 1:03-CV-955-SEB-WTL (January 20, 2006).

Testimony of Daniel R. Fischel In Re. Hideji Jumbo Tanaka v. Cerberus Far East Management, L.L.C., et al., AAA Case No. 50 T 116 00284 03, (December 15, 2005).

Deposition of Daniel R. Fischel In Re: McKesson HBOC, Inc. Securities Litigation, in the United States District Court for the Northern District of California, No. C-99-20743-RMW (August 16, 2005).

Testimony of Daniel R. Fischel In the Matter of Visconsi Companies Ltd., et al. and Lehman Brothers, et al., National Association of Securities Dealers Department of Arbitration, Grievance No. 03-07606 (July 26, 2005).

Testimony of Daniel R. Fischel In Re: John P. Crowley, as Receiver of Ambassador Insurance Company v. Doris June Chait, et al., in the United States District Court for the District of New Jersey, Case No. 85-2441 (HAA) (July 21 and 22, 2005).

Deposition of Daniel R. Fischel In Re: Electronic Data Systems Corporation Securities Litigation, in the United States District Court for the Eastern District of Texas, Tyler Division, Case No. 6:03-MD-1512 (July 20, 2005).

Testimony of Daniel R. Fischel In Re: United States of America v. Philip Morris, Inc., et al, in the United States District Court for the District of Columbia, Case No. 1:99CV02496 (May 26 and 27, 2005).

Deposition of Daniel R. Fischel In Re: Cordis Corporation v. Boston Scientific Corporation, et ano, in the United States District Court for the District of Delaware, Case No. 03-027-SLR (May 25, 2005).

Deposition of Daniel R. Fischel In Re: United States of America v. Philip Morris, Inc., et al, in the United States District Court for the District of Columbia, Case No. 1:99CV02496 (May 16, 2005).

Testimony of Daniel R. Fischel In Re: Drury Industries, Inc. v. Drury Properties, Inc., in the First Judicial District Court of the State of Nevada in and for Carson City, Nevada (April 6 and 7, 2005).

Deposition of Daniel R. Fischel In Re: Jerry R. Summers and George T. Lenormand, et al v. UAL Corporation ESOP Committee, Marty Torres, Barry Wilson, Doug Walsh, Ira Levy, Don Clements, Craig Musa, and State Street Bank and Trust Company, in the United States District Court for the North District of Illinois, Eastern Division, No. 03 C 1537 (March 9, 2005).

Deposition of Daniel R. Fischel In Re: Drury Industries, Inc. v. Drury Properties, Inc., in the First Judicial District Court of the State of Nevada in and for Carson City, Nevada (March 7 and 10, 2005).

Testimony of Daniel R. Fischel In the Matter of Fyffes PLC v. DCC PLC, S&L Investments Limited, James Flavin and Lotus Green Limited, in The High Court, Dublin, Ireland (2002 No. 1183P) (February 1 and 2, 2005).

Deposition of Daniel R. Fischel In the Matter of the Arbitration between The Canada Life Assurance Company and The Guardian Life Insurance Company of America (January 12, 2005).

Deposition of Daniel R. Fischel In Re: IDT Corporation vs. Telefonica, S.A., et al, in the United States District Court, District of New Jersey, Civil Action No. 01-CV 471 (December 14, 2004).

Deposition of Daniel R. Fischel In Re: DQE, Inc. Securities Litigation, in the United States District Court, Western District of Pennsylvania, Master File No. 01-1851 (December 7, 2004)

Testimony of Daniel R. Fischel In Re: United States of America v. Daniel Bayly, James A Brown, Robert S. Furst, Daniel O. Boyle, William R. Fuhs and Sheila K. Kahanek, in the United States District Court of Southern Texas Houston Division, Case No. H-CR-03-363 (November 4, 2004).

Testimony of Daniel R. Fischel In the Matter of the Arbitration Between the Canada Life Assurance Company, Petitioner v. Caisse Centrale De Reassurance, Respondent, (November 2, 2004).

Testimony of Daniel R. Fischel In Re: Yankee Atomic Electric Company, Connecticut Yankee Atomic Power Company, and Maine Yankee Atomic Power Company v. The United States, in the United States Court of Federal Claims, Case Nos. 98-126C, 98-154C and 98-474C (August 9, 2004).

Affidavit of Daniel R. Fischel In Re: Oracle Corp. Derivative Litigation, in the Court of the Chancery of the State of Delaware In and For New Castle County, Consolidated Civil Action No. 18751 (June 8, 2004).

Deposition of Daniel R. Fischel In Re: Reading International, Inc., et al v. Regal Entertainment Group, et al, (Delaware Chancery Court) (May 30, 2004).

Affidavit of Daniel R. Fischel In Re: Reading International, Inc., et al v. Regal Entertainment Group, et al, (Delaware Chancery Court) (May 28, 2004).

Deposition of Daniel R. Fischel In Re: Northeast Savings, F.A. v. United States of America, in the United States Claims Court, Case No. 92-550-C (May 4, 5 and 6, 2004).

Deposition of Daniel R. Fischel In Re: Tyson Foods, Inc. Securities Litigation, in the United States District Court for the District of Delaware, Civil Action No. 01-425-SLR (March 18, 2004).

Testimony of Daniel R. Fischel In the Matter of Coram Healthcare Corp. and Coram, Inc., Debtors, In the United States Bankruptcy Court for the District of Delaware, Case No. 00- 3299 Through 00-3300 (MFW) (March 4, 2004).

Testimony of Daniel R. Fischel In Re: Tracinda Corporation v. DaimlerChrysler AG, et al, in the United States District Court for the District of Delaware, Civil Action No. 00-984 (February 11, 2004).

Deposition of Daniel R. Fischel In Re: Gerald K. Smith, as Plan Trustee for and on behalf of the Estates of Boston Chicken, Inc., et al. v. Arthur Anderson LLP, et al., in the United States District Court for the Northern District of Illinois, Case Nos. CIV-01-218-PHX-PGR, CIV-01- 246-PHX-EHC, CIV-02-1162-PHX-PGR, CIV-02-1248-PHX-PGR (Consolidated) (October 29 and 30, 2003).

Deposition of Daniel R. Fischel In Re: Irene Abrams, on behalf of herself and all others similarly situated v. Van Kampen Funds, Inc., Van Kampen Investment Advisory Corp., Van Kampen Prime Rate Income Trust, Howard Tiffen, Richard F. Powers III, Stephen L. Boyd, Dennis J. McDonnell and Jeffrey W. Maillet, in the United States District Court for the Northern District of Illinois, Eastern Division, Case No. 01-C-7538 (October 21, 2003).

Deposition of Daniel R. Fischel In the Matter of Coram Healthcare Corp. and Coram, Inc., Debtors, In the United States Bankruptcy Court for the District of Delaware, Case No. 00- 3299 Through 00-3300 (MFW) (October 13, 2003).

Testimony of Daniel R. Fischel In Re: Transcore Holdings, Inc. v. Rocky Mountain Mezzanine Fund II, LP; Hanifen Imhoff Mezzanine Fund, LP; Moramerica Capital Corporation; and NDSBIC, LP and W. Trent Ates and Fred H. Rayner, In Re: Jams Arbitration, Case No. 1410003193 (September 24, 2003).

Deposition of Daniel R. Fischel In Re: Transcore Holdings, Inc. v. Rocky Mountain Mezzanine Fund II, LP; Hanifen Imhoff Mezzanine Fund, LP; Moramerica Capital Corporation; and NDSBIC, LP and W. Trent Ates and Fred H. Rayner, In Re: Jams Arbitration, Case No. 1410003193 (May 13, 2003).

Deposition of Daniel R. Fischel In Re: AT&T Broadband Management Corporation v. CSG Systems, Inc., American Arbitration Association No. 77 181 00159 02 VSS (April 9, 2003).

Deposition of Daniel R. Fischel In Re: DaimlerChrysler AG Securities Litigation, in the United States District Court for the District of Delaware, Civil Action No. 00-993-JJF (February 11 and 12, 2003).

Deposition of Daniel R. Fischel In Re: David T. Bard, Commissioner of Banking and Insurance for the State of Vermont, as Receiver for Ambassador Insurance Company v. Arnold Chait, et al, in the United States District Court for the District of New Jersey, Civil Action No. 85- 2441 (December 12, 2002).

Testimony of Daniel R. Fischel In Re: MHC Financing Limited Partnership, et al vs. City of San Rafael, et al, in the United States District Court, Northern District of California, Case No. C 00-3785 VRW (November 6, 2002).

Deposition of Daniel R. Fischel In Re: MHC Financing Limited Partnership, et al vs. City of San Rafael, et al, in the United States District Court, Northern District of California, Case No. C 00-3785 VRW (October 16, 2002).

Deposition of Daniel R. Fischel In Re: Maine Yankee Atomic Power Company v. United States of America, In the United States Court of Federal Claims, Case No. 98-474 C (October 8 and 9, 2002).

Testimony of Daniel R. Fischel In Re: California Federal Bank, FSB v. The United States of America, In the United States Court of Federal Claims, Case No. 92-138C (September 20 and 23, 2002).

Deposition of Daniel R. Fischel In Re: Maine Yankee Atomic Power Company v. United States of America, In the United States Court of Federal Claims, Case No. 98-474 C (September 4 and 6, 2002).

Deposition of Daniel R. Fischel In the Matter of RDM Sports Group, Inc., et al v. Smith, Gambrell, Russell, L.L.P.; et al, In the United States Bankruptcy Court for the Northern District of Georgia, Newnan Division, Case No. 00-1065 (May 14 and 15, 2002).

Deposition of Daniel R. Fischel In Re: Walter B. Hewlett, individually and as Trustee of the William R. Hewlett Revocable Trust, and Edwin E. van Bronkhorst as Co-Trustee of the William R. Hewlett Revocable Trust v. Hewlett-Packard Company, in the Court of the Chancery of the State of Delaware in and for New Castle County (April 24, 2002).

Deposition of Daniel R. Fischel In Re: California Federal Bank, FSB, v. The United States of America, in the United States District Court of Federal Claims, Case No. 92-138C (April 16 and 17, 2002).

Deposition of Daniel R. Fischel In Re: Computer Associates Class Action Securities Litigation, in the United States District Court, Eastern District of New York, File No. 98-CV-4839 (TPC) (MLO) (March 19 and 20, 2002).

Deposition of Daniel R. Fischel In Re: United States of America v. David Blech, In the United States District Court, Southern District of New York, Case No. S1 97 Cr. 402 (KTD) (February 13, 2002).

Testimony of Daniel R. Fischel In the Matter of Coram Healthcare Corp. and Coram, Inc., Debtors, In the United States Bankruptcy Court for the District of Delaware, Case No. 00- 3299 Through 00-3300 (MFW) (December 14, 2001).

Deposition of Daniel R. Fischel In Re: Sunbeam Securities Litigation, In the United States District Court, Southern District of Florida, Miami Division, Case No. 98-8258-CIV – Middlebrooks (December 4, 5 and 6, 2001).

Affidavit of Daniel R. Fischel In Re: Jack M. Webb, Special Deputy Receiver for American Eagle Insurance Company v. Elvis Mason, Mason Best Company, L.P., Don D. Hutson, American Eagle Group, Inc., Marion Phillip Guthrie, Frederick G. Anderson, George F. Cass, Richard M. Kurz, Patricia S. Pickard, Arthur Andersen & Co., L.L.P., and Towers, Perrin Forester & Crosby, Inc., D/B/A Tillinghast, In the District Court of Travis County, Texas, 201st Judicial District, Cause No. 99-08253 (September 7, 2001).

Declaration of Daniel R. Fischel In the Matter of Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities: Before the Federal Communications Commission, Washington DC, GN Docket No. 00-185, (Declaration with K. Arrow, G. Becker, D. Carlton, R. Gertner, J. Kalt, H. Sider, and Gustavo Bamberger) (July 24, 2001).

Declaration of Daniel R. Fischel In Re: Walter Green, on behalf of himself and all others similarly situated v. Merck-Medco Managed Care, L.L.C., United States District Court, Southern District of New York, Civil Action No. 99 CIV 0847 (CLB) (June 18, 2001).

Testimony of Daniel R. Fischel In Re:Tyson Foods, Inc. and Lasso Acquisition Corporation v. IBP, Inc., Delaware Chancery Court, (May 25, 2001).

Deposition of Daniel R. Fischel In Re:Tyson Foods, Inc. and Lasso Acquisition Corporation v. IBP, Inc., Delaware Chancery Court, (May 10, 2001).

Deposition of Daniel R. Fischel In Re: Myron Weiner, Nicholas Sitnycky, Ronald Anderson and Robert Furman on behalf of themselves and all others similarly situated v. The Quaker Oats Company and William D. Smithburg, United States District Court, Northern District of Illinois, Case No. 98 C 3123, (January 24, 2001).

Deposition of Daniel R. Fischel In Re: Retsky Family Limited Partnership v. Price Waterhouse, LLP, United States District Court, Northern District of Illinois, Eastern Division, No. 97 C 7694, (October 31, 2000).

Joint Affidavit of Daniel R. Fischel and David J. Ross In Re: Floyd D. Wilson, for himself and all others similarly situated v. Massachusetts Mutual Life Insurance Company, in the First Judicial District Court, County of Santa Fe, State of New Mexico, No. D0101 CV-98-02814 (August 4, 2000).

Affidavit of Daniel R. Fischel In Re: T. Rowe Price Recovery Fund, L.P., and Carl Marks Management Co., L.P., individually and derivatively on behalf of Seaman Furniture Co., Inc. v. James Rubin, M.D. Sass Associates, Inc., Resurgence Asset Management, L.L.C., M.D. Sass Corporation Resurgence Partners, L.P. , M.D. Sass Corporate Resurgence International, Ltd., Robert Symington, Byron Haney, Alan Rosenberg, Steven H. Halper, and Peter McGeough and Seaman Furniture Co., Inc., In the Court of Chancery of the State of Delaware in and for New Castle County, C.A. No. 18013, (June 7, 2000).

Testimony of Daniel R. Fischel In Re: Bank United of Texas, FSB, et al., v. United States of America, United States Court of Federal Claims, Case Number 95-437C, (October 12 and 14, 1999).

Deposition of Daniel R. Fischel In Re: Bank United of Texas, FSB, et al., v. United States of America, United States Court of Federal Claims, Case Number 95-437C, (September 26, 1999; July 10, 1999; and June 16, 17, 1999).

Testimony of Daniel R. Fischel In Re: C. Robert Suess, et al., v. The United States, United States Court of Federal Claims, No. 90- 981C (May 17, 1999).

Testimony of Daniel R. Fischel In Re: Lexecon, Inc. v. Milberg Weiss Bershad Specthrie & Lerach, et al., in the United States District Court, Northern District of Illinois Eastern Division, Case No. 92 C 7768 (March 8, 9, 10 and 15, 1999).

Testimony of Daniel R. Fischel In Re: California Federal Bank v. United States, in the United States Court of Federal Claims, Case Number 92-138C, (February 4 and 11, 1999).

Deposition of Daniel R. Fischel In Re: California Federal Bank v. United States, in the United States Court of Federal Claims, Case Number 92-138C, (February 6, 1999; January 27 and 30, 1999).

Deposition of Daniel R. Fischel In Re: C. Robert Suess, et al., v. The United States, United States Court of Federal Claims, No. 90- 981C (October 27 and 28, 1998).

Deposition of Daniel R. Fischel In Re: Connector Service Corporation v. Jeffrey Briggs, United States District Court, Northern District of Illinois, Eastern Division, No. 97-C-7088 (August 28, 1998).

Deposition of Daniel R. Fischel In Re: Statesman Savings Holding Corp., et al. v. United States of America, United States Court of Federal Claims, Case No. 90-773C, (May 4, 1998 and February 12, 1998).

Testimony of Daniel R. Fischel In Re: Glendale Federal Bank FSB v. United States of America, United States Court of Federal Claims, No. 90-772C, (March 24, 25 and 26, 1998; September 2, 3, 4, 5, 8, 9, 10, 11, 12, 24, 25, 26 and 27, 1997; October 7, 9, 16, 17, 30 and 31, 1997; December 8, 9 and 10, 1997).

Affidavit of Daniel R. Fischel and David J. Ross In Re: Publicis Communication v. True North Communications Inc., et al., United States District Court, Northern District of Illinois, Eastern Division, Case No. 97-C-8263, (December 7, 1997).

Deposition of Daniel R. Fischel In Re: Glendale Federal Bank FSB v. United States of America, United States Court of Federal Claims, No. 90-772C, (August 27 and 28, 1997).

Testimony of Daniel R. Fischel In Re: AUSA Life Insurance Company, et al. v. Ernst & Young, in the United States District Court, Southern District of New York, Master File No. 94 CIV. 3116 (CLB) (July 7 and 8, 1997).

Deposition of Daniel R. Fischel In Re: Santa's Best, f/k/a National Rennoc, an Illinois general partnership, and Tinsel/Ruff Group Limited Partnership, an Illinois limited partnership v. Rennoc Limited Partnership, a New Jersey limited parternship, v. Tinsel/Ruff Group Limited Parternship, an Illinois limited partnership, in the Circuit Court of Cook, Illinois County Department - Chancery Division, No. 95 CH 12160, (June 17, 1997).

Arbitration of Daniel R. Fischel In Re: Lerner v. Goldman Sachs, et. al., Before the American Arbitration Association, 75-136-00090-94 (April 10, 1997).

Affidavit of Daniel R. Fischel In Re: Hilton Hotels Corporation and HLT Corporation v. ITT Corporation, United States District Court, District of Nevada, CV-S-97-00095-PMP (RLH) (March 24, 1997).

Deposition of Daniel R. Fischel In Re: Glendale Federal Bank, FSB v. United States of America, Washington, D.C., Case No. 90-772C, (March 19, 1997; January 30 and 31, 1997).

Deposition of Daniel R. Fischel In Re: Statesman Savings Holding Corporation v. United States of America, Washington, D.C., Case No. 90-773-C, (February 19 and 20, 1997).

Testimony of Daniel R. Fischel In Re: Westcap Enterprises, Inc. and Westcap Corporation, Debtor; in the United States Bankruptcy Court, for the Southern District of Texas, Houston Division, Houston, Texas; Case No. 96-43191-H2-11, (November 1996).

Testimony of Daniel R. Fischel In Re: United States of America v. Robert R. Krilich, in the United States District Court, Northern District of Illinois, Eastern Division, No. 94 CR 419, (August 20, 1996 and July 15, 1996)

Deposition of Daniel R. Fischel In Re: McMahan & Company, Froley, Revy Investment Co., Inc. and Wechsler & Krumholz, Inc. v. Wherehouse Entertainment, Inc., Louis A. Kwiker, George A. Smith, Michael T. O'Kane, Lawrence K. Harris, et al., United States District Court, Southern District of New York, Index No. 88 Civ. 0321 (SS) (AJP), (July 16, 1996 and June 10, 1996).

Deposition of Daniel R. Fischel In Re: Joseph W. and Helen B. Teague, Steven Allen Barker, Rita Strahowski, Swannee Beck, and Lifetime Partners of PTL, as representatives of a nationwide class consisting of 150,129 Lifetime Partners and of 27,839 persons who have partially paid for Lifetime Partnerships v. James O. Bakker, in the United States District Court for the Western District of North Carolina, Civil Action No. 3:87CV514, (June 28, 1996).

Deposition of Daniel R. Fischel In Re: Snapple Beverage Corporation Securities Litigation, in the United States District Court, Eastern District of New York, Master File No. CV 94-3647 (May 30, 1996).

Testimony of Daniel R. Fischel In Re: Chuck Quackenbush, Insurance Commissioner of the State of California, in his capacity as Trustee of Mission Insurance Company Trust, et al. v. Borg-Warner Corporation, Borg Warner Equities Corporation, Borg-Warner Insurance Service, Inc., et al., for the Superior Court of the State of California, for the County of Los Angeles, No. C688487 (April 18, 1996).

Deposition of Daniel R. Fischel In Re: Chuck Quackenbush, Insurance commissioner of the State of California, in his capacity as Trustee of Mission Insurance Company Trust, et al. v. Borg-Warner Corporation, Borg Warner Equities Corporation, Borg-Warner Insurance Service, Inc., et al., for the Superior Court of the State of California, for the County of Los Angeles, No. C688487 (April 17, 1996).

Deposition of Daniel R. Fischel In Re: Household Commercial Financial Services, Inc. a citizen of the states of Delaware and Illinois v. Julius Trump, a citizen of the State of Florida, Edmond Trump, a citizen of the state of Florida, James M. Jacobson, a citizen of the State of New York, and Parker, Chapin, Flattau & Klimpl, a citizen of the states of New York and New Jersey, in the United States District Court, for the Northern District of Illinois Eastern Division, 92 C 5010 (February 1, 1996).

Deposition of Daniel R. Fischel In Re: JWP, Inc. Securities Litigation, in the United States District Court, Southern District of New York, Master File No. 92 Civ. 5815 (CLB); AUSA Life Insurance Company, et al. v. Ernst & Young, in the United States District Court, Southern District of New York, Master File No. 94 Civ. 3116 (CLB) (November 30, 1995; November 9, 1995; October 18 and 19, 1995; September 28, 1995).

Deposition of Daniel R. Fischel In Re: City of Houston Municipal Employees Pension System, a Texas association v. PaineWebber Group Inc., et al., in the United States District Court, Eastern District of Missouri, Eastern Division, No. 4:94CV0073CAS (November 15 and 16, 1995).

Testimony of Daniel R. Fischel In Re: American Continental Corporation/Lincoln Savings & Loan Securities Litigation - Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach and Kevin P. Roddy, in the United States District Court, District of Arizona, Civ-93-1087-PHX-JMR (July 25 and 26, 1995).

Deposition of Daniel R. Fischel In Re: Keith C. Bogard, et al., v. National Community Bank Inc., et al., in the United States District Court, District of New Jersey, No. 90-5-32 (HAA) (December 20, 1994).

Deposition of Daniel R. Fischel In Re: Harvey Rosen, Ben Rogers and Julie Rogers v. Deloitte & Touche, Elias Zinn, Julius Zinn, Dennis Lamm, and Ronald Begnaud, in the 268th Judicial District Court, of Fort Bend County, Texas, Cause No. 84-482 (November 9, 1994).

Testimony of Daniel R. Fischel In Re: PPM America, Inc., et al. v. Marriott Corporation et al., in the United States District Court, for the District of Maryland, Civil Docket No. H-92-3068 (October 12, 1994).

Deposition of Daniel R. Fischel In Re: Browning-Ferris Industries, Inc., Securities Litigation, United States District Court, for the Southern District of Texas, Houston Division, Civil Action H-903477 (September 1, 1994).

Testimony of Daniel R. Fischel In Re: Computer Associates International Inc. Securities Litigation, United States District Court, Eastern District of New York, CV-90-2398 (JBW) (May 26 and 27, 1994).

Deposition of Daniel R. Fischel In Re: PPM America, Inc., et al. v. Marriott Corporation et al., United States District, for the District of Maryland, H-92-3068 (May 10, 1994 and March 8, 1994).

Deposition of Daniel R. Fischel In Re: Securities and Exchange Commission v. Shared Medical Systems Corporation, R. James Macaleer, James C. Kelly and Clyde M. Hyde, United States District Court, for the Eastern District of Pennsylvania, Civil Action - Law: No. 91- CV-6549 (February 22, 1994).

Testimony of Daniel R. Fischel In Re: Peter M. Schultz and Pamela A. Schultz v. Rhode Island Hospital Trust National Bank, N.A., et al., United States District Court, District of Massachusetts, Civil Action No. 88-2870-T (February 16, 1994).

Deposition of Daniel R. Fischel In Re: Henry T. Endo, et al. v. John M. Albertine, et al., United States District Court, Northern District of Illinois, Eastern Division, No. 88 C 1815 (November 11 and 12, 1993; October 28, 1993).

Deposition of Daniel R. Fischel In Re: Computer Associates International Inc. Securities Litigation, United States District Court, Eastern District of New York, CV 90-2398 (JBW) (November 2, 1993 and February 4, 1993).

Affidavit of Daniel R. Fischel In Re: Peter M. Schultz and Pamela A. Schultz v. Rhode Island Hospital Trust National Bank, N.A. et al., United States District Court, District of Massachusetts, Civil Action No. SS-2870-T (October 28, 1993).

Deposition of Daniel R. Fischel In Re: Alpheus John Goddard, III, etc. v. Continental Bank N.A., etc., State of Illinois, County of Cook, Circuit Court of Cook County, County Department- Chancery Division, No. 89 CH 1081 (September 10, 1993).

Deposition of Daniel R. Fischel In Re: Taxable Municipal Bond Section "G" Securities Litigation, United States District Court, Eastern District of Louisiana, MDL No. 863 (September 2, 1993).

Reply Affidavit of Daniel R. Fischel In Re: Columbia Securities Litigation, United States District Court Southern District of New York, 89 Civ. 6821 (LBS) (August 30, 1993).

Affidavit of Daniel R. Fischel In Re: Consumers Gas & Oil, Inc. v. Farmland Industries, Inc., et al., United States District Court, for the District of Colorado, Civil Action No. 92-F-1394 (August 26, 1993).

Declaration of Daniel R. Fischel In Re: Equitec Rollup Litigation, United States District Court for the Northern District of California, Master file No. C90 2064 CAL (July 28, 1993).

Deposition of Daniel R. Fischel In Re: United Telecommunications, Inc. Securities Litigation, United States District Court for the District of Kansas, No. 90-2251-0 (July 22, 1993, April 21 and 22, 1993).

Deposition of Daniel R. Fischel In Re: Consumers Gas & Oil, Inc., a Colorado farm cooperative in liquidation, on behalf of itself and others similarly situated v. Farmland Industries, Inc., a Kansas farm cooperative, et al., United States District Court, District of Colorado, 92-F- 1394 (June 18, 1993).

Deposition of Daniel R. Fischel In Re. Rosalind Wells v. HBO & Company, United States District Court, Northern District of Georgia, Atlanta Division, 8-87-CV-657A (JTC) (June 10, 1993 and May 24, 1993).

Deposition of Daniel R. Fischel In Re: Equitec Rollup Litigation, United States District Court, Northern District of California, No. C-90-2064 CAL (June 2 and 3, 1993).

Supplemental Declaration of Daniel R. Fischel In Re: Oracle Securities Litigation, United States District Court, Northern District of California, Master File No. C 90 0931 VRW (May 20, 1993).

Affidavit of Daniel R. Fischel and Kenneth R. Cone In Re: Raymond P. Hayden, et al. v. Jeffrey L. Feldman, et al., United States District Court, Southern District of New York No. 88 Civ. 8048 (JES) (May 12, 1993).

Testimony of Daniel R. Fischel In Re: Melridge, Inc., Securities Litigation, United States District Court for the District of Oregon, CV No. 87-1426-FR (May 4 and 5, 1993).

Declaration of Daniel R. Fischel In Re: Oracle Securities Litigation, United States District Court, Northern District of California, Master File No. C 90 0931 VRW (April 20, 1993).

Deposition of Daniel R. Fischel In Re: Gillette Securities Litigation, United States District Court, District of Massachusetts, No. 88-1858-K (April 1, 1993).

Affidavit of Daniel R. Fischel In Re: Columbia Securities Litigation, United States District Court, Southern District of New York, 89 Civ. 6821 (LBS) (March 25, 1993).

Deposition of Daniel R. Fischel In Re: Westinghouse Securities Litigation, United States District Court, Western District of Pennsylvania, CV No. 91 354 (March 23, 1993).

Declaration of Daniel R. Fischel In Re: Oracle Securities Litigation, United States District Court, Northern District of California, Master File No. C 90-0931 VRW (March 22, 1993).

Deposition of Daniel R. Fischel In Re: Kroy, Inc., a Minnesota corporation et al. v. Bankers Trust New York Corporation, et al., Superior Court of the State of Arizona in and for the County of Maricopa, No. CV 89-35680 (March 18, 1993).

Deposition of Daniel R. Fischel In Re: Amos M. Ames, Helen M. Ames, Robert F. Bourke, Louise L. Bourke, Leo E. Corr, April C. Corr, Wence M. Horak, Ruth Horak, Robert T. Freas, Maurita Freas, Bruce Fink, Jr., William H. Jones, Candace A. Jones, Richard Paul, William L. Paul, Carole Paul, Steven J. Paul, Best Power Technology, Incorporated, and Best Power Technology Sales Corporation, in the State of Wisconsin, Circuit Court, Juneau County, Consolidated Case Nos. 92-CV-31, 92-CV-32 (January 26, 1993).

Deposition of Daniel R. Fischel In Re: Federal Express Corporation Shareholder Litigation, in the United States District Court, Western District of Tennessee, Master File No. 90-2359- 4B (December 3, 1992).

Deposition of Daniel R. Fischel In Re: Raymond Snyder, Individually and on behalf of all those similarly situated v. Oneok, Inc., et al., in the United States District Court, Northern District of Oklahoma, Civil Action No. 88 C 1500 E (October 15 and 16, 1992).

Deposition of Daniel R. Fischel In Re: Melridge, Inc. Securities Litigation, Consolidated Actions, United States District Court, District of Oregon, Master File No. CV87-1426-JU and Nos. 387-06589-P11, 88-05-JU, 88-221-JU, 88-0699-PA, 88-1266-JU (September 17, 1992; July 25 and 26, 1991).

Deposition of Daniel R. Fischel In Re: Maxus Corporate Company v. Kidder, Peabody & Co. Incorporated, Martin A. Siegel and Ivan F. Boesky, in the District Court Dallas County, Texas, 298th Judicial District, No. 87-15583-M (September 11, 1992; August 18 and 19, 1992).

Deposition of Daniel R. Fischel In Re: Jennifer A. Florin and Alan L. Mundt, on behalf of themselves and all others similarly situated v. Wesray Capital Corp., Citizens and Southern Trust Company, a subsidiary of Citizens and Southern Corporation, Robert K. Barton, Leonard S. Gaby, Allen G. Lacoe, Robert A. Magnusson, Anthony A. Saliture, Harlan B. Smith, Thomas F. Stutzman, Raymond G. Chambers, Frank E. Richardson, E. Burke Ross, Jr., William E. Simon and Frank W. Walsh, Jr., in the United States District Court, Western District of Wisconsin, Civil Action No. 91C-0948 (August 12, 1992).

Deposition of Daniel R. Fischel In Re: Pearl Newman, Shanna Lehmann & Athanasios Tsivelekidis, on their own behalf and on behalf of all other persons similarly situated v. On- Line Software International, Inc. Jack M. Berdy, John C. Crocker, Richard A. Granger, Richard R. Holtmeier, Michael S. Juceam, Edward J. Siegel, Howard P. Sorgen and Richard Ward, United States District Court, District of New Jersey, Consolidated Civil Action Nos. 88-3247, 88-3411 (July 28 and 29, 1992).

Deposition of Daniel R. Fischel In Re: Crazy Eddie Securities Litigation, Oppenheimer-Palmieri Fund, I.P., et al. v. Peat Marwick Main & Co., et al., United States District Court for the Eastern District of New York, 87 Civ. 0033 (EHN), 88 Civ. 3481 (EHN) (June 11, 1992; March 26 and 27, 1992).

Testimony of Daniel R. Fischel In Re: American Continental Corporation/Lincoln Savings and Loan Securities Litigation, in the United States District Court, for the District of Arizona MDL Docket No. 834 (June 4, 1992; May 26, 27 and 28, 1992).

Testimony of Daniel R. Fischel In Re: State of West Virginia v. Morgan Stanley & Co. Incorporated, in the Circuit Court of Kanawha County, State of West Virginia, Civil Action No. 89-C-3700 (April 27, 1992).

Affidavit of Daniel R. Fischel In Re: William Steiner, on behalf of himself and all others similarly situated v. Tektronix, Inc., et al., in the United States District Court, District of Oregon, Civil No. 90-587-JO (March 23, 1992).

Deposition of Daniel R. Fischel In Re: Martin Kaplan and Selma Kaplan, on Behalf of Themselves and All Others Similarly Situated v. VICORP Restaurants, Inc., Charles R. Frederickson, Robert S. Benson, Emerson B. Kendall, Robert T. Marto and Johyn C. Hoyt, United States District Court, District of Colorado, Civil Action No. 90-C-2182 (February 11, 1992).

Deposition of Daniel R. Fischel In Re: Interco Incorporated v. Wasserstein, Perella & Co., Inc., United States District Court, Eastern District of Missouri, Eastern Division, No. 91-0151-C- 6 (February 3, 1992 and December 12, 1991).

Statement of Daniel R. Fischel In Re: Far West Federal Bank, S.B., et al. v. Director, Office of Thrift Supervision, et al., United States District Court for the District of Oregon, Civil Action No. 90-103 PA (February 3, 1992).

Deposition of Daniel R. Fischel In Re: Capital Bank of California v. Morgan Stanley & Co., Incorporated, United States District Court, Central District of California, No. 91-1650-R (January 24, 1992).

Deposition of Daniel R. Fischel In Re: Trinity Ventures, et al. v. Federal Deposit Insurance Corporation, in its own capacity and as successor to the Federal Savings and Loan Insurance Corporation, United States District Court, for the District of Oregon, No. 90-103- PA (January 6, 1992).

Deposition of Daniel R. Fischel In Re: First Republicbank Securities Litigation, United States District Court, Northern District of Texas, Dallas Division, Civil Action No. 3-88-0641-H (January 2, and 3, 1992; November 26, 1991).

Deposition of Daniel R. Fischel In Re: State of West Virginia v. Morgan Stanley & Co. Incorporated; Salomon Brothers Inc.; and Goldman Sachs & Co., in the Circuit Court of Kanawha County, State of West Virginia, Civil Action No. 89-C-3700 (December 19 and 20, 1991).

Deposition of Daniel R. Fischel In Re: The Regina Company, Inc. Securities Litigation, United States District Court, District of New Jersey, Civil Action No. 88-4149 (HAA) (October 31, 1991).

Affidavit of Daniel R. Fischel In Re: Gillette Securities Litigation, United States District Court, District of Massachusetts, Civil Action No. 88-1858-K (October 7, 1991).

Deposition of Daniel R. Fischel In Re: Capital Maritime Corporation v. Amfels, Inc., Far East Levingston Shipbuilding Ltd., John B. Allison and Patrick A. McDermid, United States District Court for the Southern District of Texas Houston Division, C.A. No. H-90-3417 (September 12, 1991).

Deposition of Daniel R. Fischel In Re: Thomas J. Caldarone, Jr. v. Isidore Brown, et al., and John E. Washburn, et al. v. Isidore Brown, et al., United States District Court, Northern District of Illinois, Eastern Division, Docket Nos. 80 C 6251 and 81 C 1475 (August 28, 29, and 30, 1991).

Testimony of Daniel R. Fischel In Re: Apple Securities Litigation, United States District Court, Northern District of California, Northern Division, Docket No. C-84-20148 (May 20 and 21, 1991).

Testimony of Daniel R. Fischel In Re: The Stuart-James Co., Inc., et al. Litigation, United States of America before the Securities & Exchange Commission, in Denver, Colorado, Administrative Proceeding File No. 3-7164 (May 6, 1991).

Deposition of Daniel R. Fischel In Re: Jennie Farber on behalf of herself and all others similarly situated v. Public Service Company of New Mexico; Jerry D. Geist; John P. Bundrant and Albert J. Robison, United States District Court for the District of New Mexico, CIV 89-456 JB WWD (April 17 and 18, 1991).

Affidavit of Daniel R. Fischel In Re: Moise Katz, Frederick Rand, Elias Weissman, Richard D. Morgan, Marion R. Morgan and Mortimer Schulman v. Raymond A. Hay, United States District Court, Southern District of New York, No. 86 Civ. 5640 (JES) (March 29, 1991).

Deposition of Daniel R. Fischel In Re: Standard Chartered PLC., a United Kingdom corporation, et al. v. Price Waterhouse, a general partnership, Superior Court of the State of Arizona, in and for the County of Maricopa, CV 88-34414 (March 13 and 14, 1991).

Affidavit of Daniel R. Fischel In Re: United States of America v. AVX Corporation, and Commonwealth of Massachusetts v. AVX Corporation, United States District Court, District of Massachusetts, Civil Action Nos. 83-3882-Y and 83-3899-Y (January 29, 1991).

Deposition of Daniel R. Fischel In Re: Apple Computer Securities, United States District Court Northern District of California, San Jose Division, No. C-84-20148 (a) JW (December 13 and 14, 1990).

Deposition of Daniel R. Fischel In Re: Polycast Technology Corporation, and Uniroyal Plastics Acquisition Corp. v. Uniroyal, Inc., et al., United States District Court Southern District of New York, No. 87 Civ. 3297 (December 6, 1990 and November 28, 1990).

Deposition of Daniel R. Fischel In Re: Ellen Rudd, on behalf of herself and all others similarly situated, and Mayer Corporation on behalf of themselves, and all others similarly situated, and Louis Brandt, and Israel Baker, Jay R. Kuhne, Pininfarina Corp., and American Transfer Co., on behalf of themselves and all others similarly situated v. Kirk Kerkorian, et al., Superior Court of the State of California, County of Los Angeles, Nos. CA 000980, CA 000981, CA 001017, CA 620279 (June 21, 1990).

Testimony of Daniel R. Fischel In Re: City of San Jose v. Paine, Webber, Jackson & Curtis, Incorporated, et al., and related counter- and Third-Party Claims, United States District Court, Northern District, No. C-84-20601 RPA (May 23 and 24, 1990).

Deposition of Daniel R. Fischel In Re: City of San Jose v. Paine, Webber, Jackson & Curtis, Incorporated, et al., and related counter- and Third-Party Claims, United States District Court, Northern District, No. C-84-20601 RPA (May 22, 1990), No. RPA 84-20601 (November 16, 1989 and September 8, 1989).

Testimony of Daniel R. Fischel In Re: Kulicke and Soffa Industries, Inc. Securities Litigation, United States District Court for the Eastern District of Pennsylvania, No. 86-1656 (March 20 and 21, 1990).

Deposition of Daniel R. Fischel In Re: Kulicke and Soffa Industries, Inc. Securities Litigation, United States District Court for the Eastern District of Pennsylvania, No. 86-1656 (March 9, 1990; December 19 and 21, 1989).

Affidavit of Daniel R. Fischel In Re: Viacom International Inc. v. Carl C. Icahn, et al., v. Ralph M. Baruch, et al., United States District Court, Southern District of New York, No. 86 Civ. 4215 (RPP) (March 8, 1990).

Deposition of Daniel R. Fischel In Re: Technical Equities Coordination Litigation, Superior Court of the State of California for the County of Santa Clara, Master File No. 1991, Santa Clara County Superior No. 600306 (March 1, 1990).

Deposition of Daniel R. Fischel In Re: Amalgamated Clothing and Textile Workers Union, AFL- CIO, et al. v. David A. Murdock, et al., United States District court for the Central District of California, No. CV-86-6410 IH (February 8, 1990).

Deposition of Daniel R. Fischel In Re: Connecticut National Life Insurance Company, et al. v. Peter A. Sprecher and Laventhol & Horwath, United States District Court, Central District of California, No. CV 87-1945 WJR (Tx) (January 30, 1990).

Deposition of Daniel R. Fischel In Re: Consolidated Capital Securities Litigation, United States District Court, Northern District of California, No. C-85-7332 AJZ (January 22, 1990).

Declaration of Daniel R. Fischel In Re Plaintiffs' Damages in Re: Liquidity Fund, et al. v. Southmark Corporation, et al. in the Superior Court of the State of California for the County of San Mateo, No. 332435 (January 18, 1990).

Deposition of Daniel R. Fischel In Re: Norman Kamerman, Shirley Brown, Edward Rosen, Lexim Investors Corp., and Dohsa Anstalt, on behalf of themselves and all others similarly situated, and Barnett Stepak v. Saul Steinberg, Reliance Group Holdings, Inc., Reliance Group, Inc., Reliance Financial Services corp., and Reliance Insurance Company, United States District Court, Southern District of New York, No. 84 Civ. 4440 (September 13, 1989).

Affidavit of Daniel R. Fischel In Re: Edward A. Taylor, et al. v. A. O. Smith Corporation et al., Circuit Court for Lincoln County, Tennessee, No. 098-84 (August 11, 1989).

Deposition of Daniel R. Fischel In Re: Container Products Inc. v. Pace Industries, United States District Court, Southern District of New York, No. 88-CIV. 3549 (KMW) (July 19, 1989).

Deposition of Daniel R. Fischel In Re: Joseph B. Moorman, et al. v. Southmark Corporation, et al., Liquidity Fund, et al. v. Southmark Corporation, et al., Superior Court of the State of California for the County of San Mateo, Nos. 322135 and 332435 (July 11, 1989).

Testimony of Daniel R. Fischel In Re: Tessie Wolfson, et al. v. Frederick S. Hammer, and Meritor Financial Group, United States District Court for the Eastern District of Pennsylvania, Civil Action No. 87-8471 (June 20, 1989).

Deposition of Daniel R. Fischel In Re: Richard J. Heckmann, et al. v. C. L. Ahmanson, et al., and Consolidated Cases, Superior Court of the State of California for the County of Los Angeles, Nos. CA000851 and C642081 (June 8, 1989).

Deposition of Daniel R. Fischel In Re: Tessie Wolfson, et al. v. Frederick S. Hammer, United States District Court for the Eastern District of Pennsylvania, Civil Action No. 87-8472 (May 11, 1989).

Testimony of Daniel R. Fischel In Re: Tessie Wolfson, et al. v. Frederick S. Hammer, United States District Court for the Eastern District of Pennsylvania, Civil Action No. 87-8472 (April 13, 1989).

Deposition of Daniel R. Fischel In Re: National Union Fire Insurance Company of Pittsburgh, PA v. Wells Fargo Bank, N.A., District Court of Harris County, Texas, 125th Judicial District, No. 88-49246 (April 10 and 11, 1989).

Deposition of Daniel R. Fischel In Re: Susan Rothenberg, as Custodian for Stephen J. Rothenberg v. Charles E. Hurwitz, United Financial Corporation, United Savings Association of Texas, et al., United States District Court for the Southern District of Texas, Houston Division, Civil Action No. H-86-1435 (March 30, 1989).

Deposition of Daniel R. Fischel In Re: Jose Nodar, et al. v. William Weksel, Albert Bromberg, Henry B. Turner, IV, Frank L. Bryant, Leo Kuperschmid, Bennett S. Lebow, Ernst & Whinney and Oppenheimer & Co., Inc., United States District Court, Southern District of New York, No. 84 Civ. 3870 (VLB) and consolidation case No. 84 Civ. 5132 (VLB) (December 15 and 16, 1988).

Deposition of Daniel R. Fischel In Re: William Steiner, et al. v. Whittaker Corporation, et al., Superior Court of the State of California for the County of Los Angeles, No.CA000817 (December 7, 1988).

Deposition of Daniel R. Fischel In Re: Arnold I. Laven, et al. v. Western Union Corporation, et al., United States District Court for the District, Western District of Washington, MDL No. 551 (August 30 and 31, 1988).

Deposition of Daniel R. Fischel In Re: Washington Public Power Supply System Securities Litigation, United States District Court, Western District of Washington, MDL No. 551 (August 16 and 22, 1988).

Affidavit of Daniel R. Fischel In Re: District Business Conduct Committee for District No. 3 v. Blinder, Robinson & Company Inc., et al., National Association of Securities Dealers, Inc. National Business Conduct Committee, Complaint No. DEN-666 (July 21, 1988).

Deposition of Daniel R. Fischel In Re: Joseph Seidman, et al. v. Stauffer Chemical Company, et al, United States District Court for the District of Connecticut, No. B 84-543 (TFGD) (June 10, 1988 and May 5, 1987).

Deposition of Daniel R. Fischel In Re: Edlin Cattle Co., Inc., and James Edlin v. A. O. Smith Harvestore Products, Inc., et al., United States District Court for the Northern District of Texas, Amarillo Division, No. CA-2-86-0122 (May 12, 1988).

Deposition of Daniel R. Fischel In Re: MicroPro Securities Litigation, United States District Court for the Northern District of California, No. C-85-7428-EFL (A) (May 2, 1988).

Affidavit of Daniel R. Fischel In Re: Pizza Time Theatre Securities Litigation, United States District Court for the Northern District of California, Civil File No. 84-20048-(A)-RPA (March 25, 1988).

Affidavit of Daniel R. Fischel and Robert A. Sherwin In Re: First National Bank of Louisville v. Brooks Farms, and George C. Brooks, et al., Third-Party Plaintiffs v. A. O. Smith Corporation, et al., Circuit Court for Maury County, Tennessee, No. 2058 (March 3, 1988).

Testimony of Daniel R. Fischel In Re: Nucorp Energy Securities Litigation, United States District Court for the Southern District of California, M.D.L. 514 (March 15, 16, 17, and 18, 1988).

Deposition of Daniel R. Fischel In Re: Nucorp Energy Securities Litigation, United States District Court for the Southern District of California, M.D.L. 514 (January 27, 1988).

Deposition of Daniel R Fischel In Re: Anheuser-Busch Companies, Inc. v. W. Paul Thayer, et al., United States District Court for the Northern District of Texas, Dallas Division, No. CA- 3-85-0794-R (January 21, 1988; December 4, 1987; and November 5, 1987).

Testimony of Daniel R. Fischel In Re: Securities and Exchange Commission v. First City Finance Corporation Ltd., and Marc Belzberg, United States District Court for the District of Columbia, Civil Action No. 86-2240 (December 18, 1987).

Testimony of Daniel R. Fischel In Re: The Irvine Company v. Athalie Irvine Smith and Athalie R. Clarke, Trustee, State of Michigan Circuit Court for the county of Oakland, Civil Action No. 8327011-CZ (December 14, 15, and 16, 1987).

Deposition of Daniel R. Fischel In Re: Securities and Exchange Commission v. First City Finance Corporation, Ltd. and Marc Belzberg, United States District Court for the District of Columbia, Civil Action No. 86-2240 (December 11, 1987).

Affidavit of Daniel R. Fischel In Re: Gerald D. Broder and Constance D. Broder v. Alphonse H. Bellac and William B. Weinberger v. Combustion Equipment Associates, Inc., et al., and William B. Weinberger v. Coopers & Lybrand, United States District Court for the Southern District of New York, 80 CIV 6175 (CES) 80 CIV 6839 (CES) 84 CIV 8217 (CES) (July 22, 1987).

Deposition of Daniel R. Fischel In Re: The Irvine Company v. Athalie Irvine Smith and Athalie R. Clarke, Trustee, State of Michigan, Circuit Court for the County of Oakland, Civil Action No. 83270011-CZ (June 1, 1987).

Deposition of Daniel R. Fischel In Re: Fortune Systems Securities Litigation, United States District for the Northern District of California, Master File No. 83-3348A-WHO (May 7, 1987).

Deposition of Daniel R. Fischel In Re: Victor Technologies Securities Litigation, United States District Court for the Northern District of California, Master File No. C-83-3906(A)-RFP (FW) (January 8, 1987 and October 30, 1986).

Reply Declaration of Daniel R. Fischel in Support of the Motion by the Activision Defendants for Summary Judgment In Re: Activision Securities Litigation, United States District Court for the Northern District of California, Master File No. C-83-4639(A)-MHP (October 27, 1986).

Testimony of Daniel R. Fischel In Re: NVHomes, L.P. v. Ryan Homes, Inc.; and Ryan Homes, Inc. v. NVHomes, L.P., et al., United States District Court for the Western District of Pennsylvania, Civil Action No. 86-2139 (October 24, 1986).

Supplemental Affidavit of Daniel R. Fischel In Re: NVHomes, L.P. v. Ryan Homes, Inc.; and Ryan Homes, Inc. v. NVHomes, L.P. and NVAcquisition L.P., et al., United States District Court the Western District of Pennsylvania, Civil Action No. 86-2139 (October 24, 1986).

Affidavit of Daniel R. Fischel in Support of the Motion by the Activision Defendants for Summary Judgment In Re: Activision Securities Litigation, United States District Court for the Northern District of California, Master File No. C-86-2139 (October 20, 1986).

Declaration of Daniel R. Fischel in Support of the Motion by the Activision Defendants for Summary Judgment In Re: Activision Securities Litigation, United States District Court for the Northern District of California, Master File No. C-83-4639(A)-MHP (October 2, 1986).

Affidavit in Support of Defendants Motion for Summary Judgment In Re: MCorp Securities Litigation, United States Court for the Southern District of Texas, Civil Action No. H-85- 5894 (September 25, 1986).

Deposition of Daniel R. Fischel In Re: Activision Securities Litigation, United States District Court for the Northern District of California, No. C 83 4639 (August 18 and 19, 1986).

Deposition of Daniel R. Fischel In Re: John Mancino v. James A. McMaghan, et al., United States District Court for the Northern District of California, Civil No. C-84-0407-TEH (August 14, 1986).

Testimony of Daniel R. Fischel In Re: Charles W. Leigh, et al. and George Johnson, et al. v. Clyde William Engle, et al., United States District Court for the Northern District of Illinois, Eastern Division, Case No. 78 C 3799 (August 1, 1986).

Reply Affidavit of Daniel R. Fischel In Re: The Amalgamated Sugar Company v. NL Industries, United States District Court for the Southern District of New York, 86 Civ. 5010 (VLB) (July 28, 1986).

Affidavit of Daniel R. Fischel In Re: The Amalgamated Sugar Company v. NL Industries, United States District Court for the Southern District of New York, 86 Civ. 5010 (VLB) (July 18, 1986).

Deposition of Daniel R. Fischel In Re: Charles W. Leigh, et al. and George Johnson, et al. v. Clyde William Engle, et al., United States District Court for the Northern District of Illinois, Eastern Division, Case No. 78 C 3799 (July 1, 1986).

Deposition of Daniel R. Fischel In Re: Seafirst Corporation v. William M. Jenkins, et al.; and Seafirst Corporation v. John R. Boyd, et al., United States District Court for the Western District of Washington at Seattle, Case No. C83-771R (February 27, 1986).

Deposition of Daniel R. Fischel In Re: Kreindler v. Sambo's Restaurants, Inc., United States District Court for the Southern District of New York, Case No. 79 Civ. 4538 (December 17, 1985).

Affidavit of Daniel R. Fischel In Re: United States of America v. S. Richmond Dole and Clark J. Matthews II (March 19, 1985).

Deposition of Daniel R. Fischel In Re: Craig T. McFarland, et al. v. Memorex Corporation, United States District Court for the Northern District of California, No. C 79-2926-WAI, C 79-2007-WAI, C 79-241- WAI (February 26, 1985; January 29 and 30, 1985).

Testimony of Daniel R. Fischel In Re: Robert J. Lawrence v. Grumman Corp. Pension Plan, et al., United States District Court for the Eastern District of New York, No. CV-81-3530 (December 19, 1983).

Testimony of Daniel R. Fishel In Re: Telvest, Inc. v. Junie L. Bradshaw, et al. and American Furniture Company, United States District Court, for the Eastern District of Virginia Richmond Division, No. CA-79-0722-R (December 4, 1981).

## **OTHER ACTIVITIES**

Member, American Economic Association, American Finance Association.

Former Member of the Board of Overseers of the Becker-Friedman Institute at the University of Chicago.

Former Advisor to the Harvard Program on Corporate Governance at Harvard University. Former

Member, Board of Directors, Center for the Study of the Economy and the State. Former Member, Mid-

America Institute Task Force on Stock Market Collapse.

Have acted as a consultant and/or advisor to the New York Stock Exchange, the National Association of Securities Dealers, the Chicago Board of Trade, the Chicago Board Options Exchange, the Chicago Mercantile Exchange, the New York Mercantile Exchange, the Federal Trade Commission, the Department of Labor, the Securities and Exchange Commission, the Canadian Securities and Exchange Commission, the United States Department of Justice, the Federal Deposit Insurance Corporation, the Resolution Trust Corporation, the Federal Housing Finance Agency, and the Office of Thrift Supervision.

Referee, Journal of Financial Economics, Journal of Law and Economics, Journal of Legal Studies.

Participant and speaker at multiple conferences on the Economics of Corporate, Securities and Commodities Law and the Regulation of Financial Markets.

Former Chairman, American Association of Law Schools' Section on Law and Economics.

# APPENDIX D

1719

| | | |
|---|---|---|
| 03:26:05 | 1 | THE COURT: Okay. |
| 03:26:05 | 2 | You know what, he can step up once you call him. |
| 03:26:09 | 3 | MR. MENCHEL: Sure. |
| 03:26:10 | 4 | THE COURT: Let's bring them in. |
| 03:26:18 | 5 | Mr. Pavlis, I'll first ask if Mr. Bases intends to |
| 03:26:21 | 6 | present anyone and then -- |
| 03:26:23 | 7 | MS. PORTER: I'll answer your question. Thank you, |
| 03:26:25 | 8 | Judge. |
| 03:27:16 | 9 | (Jury in.) |
| 03:27:25 | 10 | THE COURT: Ms. Porter, does Mr. Bases wish to |
| 03:27:27 | 11 | present any witnesses at this time? |
| 03:27:28 | 12 | MS. PORTER: Your Honor, we don't. Mr. Bases rests |
| 03:27:30 | 13 | his case. |
| 03:27:31 | 14 | THE COURT: Thank you. |
| 03:27:32 | 15 | Mr. Menchel, does Mr. Pacilio wish to present any |
| 03:27:36 | 16 | witnesses at this time? |
| 03:27:37 | 17 | MR. MENCHEL: Yes, your Honor. We'd like to call |
| 03:27:39 | 18 | Professor Daniel Fischel to the stand. |
| 03:27:41 | 19 | THE COURT: Professor Fischel, if you would come up |
| 03:27:43 | 20 | to my left. |
| | 21 | And, sir, if you would remain standing and be sworn |
| | 22 | in. |
| 03:28:19 | 23 | DANIEL FISCHEL, DEFENDANT PACILIO'S WITNESS, SWORN |
| 03:28:12 | 24 | THE COURT: Please, sir, take a seat. |
| | 25 | THE WITNESS: Good afternoon, your Honor. |

Fischel - direct

1720

03:28:14    1    THE COURT:  And please remove your mask.

            2    THE WITNESS:  Thank you.

03:28:15    3    THE COURT:  You may proceed, Mr. Menchel.

03:28:17    4    MR. MENCHEL:  Thank you, your Honor.

            5                 DIRECT EXAMINATION

            6    BY MR. MENCHEL:

03:28:20    7    Q.  Professor Fischel, good afternoon.

03:28:22    8    A.  Good afternoon.

03:28:22    9    Q.  Where are you employed?

03:28:23   10    A.  I'm employed at two places:  At the University of Chicago

03:28:30   11    and at a consulting firm by the name of Compass Lexecon.

03:28:34   12    Q.  What is your position at the University of Chicago?

03:28:36   13    A.  Currently, I'm the Lee and Brena Professor of Law and

03:28:42   14    Business Emeritus at the University of Chicago Law School.

03:28:45   15    Q.  What does that all mean?

03:28:46   16    A.  Well, I spent much of my career as an active member of the

03:28:58   17    faculty.  Being awarded a chair is generally understood as a

03:29:03   18    kind of recognition of accomplishment.  And being emeritus

03:29:08   19    means pretty much I've retired from being an active member of

03:29:13   20    the faculty.

03:29:14   21    Q.  And the second job that you mentioned was with a company

03:29:19   22    called Compass Lexecon; is that right?

03:29:21   23    A.  That's correct.

03:29:22   24    Q.  What is Compass Lexecon?

03:29:24   25    A.  Compass Lexecon is an economics consulting firm that

Fischel - direct

1721

03:29:29  1  specializes in the application of economics primarily to

03:29:35  2  various legal and regulatory proceedings.

03:29:39  3  Q.  What is your position there, sir?

03:29:41  4  A.  I'm the chairman and the president of the company.

03:29:44  5  Q.  Where are they located?

03:29:47  6  A.  Well, it's now become a worldwide business.  So, we're

03:29:52  7  really located all over the world.  Our main office is in

03:29:56  8  Chicago, but we have multiple offices in the United States,

03:30:02  9  multiple offices in Europe.  We have offices in South America.

03:30:06  10  We have offices in Asia.  We have an office in Israel.  So,

03:30:11  11  really a worldwide business.

03:30:12  12  Q.  And what types of people work at Compass Lexecon,

03:30:15  13  primarily?

03:30:15  14  A.  Almost exclusively economists and people with related

03:30:23  15  skills to economists, such as computer programmers, for

03:30:28  16  example, or financial analysts.  We also have a big research

03:30:32  17  staff.  We also have various affiliations with experts in

03:30:40  18  various fields, including several Nobel Prize winners in

03:30:45  19  economics.  And occasionally we engage with -- if we don't

03:30:52  20  have somebody with a particular expertise, we form an

03:30:57  21  association for a particular matter or series of matters.

03:31:00  22  Q.  And who are Compass Lexecon's clients?

03:31:04  23  A.  Well, they're the range of parties that can be involved in

03:31:14  24  legal and regulatory proceedings.  So, obviously the United

03:31:16  25  States government is a major client of ours.  Many companies

Fischel - direct

1722

03:31:22  1    are clients.  Various investors and investor groups are

03:31:28  2    clients.  State and local governments are clients.

03:31:33  3                So, it really just depends on the type of issue and

03:31:38  4    the type of party that's involved in a particular legal or

03:31:41  5    regulatory dispute.

03:31:43  6    Q.  Now, you mentioned earlier that you are the chairman and

03:31:46  7    the president of Compass Lexecon; is that right?

03:31:48  8    A.  That's correct.

03:31:48  9    Q.  And as such, what are your responsibilities at the

03:31:51  10   company?

03:31:53  11   A.  Well, I have basically two types of responsibilities.

03:31:58  12   One, because I am the chairman and the president, I have

03:32:02  13   overall responsibility for the whole company and the

03:32:07  14   operations of the company and the finances of the company and

03:32:10  15   the personnel -- the major personnel decisions of the company.

03:32:15  16   So, that's one part of my job.

03:32:17  17               The other part of my job is I have a very active

03:32:21  18   consulting practice and practice as an expert witness as I'm

03:32:27  19   doing here.

03:32:27  20   Q.  Have you -- you mentioned the University of Chicago and

03:32:35  21   your current position.  Have you held other positions at the

03:32:38  22   University of Chicago before?

03:32:39  23   A.  Yes.  I served for a number of years as dean of the

03:32:45  24   University of Chicago Law School.  I also was director of the

03:32:53  25   university-wide law and economics program at the university

Fischel - direct

1723

03:32:56  1   for many years.  And also for a number of years, I had a

03:33:02  2   courtesy appointment at the University of Chicago Graduate

03:33:04  3   School of Business, where I also taught.

03:33:08  4   Q.  Have you held academic positions at other universities?

03:33:13  5   A.  Yes.  I also have had a close relationship with

03:33:15  6   Northwestern University in Chicago.  And, again, I was a

03:33:23  7   chaired visiting professor there, as well as also having a

03:33:27  8   courtesy appointment in the graduate school of business at

03:33:29  9   Northwestern.

03:33:30  10  Q.  So, at both those schools, the University of Chicago and

03:33:33  11  Northwestern University, what types of classes have you

03:33:36  12  taught?

03:33:37  13  A.  I taught a number of different classes in a number of

03:33:43  14  different areas.  But I would say my principal focus was in

03:33:46  15  the area of business associations and corporate finance, the

03:33:53  16  economics of financial markets and generally the application

03:33:57  17  of economics to various issues that come up in legal

03:34:05  18  proceedings.

03:34:05  19  Q.  You taught those classes in law school?

03:34:09  20  A.  Yes, but I've also taught in business school, as I said.

03:34:12  21  Q.  Now, can you briefly describe your educational background,

03:34:17  22  please.

03:34:18  23  A.  I went to Cornell University where I got a bachelor's

03:34:23  24  degree in history with a minor in economics in 1972.  Then I

03:34:30  25  went to graduate school in history, actually, where I got a

Fischel - direct

1724

master's degree from Brown University in 1974.  And, then, I
got a law degree from the University of Chicago in 1977, where
I really began my study of law and economics.

Q.  And where did you first begin working after you graduated
from law school?

A.  I had the great privilege of being selected as a law
clerk, first for the Honorable Thomas Fairchild, who was then
the chief judge of the Seventh Circuit, actually right in this
building where I worked.  And, then, after that, as I said,
the great privilege of being selected as a law clerk for the
Honorable Potter Stewart, who was then a justice on the United
States Supreme Court.

Q.  The Supreme Court?

A.  United States Supreme Court, correct.

Q.  Now, I want to talk a little bit about your publications.
Have you published any books or articles?

A.  Yes.  I've published a number of books, as well as I think
approximately 50 articles in legal and economics journals.

Q.  And have any of your books or articles ever been cited by
any court?

A.  Yes.  My articles have been cited hundreds of times by
courts of all levels, from the United States Supreme Court on
down.

Q.  And do any of your books or articles cover the same issues
that are relevant to this case?

Fischel - direct

1725

A.   Yes.  I've written about the economics of manipulation and, in a variety of contexts, the reaction of market participants to trades or orders.  The informational effect of those kinds of actions in the -- really, across different types of markets, stock markets, futures markets.  And also in connection with not just manipulation cases, but insider trading cases, fraud cases, all of which involve similar issues of trying to interpret the meaning of orders or trades and the informational content that's associated with those particular actions.

Q.   And you used the phrase manipulation a couple of times in that answer.  Are you referring to market manipulation?

A.   Yes.

Q.   Have you ever served as a consultant on economic issues to any government agencies or regulatory bodies?

A.   Yes.  I've been a frequent expert witness for the United States Department of Justice.  I've also been an expert witness for a number of other government agencies.  I've also been an economic consultant on various regulatory issues to a wide variety of regulatory bodies, the United States Securities and Exchange Commission, the various commodities exchanges, the New York Stock Exchange, the National Association of Securities Dealers.  So, it's a fairly long list.

Q.   Okay.

Fischel - direct

1726

03:37:54  1      I'm going to ask you some questions about your prior

03:37:56  2   experience as an expert.

03:37:58  3      Have you ever testified in a court of law as an

03:38:00  4   expert before?

03:38:00  5   A.  Yes, many times.

03:38:01  6   Q.  Approximately how many?

03:38:02  7   A.  Well, I've been doing it for a long time.  So, I think

03:38:08  8   over, you know, close to a 40-year period, I think I've

03:38:12  9   testified in approximately a hundred trials or arbitrations.

03:38:17  10  Q.  In what courts?

03:38:19  11  A.  Well, again, courts of all different types in all

03:38:26  12  different places.  Certainly, in the Northern District of

03:38:30  13  Illinois where we are now, which is where I live.  But also in

03:38:36  14  federal and state courts across the country.

03:38:39  15  Q.  Have you ever testified as an expert in cases involving

03:38:44  16  issues that are similar to the issues that are presented here,

03:38:47  17  meaning market manipulation, and the like?

03:38:50  18  A.  Yes, I have.

03:38:51  19  Q.  Can you describe that, please?

03:38:53  20  A.  Well, I testified a number of years ago in another matter

03:39:03  21  involving alleged spoofing.  And as I said, many of the cases

03:39:12  22  that I've been involved in, whether they're manipulation

03:39:16  23  cases, insider trading cases, securities fraud cases, all

03:39:20  24  involve similar issues of how to interpret trading behavior in

03:39:26  25  terms of what information is communicated to market

Fischel - direct

1727

03:39:30 1    participants based on either trades or orders or similar types

03:39:37 2    of actions.

03:39:38 3    Q.  Does that also include or involve how traders react to the

03:39:42 4    actions of other traders?

03:39:44 5    A.  Yes.  I mean, that's very much the point.

03:39:46 6    Q.  Right.

03:39:48 7         MR. MENCHEL:  Your Honor, I would tender Professor

03:39:50 8    Fischel as an expert in the field of economics and financial

03:39:54 9    markets.

03:39:54 10        THE COURT:  Any objection?

03:39:55 11        MR. ARMSTRONG:  No, your Honor.

03:39:56 12        THE COURT:  All right.  So accepted.

03:39:59 13        THE WITNESS:  Thank you, your Honor.

14    BY MR. MENCHEL:

03:40:01 15   Q.  Now, Professor, can you describe what you understood your

03:40:06 16   assignment to be in this case?

03:40:07 17   A.  Really to analyze the economic evidence, particularly

03:40:12 18   based on the, sort of, voluminous database of trades and

03:40:18 19   orders to analyze the particular claims made by the

03:40:26 20   government, particularly in connection with their 1-to-50

03:40:32 21   sequence that they have focused on in connection with trading

03:40:35 22   behavior.

03:40:35 23   Q.  And when you say 1-to-50 sequence, are you referring to

03:40:40 24   the episodes that were numbered 1 to 50 in the Government's

03:40:44 25   Exhibit 1?

Fischel - direct

1728

03:40:45  1   A.  Yes, exactly.

03:40:46  2   Q.  Now, how long has Compass Lexecon, approximately, been

03:40:49  3   working on this matter?

03:40:50  4   A.  I think approximately two-and-a-half years.

03:40:51  5   Q.  And how much work has Compass Lexecon had to do in

03:40:56  6   preparation for your testimony today?

03:40:57  7   A.  Really a massive amount of work because of all of the

03:41:04  8   trading data over a multi-year period from two different data

03:41:12  9   sources.  Really, just a -- sort of every order, every trade

03:41:19  10  over -- you know, beginning in 2008 to 2014, and from another

03:41:29  11  data source from 2009 to 2014.  Just -- it's really hard to

03:41:38  12  describe how much data that includes.  Every trade, every

03:41:45  13  order, every change in trade.  Everything that changed over

03:41:51  14  every millisecond, which is the way that the data is

03:41:58  15  presented.

03:41:59  16       It's something that no human being could do without

03:42:01  17  massive computer capability and constant analysis in response

03:42:08  18  to just your own analysis of the data, but also analyzing all

03:42:16  19  of the government's claims, the government's exhibits, the

03:42:20  20  changing exhibits that were presented by the government, the

03:42:26  21  possibility of certain witnesses and their prior testimony and

03:42:32  22  what they testified about in other cases that wound up not

03:42:36  23  appearing.  It's just a -- really an astronomical amount of

03:42:42  24  data.

03:42:42  25  Q.  You mentioned two datasets.  Are you referring to what was

Fischel - direct

1729

03:42:46  1  called the RAPID data and the ARMADA data?

03:42:48  2  A.  Yes, exactly.

03:42:48  3  Q.  And, to date, approximately how much has Compass Lexecon

03:42:52  4  billed for this work?

03:42:53  5  A.  I think approximately $4.6 million.

03:42:56  6  Q.  Now, have you prepared an exhibit setting forth your

03:43:00  7  understanding of the government's claims concerning the

03:43:02  8  alleged fraudulent scheme in this case?

03:43:04  9  A.  Yes.

03:43:04  10  Q.  If you would, please, I want to show you what has been

03:43:09  11  marked as DX 811.

03:43:12  12        MR. MENCHEL:  This is for the witness only at this

03:43:14  13  point, your Honor.

          14  BY MR. MENCHEL:

03:43:16  15  Q.  Professor Fischel, do you recognize what is being shown to

03:43:19  16  you marked as Defendants' Exhibit 811?

03:43:21  17  A.  I do.

03:43:22  18  Q.  What is it, please?

03:43:23  19  A.  This is my understanding of what the government has

03:43:27  20  referred to as the four-step fraudulent scheme that worked

03:43:31  21  like clockwork.

03:43:33  22        MR. MENCHEL:  Your Honor, I would offer Defendants'

03:43:35  23  Exhibit 811 for demonstrative purposes only.

03:43:38  24        THE COURT:  Any objection?

03:43:39  25        MR. ARMSTRONG:  Your Honor, could we be heard at

Fischel - direct

1730

03:43:42   1   sidebar.

03:43:50   2     (Proceedings had at sidebar:)

03:43:53   3        MR. ARMSTRONG:  Your Honor, unfortunately it's not up

03:43:55   4   on the screen anymore.  So, I'm in your Honor's situation,

03:43:59   5   where I'm driving blind.

03:44:00   6        But it seemed to be an argumentative summary of

03:44:05   7   statements that I made during opening and other facts.  And

03:44:11   8   that doesn't seem to be proper demonstrative material.  It

03:44:14   9   seems more like it's just argumentative.

03:44:18   10       MR. MENCHEL:  That's the point of a demonstrative

03:44:20   11   exhibit.  It argues something.  That's why it's not going back

03:44:23   12   to the jury.  This is his understanding of what the claims are

03:44:27   13   here that he was tasked to evaluate.

03:44:30   14       THE COURT:  This is Dr. Fischel's understanding of

03:44:33   15   the claims.

03:44:34   16       MR. MENCHEL:  That's correct.

03:44:36   17       THE COURT:  Can I see it again?

03:44:40   18      Joe, can you turn off the white noise.

03:45:10   19    (Proceedings had in open court:)

03:45:10   20       THE COURT:  The objection is overruled.  The

03:45:12   21   defendants can use Defendants' Exhibit 811 as a demonstrative

03:45:16   22   for demonstrative purposes only.

03:45:18   23       MR. MENCHEL:  Can you publish that, please, your

03:45:21   24   Honor.

          25   BY MR. MENCHEL:

Fischel - direct

1731

03:45:24  1  Q.  So, Professor, do you see what's on the screen as

03:45:27  2  Defendants' Exhibit 811 for demonstrative purposes?

03:45:30  3  A.  I do.

03:45:30  4  Q.  Can you walk through the jury, please, your understanding

03:45:33  5  of what the fraudulent scheme was and what your assignment was

03:45:36  6  in this case?

03:45:36  7  A.  Yes, these are the four steps that that make up the claim

03:45:42  8  of a fraudulent scheme.  So, and I'll just walk through it.

03:45:48  9       So, step one -- and I'm focused on Mr. Pacilio

03:45:53  10  because that's the client who retained me in this matter.  But

03:45:58  11  in step one, Mr. Pacilio places an iceberg order on one side

03:46:05  12  of the market.  The particular example really doesn't matter,

03:46:12  13  but it's -- that is the order that is the object of the

03:46:18  14  scheme, to have that order filled.

03:46:22  15       And, then, step two, according to the government's

03:46:27  16  allegation -- allegations -- is that Mr. Pacilio would then

03:46:33  17  place a large visible order on the opposite side of the

03:46:41  18  iceberg.

03:46:43  19       And that, moving to number three, the government

03:46:49  20  claims that the purpose of placing the visible order on the

03:46:56  21  opposite side of the iceberg is to induce other traders who

03:47:05  22  see the large, visible order on the opposite side of the

03:47:11  23  iceberg to believe that that particular trader that's placing

03:47:18  24  the large order -- in this case, Mr. Pacilio -- knows

03:47:23  25  something about how prices are going to move; and, therefore,

Fischel - direct

1732

03:47:28    1    other traders trade in the same direction as the visible order

03:47:38    2    and move -- because they're trading in the same direction,

03:47:44    3    they move closer and closer to the objective of the scheme,

03:47:49    4    the step one, the iceberg.

03:47:56    5              And moving to step four, which is --

03:47:58    6         MR. PERRY:  Your Honor, could I just interject very

03:48:00    7    briefly, here.  Could I just be heard very briefly on this

03:48:02    8    before we proceed with step four.

03:48:11    9       (Proceedings had at sidebar:)

03:48:11   10         MR. PERRY:  Here's the issue.  This is not actually

03:48:13   11    what we claimed, right?  That's the problem is he is saying

03:48:16   12    that our claim is that the scheme is the first two steps and

03:48:20   13    that step four proves steps one and two.  In other words, he's

03:48:26   14    saying that we say that the scheme is placing icebergs

03:48:31   15    opposite visible orders and that the evidence of that scheme

03:48:36   16    is that the orders were canceled like clockwork.

03:48:39   17              That's not actually what we're alleging.  We're

03:48:42   18    alleging about a scheme that involves the rapid placement of

03:48:46   19    orders, not as evidence of the scheme, but as an integral part

03:48:49   20    of the scheme.  That's actually a crucial distinction because

03:48:53   21    what he's doing is expanding the universe from actually the

03:48:57   22    four-step process, which includes the necessary step of

03:49:01   23    cancelling orders quickly after placement, to only having two

03:49:06   24    steps, which is iceberg opposite a visible order, and then

03:49:09   25    claiming that we think that step four is actually evidence of

Fischel - direct

1733

| | | |
|---|---|---|
| 03:49:14 | 1 | the only -- the two-step scheme. |
| 03:49:17 | 2 | I know that that's complicated, but what he is |
| 03:49:20 | 3 | claiming is our scheme and showing the jury as our claim is |
| 03:49:23 | 4 | not actually our claim. |
| 03:49:28 | 5 | THE COURT:  Mr. Menchel? |
| 03:49:30 | 6 | MR. MENCHEL:  Judge, that's what cross-examination is |
| 03:49:32 | 7 | for.  This is the four steps they opened on.  I'm not really |
| 03:49:37 | 8 | sure I even understand the argument.  But if they think this |
| 03:49:40 | 9 | is not the scheme, they can cross him on it. |
| 03:49:44 | 10 | MR. PERRY:  No, they don't get to define what our |
| 03:49:46 | 11 | scheme is by showing something to the jury that isn't our |
| 03:49:49 | 12 | scheme, and then say, well, you can cross on it, even though |
| 03:49:52 | 13 | it's misleading. |
| 03:50:53 | 14 | THE COURT:  All right.  So far, he has -- well, his |
| 03:50:57 | 15 | description is correct, right?  Steps one, two and three. |
| 03:51:03 | 16 | MR. PERRY:  So far.  The problem is that he is |
| 03:51:05 | 17 | construing step four as evidence that steps one and two were |
| 03:51:11 | 18 | executed with the intent, right?  Whereas, we are building |
| 03:51:15 | 19 | step four as part of the necessary process. |
| 03:51:17 | 20 | So, just to give an example of why this is |
| 03:51:19 | 21 | problematic, what he is saying is the government has defined a |
| 03:51:23 | 22 | scheme as:  Every time there's a visible order opposite an |
| 03:51:26 | 23 | iceberg order.  And the reason the government is claiming that |
| 03:51:29 | 24 | that's problematic is because, like clockwork, every time |
| 03:51:32 | 25 | there's a visible order opposite an iceberg order there's a |

Fischel - direct

1734

03:51:35  1    quick cancellation.  That's not what we're claiming.  We're

03:51:38  2    not claiming every time there's a visible order opposite an

03:51:41  3    iceberg order there's a quick cancellation.  That's not what

03:51:44  4    the evidence is of our scheme and it's not how we've defined

03:51:48  5    our scheme.

03:51:48  6         What we are claiming is when there's an iceberg

03:51:50  7    opposite a visible order and the visible order is canceled

03:51:54  8    quickly, that is the scheme.  And that's completely different

03:51:55  9    and it expands what is a fairly narrow universe within the --

03:52:00  10        THE COURT:  So, I'm just trying to understand the

03:52:03  11   difference.

03:52:06  12        Mr. Perry, in your view, the difference is that in

03:52:11  13   the government's case -- theory of the case -- the

03:52:19  14   cancellation is part of the scheme.

03:52:20  15        MR. PERRY:  Yes.

03:52:20  16        THE COURT:  And what you're saying is the way you see

03:52:25  17   Dr. Fischel's testimony is that the cancellation is not an

03:52:31  18   integral part of the scheme, it's just something that happens.

03:52:36  19        MR. PERRY:  Correct.

03:52:37  20        And I have no objection to him, you know, bringing in

03:52:40  21   the testimony of -- you know, the evidence of everything that

03:52:43  22   he looked at, icebergs opposite visible orders, all of that.

03:52:47  23   But to claim that our scheme is simply limited to two steps,

03:52:52  24   icebergs opposite visible orders, is not what we've alleged in

03:52:55  25   the indictment and not what we've, you know, put on evidence

Fischel - direct

1735

03:52:59  1    at the trial.  Because the way that he's defining it is every

03:53:03  2    time you have an iceberg opposite a visible order, even if the

03:53:07  3    visible order is canceled ten minutes later.  We have not said

03:53:09  4    anything close to that.

03:53:10  5            THE COURT:  So, with that, I agree with Mr. Menchel

03:53:13  6    that that is the stuff of cross-examination.  If, in fact, Dr.

03:53:19  7    Fischel's construction of the government's allegations is

03:53:21  8    completely wrong, then it seems like you could -- it would be

03:53:24  9    rather simple to bring that up in cross.  So far, I don't hear

03:53:28  10   anything that is particularly objectionable.

03:53:30  11           So, let's move on.

03:53:31  12           MR. PERRY:  Thank you.

03:53:35  13      (Proceedings had in open court:)

03:53:43  14           MR. MENCHEL:  Just trying to remember where we were.

03:53:45  15           MR. PERRY:  Step four.

03:53:46  16           THE COURT:  Step four.

03:53:48  17           MR. MENCHEL:  Okay.

          18   BY MR. MENCHEL:

03:53:50  19   Q.  Professor, I think you were about to discuss step four?

03:53:53  20   A.  Yes.

03:53:56  21           So, step four is that, after step three, the

03:54:08  22   placement of the visible order opposite the iceberg with the

03:54:13  23   expectation or the belief that other traders will trade in the

03:54:17  24   same direction and increase the probability of hitting the

03:54:29  25   initial iceberg -- step one, which is the objective of the

Fischel - direct

1736

03:54:33  1  scheme -- step four is the visible order's result in the

03:54:37  2  iceberg order executing at least in part, as the government

03:54:42  3  claims Mr. Pacilio intended from the beginning.  And now that

03:54:47  4  the purpose of the scheme has been achieved, according to the

03:54:53  5  government, Mr. Pacilio then cancels the visible order, as the

03:54:59  6  government alleges was planned from the very beginning, which

03:55:04  7  is step four.

03:55:05  8  Q.  And have you reviewed the subset of the government's 72

03:55:11  9  trial episodes that include trading by Mr. Pacilio?

03:55:13  10  A.  I have.

03:55:14  11  Q.  And do you understand that of those, only 27 involve Mr.

03:55:16  12  Pacilio; is that right?

03:55:17  13  A.  I understand that.

03:55:18  14  Q.  And have you also reviewed other trading sequences

03:55:23  15  involving Mr. Pacilio in which large visible orders were

03:55:26  16  placed opposite icebergs?

03:55:28  17  A.  Yes, I have.

03:55:29  18  Q.  And based on that analysis, have you formed any opinions

03:55:33  19  about the government's case?

03:55:34  20  A.  Yes, I have.  That the government's case is based on a

03:55:41  21  really basic fundamental misunderstanding of trading behavior.

03:55:46  22  And also that the sample of orders and trades that the

03:55:53  23  government includes in its four-step fraudulent scheme is a

03:56:00  24  biased and unrepresentative sample of Mr. Pacilio's trading

03:56:07  25  behavior.

Fischel - direct

1737

03:56:07  1        In other words, there are many visible orders placed

03:56:11  2   by Mr. Pacilio opposite icebergs.  That there are many large

03:56:18  3   orders that Mr. Pacilio places.

03:56:22  4        And I think to really form an accurate understanding

03:56:26  5   of the data, you can't limit the data to what appears in these

03:56:33  6   four steps given the massive amount of data that exists.  I

03:56:38  7   think you have to look at all of it to have a reasonable

03:56:42  8   understanding of the data and what the data shows.

03:56:47  9        Now, I have a lot of, sort of, articles and exhibits

03:56:53  10  that show I think what I just said.  But there's also a -- you

03:56:58  11  know, what I would call almost a common sense intuition that

03:57:02  12  really can explain the problem with the government's four-step

03:57:07  13  fraudulent scheme.

03:57:09  14  Q.  Please do.

03:57:11  15  A.  Yeah.  So, you know, just to take the simplest example of

03:57:17  16  what the government refers to as a trader, whether it's Mr.

03:57:24  17  Pacilio or anybody else, placing a large visible order in the

03:57:32  18  market, and I think the expression is shocking the market by

03:57:38  19  the size of the visible order.  And the government claims in

03:57:44  20  this four-step scheme that the result of placing the large

03:57:52  21  visible order into the market is that other traders will look

03:57:59  22  at the large visible order, and they will sit -- they will

03:58:04  23  think that this trader knows something.  So, for example, if

03:58:09  24  the large visible order is a buy order, they will think that

03:58:12  25  prices are going up and they will react by whatever price the

Fischel - direct

1738

03:58:17  1  large visible order was at, they will start to bid up the

03:58:22  2  price even higher because they think the price is going up.

03:58:26  3  They will trade on the same side of the market.

03:58:29  4        And as a result of that, in this alleged scheme,

03:58:34  5  because the other traders will trade on the same side of the

03:58:39  6  market, the prices will rise and eventually, according to the

03:58:45  7  government, the iceberg will be executed.

03:58:50  8        But is that logical?  I mean, does that make sense?

03:58:53  9        MR. ARMSTRONG:  Objection, your Honor.  Narrative.

03:58:58  10       THE COURT:  Can we have a sidebar.

03:59:09  11    (Proceedings had at sidebar:)

03:59:09  12       THE COURT:  All right.  So, so far I've been pretty

03:59:12  13  lenient on who can formally object or lodge objections to

03:59:19  14  witness testimony.  Who is going to cross Dr. Fischel?

03:59:24  15       MR. ARMSTRONG:  I am, your Honor.

03:59:25  16       THE COURT:  You are?

03:59:25  17       MR. ARMSTRONG:  Yes.

03:59:26  18       THE COURT:  Okay.

03:59:26  19       So, then, Mr. Armstrong, I anticipate that you will

03:59:31  20  be the exclusive person on behalf of the government who will

03:59:34  21  be objecting during the direct.

03:59:36  22       MR. ARMSTRONG:  Perfect.

03:59:45  23    (Proceedings had in open court:)

03:59:45  24       THE COURT:  Overruled.

          25  BY MR. MENCHEL:

Fischel - direct

1739

03:59:46   1   Q.  I think where we were, Professor, was you were posing the

03:59:50   2   question is it logical to make that inference?

03:59:53   3   A.  Yes.  And what I'm going to demonstrate is that it's not

03:59:55   4   logical.  And here's the reason:  That while some traders may

03:59:58   5   behave that way -- in other words, some traders may say this

04:00:04   6   large visible order makes me think that prices are going up so

04:00:09   7   I'm going to also be a buyer at increasing prices, but is that

04:00:17   8   the only possible reaction the way the government's scheme

04:00:20   9   suggests?  That the only way that traders will interpret the

04:00:25  10   large order is to trade in the same direction, and if it's a

04:00:29  11   buy order to continue to make offers to -- enter orders at

04:00:37  12   higher prices?

04:00:39  13        Isn't it possible that there's also potential sellers

04:00:44  14   in the market; and when they see all of a sudden a large

04:00:49  15   visible order to buy, that they now think they now have a

04:00:54  16   selling opportunity that didn't exist before because there's

04:00:58  17   this now new large buy order so people will trade on the

04:01:03  18   opposite side of the market, not on the same side of the

04:01:06  19   market?

04:01:07  20        And that's exactly what is not considered in the

04:01:11  21   government's four-part scheme.

04:01:14  22        Or how about another possibility?  People -- traders

04:01:18  23   see all of a sudden a large visible buy order that didn't

04:01:24  24   exist before, and they think to themselves, I don't know

04:01:27  25   what's going on.  You know, this is different.  It shakes up

Fischel - direct

1740

04:01:30  1    the market.  And even if I was thinking I wanted to trade

04:01:35  2    before or enter an order before, now I'm not so sure.  I can't

04:01:40  3    read the signals.  Is this somebody who knows something and,

04:01:45  4    therefore, I should be buying, or is this an opportunity to

04:01:49  5    sell so I should be selling?  Or maybe I can't figure it out

04:01:52  6    so I just want to sit on the sidelines and wait.

04:01:57  7         And what I'm going to demonstrate is that if you look

04:02:02  8    at the economic literature on trading behavior, as well as if

04:02:06  9    you look at what I would call a non-biased -- a representative

04:02:13  10   sample of Mr. Pacilio's trades, it's characteristic of all

04:02:18  11   those things.  Sometimes traders will trade in the same

04:02:24  12   direction and increase the price if it's a buy or lower the

04:02:27  13   price if it's a sell.  But sometimes the opposite will occur.

04:02:31  14   Sometimes the visible orders will execute because sellers now

04:02:38  15   see new opportunities to sell that didn't exist before, and

04:02:42  16   they come into the market and, therefore, in contrast with the

04:02:47  17   government's four-part scheme where none of the visible orders

04:02:53  18   result in sales and, therefore, none of the visible orders get

04:02:59  19   executed.  It turns out a lot of visible orders get executed

04:03:04  20   opposite icebergs.  And we'll see that in the data.  We'll see

04:03:09  21   that in the economic literature about trading behavior.

04:03:13  22        And, again, sometimes nothing happens.  Sometimes the

04:03:16  23   icebergs don't get hit.  Sometimes the visible orders get

04:03:20  24   canceled and the icebergs get canceled.  So, in other words,

04:03:25  25   there is a rich set of different possible reactions to a

Fischel - direct

1741

04:03:30  1   trade.  Traders will interpret the actions of placing a large

04:03:38  2   visible order that didn't exist before in different ways.

04:03:43  3   Some people will want to buy at higher prices.  Some people

04:03:46  4   will want to sell, take advantage of the opportunity to sell.

04:03:51  5   Others won't want to do anything.  They just won't understand

04:03:54  6   what's going on.  They'll want to sit on the sidelines.

04:03:57  7        But if you go back and look at the government's

04:04:00  8   four-part scheme, it only has one of those alternatives.  And

04:04:05  9   the government says that that one alternative happens every

04:04:08  10  time like clockwork.  And that is false.  That is a

04:04:13  11  misrepresentation of the relevant trading data.  That is a

04:04:16  12  misrepresentation of the academic literature on trading

04:04:20  13  behavior.  And it's certainly a misrepresentation of the

04:04:24  14  experience of what happens in the market over the period that

04:04:31  15  I've investigated when Mr. Pacilio places a large visible

04:04:36  16  order opposite an iceberg.  And there's a lot of --

04:04:42  17        THE COURT:  Actually, Dr. Fischel, let's let

04:04:45  18  Mr. Menchel ask you some questions.

04:04:46  19        THE WITNESS:  I apologize, your Honor.

04:04:48  20        MR. MENCHEL:  It has been a long day already.

04:04:49  21        THE WITNESS:  Right.  I apologize.

04:04:51  22        MR. MENCHEL:  That's all right.

          23  BY MR. MENCHEL:

04:04:52  24  Q.  So, you mentioned academic literature a moment ago that

04:04:55  25  supports the idea that traders can react in a variety of ways;

Fischel - direct

1742

04:04:57　　1　　is that right?

04:04:58　　2　　A.　That's right.

04:04:58　　3　　Q.　Okay.

04:04:59　　4　　　　　I want to show you for your eyes only at this point

04:05:02　　5　　Defense Exhibit 147.

04:05:09　　6　　　　　Do you recognize this?

04:05:09　　7　　A.　I do.

04:05:10　　8　　Q.　What is it?

04:05:11　　9　　A.　Well, it's an article on trading behavior and different

04:05:17　　10　　types of traders published in the Journal of Financial

04:05:21　　11　　Economics.

04:05:22　　12　　Q.　And what is the Journal of Financial Economics?

04:05:25　　13　　A.　It's a very well-recognized leading journal on the subject

04:05:31　　14　　of financial economics.

04:05:34　　15　　Q.　Is it what's referred to as a peer-reviewed journal?

04:05:37　　16　　A.　Oh, very much so.

04:05:37　　17　　Q.　Can you explain to the members of the jury who might not

04:05:39　　18　　be familiar with that term what peer-reviewed means?

04:05:42　　19　　A.　Peer-reviewed -- for a journal like this, in order to get

04:05:46　　20　　an article published, the article is -- before it's published

04:05:57　　21　　is distributed to other experts in the field who have to --

04:06:01　　22　　whether they agree with the article or not, they have to

04:06:05　　23　　express an opinion that the article is of a sufficiently high

04:06:12　　24　　professional quality to be suitable for publication.

04:06:17　　25　　Q.　And is this one of the articles that was relevant to your

Fischel - direct

1743

04:06:20  1   opinion in this case?

04:06:21  2   A.  Yes, very much so.

04:06:23  3          MR. MENCHEL:  Your Honor, I'd ask that it be

04:06:24  4   published for demonstrative purposes only under Rule 703.

04:06:28  5          MR. ARMSTRONG:  Objection.

04:06:32  6          THE COURT:  Is there a particular site or particular

04:06:34  7   paragraph that you want to --

04:06:36  8          MR. MENCHEL:  Yeah, there's several.  Do you want me

04:06:38  9   to tell you what those are?  Okay.

04:06:40  10          The first one, your Honor, is on Page 364, Section

04:06:43  11  2.2.

04:06:45  12          Abbie, if you could blow that up for the Court.

04:07:09  13          Your Honor, that goes to the next page.  Let me know

04:07:15  14  when you want to do that.

04:07:18  15          THE COURT:  All right.

04:07:19  16          So, Mr. Armstrong, let's talk about that.

04:07:33  17     (Proceedings had at sidebar:)

04:07:33  18          THE COURT:  What is the basis for the objection?

04:07:35  19          MR. ARMSTRONG:  Your Honor, this is displaying rank

04:07:37  20  hearsay before the jury in the form of a demonstrative.  If

04:07:43  21  I'm wrong and that's permissible, I'm sure your Honor will

04:07:48  22  correct me, but I don't think I am.

04:07:50  23          MR. MENCHEL:  With respect, I believe Mr. Armstrong

04:07:53  24  is wrong.  Rule 703, basis of an expert's opinion.  An expert

04:07:59  25  may base an opinion on facts or data in a case that the expert

Fischel - direct

1744

04:08:03  1   has been made aware of or personally observed.  If the

04:08:07  2   expert's in a particular field would reasonably rely on those

04:08:10  3   kind of fact or data in forming an opinion on the subject,

04:08:14  4   they may not be admissible for the opinion to be admitted.

04:08:18  5   But if the facts or data would otherwise be inadmissible, the

04:08:21  6   proponent of the opinion may disclose them to the jury only if

04:08:25  7   their probative value in helping the jury evaluate the opinion

04:08:28  8   substantially outweighs their prejudicial effect.

04:08:30  9       This is an article that speaks to the three ways in

04:08:34  10  which traders react to large visible orders, exactly as

04:08:38  11  Professor Fischel described:  Passive, aggressive, defensive.

04:08:46  12      THE COURT:  Objection is overruled.

04:09:02  13   (Proceedings had in open court:)

04:09:03  14      MR. MENCHEL:  Can we go back to the first page,

04:09:05  15  please.

04:09:08  16      Your Honor, may we publish.

04:09:10  17      THE COURT:  It is.

04:09:11  18      MR. MENCHEL:  Thank you.

          19  BY MR. MENCHEL:

04:09:12  20  Q.  Professor, what is the name of this article, please?

04:09:16  21  A.  The title of the article is "Hidden Liquidity:  An

04:09:20  22  Analysis of Order Exposure Strategies in Electronic Stock

04:09:25  23  Markets."

04:09:26  24  Q.  And it's a pretty technical article with a lot of data,

04:09:29  25  stats?

Fischel - direct

1745

04:09:30  1   A.   Correct, it is.

04:09:31  2   Q.   But in a nutshell, what is this article addressing in its

04:09:34  3   research?

04:09:35  4   A.   It's addressing the different types of traders who react

04:09:43  5   to the presentation of new orders in the marketplace.

04:09:49  6   Q.   Okay.

04:09:50  7           And let's go to a couple of sections that -- I think

04:09:55  8   you identified as being relevant to your opinion; is that

04:09:58  9   right?

04:09:58  10  A.   That's correct.

04:09:58  11  Q.   If we can go to Page 364, please, under section 2.2.

04:10:16  12          Can you read to us what this says and then explain it

04:10:18  13  in perhaps better layman's English?

04:10:24  14  A.   Okay.  It's talking about a previous contribution by

04:10:30  15  Harris.  And the article states Harris has articulated some

04:10:37  16  important economic reasoning relevant to understanding hidden

04:10:42  17  order usage.  He observes that some traders follow a passive

04:10:47  18  strategy where they wait for other traders to indicate their

04:10:50  19  interest in trading on favorable terms.  The presence of these

04:10:53  20  passive or reactive traders increases the attractiveness of

04:10:59  21  publicly displaying one's interest in trading, in order to

04:11:03  22  draw out the passive traders.

04:11:05  23  Q.   Stop right there.

04:11:06  24          So, in more regular English, what does that mean?

04:11:09  25  A.   That means exactly what I was describing a minute ago.

Fischel - direct

1746

04:11:14  1    That when -- one of the purposes of, according to this

04:11:21  2    article, of placing a new large order in the marketplace on

04:11:27  3    one side of the market, it attracts reactive traders to trade

04:11:35  4    on the other side of the market where they were waiting for

04:11:39  5    the opportunity to do so.

04:11:41  6           So, in other words, if there's a large buy order

04:11:45  7    that's placed in the market, some traders who are interested

04:11:48  8    in selling who are sitting on the side lines waiting for the

04:11:56  9    opportunity to sell now see an opportunity that didn't exist

04:11:58  10   before.  So they come into the market with sell orders in

04:12:03  11   order to execute with the buy order.

04:12:08  12   Q.  If we can continue, please, where it says other traders in

04:12:11  13   contrast?

04:12:11  14   A.  Okay.

04:12:13  15          "Other traders in contrast follow what Harris calls

04:12:17  16   defensive and pair sit I can strategies.  Pair sit I can

04:12:22  17   traders seek to exploit the existence of large buy orders by

04:12:26  18   front running the order or by using order matching strategies,

04:12:31  19   by posting a limit order at a price one tick more favorable

04:12:35  20   than the existing order."

04:12:39  21   Q.  Again, can you explain to us what that means when the term

04:12:42  22   defensive or pair sit I can is used, what does that mean in

04:12:45  23   terms of when someone places a large buy order on one side of

04:12:48  24   the market?

04:12:48  25   A.  That, again, the possibility that's the focus in the

Fischel - direct

1747

04:12:54  1   government's four-step fraudulent scheme, that other traders

04:13:01  2   look at the large order and think that this person is placing

04:13:06  3   a large order because they know something about the way that

04:13:09  4   the market is going to move.  And, so, they trade in the same

04:13:13  5   direction as stated in the article.  They post limit orders at

04:13:19  6   a price one tick more favorable than the existing order.  In

04:13:25  7   other words, they trade in the same direction, but they either

04:13:30  8   improve the bid by offering to pay more or improve the ask by

04:13:39  9   willing to sell for less.

04:13:42  10  Q.  There's a reference here that a pair sit I can trader as

04:13:45  11  defined by Harris is doing something called front running.

04:13:49  12  What does that mean?

04:13:50  13  A.  Front running in this context is means that it's the

04:13:56  14  ability if let's say the existing order is to buy at 10, to

04:14:04  15  immediately enter an order, as the article states, one tick

04:14:08  16  higher, to buy at 10.10, in order to base deal knockout the

04:14:17  17  existing order by offering a slightly better price, front

04:14:20  18  running above the existing order in order to take advantage of

04:14:27  19  the belief that prices are going to be rising.

04:14:30  20  Q.  Then I want to direct your attention to the sentence that

04:14:34  21  begins with?

04:14:40  22           MR. MENCHEL:  Can you clean this, Abbie.

04:14:45  23           Just the highlighting, please.

04:14:46  24           Can you start off where it shows the word or.  Let me

04:14:49  25  see if I can help you out.

Fischel - direct

1748

| | | |
|---|---|---|
| 04:14:50 | 1 | THE WITNESS: Right. |
| 04:14:51 | 2 | MR. MENCHEL: Can you highlight that, please, and go |
| 04:14:54 | 3 | to the next page, as well, Abbie. It might have to be a side |
| 04:14:57 | 4 | by side. |
| | 5 | BY MR. MENCHEL: |
| 04:15:04 | 6 | Q. Can you read that section, please? |
| 04:15:05 | 7 | A. Yes. |
| 04:15:06 | 8 | "Or in those cases where the display of trading |
| 04:15:09 | 9 | interest, the posting of a large buy limit order, conveys that |
| 04:15:13 | 10 | the limit order trader may possess positive private |
| 04:15:17 | 11 | information regarding security value, defensive traders may |
| 04:15:22 | 12 | react by ceasing to submit -- " |
| 04:15:24 | 13 | Q. Hold on one second. |
| 04:15:27 | 14 | MR. MENCHEL: Do you have it on the screen? |
| 04:15:30 | 15 | Thank you. |
| | 16 | BY THE WITNESS: |
| 04:15:32 | 17 | A. Should I continue? |
| 04:15:33 | 18 | BY MR. MENCHEL: |
| 04:15:33 | 19 | Q. Yes, please. |
| 04:15:34 | 20 | A. " -- by ceasing to submit market sell orders or cancelling |
| 04:15:37 | 21 | existing limit sell orders." |
| 04:15:40 | 22 | Q. Okay. |
| 04:15:40 | 23 | So, what type of trader is that? |
| 04:15:42 | 24 | A. That's the kind of trader who, again, is unsure what the |
| 04:15:49 | 25 | order represents and, therefore, that trader, referred to here |

Fischel - direct

1749

04:15:57  1   as a defensive trader, as is stated, may react by ceasing to

04:16:02  2   submit orders or cancelling orders that they've submitted.

04:16:06  3          In other words, this description in more -- if you

04:16:10  4   want to say more technical terms, because it's a technical

04:16:14  5   article, is exactly the three different strategies that I

04:16:17  6   mentioned earlier.

04:16:19  7   Q.  So, let me just make sure we understand.

04:16:23  8          The article mentions a reactive trader?

04:16:25  9   A.  Correct.

04:16:26  10  Q.  That's the person who will actually go and meet the large

04:16:31  11  order by -- if it's a buy, by selling?

04:16:33  12  A.  Correct.

04:16:34  13  Q.  We have the parasitic trader.  That's the trader who will

04:16:40  14  front run the large order by getting ahead of that order?

04:16:43  15  A.  Exactly.

04:16:43  16  Q.  And we have the defensive trader who may just get out of

04:16:45  17  the market altogether?

04:16:46  18  A.  Exactly.

04:16:47  19  Q.  Okay.

04:16:50  20          MR. MENCHEL:  If we could, please, let's go to Page

04:16:54  21  365 starting -- can you blow up the paragraph, please, Abbie,

04:17:06  22  that starts limit orders -- "limit order traders can draw

04:17:09  23  reactive traders."  Just that paragraph, please.

          24  BY MR. MENCHEL:

04:17:13  25  Q.  Professor, can you read to us what is being said in this

Fischel - direct

1750

04:17:16  1   paragraph.

04:17:18  2   A.  All right.  Well, it's a long paragraph, but there's

04:17:20  3   several things that I think are particularly worthwhile to

04:17:24  4   focus on.

04:17:26  5        First of all, the first sentence:  "Limit order

04:17:29  6   traders can draw reactive traders -- " namely, traders to

04:17:34  7   trade on the opposite side of the market "-- either by posting

04:17:37  8   an attractive price or by exposing order size."

04:17:41  9   Q.  Let me stop you there.

04:17:42  10        So, an attractive price would mean somebody -- if

04:17:46  11   we're at the best bid and the best offer, what would be an

04:17:51  12   attractive price for a bid?

04:17:52  13   A.  A price that's closer to the price that they want to

04:17:55  14   transact at.

04:17:56  15   Q.  So, in other words --

          16   A.  So --

04:17:57  17   Q.  -- if the current --

04:17:57  18   A.  -- improvement on the best bid or the best ask.

04:18:00  19   Q.  So, in other words, if the best bid was 9 and the trader

04:18:04  20   puts in 9.10, one way they're going to attract a reaction for

04:18:07  21   people to sell is you've now improved the price for them?

04:18:11  22   A.  Correct.

04:18:11  23   Q.  Okay.

04:18:11  24        And what about the second piece about exposing order

04:18:15  25   size?

Fischel - direct

1751

04:18:15   1   A.  Yes.  And, again, let's say there's a trader that wants to

04:18:24   2   sell a large number of contracts but doesn't see an

04:18:32   3   opportunity to do that, but if all of a sudden a new buy order

04:18:37   4   that's large comes into the market, that creates a selling

04:18:45   5   opportunity just because of the number of contracts that are

04:18:52   6   available to -- well, buy or sell depending on which side the

04:18:58   7   trader on the opposite side of the market is that didn't exist

04:19:03   8   before.

04:19:05   9        So, that trader who is on the sidelines waiting for

04:19:09   10  an opportunity to, let's say, sell a large number of

04:19:16   11  contracts, if all of a sudden there's a new buy order for a

04:19:20   12  large number of contracts, again, that's an opportunity that

04:19:23   13  didn't exist before, just like a better price is an

04:19:26   14  opportunity that didn't exist before.

04:19:28   15  Q.  Okay.

04:19:29   16  A.  And that can draw traders into the market that wouldn't

04:19:33   17  otherwise be into the market.  Those are the reactive traders.

04:19:37   18  Q.  Okay.

04:19:37   19        I want to direct your attention to the sentence that

04:19:41   20  begins "large, aggressively priced orders are, therefore,

04:19:47   21  likely to be perceived as originating from informed traders."

04:19:50   22        Can you read that, please.

04:19:51   23  A.  Yes.

04:19:52   24        "Large, aggressively priced orders are, therefore,

04:19:54   25  likely to be perceived as originating from informed traders,

Fischel - direct

1752

04:19:57  1  which can cause defensive traders to exit the market or

04:20:01  2  parasitic traders to indulge in front running strategies."

04:20:05  3  Q.  And that's what we discussed earlier, right?

04:20:07  4  A.  Yes.  Those are the two other strategies that we discussed

04:20:10  5  earlier.

04:20:10  6  Q.  Okay.

04:20:21  7       So, I want to, just finally on this article, direct

04:20:24  8  your attention to Page 369 under what's called Paragraph 4.

04:20:33  9  And I'm just going to direct your attention to one part of it

04:20:36  10  so we can move a little bit more quickly.

04:20:51  11       MR. MENCHEL:  It's hard for me to see on this screen.

04:20:54  12       Do you see, Abbie, where it says "the latter

04:20:56  13  reasoning suggests" in this paragraph right here?

04:21:01  14  BY MR. MENCHEL:

04:21:03  15  Q.  Professor, you see where it says "the latter reasoning

04:21:06  16  suggests"?

04:21:07  17  A.  Yes, I do.

04:21:07  18  Q.  Can you read that, please.

04:21:09  19  A.  "The latter reasoning suggests that exposing an order can

04:21:13  20  increase the likelihood of order execution."

04:21:17  21  Q.  Let me stop you right there.

04:21:19  22       What does that mean?

04:21:20  23  A.  That means that the finding of this article is that

04:21:28  24  placing a visible order exposing an order, meaning it's a

04:21:33  25  visible order, can increase the likelihood that that visible

Fischel - direct

1753

04:21:38  1  order will execute as opposed to being canceled.

04:21:42  2  Q.  So, in your opinion, are the government's claims

04:21:50  3  concerning the trading behavior consistent with this published

04:21:52  4  article?

04:21:54  5  A.  No.

04:21:54  6  Q.  Why not, briefly?

04:21:56  7  A.  Briefly, because the government's four-step alleged

04:22:02  8  fraudulent scheme only takes into account one of the possible

04:22:08  9  reactions of traders in the marketplace and ignores the other

04:22:13  10  two.  And for that reason, the government's alleged scheme is

04:22:20  11  fundamentally inconsistent and contradicted by the academic

04:22:25  12  research on trading behavior.

04:22:28  13       MR. MENCHEL:  Take that down.  Thank you, Abbie.

          14  BY MR. MENCHEL:

04:22:30  15  Q.  Professor, are you familiar with the term "aggressive

04:22:33  16  order"?

04:22:33  17  A.  I am.

04:22:33  18  Q.  Can you please explain to the members of the jury, please,

04:22:36  19  what an aggressive order is?

04:22:37  20  A.  An aggressive order is a marketable order which by

04:22:45  21  definition executes immediately in whole or in part.

04:22:50  22  Q.  Is that because it crosses the bid-ask spread?

04:22:53  23  A.  Yes, it crosses the spread.  If it's a buy order, it

04:22:56  24  crosses the spread to the best ask, and the reverse if it's a

04:23:02  25  sell order.

Fischel - direct

1754

04:23:03  1    Q.  So, in other words, if the best bid is 9 and the best

04:23:07  2    offer is 10, an aggressive order would be a bidder going to

04:23:10  3    10?

04:23:10  4    A.  Correct.

04:23:11  5    Q.  Now, can an aggressive order have both aggressive

04:23:14  6    executions and non-aggressive executions?

04:23:17  7    A.  Yes, that frequently occurs.

04:23:20  8    Q.  Can you explain that, please.  I'm sorry, with an example

04:23:28  9    might be helpful?

04:23:29  10   A.  Yeah.

04:23:31  11        So, let's say a trader places an aggressive order to

04:23:37  12   purchase a hundred contracts at 10 -- again, just to make up a

04:23:43  13   number -- but it turns out that there's only 50 contracts that

04:23:50  14   are available for sale at 10.  So, the aggressive order

04:23:57  15   will -- because it crosses the spread, will -- execute for the

04:24:05  16   50 contracts that are available for sale at 10.

04:24:11  17        But the other 50 contracts of the aggressive order,

04:24:17  18   there aren't contracts available to execute at that price.

04:24:22  19   So, the leftover contracts that are not immediately executed

04:24:28  20   become, in effect, resting orders.

04:24:30  21   Q.  Is that relevant to your analysis?

04:24:33  22   A.  It is relevant because, again, you know, I would consider

04:24:39  23   it a way to test the consistency of the four -step government

04:24:47  24   scheme -- alleged fraudulent scheme -- that's supposed to work

04:24:51  25   like clockwork with actual trading behavior.

Fischel - direct

1755

04:24:54  1   Q.  Okay.

04:24:55  2        Now, have you in this case analyzed what the

04:24:59  3   government has referred to as large visible orders that Mr.

04:25:02  4   Pacilio placed?

04:25:03  5   A.  Yes.  I've analyzed that quite extensively.

04:25:07  6   Q.  And I want to show you just for your eyes only at this

04:25:09  7   point Defense Exhibits 188 and 317.

04:25:21  8        MR. MENCHEL:  If you can do a side by side, please,

04:25:23  9   Abbie.

          10   BY MR. MENCHEL:

04:25:33  11   Q.  Professor, do you recognize what is displayed in

04:25:36  12   Defendants' Exhibits 188 and 317?

04:25:41  13   A.  Yes, I do.

04:25:42  14   Q.  What is it?  What are they, I should say?

04:25:44  15   A.  Well, if it's possible to -- it's a little bit hard to --

04:25:53  16   Q.  Do you have a binder?

04:25:54  17   A.  Yeah.  Maybe I'll look at the binder.

04:25:56  18        MR. MENCHEL:  With the Court's permission, may he

04:25:58  19   look at the binder that contains the same exhibit?

04:26:00  20        THE COURT:  That's fine.

          21   BY THE WITNESS:

04:26:02  22   A.  So, one is -- Exhibit 188 is an analysis of Mr. Pacilio's

04:26:10  23   resting non-iceberg limit orders in the top five levels.

04:26:16  24   That's one of them.

04:26:17  25        And the other, Exhibit 317, is an analysis of Mr.

Fischel - direct

1756

04:26:23  1    Pacilio's aggressive, non-iceberg limit orders.

04:26:30  2            MR. MENCHEL:  Okay.  I would offer those, your Honor.

04:26:31  3            THE COURT:  Any objection?

04:26:34  4            MR. ARMSTRONG:  No objection.

04:26:36  5            THE COURT:  Defendants' Exhibit 188 and 317 are

04:26:40  6    admitted in evidence.

          7        (Government Exhibit Nos. 188 and 317 received in

04:26:46  8    evidence.)

04:26:46  9            MR. MENCHEL:  Publish, please, your Honor.

04:26:47  10           Thank you.

          11   BY MR. MENCHEL:

04:26:49  12   Q.  There's a lot of numbers on these charts, right?

04:26:51  13   A.  Yes.

04:26:51  14   Q.  Okay.

04:26:51  15           Have you also created graphical depictions of the

04:26:54  16   data that are displayed in Defendants' Exhibits 188 and 317?

04:26:58  17   A.  Yes.

04:26:58  18   Q.  I want to show you what has been marked --

04:27:04  19           MR. MENCHEL:  You can take that off the screen.

04:27:06  20           Thank you, Abbie.

          21   BY MR. MENCHEL:

04:27:08  22   Q.  -- for your eyes only, please, Defense Exhibit 813 and

04:27:11  23   Defense Exhibit 812.

04:27:34  24           MR. MENCHEL:  Wrong one.

04:27:34  25           Your Honor, I know this is a long day.  Any chance we

Fischel - direct

1757

04:27:36  1  could have a standing break at this moment, a little stretch

04:27:39  2  break?

04:27:39  3          THE COURT:  That's fine.

04:27:40  4          Let's go ahead and just stand up and stretch a little

04:27:44  5  bit.

04:29:18  6      (Brief pause.)

          7  BY MR. MENCHEL:

04:29:19  8  Q.  Now, Professor, are Defendants' Exhibits 813 and 812

04:29:23  9  graphical depictions of those numerical charts that were

04:29:26  10  Defense Exhibit 188 and 317, respectively?

04:29:28  11  A.  Yes.

04:29:29  12          MR. MENCHEL:  I would offer them, your Honor.

04:29:31  13          THE COURT:  Any objection?

04:29:32  14          MR. ARMSTRONG:  Sure.  No objection.

04:29:34  15          THE COURT:  Defendants' Exhibits 113 -- I'm sorry,

04:29:37  16  813 and 812 are admitted in evidence.

          17      (Government Exhibit Nos. 812 and 813 received in

04:29:40  18  evidence.)

04:29:40  19          MR. MENCHEL:  If we could start first, please, Abbie

04:29:43  20  with 813.

04:29:45  21          And, your Honor, could you publish, please?

04:29:51  22          THE COURT:  Go ahead.

04:29:52  23          MR. MENCHEL:  I'm sorry?

04:29:55  24          THE COURT:  It's published.

04:29:57  25          MR. MENCHEL:  Oh, okay.  I thought you said something

Fischel - direct

1758

| | | |
|---|---|---|
| 04:29:59 | 1 | else.  It's a long day. |
| | 2 | BY MR. MENCHEL: |
| 04:30:01 | 3 | Q.  Can you explain to the members of the jury, please, what |
| 04:30:03 | 4 | is depicted in Defense Exhibit 813? |
| 04:30:06 | 5 | A.  This is a bar chart that depicts the execution speed for |
| 04:30:19 | 6 | Mr. Pacilio's aggressive, non-iceberg, large and group orders |
| 04:30:26 | 7 | from the period March 23rd, 2009, through October 29th, 2014. |
| 04:30:34 | 8 | Q.  Now, I just want to ask you because you're using the word |
| 04:30:38 | 9 | "large and group orders."  Is that a term that the government |
| 04:30:43 | 10 | used in its graphical depictions in this case? |
| 04:30:48 | 11 | A.  Yes, and that's why I chose it. |
| 04:30:50 | 12 | Q.  And do they match in terms of the size of what is |
| 04:30:52 | 13 | considered large, what's considered a group, both for the gold |
| 04:30:55 | 14 | and silver markets? |
| 04:30:57 | 15 | A.  Yes. |
| 04:30:57 | 16 | Q.  Can you then explain to us what this graph depicts? |
| 04:31:01 | 17 | A.  Well, it depicts several things.  First of all, it depicts |
| 04:31:08 | 18 | executions for non-iceberg large and group orders.  And, you |
| 04:31:18 | 19 | know, for gold, you can see that there are 12,114 executions; |
| 04:31:25 | 20 | and for silver, 3,819 executions. |
| 04:31:32 | 21 | Another -- |
| 04:31:32 | 22 | Q.  Let me stop you, Professor, so that everyone understands. |
| 04:31:35 | 23 | So, these are all of Mr. Pacilio's aggressive, large |
| 04:31:39 | 24 | iceberg -- I'm sorry, non-iceberg orders that fit the |
| 04:31:43 | 25 | government's definition of what large or group is for the |

Fischel - direct

1759

04:31:46   1   entire period of March 2009 to October 2014?

04:31:51   2   A.   Correct.

04:31:51   3   Q.   Okay.

04:31:52   4        And, so, for gold, counting up -- you looked at all

04:31:56   5   of them -- there's 12,114 executions that occurred?

04:31:59   6   A.   That's correct.

04:32:00   7   Q.   For silver, 3,819 executions?

04:32:03   8   A.   That's right.

04:32:04   9   Q.   Okay.

04:32:04   10       What's the next thing that this depicts?

04:32:07   11   A.   The next thing that it depicts is how fast, how -- the

04:32:14   12   executions occurred.  And, so, as I said, a minute ago, the

04:32:22   13   aggressive non-iceberg large and group orders, they execute

04:32:29   14   immediately because they cross the spread.  That's a

04:32:32   15   marketable order that crosses the spread.  And, so, that's

04:32:37   16   immediate execution.

04:32:38   17   Q.   And let me just stop you.

04:32:39   18       Is that what's depicted in green in both of these bar

04:32:43   19   graphs for the gold and silver markets?

04:32:44   20   A.   Correct.

04:32:45   21   Q.   All right.

04:32:46   22       So, the green shading shows a large order has crossed

04:32:49   23   the spread, and this shows, what?  What does the green show?

04:32:53   24   A.   It shows that it executes immediately.  And that's the

04:32:59   25   definition of what the type of order is.  That's what an

Fischel - direct

1760

04:33:03  1  aggressive order means.  So, it executes instantly.

04:33:10  2  Q.  Okay.

04:33:10  3       And, then, what does the blue bar in each of these

04:33:13  4  show?

04:33:13  5  A.  Yeah, the blue bar, if you look at the legend on the

04:33:17  6  bottom, the blue bar is executions that occur in less than

04:33:26  7  half a second.

04:33:29  8  Q.  Okay.

04:33:29  9       And for the gold market, what are we seeing depicted

04:33:34  10  by the blue bar for all of Mr. Pacilio's aggressive large and

04:33:39  11  group orders?

04:33:40  12  A.  Well, it looks like a little bit less than half of Mr.

04:33:50  13  Pacilio's aggressive, non-iceberg large and group orders

04:33:59  14  executed within less than half a second.  Again, these are, in

04:34:06  15  effect, the parts of the aggressive orders that did not

04:34:11  16  execute instantly.  They're basically the leftover part that I

04:34:15  17  described in my example earlier.

04:34:18  18  Q.  Okay.

04:34:19  19       And for the silver?

04:34:21  20       So, this -- let me interrupt you.

04:34:22  21       So, these are all the executions that, once the large

04:34:25  22  orders just sitting there, are executed in half a second or

04:34:29  23  less?

04:34:30  24  A.  Right.

04:34:31  25       And the other thing that's significant about that is

Fischel - direct

1761

04:34:35    1    not just the speed of execution, but in order for those

04:34:45    2    orders -- excuse me, for those contracts -- to execute, they

04:34:52    3    have to be basically hit by traders on the opposite side of

04:34:58    4    the market, not on the same side of the market, as in the

04:35:03    5    government's four-part -- four-step fraudulent scheme.  On the

04:35:09    6    opposite side of the market.

04:35:10    7            In other words, all the contracts that execute above

04:35:17    8    green, under the logic of the government's four-step

04:35:22    9    fraudulent scheme, should never execute because these are --

04:35:27   10    if the aggressive order shocks the market, then the only

04:35:36   11    contracts that should -- the only response from traders should

04:35:41   12    be to keep trading on the same side of the market, the front

04:35:46   13    running strategy.

04:35:47   14            But all of these executions that are in blue and

04:35:51   15    above blue only occur because those are resting orders that

04:35:56   16    are then hit by traders on the opposite side of the market.

04:36:02   17    Again, what's completely left out of the government's

04:36:06   18    four-step fraudulent scheme.

04:36:08   19    Q.  Okay.

04:36:08   20            Now, in the blue bar then, who's ever hitting these

04:36:15   21    orders has to be able to do so with the ability to trade in

04:36:18   22    less than half a second; is that right?

04:36:20   23    A.  That's right.

04:36:20   24    Q.  Okay.

04:36:21   25            And, then, what does the remaining bars show, very

Fischel - direct

1762

04:36:25  1    quickly, please?

04:36:26  2    A.   Just executions within either half a second to one second

04:36:37  3    or one to five seconds or executions greater -- that occur in

04:36:42  4    a period greater than five seconds.

04:36:44  5    Q.   Okay.

04:36:46  6            MR. MENCHEL:   Abbie, can you put that down, please,

04:36:48  7    and can you go to Defense Exhibit 812 now in evidence.

          8    BY MR. MENCHEL:

04:37:02  9    Q.   Now, how is this Defendants' Exhibit 812 different than

04:37:07  10   the last exhibit we just looked at?   Because it looks awfully

04:37:11  11   similar.

04:37:11  12   A.   It's different because these are not aggressive -- this is

04:37:16  13   an exhibit not dealing with aggressive orders but just with

04:37:21  14   resting -- large, resting, non-iceberg orders.

04:37:25  15   Q.   Okay.

04:37:26  16           So, in the government's case where we saw all those

04:37:29  17   Episodes 1 through 72, this is the scenario where a large

04:37:34  18   resting order is placed into the market; is that right?

04:37:37  19   A.   That's right.

04:37:37  20   Q.   Okay.

04:37:38  21           And, again, have you looked at all of the executions

04:37:42  22   that occurred from March 2009 to October 2014?

04:37:46  23   A.   That's right.

04:37:46  24   Q.   Okay.

04:37:47  25           And what does the data show?

Fischel - direct

1763

04:37:49  1    A.  It shows that, again, it's quite similar for the blue; is

04:37:57  2    executions that occurred in less than half a second.  That

04:38:01  3    looks, you know, for both gold and silver approximately 40

04:38:05  4    percent of the executions occurred less than half a second.

04:38:10  5         And, then, the other colors are executions at

04:38:17  6    different times, as indicated by the legend at the bottom.

04:38:21  7    Basically, the same legend as we just looked at for the

04:38:25  8    aggressive orders.

04:38:32  9    Q.  Now, the government has claimed that cancelling an order

04:38:45  10   soon after it was placed by Mr. Pacilio is not consistent with

04:38:49  11   an intent to execute that.  In other words, it's placed so

04:38:51  12   fast, canceled so fast, that suggests he never intended it to

04:38:55  13   execute in the first place.

04:38:56  14        You understand that?

04:38:57  15   A.  I do.

04:38:58  16   Q.  Do you agree with that?  The mere fact that an order by

04:39:01  17   Mr. Pacilio opposite an iceberg order is placed quickly and

04:39:05  18   canceled quickly -- I'm sorry, placed and canceled quickly --

04:39:08  19   is evidence that he did not intend for it to execute?

04:39:13  20   A.  No, that's incorrect as an inference from that type of

04:39:19  21   trading action.

04:39:19  22   Q.  Why is that?

04:39:20  23   A.  Because as you can see, executions happen so quickly --

04:39:28  24   almost half the time in less than half a second -- that even

04:39:35  25   an order that's placed and canceled immediately, that might be

Fischel - direct

1764

04:39:43　1　done really for two reasons.  One is because you know that --

04:39:50　2　the trader knows that the executions can happen immediately,

04:39:55　3　instantly.  That's one possibility.

04:39:59　4　　　　　And the other possibility, which is not mutually

04:40:02　5　exclusive, is that the cancellation protects the trader -- Mr.

04:40:09　6　Pacilio or any other trader -- from being exposed in the

04:40:14　7　market to risk in the event that the market moves in the wrong

04:40:21　8　direction.

04:40:21　9　Q.  So, the jury's heard some terminology called a free

04:40:26　10　option.  Are you familiar with that term?

04:40:27　11　A.  Yes.

04:40:27　12　Q.  And is that what you're referring to here?

04:40:29　13　A.  Basically, yes.

04:40:30　14　Q.  So, in other words, if Mr. Pacilio or anybody else places

04:40:35　15　a bid at 9 and he gets front run with somebody else coming in

04:40:40　16　at 9.10 and the price went -- so, that order is the one that's

04:40:45　17　going to execute if anyone's going to execute, right?  The

04:40:47　18　better bid?

04:40:48　19　A.  That's right.

04:40:48　20　Q.  And if the trader that had the price at 9.10 thinks the

04:40:53　21　price may drop, what is the effect of Mr. Pacilio's order

04:40:58　22　still sitting in the market if it's just resting there?

04:41:00　23　A.  The -- if the trader thinks the price is -- the front

04:41:07　24　running trader thinks the price is going to increase, they'll

04:41:09　25　benefit from the increase.

Fischel - direct

1765

04:41:10　　1　　　　If they think the price is going to fall, they will

04:41:13　　2　sell back to, in this case, Mr. Pacilio in the example at 9.

04:41:20　　3　Q.　So, he acts as an insurance policy for the person that

04:41:25　　4　front run him?

04:41:26　　5　　　　　MR. ARMSTRONG:　Objection to form.

04:41:27　　6　　　　　THE COURT:　Sustained.

　　　　　　7　BY MR. MENCHEL:

04:41:29　　8　Q.　What, in essence, is the problem with keeping a large

04:41:31　　9　resting order open once you've been front run?

04:41:35　10　A.　The problem is you don't know which way the market is

04:41:37　11　going to move.　So, either you lose the ability to get the

04:41:43　12　upside if the market moves in one direction.　And if the

04:41:46　13　market moves in the wrong direction, in effect, you bear a lot

04:41:50　14　of the loss because the front running trader just sells back

04:41:54　15　to you at the resting order that's still there.　And if you

04:42:01　16　cancel, you avoid that risk.

04:42:03　17　Q.　So, is it economically rational for a trader who has been

04:42:08　18　front run to quickly cancel to avoid being the free option to

04:42:13　19　the front running trader?

04:42:14　20　A.　Yes.　I mean, the basic idea is you can cancel at the --

04:42:22　21　very quickly at the time you place an order and you still may

04:42:25　22　get a lot of executions just because of the speed of

04:42:28　23　executions where half the executions approx- -- little bit

04:42:33　24　less than half occur in less than half a second.　And you also

04:42:37　25　avoid the risk of basically being taken advantage of by front

Fischel - direct
1766

04:42:44  1  running traders who, again, get the benefit if the price moves

04:42:47  2  in one direction and you bear a lot of the loss if the price

04:42:50  3  moves in the other direction.  And you can avoid that risk by

04:42:55  4  getting executions if they occur and cancelling to avoid the

04:43:01  5  possibility of being taken advantage of by front running

04:43:04  6  traders.

04:43:05  7  Q.  So, is what's depicted in Defendants' Exhibit 812

04:43:10  8  instances where Mr. Pacilio placed a large visible order and

04:43:14  9  nonetheless got executions?

04:43:16  10  A.  Yes, exactly.  That's exactly what it depicts.

04:43:19  11  Q.  Did you analyze the large and group orders placed by

04:43:29  12  traders other than Mr. Pacilio, Mr. Bases and Mr. Lakhan?

04:43:33  13  A.  Yes.

04:43:33  14  Q.  I'd like to show you, for your eyes only, please, Defense

04:43:37  15  Exhibit 823.

04:43:44  16       And do you recognize this exhibit?

04:43:47  17  A.  I do.

04:43:47  18  Q.  What is it?

04:43:48  19  A.  It's an analysis of large and group non-iceberg orders in

04:44:01  20  the top five levels for traders other than Mr. Pacilio, Mr.

04:44:08  21  Bases and Mr. Lakhan on the dates of the government's episodes

04:44:18  22  1 through 50 involving Mr. Pacilio.

04:44:22  23       MR. MENCHEL:  I would offer Defendants' Exhibit 823,

04:44:24  24  your Honor.

04:44:24  25       MR. ARMSTRONG:  Your Honor, could we be heard on

Fischel - direct

1767

04:44:26  1    this, please?

04:44:45  2        (Proceedings had at sidebar:)

04:44:45  3            MR. ARMSTRONG:  Your Honor, this seems pretty far

04:44:50  4    afield and irrelevant to the trading patterns and the trading

04:44:54  5    activity of the defendants in this case.  This opens the door

04:44:59  6    to a litany of issues about an untold number of other traders

04:45:03  7    performing untold strategies and unknown strategies that the

04:45:07  8    jury has no awareness of and has heard nothing about.

04:45:11  9            I think that the relevance and the probative value is

04:45:13  10   almost zero of this and substantially outweighed by the

04:45:18  11   confusion of the issues and the misleading effect that it's

04:45:21  12   going to have on the jury.

04:45:22  13           I fail to see how this proves one way or the other

04:45:25  14   the patterns that we saw in the activity of Mr. Bases and Mr.

04:45:31  15   Pacilio.

04:45:31  16           THE COURT:  Mr. Menchel?

04:45:33  17           MR. MENCHEL:  Your Honor, this exhibit shows, and in

04:45:37  18   the very same days that the government has chosen as episodes

04:45:39  19   that demonstrate Mr. Pacilio's attempt to spoof and shock the

04:45:43  20   market, there were other participants in the market behaving

04:45:47  21   in a very similar fashion, meaning placing large orders as

04:45:51  22   defined by the government and cancelling quickly and getting a

04:45:55  23   low fill ratio -- and getting low fill ratios.

04:45:59  24           The point of this chart is to show that when you

04:46:03  25   compare these traders to other traders in the market on the

Fischel - direct

1768

04:46:06  1    same days, there's nothing unusual about their trading

04:46:08  2    pattern.

04:46:16  3          THE COURT:  So, does that prove that Mr. Pacilio did

04:46:22  4    not spoof or does it prove that there were a bunch of other

04:46:25  5    traders spoofing?

04:46:26  6          MR. MENCHEL:  Well, I think that's open to cross-

04:46:29  7    examination.

04:46:29  8          THE COURT:  Objection sustained.

04:46:33  9       (Proceedings had in open court:)

         10    BY MR. MENCHEL:

04:46:50 11    Q.  Okay.  Now, Professor, we're going to move on to the

04:46:52 12    government's trial episodes that were used in this case, okay?

04:46:57 13    A.  Okay.

04:46:58 14    Q.  Did you determine if there were other trading sequences

04:47:03 15    involving Mr. Pacilio besides the 50 trial episodes in which

04:47:07 16    large visible orders were placed opposite an iceberg order?

04:47:11 17    A.  Yes, I did.

04:47:12 18    Q.  I want to show you, for your eyes only, Defense Exhibit

04:47:15 19    319.

04:47:19 20          If you need to use the binder, Professor, you can do

04:47:22 21    that, as well.

04:47:25 22    A.  Okay.  I see it.

04:47:27 23    Q.  Do you recognize it?

04:47:28 24    A.  I do.

04:47:28 25    Q.  What is it, please?

Fischel - direct

1769

04:47:29   1   A.   It's a set of the number of visible orders opposite

04:47:40   2   icebergs involving Mr. Pacilio from the period August 2008

04:47:48   3   through October 2014, where the episodes, again, involve the

04:47:56   4   government's criteria of large visible orders.

04:48:01   5          MR. MENCHEL:  I would offer it, your Honor.

04:48:03   6          MR. ARMSTRONG:  Your Honor, Court's indulgence.

04:48:06   7   There's a lot of information.  If we can just digest it for

04:48:10   8   just two seconds.

04:48:11   9          THE COURT:  Yes, go ahead.

04:48:21  10      (Brief pause.)

04:48:21  11          MR. ARMSTRONG:  Your Honor, could we be heard on

04:48:23  12   this, please?

04:48:35  13      (Proceedings had at sidebar:)

04:48:35  14          THE COURT:  Go ahead.

04:48:37  15          MR. ARMSTRONG:  Your Honor, I have a very clear

04:48:40  16   recollection -- if I'm wrong, someone can correct me -- that

04:48:45  17   your Honor restricted the coordinated activities to just the

04:48:48  18   conspiracy period because we did not allege, and we're not

04:48:52  19   trying to prove, coordination outside that period.  This seems

04:48:55  20   to go beyond that and go beyond what we're trying to prove and

04:49:00  21   the relevance of what we're trying to prove for the period of

04:49:03  22   coordination, which is that one-year period when all three

04:49:06  23   were at Bank of America.

04:49:12  24          It says in the first line that it involves a period

04:49:16  25   of 2008 to 2014, which obviously is expansive on both sides

Fischel - direct

1770

04:49:24  1    dan not relevant at all to the period in which we allege the

04:49:27  2    conspiracy with coordinated activity.

04:49:44  3            THE COURT:  Mr. Menchel, at this time, do you know

04:49:46  4    all the exhibits that you're going to use with Dr. Fischel?

04:49:51  5            MR. MENCHEL:  Yes, and they've been disclosed.

04:49:54  6            MR. ARMSTRONG:  Your Honor, we received about 200

04:49:56  7    exhibits over the last couple days.  It's been a herculean

04:50:01  8    task.

04:50:02  9            MR. MENCHEL:  That's not true.  I specifically

04:50:03  10   disclosed the exhibits we were going to use with this witness

04:50:06  11   so that you knew exactly the curated amount he'll be using.

04:50:13  12           THE COURT:  And how many is that?  How many more?

04:50:17  13           MR. MENCHEL:  Approximately ten.

          14       (Proceedings had in open court:)

04:50:31  15           THE COURT:  Ladies and gentlemen, we're going to

04:50:32  16   adjourn for the day.  There's some things that we all need to

04:50:35  17   talk about outside of your presence.

04:50:39  18           So, during the overnight break, please do not discuss

04:50:42  19   this case with anyone, including family members, including one

04:50:44  20   another, and please do not do any independent research

04:50:47  21   regarding any of the issues that you've heard discussed in

04:50:50  22   this case.

04:50:50  23           Thank you very much for your attention today.  We

04:50:53  24   will reconvene and start again at 10:00 o'clock tomorrow

04:50:56  25   morning.

Fischel - direct by Menchel

1795

1     Mr. Menchel, please proceed.

2     DANIEL FISCHEL, DEFENDANT PACILIO'S WITNESS, PREVIOUSLY SWORN,

3     DIRECT EXAMINATION (RESUMED)

4     BY MR. MENCHEL:

5     Q.  You all set?

6     A.  Yes, thank you.

7     Q.  Dr. Fischel, good morning.

8     A.  Good morning.

9     Q.  I want to talk to you now about the government's trial

10    episodes involving Mr. Pacilio, okay?

11    A.  Yes.

12    Q.  Did you determine whether there were other trading

13    sequences involving Mr. Pacilio besides the 50 trial episodes

14    in which large visible orders were placed opposite iceberg

15    orders?

16    A.  Yes.

17    Q.  And did you prepare a chart summarizing your findings?

18    A.  Yes.

19    Q.  I'd like to show you, for your eyes only, tab 9 -- I'm

20    sorry, Exhibit 319 --

21        MR. MENCHEL:  Defendants' Exhibit 319, your Honor,

22    please.

23    BY MR. MENCHEL:

24    Q.  And what is this, Dr. Fischel?

25    A.  It is --

Fischel - direct by Menchel

1796

1    Q.   If you need to use the binder --

2    A.   Yes.

3    Q.   -- for the sake of both our eyes, that's fine.

4    A.   All right.

5         It's an analysis of the total number of episodes

6    involving Mr. Pacilio where there were icebergs placed --

7    excuse me -- visible orders placed opposite icebergs and the

8    visible orders had to meet the large criteria identified by

9    the government.

10        MR. MENCHEL:  Okay.  I would offer that, your Honor.

11        THE COURT:  Any objection?

12        MR. ARMSTRONG:  No, your Honor.

13        THE COURT:  All right.  Defendants' Exhibit 319 is

14   admitted in evidence.

15        (Defendants' Exhibit No. 319 received in evidence.)

16   BY MR. MENCHEL:

17   Q.   Now, again, Dr. Fischel, there are a lot of numbers on

18   this, and for those of us that are less numerate, did you

19   prepare a graphical depiction of what's shown in Defendants'

20   Exhibit 319?

21   A.   Yes.

22   Q.   Okay.  I'd like to show you, again, just for your eyes

23   only, Defendants' Exhibit 814, please.  And there are four

24   exhibits -- I'm sorry -- four graphical depictions within

25   that.

Fischel - direct by Menchel
1797

1    Can you look at those, please.

2    Let me know when you're finished.

3    A.   I've done it.

4    Q.   Okay.  And do those four graphics accurately depict what's

5    shown numerically in Defendants' Exhibit 319?

6    A.   Yes.

7    MR. MENCHEL:  I would offer, your Honor, Defendants'

8    Exhibit 814.

9    MR. ARMSTRONG:  No objection, your Honor.  And just

10   to speed it up, we have no objection to any of the exhibits

11   Mr. Menchel mentioned earlier.

12   MR. MENCHEL:  Thank you.  Appreciate that.

13   THE COURT:  All right.

14   814 is admitted in evidence, Defense Exhibit.

15   (Defendants' Exhibit No. 814 received in evidence.)

16   MR. MENCHEL:  Please publish it, your Honor.

17   THE COURT:  It's published.

18   BY MR. MENCHEL:

19   Q.   Okay.  So, looking at the first page of Defendants'

20   Exhibit 814, Dr. Fischel, can you explain to the jury what

21   this chart depicts?

22   A.   It's a comparison of the total number of episodes where

23   Mr. Pacilio had large visible orders opposite icebergs.  And

24   it's a comparison of the total number between August 2008 and

25   October 14 -- October 2014, and a comparison of that number

Fischel - direct by Menchel

1798

1   with the number of episodes that are included in the

2   government's sample of 72 total episodes.

3   Q.  So, as I understand it, this particular graphic shows that

4   in the government's trial episodes, there are 21 that only

5   involve Mr. Pacilio on both sides; is that right?

6   A.  That's correct.

7   Q.  But in the overall data for the same time period, there

8   were actually 776 episodes?

9   A.  Involving Mr. Pacilio on both sides, that's correct.

10  Q.  Does the small sample size that's in the DOJ's -- the

11  government's trial exhibits cause concern for you?

12  A.  It does.

13  Q.  Why is that?

14  A.  Because, again, if you want to analyze trading data, you

15  can't just choose a tiny slice of trading data.  If you want

16  to analyze the effect of Mr. Pacilio's placement of large

17  visible orders opposite icebergs, you can't only look at a

18  tiny number of occasions when that occurred, as opposed to the

19  total number of when that occurred.

20  Q.  Okay.

21          MR. MENCHEL:  If we can move to the next page of this

22  exhibit, which would be page 2.

23  BY MR. MENCHEL:

24  Q.  Can you show us, Dr. Fischel, what this graphic depicts --

25  tell us, I mean.

Fischel - direct by Menchel

1799

1   A.   This is very similar to the first graph, except the

2   difference is this is a combination of Mr. Pacilio and Mr.

3   Bases, where one of them was on the visible order side and the

4   other was on the iceberg side.

5          And what it shows is that there were 608 total

6   episodes where that was the case between October -- August

7   2008 and October 2014, and only five of the 6,008 were

8   included in the government's 72 episodes.

9   Q.   And, again, sir, as an economist, does that give you

10  concern, that out of the 608 episodes where Mr. Pacilio and

11  Mr. Bases were on opposite sides of the market, the government

12  has chosen to show the jury five?

13  A.   Yes.  It raises a serious concern of what statisticians

14  refer to as selection bias.

15  Q.   What do you mean by selection bias?  What does that term

16  mean?

17  A.   Selection bias is where you reach a conclusion based on a

18  biased and unrepresentative sample of whatever the data that

19  you're looking at, and if you looked at the full set of data,

20  you would reach a different conclusion.

21  Q.   And is this term, selection bias, is it a known problem in

22  statistical and economic analysis?

23  A.   Yes.  It's one of the best known errors that can be

24  committed analyzing data, to use an unrepresentative and

25  biased sample of data.

Fischel - direct by Menchel

1800

1    Q.  Is there a colloquial name that some of us may be more

2    familiar with who are not economists and statisticians to

3    explain selection bias?

4    A.  It's frequently referred to as cherry-picking.

5    Q.  Cherry-picking?

6    A.  Cherry-picking.

7    Q.  So -- okay.  Thank you.

8            MR. MENCHEL:  Can we go to the next slide, please.

9    BY MR. MENCHEL:

10   Q.  This is Page 3 of the exhibit.  What does this represent,

11   Dr. Fischel?

12   A.  This, again, is the same idea, but this is the combination

13   of Mr. Pacilio and Mr. Lakhan.

14   Q.  And what does it show?

15   A.  It shows that, again, in the same period, from August 2008

16   to October 2014, there were 109 episodes involving Mr. Pacilio

17   and Mr. Lakhan where one of them had a large visible ice -- a

18   large visible order on one side and an iceberg on the opposite

19   side.  There are 109 episodes of that, that fit that

20   definition, and only three of the 109 were included in the

21   government's sample.

22   Q.  And does this raise the same concern about cherry-picking,

23   or selection bias?

24   A.  Yes.

25   Q.  Is three a fair and representative sample of 109 times

Fischel - direct by Menchel

1801

1    that Mr. Lakhan and Mr. Pacilio were on opposite sides of the

2    market from August 2008 to October 2014?

3    A.   No.

4    Q.   You understand that one of the things that the government

5    is doing is asking the jury to infer intent, what's inside Mr.

6    Pacilio's mind at the time that he's on another side of the

7    order of one of the other defendants or even with himself; is

8    that right?

9    A.   That's my understanding.

10   Q.   Okay.

11        And do you have an opinion about whether or not it's

12   appropriate to infer intent from a sample size as small as

13   three?

14   A.   No, particularly when a larger sample produces a very

15   different answer.

16   Q.   I think you said "no" to my question, but I want to make

17   sure the record is clear.

18        I asked if you have an opinion?

19   A.   Oh, excuse me.  Yes, I have an opinion.

20   Q.   What is that opinion?

21        MR. ARMSTRONG:  Objection, your Honor.  May we be

22   heard on this?

23    (Proceedings had at sidebar:)

24        THE COURT:  Yes.

25        MR. ARMSTRONG:  Your Honor, I think this is getting

Fischel - direct by Menchel

1802

 1   dangerously close to ultimate issue and saying that Mr.

 2   Pacilio did or did not have intent to do anything.  And that

 3   certainly was not disclosed.  And that certainly was not how

 4   Mr. Fischel was presented to us and the contours of what he

 5   would be testifying about.

 6              So, we think it's, number one, not disclosed and,

 7   number two, improper under 403.  It's the jury's job to infer

 8   the intent of Mr. Pacilio or not.

 9              MR. MENCHEL:  Let me just look at how I asked the

10   question, if I may.

11              My question was:  Do you have an opinion about

12   whether or not it's appropriate to infer intent from a sample

13   size.

14              I don't see anything wrong with that question.  I'm

15   not asking him to opine on anybody's intent.

16              And, frankly, had Dr. Venkataraman testified, he

17   would have absolutely said you can infer intent or that the

18   pattern is consistent with inferring an intent.  I'm asking

19   him the opposite question.

20              MR. ARMSTRONG:  Your Honor, that's cutting it pretty

21   thin.  He's essentially asking the jury that they can't infer

22   any intent from the pattern.

23              THE COURT:  I'm going to allow the question as asked.

24   But can you ask it precisely again.

25              MR. MENCHEL:  Yes.

Fischel - direct by Menchel

1803

1       THE COURT:  And I'm going to ask him to give a "Yes"

2  or "No" answer.

3       MR. MENCHEL:  Can he explain it after that, or no?

4  I'm just asking him why the number size is not appropriate to

5  allow an economist to infer intent from that small a size.

6       THE COURT:  And if you ask him that question, yes, he

7  can explain his answer, as long as he doesn't give an opinion

8  as to what he thinks the intent is or was.

9    (Proceedings had in open court:)

10  BY MR. MENCHEL:

11  Q.  Dr. Fischel, I just want you to stay within the confines

12  of the questions I'm about to ask you, okay?

13  A.  Okay.

14  Q.  All right.

15       Do you have an opinion about whether or not it's

16  appropriate to infer intent from a sample size as small as

17  three?  And what I want from that is a "Yes" or "No" answer.

18  Do you have an opinion?

19  A.  Yes.

20  Q.  Okay.

21       And what is your opinion?

22  A.  That it's not appropriate.

23  Q.  Why is it not appropriate to try to draw conclusions about

24  one's intent from a sample size of three?

25  A.  Because you're not looking at the full data set; and,

Fischel - direct by Menchel

1804

1  therefore, you may get the wrong answer.

2  Q.  Okay.  Thank you.

3          I think there's one final page on this exhibit.  And

4  can you -- this is Page 4, for the record, of this exhibit.

5          Can you, Dr. Fischel, tell us what this graphic

6  depicts?

7  A.  This is a total of all of the episodes involving Mr.

8  Pacilio, whether Mr. Pacilio was on both sides of the

9  transaction or in some combination with either Mr. Bases or

10  Mr. Lakhan.

11  Q.  Let me just stop you there just so -- because it doesn't

12  say that on the chart.  I want to be very precise.

13          So, in other words, these are episodes that involve

14  Mr. Pacilio and/or Mr. Lakhan or Mr. Bases?

15  A.  Correct.

16  Q.  Or himself?

17  A.  Correct.

18  Q.  Total?

19  A.  Correct.

20  Q.  All right.

21          And what does the graphic show?

22  A.  That there were 1,493 episodes involving Mr. Pacilio where

23  there was a large visible order, meeting the government's

24  definition of what a large order was, and opposite an iceberg.

25  And of those 1,493 episodes, the government included 29 in

Fischel - direct by Menchel

1805

1   their 1 -- episodes 1 to 72.

2   Q.  And, again, Doctor -- I'm sorry, Professor Fischel, what

3   is the significance of the 1,493 total episodes versus the 29

4   that the government chose?

5   A.  Again, it's just a classic example of selection bias, of

6   drawing a conclusion based on an unrepresentative and biased

7   sample of data.

8   Q.  Okay.

9           Now, I want to show you --

10          MR. MENCHEL:  And I understand there's no objection,

11  your Honor, to Defendants' Exhibit 320.

12          I would move this in evidence, your Honor.

13          THE COURT:  Defendants' Exhibit 320 is accepted in

14  evidence.

15      (Defendants' Exhibit No. 320 received in evidence.)

16  BY MR. MENCHEL:

17  Q.  What does this chart that you've prepared, Dr. Fischel,

18  show?

19  A.  This shows a number of different things:  The percentage

20  of times that some icebergs executed, the percentage of times

21  that some visible orders executed, and some other data

22  involving how quickly orders remained open before they were

23  closed.

24  Q.  And as before, have you also prepared graphical depictions

25  of what these numbers are in ways that we can see visually?

Fischel - direct by Menchel

1806

1   A.  Yes.

2   Q.  All right.

3        I'd like to show you --

4        MR. MENCHEL:  My understanding is there is no

5   objection to this, as well, your Honor.

6   BY MR. MENCHEL:

7   Q.  -- Defendants' Exhibit 815.

8        Is this one of the graphs that is shown numerically

9   in Defendants' Exhibit 320?

10  A.  Yes.

11  Q.  Can you explain to the members of the jury what this

12  shows, please.

13  A.  Yes.  This is a comparison in the full set of data what

14  percentage of the time some of the visible icebergs that were

15  placed -- visible orders, excuse me, that were placed opposite

16  icebergs executed, as compared with the percentage of times

17  that some percentage of the icebergs orders executed, again,

18  for the full data set versus what the result would be if you

19  just looked at the government data included in episodes 1 to

20  72.

21  Q.  So, let me just start first with the government's

22  episodes.

23        So, in the government's trial episodes, the 1 to 72,

24  how often does the iceberg get an execution?

25  A.  A hundred percent.

Fischel - direct by Menchel

1807

1    Q.  Okay.

2           And in the government's trial episodes, how often

3    does Mr. Pacilio get an execution on what they call the spoof

4    side, the visible side?

5    A.  4.8 percent.

6    Q.  Okay.

7           And when you go to the overall data involving Mr.

8    Pacilio when he's placing visible orders against iceberg

9    orders, how often in the overall data does Mr. Pacilio get

10   executions on the iceberg side?

11   A.  41 percent.

12   Q.  To be precise, 41.4?

13   A.  Excuse me, 41.4 percent.

14   Q.  Okay.

15          And in the visible side, the side that the government

16   is claiming you would never want to get an execution on, how

17   often does that happen?

18   A.  21 percent.

19   Q.  Okay.

20          And what can you conclude when you compare the

21   government's trial episodes to all the episodes in which Mr.

22   Pacilio, during the period of time, 2008 to October 2014, was

23   placing large visible orders opposite iceberg orders?

24   A.  You conclude, again, that if you look at a biased and

25   non-representative sample of data, you get the wrong answer, a

Fischel - direct by Menchel

1   very different answer, than if you look at the complete set of

2   data.

3           MR. MENCHEL:  Can we go to the next chart, please.

4   This would be Page 2 of Exhibit 815.

5   BY MR. MENCHEL:

6   Q.  Can you again describe for us, Dr. Fischel, what this

7   shows?

8   A.  This is, again, the same type of analysis, but as opposed

9   to Mr. Pacilio being both on the visible order side and the

10  iceberg side, this is a combination of Mr. Pacilio and Mr.

11  Bases where one was on one side and the other was on the other

12  side.

13  Q.  And using just the government's episodes, when Mr. Pacilio

14  and Mr. Bases were on one side of the market and the other was

15  on the other side, how often did the iceberg side get

16  executions?

17  A.  A hundred percent.

18  Q.  And when Mr. Bases and Mr. Pacilio were on opposite sides

19  of the market at the same time, how often did the large --

20  what they call -- spoof order get executions?

21  A.  Zero percent.

22  Q.  When you look at all of the times that Mr. Pacilio and Mr.

23  Bases were on opposite sides of the market from August 2008 to

24  October 2014, how many times did they get executions on what

25  were considered to be the spoof side?

Fischel - direct by Menchel

1809

1   A.   36.7 percent.

2   Q.   And how often did they actually get executions on what

3   they -- what the government is calling the real order, the

4   iceberg order?

5   A.   9.5 percent.

6   Q.   Dr. Fischel, what can you conclude from this graph?

7   A.   The same answer.  When you look at a biased and

8   non-representative sample of data, you get the wrong answer;

9   and you get a very different answer if you look at the full

10  set of data.

11  Q.   And if one were trying to infer intent, okay, would this

12  graph be an example of why that would be problematic?

13  A.   Yes.  It would be problematic not to look at the entire

14  set of data.

15          MR. MENCHEL:  Can we go to the next slide, please,

16  which -- I believe it's Page 3 of this exhibit.

17  BY MR. MENCHEL:

18  Q.   What does this show, please?

19  A.   This is the same analysis, but now the combination is Mr.

20  Pacilio and Mr. Lakhan.

21  Q.   Okay.

22          And you understand there's been testimony in this

23  case by Mr. Lakhan that Mr. Pacilio and Mr. Lakhan were

24  working in a coordinated fashion, as well?

25  A.   That's my understanding.

Fischel - direct by Menchel

1   Q.  Okay.

2           So, in the government's episodes, when they have Mr.

3   Lakhan and Mr. Pacilio opposite each other in the market, how

4   often does what the government calls the real or the iceberg

5   side get executions?

6   A.  100 percent.

7   Q.  And in that same -- in those same examples, how often does

8   what the government called the fake or spoof side get

9   executions?

10  A.  Zero percent.

11  Q.  Okay.

12          Now, when you look at all of the data where Mr.

13  Pacilio and Mr. Lakhan were opposite each other from August

14  2008 to October 2014, how often do they get an execution on

15  what the government's calling the fake side?

16  A.  56 percent.

17  Q.  And how often are they getting executions on what the

18  government is saying is the side they really want to get

19  executions on?

20  A.  18.3 percent.

21  Q.  Again, what can you conclude when you look at all of the

22  data instead of just the ones that were specifically selected

23  by the government?

24  A.  Same answer.  If you look at a biased and

25  non-representative sample of data, you get the wrong answer;

Fischel - direct by Menchel

1811

 1    and you get a much more accurate answer if you look at all the

 2    data.

 3    Q.  Okay.

 4          Now, you also created additional graphs using that

 5    same numerical chart that we saw before --

 6          THE COURT:  Hold on.

 7          Go ahead.

 8          MR. MENCHEL:  Okay.

 9          I wasn't sure if I was too loud or something.

10    BY MR. MENCHEL:

11    Q.  I'd like to show you now, Professor, Defendants' Exhibit

12    816.

13          MR. MENCHEL:  And my understanding, your Honor, is

14    there's no objection.  So I would move to admit that.

15          THE COURT:  Defendants' Exhibit 816 is admitted in

16    evidence.

17       (Defendants' Exhibit No. 816 received in evidence.)

18    BY MR. MENCHEL:

19    Q.  Okay.

20          So, Professor, can you again show us what it is

21    that's being depicted in Defense Exhibit 816?

22    A.  This is a comparison of how quickly orders closed within

23    five seconds -- orders were canceled within five seconds,

24    again, comparing the government's episodes 1 to 72 with all of

25    Mr. Pacilio's episodes where he was on both sides of the

Fischel - direct by Menchel

1812

1　episode, the -- placing the visible -- the large visible order

2　and the iceberg.

3　Q.  You know, Professor, I apologize.  I want to go back.  I

4　left out some questions I wanted to ask you with the prior

5　exhibits.

6　　　　　MR. MENCHEL:  Can we pull up the third page of 815 --

7　my apologies -- just as an example.

8　BY MR. MENCHEL:

9　Q.  Do these findings -- are they consistent with your prior

10　testimony about how market participants can respond to a large

11　visible order?

12　A.  Yes.

13　Q.  In what way?

14　A.  Well, if you look at, for example, the 56 percent, looking

15　at the full data set of visible orders, that means there were

16　some executions in 56 percent of the time when there was a

17　large visible order opposite an iceberg.  And based on the

18　government's claim, there should be no executions opposite a

19　large visible -- excuse me, when you place a large visible

20　order because if you remember, steps 1 through 4 where we

21　began, all of the visible orders were canceled.  There were no

22　executions.  And what -- and you can see that that's

23　consistent, zero percent in the DOJ trial episodes.  But when

24　you look at all of the data, you get a very different answer.

25　　　　　And, again, that's because, as I explained yesterday,

Fischel - direct by Menchel

1813

1  there are different types of reactions to the placement of

2  visible orders, including people who now see an opportunity to

3  transact on the opposite side of the visible order and execute

4  against those orders.

5        So, the 56 percent represents all the different

6  categories of traders, and the zero percent represents the one

7  sliver of data that the government chose to represent.

8  Q. So, looking at the actual data, is it fair to say this

9  pattern will always work like clockwork, meaning you place an

10  iceberg opposite a large visible order and, like clockwork,

11  it's always -- the market's always going to move in the

12  direction of the large visible order?

13  A. No, that's not fair.

14  Q. Because why?

15  A. Because that's not what happens. That happens some of the

16  time. That's what the government trial episodes show. I

17  mean, it's real data for the 72 episodes. But it doesn't

18  happen all the time. And the phrase, "working like

19  clockwork," suggests or means that it happens all the time.

20  But, again, based on economic literature and based on the

21  data, it doesn't happen all the time.

22  Q. All right. Thank you.

23        MR. MENCHEL: And, by the way, your Honor, I don't

24  know if I formally moved to admit 815.

25        THE COURT: You did not.

Fischel - direct by Menchel

1814

1      MR. MENCHEL:  So I'm doing it now, please.

2      THE COURT:  815 is admitted in evidence.

3    (Defendants' Exhibit No. 815 received in evidence.)

4      MR. MENCHEL:  Now let's go to 816, which I think I

5  have formally moved to admit.

6      THE COURT:  You have.

7  BY MR. MENCHEL:

8  Q.  And, I apologize, can you just summarize this again,

9  please?

10  A.  Yes.  This is, again, the same data set now with Mr.

11  Pacilio on both sides placing a large visible order and

12  opposite the iceberg.  And it's analyzing, when the visible

13  orders were closed within five seconds, how often that

14  occurred.

15  Q.  And in the government's trial episodes involving Mr.

16  Pacilio, how often did the large visible order, when it was

17  opposite an iceberg order, close within five seconds or less?

18  A.  100 percent of the time.

19  Q.  And when you looked at all of the episodes -- which were

20  776; is that right?

21  A.  That's right.

22  Q.  How often did Mr. Pacilio's large visible order cancel

23  within five seconds or less?

24  A.  36.7 percent.

25  Q.  So, if we were to invert that, approximately how often did

Fischel - direct by Menchel

1   Mr. Pacilio place a large visible order versus an iceberg

2   where he didn't -- he canceled it after five seconds or

3   longer?

4   A.  If my math is right, 63.3 percent of the time.

5   Q.  So, two-thirds of the time, approximately, he actually

6   kept the large visible order open for more than five seconds?

7   A.  That's right.

8   Q.  All right.

9           And is five seconds based on your study of the

10  market --

11  A.  No, it --

12  Q.  Well, hold on.  Let me finish the question.

13  A.  Again, it's based on the government criteria.

14  Q.  I didn't finish the question.

15          One second, please.

16  A.  Excuse me.

17  Q.  Does it also show in this chart how often the icebergs got

18  executions?

19  A.  I'm --

20  Q.  I'm sorry.  One second, please.

21      (Brief pause.)

22  BY MR. MENCHEL:

23  Q.  I'm sorry.  What I meant to ask you was:  Does this chart

24  also show the large visible order where there were icebergs

25  being executed and how often that order stayed open?

Fischel - direct by Menchel

1816

1    A.  Yes.  That's right.  I wanted to make sure I understood

2    your question.

3    Q.  Yes.  My question was poorly framed.  I apologize.

4            MR. MENCHEL:  Next slide, please.

5    BY MR. MENCHEL:

6    Q.  What does this demonstrate, Professor Fischel?

7    A.  Again, it's the same analysis, but this time with the

8    combination of Mr. Pacilio and Mr. Bases.

9    Q.  Okay.

10           And if we look at the graphical depiction on the

11   right, what does the hundred percent represent?

12   A.  It represents, in situations where there are iceberg

13   executions in the government sample, all visible orders

14   opposite icebergs were canceled within five seconds a hundred

15   percent of the time.

16   Q.  Okay.

17           And when you looked at all of the episodes in which

18   Mr. Pacilio and Mr. Bases were on opposite sides of the market

19   where there was a large visible order and there were iceberg

20   executions, how often did the large visible order stay open --

21   I'm sorry -- close within five seconds or less?

22   A.  4.9 percent of the time.

23   Q.  So, conversely, how often did an order -- a large visible

24   order opposite an iceberg where the iceberg got executions did

25   the large visible order stay open for longer than five

Fischel - direct by Menchel

1817

1     seconds?

2     A.   95.1 percent of the time.

3     Q.   And in these markets, by the way, based on your

4     understanding of the speed, how much time is five seconds?

5     A.   It's a very long period.

6     Q.   Why is that?

7     A.   Because trades either get executed or canceled very

8     quickly, prices move very quickly, time is monitored in

9     milliseconds.  It's a speed that is really hard to appreciate.

10    But with manual traders and algorithmic traders all operating

11    at the same time, the speed of both cancellations and

12    executions typically happens very quickly.

13    Q.   Thank you.

14            MR. MENCHEL:  Next page, please.

15    BY MR. MENCHEL:

16    Q.   What does this depict?

17    A.   This is the same analysis, but now the combination is Mr.

18    Pacilio and Mr. Lakhan.

19    Q.   And, so, this -- in the government's episodes, how often

20    is it that either Mr. Pacilio or Mr. Lakhan places a large

21    visible order, the iceberg gets executions, and the order

22    closes -- the visible order closes within five seconds or

23    less?

24    A.   A hundred percent of the time.

25    Q.   Okay.

Fischel - direct by Menchel

1818

1        And when you look at all the episodes involving Mr.

2    Pacilio and Mr. Lakhan, which were 109 episodes, how often was

3    it that the large visible order, after the iceberg got

4    executions, was canceled within five seconds or less?

5    A.  10.1 percent of the time.

6    Q.  And, therefore, conversely, how often was the large

7    visible order -- what the government is calling fake -- how

8    often did it stay open for longer than five seconds or more?

9    A.  89.9 percent of the time.

10    Q.  Okay.

11        I want to show you now Defense Exhibit 321, please.

12        MR. MENCHEL:  I would move this into evidence, your

13    Honor.

14        THE COURT:  Defense Exhibit 321 is accepted in

15    evidence.

16      (Defendants' Exhibit No. 321 received in evidence.)

17    BY MR. MENCHEL:

18    Q.  Dr. Fischel, what does this chart represent, please?

19        I'm sorry, I keep calling you "doctor."  It's

20    Professor Fischel?

21    A.  Yeah, it is -- I'm not a doctor, I'm a professor, so --

22    Q.  Yeah.

23        What does this show, please?

24    A.  This is, again, a similar but a different type of

25    comparison.  It's a comparison of the number of contracts

Fischel - direct by Menchel

1819

1    executed on the visible order side and the iceberg order side

2    in episodes where Mr. Pacilio was both on the visible order --

3    the large visible order side and also on the iceberg side.

4          MR. MENCHEL:  And, you know what -- apologize again.

5    But before we get there, can we go back to 816 and just

6    quickly scroll through, Abbie.

7    BY MR. MENCHEL:

8    Q.  Do these exhibits, in your opinion, Dr. Fischel, also show

9    the cherry-picking or selection?

10   A.  Professor.  Professor, please.

11   Q.  I could blame the Court because he started with it, but it

12   would really be unfair because I'm doing the same thing, too.

13          Professor, do these exhibits also show, inherent in

14   the government's selection, that it's biased and

15   cherry-picked?

16   A.  In my opinion, yes.

17   Q.  And why is that again?

18   A.  Because if you look at the government's biased and

19   non-representative sample, you get a very different answer,

20   and the wrong answer, as compared with the answer that you get

21   looking at the full sample.

22   Q.  Okay.

23          MR. MENCHEL:  Now going back to 321, please.

24   BY MR. MENCHEL:

25   Q.  Did you also prepare graphical depictions of what's shown

Fischel - direct by Menchel

1820

1   in Defense Exhibit 321?

2   A.  Yes.

3   Q.  All right.

4        I'd like to show you Defense Exhibit 817.

5        MR. MENCHEL:  I would move to admit that, your Honor.

6        THE COURT:  Defense Exhibit 817 is admitted in

7   evidence.

8     (Defendants' Exhibit No. 817 received in evidence.)

9   BY MR. MENCHEL:

10   Q.  Now, I want to move slowly on this one, Professor, okay?

11        What does the first page of Defendants' Exhibit 817

12   show, please?

13   A.  Again, these are episodes where Mr. Pacilio is both on the

14   visible order side, the large visible order side, and on the

15   iceberg side.  And it's a comparison of the number of

16   contracts traded -- the number of executions, in other

17   words -- contracts traded on the visible side and the iceberg

18   side in the government's sample of 1 to 72, as compared with

19   the full sample that I have analyzed.

20   Q.  Okay.

21        Now, I think you were here for some of the testimony

22   by one of the case agents in this case that showed charts

23   showing fill ratios.

24        Do you recall that?

25   A.  Yes.

Fischel - direct by Menchel

1821

1    Q.  Okay.

2           And what does this show in comparison to showing

3    ratios?  What does 817 show?

4    A.  This shows actual number of fills, actual number of

5    contracts executed rather than a percentage.

6    Q.  Okay.

7           And when we look at the actual number of fills, as

8    you called it, or contracts that have been executed, in the

9    government's episode on the iceberg side, how often are there

10   executions on the iceberg side?

11   A.  307 times.

12   Q.  And how often in the government's episodes are there any

13   executions on what they call the fake or spoof side?

14   A.  One time.

15   Q.  Okay.

16          Now, when you looked at all of the data for Mr.

17   Pacilio from the years August 2008 to October 2014, in

18   actuality, sir, how many executions does Mr. Pacilio get on

19   what the government is calling the fake side, the side he

20   never wants to get filled on?

21   A.  4,117.

22   Q.  And on the iceberg side, how often does he get actual

23   fills?

24   A.  4,592 times.

25   Q.  I'm not so great at math either, but am I right that

Fischel - direct by Menchel

1822

1     approximately -- the visible side -- what the government's

2     calling the fake side -- is approximately 90 percent of the

3     iceberg side?

4     A.   That looks about right.

5     Q.   And in the government's episodes, it's about 3 percent --

6     .3 percent?  I'm sorry.

7     A.   Yeah, it's less than 3 percent.

8     Q.   It's .3 percent?

9     A.   Right.  That's right.

10    Q.   Do you think the government's episodes, therefore, are

11    fairly representative of what's going on in the broader

12    trading data when it comes to Mr. Pacilio when he places

13    visible contracts opposite icebergs?

14    A.   No, I don't.

15    Q.   Does this suffer from any type of a bias that's known in

16    the literature and in the academic study of statistical and

17    economic analysis?

18    A.   Yes.  This would be a classic -- really an extreme form --

19    of selection bias.

20         MR. MENCHEL:  Let's go to the next chart, please.

21    BY MR. MENCHEL:

22    Q.   What does this depict, Professor Fischel?

23    A.   This is the same analysis, but when -- this time it's when

24    Mr. Pacilio was on one side and Mr. Bases is on the other

25    side.

Fischel - direct by Menchel

1823

1   Q.  Okay.

2         And in the government's episodes 1 through 17, how

3   often do either Mr. Bases or Mr. Pacilio get an execution on

4   the iceberg side?

5   A.  18 times.

6   Q.  And in the government's selected episodes, how often does

7   either Mr. Pacilio or Mr. Bases get an execution on what they

8   call the spoof or fake side?

9   A.  Zero times.

10  Q.  Now, when you go to the broader data, sir, and you look at

11  all the times that Mr. Bases and Mr. Pacilio were opposite one

12  another from August 2008 to October 2014, how often are the

13  visible orders actually getting executions?

14  A.  14,888 times.

15  Q.  And how often are the icebergs executing?

16  A.  5,759 times.

17       MR. MENCHEL:  Next slide, please.

18  BY MR. MENCHEL:

19  Q.  What does this depict, sir?

20  A.  Again, the same analysis -- same comparison, but this time

21  where Mr. Pacilio is on one side and Mr. Lakhan is on the

22  other side.

23  Q.  And in the government's episodes, what happens when Mr.

24  Pacilio is on one side and Mr. Lakhan is on the other side

25  when it comes to the iceberg side?

Fischel - direct by Menchel

1824

1   A.   There are 35 executions.

2   Q.   And when it comes to the side that the government is

3   calling a spoof or fake order, how often are executions

4   occurring?

5   A.   Zero.

6   Q.   When you look at all the data from August 2008 to October

7   2014 in which Mr. Pacilio and Mr. Lakhan were opposite each

8   other, one with an iceberg and one with a visible order, how

9   often does either one of them get an execution on what the

10  government has referred to as the fake or spoof side?

11  A.   3,919 times.

12  Q.   And how often does either Mr. Lakhan or Mr. Pacilio get an

13  execution on what the government says is the only side they

14  really want executions on?

15  A.   1,759 times.

16  Q.   What does this chart tell you about the selection that the

17  government used in its 72 episodes that was presented to the

18  jury in this case?

19  A.   Again, it's a biased and non-representative sample of the

20  relevant data.

21          MR. MENCHEL:   Next slide, please.

22  BY MR. MENCHEL:

23  Q.   What does this depict?

24  A.   Again, this is the total involving all of the different

25  combinations involving Mr. Pacilio, where he was on both

Fischel - direct by Menchel

1825

 1    sides, on the large visible order side and on the iceberg

 2    side, or where he was in some combination with either Mr.

 3    Bases or Mr. Lakhan; adding all those together.

 4    Q.   And can you walk us through what it shows, please?

 5    A.   Well, if you look at the government data in Exhibit --

 6    their episodes 1 to 72, there were 360 executions on the

 7    iceberg side and one on the large visible order side.  But if

 8    you look at all the data, there were 22,924 executions on the

 9    large visible order side and 12,110 executions on the iceberg

10    side.

11    Q.   Okay.

12         So, all told, looking at all of these charts, are

13    they relevant to your opinion concerning whether the trial

14    episodes that the government selected are representative of

15    the trading sequences involving Mr. Pacilio in which large

16    visible orders were placed opposite iceberg orders?

17    A.   I do not believe they were representative.

18    Q.   And, again, why is that?

19    A.   Because if you compare the results in all the different

20    analyses that I've described, looking at just the data from

21    the government's episodes 1 to 72, and you compare that with

22    the entire set of data, you get a very different answer.

23    Q.   Now, you previously testified, I think, about your

24    analysis of Mr. Pacilio's aggressive orders; am I right?

25    A.   Correct.

Fischel - direct by Menchel

1826

1    Q.  And to remind the jury again, an aggressive order is an

2    order that actually crosses the spread to get instant

3    executions?

4    A.  Correct.

5    Q.  Were some of the large visible orders that Mr. Pacilio

6    placed opposite an iceberg order?

7    A.  Yes.

8    Q.  And did the -- I'm sorry, did the government's trial

9    episodes include any visible iceberg episodes in which Mr.

10   Pacilio placed an aggressive visible order?

11   A.  No.

12   Q.  Is that relevant to your opinion and testimony in this

13   case?

14   A.  Yes.

15   Q.  How so?

16   A.  Because when you place an aggressive visible order, you

17   want to get an execution.  You know you're going to get an

18   execution.  And to the extent that the four-step alleged

19   fraudulent scheme of the government has, for all practical

20   purposes, no executions on the large visible side, to leave

21   out a set of transactions where you know you're going to get

22   executions when you place the order, again, to me, is a form

23   of selection bias.

24   Q.  Now, there was a nice woman named Dr. Garibotti who

25   testified from AGI in this case.  You're familiar with AGI?

Fischel - direct by Menchel

1827

```
 1   A.  I am.

 2   Q.  Analysis Group?

 3   A.  Yes.

 4   Q.  And she testified that in the DOJ trial episodes, the

 5   government's episodes, she was asked about what something

 6   tended to happen.  And she said that the iceberg orders tend

 7   to be executed, and the visible orders tend not to be

 8   executed.

 9        You're aware of that testimony?

10   A.  I am.

11   Q.  Okay.

12        In your opinion, does Dr. Garibotti's observation,

13   that fact alone, support the government's position that Mr.

14   Pacilio did not intend his visible orders to be executed and

15   placed them because he expected that his large iceberg orders

16   would get executions instead?

17   A.  Does not.

18   Q.  Why not?

19   A.  Because it's a mischaracterization of the data.

20   Q.  When you look at all the data?

21   A.  When you look at all the data.

22   Q.  When you look at just the government's data, it's

23   accurate, right?

24   A.  Well, again, that's the selection bias.  But, yes, if you

25   looked at the wrong set of data, you would get that answer.
```

Fischel - direct by Menchel

1828

1   Q.  In your opinion, do the data for all the visible orders

2   opposite iceberg orders support the government's claim

3   regarding the alleged fraudulent scheme in this case?

4   A.  In my opinion, all the data, if you look at it, does not

5   support the four-step alleged fraudulent scheme in this case.

6   Q.  And why is that?

7   A.  Because in the four-step fraudulent scheme, the icebergs

8   always ind- -- always execute; the large visible orders never

9   execute.  And when you look at all the data, that clearly is

10  wrong.  That's not a fair description of the result that you

11  get if you look at all the relevant data.

12  Q.  So, in your opinion, is it appropriate to reach a

13  conclusion about what Mr. Pacilio intended when he placed

14  visible orders opposite iceberg orders from a

15  non-representative sample of trading episodes?

16  A.  My opinion, it's not appropriate.

17  Q.  Why not?

18  A.  It's really just the same answer.  If you're trying to

19  draw a conclusion from a biased and non-representative sample

20  of data, you're going to draw the wrong conclusion relative to

21  the conclusion that you would reach if you looked at the full

22  set of data.

23  Q.  Okay.

24          Now, I'd like to ask you some questions about the

25  government's exhibits concerning trial episodes 1 to 50.

Case: 1:19-cr-00669 Document #: 439-1 Filed: 10/29/21 Page 143 of 299 PageID #:7745
Fischel - direct by Menchel
1829

1          MR. MENCHEL:  And if we can pull up, please,

2    Government Exhibit 1.

3          And this is an example.  If we can go to Page No. 8,

4    please.

5    BY MR. MENCHEL:

6    Q.  Do you understand that all of the trading episodes that

7    were included in Government Exhibit 1 in which Mr. Pacilio

8    placed visible orders fit the pattern of the government's

9    four-step fraudulent scheme?

10   A.  Yes, that's my understanding.

11   Q.  Does that change your opinion about what you can infer

12   from the data?

13   A.  No.

14   Q.  Why not?

15   A.  Really for the same reason, that all of these type of

16   graphs are all based on a biased and non-representative sample

17   of data; and if you calculated or constructed the exact same

18   graphs on a full set of data, again, you would reach a

19   different conclusion.

20   Q.  Now, in this example, Mr. Pacilio placed a large visible

21   contract to sell 225 contracts.

22          Do you see that?

23   A.  Yes.

24   Q.  And then he canceled it, or he kept it open for only .733

25   seconds?

Fischel - direct by Menchel

1830

1  A.  Correct.

2  Q.  Okay.

3       And he didn't get any executions?

4  A.  Correct.

5  Q.  Can you explain, from an economic standpoint, what would

6  be a reason why a trader would place a large visible order and

7  then cancel it relatively quickly?

8       MR. ARMSTRONG:  Objection, your Honor.  Could we be

9  heard on this, please.

10     (Proceedings had at sidebar:)

11     MR. ARMSTRONG:  Your Honor, I believe this goes

12 beyond the scope of what Mr. Fischel was disclosed to be

13 testifying about.  There was nothing in the disclosure about

14 Mr. Fischel opining about specific episodes.  It was more just

15 general trends in the trading data and what the general trends

16 show or do not show.

17     MR. MENCHEL:  I could draw a hypothetical one.  I'm

18 not really sure it changes anything.  The point is to show

19 that there are economic reasons why a trader would quickly

20 place and cancel an order in these markets.

21     MR. ARMSTRONG:  Your Honor, it goes to the same

22 deficiency, that Mr. Fischel was not disclosed to be talking

23 about what hypothetical reasons traders do or do not cancel

24 trades.  He was disclosed to be talking about the patterns and

25 what he can see or not see in the patterns, not the reasons

Fischel - direct by Menchel

1831

1       for why traders do certain things.

2                THE COURT:  All right.

3                I need to find the disclosure.  So, we'll do it at a

4       break.

5          (Proceedings had in open court:)

6                THE COURT:  Ladies and gentlemen, at this time, we

7       will take our morning break, and so we'll break for

8       approximately ten minutes.  Thank you.

9          (Jury out.)

10               THE COURT:  Professor Fischel, you may step down.

11               THE WITNESS:  Thank you, your Honor.

12               MR. MENCHEL:  I'll need a moment, as well, your

13      Honor, if that's okay.

14               THE COURT:  That's fine.

15               Why don't we just take a quick break, and then we'll

16      come back and talk about this.

17         (Brief recess.)

18               THE COURT:  Mr. Menchel?

19               MR. MENCHEL:  First of all, I would point out that I

20      do think --

21               THE COURT:  Hold on for one second.

22               MR. ARMSTRONG:  Your Honor, I just want to make one

23      clarification.  I'm not jumping in front of Mr. Menchel.

24               We do plan to talk about, on cross-examination with

25      Professor Fischel, specific episodes.  So, you know, just to

Fischel - direct by Menchel

1832

 1  be fully transparent to the Court, we don't want to be, you

 2  know, having it both ways, because we are going to get into

 3  specific episodes with him on cross.  So, just to let the

 4  Court know about that.

 5          THE COURT:  Okay.

 6          But we're talking about the question of why traders

 7  can -- reasons that traders might cancel orders quickly,

 8  right?

 9          MR. MENCHEL:  Yeah.

10          THE COURT:  That was the question.

11          And, so, does the government still maintain its

12  objection to that question?

13          MR. ARMSTRONG:  I think so, your Honor.

14          THE COURT:  Go ahead, Mr. Menchel.

15          MR. MENCHEL:  Well, I think, two things.

16          One, I think it is fairly covered by the disclosure

17  on -- of May 11th, 2021, on Page 3, first middle -- first full

18  paragraph, middle of the page:  "Professor Fischel is expected

19  to testify that because traders respond quickly to changes in

20  market conditions, modern electronic markets are routinely

21  characterized by high order cancellation rates."

22          So, he's going to talk about the changes in market

23  conditions and why traders would opt to trade.

24          Also, there's been a lot of testimony elicited in the

25  government's case from virtually every witness -- from agents,

Fischel - direct by Menchel

1833

1     from other traders -- about going into these moments and

2     saying, what happened from here to here?  Was there anything

3     new -- okay -- to suggest to this jury that there would have

4     been no reason to place an order and quickly cancel it.

5          So, even if it had not been disclosed, and I would

6     respectfully submit this is sufficient, it's fair response to

7     what the government has injected into this case.  And like any

8     other witness we could call, I think he'd be entitled to say

9     that.

10         THE COURT:  All right.

11         So, I think it's fairly disclosed, to the extent that

12    Professor Fischel is going to talk about the fact that market

13    conditions might cause a trader to withdraw trades or cancel

14    trades.  I was worried that you were going to have him testify

15    as to various trading strategies.

16         MR. MENCHEL:  No.  Well, let me be clear about that.

17    He's going to say two things.  Not a specific strategy, no.

18    He's going to say, one, changes in market conditions can cause

19    a trader to change; and, two, elaborate on the point we talked

20    about yesterday, this free-option notion of not -- not being

21    the insurance for the other trader is one of the reasons why

22    you want to get out.

23         THE COURT:  Any objection to those two points?

24         MR. ARMSTRONG:  Your Honor, I think that

25    generalizations and blanket statements about reasons why

Fischel - direct by Menchel

1834

1    someone could potentially do something are fine, and we would

2    have no objection to that, as long as it is untethered to what

3    Mr. Pacilio was doing when he was canceling his trades.

4    That's the distinction.

5              MR. MENCHEL:  That's fine.  I'm really just using

6    this as a demonstrative.  I'm not getting into a specific

7    moment to say this is what must have been in his mind.  It's

8    just an example of why any trader, Mr. Pacilio or anybody,

9    would actually do what's being shown in that graph.  That's

10   all.

11             THE COURT:  All right.

12             Well, why don't you just ask him the questions

13   untethered from the charts.

14             MR. MENCHEL:  You're saying I can't use the chart?

15             THE COURT:  Right.  You can draw your own chart if

16   you want.  But given the fact that the government -- I think

17   that to use this demonstrative and to have Professor Fischel,

18   who is qualified as an expert, answer questions about the

19   chart along the lines of what you've done, which is a general

20   question, I think the jury might misinterpret that to mean

21   that it applies specifically to Mr. Pacilio.

22             MR. MENCHEL:  Okay.

23             THE COURT:  Okay?

24             MR. ARMSTRONG:  Your Honor, could we just be heard on

25   one small issue very quickly.

Fischel - direct by Menchel

1835

1    I think your Honor was clear and the parties were

2  clear that there would be no contact with the witness by the

3  attorneys last night.  I think that there was testimony that,

4  in fact, there was contact and there was discussion.

5    So, we would respectfully request an opportunity to

6  question Mr. Fischel about those conversations outside the

7  presence of the jury.

8    THE COURT:  I think the only one conversation with

9  what Mr. Menchel said he was going to tell him, which is to

10  move things along.

11    MR. MENCHEL:  I told him I thought the Judge was

12  getting aggravated with the pace, and we should tighten up the

13  questions --

14    THE COURT:  And --

15    MR. MENCHEL:  -- and answers.

16    THE COURT:  -- I think we all knew that.  And there

17  was no objection at the time.  And I'm grateful that

18  Mr. Menchel did that.  So, that request is denied.

19    All right.  Let's bring the jury in.

20    (Brief pause.)

21    MR. MENCHEL:  We need to get Professor Fischel.

22    THE COURT:  Yes, that would be helpful, too.

23    MR. McGILL:  I will get him.

24    MR. MENCHEL:  Sorry.  I didn't realize he wasn't

25  here.

Fischel - direct by Menchel

1836

1      (Jury in.)

2              THE COURT:  So, ladies and gentlemen of the jury, we

3      will go until about 11:40, at which point you'll be escorted

4      down for your Friday COVID test.

5              Please proceed.

6      BY MR. MENCHEL:

7      Q.  Professor, before the break, we were talking about the

8      episodes -- the 72 episodes that the government chose in this

9      case.

10              Have you had a chance to look at those?

11     A.  Yes.

12     Q.  And in general, do those episodes show quick cancellations

13     occurring on the large visible side; Mr. Pacilio's placing an

14     order and then quickly canceling it?

15     A.  Yes.

16     Q.  I want to draw out a diagram of just what would be an

17     example.

18              MR. MENCHEL:  If I could have the Elmo, please, your

19     Honor, or the document.

20              What do you guys call it in here, document --

21              THE COURT:  Document camera.

22              MR. MENCHEL:  Okay.  I've heard it called Elmo.  I've

23     heard it called different things.  The document camera.

24     BY MR. MENCHEL:

25     Q.  I want you to just assume any trader placing a large

Fischel - direct by Menchel

1837

1   visible order on the sell side, say, for a hundred contracts.

2          K means contracts.  You understand that?

3   A.  Yes.

4   Q.  Okay.

5          And they're right here at the best offer, okay?  I

6   want you to assume that --

7   A.  Okay.

8   Q.  -- all right?

9          And the trader then decides within less than a second

10  to cancel that order without any executions.

11         Do you see that?

12  A.  Yes, I see that.

13  Q.  All right.

14         What would be economic reasons, based on your

15  understanding of the market, of why a trader would place a

16  large visible order and then quickly cancel it within less

17  than a second?

18  A.  Well, one reason might be that there were intervening

19  events in that second that caused the trader to decide that --

20  no longer wanted to keep the offer open.

21  Q.  Okay.

22         And I think you also talked yesterday about, and I

23  might have used the term, "free option."  Do you recall that

24  testimony?

25  A.  Yes, I do.

Fischel - direct by Menchel

1838

1  Q.  Okay.

2         And I'm not -- I think I said the jury might have

3  heard that term, and I might have been wrong about that.  So,

4  I want to talk about that a little bit more.

5         Can you explain again to the members of the jury what

6  would be another reason why a trader, after placing a large

7  visible order, would want to get out of that quickly?

8  A.  Well, again, this is a market in which prices move very

9  quickly.  And placing an order and canceling it quickly, first

10  of all, does not mean that there won't be executions because

11  executions can happen instantaneously.  But whether or not

12  instant -- whether or not executions can occur, the trader

13  might not want to leave an offer outstanding because the

14  trader might want to protect himself or herself against the

15  possibility of prices moving in the wrong direction.

16         And the way to protect yourself is to limit the time

17  that the offer is open because if you limit the time that the

18  offer is open, you're not providing what was referred to

19  yesterday as a free option to other traders to execute against

20  you if it's in their interest to do so when it's not in your

21  interest to continue to be willing to trade.

22  Q.  All right.

23         So I want to draw something and maybe try to explain

24  this a little bit easier.

25         So, let's assume that the bid, the best bid at this

Fischel - direct by Menchel

1839

1  point, is $9, okay?

2  A.  Okay.

3  Q.  The best sell is $10.  So, there's a spread of $1 between

4  the best bid and the best sell or best ask, right?

5  A.  Okay.

6  Q.  Or best offer?

7  A.  Okay.

8  Q.  And a trader places an offer to buy of 9.20.  This now

9  becomes the best bid.

10      Do you see that?

11  A.  Yes.

12  Q.  And let's assume that another trader who is able to act

13  really fast jumps ahead at 9.30, and there were willing

14  sellers in the market.  Which price is more attractive to the

15  seller, the $9.20 or the $9.30?

16  A.  $9.30 obviously.

17  Q.  Okay.

18      So, this -- this becomes the executed order

19  (indicating).

20      You testified yesterday about one of the articles

21  that you reviewed and the concept of front-running.  Do you

22  recall that?

23  A.  Yes.

24  Q.  Would this be an example of being front-run, one trader by

25  another?

Fischel - direct by Menchel

1  A.  Yes, that is what front-running is in this context.

2  Q.  All right.  Now, if the prices continue to rise, let's say

3  it goes up to 9.75, whatever it is, as the price goes up, the

4  trader that purchased this at $9.30, if they want to sell it,

5  they're going to make some good money, right?

6  A.  That's right.

7  Q.  Right.

8         Now, if this order is still out on the market while

9  the prices continue to go up (indicating) but then the trader

10  who bought it at 9.30 suspects a trend of the market price

11  going down, what does the $9.20 order that's just left sitting

12  there do for the trader who bought it at $9.30?

13  A.  It provides a free option, sort of an insurance policy to

14  limit their loss to a very small amount in ways that would not

15  be possible if the order that was placed at 9.20 was canceled.

16  Q.  Okay.

17         And the longer that order is just sitting there, the

18  more the possibility exists for that order; is that correct?

19  A.  The bigger the risk, correct.

20  Q.  Okay.

21         Now, are you familiar, based on your experience in

22  studying markets, a concept called fill-and-kill orders?

23  A.  Yes.

24  Q.  What is that?

25  A.  A fill-and-kill order is an order that is placed that will

Fischel - direct by Menchel

1841

1 be canceled immediately after there is a partial execution or

2 not.

3 Q.  So, in going to yet one more example, let's assume that

4 there are ten contracts on the sell side for $10, okay?

5 A.  Yes.

6 Q.  And a trader decides to place a fill-or-kill order for 20

7 contracts -- so, it's a fill and kill -- I said "or" but I

8 meant "and" -- for 20 contracts at this time for this price of

9 $10.  There's only ten contracts available, but the trader

10 wants 20 contracts.  They placed it as a fill and kill.  What

11 will happen?

12 A.  Ten contracts would be filled, and the remaining ten will

13 be canceled.

14 Q.  How quickly?

15 A.  Instantly.

16 Q.  And what would be a reason, an economic reason, why a

17 trader would place a fill-and-kill order where they only got

18 ten, but they were asking for 20?

19 A.  The same reason they don't want to be stuck in the market

20 with an open order where they don't know which way prices are

21 going to move and other traders have the ability to take

22 advantage of them.

23 Q.  And what's the speed of a fill and kill?

24 A.  Could be, you know, some fraction of a second.

25 Q.  It's instantaneous?

Fischel - direct by Menchel

1842

 1    A.  Right.

 2    Q.  What's there is there, and the rest is gone?

 3    A.  Right.

 4    Q.  Okay.

 5         Are these types of orders commonly placed in these

 6    markets?

 7    A.  Yes.  It's sort of a routine option that traders have.

 8    Q.  Okay.

 9         MR. MENCHEL:  One second, please, your Honor.

10        (Brief pause.)

11    BY MR. MENCHEL:

12    Q.  I want to show you Defendants' Exhibit 192.

13        MR. MENCHEL:  My understanding is there was no

14    objection, your Honor, to this.

15         If we could switch over.

16        THE COURT:  Defendants' Exhibit 192 is admitted in

17    evidence.

18       (Defendants' Exhibit No. 192 received in evidence.)

19        MR. MENCHEL:  Can you publish that, please, your

20    Honor.

21    BY MR. MENCHEL:

22    Q.  What is this exhibit, Professor Fischel?

23    A.  This is an exhibit which documents changes in market

24    conditions between the time of the entry of an order by Mr.

25    Pacilio and a cancellation by Mr. Pacilio for the questioned

Fischel - direct by Menchel

1843

1    trades that are contained in the government's 1 to 72

2    episodes.

3    Q.  Okay.

4         And it goes on for -- this is like a spreadsheet that

5    goes on for several pages?

6    A.  Correct.

7    Q.  All right.

8         And this is the 1 to 72 episodes that the government

9    chose?

10    A.  That's right.

11    Q.  All right.

12         I just want --

13    A.  That Mr. Pacilio was involved in.

14    Q.  Only Mr. Pacilio?

15    A.  Correct.

16    Q.  Okay.

17         MR. MENCHEL:  I'm getting a little bit of feedback

18    here.

19    BY MR. MENCHEL:

20    Q.  I just want to pick a couple here.  If we can go to No.

21    26.

22         MR. MENCHEL:  Abbie, if you can highlight the first

23    row there, please.

24    BY MR. MENCHEL:

25    Q.  So, 26 refers to the episode that's in the DOJ's episodes;

Fischel - direct by Menchel

1844

1     is that right?

2     A.  Yes, that's right.

3     Q.  Okay.

4          And what does this data show?

5     A.  It shows that this was an order that was open for, under

6     the duration column, 3.486 seconds.  And it shows what

7     happened during those 3.486 seconds in terms of changes in

8     market conditions, the last three columns on the exhibit.

9     Q.  And what does that tell you?

10    A.  It tells you that for that 3. -- during that 3.486

11    seconds, there were 212 market updates, 63 trades and 98

12    contracts traded.

13    Q.  And how is the fact that all this activity is going on in

14    the market in literally milliseconds relevant to your opinion

15    here?

16    A.  It's relevant because it demonstrates that a lot of times

17    contracts are traded in a very short period of time, not

18    because of a pre-existing plan to cancel the contract, but

19    rather because events changed.  Events change very rapidly in

20    this market, and this is a good example of what happened in

21    this -- within a 3.486-second period.

22    Q.  Now, Professor, we're getting to the end of your

23    testimony.

24          You previously testified that there were many

25    visible/iceberg episodes involving Mr. Pacilio with different

Fischel - direct by Menchel

1845

1    outcomes?

2            Do you recall that?

3    A.  Yes.

4    Q.  Have you prepared an exhibit providing some examples of

5    these episodes?

6    A.  Yes.

7            MR. MENCHEL:  I'd like to admit, your Honor,

8    Defendants' Exhibit 193.  I understand there's no objection.

9            THE COURT:  Defendants' Exhibit 193 is admitted in

10   evidence.

11       (Defendants' Exhibit No. 193 received in evidence.)

12           MR. MENCHEL:  And, Abbie, if you could go, please, to

13   the episode September 22nd, 2009.

14   BY MR. MENCHEL:

15   Q.  Are you familiar with this example?

16   A.  Yes.

17   Q.  Now, just so the jury understands, these are charts that

18   you and your folks at Compass Lexecon prepared that look, at

19   least graphically, similar to the government's examples in

20   terms of how they're laid out in format; is that right?

21   A.  That's correct.

22   Q.  And can you explain to us, just using this -- I'm not

23   going to walk through probably more than three or four of

24   these.  But can you explain, by using this one as an example,

25   what this episode depicts and how it's relevant to your

Fischel - direct by Menchel

1846

1    opinion?

2    A.  All right.

3         Well, this is an example chosen from the larger set,

4    the more complete set of transactions that I've been

5    testifying about.

6    Q.  And does it start with the placement of an iceberg order?

7    A.  Yes.  That's the green line on the top --

8    Q.  What happened?

9    A.  -- and the green box.

10        Well, there was an order to sell 25 contracts.  This

11   is the iceberg order.  And, actually, I think it's helpful to

12   also just flash down to the bottom, as well.

13   Q.  What part do you want to look at?

14   A.  I'm sorry, the red line, the visible order.

15        There's a visible order that's placed to buy 105

16   contracts during the time that the iceberg order is open.  In

17   all of the government exhibits like this, what happened was

18   the iceberg filled, and the visible order was then canceled.

19        But here, if you look at the green line at the top --

20   and this is really the relevant point -- the most relevant

21   point, is even though there is a large visible order that's

22   open during the time that the iceberg order is open, what

23   happened in this example is that the iceberg did not fill.

24   The iceberg was canceled.  And that is a frequent pattern, but

25   a pattern that did not exist in any of the government's 1 to

Fischel - direct by Menchel

1847

1   72 episodes.

2   Q.  So, in this instance, were there any fills on either side?

3   A.  No.  And also relevant with respect to the visible order,

4   the visible order remained here open for more than five

5   seconds.  Again, inconsistent with the government episodes.

6   Q.  Well, why can't the government just argue, look, we just

7   picked the episodes where the spoofs happened; this is a

8   failed spoof?

9   A.  Well, I'm not going to comment on what the government can

10  argue.  But the issue is, from my perspective, is you have one

11  action in response to the placement of an iceberg.  The

12  government claims that every time there is the placement of a

13  visible order opposite an iceberg, the same thing happens like

14  clockwork, to use the government's example, that the iceberg

15  fills and the visible order is canceled.

16          And that is the pattern in the government's episodes

17  1 to 72.  But that is not the pattern -- there are many

18  patterns that exist if you look at the full set of data.

19          And the purpose of this graph designed to look

20  identical to the government graphs is to show, again, the

21  biased and non-representative sample that the government chose

22  because you can create the exact same graphs but get very,

23  very different answers if you look at the full set of data.

24  Q.  Okay.

25          Let's go to another one, please, January 4th, 2010.

Fischel - direct by Menchel

1848

1  And, again, just for clarity of the record, this is an episode

2  that Compass Lexecon constructed using the same criteria that

3  the government used; is that right?

4  A.   That's right.

5  Q.   Can you show us what's going on here, please?

6  A.   Again, the green line at the bottom is a large iceberg

7  order to buy 18 contracts.  And the -- if you look at the

8  ultimate outcome, the iceberg is not ever executed.  It's

9  canceled.

10      But this -- in this episode, if you look at the red

11  on the top, during the time that the iceberg was open, some of

12  the visible orders executed, but the iceberg canceled.  Again,

13  that's the opposite of the government's pattern, again

14  demonstrating that there are many patterns.

15  Q.   So, is this an example where Mr. Pacilio -- it's a large

16  order, right?  It's 325 contracts?

17  A.   That's right.

18  Q.   And in the government's episodes, you saw examples of

19  orders just as large?

20  A.   Correct.

21  Q.   And is this an example where, rather than pushing the

22  market away from Mr. Pacilio, the market came to him and

23  contracts were sold?

24  A.   Correct.  And the iceberg canceled.

25  Q.   And the iceberg canceled with nothing?

Fischel - direct by Menchel

1849

1   A.  Right.

2         MR. MENCHEL:  Go to the next one, please.

3   BY MR. MENCHEL:

4   Q.  This is December 15th, 2009.  What does this demonstrate,

5   Professor Fischel?

6   A.  It's really the same idea, again, of just looking at all

7   of the data but creating the same type of graphs.  You can get

8   very different answers.

9         Here, you have the green line at the top is an

10   iceberg to sell ten contracts.  The iceberg, again, never

11   executed.  No iceberg -- no part of the iceberg order was ever

12   part of an execution.  But you can see all the red at the

13   bottom, that there were 15 visible orders that were placed

14   during the time that the iceberg was open.  And some of the

15   visible orders executed.  None of the visible -- none of the

16   iceberg order executed, notwithstanding the fact that the 15

17   visible orders were all placed during the time that the

18   iceberg was open.

19         Again, a very different pattern than you can see from

20   the government's illustrations of -- in the same type of

21   graphs.

22   Q.  So, here's an example where Mr. Pacilio is placing large

23   visible orders to buy 170 contracts; and rather than the

24   market moving away to the iceberg, he's getting executions?

25   A.  That's correct.

Fischel - direct by Menchel

1850

1    Q.  Does the fact that the pattern can be just the opposite

2    have any relevance to you as to whether or not one can or

3    cannot infer the intent of what's in the trader's mind at the

4    time the trader places these orders?

5    A.  Yes, it has significance to me.

6    Q.  How so?

7    A.  Because you have all different outcomes.  You have all

8    different types of traders, all different types of situations.

9    There is no one pattern that occurs like clockwork.  You have

10   many, many different patterns; and, therefore, it is, in my

11   opinion, not correct to look at one of the many different

12   patterns and say that that is what was in the mind of the

13   trader the whole time, as opposed to just as easily saying

14   that the trader had the intent to do something else when they

15   have some other outcome.

16   Q.  Let's just do one last one.  This will be November 5th,

17   2010.

18          Can you explain to us what's going on in this one,

19   Professor?

20   A.  Again, you have the green line is the iceberg order to buy

21   25 contracts.  Again, you have a situation where the iceberg

22   is canceled even though there are large visible orders that

23   are in the market at a time that's opposite from the

24   iceberged -- the iceberg.  And, again, some of the visible

25   orders execute.  None of the iceberg executes.  Again, the

Case: 1:19-cr-00669 Document #: 439-1 Filed: 10/29/21 Page 165 of 299 PageID #:7767
Fischel - direct by Menchel
1851

1    exact opposite pattern of the four-step fraudulent scheme.

2    Q.  And I lied.  I want to do one last one.  Didn't see it in

3    my outline.

4         Let's just go to January 24th, 2011.  We have

5    prepared two versions of this.  One is a longer view, if you

6    will, and then we have a blowup within it.  So let's just

7    stick with the first one.

8         It's a little hard to tell because of all the

9    compression of the data, but what is going on here?  We'll

10   talk about it in more detail in a moment.

11   A.  Well, again, the green line is the iceberg order to sell

12   25 contracts.  And, again, no execution of the iceberg order

13   during all the time that the visible orders are placed in the

14   market.

15   Q.  Let's go to the blowup --

16        MR. MENCHEL:  Zoom out or zoom in, if you will, on

17   the next one so we can see this a little bit more carefully,

18   more closely.

19   BY MR. MENCHEL:

20   Q.  So, what is this showing us on the visible side, the side

21   that the government is claiming is a spoof?

22        MR. ARMSTRONG:  Objection, your Honor.  We're not

23   claiming this one's a spoof.

24        THE COURT:  Sustained.

25        MR. MENCHEL:  I'll withdraw it.

Fischel - direct by Menchel

1852

BY MR. MENCHEL:

Q.   What is happening on the side that is the large visible

side in this case?

A.   There is a series of orders that are placed, four visible

orders to buy 575 contracts.

Q.   Let me stop you there.  That is a huge number; is it not?

A.   Yes, that's a very large order.

Q.   Okay.

         And --

A.   Or combination of orders.

Q.   -- what happens as a result of placing that large order?

Does it move the market all the way into the iceberg?

A.   No.

Q.   What does it do?

A.   Well, the opposite.  One of the orders has executions, and

37 contracts were, in fact, executed.  But none of the iceberg

was executed.  Again, the exact opposite of the pattern of the

government's four-step alleged fraudulent scheme.

Q.   So, just to sum it up, based on all of the data that you

looked at, both the government's selected episodes and the

overall trading pattern, what are your ultimate conclusions in

this case?

A.   My ultimate conclusion basically is what I've said

numerous times, that the government's four-part -- four-step,

I should say -- alleged fraudulent scheme that it's claimed --

1    that's claimed to work like clockwork is based on a biased and

2    misleading selection of the data, a classic example of

3    selection bias and cherry-picking.  And if you look at the

4    full set of data, you reach a very different conclusion.

5    Q.  And is one able, looking at the full set of data, to come

6    up with a single reason why a trader would place a large

7    visible order opposite an iceberg?

8    A.  No, because of all the different outcomes that can occur.

9            MR. MENCHEL:  I pass the witness, your Honor.

10           THE COURT:  All right.

11           Ladies and gentlemen, at this time, we'll take our

12   lunch break.  We'll break till 1:00 o'clock.  During the

13   break, please do not discuss this case with anyone, including

14   one another.  And please do not do any independent research

15   regarding any of the issues in this case.

16           Thank you very much.

17       (Jury out.)

18           THE COURT:  How long do you think the cross will be

19   at this point?

20           MR. ARMSTRONG:  Yeah, longer than I expected

21   yesterday.  Probably hour-and-a-half.  Absolute most

22   hour-and-a-half.  Hopefully less, much less.

23           THE COURT:  Okay.

24           Will Mr. Bases' counsel have any examination?

25           MS. PORTER:  No.

Fischel - cross

1864

01:23:03  1        THE COURT:  All right.  Very good.

01:23:06  2        MR. MENCHEL:  Go get him?

01:23:07  3        THE COURT:  Anything else?

01:23:08  4        MR. ARMSTRONG:  So, your Honor, just to make sure

01:23:10  5   we're not running afoul of your Honor's guidance, can we ask

01:23:13  6   him:  You know, hypothetically, if Mr. Pacilio says that he

01:23:16  7   was spoofing the gold, would that have been relevant to your

01:23:19  8   opinion?

01:23:19  9        THE COURT:  Yes.

01:23:20  10       MR. ARMSTRONG:  Okay.  Great.  Thank you.

01:23:23  11       MR. MENCHEL:  Should we go get him?

01:23:26  12       THE COURT:  Yes, please.

01:23:30  13       Let's get the jury.

01:25:50  14    (Jury in.)

01:25:51  15       THE COURT:  All right, ladies and gentlemen, I hope

01:25:52  16   you had a good lunch break.

01:25:54  17       We will now proceed with the cross-examination of

01:25:57  18   Professor Fischel.

01:25:59  19       Mr. Armstrong, your witness.

01:26:02  20       MR. ARMSTRONG:  Thank you, Judge.

          21   DANIEL FISCHEL, DEFENDANT PACILIO'S WITNESS, PREVIOUSLY SWORN

          22                     CROSS-EXAMINATION

          23   BY MR. ARMSTRONG:

01:26:04  24   Q.  Professor, good afternoon.

01:26:06  25   A.  Good afternoon.

Fischel - cross

1865

01:26:24  1   Q.  Now, Professor, when you testified on direct, you

01:26:27  2   mentioned you were the professor -- I'm sorry, the chairman

01:26:30  3   and the president of Lexicon, right?

01:26:32  4   A.  That's correct.

01:26:32  5   Q.  And that is your company, right?

01:26:33  6   A.  Well, I mean, I don't own it, but I'm the chairman and the

01:26:38  7   president of it.

01:26:39  8   Q.  Is there anybody above you in the hierarchy?

01:26:43  9   A.  No.

01:26:43  10  Q.  So, you're the boss?

01:26:47  11  A.  It's not really run that way, but I have the highest

01:26:51  12  title.  I have overall responsibility for the firm.

01:26:52  13  Q.  Now, over the years, you've worked on several cases where

01:26:56  14  you've defended people who have been alleged to have spoofed,

01:26:59  15  right?

01:27:04  16  A.  Well, I testified in one case, and I've had some

01:27:09  17  involvement in some others, that's correct.

01:27:10  18  Q.  Okay.

01:27:10  19       And, so, you have worked to defend at least two

01:27:14  20  individuals or entities who have been charged by the United

01:27:17  21  States with spoofing, right?

01:27:18  22  A.  Well, in terms of testimony, it was a preliminary hearing,

01:27:32  23  but I guess you could say yes.  I certainly was --

01:27:32  24  Q.  Would it be helpful --

01:27:36  25  A.  -- adverse to the Commodity Futures Trading Commission.

Fischel - cross

1866

01:27:39    1    Q.  Would it be helpful to break it down for you?

01:27:42    2         THE COURT:  I think it would help me if you broke it

01:27:45    3    down.

01:27:45    4         MR. ARMSTRONG:  Sure.

01:27:45    5         THE COURT:  Thank you.

            6    BY MR. ARMSTRONG:

01:27:47    7    Q.  So, Professor, you have been involved in a case where the

01:27:49    8    United States charged someone named -- a Mr. Vorley with

01:27:53    9    spoofing, right?

01:27:54   10    A.  In a very minimal way, that's correct.

01:27:56   11    Q.  And your minimal involvement with that involved analyzing

01:28:01   12    trade data, right?

01:28:02   13    A.  Well, I wasn't a witness in the case, and I didn't do very

01:28:09   14    much.  And I think I talked to some of the lawyers and some of

01:28:12   15    the people at our firm, but I actually don't think I analyzed

01:28:16   16    any trading data.

01:28:16   17    Q.  Okay.

01:28:17   18         And you were paid for your time and your work in the

01:28:19   19    Vorley case, right?

01:28:20   20    A.  That's correct.

01:28:20   21    Q.  How much were you paid in the Vorley case?

01:28:24   22    A.  I don't know.

01:28:26   23    Q.  Can you ballpark it?

01:28:31   24         MR. MENCHEL:  Judge, can we have a sidebar on this?

01:28:40   25         (Proceedings had at sidebar:)

01:28:43  1          MR. MENCHEL:  This strikes me as the kind of thing I

01:28:46  2  thought we had an issue with another witness who was going to

01:28:49  3  testify about whether or not they could just bring out all the

01:28:52  4  times he's represented other individuals.

01:28:54  5          If they want to ask obviously what he got paid in

01:28:57  6  this case, which I've already fronted, and they want to break

01:29:00  7  that down, I don't have an objection.  But why are we going

01:29:03  8  through every single time this man has been hired to represent

01:29:06  9  somebody with similar charges?

01:29:08  10         THE COURT:  Objection overruled.

01:29:09  11         MS. PORTER:  Judge -- your Honor, if I may on behalf

01:29:10  12  of Mr. Bases.

01:29:11  13         I don't know what other questions Mr. Armstrong is

01:29:13  14  going to ask, but it's one thing to elicit that this witness

01:29:19  15  has been involved in spoofing cases.  I don't think it's

01:29:22  16  appropriate to elicit the criminal cases or that the United

01:29:27  17  States has charged other people with spoofing or certainly

01:29:30  18  what the results of those cases were.

01:29:33  19         He hasn't done it yet, but I didn't want to interrupt

01:29:35  20  and just wanted -- and also names.  Mr. Vorley, that name has

01:29:38  21  come up in the evidence in this case.  The names don't seem

01:29:41  22  relevant.

01:29:43  23         THE COURT:  Certainly I don't think Mr. Armstrong is

01:29:48  24  going to talk about the verdicts in those cases, and he

01:29:53  25  shouldn't.

Fischel - cross

1868

01:29:54   1     With regard to the names, they are what they are, and

01:29:59   2   this witness testified or was retained for those proceedings.

01:30:03   3   So, objection is overruled.

           4     (Proceedings had in open court:)

01:30:13   5   BY MR. ARMSTRONG:

01:30:13   6   Q.  So, Professor Fischel, I think that we left off on the

01:30:15   7   amount of money you were paid for your work defending an

01:30:18   8   individual charged with spoofing, right?

01:30:21   9     MR. MENCHEL:  Objection to the characterization

01:30:23  10   "defending."  That's not accurate.

01:30:28  11     THE COURT:  Sustained.

01:30:29  12     Please rephrase.

          13   BY MR. ARMSTRONG:

01:30:31  14   Q.  Professor, I think we left off, and you were going to tell

01:30:33  15   the jury the amount of money you got paid in the Vorley case,

01:30:37  16   right?

01:30:39  17   A.  And the answer is I don't know because, as I said, I

01:30:42  18   wasn't a witness.  I was never scheduled to be a witness.  I

01:30:47  19   wasn't directly involved.  I had some involvement, but very

01:30:51  20   minimal involvement.

01:30:51  21   Q.  And you were a consultant, right?

01:30:54  22   A.  As I said, I remember speaking to several of the lawyers

01:30:58  23   several times and also communicating with some of our people

01:31:05  24   who had some involvement in the case.

01:31:08  25   Q.  Were you getting paid to talk?  What did you actually do?

Fischel - cross

1869

01:31:10  1   A.  Yes, I certainly got paid for my time.

01:31:13  2   Q.  For, what?

01:31:16  3            MR. MENCHEL:  Objection.

01:31:18  4            THE COURT:  Sustained.

          5   BY MR. ARMSTRONG:

01:31:22  6   Q.  And you just don't know how much you got paid; is that

01:31:25  7   right?

01:31:25  8   A.  Certainly from memory, I do not know how much I got paid.

01:31:28  9   Q.  Now, are you also familiar with the -- I'm going to

01:31:35 10   butcher the pronunciation -- Oystacher case?

01:31:38 11   A.  Yes.

01:31:39 12   Q.  Was I saying it right?

01:31:40 13   A.  I don't know.  I'm not sure I ever learned to pronounce it

01:31:43 14   myself.  I call it the 3 Red case, and I'm very familiar with

01:31:46 15   that.

01:31:47 16   Q.  3 Red case.  The number 3 and the color red?

01:31:50 17   A.  Yes.

01:31:50 18   Q.  All right.

01:31:51 19            And that was another case where the CFTC charged

01:31:54 20   individuals with spoofing, right?

01:31:57 21   A.  That's correct.

01:31:57 22   Q.  And in that case, you crunched data at Lexecon, right?

01:32:01 23   A.  Yes, we did.

01:32:02 24   Q.  And you analyzed data, right?

01:32:04 25   A.  That's correct.

Fischel - cross

1870

01:32:05  1   Q.  And you made a whole bunch of charts, right?

01:32:08  2   A.  Correct.

01:32:08  3   Q.  And you actually testified in that case, right?

01:32:11  4   A.  That's right.

01:32:11  5   Q.  And you used some of the same terms that you used today,

01:32:14  6   right?

01:32:16  7   A.  That's possible.  I mean, there are only so many terms

01:32:20  8   that apply to this kind of data.  So, I probably did.

01:32:24  9   Q.  So, you testified all about selection bias, right?

01:32:27  10  A.  Yes, I did.

01:32:28  11  Q.  And you talked about confirmation bias, right?

01:32:31  12  A.  That's correct.

01:32:31  13  Q.  You talked about how the data was fundamentally flawed,

01:32:34  14  right?

01:32:34  15  A.  Correct.

01:32:35  16  Q.  And how much were you paid in that case?

01:32:40  17  A.  You know, I think that was, like, five years ago or

01:32:42  18  something.  You could tell me what the date was, but it was a

01:32:46  19  number of years ago.

01:32:47  20       So, I mean, I was very involved in that case.  So,

01:32:50  21  I'm sure I got paid a significant amount, but I have no idea

01:32:54  22  how much that was as I sit here today.

01:32:56  23  Q.  Do you think it was more or less than you got paid in this

01:32:59  24  case?

01:33:00  25  A.  I don't know.

Fischel - cross

1871

01:33:01　1　Q.　And, in fact, the same individual asking you questions in

01:33:04　2　that case was Mr. Menchel, right?

01:33:06　3　A.　Yes, that's correct.

01:33:07　4　Q.　And, so, you guys ran through the same general topics that

01:33:10　5　you ran through today, right?

01:33:12　6　　　　　MR. MENCHEL:　Objection.

01:33:13　7　　　　　THE COURT:　Overruled.

　　　　　8　BY THE WITNESS:

01:33:17　9　A.　Well, it's the same type of a case, but obviously exactly

01:33:24　10　what -- the questions that were asked and the answers that I

01:33:27　11　gave were tailored to the facts and circumstances of that

01:33:31　12　case.

　　　　　13　BY MR. ARMSTRONG:

01:33:31　14　Q.　But the point was you attacked the CFTC's expert as having

01:33:34　15　a fundamentally flawed opinion about spoofing, didn't you?

01:33:38　16　A.　Yes, I did.

01:33:39　17　Q.　And, then, after that, the judge issued a ruling, right?

01:33:44　18　A.　Correct.

01:33:44　19　　　　　MR. MENCHEL:　Objection, Judge.

01:33:48　20　　　　　Can we have a sidebar on this?

01:33:49　21　　　　　THE COURT:　Sidebar.

01:33:56　22　　　(Proceedings had at sidebar:)

01:33:57　23　　　　　MR. ARMSTRONG:　Your Honor, I'm going to elicit from

01:33:59　24　this witness that at the conclusion of that same testimony

01:34:01　25　that he provided, the judge in that case said that he placed

Fischel - cross

1872

01:34:05   1    heavy focus on the individual factors related to the spoofing

01:34:09   2    mechanisms but often ignored the impact of all these factors

01:34:12   3    in the aggregate.

01:34:14   4         It directly rebuts there's only one way to do this,

01:34:16   5    that he is the authority on this.

01:34:18   6         THE COURT:  So, the judge in that case issued an

01:34:25   7    opinion, and in what procedural context was that opinion

01:34:32   8    issued?

01:34:32   9         MR. ARMSTRONG:  It was in the context of a

01:34:33   10   preliminary injunction requested by the CFTC against the two

01:34:38   11   individuals that we just mentioned, Oystacher and 3 Red.  And

           12   the professor gave the same testimony that he gave today,

           13   about selection bias, criteria bias, fundamentally flawed

           14   analysis; and the judge said, no, I completely disagree with

01:34:51   15   this.

01:34:51   16        THE COURT:  Well, what exactly did the judge say?

01:34:54   17        MR. ARMSTRONG:  The judge said in the opinion --

01:34:56   18        MS. PORTER:  I'm sorry to interrupt.  I'm sure it's

01:34:58   19   not intentional, but it's very easy to hear you, Mr.

01:35:00   20   Armstrong, over the noise.

01:35:02   21        MR. ARMSTRONG:  Judge, I have a copy, if you want me

01:35:05   22   to hand you up a copy.

01:35:08   23        MR. MENCHEL:  Do you have a copy for me?

01:35:10   24       (Document tendered to the Court.)

01:37:10   25       (Brief pause.)

Fischel - cross

1873

01:37:10   1          THE COURT:  The objection is sustained.  I'm not

01:37:15   2    going to let you go into what the judge in this case

01:37:18   3    determined, given the -- it's just not clear to me from the

01:37:23   4    case that the criticisms that Professor Fischel had with

01:37:32   5    regard to Professor Bessembinder in the United States

01:37:40   6    Commodity Futures Trading Commission, while they might be,

01:37:43   7    writ large, at a 40,000-foot level be similar to his analysis

01:37:48   8    here, it's not -- it's clear that Professor Bessembinder was

01:37:55   9    taking a different approach than the one that Professor

01:38:00   10   Fischel is addressing in this case.

01:38:02   11          And, so, to the extent it has any relevance, I think

01:38:08   12   it should be barred under Rule 403 because I think it is

01:38:11   13   unduly prejudicial to defendants, and that prejudice

01:38:14   14   substantially outweighs whatever probative value it may have,

01:38:19   15   and I think it has minimal.

01:38:28   16      (Proceedings had in open court:)

01:38:28   17          MR. ARMSTRONG:  May I proceed, your Honor?

01:38:45   18          Thank you.

           19   BY MR. ARMSTRONG:

01:38:51   20   Q.  So, Professor, this is now your third occasion on which

01:38:53   21   you have defended individuals charged with spoofing, right?

01:38:58   22          MR. MENCHEL:  Objection to the characterization of

01:38:59   23   "defending."

01:39:00   24          MR. ARMSTRONG:  I'm sorry.  Individuals.

01:39:01   25          THE COURT:  Sustained.

Fischel - cross

1874

01:39:03   1          Hold on.  Can you rephrase the question, please?

01:39:05   2          MR. ARMSTRONG:  Of course.

           3   BY MR. ARMSTRONG:

01:39:07   4   Q.  Now, Professor, this is your third time where you've been

01:39:09   5   involved with individuals who have been alleged to have

01:39:13   6   spoofed, right?

01:39:14   7   A.  You know, all three are very different; but in some way,

01:39:17   8   yes, that's correct.

01:39:22   9          MR. ARMSTRONG:  Now, can I have the Elmo, your Honor,

01:39:24  10   please.

          11   BY MR. ARMSTRONG:

01:39:30  12   Q.  Now, Professor, how much has your company billed in this

01:39:33  13   case?

01:39:33  14   A.  I think I said I believe it's $4.6 million.

01:39:39  15   Q.  And that has involved work with the data, right?

01:39:46  16   A.  Most of it is work with the data, correct.

01:39:48  17   Q.  And it's also involved part of your opinion here today,

01:39:51  18   right?

01:39:51  19   A.  Correct.

01:39:51  20   Q.  Now, have you been paid or has your company been paid that

01:39:56  21   full amount yet?

01:39:57  22   A.  The full amount, probably not just because of the timing

01:40:01  23   of when bills go out.

01:40:03  24   Q.  Do you know how much your company had been paid as of July

01:40:07  25   15th, 2021?

Fischel - cross

1875

01:40:10  1    A.  Not from memory, no.

01:40:13  2            MR. ARMSTRONG:  May I approach, your Honor?

01:40:14  3            THE COURT:  You may.

          4    BY MR. ARMSTRONG:

01:40:21  5    Q.  Sir, if I could direct your attention to Paragraph 3 of

01:40:23  6    this document.

01:40:25  7        (Document tendered.)

          8    BY MR. ARMSTRONG:

01:40:25  9    Q.  And please let me know when you've read it.

01:40:29  10       (Brief pause.)

          11   BY THE WITNESS:

01:40:37  12   A.  I've read it.

          13   BY MR. ARMSTRONG:

          14   Q.  Okay.

01:40:38  15           Does that refresh your memory that your company has

01:40:41  16   been paid about --

01:40:42  17           MR. MENCHEL:  Objection to the form of the question.

01:40:45  18           THE COURT:  Overruled.

          19   BY MR. ARMSTRONG:

01:40:47  20   Q.  Does that refresh your memory, sir, that your company's

01:40:50  21   been paid about $2.8 million so far?

01:40:52  22   A.  Yes.  But it doesn't refresh my memory because I didn't

01:40:55  23   know it before.

01:40:59  24   Q.  You have no reason to disagree with it, right?

01:41:02  25   A.  No.  I'm sure it's accurate.

Fischel - cross

1876

01:41:05  1  Q.  So, you've only been paid -- your company, that is -- $2.8

01:41:11  2  million, right?

01:41:13  3  A.  I don't know if that's true as of today, but it was true

01:41:16  4  as of the date of that letter.

01:41:18  5  Q.  Now, you've got to help me.  So 4.6 million minus 2.8

01:41:23  6  million is about, what?

01:41:25  7  A.  1.8 million.

01:41:26  8  Q.  $1.8 million.

01:41:29  9      So, your company is still owed $1.8 million, right?

01:41:35  10  A.  As I said, I don't know if that's right.

01:41:37  11  Q.  Well, you have no reason to disagree with it, correct?

01:41:40  12  A.  I don't have any reason to either agree or disagree.

01:41:44  13  Q.  And do you know who pays your bills?

01:41:47  14  A.  Actually, no, I don't.

01:41:49  15  Q.  You don't know if it's Mr. Menchel or any of the attorneys

01:41:51  16  in this case?

01:41:52  17      MR. MENCHEL:  I wish.

01:41:54  18  (Laughter.)

         19  BY THE WITNESS:

01:41:57  20  A.  I don't know.  I don't send out the bills.  I don't

01:41:59  21  receive payment for the bills.  But I'm confident it was not

01:42:05  22  money that Mr. Menchel paid to us.

         23  BY MR. ARMSTRONG:

01:42:08  24  Q.  So, at some point you're going to leave the witness

01:42:11  25  stand -- hopefully soon -- you're going to walk out the door,

Fischel - cross

1877

01:42:14　1　and somebody is going to pay you $1.8 million, right?

01:42:18　2　A.　Well, first of all, the payment is not to me.　It's a bill

01:42:20　3　sent out by the firm, paid to the firm.　And hopefully, yes, I

01:42:25　4　hope we'll be paid in full.

01:42:29　5　Q.　Do you have any idea when that will be?

01:42:32　6　A.　I mean, I hope soon, but I haven't had any discussions

01:42:36　7　about it, so I don't know.

01:42:37　8　Q.　So, it's possible that you could just walk out and someone

01:42:39　9　will give you a check for $1.8 million to the company?

01:42:42　10　　　　　MR. MENCHEL:　Objection.

01:42:42　11　　　　　THE COURT:　Sustained.

12　BY MR. ARMSTRONG:

01:43:01　13　Q.　Now, Professor --

01:43:02　14　　　　　MR. ARMSTRONG:　May I approach, your Honor?

01:43:04　15　BY MR. ARMSTRONG:

01:43:04　16　Q.　Now, Professor, you talked at length about the options

01:43:07　17　that might happen after a large order is placed in the market,

01:43:11　18　right?

01:43:11　19　A.　That's correct.

01:43:11　20　Q.　And the first option was that -- I think you called it

01:43:15　21　front-running?

01:43:16　22　A.　Correct.

01:43:16　23　Q.　So, basically you put in a buy order; other people in the

01:43:22　24　market might put in more buy orders, right?

01:43:24　25　A.　Correct.

Fischel - cross

1878

01:43:25  1   Q.  And in that situation, generally speaking, the price would

01:43:32  2   go up, right?

01:43:32  3   A.  If it's a buy order, that's right.

01:43:34  4   Q.  And the second option could be that people would put in a

01:43:38  5   sell order and actually trade with the large order, right?

01:43:41  6   A.  That's correct.

01:43:41  7   Q.  So, traders sell, buy, right?

01:43:56  8        Now, if you're trying to spoof, obviously -- and you

01:44:00  9   have a sell order up here, obviously, outcome 1 is a good

01:44:05  10  outcome for you, right?

01:44:07  11  A.  If you're trying to -- if you're trying to spoof and have

01:44:14  12  an execution on your -- is that an iceberg --

01:44:17  13  Q.  Correct.

01:44:17  14  A.  -- on the top there?

01:44:19  15       Yes, that would be a good outcome.

01:44:20  16  Q.  That would be a really good outcome because what would

01:44:23  17  happen is the price from the large buy order would jack up the

01:44:26  18  price so you could get a fill at the price you want, right?

01:44:31  19  A.  That could happen, certainly.

01:44:33  20  Q.  But the other outcome in outcome 2 is that other traders

01:44:38  21  in the market could hit the spoof, right?

01:44:40  22  A.  Well, I wouldn't presume it's a spoof unless you're asking

01:44:46  23  me to assume it's a spoof.  I mean --

01:44:48  24  Q.  So, hypothetically, in the situation if the large order is

01:44:53  25  a spoof order, the first option is that you could jack up the

Fischel - cross

1879

01:44:56　　1　price and help your sell side order, right?

01:44:59　　2　A.　That's right.

01:45:00　　3　Q.　But the other option is that this is a spoof order, other

01:45:05　　4　people in the market could hit the spoof order, right, and

01:45:07　　5　actually execute on it?

01:45:09　　6　A.　Well, unless you're asking me to assume it's a spoof

01:45:12　　7　order, there's no reason to believe in that scenario in option

01:45:16　　8　2, or for that matter even in option 1, that it's a spoof

01:45:20　　9　order.

01:45:20　　10　Q.　I'm just asking you hypothetically, sir, okay?

01:45:24　　11　　　　　So, hypothetically, if the large order is a spoof

01:45:28　　12　order, the second option would be that traders could actually

01:45:30　　13　hit the spoof, right?

01:45:33　　14　A.　If you're asking me to assume that, yes, that would be a

01:45:36　　15　failed spoof.

01:45:38　　16　Q.　Okay.

01:45:38　　17　　　　　And have you heard the term "hit the spoof" before?

01:45:42　　18　A.　Yes.

01:45:42　　19　Q.　And, so, you know what I'm talking about, right?

01:45:46　　20　A.　I know exactly what you're talking about.

01:45:57　　21　　　　　MR. ARMSTRONG:　And, Mr. Fineman, if you can please

01:45:59　　22　pull up for demonstrative purposes GX 49 -- 249 and Page 1741,

01:46:15　　23　please, Mr. Fineman.

　　　　　　24　BY MR. ARMSTRONG:

01:46:24　　25　Q.　Sir, do you recognize what's on the screen is your

Fischel - cross

1880

01:46:26   1   testimony from yesterday?

01:46:27   2   A.   Yes, sir, I do.

01:46:27   3           MR. ARMSTRONG:   Permission to publish, your Honor?

01:46:29   4           THE COURT:   Any objection?

01:46:31   5           MR. MENCHEL:   I've never heard of it -- oh,

01:46:33   6   published?   No.   No objection to being published.   I

01:46:43   7   apologize.

          8   BY MR. ARMSTRONG:

01:46:43   9   Q.   Now, Professor, you said yesterday:   "But if you go back

01:46:46   10   and look at the government's four-part scheme, it only has one

01:46:49   11   of these alternatives."

01:46:51   12           So, we're talking about step one that I wrote on the

01:46:54   13   board, right?

01:46:58   14   A.   Yes, that's right.

01:46:59   15   Q.   And the government says:   "That that one alternative

01:47:04   16   happens every time, like clockwork.

01:47:06   17           And you said:   "That is false.   That is a

01:47:08   18   misrepresentation of the relevant trading data, and that is a

01:47:11   19   misrepresentation of the academic literature on trading

01:47:15   20   behavior.   And it's certainly a misrepresentation of the

01:47:18   21   experience of what happens in the market over that period I've

01:47:21   22   investigated when Mr. Pacilio places a large visible

01:47:25   23   opposite -- large visible order opposite the iceberg?"

01:47:27   24           Do you see that?

01:47:28   25   A.   Yes, that's exactly what I said.

Fischel - cross

1881

01:47:32　1　Q.　But did you actually sit through trial in this case?

01:47:35　2　A.　No, I did not.

01:47:36　3　Q.　You were allowed to, right?

01:47:37　4　A.　I assume so.  It's a public trial.  But I didn't

01:47:43　5　investigate whether I was allowed to or not.

01:47:44　6　Q.　And, so, you accused the government of misleading the jury

01:47:47　7　without even bothering to sit through trial?

01:47:51　8　A.　I based my opinions on the data analysis that I did, and I

01:47:59　9　felt that was a sufficient basis to express the opinions that

01:48:02　10　I expressed.

01:48:02　11　Q.　You don't think it would have been helpful to sit through

01:48:07　12　the trial and actually hear the evidence about what the

01:48:10　13　government told the jury?

01:48:13　14　A.　For my purposes, as I said, I think what I did was

01:48:18　15　sufficient for me to form the opinions and the testimony that

01:48:21　16　I gave.

01:48:21　17　Q.　So, you don't know, because you didn't sit through trial,

01:48:29　18　how many times the government showed the jury when the spoof

01:48:33　19　orders got hit in option 2, do you?

01:48:36　20　A.　No, I don't.

01:48:36　21　Q.　Do you want to amend your testimony from yesterday?

01:48:45　22　A.　No, I don't.

01:48:46　23　Q.　What were you doing, instead of sitting through trial, the

01:48:55　24　testimony that you were going to provide in this case --

01:48:57　25　　　　　MR. MENCHEL:  Object- -- sorry, let him finish.

Fischel - cross

1882

| | | |
|---|---|---|
| 01:49:00 | 1 | THE COURT:  Sustained. |
| 01:49:00 | 2 | Please rephrase. |
| | 3 | BY MR. ARMSTRONG: |
| 01:49:02 | 4 | Q.  Were you making charts instead of listening to the |
| 01:49:03 | 5 | testimony? |
| 01:49:05 | 6 | MR. MENCHEL:  Objection. |
| 01:49:05 | 7 | THE COURT:  Sustained. |
| | 8 | BY MR. ARMSTRONG: |
| 01:49:13 | 9 | Q.  So, you didn't hear Mr. Lakhan testify about the four-part |
| 01:49:17 | 10 | scheme that you called so misleading, right? |
| 01:49:19 | 11 | MR. MENCHEL:  Objection, based on the prior argument |
| 01:49:22 | 12 | made earlier.  Hypothetical is one thing. |
| 01:49:26 | 13 | THE COURT:  Overruled. |
| | 14 | BY MR. ARMSTRONG: |
| 01:49:27 | 15 | Q.  So, Professor, you didn't hear Mr. Lakhan testify at |
| 01:49:32 | 16 | length over two or three days about the four-part scheme that |
| 01:49:35 | 17 | you called so misleading, did you? |
| 01:49:37 | 18 | A.  I did not hear him testify.  I was not in the courtroom. |
| 01:49:41 | 19 | Q.  You had the opportunity to listen to him, right? |
| 01:49:44 | 20 | A.  As I said, I don't know what the Court's ruling would have |
| 01:49:48 | 21 | been if I would have wanted to, but I didn't investigate that, |
| 01:49:52 | 22 | so I don't know. |
| 01:49:53 | 23 | Q.  Did any of the attorneys sitting over here tell you, in |
| 01:49:56 | 24 | fact, that you were allowed to listen in in all the testimony? |
| 01:50:01 | 25 | A.  I don't believe that subject ever came up. |

Fischel - cross

1883

01:50:03  1   Q.  Now, after the testimony, did you review the transcripts?

01:50:10  2   A.  I reviewed some of the transcripts.

01:50:12  3   Q.  But just not Mr. Lakhan's?

01:50:14  4   A.  I reviewed some of Mr. Lakhan's.

01:50:15  5   Q.  Okay.

01:50:16  6       So, you did see Mr. Lakhan's testimony?

01:50:20  7       MR. MENCHEL:  Objection.

01:50:21  8       THE COURT:  Overruled.

01:50:23  9       I'm sorry.  Sustained.

01:50:24  10      Please rephrase.

01:50:27  11      Do you mean "see" as in read the transcript or "see"

01:50:30  12  as in observe Mr. Lakhan testify?

01:50:34  13      MR. ARMSTRONG:  I'll move on, your Honor.

01:50:35  14      THE COURT:  Okay.

         15  BY MR. ARMSTRONG:

01:50:47  16  Q.  So, did you hear Mr. Lakhan describe scenario 2 that you

01:50:52  17  accused the government of not providing to the jury?

01:50:57  18  A.  As I've said several times, I did not hear any testimony

01:51:00  19  of Mr. Lakhan because I was not present in the courtroom.

01:51:08  20  Q.  Did you hear anyone say in the courtroom "sometimes it

01:51:12  21  works, sometimes it doesn't" in relation to spoof orders?

01:51:18  22  A.  I don't recall hearing that or seeing that.

01:51:21  23  Q.  That certainly would be relevant to whether the government

01:51:27  24  gave the correct impression to the jury, wouldn't it?

01:51:30  25  A.  As I said, for my purposes, I felt the analysis that I

Fischel - cross

1884

01:51:35  1  performed was a sufficient basis to reach the opinions that I

01:51:39  2  reached and to testify about the subjects that I testified

01:51:43  3  about.

01:51:45  4  Q.  So, is it your testimony that it would not be relevant to

01:51:48  5  actually know if the government presented to the jury option 2

01:51:52  6  before you accused the jury -- before you accused the

01:51:55  7  government of misconduct?

01:51:56  8          MR. MENCHEL:  Objection.  There was no statement of

01:51:58  9  misconduct.

01:52:08  10          THE COURT:  Sustained.

01:52:09  11          Please rephrase.

         12  BY MR. ARMSTRONG:

01:52:15  13  Q.  So, is it your testimony that it would not be relevant to

01:52:18  14  actually know if the government presented to the jury option 2

01:52:22  15  before you accused the government of a misleading narrative?

01:52:30  16  A.  Mr. Armstrong, I hate to be personal, but I read your

01:52:33  17  opening statement very carefully, word for word.  I read what

01:52:38  18  you said about the four-step scheme.  I read that you said it

01:52:42  19  worked like clockwork.  Those were your words.  And for those

01:52:47  20  reasons -- and that's why I started my testimony with

01:52:51  21  basically my understanding of exactly what you said word for

01:52:55  22  word in terms of what you said to the jury.

01:52:58  23          And I felt my analysis was a fair review of whether

01:53:04  24  or not the evidence supported the statements that you,

01:53:07  25  yourself -- you personally -- made to the jury about what the

Fischel - cross

1885

01:53:11  1  evidence will show.  And I reached the conclusions that I did

01:53:14  2  based on the analysis that I performed.

01:53:17  3  Q.  Now, sir, you were a Supreme Court clerk, right?

01:53:19  4  A.  Well, yes, a clerk for a Supreme Court justice, that's

01:53:22  5  correct.

01:53:22  6  Q.  The highest court in the land, right?

01:53:24  7  A.  That's right.

01:53:25  8  Q.  And you were a practicing lawyer for a long time, right?

01:53:27  9  A.  Not correct.

01:53:28  10  Q.  You just practiced in academia?

01:53:31  11  A.  I actually was a practicing lawyer for a few months, less

01:53:34  12  than a year, before I accepted a teaching position at

01:53:37  13  Northwestern University.

01:53:39  14  Q.  And, so, you know, sir, based on your extensive

01:53:42  15  experience, that what a lawyer says in opening statements is

01:53:46  16  not evidence, right?

01:53:47  17      MR. MENCHEL:  Objection, your Honor.

01:53:49  18      THE COURT:  Overruled.

19  BY MR. ARMSTRONG:

01:53:53  20  Q.  Sir, you know that what a lawyer says to the jury in

01:53:55  21  opening statements is not evidence, right?

01:54:00  22  A.  I know it's not evidence.  But, I mean, if you're asking

01:54:05  23  me what my understanding is, it is what the proponent of the

01:54:11  24  statement intends to demonstrate what the evidence will show.

01:54:16  25  Q.  All right.

Fischel - cross

1886

01:54:16  1       But the evidence is actually what people say in the
01:54:20  2  witness stand that you're sitting in right now, right?
01:54:22  3  A.  That's correct.
01:54:23  4  Q.  And that was the same evidence you didn't bother to show
01:54:26  5  up for, right?
01:54:31  6  A.  Was that a -- I'm -- I'm sorry, you're asking me a
01:54:36  7  question?  I've said several times I was not physically
01:54:39  8  present at -- during the trial except for a very small part of
01:54:42  9  it.
01:54:43  10  Q.  Were you in Chicago at the time?
01:54:48  11       MR. MENCHEL:  Objection.
01:54:49  12       THE COURT:  Sustained.
01:54:51  13       MR. ARMSTRONG:  Mr. Fineman, if you can please pull
01:54:54  14  up DX 147.
01:55:00  15       And permission to publish.
01:55:02  16       Thank you.
         17  BY MR. ARMSTRONG:
01:55:03  18  Q.  Now, Professor, that was the article you showed to the
01:55:06  19  jury, right?
01:55:06  20  A.  That's correct.
01:55:07  21  Q.  And you read, I think, several paragraphs to the jury,
01:55:09  22  right?
01:55:09  23  A.  That's right.
01:55:10  24  Q.  And I think you testified that this article was very
01:55:14  25  relevant to your opinions in this case, right?

Fischel - cross

1887

01:55:17  1   A.  Correct.

01:55:23  2        MR. ARMSTRONG:  Now, Mr. Fineman, if you can please

01:55:25  3   go to Page 5.

01:55:26  4        And if you can please blow up that paragraph.

          5   BY MR. ARMSTRONG:

01:55:29  6   Q.  And, sir, can you please just read to the jury the

01:55:31  7   highlighted sentence?

01:55:32  8   A.  "We examine traders' order submission strategies for a

01:55:36  9   broad cross-section of Euronext-Paris firms using the Base

01:55:46  10  de Données de Marche database from April 2003."

01:55:48  11  Q.  Did you forget to tell the jury that -- when you were

01:55:50  12  reading a lot of this exhibit -- that all the topics you were

01:55:53  13  talking about were about a French exchange from 2003?

01:55:56  14        MR. MENCHEL:  Objection to the characterization of

01:55:58  15  the question.

01:56:01  16        THE COURT:  Sustained.

01:56:02  17        Please rephrase the question.

          18  BY MR. ARMSTRONG:

01:56:05  19  Q.  Sir, you didn't tell the jury when you were reading

01:56:09  20  paragraphs of DX 147 that the whole article related to stock

01:56:15  21  trades in Paris in April of 2003, did you?

01:56:18  22  A.  I did not mention that in my discussion of the article,

01:56:21  23  correct.

01:56:22  24  Q.  Now, sir, you know that this is a case about futures

01:56:25  25  trading in Chicago, right?

Fischel - cross

1888

01:56:28  1   A.  I'm aware of that.

01:56:29  2   Q.  And you know that there's not a single trade in this case

01:56:32  3   that goes back to April 2003, right?

01:56:35  4   A.  I know that, as well.

01:56:36  5   Q.  And, so, you thought it was more relevant to read and

01:56:45  6   study this article than sit through trial?

01:56:51  7   A.  I think the article discusses --

01:56:54  8         MR. MENCHEL:  Objection.  Before the witness answers,

01:56:56  9   objection to the form of this question, your Honor.

01:56:59  10        THE COURT:  Sustained.

01:57:00  11        MR. MENCHEL:  It's argumentative.

          12   BY MR. ARMSTRONG:

01:57:07  13   Q.  What is the Base de Données de Marche?  What is that?

01:57:14  14   A.  I don't know exactly what it is.

01:57:15  15   Q.  But that was part of your opinion here today or yesterday,

01:57:23  16   right?

01:57:24  17   A.  No.  My opinion wasn't based on the database.  It was a

01:57:29  18   description of the type of traders that exist in markets,

01:57:33  19   which is not specific to this database or this time period, as

01:57:38  20   is well-known in the economics of trading behavior.

01:57:42  21   Q.  But, sir, you know that the defendants in this case didn't

01:57:45  22   trade on whatever this is, the BDM, right?

01:57:49  23   A.  Yes, I know that.  Well, at least I assume that.

01:58:04  24   Q.  Now, sir, you're generally familiar with the term

01:58:07  25   "spoofing," right?

Fischel - cross

1889

01:58:08  1    A.  Yes.

01:58:08  2    Q.  And you generally know that spoofing involves placing a

01:58:11  3    trade on one side that you don't intend to actually trade

01:58:15  4    with, right?

01:58:17  5    A.  That you don't intend to execute, that's my understanding.

01:58:20  6    Q.  And it's often offered, that trade, with the intent to

01:58:25  7    push up or push down prices, right?

01:58:29  8    A.  That's the allegation.

01:58:30  9    Q.  And that's your understanding, as well, right?

01:58:33  10   A.  It's my understanding of the allegation of what spoofing

01:58:37  11   means.

01:58:37  12   Q.  Is your testimony that you have no understanding about the

01:58:41  13   purpose of spoofing and how spoofing is intended to push up or

01:58:44  14   push down prices?

01:58:45  15   A.  I think I just said that is my understanding of what

01:58:49  16   spoofing means.

01:58:52  17   Q.  Outside the allegations of this case, right?  It's just a

01:58:56  18   common industry term, right?

01:58:59  19   A.  I don't know how common it is, but I'm aware of that usual

01:59:05  20   characterization of what spoofing means outside the context of

01:59:08  21   this case.

01:59:09  22   Q.  Okay.

01:59:09  23        Now, going back to the article about the French

01:59:13  24   traders in 2003, based on that article, you described option

01:59:19  25   1, where a large order gets put in and that encourages more

Fischel - cross

1890

01:59:22  1  buying, right?

01:59:23  2  A.  That's right.

01:59:23  3  Q.  And you studied how French traders react to that scenario,

01:59:34  4  right?

01:59:34  5  A.  I didn't perform any studies myself of how French traders

01:59:37  6  reacted to anything.

01:59:38  7  Q.  You told the jury in the demonstrative that we just looked

01:59:41  8  at, DX 147, about how the study examined how French traders

01:59:45  9  react in that exchange, right?

01:59:47  10  A.  There was nothing in my testimony about French traders.

01:59:53  11  My testimony dealt with the different categories of traders,

01:59:58  12  which is not limited to this particular time period or this

02:00:04  13  particular exchange.  It is a well-known phenomenon in the

02:00:08  14  economics of trading.

02:00:11  15       And my point was to illustrate to the jury that,

02:00:14  16  contrary to your opening statement, there is not only one type

02:00:18  17  of trader or one type of reaction to the placement of a large

02:00:23  18  visible order opposite an iceberg order.

02:00:25  19  Q.  And the segment that you read to the jury from that

02:00:33  20  article drew those conclusions from examining the French

02:00:37  21  exchange, right?

02:00:42  22  A.  As I keep saying, those conclusions are not based on the

02:00:49  23  French exchange, although they rely on a database from the

02:00:53  24  French exchange.  But the three types of traders exist on any

02:00:56  25  exchange.

Fischel - cross

1891

02:00:57  1  Q.  Now, did you actually look and see what the defendants

02:01:05  2  said at the time about how their orders affected the market?

02:01:11  3  A.  I'm not sure what you mean.

02:01:13  4  Q.  Are you aware of things called Bloomberg chats?

02:01:16  5  A.  You mean, the chats in this case?

02:01:19  6  Q.  Exactly.

02:01:19  7  A.  Yes, I am aware of those.

02:01:21  8  Q.  And did you review the chats in this case?

02:01:23  9  A.  Yes.  Well, I mean, as part of my familiarity with the --

02:01:29  10  or becoming familiar with the background of this case, I did

02:01:32  11  see the chats that were part of the evidence and the

02:01:38  12  allegations in the case.

02:01:38  13  Q.  And, so, you, in fact, did review chats in this case as

02:01:46  14  part of your opinion today?

02:01:48  15  A.  Not really part of my opinions because I don't have any

02:01:50  16  opinions about the chats.  But I am familiar with them.

02:01:53  17  Q.  Okay.

02:01:56  18       And, so, you saw in the chats how the defendants

02:02:02  19  described the effect of their large orders on the market,

02:02:06  20  right?

02:02:08  21  A.  Again, I don't want to characterize the chats.  I don't

02:02:12  22  have any opinion about them.  But if you want to show me one,

02:02:17  23  I'll tell you what my understanding of what it means.

02:02:19  24  Q.  Sure.

02:02:30  25       MR. ARMSTRONG:  Your Honor, if we could please pull

Fischel - cross

1892

02:02:32   1   up DX 52.

02:02:38   2          And please go to Page 2, Mr. Fineman.

          3          GX.

          4   BY MR. ARMSTRONG:

02:02:51   5   Q.  Now, Professor, you see here in the testimony that was

02:02:54   6   elicited in this case and the evidence in this case:

02:02:57   7          "That was me offering silver to try to buy your 83s?

02:03:02   8          "NP:  I thought it was a 50-lot order when I asked

02:03:06   9   you to buy the first 100K.

02:03:08  10          "Didn't get it.

02:03:09  11          "Ha, ha, ha, cheeky monkey."

02:03:12  12          Do you see that?

02:03:13  13   A.  I do.

02:03:13  14   Q.  Okay.

02:03:18  15          MR. ARMSTRONG:  And Page 3, please, Mr. Fineman.

          16   BY MR. ARMSTRONG:

02:03:23  17   Q.  And you see here Mr. Bases says:

02:03:26  18          "Someone else joining.  Wow.  My offering that

02:03:33  19   clearly attracted selling."

02:03:34  20          Do you see that?

02:03:34  21   A.  I do.

02:03:35  22   Q.  Now, what's being described is option 1 that we just went

02:03:40  23   over, isn't it?

02:03:42  24          MS. PORTER:  Judge, may I be heard at sidebar,

02:03:44  25   please?

Fischel - cross

1893

02:03:44  1            THE COURT:  You may.

02:03:51  2        (Proceedings had at sidebar:)

02:03:51  3            MS. PORTER:  Your Honor, I specifically asked the

02:03:53  4    government before they began their cross-examination if they

02:03:56  5    intended to use any chats involving Mr. Bases, and the only

02:03:58  6    one that Mr. Armstrong identified was the defense exhibit

02:04:02  7    where Mr. Bases said words to the effect of "sometimes it

02:04:05  8    works, sometimes it doesn't."

02:04:08  9            Mr. Bases did not put on a defense case and did not

02:04:11  10   call Professor Fischel.  I'm not understanding why, despite

02:04:18  11   the representation, Mr. Armstrong is crossing on words of our

02:04:22  12   client.  So, I ask that the chat be taken down and that

02:04:27  13   Mr. Armstrong move on.

02:04:28  14           MR. ARMSTRONG:  Your Honor, it was actually a

02:04:31  15   surprise to us that Professor actually looked at chats because

02:04:35  16   it was told to us that he did not.

02:04:37  17           And, so, now we're just probing what exactly he

02:04:41  18   looked at.  And he offered to give us his opinion about what

02:04:44  19   the words say, and so we took him at his word.

02:04:47  20           MS. PORTER:  Your Honor, neither I nor anyone I'm

02:04:49  21   aware of on Mr. Bases' team made any representations at all.

02:04:53  22   This isn't our witness.  And Fischel's opinion about Mr.

02:04:57  23   Bases' chats is not relevant in the case.

02:05:00  24           MR. ARMSTRONG:  Your Honor, he's talking to Mr.

02:05:02  25   Pacilio in this chat.

Fischel - cross

1894

| | | |
|---|---|---|
| 02:05:04 | 1 | THE COURT:  All right.  The objection is overruled. |
| 02:05:10 | 2 | Mr. Bases' counsel has the ability to cross-examine |
| 02:05:13 | 3 | Dr. Fischel if Mr. Bases wishes to. |
| 02:05:15 | 4 | So, this witness said he looked at chats to get |
| 02:05:22 | 5 | background information to prepare his opinions.  He offered to |
| 02:05:27 | 6 | look at some of those chats.  The government -- the witness |
| 02:05:30 | 7 | opened the door, and the government can present him with |
| 02:05:34 | 8 | chats. |
| 02:05:38 | 9 | (Proceedings had in open court:) |
| | 10 | BY MR. ARMSTRONG: |
| 02:05:40 | 11 | Q.  So, Professor Fischel, we're still on Page 3 of Government |
| 02:05:46 | 12 | Exhibit 52, and Mr. Bases says:  "By offering, that clearly |
| 02:05:50 | 13 | attracted selling." |
| 02:05:51 | 14 | You see that, right? |
| 02:05:53 | 15 | A.  I do. |
| 02:05:53 | 16 | Q.  And what he's describing, in your expert opinion, is when |
| 02:05:59 | 17 | you put in a large order, that attracts more orders to go the |
| 02:06:03 | 18 | same direction, right? |
| 02:06:12 | 19 | A.  Are you still asking me to assume that option 1 is |
| 02:06:15 | 20 | spoofing?  Because this does -- I mean, if you're asking me my |
| 02:06:17 | 21 | understanding of this, again, I don't want to comment on the |
| 02:06:20 | 22 | chats.  I have no opinion about the chats.  It's not part of |
| 02:06:23 | 23 | my opinions. |
| 02:06:24 | 24 | But if you want me to tell you what I think this |
| 02:06:26 | 25 | shows, it doesn't show spoofing by itself for sure because |

Fischel - cross

1895

02:06:31  1  orders can move prices in perfectly legitimate ways.  That

02:06:38  2  happens all the time, and it has nothing do, by itself, with

02:06:43  3  any evidence of improper behavior.

02:06:44  4  Q.  Okay.

02:06:45  5       And, so, we can agree that sometimes orders move

02:06:47  6  prices, right?

02:06:48  7  A.  All the time.

02:06:48  8  Q.  Okay.

02:06:50  9       And, so, what is important is actually the intent of

02:06:54  10  the individual who places the order, right?

02:06:58  11       MR. MENCHEL:  Objection.

02:06:58  12       THE COURT:  Sustained.

13  BY MR. ARMSTRONG:

02:07:14  14  Q.  Now, sir, you would agree that in this situation, Mr.

02:07:20  15  Bases is describing how one of his orders attracted more

02:07:25  16  selling, right?

02:07:34  17  A.  It says:  "Wow.  By offering, that clearly attracted

02:07:39  18  selling."

02:07:39  19  Q.  And do you know if Mr. Bases, or someone else he was

02:07:42  20  talking to, was on the other side of that and actually had a

02:07:45  21  buy order at the same time?

02:07:47  22  A.  No, I don't.

02:07:48  23  Q.  Wouldn't that be helpful to know to understand the trade

02:07:55  24  at issue?

02:07:56  25  A.  I wasn't trying to understand this particular chat.  As

Fischel - cross

1896

02:07:59  1  I've said several times, I didn't form any opinion about the

02:08:03  2  chats.

02:08:04  3  Q.  But you certainly reviewed them, right?

02:08:06  4  A.  Again, as part of the background of the case, I became

02:08:10  5  familiar with the fact that there were -- part of the evidence

02:08:15  6  or allegations involved chats and, more specifically,

02:08:21  7  government episodes 51 to 72 were episodes involving chats.

02:08:27  8       But I limited my opinions and my analysis to trading

02:08:33  9  behavior.  But, again, if you show me something and you want

02:08:35  10  my opinion, I'll give it to you --

         11  Q.  So --

02:08:37  12  A.  -- but it wasn't part of my analysis.

02:08:39  13  Q.  I just want to make sure that I understand now.  I'm sorry

02:08:41  14  to interrupt you.

02:08:42  15       So, are you saying that you didn't look at the

02:08:44  16  trading episodes that had chats associated with them?

02:08:48  17  A.  Well, I wouldn't say it's correct to say I didn't look at

02:08:54  18  them, but I focused on episodes 1 through 50 because those

02:08:58  19  were the episodes that, again, you yourself, Mr. Armstrong,

02:09:04  20  claimed were the basis for being able to infer intent from

02:09:10  21  trading behavior.

02:09:12  22  Q.  Okay.

02:09:12  23       But did you look at the episodes associated with the

02:09:19  24  defendants' chats as part of inferring intent for trading

02:09:23  25  behavior?

Fischel - cross

1897

02:09:23   1    A.  Well, again, I'm not inferring intent.  That's --

02:09:27   2    that's -- I'm not a mind reader, and I'm not in a position to

02:09:31   3    do that.

02:09:32   4         But if you look at my exhibits, they contain not just

02:09:36   5    episodes 1 through 50, but also episodes 51 to 72.  So, I

02:09:42   6    certainly did look at them and analyze them, and they were

02:09:46   7    part of the biased and misleading sample that I testified

02:09:49   8    about repeatedly.  But I didn't form any opinion about chats.

02:09:54   9    Q.  So, is it your testimony here today that the defendants'

02:09:58   10   own words about their own trades at the time didn't influence

02:10:04   11   your opinion in any way?

02:10:05   12   A.  Correct, did not influence my opinion in any way one way

02:10:09   13   or the other.

02:10:10   14   Q.  Now, sir, you certainly know that there are two kinds of

02:10:17   15   evidence, right?

02:10:20   16   A.  You have to be a little bit more specific.

02:10:22   17   Q.  Sure.

02:10:25   18        There's something called direct evidence, right?

02:10:27   19   A.  Yes, I'm familiar with that term.

02:10:29   20   Q.  And there's something called circumstantial evidence,

02:10:30   21   right?

02:10:30   22   A.  I'm familiar with that term, as well.

02:10:33   23   Q.  And direct evidence is statements actually made at the

02:10:39   24   time about the person who you're investigating, right?

02:10:43   25        MR. MENCHEL:  Objection.

Fischel - cross

1898

02:10:44  1      THE COURT:  Sustained.

02:10:46  2      Perhaps if you could reformulate your question so

02:10:51  3  you're not talking about what evidence is, but perhaps what

02:10:56  4  factors the professor considers important.

02:11:01  5      MR. ARMSTRONG:  Certainly, your Honor.

02:11:12  6      Court's indulgence.

02:11:14  7  (Brief pause.)

02:11:22  8  BY MR. ARMSTRONG:

02:11:22  9  Q.  Now, sir, just to make sure we're on the same page, you

02:11:24  10  would agree that direct evidence could be found in written or

02:11:27  11  oral admissions, right?

02:11:28  12      MR. MENCHEL:  Objection.  I thought the Court had

02:11:30  13  given Mr. Armstrong some direction about how to handle this.

02:11:33  14      MR. ARMSTRONG:  Your Honor, could I be heard on this?

02:11:34  15      THE COURT:  You may.

02:11:41  16  (Proceedings had at sidebar:)

02:11:41  17      MR. ARMSTRONG:  Your Honor, this witness in the 3 Red

02:11:44  18  case specifically criticized the government's witness for not

02:11:47  19  taking into account direct evidence.  And he said that

02:11:51  20  because that --

02:11:53  21      MR. PAVLIS:  Your Honor, I just took my headphones

02:11:56  22  off.  He's speaking very loudly.  The jury can hear everything

02:11:58  23  he's saying.

02:11:59  24      MR. ARMSTRONG:  Your Honor, in the 3 Red case, this

02:12:01  25  witness, in a sworn affidavit, said that:  Significantly,

02:12:05   1   Professor Bessembinder's opinion that Mr. Oystacher acted

02:12:11   2   without intent to execute trades is not based on any direct

3   evidence of intent, such as could be potentially found in a

4   trading algorithm or written or oral admissions.

5           THE COURT REPORTER:  Please slow down.

02:12:22   6           MR. ARMSTRONG:  Sorry.

02:12:22   7           So, your Honor, in the affidavit that this witness

02:12:25   8   presented to the Court, he said in paragraph 8 that:

02:12:29   9   Significantly, Professor Bessembinder's opinion that the

02:12:33  10   individual charged with spoofing acted without the intent to

02:12:36  11   execute trades is not based on any direct evidence of intent,

02:12:41  12   such as could be potentially found in a trading algorithm or

02:12:44  13   written or oral admissions.

02:12:46  14           And, so, he is directly doing what he criticized

02:12:49  15   someone else for doing.

02:12:53  16           THE COURT:  Objection overruled.

02:12:54  17           To the extent you want to cross him with his prior

02:12:56  18   statements, you may do so.

02:12:57  19      (Proceedings had in open court:)

20   BY MR. ARMSTRONG:

02:13:03  21   Q.  Now, Professor, before we left, we were talking about

02:13:06  22   direct evidence, right?

02:13:09  23   A.  You were talking about direct evidence.

02:13:11  24   Q.  Okay.

02:13:11  25           And you agree that direct evidence -- I want to make

Fischel - cross

1900

02:13:14 1 sure I get this right.

02:13:15 2 Direct evidence could be potentially found in oral or

02:13:19 3 written admissions, right?

02:13:21 4 MR. MENCHEL: I still have the same objection, your

02:13:22 5 Honor.

02:13:22 6 THE COURT: Overruled.

7 BY THE WITNESS:

02:13:25 8 A. I mean, it sounds like it's calling for a legal opinion on

02:13:28 9 the definition of direct evidence. So, I'm not sure how to

02:13:31 10 answer. It sounds right. I guess I can say that much.

02:13:34 11 BY MR. ARMSTRONG:

02:13:34 12 Q. How about this: Did you say yourself that direct evidence

02:13:38 13 of intent could be potentially found in oral or written

02:13:42 14 admissions?

02:13:43 15 A. That's a different question. But, yes, I did -- well, I

02:13:46 16 probably said that. That sounds like something I could say.

02:13:49 17 Q. Okay.

02:13:50 18 And, in fact, in the 3 Red case that we just talked

02:13:52 19 about, you actually criticized the government's expert for not

02:13:55 20 looking at direct evidence, right?

02:13:58 21 A. I don't recall.

02:14:01 22 MR. ARMSTRONG: May I approach, your Honor?

02:14:03 23 THE COURT: You may.

24 BY MR. ARMSTRONG:

02:14:05 25 Q. Sir, I'm handing you what's been marked for demonstrative

Fischel - cross

1901

02:14:08  1  purposes as Government Exhibit 244.

02:14:10  2      (Document tendered.)

          3  BY MR. ARMSTRONG:

02:14:11  4  Q.  Does that refresh your recollection about how you

02:14:12  5  criticized a government witness for not looking at direct

02:14:17  6  evidence in forming his opinion?

02:14:18  7  A.  With your permission, can I read the paragraph that you're

02:14:21  8  referring to?

02:14:21  9          THE COURT:  You may, Professor.  Go ahead.

02:14:24  10         THE WITNESS:  Thank you.

02:14:56  11     (Brief pause.)

          12  BY THE WITNESS:

02:14:57  13  A.  Okay.  I've reviewed it.

          14  BY MR. ARMSTRONG:

02:14:59  15  Q.  So, I'm correct that you, in fact, criticized a government

02:15:01  16  expert for not examining at all direct evidence of intent,

02:15:04  17  right?

02:15:05  18  A.  I don't think that's a fair characterization of the

02:15:07  19  paragraph.

02:15:08  20         MR. ARMSTRONG:  Your Honor, permission to introduce

02:15:10  21  GX 252, Paragraph 8, as a prior inconsistent statement.

02:15:20  22         MR. MENCHEL:  Can we have a sidebar on this?

02:15:26  23     (Proceedings had at sidebar:)

02:15:27  24         MR. MENCHEL:  So, even though I was in this case, I

02:15:29  25  haven't looked at this affidavit in -- whatever year it was.

Fischel - cross

1902

02:15:32  1    If we can have a moment to read it, I could decide if I should

02:15:36  2    lodge an objection, but I'm completely blind.

02:16:21  3         (Document tendered.)

02:16:21  4         (Brief pause.)

02:16:22  5         MR. MENCHEL:  The professor is right.  This is not a

02:16:26  6    criticism of something.  He's merely saying here, is Professor

02:16:33  7    Bessembinder -- opinion is limited to the data.  And what

02:16:36  8    Professor Fischel did was the same thing.  They go to the

02:16:38  9    data, and they look at it.

02:16:40  10        Professor Fischel, based on my recollection anyway,

02:16:42  11   did not purport to testify in the 3 Red case about extrinsic

02:16:48  12   evidence or chats or anything like that.  His testimony was

02:16:51  13   similarly limited to the confines of Professor Bessembinder's

02:16:55  14   testimony.

02:16:55  15        THE COURT:  Mr. Armstrong, what prior statement that

02:17:01  16   Professor Fischel made here is inconsistent with that

02:17:08  17   statement?

02:17:08  18        MR. ARMSTRONG:  "So, I'm correct that you, in fact,

02:17:11  19   criticized a government expert for not examining at all direct

02:17:14  20   evidence of intent?

02:17:15  21        "Answer:  I don't think that's a fair

02:17:16  22   characterization of the paragraph."

02:17:18  23        And, so, it's inconsistent, your Honor.

02:17:23  24        THE COURT:  In my mind, that is not an inconsistent

02:17:26  25   prior statement.  It's not something that directly contradicts

Fischel - cross

1903

02:17:32   1   his testimony here in court.  And, so, therefore the objection

02:17:36   2   is sustained.

02:17:42   3       (Proceedings had in open court:)

           4   BY MR. ARMSTRONG:

02:17:46   5   Q.  Now, Professor, if you had direct evidence of intent,

02:17:49   6   certainly that would be important to look at, right?

02:17:54   7   A.  Well, you know, for what purpose, I guess, is the

02:18:00   8   question.

02:18:02   9   Q.  If you were tasked with trying to figure out the intent

02:18:05  10   behind a trade, direct evidence of the trader at the time

02:18:10  11   would be important to that question, right?

02:18:13  12   A.  It certainly could be important to that question for the

02:18:16  13   Court or for the jury or potentially for me, depending on what

02:18:22  14   it was.

02:18:23  15       But in the case that you're referring to, as well as

02:18:26  16   in this case, my analysis was focused on the trading behavior

02:18:31  17   at issue, and I reached the conclusions that I did in that

02:18:35  18   case as well as in this case.

02:18:36  19   Q.  Okay.

02:18:37  20       And, so, by reaching your conclusion in this case,

02:18:40  21   you ignored direct evidence, such as statements made in chats,

02:18:45  22   right?

02:18:46  23   A.  Wouldn't say I ignored them.  As I said, I became familiar

02:18:50  24   with them, and I analyzed the trading behavior itself in the

02:18:59  25   episodes where chats were alleged to have occurred.  Those

02:19:04   1   were episodes 51 to 72, which were just as much a part of my

02:19:09   2   analysis as episodes 1 through 50.

02:19:13   3          So, it's not correct to say that I ignored them or

02:19:16   4   the economic evidence associated with them in terms of those

02:19:22   5   were the episodes where allegedly the chats occurred.  I just

02:19:27   6   did not form an independent opinion about the meaning of the

02:19:32   7   chats as opposed to forming an independent opinion about how

02:19:37   8   the episodes, where -- which were alleged to be part of the

02:19:46   9   four-part -- the four-step alleged fraudulent scheme were

02:19:49  10   based on a biased and non-representative sample and provided

02:19:56  11   no support, in fact undermined the precise opening statement

02:20:01  12   that you gave, Mr. Armstrong.

02:20:03  13   Q.  Okay.

02:20:04  14          Thank you for that, sir.

02:20:06  15          MR. ARMSTRONG:  All right.  Now, Mr. Fineman, GX 1,

02:20:08  16   episode 19, please.

02:20:15  17   BY MR. ARMSTRONG:

02:20:15  18   Q.  Now, sir, maybe you recognize this as something that you

02:20:18  19   reviewed in this case, right?

02:20:20  20   A.  You know, there's so many of these that look like this,

02:20:26  21   it's sort of hard to tell them apart.  If it was one of the

02:20:29  22   government's exhibits or one of my exhibits, you know, then I

02:20:37  23   reviewed it, but --

02:20:38  24   Q.  Does it refresh your memory, if you look at the top

02:20:41  25   right-hand corner, and see this is episode No. 19?

Fischel - cross

1905

02:20:43  1   A.  Yes, I see that.  So, this would be one of the government

02:20:50  2   exhibits.

02:20:50  3   Q.  Okay.

02:20:50  4       And this is one of the exhibits that you reviewed,

02:20:53  5   right?

02:20:53  6   A.  Correct.

02:20:55  7       MR. ARMSTRONG:  And, Mr. Fineman, if we can please

02:20:57  8   put next to episode 1 -- I'm sorry, GX 1, episode 19 and GX 1,

02:21:04  9   episode 47.

          10   BY MR. ARMSTRONG:

02:21:13  11  Q.  And, Professor, do you see that GX 1, episode 47, is also

02:21:18  12  one of the episodes you reviewed in this case?

02:21:20  13  A.  Yes, I see that.

02:21:21  14  Q.  And do you see on the right in episode 34, that's an

02:21:25  15  episode of Mr. Lakhan, right?  Episode 19?

02:21:33  16  A.  I'm -- you know, respectfully, I just don't understand

02:21:36  17  what you want me to look at.

02:21:37  18  Q.  I'm just directing your attention to the episode on the

02:21:40  19  right, episode 19.  That's an episode involving Mr. Lakhan,

02:21:45  20  right?

02:21:45  21  A.  How do I know that?  Oh, I see it.  I see it at the top.

02:21:51  22  I'm sorry.

02:21:52  23  Q.  That's okay.

02:21:52  24      All right.  So, Mr. Lakhan's on the buy and sell

02:21:55  25  side, right?

Fischel - cross

1906

02:22:01  1   A.  Yes.  I see that.

02:22:02  2   Q.  Okay.

02:22:03  3           And on the left, we have Mr. Pacilio on the buy and

02:22:07  4   sell side, right?

02:22:08  5   A.  Yes, sir, I see that, as well.

02:22:13  6   Q.  And we see that in both instances, there is an iceberg

02:22:19  7   first to buy, right?

02:22:26  8   A.  Again, if you want me to respond, can I just take a minute

02:22:30  9   to just look at these first?

02:22:31  10  Q.  Of course.

02:22:32  11  A.  Without your red, which is blocking the --

02:22:35  12  Q.  Oh, I'm sorry.

02:22:38  13  A.  -- the boxes.

02:22:40  14           Just give me a second, and I'll --

02:22:41  15  Q.  Sure, take your time.

02:22:42  16  A.  -- be ready.

          17     Brief pause.)

          18  BY THE WITNESS:

02:23:04  19  A.  Okay.  I'm ready.

02:23:06  20  BY MR. ARMSTRONG:

02:23:06  21  Q.  All right.

02:23:06  22           So, now in both instances, we have first an iceberg

02:23:09  23  order to buy, right?

02:23:10  24  A.  Correct.

02:23:10  25  Q.  And on the opposite of the iceberg order to buy, we have

Fischel - cross

1907

| | | |
|---|---|---|
| 02:23:15 | 1 | an approximate 100-lot order to sell, right? |
| 02:23:19 | 2 | A.  Correct. |
| 02:23:20 | 3 | Q.  Now, did you sit through testimony and hear how Mr. Lakhan |
| 02:23:27 | 4 | described how he learned to spoof? |
| 02:23:32 | 5 | A.  I didn't sit through any testimony by Mr. Lakhan, as I've |
| 02:23:37 | 6 | tried to make clear. |
| 02:23:41 | 7 | I think I do remember, just from reading what he said |
| 02:23:45 | 8 | about how he learned how to spoof by learning from his |
| 02:23:48 | 9 | colleagues or something of that nature.  At least that's what |
| 02:23:52 | 10 | I recall. |
| 02:23:52 | 11 | Q.  And, so, you understand, as part of testifying today, that |
| 02:23:57 | 12 | Mr. Lakhan was taught by Mr. Pacilio how to spoof, right? |
| 02:24:00 | 13 | MR. MENCHEL:  Objection to the form of the question. |
| 02:24:02 | 14 | THE COURT:  Sustained. |
| 02:24:04 | 15 | Please rephrase. |
| | 16 | BY MR. ARMSTRONG: |
| 02:24:10 | 17 | Q.  And, so, you understand, as part of formulating your |
| 02:24:13 | 18 | opinion, that Mr. Lakhan was taught by Mr. Pacilio how to |
| 02:24:18 | 19 | spoof, right? |
| 02:24:18 | 20 | MR. MENCHEL:  Same objection. |
| 02:24:25 | 21 | He's asking him to credit the witness. |
| 02:24:28 | 22 | MR. ARMSTRONG:  That's not what I'm asking, your |
| 02:24:30 | 23 | Honor. |
| 02:24:30 | 24 | THE COURT:  That's not what he's asking.  He's asking |
| 02:24:34 | 25 | Professor Fischel what he considered. |

Fischel - cross

1908

BY THE WITNESS:

02:24:40  A.  I have -- I don't have the testimony in front of me, but I

02:24:46  have a recollection that that is basically what Mr. Lakhan

02:24:49  testified to, although obviously I'd feel more comfortable if

02:24:52  I had the testimony in front of me.

BY MR. ARMSTRONG:

02:24:55  Q.  Sure.

02:24:56  A.  The transcript.

02:24:57  But as I said, your question is basically consistent

02:25:00  with my recollection of what Mr. Lakhan testified to.

02:25:04  Q.  And, so, it was Mr. Lakhan who actually described the

02:25:08  four-part scheme as far as your understanding for testifying

02:25:11  here today, right?

02:25:13  A.  He certainly -- he certainly described the four-part

02:25:16  scheme, correct.

02:25:17  Q.  And you understood that he was actually the one who was

02:25:20  there at the time, right?

02:25:21  A.  I understood that, as well.

02:25:22  Q.  And, so, in the course of testifying about the misleading

02:25:43  picture that the government presented to the jury, you didn't

02:25:48  consider Mr. Lakhan's testimony about the four-part scheme?

02:25:52  A.  I not only considered it, I tested it; and I had a number

02:25:58  of exhibits involving Mr. Lakhan, and they were just as biased

02:26:02  and non-representative as the other episodes in the government

02:26:11  episodes 1 through 72.

Fischel - cross

1909

02:26:16   1   Q.  So, it's your testimony that you're just not crediting Mr.

02:26:18   2   Lakhan's testimony?

02:26:20   3               MR. MENCHEL:  Objection.

02:26:20   4               THE COURT:  Sustained.

02:26:21   5               Please rephrase.

           6   BY MR. ARMSTRONG:

02:26:23   7   Q.  So, is it your testimony that you are just putting to the

02:26:27   8   side Mr. Lakhan's own words and his own testimony in analyzing

02:26:33   9   his trading patterns?

02:26:38  10   A.  What I'm saying is I did an objective analysis of the

02:26:46  11   episodes that Mr. Lakhan was involved in, as I did with Mr.

02:26:54  12   Pacilio and Mr. Bases, and I concluded with respect to all of

02:26:59  13   those episodes, including the ones where Mr. Lakhan was

02:27:03  14   involved, that the episodes that Mr. Lakhan was involved in

02:27:11  15   government episodes 1 through 72 represented a biased and

02:27:16  16   non-representative sample of the relevant data, which I

02:27:21  17   described at length in my testimony.

02:27:24  18   Q.  And, so, certainly you saw then that Mr. Lakhan described

02:27:27  19   how he spoofed frequently, right?

02:27:29  20   A.  I think that's what he said.

02:27:32  21   Q.  And certainly you understood that Mr. Lakhan described how

02:27:35  22   the defendants spoofed frequently, as well, right?

02:27:38  23   A.  I think that's what he said.

02:27:41  24   Q.  And, so, is it your opinion that in order for the

02:27:46  25   government to prove its case, we have to present to the jury

Fischel - cross

1910

02:27:49    1    every single instance in which the defendants allegedly

02:27:53    2    spoofed?

02:27:53    3            MR. MENCHEL:  Objection.

02:27:54    4            THE COURT:  Sustained.

            5    BY MR. ARMSTRONG:

02:28:04    6    Q.  Is it your opinion, sir, that the only way the government

02:28:08    7    could not present a false and misleading narrative to the jury

02:28:11    8    is to present to the jury every single instance in which the

02:28:14    9    defendants allegedly spoofed?

02:28:23   10    A.  My opinion is based on whether the episodes in government

02:28:33   11    episodes 1 to 72 were -- contained a fair and representative

02:28:42   12    sample of the trading behavior that Mr. Pacilio, Mr. Bases and

02:28:48   13    Mr. Lakhan were involved in.

02:28:51   14            And I concluded that the episodes that the government

02:28:56   15    presented and the trading data in those episodes represented a

02:29:01   16    biased and non-representative sample of the relevant trading

02:29:06   17    behavior in question.  And that you, sir, Mr. Armstrong,

02:29:12   18    represented a false picture of what the evidence would show in

02:29:17   19    connection with those episodes in your opening statement to

02:29:21   20    the jury.

02:29:21   21    Q.  Thank you, sir.  I just want to make sure we're on the

02:29:24   22    same page.

02:29:25   23            So, is it your opinion that the only way that the

02:29:27   24    government can not be false and misleading is to just present

02:29:31   25    to the jury chart after chart after chart after chart of every

Fischel - cross

1911

02:29:35  1  single instance in which the defendants were allegedly

02:29:38  2  spoofing?

02:29:40  3  A.  That was not my opinion.

02:29:49  4  Q.  And, sir, you're not a trial attorney, right?

02:29:51  5  A.  I am not.

02:29:53  6  Q.  Okay.  Ever been to court in a non-testifying capacity?

02:29:56  7  A.  You mean, in any -- like, watching or --

02:30:03  8  Q.  Doing what I'm doing right now.

02:30:04  9  A.  Doing what you're doing, no.  No, never.

02:30:14  10          MR. ARMSTRONG:  Your Honor, may I seek your guidance

02:30:15  11  on an issue?

02:30:21  12      (Proceedings had at sidebar:)

02:30:22  13          MR. ARMSTRONG:  Your Honor, as a --

02:30:28  14          THE COURT:  Mr. Menchel.

02:30:33  15      (Brief pause.)

02:30:33  16          MR. ARMSTRONG:  Your Honor, as a segue into the data

02:30:36  17  and the charts that this witness has shown to the jury, I

02:30:39  18  intend to ask the witness whether another court has found that

02:30:43  19  his opinion should be barred because it was the product of

02:30:47  20  unreliable principles and methods reliably applied.

02:30:53  21          And, so, I think that's directly relevant to his

02:30:54  22  testimony and his allegation that it's the government that's

02:30:58  23  cherry-picking and presenting a misleading picture to the

02:31:00  24  jury.

02:31:00  25          THE COURT:  And what case is that?

| | | |
|---|---|---|
| 02:31:04 | 1 | MR. ARMSTRONG: In re Pfizer, Inc. Securities |
| 02:31:06 | 2 | Litigation. I have a copy if your Honor wants it. |
| 02:31:12 | 3 | THE COURT: Mr. Menchel? |
| 02:31:13 | 4 | MR. MENCHEL: I'd like to see it. |
| 02:31:19 | 5 | THE COURT: Could I see a copy, as well? |
| 02:31:23 | 6 | Thank you. |
| 02:31:58 | 7 | (Document tendered to the Court.) |
| 02:31:58 | 8 | MR. MENCHEL: My understanding is this was reversed |
| 02:32:00 | 9 | on appeal by the appellate court. The case was sent back, and |
| 02:32:05 | 10 | actually Mr. -- Professor Fischel's client actually prevailed |
| 02:32:10 | 11 | in this case. |
| 02:32:12 | 12 | Do we really want to get into trials about other |
| 02:32:14 | 13 | cases where courts reversed? |
| 02:32:17 | 14 | THE COURT: Did the issue of Dr. Fischel being |
| 02:32:23 | 15 | excluded under Rule 702, did that come up on appeal? |
| 02:32:29 | 16 | MR. MENCHEL: Let me double-check. That's my |
| 02:32:31 | 17 | understanding, but let me double-check. |
| 02:33:04 | 18 | Judge, we're not -- my consultant is not a hundred |
| 02:33:07 | 19 | percent sure. Can we just take -- we're looking, pulling it |
| 02:33:08 | 20 | up on Westlaw as we speak. |
| 02:33:24 | 21 | MR. ARMSTRONG: Your Honor, I believe that the |
| 02:33:26 | 22 | subsequent order says, "As for Fischel's adjustment to the |
| 02:33:30 | 23 | price increases, the district court did not abuse its |
| 02:33:33 | 24 | discretion in concluding that this change was not sufficiently |
| 02:33:36 | 25 | reliable to be presented to the jury. However, Fischel's |

02:33:42  1   error did not render the remainder of his testimony

02:33:46  2   unreliable.  The Court should have prevented him from

02:33:50  3   testifying about the adjustment but otherwise allowed him to

02:33:52  4   present his findings on loss, causation and damages."

02:34:02  5           MR. MENCHEL:  I mean, if they want to go into this,

02:34:04  6   we'll bring out all the things the Court said were perfectly

02:34:07  7   appropriate.  I don't know what it gains them, but if that's

02:34:09  8   what they want to do, that's fine.

02:34:16  9           THE COURT:  You can go ahead and do that.

02:34:29  10      (Proceedings had in open court:)

          11   BY MR. ARMSTRONG:

02:34:29  12   Q.  Now, Professor Fischel, you showed the jury --

02:34:32  13           MR. MENCHEL:  I'm sorry, your Honor, one second,

02:34:33  14   please.  I apologize.  I'm trying to read this on the fly.

02:34:54  15      (Proceedings had at sidebar:)

02:34:54  16           MR. MENCHEL:  Your Honor, in this case, the district

02:34:55  17   court -- the appellate court reversed, finding that the

02:35:01  18   district court abused its discretion by excluding all of

02:35:04  19   Fischel's testimony.  In other words, this court was found to

02:35:09  20   have been wrong in preventing Professor Fischel from

02:35:11  21   testifying.

02:35:12  22           THE COURT:  Well, as to a number of opinions, right,

02:35:15  23   but not all of them?

02:35:17  24           MR. ARMSTRONG:  Correct.

02:35:18  25           THE COURT:  So, if the government wants to get into

Fischel - cross

1914

02:35:23    1    the fact that a court has at least found one of his

02:35:30    2    opinions -- you know, that there was an instance where a

02:35:33    3    district -- a court found an opinion that's being offered by

02:35:36    4    Professor Fischel as being unreliable, they're entitled to do

02:35:40    5    that.

02:35:41    6            MR. MENCHEL:  Okay.

02:36:00    7       (Proceedings had in open court:)

02:36:00    8            MR. ARMSTRONG:  Your Honor, may I have my copy back?

          9            THE COURT:  Oh, yes.

       10       (Document tendered.)

02:36:06   11            MR. ARMSTRONG:  Thank you.

       12    BY MR. ARMSTRONG:

02:36:13   13    Q.  Now, Professor Fischel, you were involved in the Pfizer

02:36:18   14    Securities Litigation case, right?

02:36:19   15    A.  Yes, I was.

02:36:20   16    Q.  And in that case, you tried to give an opinion at the

02:36:30   17    district court level, and the judge barred you from doing part

02:36:35   18    of that, didn't he or she?

02:36:38   19    A.  Yes, that's correct, for -- that's -- at the district

02:36:41   20    court level, that's correct.

02:36:42   21    Q.  And the court found that you failed to take into account

02:36:48   22    the impact of certain evidence, right?

02:36:56   23    A.  You're talking about the district court level?

02:36:58   24    Q.  Correct.

02:36:59   25    A.  Again, I don't remember exactly what the court found, but

Fischel - cross

1915

02:37:05  1    that's certainly consistent with my recollection.

02:37:06  2    Q.  And, so, the court said you can't present your opinion at

02:37:11  3    trial because you just didn't take into account important

02:37:16  4    evidence, right?

02:37:19  5    A.  You're not talking about the court of appeals, right?  I

02:37:22  6    mean, where --

02:37:24  7    Q.  The trial court, like this.

02:37:27  8    A.  Yes, that's what the trial court found.

02:37:29  9    Q.  And despite that ruling in the trial court, where we are

02:37:39  10   today, you still didn't sit through testimony, and you still

02:37:43  11   didn't review all the defendants' chats in this case, right?

02:37:46  12              MR. MENCHEL:  Objection.  Completely irrelevant to

02:37:48  13   this question.

02:37:50  14              THE COURT:  Sustained.

02:37:53  15              It's also asked and answered.  I think we all know

02:37:56  16   the answer to that question.

02:37:57  17              MR. ARMSTRONG:  Thank you, Judge.

02:37:58  18              MR. MENCHEL:  I should have said asked and answered.

          19   BY MR. ARMSTRONG:

02:38:07  20   Q.  Now, sir, a critical part of the four-part scheme that Mr.

02:38:12  21   Lakhan described was canceling the large orders quickly, and

02:38:16  22   you understood that, right?

02:38:18  23   A.  That's the claim, yes, I understand that.  The large

02:38:22  24   visible orders quickly.

02:38:23  25   Q.  It's also the evidence from a witness who sat in that

Fischel - cross

1916

02:38:28   1   chair, right?

02:38:30   2        MR. MENCHEL:  Objection to what's evidence and what's

02:38:32   3   not evidence.

02:38:33   4        THE COURT:  Sustained.

           5   BY MR. ARMSTRONG:

02:38:35   6   Q.  That's the testimony of Mr. Lakhan that you say you looked

02:38:38   7   at, right?

02:38:38   8   A.  Correct.

02:38:39   9   Q.  And, so, you understood, of course, the importance of

02:38:44  10   orders that are canceled quickly in a spoofing scheme, right?

02:38:55  11   A.  I'm not sure how to answer that.  Are you asking me to

02:38:57  12   assume that there was a spoofing scheme?

02:39:00  13   Q.  You understood that the way the scheme was described was

02:39:04  14   that the cancellation of the spoof order was critical to the

02:39:08  15   operation of the scheme, right?

02:39:10  16   A.  You mean do I understand that Mr. Lakhan said that?  Or do

02:39:14  17   I understand that that's true?  Or what exactly are you asking

02:39:17  18   me?

02:39:17  19   Q.  I'm asking you, based on preparing for today, you

02:39:21  20   understood that, as part of all the evidence you reviewed,

02:39:27  21   that the cancellation of the spoof order was an important part

02:39:30  22   of the described scheme, right?

02:39:32  23   A.  Described by Mr. Lakhan?

02:39:35  24   Q.  Sure.

02:39:35  25   A.  Because I don't think the orders were canceled quickly.

Fischel - cross

1917

02:39:38  1  But if you want to know what he said based on my recollection,

02:39:42  2  which I think, again, is contrary to what the data show, I

02:39:46  3  think that is what he said.

02:39:50  4  Q.  And you understood that part of the government's evidence

02:40:01  5  in this case was orders that were canceled in less than five

02:40:05  6  seconds, right?

02:40:10  7  A.  Again, yes, I understand that, and that's what I tested.

02:40:14  8  That's part of the biased and non-representative sample of

02:40:18  9  data that the government presented.

02:40:20  10  Q.  Got it.

02:40:21  11       So, you understood that part of the evidence -- proof

02:40:24  12  in this case was the cancellation of large orders in less than

02:40:27  13  five seconds, right?

02:40:29  14  A.  I understand that's what the government claimed.

02:40:31  15  Q.  Okay.

02:40:33  16       MR. ARMSTRONG:  Government Exhibit 193, please,

02:40:36  17  Mr. Fineman -- sorry, Defendants' Exhibit 193.

02:40:39  18       Thank you.

02:40:40  19       And Page 6, please, Mr. Fineman.

          20  BY MR. ARMSTRONG:

02:40:47  21  Q.  So, sir, you see on the screen here -- and let me know

02:40:50  22  when you're ready.

02:40:50  23  A.  Just give me a second, please.

02:40:52  24  Q.  Of course.

02:40:52  25  A.  Thank you.

Fischel - cross

1918

02:41:05    1      (Brief pause.)

            2    BY THE WITNESS:

02:41:06    3    A.  Okay.  I see that.

            4    BY MR. ARMSTRONG:

02:41:07    5    Q.  Now, sir, the large red order, the 200-lot order placed by

02:41:11    6    Mr. Pacilio, that was on the market for a minute and seven

02:41:17    7    seconds, right?

02:41:19    8    A.  Yes, that's correct.

02:41:20    9    Q.  Now, you know, based on all the evidence you reviewed,

02:41:25   10    that's not part of the government's spoof scheme?

02:41:29   11    A.  That -- that's the point.  I mean, the evidence is

02:41:32   12    inconsistent with the government's claims.

02:41:34   13    Q.  That has nothing to do with it.

02:41:37   14    A.  Excuse me, claims as presented in episodes 1 to 72.

02:41:40   15    Q.  Sir, there's not a single piece of testimony or chat that

02:41:50   16    you've seen that describes how an order on the market for a

02:41:55   17    minute and seven seconds was part of a spoof scheme, was

02:41:58   18    there?

02:42:07   19    A.  Again, that is just evidence of large visible orders

02:42:12   20    placed opposite icebergs in the total sample that reveals what

02:42:22   21    I'll call evidence -- economic evidence -- fundamentally

02:42:27   22    inconsistent with the government's claims of what the data

02:42:30   23    showed in episodes 1 through 72.  It is one of the reasons why

02:42:36   24    the government's sample is so biased and non-representative,

02:42:42   25    because it does not describe what actually happened looking at

Fischel - cross

1919

02:42:45   1   the full set of data.

02:42:47   2   Q.   Now, sir, you testified about how markets can move at the

02:43:04   3   speed of light essentially, right?

02:43:06   4   A.   Extremely quickly, that's right.

02:43:08   5   Q.   And you would agree that putting a large order on the

02:43:14   6   market for a minute and seven seconds is just not really

02:43:18   7   evidence of a spoof scheme, right?

02:43:28   8   A.   I don't know how to answer that other than what I've

02:43:30   9   already said.

02:43:32   10         This particular exhibit, now that you've showed it to

02:43:37   11   me, is another example of a large visible order. Using the

02:43:43   12   definition used by the government for what a large visible

02:43:47   13   order is, opposite an iceberg and rather operating like

02:43:57   14   clockwork as you represented to the jury, it was the exact

02:44:00   15   opposite, and that's what this exhibit shows.

02:44:02   16   Q.   All right.

02:44:03   17         Now, sir, just two more questions on this exhibit.

02:44:05   18   You certainly understand as part of your testimony here today

02:44:08   19   that the government's four-part scheme involves a quick

02:44:11   20   cancellation, right?

02:44:16   21   A.   My understanding is that the episodes in 1 to 72 that the

02:44:25   22   government relies upon all had quick cancellations, but I also

02:44:30   23   understand that that's one of the reasons that those episodes

02:44:36   24   represent a biased and non-representative sample of what the

02:44:40   25   data actually show.

Fischel - cross

1920

02:44:42  1  Q.  Okay.

02:44:43  2      And you certainly can understand the government is

02:44:46  3  not alleging that Mr. Pacilio never put on large orders in the

02:44:49  4  market, right?

02:44:51  5  A.  As far as I know, there's no allegation to that effect.

02:44:55  6  Q.  And, so, this document just proves that Mr. Pacilio put on

02:45:02  7  a large order and kept it on there for a while, right?

02:45:08  8  A.  No.  I think what it shows is that you can create charts

02:45:15  9  just like the government charts that show the exact opposite,

02:45:21  10  providing further evidence that the government relied on a

02:45:24  11  biased and non-representative sample of data.

02:45:30  12  Q.  Biased and non-representative, kind of like not looking at

02:45:34  13  charts to figure out intent, right?

02:45:38  14          MR. MENCHEL:  Objection to form of the question.

02:45:39  15          THE COURT:  Sustained.

02:45:40  16          MR. ARMSTRONG:  Withdrawn, your Honor.

02:45:41  17          Mr. Fineman, if you can please pull up DX 192,

02:45:44  18  please.

02:45:48  19          Page 2, please.

02:45:51  20          And, Mr. Fineman, if you can please pull up for the

02:45:53  21  jury and the professor Line 31, please.

02:46:03  22          And if you can please highlight Line 31, Mr. Fineman.

         23  BY MR. ARMSTRONG:

02:46:09  24  Q.  Sir, do you recognize that Line 31 is -- as part of DX

02:46:14  25  192 -- was one of the exhibits that you made to talk about

Fischel - cross

1921

02:46:18  1    today?

02:46:19  2    A.  Yes, I do recognize it.

02:46:20  3    Q.  And that is one of Mr. Pacilio's episodes, right?

02:46:23  4    A.  Yes.

02:46:27  5    Q.  And this shows that Mr. Pacilio put in a 500-lot order to

02:46:34  6    buy that had a duration of .49 milliseconds, right?

02:46:44  7    A.  .496 seconds, correct.

02:46:47  8    Q.  That's pretty quick, right?

02:46:48  9    A.  Very quick.

02:46:48  10   Q.  That's a quick cancellation, right?

02:46:52  11   A.  It is.

02:46:52  12   Q.  And on the right of the screen, you described what happens

02:47:00  13   next, right, after that 500-lot buy order hit the market?

02:47:10  14   A.  Well, the duration is the time between entry and

02:47:14  15   cancellation.  So, to the right is what happened in that

02:47:20  16   intervening time.

02:47:22  17   Q.  So, on the right, this shows what exactly happened in the

02:47:26  18   market for those .49 milliseconds, right?

02:47:29  19   A.  That's right.

02:47:30  20   Q.  And what happened was 31 contracts -- I'm sorry -- there

02:47:42  21   were 26 trades for 31 contracts, right?

02:47:45  22   A.  That's right.

02:47:46  23   Q.  Now, do you know how many of those contracts traded were

02:47:52  24   Mr. Pacilio's?

02:47:53  25   A.  No, I don't.

Fischel - cross

1922

02:47:54  1    Q.   So, you see here that it says 31, right?

02:47:58  2    A.   Yes, I see that.

02:47:59  3    Q.   So, that's the number of contracts that were traded in

02:48:03  4    this .49-second duration, right?

02:48:05  5    A.   Correct.

02:48:05  6    Q.   And the date of this is January 4th, 2011, right?

02:48:11  7    A.   That's right.

02:48:12  8         MR. ARMSTRONG:  Mr. Fineman, could you please pull up

02:48:16  9    GX 1, episode 31.

         10    BY MR. ARMSTRONG:

02:48:20 11    Q.   And, sir, do you recognize that this is the exact same

02:48:21 12    episode for the line that we just looked at in DX 192, right?

02:48:34 13    A.   Yeah, again, I'm not disagreeing, but I'm not --

02:48:37 14    Q.   Take your time.

02:48:38 15    A.   -- sure how you know that.

02:48:40 16    Q.   Well, we can match it up.  We went through before how Line

02:48:44 17    31 was the silver market for January 4th, 2011, in which Mr.

02:48:48 18    Pacilio put in a 500-lot buy order that had the duration of

02:48:54 19    .49 seconds --

02:48:55 20    A.   Yes.  You're quite right.  I see it.

02:48:57 21    Q.   Okay.

02:48:58 22         And how many of those 31 contracts, in the duration

02:49:01 23    of this .496 seconds, were orders of Mr. Pacilio?

02:49:27 24    A.   I mean, it says the order was 92.1 percent of the visible

02:49:31 25    order book.

Fischel - cross

1923

02:49:32    1    Q.  No, I'm sorry.  I'll circle it on the screen if it helps.

02:49:36    2            So, we saw before how, in the duration of .496

02:49:43    3    seconds, 31 contracts exchanged hands, right?

02:49:47    4    A.  Correct.

02:49:47    5    Q.  And this shows that of those 31, ten were iceberg orders

02:49:55    6    to sell of Mr. Pacilio, right?

02:50:00    7    A.  Yes, that's what it shows.

02:50:01    8    Q.  So, one-third of the contracts exchanging hands after Mr.

02:50:07    9    Pacilio places this 500-lot buy order were Mr. Pacilio's

02:50:13   10    orders to sell, right?

02:50:14   11    A.  It looks like that.  It looks like that.

02:50:27   12    Q.  Now, sir, when you were talking before about what other

02:50:30   13    traders see and don't see, you would agree that 92 percent of

02:50:34   14    the visible order book is a large amount, right?

02:50:38   15    A.  Yes, I would agree with that.

02:50:39   16    Q.  For just one person?

02:50:43   17    A.  Well, for -- any time something is 92.1 percent of the

02:50:48   18    visible order book, I would agree that's a high percentage.

02:50:51   19    Q.  And, so, in this instance, Mr. Pacilio is changing his

02:51:01   20    mind, according to you, about buying or selling $94 million in

02:51:09   21    silver?

02:51:09   22            MR. MENCHEL:  Objection.  There's been no testimony

02:51:11   23    about the mind of Mr. Pacilio by Professor Fischel.

02:51:14   24            MR. ARMSTRONG:  I'll rephrase it, your Honor.

02:51:15   25            THE COURT:  All right.

02:51:16   1              Go ahead and rephrase.

           2      BY MR. ARMSTRONG:

02:51:30   3      Q.  And, so, sir, we see that Mr. Pacilio put on, then took

02:51:35   4      off the market in a duration of less than half a second $74

02:51:40   5      million, right?

02:51:41   6      A.  The order to buy was for $74 million, that's correct.

02:51:51   7      Q.  And do you know whether this order was part of the

02:51:56   8      four-part scheme that Mr. Lakhan described as part of

02:51:59   9      testifying here today?

02:52:03  10      A.  You mean according to Mr. Lakhan?  Because I don't think

02:52:06  11      this demonstrates a four-part scheme even based on the

02:52:10  12      government's own exhibit.

02:52:13  13              But -- but if you're asking me do I remember that Mr.

02:52:18  14      Lakhan testified about this specific incident, no, I don't.

02:52:22  15      Q.  Sir --

02:52:39  16              MR. ARMSTRONG:  Mr. Fineman, if you can please pull

02:52:41  17      up DX 817.

          18      BY MR. ARMSTRONG:

02:52:46  19      Q.  Now, Professor, you recognize that this is one of the

02:52:49  20      documents that you testified about on direct examination with

02:52:54  21      Mr. Menchel, right?

02:52:55  22      A.  Yes, I do remember that.

02:52:59  23      Q.  And you show here that there were 4,117 visible orders

02:53:07  24      placed on the market around this time, right?

02:53:09  25      A.  During this time, correct.

Fischel - cross

1925

02:53:13  1    Q.   Now --

02:53:19  2    A.   The contracts traded, to be more precise.

02:53:21  3    Q.   Now, where on this exhibit do you explain to the jury how

02:53:26  4    quickly those 4,117 visible orders were canceled?

02:53:35  5    A.   I have that -- how quickly they were canceled?  Well, I'm

02:53:45  6    a little bit confused by the question.  This is contracts that

02:53:48  7    were traded as opposed to canceled.

02:53:53  8    Q.   Now, sir, in GX -- I'm sorry, DX 815, you talked about the

02:54:15  9    21 percent of the visible orders that were hit, right?

02:54:24  10   A.   Correct.

02:54:25  11   Q.   Now, could you explain to the jury the actual number of

02:54:34  12   contracts that were bought or sold with those 21 percent?

02:54:45  13   A.   I think the exhibit that you just showed, I believe, had

02:54:51  14   that data on it.

02:54:53  15   Q.   And, sir, in the course of testifying here today, did you

02:54:56  16   review Government Exhibit 237?

02:55:00  17   A.   I have to see it.

02:55:01  18   Q.   Sure.

02:55:05  19        MR. MENCHEL:  Is that in evidence?

02:55:06  20        MR. ARMSTRONG:  No.

02:55:22  21      (Document tendered.)

02:55:22  22      (Brief pause.)

          23   BY THE WITNESS:

02:55:36  24   A.   I have seen this exhibit before.

          25   BY MR. ARMSTRONG:

Fischel - cross

1926

1 Q.   Okay.

02:55:38    2            And, sir -- if I can have it back, please?

02:55:41    3            MR. MENCHEL:  Your Honor, can we have a sidebar,

02:55:44    4  please?

02:55:44    5            THE COURT:  All right.

02:55:54    6       (Proceedings had at sidebar:)

02:55:54    7            MR. MENCHEL:  Your Honor, this was the exhibit that

02:55:57    8  the government made a strategic decision not to try to

02:56:03    9  introduce through the case agent.  And this was their basis,

02:56:07   10  in part, for trying to prevent Dr. Fischel from -- Professor

02:56:13   11  Fischel from testifying.

02:56:14   12            I don't -- while he may have seen this exhibit, he

02:56:18   13  cannot lay a foundation or testify as to the accuracy of this

02:56:21   14  data at all.  This was not created by him, and I don't -- I

02:56:25   15  object to him being questioned about a document for which no

02:56:28   16  foundation has been laid as to its accuracy.  I was not

02:56:32   17  allowed to cross-examine on it because it was not introduced.

02:56:35   18            MR. ARMSTRONG:  Your Honor, that foundation has been

02:56:37   19  laid.  The professor reviewed it in the course of testifying

02:56:39   20  here today.  We're not going to seek to move it in.  We just

02:56:43   21  want to show that it presents a different picture from what is

02:56:46   22  depicted in DX 815 on Page 8.

02:56:50   23            MR. MENCHEL:  My point is just because he looked at

02:56:52   24  it doesn't mean he can verify it's accurate, and they're

02:56:55   25  trying to backdoor in an exhibit that they chose not to

Fischel - cross

1927

02:56:59   1   introduce before this jury.

02:57:03   2              THE COURT:  I'm going to allow the government to

02:57:05   3   examine Dr. Fischel on this document, given the fact that he

02:57:08   4   reviewed it as part of formulating his opinions in the case.

02:57:13   5              MS. PORTER:  Your Honor, we would object to questions

02:57:16   6   about the slides that relate to Mr. Bases.  I don't know if

02:57:20   7   Mr. Armstrong was even planning to question about those.

02:57:22   8              MR. ARMSTRONG:  I'm not.

02:57:23   9              MS. PORTER:  Okay.

          10          (Proceedings had in open court:)

          11   BY MR. ARMSTRONG:

02:57:31  12   Q.  So, Dr. Fischel, I think we have on the screen DX --

02:57:33  13   A.  Professor, please.

          14   Q.  I'm sorry.

02:57:35  15   A.  Mr. or Professor.

02:57:35  16   Q.  Professor --

02:57:37  17              MR. MENCHEL:  Your Honor, with respect, is this being

02:57:39  18   published?  It's not in evidence before this case.

02:57:41  19              MR. ARMSTRONG:  I'm not there yet.

02:57:41  20              THE COURT:  815?

02:57:45  21              MR. MENCHEL:  No, it's not published yet.  Never

02:57:48  22   mind.

          23   BY MR. ARMSTRONG:

02:57:49  24   Q.  Professor, we talked about how in DX 815 this shows that

02:57:54  25   21 percent of Mr. Pacilio's visible orders got hit, right?

Fischel - cross

1928

02:57:58   1   A.   Correct.

02:57:59   2   Q.   But you don't say on here the actual number of contracts

02:58:05   3   that were traded in this 21 percent of visible orders, right?

02:58:11   4   A.   Not on this exhibit, that's correct.

02:58:13   5   Q.   Do you know the answer to that question?

02:58:15   6   A.   Not from memory, no.

02:58:16   7   Q.   Okay.

02:58:16   8         If I show you --

02:58:18   9         MR. ARMSTRONG:  For the witness only, please.

           10   BY MR. ARMSTRONG:

02:58:25  11   Q.   -- GX 237, Page 8 --

02:58:29  12         MR. MENCHEL:  Your Honor, I'd like to make the same

02:58:31  13   objection as before.  It assumes the accuracy of what's being

02:58:34  14   shown.

02:58:35  15         THE COURT:  Objection is overruled.

           16   BY MR. ARMSTRONG:

02:58:38  17   Q.   Now, Professor, do you know that of those 21 percent of

02:58:43  18   visible orders that only 418 of the roughly 150,000 contracts

02:58:49  19   were actually filled?

02:58:53  20   A.   I don't know that.  I don't know what the sample is of --

02:58:58  21   that's referred to on this particular document.  It's not even

02:59:03  22   listed what sample this refers to.  So, I have no idea whether

02:59:09  23   what you're saying is accurate or not accurate.

02:59:12  24   Q.   Okay.

02:59:14  25         So, going back to 815, it is your testimony here

Fischel - cross

1929

02:59:18  1  today that you have no idea, number one, the actual number of

02:59:24  2  contracts in these visible orders, and, number two, the number

02:59:29  3  of contracts that were actually filled; is that right?

02:59:33  4  A.  I think I have another exhibit on the number of contracts

02:59:37  5  that were executed based on the sample that I reviewed.  You

02:59:43  6  gave me something with no labeling, no sample, no

02:59:46  7  identification of what it is.  So, I can't comment on it.  But

02:59:50  8  I do know how many contracts were executed because I have a

02:59:53  9  separate exhibit on it.

02:59:55  10  Q.  Okay.

02:59:55  11       Well, how many were there?

02:59:57  12  A.  Hold on.

03:00:03  13     (Brief pause.)

         14  BY THE WITNESS:

         15  A.  All right.

03:00:16  16       If you look at Exhibit 817 for the visible orders,

03:00:33  17  the answer is 4,117.

03:00:42  18  Q.  4,117.

03:00:45  19       What is the denominator?  Of how many?

03:00:49  20  A.  I don't know.

03:00:50  21  Q.  That wasn't part of what you put together to talk about

03:01:04  22  before the jury today?

03:01:08  23  A.  Not on this exhibit.  There are other exhibits, I think,

03:01:12  24  that have fill rate percentages on them.  But for purposes of

03:01:21  25  this exhibit, that data's not contained on this exhibit.

Fischel - cross

1930

03:01:25  1  Q.  And you would not, of course, want to give the jury a

03:01:28  2  false and misleading impression if the number was, in fact,

03:01:31  3  significantly higher than 4,000, right?

03:01:35  4  A.  I don't understand the question.  The 4,117 is the right

03:01:40  5  number.  There's nothing misleading about it.

03:02:08  6  Q.  Now, sir, DX 188 --

03:02:16  7         MR. ARMSTRONG:  Mr. Fineman, if you can please blow

03:02:21  8  up the bottom half.

03:02:25  9         I'm sorry, Mr. Fineman, the top half.

          10  BY MR. ARMSTRONG:

03:02:33 11  Q.  And, sir, of Mr. Pacilio's non-iceberg orders, a hundred

03:02:40 12  lots or more, how many of those -- what's the fill rate of

03:02:46 13  those kinds of orders?

03:02:56 14  A.  For those orders, .4 percent.

03:02:59 15  Q.  And with an opposite side iceberg?

03:03:03 16  A.  .2 percent.

03:03:05 17  Q.  So, the fill rate of Mr. Pacilio's 100-lot orders opposite

03:03:12 18  an iceberg is .2 percent; is that right?

03:03:16 19  A.  Correct.

03:03:32 20         MR. ARMSTRONG:  Defense Exhibit 815 at 2, please.

          21  BY MR. ARMSTRONG:

03:03:41 22  Q.  Sir, you presented this document to the jury, correct?

03:03:43 23  A.  I did.

03:03:44 24  Q.  And the time period that you chose in this episode is

03:03:49 25  August 2008 through October 2014, right?

Fischel - cross

1931

03:03:52　1　A.　That's correct.

03:03:53　2　Q.　And this is showing episodes where Mr. Pacilio and Mr.

03:04:00　3　Bases are essentially on the opposite side, right?

03:04:04　4　A.　Correct.

03:04:04　5　Q.　Now, you understand, from your review of the documents in

03:04:08　6　this case, that Mr. Pacilio and Mr. Bases only worked together

03:04:16　7　at the same bank for about a year, right?

03:04:19　8　A.　I don't recall that specifically.

03:04:23　9　Q.　That wasn't in the indictment that you reviewed in this

03:04:25　10　case?

03:04:26　11　A.　It may have been.  I just don't remember it.

03:04:30　12　　　　　　MR. ARMSTRONG:  Okay.  GX 150, please.

13　BY MR. ARMSTRONG:

03:04:37　14　Q.　Sir, does this refresh your memory -- and take your time

03:04:40　15　and read it -- that Mr. Pacilio and Mr. Bases were only at the

03:04:47　16　same bank for roughly a one-year period in 2010 and 2011?

03:05:07　17　A.　A little hard for me to understand this, but it look -- I

03:05:11　18　mean, the overlap looks like it's approximately one year.

03:05:14　19　Q.　Okay.

03:05:14　20　　　　　　So, there's a one-year period of time where Mr.

03:05:17　21　Pacilio and Mr. Bases worked at the same bank, right?

03:05:21　22　A.　Based on this exhibit, correct.

03:05:22　23　Q.　And that was the period of time around 2010, 2011, right?

03:05:28　24　A.　Correct.

03:05:29　25　Q.　But instead of analyzing that one-year period, you looked

Fischel - cross

1932

03:05:32  1   at the three years before they even worked at the same bank,

03:05:38  2   right?

03:05:39  3   A.  I looked at the entire period that the indictment covered,

03:05:41  4   correct.

03:05:45  5          MR. ARMSTRONG:  Go back to 815, please, DX.

          6   BY MR. ARMSTRONG:

03:05:51  7   Q.  So, on this chart here, which, again, involves Mr. Bases

03:05:55  8   and Mr. Pacilio on opposite sides of the market, for, what is

03:06:01  9   it, six of the seven years, they're not even at the same bank;

03:06:05  10  is that right?

03:06:06  11  A.  Yes, that appears to be correct based on the exhibit that

03:06:09  12  you just showed me.

03:06:09  13  Q.  And you recognize that the CME's an anonymous market,

03:06:14  14  right?

03:06:14  15  A.  Yes.

03:06:14  16  Q.  And, so, if they're not at the same bank working next to

03:06:20  17  each other, it's going to be pretty hard to figure out what

03:06:23  18  the other one's doing, wouldn't it?

03:06:24  19  A.  Not necessarily.

03:06:34  20  Q.  They could talk all the time, I guess, right?

03:06:39  21  A.  Again, you're asking me to speculate on their

03:06:42  22  communications.  But they could communicate in various ways

03:06:46  23  regardless of whether they were standing or sitting next to

03:06:49  24  each other.

03:06:49  25  Q.  Okay.

03:06:52  1          And, so, for the alleged conspiracy part, the alleged

03:06:56  2  conspiracy, as part of the indictment that you reviewed in

03:06:57  3  this case, you did not narrow your time period to the time

03:07:00  4  period alleged for the conspiracy, right?

03:07:04  5  A.  Not for purposes -- not for purposes of this exhibit.

03:07:10  6          MR. ARMSTRONG:  DX 817, please, Mr. Fineman.

          7  BY MR. ARMSTRONG:

03:07:23  8  Q.  Sir, does this exhibit on the visible side order talk

03:07:26  9  about how long these contracts are actually on the market on

03:07:31  10  the visible side?

03:07:33  11  A.  Not this exhibit.  Other exhibits do that.

03:07:43  12          MR. ARMSTRONG:  Your Honor, would now be a good time

03:07:45  13  for a short break?

03:07:46  14          THE COURT:  That's fine.

03:07:47  15          Ladies and gentlemen, we'll take our afternoon break.

03:07:49  16  We'll reconvene in 15 minutes.  Thank you for your attention.

03:07:52  17          During the break do not discuss the case with anyone,

03:07:55  18  including one another, and please do not do any independent

03:07:57  19  research regarding the case.

03:07:58  20          Thank you.

03:08:20  21      (Jury out.)

03:08:22  22          THE COURT:  Professor Fischel, you may step down.

03:08:24  23  Thank you.

03:08:24  24          THE WITNESS:  Thank you, your Honor.

03:08:33  25          THE COURT:  Please be seated.

Fischel - cross

1934

03:08:37   1          Mr. Armstrong, how much longer do you think you have?

03:08:46   2          MR. ARMSTRONG:  Last folder, 10, 15 minutes.

03:08:48   3          THE COURT:  Okay.

03:08:48   4          Mr. Menchel, perhaps you can educate me.

03:08:54   5          So, during the cross-examination, Mr. Armstrong

03:09:02   6   showed a -- I guess an episode that's not included in the

03:09:11   7   government's 70 or so episodes where the visible order was

03:09:17   8   maintained for more than a minute, right?

03:09:21   9          How is that -- how does that kind of work into

03:09:30  10   Professor Fischel's analysis?  Like why is -- what is he

03:09:35  11   drawing from that?

03:09:37  12          MR. MENCHEL:  The government is suggesting that the

03:09:40  13   only economically rational reason to place a large order

03:09:44  14   opposite an iceberg is to push the price into the direction of

03:09:48  15   the iceberg.  And, therefore, because you don't want to get

03:09:52  16   hit, you cancel quickly.  That's their case.  Okay?

03:09:55  17          And what Professor Fischel is saying is there may be

03:09:58  18   many reasons to keep a large visible order on the market

03:10:01  19   opposite an iceberg, and just as often as it's canceled

03:10:04  20   quickly -- I shouldn't say just as often.  I don't know the

03:10:06  21   numbers.  Although it often is the case that it cancels

03:10:10  22   quickly, it also doesn't cancel quickly.

03:10:12  23          And the whole point, your Honor, is the government is

03:10:16  24   selecting the episodes where only that thing happened; that

03:10:21  25   is, the quick cancellation, and suggesting to the jury through

Fischel - cross

1935

03:10:25   1   those episodes that if there's a quick cancellation, it means

03:10:28   2   he didn't intend to execute it.

03:10:30   3           I would also point out that in the same exhibit, we

03:10:33   4   have multiple examples, eight of them I'm going to put up --

03:10:36   5   probably won't go through eight -- where there is a very quick

03:10:39   6   cancellation followed by -- the placement of the large order,

03:10:42   7   cancel quickly, and where the spoof does not go in the

03:10:45   8   direction -- the pattern that they're alleging is a spoof --

03:10:48   9   does not go in that direction.

03:10:53   10           Can I also have a moment?

03:10:55   11         THE COURT:  Yes.

03:10:56   12     (Brief pause.)

03:11:05   13         MR. PERRY:  Your Honor, respectfully, this is exactly

03:11:07   14   the definitional issue I've been trying to flag for a bit of

03:11:11   15   time.

03:11:12   16           Our scheme is not that every time there's an iceberg

03:11:15   17   on one side and a visible order on the other side it is a

03:11:18   18   spoof.  That is not our scheme.  It's not what's alleged in

03:11:21   19   the indictment.  It's not the pattern that we've put on.  It's

03:11:26   20   not the scheme.  And this is why I was opposed to this

03:11:28   21   testimony.

03:11:28   22           Our scheme is when there's an iceberg and visible

03:11:32   23   order that is -- on the opposite side that is canceled

03:11:34   24   quickly, regardless whether the iceberg's filled or not,

03:11:37   25   frankly, but where the visible order is canceled quickly, that

03:11:40  1   is the scheme.  Nobody would allege -- we are not alleging --

03:11:43  2   that an order that stays in the market for one minute, two

03:11:47  3   minutes or, as in DX 193, Page 1, that remains in the market

03:11:50  4   for 50 seconds until it is fully filled is part of the

03:11:54  5   scheme --

03:11:54  6              THE COURT:  And --

         7              MR. PERRY:  So --

03:12:02  8              THE COURT:  It's like trying to take apart one thin

03:12:05  9   layer of an onion and splitting it up into two different

03:12:08  10  layers, right?

03:12:09  11             So, the government's theory of the case is that the

03:12:15  12  cancellation is part and parcel of what was originally

03:12:17  13  intended.

03:12:19  14             MR. PERRY:  Exactly.

03:12:23  15             THE COURT:  And not that the -- I was going to say

03:12:34  16  and not the fact that the reason that it's canceled is because

03:12:38  17  they didn't want to risk their large orders being on the

03:12:42  18  market, which is what Dr. Fischel -- Professor Fischel is

03:12:47  19  talking about, right?

03:12:49  20             MR. MENCHEL:  I just want to make sure I understand

03:12:51  21  what you just said.

03:12:55  22             THE COURT:  I guess I'm trying --

03:12:57  23             MR. PERRY:  Correct, correct.  That's exactly the

03:12:59  24  issue, right, is we've alleged in the indictment and described

03:13:02  25  a scheme that involves the rapid cancellation of an order.

Fischel - cross

1937

03:13:05  1   And he's rebutting that evidence with evidence of orders that

03:13:08  2   remain on the market for an eternity or that are fully filled.

03:13:13  3   And --

03:13:13  4         THE COURT:  I know, but the government's -- part of

03:13:16  5   the government's theory of the case, though, is that the

03:13:22  6   reason why a person that wants to do a spoof goes into the

03:13:28  7   spoof, knowing that they're going to cancel quickly, is

03:13:31  8   because that there's a risk they're going to get hit, right?

03:13:35  9         MR. PERRY:  Yes.

03:13:35 10         THE COURT:  Right?

03:13:36 11         MR. PERRY:  Yes.

03:13:37 12         THE COURT:  And, so, that's what's kind of -- that

03:13:44 13   risk is what is in the trader's mind when they first put in

03:13:49 14   the order, and that is what necessitates, as part of the

03:13:55 15   scheme, the trader's desire to cancel that order before it

03:13:57 16   executes, right?  The definition of spoofing.

03:14:01 17         MR. PERRY:  Yes.

03:14:01 18         THE COURT:  And I think what Dr. Fischel is trying to

03:14:04 19   get at is that that assumption, that jump, that a trader will

03:14:15 20   always be afraid of getting a big order hit, right, is not

03:14:24 21   true.

03:14:24 22         MR. MENCHEL:  Correct.  It shows that there are other

03:14:26 23   reasons why a trader would place a large visible order

03:14:31 24   opposite an iceberg.

03:14:33 25         THE COURT:  So, what Dr. Fischel is kind of attacking

Fischel - cross

1938

03:14:39  1    in this particular arena is the government's assumption under

03:14:48  2    its four-step theory that you would never want -- going into a

03:14:55  3    spoof -- that no one want a large order hit, and so,

03:15:02  4    therefore, you assume when someone places a large order that

03:15:07  5    it's part of the spoof, and the fact that it's canceled is

03:15:14  6    just part of the scheme.

03:15:18  7            MR. MENCHEL:  Correct.

03:15:20  8            MR. PERRY:  Respectfully, your Honor, and I know that

03:15:23  9    it's nuanced and I appreciate that the Court's giving it full

03:15:27  10   consideration, it is simply reading out -- what he is doing is

03:15:32  11   he is attributing to us a two-step scheme, and that is simply

03:15:40  12   not it because the quick cancellation is a definitional

03:15:43  13   element of the scheme.

03:15:45  14           At every step of this litigation, that has been a

03:15:49  15   definitional step of the scheme; and, therefore, orders that

03:15:52  16   are left in the market for an eternity, like DX 193, Page 1,

03:15:55  17   are not part of the scheme.

03:15:56  18           THE COURT:  I understand that.

03:15:57  19           But the government's saying that the reason why a

03:16:02  20   spoofer, if I can use that term, cancels quickly is because

03:16:04  21   they don't want to get hit, right?

03:16:07  22           MR. PERRY:  On their spoof orders.

03:16:08  23           THE COURT:  Right, on their spoof orders.

03:16:10  24           MR. PERRY:  Not on every large order.

03:16:11  25           THE COURT:  No, I understand.

Fischel - cross

1939

03:16:12    1      MR. PERRY:  Okay.

03:16:13    2      THE COURT:  Right?  And, so -- and that's what I

03:16:19    3  think the government is going to argue to the jury is that we

03:16:22    4  know this is spoofing because, you know, we have -- aside from

03:16:28    5  whatever corroborating data -- corroborating evidence we have,

03:16:31    6  that they're going to do the four-step process, and they're

03:16:35    7  going to cancel the order quickly because they don't want

03:16:39    8  their big order hit.

03:16:44    9      And what Dr. Fischel is trying do is that he's kind

03:16:48   10  of peeling some of that back and saying, look, you know,

03:16:55   11  the -- it's not always the case that a cancellation is

03:16:59   12  indicative of a scheme to defraud because just because you

03:17:05   13  have a big order doesn't mean you're automatically going to

03:17:08   14  cancel because sometimes big orders stay on the market.

03:17:10   15      MR. MENCHEL:  Correct.  And I would also point out

03:17:12   16  that even five seconds, which is, I think, the government's

03:17:18   17  parameters are, as you -- I don't have to say it.  You know.

03:17:24   18      THE COURT:  Okay.  Thank you.  That was very --

03:17:28   19      MR. PERRY:  Very helpful?

03:17:29   20      THE COURT:  -- that was helpful.

           21    (Laughter.)

           22      THE COURT:  So we'll take a five-minute break.

           23      We'll do ten.  Ten minutes.

03:17:45   24    (Brief recess.)

03:32:37   25    (Jury in.)

Fischel - cross

1940

03:32:39    1        THE COURT:  Professor Fischel?

03:32:40    2        THE WITNESS:  Thank you, your Honor.

03:32:56    3        THE COURT:  Mr. Armstrong?

03:33:00    4        MR. ARMSTRONG:  Thank you, Judge.

            5   BY MR. ARMSTRONG:

03:33:06    6   Q.  Professor Fischel, almost done.

03:33:07    7   A.  Okay.

03:33:09    8        THE COURT:  Those are famous last words.

            9        MR. ARMSTRONG:  Yes.

03:33:12   10     (Laughter.)

           11   BY MR. ARMSTRONG:

03:33:17   12   Q.  Professor Fischel, do you mind if I come over to you and

03:33:19   13   draw on this butcher block paper?

03:33:21   14   A.  Not at all.

03:33:22   15   Q.  So, there's some elemental definitional points I just want

03:33:28   16   to go through with you very quickly, okay?

03:33:30   17   A.  That's fine.

03:33:30   18   Q.  Okay.

03:33:31   19        So, you understand the government's scheme is that

03:33:33   20   step one is the placement of an iceberg, right?

03:33:37   21   A.  Correct.

03:33:37   22   Q.  And step two is the placement of the large visible order,

03:33:42   23   right?

03:33:43   24   A.  Correct.

03:33:43   25   Q.  On the opposite side, of course, right?

Fischel - cross

1941

03:33:48  1    A.  Correct.

03:33:49  2    Q.  And then step three is that the iceberg gets filled,

03:33:55  3    right?

03:33:55  4    A.  Correct.

03:33:56  5    Q.  And step four is the large order is canceled, right?

03:34:04  6    A.  That's right.

03:34:04  7    Q.  And it's canceled quickly, right?

03:34:06  8    A.  Correct.  That's the four-step scheme.

03:34:12  9    Q.  That's the four-step scheme.

03:34:15  10         Now, in all your analysis that you did with

03:34:18  11   Mr. Menchel, your charts don't take into account the visible

03:34:22  12   orders that were canceled, right?

03:34:28  13   A.  I wouldn't say that's right.  I think we took into

03:34:31  14   account, and I took into account, all the relevant data,

03:34:39  15   execution rates, as well as cancellation rates.

03:34:41  16   Q.  But the charts you presented to the jury do not have any

03:34:46  17   requirement that the visible orders are actually canceled

03:34:50  18   quickly, right?

03:34:53  19   A.  They certainly don't have that as a requirement.

03:34:55  20   Q.  Okay.

03:34:56  21         And, so, the charts you showed to the jury just

03:34:59  22   showed steps one and two; just an iceberg with just a large

03:35:07  23   order opposite it, right?

03:35:13  24   A.  I wouldn't say that's the only thing we showed to the jury

03:35:16  25   or I showed to the jury.  But it certainly includes steps one

Fischel - cross

1942

03:35:23  1    and two.

03:35:23  2    Q.   Right.

03:35:24  3         It included steps one and two to the exclusion of the

03:35:26  4    last step in the four-part scheme, right?

03:35:28  5    A.   I would not say that's right.

03:35:30  6    Q.   Now, sir, you certainly understand, as we just went over,

03:35:41  7    the government's four-part scheme, right?  It involves a quick

03:35:46  8    cancellation, right?

03:35:46  9    A.   That's part of the claim.

03:35:47  10   Q.   Okay.

03:35:49  11        And the cancellation, as you know, can happen

03:35:51  12   anywhere between zero seconds and five seconds, right?

03:35:55  13   A.   According to the government.  But, again, that's one of

03:36:01  14   the things that was tested.

03:36:01  15   Q.   According to the government and according to Mr. Lakhan,

03:36:05  16   right?

03:36:05  17   A.   That's right.  According to them.

03:36:08  18   Q.   Yes.  Perfect.  All right.

03:36:10  19        The cancellation in less than five seconds of the

03:36:15  20   large order, right?

03:36:18  21   A.   That's the allegation.  Again, that's what was analyzed

03:36:24  22   and demonstrated to be a biased and non-representative sample

03:36:30  23   of the relevant data.

03:36:31  24   Q.   So, in DX 193, Page 1, this large order is on the market

03:36:43  25   for 35 seconds, right?

Fischel - cross

1943

03:36:49    1    A.  Yes, that's right.

03:36:49    2    Q.  So, you just read out of the government's scheme the last

03:36:56    3    step that requires a quick cancellation, right?

03:36:59    4    A.  Wrong.  It's wrong because what the full data set reveals,

03:37:11    5    first of all, is that visible orders are not always canceled,

03:37:16    6    contrary to what you claim -- you personally in your opening

03:37:22    7    statement, as well as what the government claims that Exhibits

03:37:27    8    1 through 72 show.  And not only do the visible orders not

03:37:37    9    always cancel, but they frequently get executed very, very

03:37:41   10    quickly, actually in less than five seconds, to use your

03:37:46   11    example.

03:37:46   12    Q.  But, sir, we can agree, right, that an order that's a

03:37:49   13    large order that's left on the market doesn't have anything to

03:37:52   14    do with the four-part scheme in this case, right?

03:37:58   15    A.  It has nothing to do with the claim of what -- whether the

03:38:06   16    evidence is consistent with a four-part scheme, but it has

03:38:09   17    everything to do with demonstrating that the trading data when

03:38:13   18    viewed in its entirety demonstrates that the government's

03:38:17   19    allegations about what the data show are based on a biased and

03:38:22   20    non-representative sample of the data.

03:38:26   21    Q.  Okay.

03:38:26   22         You keep saying biased and non-representative sample.

03:38:30   23    And that's your accusation of the government, right?

03:38:32   24    A.  It's certainly not an accusation.  It's what I believe the

03:38:36   25    evidence shows.

Fischel - cross

1944

03:38:38  1  Q.  Okay.

03:38:38  2       Now, as part of removing bias, you, of course, want

03:38:46  3  to look at the full record before you, right?

03:38:48  4  A.  I'm sorry, the -- what bias?

03:38:53  5  Q.  As part of an academic, someone who studies bias, one way

03:38:58  6  to remove bias is to look at all the evidence you possibly

03:39:01  7  can, right, to inform your judgment, right?

03:39:03  8  A.  All the evidence that's relevant to the opinions that

03:39:07  9  you're expressing, that's correct.

03:39:08  10  Q.  And certainly in this case, as we went over before, the

03:39:13  11  relevant evidence would include the own words of the traders

03:39:18  12  whose trades you were analyzing, right?

03:39:21  13       MR. MENCHEL:  Your Honor, this has been asked and

03:39:23  14  answered, I think, repeatedly.

03:39:24  15       THE COURT:  Overruled.

03:39:24  16       The witness may answer.

        17  BY THE WITNESS:

03:39:32  18  A.  I would say the episodes -- episodes 51 through 72 where

03:39:39  19  those -- I guess what are referred to as chats, where they

03:39:44  20  occurred, that is certainly part of the analysis that I

03:39:49  21  performed and would have been incorrect if I had ignored those

03:39:58  22  episodes as a matter of proper methodology.

03:40:01  23       MR. ARMSTRONG:  So, GX 21, episode 63-C, please.

        24  BY MR. ARMSTRONG:

03:40:20  25  Q.  Let me know when you're ready, sir.

Fischel - cross

1945

| | | |
|---|---|---|
| 03:40:23 | 1 | A.  I'm sorry? |
| 03:40:24 | 2 | Q.  Let me know when you're ready? |
| 03:40:25 | 3 | A.  Okay.  One second. |
| 03:40:27 | 4 | Q.  Sure. |
| 03:40:28 | 5 | (Brief pause.) |
| | 6 | BY THE WITNESS: |
| 03:40:51 | 7 | A.  Okay.  I reviewed it. |
| | 8 | BY MR. ARMSTRONG: |
| 03:40:53 | 9 | Q.  Now, sir, is it your testimony that the large orders, the |
| 03:41:02 | 10 | 200-lot orders in episode 63-C, have nothing to do with the |
| 03:41:10 | 11 | four-part spoofing scheme that's alleged in this case? |
| 03:41:14 | 12 | A.  I think I've covered this multiple times.  I think all of |
| 03:41:20 | 13 | the trading data, not just in episodes 1 -- government |
| 03:41:25 | 14 | episodes 1 through 72, but all the other data that the |
| 03:41:29 | 15 | government left out of its analysis, all of that data is |
| 03:41:32 | 16 | relevant to analyzing whether the data, when viewed in its |
| 03:41:38 | 17 | entirety, is consistent or inconsistent with the government's |
| 03:41:42 | 18 | alleged four-part scheme. |
| 03:41:45 | 19 | Q.  Okay, sir.  Just let me know if you agree with this |
| 03:41:47 | 20 | question or not, okay? |
| 03:41:49 | 21 | Is it your position here today that the episode in |
| 03:41:53 | 22 | 63-C is not part of a four-part spoofing scheme? |
| 03:42:04 | 23 | A.  My opinion would be that this episode by itself sheds no |
| 03:42:10 | 24 | light whatsoever on whether or not there was a spoofing |
| 03:42:13 | 25 | scheme. |

Fischel - cross

1946

03:42:14    1    Q.  Okay.

03:42:14    2         Well, let's take a look at the direct evidence what

03:42:18    3    was being said at the time, okay?

03:42:20    4    A.  Okay.

03:42:20    5    Q.  So, we see here --

03:42:23    6         MR. ARMSTRONG:  Mr. Fineman, if you can please blow

03:42:25    7    up the top box.

03:42:27    8    BY MR. ARMSTRONG:

03:42:27    9    Q.  At 8:40:52, Mr. Pacilio says:  "Guys, the algos are really

03:42:33   10    geared up in here.  If you spoof this, it really moves."

03:42:40   11         Do you see that?

03:42:41   12    A.  I do.

03:42:43   13         MR. ARMSTRONG:  Mr. Fineman, please take that down.

           14    BY MR. ARMSTRONG:

03:42:47   15    Q.  And Mr. Fischel -- Professor Fischel, can you just tell

03:42:51   16    the jury what Mr. Pacilio does 42 seconds before saying:  "If

03:42:56   17    you spoof this, it really moves"?

03:43:04   18    A.  You want me to read what's in the red box?  What are you

03:43:07   19    telling me to do?

03:43:08   20    Q.  I want you to tell the jury what Mr. Pacilio does 42

03:43:12   21    seconds before saying:  "If you spoof this, it really moves"?

03:43:22   22    A.  It looks like he places a series of orders, and the best

03:43:39   23    bid and best ask, and the price move.

03:43:42   24    Q.  Okay.

03:43:42   25         So, let's just do it together.  So, the first thing

Fischel - cross

1947

03:43:45    1    Mr. Pacilio does, 42 seconds before saying, "If you spoof

03:43:49    2    this, it really moves," is he puts in a 200-lot visible buy

03:43:55    3    order, right?

03:43:56    4    A.   That's correct.

03:43:57    5    Q.   All right.

03:43:57    6         And, then, about a minute after that, he puts in some

03:44:06    7    sell orders, right?

03:44:16    8         The green?

03:44:16    9    A.   Yeah, no, I'm looking.

03:44:31    10         I'm trying to understand the legend.   I'm sorry.

03:44:34    11    Q.   That's okay.   Take your time.

03:44:37    12      (Brief pause.)

           13    BY MR. ARMSTRONG:

03:44:45    14    Q.   Sir, isn't this the same exact legend from your charts?

03:44:49    15    A.   I'm sorry, what's that?

03:44:50    16    Q.   Isn't this the same exact legend from your charts?

03:44:52    17    A.   Yes, but they're not colored, so --

03:44:55    18    Q.   Got it.

03:44:56    19    A.   But it looks like there's some executions on the iceberg

03:44:59    20    side.

03:44:59    21    Q.   Okay.

03:45:00    22         So, approximately one minute after saying, "If you

03:45:07    23    spoof this, it really moves," Mr. Pacilio puts an iceberg

03:45:12    24    order to sell, right?

03:45:19    25    A.   Yes.

Fischel - cross

1948

03:45:19  1   Q.  And then he puts in, as we can both agree, large orders to

03:45:24  2   buy, right?

03:45:25  3   A.  Correct.

03:45:25  4   Q.  And, so, as we see in the chart, step one is that Mr.

03:45:36  5   Pacilio puts in an iceberg to sell, right?

03:45:40  6   A.  No.  I mean, I don't agree that that by itself

03:45:44  7   demonstrates anything, let alone that it's proof of step one

03:45:49  8   of a four-step illegal spoofing scheme.

03:45:53  9   Q.  Okay.

03:45:54  10        So, it's your testimony here today that one minute

03:45:59  11  before and after Mr. Pacilio says, "If you spoof this, it

03:46:05  12  really moves," that this episode is not part of a spoofing

03:46:11  13  scheme?

03:46:12  14  A.  Again, I'm not commenting on the meaning of the words.

03:46:17  15  You'll have to find that from somebody else.

03:46:21  16        I'm saying this pattern of trading is completely

03:46:25  17  routine.  It happens all the time.  It's in no way indicative

03:46:30  18  of any wrongful conduct or spoofing scheme or anything else.

03:46:36  19  Q.  Okay.

03:46:36  20        So, just to make sure we're on the same page, your

03:46:39  21  testimony is that this pattern is not indicative of spoofing,

03:46:44  22  even though Mr. Pacilio says he's spoofing?

03:46:50  23  A.  Again, I'm not commenting on what Mr. Pacilio said or what

03:46:54  24  he meant.  I'm commenting on what the relationship between the

03:47:01  25  visible orders and the iceberg -- what that demonstrates in

Fischel - cross

1949

03:47:06  1    terms of whether it's supportive of a spoofing scheme or your

03:47:10  2    four-step spoofing illegal scheme.  And the answer is it shows

03:47:15  3    nothing.  Zero.

03:47:16  4  Q.  Got it.

03:47:17  5       So, your testimony is that it's just impossible to

03:47:19  6    figure out what someone could be doing, even though we have

03:47:23  7    the trade data and their own words and we can all look at them

03:47:27  8    together?

03:47:30  9  A.  I'm saying that I don't know what Mr. Pacilio meant.  I

03:47:38  10   don't know what he meant by the terms that he was using.  My

03:47:43  11   opinion is based on the trading data, as I've said numerous

03:47:48  12   times.

03:47:50  13      And this trading data that you've demonstrated in

03:47:54  14   this particular exhibit is completely routine.  It happens all

03:47:59  15   the time, along with the opposite happening all the time.

03:48:04  16      So, therefore, it shows nothing, zero, in terms of

03:48:09  17   whether it provides any support for your four-part spoofing

03:48:13  18   illegal scheme.

03:48:14  19  Q.  Okay.

03:48:15  20      Is it my illegal scheme?  Am I the one who was

03:48:17  21   trading here?

03:48:18  22  A.  You're not the one who was trading it, but you're the one

03:48:22  23   who is asserting it, who is alleging it, who's trying to prove

03:48:24  24   it and using this particular exhibit as evidence in support of

03:48:29  25   it.  And I'm saying in the scheme of looking at all the

Fischel - cross

1950

03:48:34  1   relevant data, it proves absolutely nothing.

03:48:38  2   Q.  So --

03:48:39  3   A.  Zero.

03:48:40  4   Q.  -- is it your testimony that even though Mr. Pacilio says,

03:48:47  5   "If you spoof this, it really moves," that this kind of

03:48:52  6   trading conduct is just routine?

03:48:55  7   A.  You know, I've gone through this several times.  I'll say

03:48:58  8   it one more time.  I have no opinion on what Mr. Pacilio meant

03:49:02  9   when he said what he said.  My opinion is based on the

03:49:07  10  evidence from the trading pattern.

03:49:10  11       And what I'm saying is the trading pattern is

03:49:13  12  completely consistent with normal market activity that

03:49:18  13  provides no support for the four-step spoofing scheme that you

03:49:23  14  advanced in your opening argument.

03:49:25  15  Q.  Okay.

03:49:25  16       So, last question on this, sir.  I promise.  Just to

03:49:28  17  make sure we're on the same page, it's your testimony here

03:49:32  18  today that Mr. Pacilio's statement, "If you spoof this, it

03:49:36  19  really moves," does not prove one way or the other what he's

03:49:40  20  doing?

03:49:42  21  A.  Whether it proves to somebody other than me, that other

03:49:52  22  person can decide one way or the other.

03:49:53  23  Q.  I'm asking if it proves it to you?

03:49:55  24  A.  It doesn't prove anything to me.

03:49:56  25  Q.  It means nothing?

Fischel - cross

1951

03:49:57  1    A.  It means nothing in the context of all of the relevant

03:50:00  2    trading data, including this trading data.

03:50:03  3    Q.  And that's your opinion, right?

03:50:05  4    A.  Yes, that is my opinion.

03:50:06  5    Q.  And that is the opinion for which, in part, you've been

03:50:10  6    paid over $4 million, right?

03:50:11  7    A.  I only wish I personally was paid over $4 million.  That

03:50:16  8    is what the firm has billed for the time that we have spent on

03:50:23  9    the case.

03:50:23  10   Q.  Money you haven't gotten yet, right?

03:50:27  11   A.  From the letter that you showed me, it appears that the

03:50:29  12   firm has not been paid in full for the bills that we either

03:50:35  13   have sent or have represented that we will send.

03:50:39  14   Q.  Okay.

03:50:41  15        MR. ARMSTRONG:  And, Mr. Fineman, if you can please

03:50:43  16   pull up GX 42 at 17, please.

          17   BY MR. ARMSTRONG:

03:50:56  18   Q.  And, Professor, the jury's heard testimony about this

03:50:59  19   episode, but you have not, correct?

03:51:03  20   A.  Correct.

03:51:03  21   Q.  And, again, just very quickly walk it through with me.  At

03:51:14  22   least the government's case, according to you, is that these

03:51:17  23   orders involve iceberg orders, large orders, icebergs that are

03:51:25  24   filled, and large orders that are canceled quickly, right?

03:51:31  25   A.  Exactly what are you asking me?

Fischel - cross

1952

```
03:51:34   1    Q.  Do you agree that --
03:51:36   2    A.  Do I agree that those are the four parts of the
03:51:39   3    government's four-part, four-step scheme?
03:51:41   4    Q.  As shown in this episode?
03:51:43   5    A.  It's really the same question all over again.
03:51:49   6         The fact that you can find examples where the four
03:51:53   7    things that are alleged, that there's an iceberg order, a
03:51:57   8    large order, the iceberg fills, and the visible order is
03:52:01   9    canceled quickly, there's no question you can find examples
03:52:04  10    that those occur.
03:52:05  11         But what you said in your opening argument is that
03:52:08  12    those are the only examples that ever occur.  And that's
03:52:10  13    what's wrong.  That's the biased and non-representative sample
03:52:14  14    that I've tried to explain that's inconsistent with just
03:52:23  15    looking at government episodes 1 to 72, which, as I've said
03:52:29  16    numerous times, present a biased and misleading, non-
03:52:33  17    representative sample of what the data show.
03:52:36  18         MR. ARMSTRONG:  Mr. Fineman, can you please blow up
03:52:38  19    what I have generally highlighted, please.
03:52:41  20         Going down to -- perfect.
03:52:42  21         Can you cut it off about right here, please.
          22    BY MR. ARMSTRONG:
03:52:50  23    Q.  Now, Professor, what does Mr. Pacilio say around the time
03:52:58  24    that he puts in a large visible order opposite an iceberg that
03:53:06  25    he cancels?
```

Fischel - cross

1953

03:53:10   1   A.   What does he say?  You mean you want me to read what's --

03:53:17   2   Q.   Exactly.

03:53:17   3   A.   -- in the red boxes?

03:53:18   4   Q.   How about this one right here (indicating).

03:53:20   5   A.   "That was me pushing it."

03:53:24   6   Q.   And, of course, you can understand that in a spoofing

03:53:29   7   scheme, "pushing it" is pushing the price, right?

03:53:35   8   A.   I assume so.  I mean, that certainly sounds reasonable.

03:53:39   9   Q.   And, so --

03:53:40   10  A.   It could mean a lot of other things.

03:53:42   11  Q.   What, pushing it like an ice cream truck?

03:53:45   12  A.   No, not pushing an ice cream truck.  Pushing a particular

03:53:49   13  strategy, pushing a particular set of planned trades.  Pushing

03:53:57   14  it is not a very self-defining term.

03:54:00   15  Q.   And --

03:54:06   16       MR. ARMSTRONG:  Mr. Fineman, if you can just scooch

03:54:11   17  over the boxes, please.

          18  BY MR. ARMSTRONG:

03:54:15   19  Q.   After saying, "That was me pushing it," and then canceling

03:54:18   20  those large orders, Mr. Pacilio says, "Don't spoof it," right?

03:54:25   21  A.   That's what's reflected in the box.

03:54:27   22  Q.   And, again, to understand or to help understand what's

03:54:31   23  going on in this episode, it would be helpful, as part of

03:54:37   24  formulating your opinion, to hear from someone who

03:54:40   25  participated in this, right?

Fischel - cross

1954

03:54:42  1   A.  It might be helpful for certain purposes, but it's not

03:54:46  2   helpful for purposes of formulating my opinion because what I

03:54:50  3   analyzed are the episodes in which these statements or chats

03:54:56  4   occurred, and I reached the conclusions that I did.

03:55:00  5   Q.  Okay.

03:55:00  6        So, just to be clear, is it your opinion here today

03:55:03  7   that all of these large visible orders opposite icebergs that

03:55:09  8   are canceled quickly around the time Mr. Pacilio says, "That

03:55:14  9   was me pushing it," have nothing to do with the four-part

03:55:18  10  scheme to spoof?

03:55:21  11  A.  My opinion is as I've stated several times.  It's not

03:55:24  12  based on the meaning of any of the chats.  It's based on

03:55:29  13  analysis of the episodes in which the chats occurred.  And

03:55:34  14  your description of the trading data is, again, a

03:55:43  15  misrepresentation of what the data show.

03:55:44  16       For every graph like this, there are graphs that show

03:55:47  17  the exact opposite.  And that is why the data that you've

03:55:57  18  presented is a biased and non-representative sample of what

03:56:00  19  the trading data show.

03:56:02  20  Q.  So, how many examples are there like this where Mr.

03:56:06  21  Pacilio is telling someone else don't spoof it, and he's

03:56:09  22  placing opposite side large orders that he cancels very

03:56:13  23  quickly at the same time?

03:56:15  24       MR. MENCHEL:  Objection.

03:56:20  25       THE COURT:  Sustained.

Fischel - cross

1955

03:56:21   1          Can you rephrase?

03:56:23   2          MR. ARMSTRONG:  Sure.

03:56:27   3          Mr. Fineman, if you can please go to GX 42 at 4.

          4   BY MR. ARMSTRONG:

03:56:36   5   Q.  Sir, maybe this one is a little bit more clear.

03:56:42   6          MR. ARMSTRONG:  Mr. Fineman, if you can please pull

03:56:44   7   up this half of the screen, please.

          8   BY MR. ARMSTRONG:

03:56:48   9   Q.  Sir, do you see the large visible order placed by Mr.

03:56:53  10   Pacilio for 425 lots that he quickly cancels opposite his

03:56:59  11   icebergs to sell?

03:57:01  12   A.  Yes, I see that.

03:57:02  13   Q.  And do you see Mr. Pacilio say in his own words, "I just

03:57:06  14   put in 500 lots to spoof the gold"?

03:57:09  15   A.  I see that.

03:57:10  16   Q.  And have you looked at this chat before today?

03:57:13  17   A.  Well, I looked at all the chats, and I looked at all the

03:57:19  18   government exhibits, so the answer is yes.

03:57:21  19   Q.  And, so, just to be clear, it's your testimony here today

03:57:24  20   that even though Mr. Pacilio says, "I just put in 500 lots to

03:57:30  21   spoof the gold," that he wasn't actually spoofing the gold?

03:57:36  22   A.  You know, again, I've said this numerous times.  I'm not

03:57:41  23   forming my opinion based on the meaning of the chats.  I have

03:57:45  24   no opinion on what the chats -- what they mean, the context in

03:57:51  25   which they were given.

Fischel - cross

1956

03:57:52  1        But what I do have an opinion about is whether this

03:57:56  2   particular episode where the chat occurs demonstrates anything

03:58:01  3   about -- anything unusual or anything that would indicate that

03:58:07  4   there is something about this evidence, this trading evidence,

03:58:13  5   that's any more relevant than all of the other trading

03:58:16  6   evidence that Mr. Pacilio participated in which shows the

03:58:21  7   exact opposite.

03:58:23  8        And that's why this particular exhibit is no

03:58:26  9   different from all the other exhibits that the government has

03:58:32  10  presented that paint a very distorted and misleading picture

03:58:36  11  of the trading activity by Mr. Pacilio.

03:58:38  12  Q.  So, it's your testimony to the jury that it's misleading

03:58:43  13  to say that Mr. Pacilio was spoofing the gold when he says he

03:58:49  14  was spoofing the gold?

03:58:53  15  A.  Again, I've answered that many times.  My opinion is not

03:58:58  16  based on what Mr. Pacilio said or what he meant.  My opinion

03:59:05  17  is based on what he did.

03:59:07  18        And if you look at what he did in the episodes that

03:59:11  19  the government is basing its allegations on, episodes 1 to 72,

03:59:19  20  in the context of the full set of trading data, not focusing

03:59:25  21  on words, but focusing on actions, there is nothing to

03:59:30  22  indicate that there is anything unusual or different from

03:59:34  23  normal market activity that Mr. Pacilio engaged in looking at

03:59:40  24  the full range of trading data.

03:59:42  25  Q.  So, in your professional expertise, words just don't

Fischel - cross

1957

03:59:46  1    matter; is that right?

03:59:50  2    A.  I certainly didn't say that.  I said what my opinion is.

03:59:56  3    I can repeat it if it's helpful to you.  But it's certainly

03:59:59  4    not what you just represented.

04:00:01  5    Q.  So, is it fair to say that words do matter?

04:00:05  6              MR. MENCHEL:  Objection.

04:00:06  7              THE COURT:  Sustained.

        8    BY MR. ARMSTRONG:

04:00:09  9    Q.  So, Professor Fischel, in going through the data that you

04:00:14  10   presented to the jury today, you did not take into account the

04:00:18  11   defendant's own words, and you did not take into account the

04:00:21  12   testimony in this case, right?

04:00:22  13   A.  The two things that you mentioned, the testimony and the

04:00:30  14   chats, were not the basis of my opinions, that's correct.

04:00:34  15   Q.  Does it cost more money to give an opinion based upon

04:00:51  16   chats?

04:00:51  17             MR. MENCHEL:  Objection.

04:00:52  18             THE COURT:  Sustained.

04:00:55  19             MR. ARMSTRONG:  No further questions, your Honor.

04:00:57  20             MR. MENCHEL:  May I, your Honor?

04:01:00  21             May I?

04:01:00  22             THE COURT:  You may.

04:01:01  23             Before you do, is there any examination from any

04:01:04  24   other parties?

04:01:05  25             MS. PORTER:  No, your Honor.  Thank you.

Fischel - redirect

1958

04:01:08    1          THE COURT:  Go ahead, Mr. Menchel.  Redirect.

04:01:11    2          MR. MENCHEL:  Yes.

04:01:14    3          Can actually we just leave this exhibit up for one

04:01:17    4   second?  Would the government mind?

            5                    REDIRECT EXAMINATION

            6   BY MR. MENCHEL:

04:01:20    7   Q.  Professor, in this exhibit, which I believe is GX 42 at 4,

04:01:25    8   approximately -- am I right, sir, that the visible order, the

04:01:35    9   425 lots, is over $4 away from where the icebergs are on the

04:01:40   10   other side?

04:01:40   11   A.  Yes, that's correct.

04:01:42   12   Q.  And the government has said that a spoof are those four

04:01:46   13   steps that we're seeing on that whiteboard, white paper board

04:01:50   14   to your left.  You see what I'm talking about?

04:01:51   15   A.  Yes.

04:01:52   16   Q.  Okay.

04:01:52   17          Was this a successful spoof?

04:01:56   18   A.  I can't imagine that it would be, given the fact that

04:02:01   19   the --

04:02:02   20          MR. MENCHEL:  Let me withdraw that question.

           21   BY MR. MENCHEL:

04:02:05   22   Q.  Where Mr. Pacilio said, "I just put in 500 lots to spoof

04:02:08   23   the gold," did these icebergs execute?

04:02:10   24   A.  You know, could I see the -- I only have part of the --

04:02:14   25   Q.  Yeah, but I'm asking you --

Fischel - redirect

1959

1    A.   -- exhibit on the screen.

04:02:16    2    Q.   -- at this moment -- this is the only thing I'm asking

04:02:18    3    you.

4    A.   Oh, I --

04:02:18    5    Q.   When this -- when this visible 42- --

04:02:20    6    A.   No.  No, they didn't.

04:02:21    7    Q.   Okay.

04:02:23    8         So, by the definition of the government's definition

04:02:25    9    of spoofing, when Mr. Pacilio said, "I just put in 500 lots to

04:02:28    10   spoof the gold," did those four steps happen?

04:02:31    11   A.   No.

04:02:32    12   Q.   Okay.

04:02:33    13        Is there something in trading behavior called price

04:02:37    14   discovery, putting in orders to ascertain what liquidity may

04:02:42    15   or may not be in the market?

04:02:43    16   A.   Yes.

04:02:44    17   Q.   Is that a legitimate strategy?

04:02:45    18   A.   Absolutely.

04:02:46    19   Q.   Can you explain that, please?

04:02:47    20   A.   Yes.  A lot of times you don't know what the interest of

04:02:57    21   traders in the market are in trading and, if they are

04:03:02    22   interested, what price they are willing to trade at.  So, one

04:03:07    23   of the things that you can do is to place an order yourself to

04:03:12    24   see what kind of reaction you get, both in terms of interest

04:03:17    25   and price.

Fischel - redirect

1960

1    MR. MENCHEL: Abbie, can you pull up GX 42 at Page

2    13, please.

3    BY MR. MENCHEL:

4    Q. This was one of the other episodes that Mr. Armstrong went

5    over with you.

6    MR. McGILL: I don't think we have control.

7    MR. MENCHEL: We need control apparently.

8    Thank you.

9    BY MR. MENCHEL:

10   Q. Now, I want to focus on what it was Mr. Armstrong asked

11   you about. He asked you about this (indicating) particular

12   statement by Mr. Pacilio saying, "Guys, the algos are really

13   geared up here. If you spoof it, it really moves. That's

14   where a lot of this noise is coming from."

15   Do you remember being asked questions about that?

16   A. Yes.

17   Q. And he said that this happened shortly after Mr. Pacilio

18   had placed his 200-lot visible order.

19   Do you see that?

20   A. Yes, I do.

21   Q. At the time that Mr. Pacilio placed that 200-lot order,

22   was there an iceberg on the other side?

23   A. No.

24   Q. Did the government's four-step process happen when Mr.

25   Pacilio said, "If you spoof it, it really moves"? Had

Fischel - redirect

1961

| | | |
|---|---|---|
| 04:04:30 | 1 | anything happened yet? |
| 04:04:31 | 2 | A.  No. |
| 04:04:31 | 3 | Q.  Were any icebergs executed when Mr. Pacilio said, "If you |
| 04:04:36 | 4 | spoof it, this really moves"? |
| 04:04:38 | 5 | A.  No. |
| 04:04:45 | 6 | MR. MENCHEL:  Thank you.  You can take that down. |
| | 7 | BY MR. MENCHEL: |
| 04:04:48 | 8 | Q.  Professor, how many times have you testified as an expert |
| 04:04:51 | 9 | in various courts? |
| 04:04:53 | 10 | A.  I think -- well, including arbitrations, approximately a |
| 04:04:59 | 11 | hundred. |
| 04:04:59 | 12 | Q.  Okay. |
| 04:05:00 | 13 | And you were asked on cross-examination by |
| 04:05:04 | 14 | Mr. Armstrong if you recalled the Pfizer litigation.  Do you |
| 04:05:07 | 15 | recall that?  Pfizer Securities? |
| 04:05:09 | 16 | A.  Yes, I do recall that. |
| 04:05:11 | 17 | Q.  And Mr. Armstrong confined his questions to what happened |
| 04:05:14 | 18 | at the district court level with respect to whether you could |
| 04:05:17 | 19 | testify.  Do you recall that? |
| 04:05:18 | 20 | A.  Yes. |
| 04:05:19 | 21 | Q.  And because you're a law professor, because you clerked on |
| 04:05:23 | 22 | the Supreme Court, I'm going to ask you some questions for the |
| 04:05:26 | 23 | benefit of the jury. |
| 04:05:26 | 24 | What court are we in now? |
| 04:05:28 | 25 | A.  Federal district court. |

Fischel - redirect

1962

04:05:30  1   Q.  So, Judge Lee is a federal district court judge?

04:05:33  2   A.  Correct.

04:05:34  3   Q.  And as wise as he is, is there anybody that sits above him

04:05:39  4   as judges?

04:05:40  5   A.  The United States Supreme Court and the federal court of

04:05:43  6   appeals.

04:05:44  7   Q.  Well, let's just do it in order.  What's directly above

04:05:46  8   the district court?

04:05:47  9   A.  The federal court of appeals.

04:05:52  10  Q.  All right.

04:05:52  11          And in the Pfizer litigation, did the court of

04:05:54  12  appeals reverse the decision of the trial court and allow you

04:05:57  13  to testify?

04:05:58  14  A.  Yes.  The court of appeals reversed the decision of the

04:06:03  15  district court, said that my testimony was appropriate to be

04:06:05  16  presented to the jury, and then the case then settled for a

04:06:10  17  very, very large amount.

04:06:11  18  Q.  Well, let's forget about that.

04:06:13  19          By the way, there's been questions about your bill.

04:06:15  20  Is it your understanding that the money's being held back

04:06:19  21  until you say something that we want to hear?

04:06:21  22  A.  That's not my understanding.

04:06:22  23  Q.  Okay.

04:06:23  24          By the way, would that change your opinion, that

04:06:26  25  there's outstanding money still owed?

Fischel - redirect

1963

04:06:28  1   A.   No.

04:06:29  2   Q.   Is it a normal process in the billing of any company that

04:06:33  3   there's a lag between when the bills are invoiced and when

04:06:36  4   they're paid?

04:06:37  5   A.   Yes.

04:06:37  6   Q.   Okay.

04:06:38  7        Do you have any understanding that there's any

04:06:39  8   conditions attached to how you're going to get paid based on

04:06:42  9   your testimony in this case?

04:06:44  10  A.   There are no conditions.

04:06:45  11  Q.   Based on the outcome that this jury may present?

04:06:49  12  A.   That's irrelevant to whether or not our bill will be paid.

04:06:54  13  Q.   By the way, are there times when you have been asked by

04:06:59  14  either -- anybody, the government, a private party -- to

04:07:02  15  render an opinion and you've turned down the engagement?

04:07:05  16  A.   Many times.

04:07:06  17  Q.   Why is that?

04:07:06  18  A.   Because I have a long track record of both testimony and

04:07:13  19  publications.  And, therefore, I have certain beliefs, certain

04:07:20  20  views, as well as what the general obligations are of an

04:07:25  21  expert.  And there are times -- and it happens fairly

04:07:30  22  frequently, actually -- where there are -- we have clients or

04:07:36  23  potential clients who want to retain us or retain me to

04:07:40  24  express a particular conclusion about a particular set of

04:07:47  25  economic evidence.  And if I can't support it, I'm not willing

Fischel - redirect

1964

04:07:53  1  to do it.  And I'm also not very helpful to the client who

04:07:57  2  would want that opinion as part of their presentation if I'm

04:08:02  3  not willing to do it.

04:08:04  4  Q.  Okay.

04:08:05  5  A.  So, typically, we reach a mutual decision prompted by my

04:08:10  6  saying I can't support -- I can't help you.  I cannot support

04:08:14  7  what you want someone to say.

04:08:16  8  Q.  And by mutual decision, you mean you walk away from the

04:08:19  9  engagement?

04:08:20  10  A.  Walk away from the engagement, again, typically with the

04:08:23  11  client's understanding.

04:08:25  12          MR. MENCHEL:  Can we put on the screen, please, for

04:08:28  13  demonstrative purposes, your Honor, the Defendants' Exhibit

04:08:33  14  147.

          15  BY MR. MENCHEL:

04:08:35  16  Q.  Now, this was the journal, again, that you were asked

04:08:38  17  about by Mr. Armstrong on cross-examination.  Do you recall

04:08:41  18  that?

04:08:41  19  A.  I do.

04:08:41  20  Q.  And Mr. Armstrong made the point that this was about a

04:08:45  21  French market?

04:08:46  22  A.  Correct.

04:08:46  23  Q.  Okay.

04:08:47  24          I want to just blow up the abstract portion first.

04:08:51  25          MR. MENCHEL:  If you would, Abbie, please, where it

Fischel - redirect

1965

04:08:53  1   says "many stock exchanges."

2   BY MR. MENCHEL:

04:08:56  3   Q.  Did you understand that this article, which was published

04:08:58  4   in a peer-reviewed journal, was only supposed to be narrowed

04:09:01  5   to the data set they happened to be looking at to draw their

04:09:05  6   conclusions?

04:09:05  7   A.  No.  The opposite.

04:09:07  8   Q.  In fact, can you read the first sentence of the abstract,

04:09:10  9   please?

04:09:11  10  A.  "Many stock exchanges choose to reduce market transparency

04:09:16  11  by allowing traders to hide some or all of their order size."

04:09:21  12  Q.  Okay.

04:09:21  13          So, this article was -- the data set chosen here was

04:09:26  14  to address what many exchanges do, correct?

04:09:29  15  A.  Yes.  I think that's what I said in my testimony.

04:09:32  16  Q.  Okay.

04:09:33  17          MR. MENCHEL:  And if we can go to the introduction,

04:09:35  18  please, of this first page.

04:09:37  19          THE WITNESS:  I'm sorry?  Say it again?

04:09:40  20          MR. MENCHEL:  I'm directing Abbie to do something.

04:09:42  21          THE WITNESS:  Oh, I'm sorry.

04:09:45  22          MR. MENCHEL:  Can you take this off, please, Abbie

04:09:46  23  and go to the introduction.

24  BY MR. MENCHEL:

04:09:53  25  Q.  Can you read the first sentence, please?

Fischel - redirect

1966

04:09:56  1  A.  "Electronic limit order markets, which automatically

04:10:00  2  execute traders' orders on the basis of specified priority

04:10:03  3  rules, account for a large and increasing percentage of global

04:10:07  4  financial and commodity trading."

04:10:10  5  Q.  Okay.

04:10:10  6        So, is this article just about what happens in one

04:10:13  7  market with French people?

04:10:15  8  A.  No.  As I said, it's a -- it's meant to be a general

04:10:19  9  discussion of the different types of traders and how they

04:10:26  10  react to limit orders that have been placed.

04:10:35  11        MR. MENCHEL:  Now, if we can go to Defendants'

04:10:37  12  Exhibit 188, please.

          13  BY MR. MENCHEL:

04:10:41  14  Q.  You recall Mr. Armstrong asked you questions about the

04:10:43  15  fill rate of large orders.  Do you recall that?

04:10:45  16  A.  I do.

04:10:46  17  Q.  And he was suggesting about something being misleading.

04:10:51  18  Do you remember that?

04:10:51  19  A.  I remember the questioning.

04:10:53  20  Q.  Okay.

04:10:54  21        First of all, let's be clear.  This is the data that

04:10:58  22  you produced which has been offered in evidence before this

04:11:00  23  jury; is that correct?

04:11:01  24  A.  That's correct.

04:11:01  25  Q.  All right.

Fischel - redirect

1967

04:11:02  1          MR. MENCHEL:  So, I want to blow up, please, Abbie,

04:11:07  2    if you would, that line that has the 4 percent.  If you could

04:11:12  3    blow up that whole line across.

04:11:13  4          Yeah, that's good right there.  Thank you.

          5    BY MR. MENCHEL:

04:11:16  6    Q.  Now, you see where it says the 4 percent over here?

          7    A.  Yes --

04:11:24  8    Q.  Next --

04:11:24  9    A.  -- I see that.

04:11:28  10   Q.  Okay.

04:11:28  11         Am I right, Dr. Fischel, that that includes large

04:11:31  12   orders as defined by the government, whether they were with or

04:11:33  13   without icebergs?

04:11:34  14   A.  Exactly.  That's what it shows.

04:11:36  15   Q.  Okay.

04:11:36  16         So, whether Mr. Pacilio had a large iceberg

04:11:40  17   opposite -- I'm sorry.  Whether Mr. Pacilio had an iceberg

04:11:42  18   opposite a large order or not, what was the fill rate?

04:11:47  19   A.  .4 percent.

04:11:48  20   Q.  Okay.

04:11:48  21         And when he had it with an opposite side iceberg,

04:11:52  22   what was the fill rate?

04:11:53  23   A.  .2 percent.

04:11:54  24   Q.  Okay.  And if I -- and I'm not going to say that I did the

04:11:58  25   math, but if I was to subtract 3,934 from 758 --

Fischel - redirect

1968

04:12:05  1          MR. MENCHEL:  Abbie, can you blow this up, please.

04:12:08  2  BY MR. MENCHEL:

04:12:09  3  Q.  -- am I right that that would give us the amount of times

04:12:11  4  of orders that Mr. Pacilio placed where there were no icebergs

04:12:15  5  but there was a large order?

04:12:17  6  A.  Yes, exactly.

04:12:18  7  Q.  And would that number be 3,176?

04:12:23  8  A.  You're taxing my ability to do arithmetic on the fly.  But

04:12:27  9  that looks about right.  It sounds like you've done the

04:12:31  10  arithmetic already.

04:12:32  11  Q.  Well, actually, I didn't, but somebody did.  I can barely

04:12:36  12  add two numbers.

04:12:36  13          But in any event, so, just so the jury understands,

04:12:39  14  the number of times that Mr. Pacilio places a large order, as

04:12:42  15  defined by the government, a hundred lots or more or in groups

04:12:45  16  and the like, is 3,176 with no icebergs?

04:12:53  17  A.  That's right.

04:12:54  18  Q.  And the fill ratio, whether it's with icebergs, including

04:12:59  19  everything, or with just icebergs, the difference is a .2

04:13:03  20  percent; is that right?

04:13:03  21  A.  Correct.

04:13:04  22  Q.  What does that tell you in terms of your economic

04:13:06  23  analysis?

04:13:07  24  A.  That -- first of all, that there are reasons to place

04:13:18  25  large limit orders that have nothing to do with trying to fill

Fischel - redirect

1969

04:13:24  1  icebergs because virtually all the time or the overwhelming

04:13:28  2  majority of the time, the orders are placed when there are no

04:13:33  3  icebergs that are opposite.

04:13:37  4          And what it also shows is that these orders tend to

04:13:40  5  be large, and so that the -- the number of fills that actually

04:13:46  6  result which produce the really low ratio is low.  But that is

04:13:54  7  equally true whether the orders are placed opposite icebergs

04:13:59  8  or, in the vast majority of cases, where the large orders are

04:14:03  9  placed without any icebergs on the opposite side.

04:14:09  10  Q.  Okay.

04:14:09  11          Whether it's a second, two second, five seconds, 20

04:14:19  12  seconds, is that enough time for an algorithmic trader to

04:14:22  13  decide what it wants to do with a large visible order?

04:14:25  14  A.  Yes, absolutely.

04:14:26  15  Q.  Why is that?

04:14:27  16  A.  Because algorithmic traders operate by computer programs

04:14:33  17  and, as a result, they can react almost instantly to any

04:14:39  18  observable event, including the placement of a limit order.

04:14:42  19  Q.  I want to show you one of the government exhibits that

04:14:47  20  Mr. Armstrong showed you on cross-examination.

04:15:00  21          MR. MENCHEL:  This is Government Exhibit 1, Page 55,

04:14:53  22  please.

04:15:00  23          Can you blow up, please, Abbie, the portion where it

04:15:02  24  says, "order to buy 500 contracts $74,512,500."

          25  BY MR. MENCHEL:

Fischel - redirect

1970

| | | |
|---|---|---|
| 04:15:11 | 1 | Q.  Do you see that? |
| 04:15:12 | 2 | A.  Yes, I do. |
| 04:15:13 | 3 | Q.  Okay. |
| 04:15:13 | 4 | Now, you understand that the way markets work is |
| 04:15:17 | 5 | banks, traders, don't actually have to put up $74 million, |
| 04:15:20 | 6 | right?  There's something called leverage in these markets? |
| 04:15:23 | 7 | A.  Yes. |
| 04:15:23 | 8 | Q.  All right. |
| 04:15:23 | 9 | And without getting too detailed about it, the point |
| 04:15:26 | 10 | is that that value is not what anyone has to actually pay |
| 04:15:30 | 11 | unless there's actually a delivery, right? |
| 04:15:32 | 12 | A.  Yes.  This is what I assume is the notional value that |
| 04:15:34 | 13 | would be paid on delivery, which, again, virtually never |
| 04:15:38 | 14 | occurs. |
| 04:15:38 | 15 | Q.  Okay. |
| 04:15:40 | 16 | MR. MENCHEL:  Can we blow this back out, please, |
| 04:15:43 | 17 | Abbie.  Just take that off for a second. |
| | 18 | BY MR. MENCHEL: |
| 04:15:45 | 19 | Q.  Now, the difference between where Mr. Pacilio -- I'm |
| 04:15:58 | 20 | sorry, I did that wrong.  Well, no. |
| 04:16:01 | 21 | The difference between where he placed his large |
| 04:16:03 | 22 | visible order and where -- I'm sorry, the difference between |
| 04:16:08 | 23 | where he had his iceberg, which was at 29.810. |
| 04:16:15 | 24 | Do you see that on the left? |
| 04:16:16 | 25 | A.  Yes, I see that. |

Fischel - redirect

1971

04:16:18  1   Q.  Okay.

04:16:18  2           To where he could have traded, if he simply wanted to

04:16:21  3   cross the spread, was where?

04:16:22  4   A.  Well, at that point in time.

04:16:28  5   Q.  Okay.

04:16:29  6           And am I right, sir, that the difference between

04:16:32  7   where he was and if he wanted to cross would have been $500?

04:16:39  8   A.  It looks like it, yes.

04:16:40  9           MR. MENCHEL:  Okay.  Thank you.  You can take that

04:16:42  10  down.

          11  BY MR. MENCHEL:

04:16:44  12  Q.  Now, the government asked you a bunch of questions about

04:16:45  13  the examples that we pulled out where the visible order was

04:16:50  14  kept open for a long time.

04:16:53  15          Do you recall that?

04:16:54  16  A.  I do.

04:16:54  17  Q.  And that that doesn't fit the pattern in the government's

04:16:58  18  episodes.

04:17:02  19          Do you recall that?

04:17:03  20  A.  I do.

04:17:04  21  Q.  Why was it relevant to your analysis to show the jury

04:17:07  22  times when a large visible order was placed and not canceled

04:17:11  23  within five seconds?

04:17:14  24  A.  Again, because that happened routinely, if you look at all

04:17:24  25  the data.  And that's exactly the opposite of what the

Fischel - redirect

1972

04:17:26    1    government said always happened as a matter of clockwork.

04:17:30    2    Q.  Now, I want to show you, again, Defendants' Exhibit 193.

04:17:41    3    And this is a compendium of some of the examples that you put

04:17:44    4    together, which shows the opposite of what's in government

04:17:50    5    exhibits episodes 1 to 72, right?

04:17:52    6    A.  Correct.

04:17:52    7    Q.  By the way, I just want to be clear on this before we go

04:17:55    8    further.  Mr. Armstrong asked you a bunch of questions about

04:17:59    9    the fact that other episodes were introduced during this trial

04:18:01   10    where it didn't go according to the episodes 1 to 72.

04:18:04   11        Do you recall that?

04:18:05   12    A.  Yes.

04:18:05   13    Q.  Okay.

04:18:05   14        Was your analysis keyed in on the 72 episodes chosen

04:18:09   15    by the government?

04:18:11   16    A.  I looked at those, but I also wanted to create exactly the

04:18:18   17    same graphs that looked exactly the same but demonstrate the

04:18:22   18    opposite result.

04:18:23   19    Q.  Okay.

04:18:23   20        And I want to pull up a couple of examples where the

04:18:28   21    durations were relatively short.

04:18:30   22        If we can go to Page 3 of this exhibit, please.  This

04:18:38   23    is the January 4th, 2010, episode, do you see that, that you

04:18:41   24    put together?

04:18:42   25    A.  Yes, I see that.

Fischel - redirect

1973

04:18:43  1   Q.  Okay.

04:18:43  2          What happened in this episode, sir?

04:18:45  3   A.  Well, first there was an iceberg to buy, it looks like, if

04:18:54  4   I'm reading correctly, 18 contracts.

04:18:59  5          And, then, there was visible orders that were placed

04:19:03  6   opposite the iceberg to sell 325 contracts.  Two of those

04:19:13  7   contracts executed in 0.184 seconds, and the remaining

04:19:24  8   contracts were canceled in 0.84 seconds after placement.

04:19:32  9          So, again, this is inconsistent with the four-part

04:19:36  10  scheme in multiple different ways.

04:19:38  11  Q.  So, if one was to try to infer one's intention just from a

04:19:42  12  pattern, does this pattern show that a trader would place the

04:19:46  13  order with the expectation that the market's going to move

04:19:50  14  away from him and go to the iceberg?

04:19:52  15  A.  No.  I mean, the opposite.

04:19:56  16          MR. MENCHEL:  Let's go to Page 7, please, which is

04:20:00  17  episode dated October 14th, 2010.

          18  BY MR. MENCHEL:

04:20:07  19  Q.  And, again, this is another episode you constructed based

04:20:09  20  on the government's criteria; is that correct?

04:20:11  21  A.  That's right.

04:20:11  22  Q.  All right.

04:20:12  23          And what are we seeing here, Professor?

04:20:14  24  A.  It's quite similar.  You have an iceberg that's placed to

04:20:17  25  buy 50 contracts, and then while the visible -- excuse me,

Fischel - redirect

1974

04:20:28  1  while the iceberg is in effect, while it's open, there's a

04:20:35  2  placement of a visible order to sell 325 contracts.  Again,

04:20:43  3  one of those contracts executes in 0.614 seconds.  And the

04:20:51  4  remaining contracts are -- the visible contracts are canceled

04:20:55  5  within 1. -- canceled in 1.672 seconds, and then the icebergs,

04:21:05  6  again, never execute.

04:21:06  7  So, you have visible orders executing very quickly,

04:21:11  8  visible orders canceling very quickly, the iceberg being open

04:21:14  9  for a long time and never being hit.  So, the iceberg just

04:21:20  10  cancels.

04:21:20  11  Q.  And is the cancellation well within the five-second

04:21:23  12  threshold that Mr. Armstrong had asked you about?

04:21:26  13  A.  Yes.

04:21:27  14  MR. MENCHEL:  Can we go, please, to Page 9, November

04:21:30  15  5th, 2010, please.

16  BY MR. MENCHEL:

04:21:34  17  Q.  What happened here, Professor?

04:21:35  18  A.  This is, again, another example that basically has the

04:21:43  19  same conclusion.  There's a placement of an iceberg order to

04:21:48  20  buy 25 contracts.

04:21:54  21  While the iceberg is open, there's a placement of two

04:22:00  22  visible orders to sell 350 contracts.  One of those contracts

04:22:07  23  had executions and with 52 -- one of those orders, excuse me,

04:22:16  24  had executions with 52 contracts being sold, and the duration

04:22:21  25  of these visible orders range from 0.97 seconds to 1.165

Fischel - redirect

1975

04:22:30  1  seconds.  And, again, the iceberg never was executed.  It was

04:22:40  2  canceled.

04:22:41  3  Q.  Is this well within the government's threshold of five

04:22:44  4  seconds?

04:22:45  5  A.  Yes, absolutely.

04:22:47  6       MR. MENCHEL:  Page 10, please.

       7  BY MR. MENCHEL:

04:22:54  8  Q.  It's November 19th, 2010.  It's another episode that you

04:22:59  9  constructed?

04:22:59 10  A.  Yes.

04:23:00 11  Q.  And just briefly on this one, please, tell us what

04:23:03 12  happened.

04:23:03 13  A.  Same issue, again.  There's an initial iceberg that is

04:23:08 14  placed to -- with an order to sell 25 contracts.  While that

04:23:14 15  iceberg is open in the market, a visible order was placed on

04:23:21 16  the opposite side to buy 600 contracts.

04:23:27 17       One of those orders had executions involving 22

04:23:32 18  contracts.  And the duration of the visible orders ranged from

04:23:40 19  0.48 seconds to 3.532 seconds.  And, again, the iceberg never

04:23:50 20  executed.

04:23:51 21       So, again, you have situations where visible orders

04:23:59 22  executed, visible orders were canceled within a very short

04:24:03 23  period of time, and the iceberg never executed.  Again,

04:24:09 24  completely the opposite in multiple ways from the government's

04:24:12 25  description of the relevant data.

Fischel - redirect

1976

04:24:14  1   Q.  Okay.

04:24:14  2        And, lastly, I want to show you a couple of charts

04:24:16  3   that Mr. Armstrong asked you about that you had constructed.

04:24:20  4        MR. MENCHEL:  Can we pull up Defendants' Exhibit 817,

04:24:23  5   please.

          6   BY MR. MENCHEL:

04:24:24  7   Q.  Do you recall being asked questions by Mr. Armstrong about

04:24:26  8   this chart?

04:24:27  9   A.  Yes, I do.

04:24:28 10   Q.  And, specifically, he reminded you that the conspiracy

04:24:33 11   period in which Mr. Pacilio and Mr. Bases were alleged to have

04:24:39 12   been conspiring with one another was between June 2010 and

04:24:42 13   June 2011.

04:24:43 14        Do you recall that?

04:24:43 15   A.  I do.

04:24:44 16   Q.  And this chart contains all the times that -- hold on one

04:24:51 17   second, please.  I think I have the wrong one.

04:25:00 18      (Brief pause.)

         19   BY MR. MENCHEL:

04:25:20 20   Q.  Now, did you also do an analysis just confining

04:25:23 21   yourself -- I think you mentioned this on cross-examination --

04:25:26 22   to the period of the alleged conspiracy?

04:25:28 23   A.  Yes.  First of all, it's contained in this larger period,

04:25:31 24   but we also looked specifically at the conspiracy period.

04:25:34 25   Q.  I want to pull up Defendants' Exhibit 821, please.

Fischel - redirect

1977

04:25:40  1          What does this show?

04:25:43  2          MR. MENCHEL:  And I would offer this, your Honor,

04:25:45  3  before it's published to the jury.

04:25:46  4          THE COURT:  Any objection?

04:25:47  5          MR. ARMSTRONG:  Your Honor, could I be heard briefly

04:25:51  6  on this.

04:25:59  7     (Proceedings had at sidebar:)

04:26:03  8          MR. ARMSTRONG:  Your Honor, at this time, I think we

04:26:04  9  would just object to as beyond the scope, moving in new charts

04:26:09 10  after a lengthy direct and not responsive to anything on

04:26:13 11  cross.

04:26:15 12          THE COURT:  Objection is overruled.

04:26:23 13     (Proceedings had in open court:)

04:26:23 14          MR. MENCHEL:  This is received, your Honor?

04:26:24 15          THE COURT:  Yes.  Defendants' Exhibit 821 is entered

04:26:29 16  in evidence.

04:26:32 17     (Defendants' Exhibit No. 821 received in evidence.)

04:26:32 18          MR. MENCHEL:  Can you please publish.

04:26:33 19          Thank you, your Honor.

         20  BY MR. MENCHEL:

04:26:35 21  Q.  Now, what does this show, Professor?

04:26:36 22  A.  This is an analysis of contracts traded in Pacilio/Bases

04:26:47 23  episodes during what I understood to be basically the

04:26:52 24  conspiracy period from June 2010 to June 2011.

04:26:58 25  Q.  Okay.

Fischel - redirect

1978

04:27:02  1        MR. MENCHEL:  And, Abbie, if you would please go back

04:27:04  2   to 817 to Page 2.

04:27:09  3        And do a side-by-side, please, with the one I just

04:27:14  4   had up.

04:27:15  5        Thank you.

6   BY MR. MENCHEL:

04:27:41  7   Q.  So, on the left, what are we looking at?

04:27:46  8   A.  I think you've got -- this is like a little bit of a

04:27:49  9   mismatch.

04:27:49  10  Q.  There we go.

04:27:51  11  A.  No -- yes, that's right.

04:27:54  12  Q.  Okay.

04:27:54  13        On the left, what are we looking at?

04:27:57  14  A.  We're looking at the Pacilio/Bases episodes for the entire

04:28:02  15  period from August 2008 through October 2014.

04:28:09  16  Q.  And on the right?

04:28:11  17  A.  We're looking at the same analysis, but for what my

04:28:16  18  understanding is of the alleged conspiracy period.

04:28:20  19  Q.  Okay.

04:28:20  20        And what does it show when you just confine your

04:28:24  21  analysis to the alleged conspiracy period?

04:28:29  22  A.  It shows that there were 5,938 contracts that were

04:28:36  23  executed on the visible order side, and 4,978 contracts that

04:28:44  24  were executed on the iceberg side.  And, again, there's then a

04:28:51  25  comparison of those numbers with the numbers that the

Fischel - redirect

1979

04:28:54  1   government presented in episodes 1 through 72.

04:28:59  2   Q.  So, if you just confine your analysis to the alleged

04:29:02  3   conspiracy, are Mr. Pacilio and Mr. Bases getting more

04:29:07  4   executions on the side that the government is alleging a spoof

04:29:11  5   than they are on the episodes that the government is alleging

04:29:13  6   is the real order?

04:29:15  7   A.  No, the opposite.  Under the supposed four-step scheme,

04:29:20  8   the red bar should be zero and instead it's 5,938 contracts.

04:29:30  9   And the green bar, the icebergs, should have all the executed

04:29:33  10  orders, as opposed to a number that's less than the executed

04:29:38  11  orders on the visible order side.

04:29:40  12  Q.  Yeah, I think you misunderstood the question, but you

04:29:42  13  answered it.  But I want the record to be clear.

04:29:44  14       So, in other words, during the period of time that

04:29:47  15  the government alleges there was a conspiracy, Mr. Bases and

04:29:51  16  Mr. Pacilio got more executions when they were on the alleged

04:29:56  17  spoof side than when they were on the iceberg side?

04:29:59  18  A.  That's correct.

04:30:00  19  Q.  Okay.

04:30:01  20       I want to look at one more of these, please.

04:30:04  21       MR. MENCHEL:  Can you pull up Government Exhibit 815.

04:30:17  22       One second, please.

04:30:22  23       Page 2.

          24  BY MR. MENCHEL:

04:30:24  25  Q.  You were similarly shown this -- I think this document by

Fischel - redirect

1980

04:30:27  1  Mr. Armstrong, if I'm remembering correctly.  Perhaps not.

04:30:30  2  But in any event, what does this show again?

04:30:32  3  A.  This is an analysis of hit rates, namely, what percentage

04:30:42  4  of the time visible orders were hit resulting in executed

04:30:47  5  contracts in Pacilio/Bases visible iceberg episodes, meaning

04:30:57  6  where one was on the visible order side and the other was on

04:31:00  7  the iceberg side.

04:31:01  8  Q.  All right.

04:31:02  9       Now, I want to show you, just for your eyes only for

04:31:05  10 a moment, Defense Exhibit 819.

04:31:17  11      Do you recognize this?

04:31:18  12 A.  Yes, I do.

04:31:18  13 Q.  What is it?

04:31:19  14 A.  It's the exact same analysis, but during -- just limited

04:31:23  15 to my understanding of the conspiracy period.

04:31:26  16      MR. MENCHEL:  I offer it.

04:31:27  17      THE COURT:  Any objection?

04:31:28  18      MR. ARMSTRONG:  No objection.

04:31:28  19      THE COURT:  Defendants' Exhibit 819 is admitted in

          20 evidence.

04:31:34  21    (Defendants' Exhibit No. 819 received in evidence.)

04:31:34  22      MR. MENCHEL:  Ask it be published please.

04:31:36  23      Can we do it in a side-by-side, please, Abbie.

04:31:43  24      Thank you.

          25 BY MR. MENCHEL:

Fischel - redirect

1981

04:31:52    1    Q.  So, when you compare --

            2            MR. MENCHEL:  You switched them the last time, but

            3    that's all right.

            4            Page 2, please.

            5    BY MR. MENCHEL:

04:32:09    6    Q.  When you compare the full dataset from August 2008 to

04:32:14    7    October 2014 with just the alleged conspiracy period of June

04:32:17    8    2010 to June 2011, does your result materially change?

04:32:21    9    A.  No.

04:32:21   10    Q.  So, what does it show -- just focusing on Defense Exhibit

04:32:24   11    819 -- just looking at the alleged conspiracy period?

04:32:30   12    A.  It shows that visible orders resulted in at least some

04:32:39   13    executions; 37.9 percent of the time for the visible orders

04:32:46   14    and 16.9 percent of the time for the iceberg orders.

04:32:51   15    Q.  And, again, just to be clear, which side is the government

04:32:54   16    alleging is the spoof side that you don't want to get

04:32:57   17    executions on?

04:32:57   18    A.  The red bar, the 37.9 percent number.

04:33:03   19    Q.  Okay.

04:33:04   20            And when we go to the full data set from October 2008

04:33:08   21    to October 2014 using Defense Exhibit 815, does it change

04:33:14   22    materially?

04:33:14   23    A.  No.  It's virtually identical.

04:33:18   24    Q.  What is the fact that the pattern seems to hold before and

04:33:22   25    after the conspiracy versus when you're just looking at the

Fischel - redirect

1982

| | | |
|---|---|---|
| 04:33:26 | 1 | conspiracy?  What does that tell you as an economist? |
| 04:33:29 | 2 | A.  It tells you that one of the things that you would want to |
| 04:33:33 | 3 | check, and which we did check, when there's allegations of |
| 04:33:38 | 4 | wrongful conduct during a particular period, the conspiracy |
| 04:33:42 | 5 | period, you want to see if the results look different when |
| 04:33:46 | 6 | there's no allegations of wrongdoing but the same type of |
| 04:33:53 | 7 | trading by the same people is involved.  And if the results -- |
| 04:33:57 | 8 | Q.  Hold on one second. |
| 04:33:58 | 9 | MR. MENCHEL:  You want to do a sidebar? |
| 04:34:00 | 10 | THE COURT:  No.  I want you to move on. |
| 04:34:02 | 11 | MR. MENCHEL:  Okay. |
| 04:34:03 | 12 | THE COURT:  The jury is to disregard that last |
| 04:34:04 | 13 | question and answer, please. |
| 04:34:08 | 14 | MR. MENCHEL:  I was trying to get something else, but |
| 04:34:10 | 15 | I read you -- |
| 04:34:15 | 16 | THE COURT:  I understand. |
| 04:34:16 | 17 | MR. MENCHEL:  One second, please. |
| 04:34:23 | 18 | (Brief pause.) |
| 04:34:24 | 19 | MR. MENCHEL:  Always helps to look at the judge. |
| 04:34:29 | 20 | Actually, I have no further questions, your Honor. |
| 04:34:31 | 21 | Thank you. |
| 04:34:31 | 22 | THE COURT:  Thank you. |
| 04:34:33 | 23 | Anything else, Mr. Armstrong? |
| 04:34:39 | 24 | MR. ARMSTRONG:  No. |
| 04:34:42 | 25 | THE COURT:  All right.  Anything else for Mr. Bases? |

04:34:44   1          MS. PORTER:  No.  Thank you, your Honor.

04:34:45   2          THE COURT:  Professor Fischel, you may step down.

04:34:47   3          THE WITNESS:  Thank you, your Honor.

04:34:48   4          THE COURT:  Thank you.

04:34:55   5      (Witness excused.)

04:34:55   6          THE COURT:  Does Mr. Pacilio have any other witnesses

04:34:58   7   that he would like to call?

04:34:59   8          MR. MENCHEL:  Can we confer briefly, your Honor.

04:35:03   9      (Brief pause.)

04:35:18   10         MR. MENCHEL:  Your Honor, Mr. Pacilio rests.

04:35:19   11         THE COURT:  All right.

04:35:21   12         So, ladies and gentlemen of the jury, the evidence

04:35:26   13  now has come to a close.  That does not mean, however, that

04:35:32   14  you can begin to talk about it amongst yourselves or anyone

04:35:35   15  else.  Not yet.  Not yet.

04:35:39   16         What will happen is Monday, we will have -- you will

04:35:44   17  hear closing arguments from the attorneys.  Then I will give

04:35:49   18  you the final instructions.  And at that point, you will be

04:35:55   19  permitted to adjourn to the jury room to begin your

04:35:58   20  deliberations.  Okay?

04:36:01   21         During the weekend break, please do not discuss this

04:36:05   22  case with anyone, including one another, and please do not do

04:36:09   23  any independent research regarding any of the issues you've

04:36:11   24  heard discussed in this case.

04:36:12   25         The other thing I would like to ask you is whether or

# APPENDIX E

# Ciamac C. Moallemi

Graduate School of Business
Columbia University

E
W

## Research Interests

Analysis, optimization, and control of stochastic systems; applications in financial engineering, market microstructure, quantitative and algorithmic trading, and blockchain technology.

## Academic Appointments

| | | |
|---|---|---|
| 2007–present | **Columbia University, Graduate School of Business** | New York, NY |
| | *Decision, Risk, & Operations Division.* | |
| 2020–present | *William von Mueffling Professor of Business.* | |
| 2015–2020 | *Associate Professor of Business (with tenure).* | |
| 2013–2015 | *Barbara and Meyer Feldberg Associate Professor of Business.* | |
| 2011–2012 | *Associate Professor.* | |
| 2008–2011 | *Assistant Professor.* | |
| 2007 | *Instructor.* | |

## Academic Degrees

| | | |
|---|---|---|
| 2003–2007 | **Stanford University** | Stanford, CA |
| | *Ph.D., Electrical Engineering, 2007* | |
| | Advisor: Benjamin Van Roy | |
| | Dissertation Title: *A Message-Passing Paradigm for Optimization* | |
| 1996–1997 | **University of Cambridge (King's College)** | Cambridge, UK |
| | *Master of Advanced Study in Mathematics, With Distinction, 1997* | |
| | (Part III of the Mathematical Tripos) | |
| 1991–1996 | **Massachusetts Institute of Technology** | Cambridge, MA |
| | *S.B., Mathematics, 1996* | |
| | *S.B., Electrical Engineering & Computer Science, 1996* | |

## Professional Experience

| | | |
|---|---|---|
| 2014–present | **Bourbaki LLC** | New York, NY |
| | *Managing Member.* Developed quantitative trading strategies. | |
| 1999–2003 | **NeoGenesis Pharmaceuticals, Inc** | Cambridge, MA |

*Director, Scientific Computing.* Founded the informatics group at NeoGenesis, a technology start-up in the area of small molecule drug discovery. Co-designed and developed the NeoGenesis Quantized Surface Complementarity Diversity (QSCD) model, a computational framework for post-genomic drug discovery. Managed a group of developers and scientists responsible for development and implementation of mathematical algorithms for chemical library design, experimental data analysis, and bioinformatics. Engineered a computational cluster consisting of 100+ nodes and associated infrastructure. Acquired by Schering-Plough Corp.

1993–1999    **Delta Global Trading, LP**                                                              Boston, MA
*Partner.* Managed a fixed-income relative value hedge fund with US\$200 million in assets under management. Developed mathematical and computational models for identifying and exploiting economic mispricings in sovereign debt markets. Used stochastic models to trade a relative value arbitrage portfolio consisting of fixed income securities and associated derivatives in G10 and emerging markets. Series 3 licensed. Responsible for all software development efforts. Supervised a group of 13 including quantitative traders, software developers, and support staff.

## Journal Papers [1]

[1]  G. Huberman, J. Leshno, and C. C. Moallemi. Monopoly without a monopolist: An economic analysis of the Bitcoin payment system. *Review of Economic Studies*, forthcoming, January 2021.

[2]  S. Min, C. Maglaras, and C. C. Moallemi. Cross-sectional variation of intraday liquidity, cross-impact, and their effect on portfolio execution. *Operations Research*, forthcoming, June 2021.

[3]  N. Bhat, V. F. Farias, C. C. Moallemi, and D. Sinha. Near optimal A-B testing. *Management Science*, 66(10):4477–4495, October 2020.

[4]  C. Maglaras, C. C. Moallemi, and H. Zheng. Queueing dynamics and state space collapse in fragmented limit order book markets. *Operations Research*, forthcoming, May 2019.
**Honorable Mention, INFORMS Financial Services Section Student Research Paper Competition, 2012**

[5]  C. C. Moallemi, M. Sağlam, and M. Sotiropoulos. Short-term trading skill: An analysis of investor heterogeneity and execution quality. *Journal of Financial Markets*, 42:1–28, January 2019.

[6]  C. C. Moallemi and M. Sağlam. Dynamic portfolio choice with linear rebalancing rules. *Journal of Financial and Quantitative Analysis*, 52(3):1247–1278, June 2017.

[7]  P. Glasserman, C. C. Moallemi, and K. Yuan. Hidden illiquidity with multiple central counterparties. *Operations Research*, 64(5):1143–1158, September–October, 2016.

[8]  M. Broadie, Y. Du, and C. C. Moallemi. Risk estimation via regression. *Operations Research*, 63(5):1077–1097, September–October, 2015.

[9]  K. Iyer, R. Johari, and C. C. Moallemi. Information aggregation and allocative efficiency in smooth markets. *Management Science*, 60(10):2509–2524, July 2014.

[10]  C. Chen, G. Iyengar, and C. C. Moallemi. An axiomatic approach to systemic risk. *Management Science*, 56(6):1373–1388, June 2013.
**Honorable Mention, INFORMS George Nicholson Student Paper Competition, 2011**

[11]  C. C. Moallemi and M. Sağlam. The cost of latency in high-frequency trading. *Operations Research*, 61(5):1070–1086, September–October, 2013.
**1st Place, INFORMS Financial Services Section Student Research Paper Competition, 2011**
**Selected for publication in the *Operations Research* Forum**

[12]  V. V. Desai, V. F. Farias, and C. C. Moallemi. Approximate dynamic programming via a smoothed linear program. *Operations Research*, 60(3):655–674, May–June, 2012.
**1st Place, INFORMS Junior Faculty Paper Competition, 2011**

[13]  V. V. Desai, V. F. Farias, and C. C. Moallemi. Pathwise optimization for optimal stopping problems. *Management Science*, 58(12):2292–2308, December 2012.
**Best Simulation Publication Award, INFORMS Simulation Society, 2014**

[14]  C. C. Moallemi, B. Park, and B. Van Roy. Strategic execution in the presence of an uninformed arbitrageur. *Journal of Financial Markets*, 15(4):361–391, January 2012.

[15]  M. Broadie, Y. Du, and C. C. Moallemi. Efficient risk estimation via nested sequential simulation. *Management Science*, 57(6):1172–1194, June 2011.

[16]  C. C. Moallemi and B. Van Roy. Resource allocation via message passing. *INFORMS Journal of Computing*, 23(2):205–219, Spring, 2011.

[17]  V. F. Farias, C. C. Moallemi, B. Van Roy, and T. Weissman. Universal reinforcement learning. *IEEE Transactions on Information Theory*, 56(5):2441–2454, May 2010.

---

[1] The standard convention in my area is that authorship is in alphabetical order.

[18] C. C. Moallemi and B. Van Roy. Convergence of min-sum message passing for convex optimization. *IEEE Transactions on Information Theory*, 56(4):2041–2050, April 2010.

[19] C. C. Moallemi and B. Van Roy. Convergence of min-sum message passing for quadratic optimization. *IEEE Transactions on Information Theory*, 55(5):2413–2423, May 2009.

[20] C. C. Moallemi and B. Van Roy. Consensus propagation. *IEEE Transactions on Information Theory*, 52(11):4753–4766, November 2006.

[21] K. Mason, N. M. Patel, A. Ledell, C. C. Moallemi, and E. A. Wintner. Mapping protein pockets through their potential small-molecule binding volumes: QSCD applied to biological protein structures. *Journal of Computer-Aided Molecular Design*, 18(1):55–70, 2004.

[22] J. M. Johnson, K. Mason, C. C. Moallemi, H. Xi, S. Somaroo, and E. Huang. Protein family annotation in a multiple alignment viewer. *Bioinformatics*, 19(4):544–545, 2003.

[23] E. A. Wintner and C. C. Moallemi. Quantized Surface Complementarity Diversity (QSCD): A model based on small molecule-target complementarity. *Journal of Medicinal Chemistry*, 43(10):1993–2006, 2000.

[24] C. C. Moallemi. Neural networks in the computer analysis of voided urine cells for bladder cancer. *IEEE Expert*, 6(6):8–12, December 1991.

## Working Papers

[1] C. C. Moallemi and M. Wang. A reinforcement learning approach to optimal execution. Working paper. Initial version: June 2021.

[2] C. Maglaras, C. C. Moallemi, and M. Wang. A deep learning approach to estimating fill probabilities in a limit order book. Working paper. Initial version: March 2021.

[3] S. Min, C. C. Moallemi, and D. J. Russo. Policy gradient optimization of Thompson sampling policies. Working paper. Initial version: June 2020.

[4] S. Min, C. Maglaras, and C. C. Moallemi. Thompson sampling with information relaxation penalties. Working paper. Initial version: February 2019. Revised: May 2021.

[5] C. C. Moallemi and K. Yuan. A model for queue position valuation in a limit order book. Working paper. Initial version: December 2016. Revised: June 2017.

[6] C. C. Moallemi and K. Yuan. Portfolio liquidity estimation and optimal execution. Working paper. Initial version: December 2016. Revised: August 2019.

[7] C. Maglaras, C. C. Moallemi, and H. Zheng. Optimal execution in a limit order book and an associated microstructure market impact model. Working paper. Initial version: May 2015.

[8] O. Besbes, J. M. Chaneton, and C. C. Moallemi. The exploration-exploitation tradeoff in the newsvendor problem. Working paper. Initial version: November 2014. Revised: June 2021.

[9] K. Iyer, R. Johari, and C. C. Moallemi. Welfare analysis of dark pools. Working paper. Initial version: October 2014. Revised: June 2018.

[10] C. Chen, G. Iyengar, and C. C. Moallemi. Asset price-based contagion models for systemic risk. Working paper. Initial version: October 2014.

[11] P. Collin-Dufresne, K. Daniel, C. C. Moallemi, and M. Sağlam. Strategic asset allocation with predictable returns and transaction costs. Working paper. Initial version: August 2013. Revised: June 2015.

[12] N. Bhat, V. F. Farias, and C. C. Moallemi. Non-parametric approximate dynamic programming via the kernel method. Working paper. Initial version: October 2012. Revised: January 2018.

[13] C. C. Moallemi and D. Shah. On the flow-level dynamics of a packet-switched network. Working paper. Initial version: November 2009. Revised: October 2012.

[14] C. C. Moallemi, S. Kumar, and B. Van Roy. Approximate and data-driven dynamic programming for queueing networks. Working paper. Initial version: December 2006. Revised: January 2013.

## Conference Papers

[1] G. Huberman, J. Leshno, and C. C. Moallemi. An economist's perspective on the Bitcoin payment system. In *American Economic Association Papers and Proceedings*, volume 109, pages 93–96, May 2019.

[2] S. Min, C. Maglaras, and C. C. Moallemi. Thompson sampling with information relaxation penalties. In *Advances in Neural Information Processing Systems 32*, pages 3549–3558, 2019.

[3] N. Bhat, V. F. Farias, and C. C. Moallemi. Non-parametric approximate dynamic programming via the kernel method. In *Advances in Neural Information Processing Systems 22*, pages 395–403, 2012.

[4] M. Broadie, Y. Du, and C. C. Moallemi. Risk estimation via weighted regression. In *Proceedings of the 2011 Winter Simulation Conference*, pages 3854–3865, December 2011.

[5] K. Iyer, R. Johari, and C. C. Moallemi. Information aggregation in smooth markets. In *EC '10: Proceedings of the 11th ACM Conference on Electronic Commerce*, pages 199–206, June 2010.

[6] C. C. Moallemi and D. Shah. On the flow-level dynamics of a packet-switched network. In *SIGMETRICS '10: Proceedings of the ACM SIGMETRICS International Conference on Measurement and Modeling of Computer Systems*, pages 83–94, June 2010.

[7] V. V. Desai, V. F. Farias, and C. C. Moallemi. A smoothed approximate linear program. In *Advances in Neural Information Processing Systems 22*, pages 459–467, 2009.

[8] C. C. Moallemi and B. Van Roy. Convergence of the min-sum algorithm for convex optimization. In *Proceedings of the 45th Allerton Conference on Communication, Control and Computing*, pages 840–847, Monticello, IL, September 2007.

[9] C. C. Moallemi and B. Van Roy. Consensus propagation. In *Advances in Neural Information Processing Systems 18*, pages 899–906. MIT Press, 2006.

[10] V. F. Farias, C. C. Moallemi, and B. Prabhakar. Load balancing with migration penalties. In *Proceedings of the IEEE International Symposium on Information Theory*, pages 558–562, Adelaide, Australia, September 2005.

[11] V. F. Farias, C. C. Moallemi, B. Van Roy, and T. Weissman. A universal scheme for learning. In *Proceedings of the IEEE International Symposium on Information Theory*, pages 1158–1162, Adelaide, Australia, September 2005.

[12] C. C. Moallemi and B. Van Roy. Distributed optimization in adaptive networks. In *Advances in Neural Information Processing Systems 16*, pages 887–894. MIT Press, 2004.

[13] C. C. Moallemi and B. Van Roy. Decentralized protocols for optimization of sensor networks. In *Proceedings of the 42nd Allerton Conference on Communication, Control and Computing*, Monticello, IL, September 2003.

## Book Chapters

[1] V. V. Desai, V. F. Farias, and C. C. Moallemi. Bounds for Markov decision processes. In F. L. Lewis and D. Liu, editors, *Reinforcement Learning and Approximate Dynamic Programming for Feedback Control*, pages 452–473. IEEE Press, December 2012.

## Other Publications

[1] R. Dewey and C. C. Moallemi. The unsolved mystery of the Medallion Fund's success. *Bloomberg Businessweek*, November 2019.

[2] G. Huberman, J. Leshno, and C. C. Moallemi. The economics of the Bitcoin payment system. *Vox EU*, December 2017.

[3] C. C. Moallemi. *A Message-Passing Paradigm for Optimization*. PhD thesis, Stanford University, September 2007.

## Honors and Awards

- Sponsored Research Gift, J.P. Morgan, 2019 ($150,000)
- Dean's Award for Teaching Excellence in a Core Course, Columbia Business School, 2014
- Best Simulation Publication Award, INFORMS Simulation Society, 2014
- NSF Grant CMMI-1235023, 2012–2015 ($229,782; co-PI: Garud Iyengar)
  Title: *Optimization Based Methods for Systemic Risk Management*
- Meritorious Service Award, *Operations Research*, 2011, 2012
- 1st Place, INFORMS Junior Faculty Paper Competition, 2011
- Benchmark Stanford Graduate Fellowship, 2003–2006
- Marshall Scholarship, 1996–1997
- 5th Place, Westinghouse Science Talent Search, 1991

## Professional Activities

- Member, INFORMS
- Member, Columbia Business School Program for Financial Studies
- Member, Columbia University Center for Financial Engineering
- Member, Columbia University Data Science Institute
- Member, Columbia University Center for Applied Probability
- Associate Editor, *Operations Research*, 2010–present
- Associate Editor, *Management Science*, 2012, 2015–present
- Guest Editor, Special Issue on FinTech, *Information Systems Research*, 2017–2018
- Associate Editor, *Operations Research Letters*, 2014–2015
- Council Member, INFORMS Applied Probability Society, 2011–2013
- Committee Member, INFORMS George Nicholson Student Paper Competition, 2013, 2014
- Technical Reviewer (Journals): *Management Science*, *Operations Research*, *Mathematics of Operations Research*, *Stochastic Systems*, *Quantitative Finance*, *SIAM Journal on Financial Mathematics*, *Mathematical Finance*, *Journal of Computational Finance*, *Journal of Financial Markets*, *Market Microstructure and Liquidity*, *Queueing Systems*, *European Journal of Operations Research*, *Computational Optimization and Applications*, *IIE Transactions*, *IEEE Trans. Information Theory*, *IEEE Trans. Signal Processing*, *IEEE Trans. Automatic Control*, *IEEE Trans. Wireless*, *Journal of Machine Learning Research*, *IEEE J. Selected Areas in Communications*, *Automatica*
- Technical Reviewer (Conferences): Winter Simulation Conference, IEEE ISIT, NIPS, IEEE Infocom, IEEE CDC, IJCAI, MSOM
- Technical Reviewer (Funding Agencies): National Science Foundation, Research Grants Council (Hong Kong)

## Doctoral Students Supervised

[1] Vijay V. Desai (Ph.D. 2011, Columbia IEOR)
Thesis title: *Approximate Dynamic Programming for Large Scale Systems*
First position: SAS Institute

[2] Yiping Du (Ph.D. 2011, Columbia IEOR, co-supervisor: Mark Broadie)
Thesis title: *Efficient Methods for Estimating Risk Measures*
First position: Barclays Capital

[3] Mehmet Sağlam (Ph.D. 2012, Columbia GSB)
Thesis title: *Dynamic Trading Strategies in the Presence of Market Frictions*
First position: Postdoctoral Associate, Bendheim Center for Finance, Princeton University

[4] Chen Chen (Ph.D. 2014, Columbia IEOR, co-supervisor: Garud Iyengar)
Thesis title: *Theory of Systemic Risk*
First position: Assistant Professor, ShanghaiTech University

[5] Juan Chaneton (Ph.D. 2015, Columbia GSB, co-supervisor: Omar Besbes)
Thesis Title: *Decision Making with Coupled Learning: Applications in Inventory Management and Auctions*
First Position: Celect

[6] Hua Zheng (Ph.D. 2015, Columbia GSB, co-supervisor: Costis Maglaras)
Thesis Title: *Microstructure Analysis of Dynamic Markets: Limit Order Books and Dynamic Matching Markets*
First Position: J.P. Morgan

[7] Nikhil Bhat (Ph.D. 2015, Columbia GSB)
Thesis Title: *Tractable Algorithms for Sequential Decision Making Problems*
First Position: Airbnb

[8] Kai Yuan (Ph.D. 2017, Columbia GSB)
Thesis Title: *Essays on Liquidity Risk and Modern Market Microstructure*
First Position: Two Sigma Investments

[9] Seungki Min (Ph.D. 2021, Columbia GSB, co-supervisor: Costis Maglaras)
Thesis Title: *Modern Dynamic Programming Approaches to Sequential Decision Making*
First Position: Assistant Professor, KAIST (Korea Advanced Institute of Science and Technology)

[10]  Muye Wang (Ph.D. 2021, Columbia GSB, co-supervisor: Costis Maglaras)
       Thesis Title: *Essays on the Applications of Machine Learning in Financial Markets*
       First Position: Two Sigma Securities

## Invited Presentations

| | |
|---|---|
| 2021/03 | Lyft, Rideshare Labs |
| 2020/10 | Columbia University, Graduate School of Business, Decision, Risk, & Operations Division |
| 2020/05 | TGS Management Company |
| 2020/02 | CFM-Imperial College Quantitative Finance Seminar |
| 2019/10 | Dartmouth Tuck School of Business |
| 2019/09 | SAMSI Blockchain Workshop |
| 2019/08 | UBS/Santa Fe Institute Machine Learning, Complexity, and Market Behavior Symposium |
| 2019/06 | SIAM Conference on Financial Mathematics & Engineering |
| 2019/04 | Engineers Gate LP |
| 2019/01 | Utah Winter Operations Management Conference |
| 2018/11 | Moody's, Innovation Speaker's Series |
| 2018/08 | Goldman Sachs, Equities Execution |
| 2018/07 | SIAM Annual Meeting, Mini-symposium on Financial Technology |
| 2018/04 | Simons Institute, Foundations of Data Science Workshop |
| 2018/03 | Columbia University, Program for Financial Studies |
| 2018/02 | Cornell Tech, Financial Engineering in Manhattan |
| 2017/12 | University of Cincinatti Lindner College of Business |
| 2017/11 | Columbia University, Applied Mathematics Department |
| 2017/11 | Columbia University, Graduate School of Business, Finance & Economics Division |
| 2017/06 | Clinton Group |
| 2017/03 | Symposium on High Frequency Trading, Carnegie Mellon University and University of Pittsburgh, Keynote Talk |
| 2016/11 | Stevens Institute, High Frequency Finance and Data Analytics Conference |
| 2016/04 | Columbia University, Graduate School of Business, Decision, Risk, & Operations Division |
| 2016/01 | Citadel LLC |
| 2015/10 | Deutsche Bank Annual Quantitative Strategy Conference |
| 2015/10 | Columbia-JAFEE Conference on Financial Mathematics and Statistics |
| 2015/09 | Manhattan College School of Business |
| 2015/06 | IMS-FIPS Workshop on on Probability and Statistics in Finance |
| 2015/06 | Market Innovation Workshop, Columbia University Center for Pricing and Revenue Management |
| 2015/05 | Federal Reserve Bank of New York, Financial Institution Supervision Group |
| 2015/05 | Kepos Capital |
| 2015/04 | Cornell University, Financial Engineering in Manhattan / Global Association of Risk Professionals |
| 2015/03 | USC Marshall School of Business |
| 2015/03 | IPAM Workshop on Systemic Risk and Financial Networks |
| 2014/12 | Institut Louis Bachelier Conference on Market Microstructure |
| 2014/11 | SIAM Conference on Financial Mathematics, Plenary Talk |
| 2014/11 | SIAM Conference on Financial Mathematics, Mini-symposium on Systemic Risk |
| 2014/09 | Newton Institute Workshop on Monitoring Systemic Risk |
| 2014/07 | Banff International Research Station, New Directions in Financial Mathematics Workshop |
| 2014/06 | London Business School |
| 2014/06 | University College London |
| 2014/05 | SIAM Conference on Optimization, Mini-symposium on Advances in Stochastic Dynamic Programming |
| 2014/05 | MIT, Operations Research Center |
| 2014/03 | International Association of Financial Engineers, Thalesians Seminar Series |
| 2014/02 | AQR Capital Management |
| 2013/10 | Stevens Institute, Modeling High Frequency Data in Finance Conference |
| 2013/10 | INFORMS Annual Conference, Tutorial Speaker |

2013/05    University of Chicago, High-Frequency Trading Conference
2013/04    Syracuse University, Whitman School of Management, Finance Group
2013/04    Cornell University, School of Operations Research & Information Engineering
2013/02    Stanford University, Management Science & Engineering Dept
2012/12    Barclays Capital, Portfolio and Risk Research Group
2012/11    New York University, Stern School of Business, Operations Management Department
2012/10    Stanford University, Management Science & Engineering Dept, New Directions Lecture Series
2012/07    Stevens Institute, Modeling High Frequency Data in Finance Conference
2012/07    SIAM Conference on Financial Mathematics, Mini-symposium on Limit Order Books
2012/05    IMS Workshop on Probability and Statistics in Finance
2012/05    Two Sigma Investments LLC
2012/03    Goldman Sachs, Equity Strategy Group
2012/02    Pragma Trading Quantference
2011/12    University of Utah, Eccles School of Business, Finance Group
2011/10    Columbia University, High Frequency Trading and Market Microstructure Conference
2011/09    JP Morgan, Quantitative Research Group
2011/07    Stevens Institute, Modeling High Frequency Data in Finance Conference
2011/03    Duke University, Fuqua School of Business, Decision Sciences Group
2011/02    Carnegie Mellon University, Tepper School of Business, Operations Management Group
2011/01    Tata Institute for Fundamental Research
2010/12    National Bureau of Economic Research, Market Microstructure Group (discussant)
2010/11    Rutgers University, Mathematical Finance and Probability Seminar
2010/11    Stanford University, 2nd Stanford Conference in Quantitative Finance
2010/11    University of Texas Austin, McCombs School of Business, Texas Quantitative Finance Festival
2010/10    New York University, Stern School of Business, Operations Management Department
2010/05    Knight Capital Group
2010/04    New York University, Courant Institute of Mathematical Sciences
2010/04    Columbia University, Statistics Department
2010/03    Fields Institute, Workshop on Computational Methods in Finance
2010/02    Cornell University, Financial Engineering in Manhattan
2009/11    Columbia University, Center for Financial Engineering
2009/11    SAC Capital Advisors
2009/10    Northwestern University, Industrial Engineering & Management Sciences Department
2009/06    US Commodity Futures Trading Commission
2009/05    MIT, Sloan School of Management, Operations Management Department
2009/04    FDIC, Center for Financial Research
2009/03    University of Pennsylvania, Electrical & Systems Engineering Department
2008/06    Cornell University, School of Operations Research & Information Engineering
2008/05    ETH Zürich, Department of Information Technical & Electrical Engineering
2008/04    Columbia University, Graduate School of Business, Finance & Economics Division
2008/02    Columbia University, Statistics Department
2007/03    UC Berkeley, Department of Electrical Engineering & Computer Science
2007/03    Stanford University, Information Systems Laboratory
2007/02    Northwestern University, Kellogg School of Management, MEDS Department
2007/02    New York University, Stern School of Business, IOMS Department
2007/01    Columbia University, Graduate School of Business, Decision, Risk, & Operations Division

## Teaching Experience

| | **Columbia University, Graduate School of Business** | New York, NY |
|---|---|---|

| | |
|---|---|
| 2021 Spring | *Lecturer*, The Analytics Advantage (B8147–001, MBA Elective) |
| 2021 Spring | *Lecturer*, The Analytics Advantage (B8147–002, MBA Elective) |
| 2020 Fall | *Lecturer*, Business Analytics (B6101–005, MBA Core) |
| 2020 Fall | *Lecturer*, Business Analytics (B6101–006, MBA Core) |
| 2020 Fall | *Lecturer*, Business Analytics (B6101–007, MBA Core) |
| 2020 Fall | *Lecturer*, Business Analytics (B6101–008, MBA Core) |
| 2020 Spring | *Lecturer*, The Analytics Advantage (B8147–001, MBA Elective) |
| 2020 Spring | *Lecturer*, The Analytics Advantage (B8147–002, MBA Elective) |
| 2019 Fall | *Lecturer*, Business Analytics (B6101–005, MBA Core) |
| 2019 Fall | *Lecturer*, Business Analytics (B6101–006, MBA Core) |
| 2019 Fall | *Lecturer*, Business Analytics (B6101–007, MBA Core) |
| 2019 Fall | *Lecturer*, Business Analytics (B6101–008, MBA Core) |
| 2018 Fall | *Lecturer*, Business Analytics (B6101–005, MBA Core) |
| 2018 Fall | *Lecturer*, Business Analytics (B6101–006, MBA Core) |
| 2018 Fall | *Lecturer*, Business Analytics (B6101–007, MBA Core) |
| 2018 Fall | *Lecturer*, Business Analytics (B6101–008, MBA Core) |
| 2017 Fall | *Lecturer*, Business Analytics (B6101–002, MBA Core) |
| 2017 Fall | *Lecturer*, Business Analytics (B6101–004, MBA Core) |
| 2017 Fall | *Lecturer*, Business Analytics (B6101–005, MBA Core) |
| 2017 Fall | *Lecturer*, Business Analytics (B6101–008, MBA Core) |
| 2016 Fall | *Lecturer*, Business Analytics (B6101–004, MBA Core) |
| 2016 Fall | *Lecturer*, Business Analytics (B6101–005, MBA Core) |
| 2016 Fall | *Lecturer*, Business Analytics (B6101–007, MBA Core) |
| 2016 Fall | *Lecturer*, Business Analytics (B6101–008, MBA Core) |
| 2015 Fall | *Lecturer*, Business Analytics (B6101–005, MBA Core) |
| 2015 Fall | *Lecturer*, Business Analytics (B6101–006, MBA Core) |
| 2015 Fall | *Lecturer*, Business Analytics (B6101–007, MBA Core) |
| 2015 Fall | *Lecturer*, Business Analytics (B6101–008, MBA Core) |
| 2014 Fall | *Lecturer*, Business Analytics (B6101–001, MBA Core) |
| 2014 Fall | *Lecturer*, Business Analytics (B6101–002, MBA Core) |
| 2014 Fall | *Lecturer*, Business Analytics (B6101–005, MBA Core) |
| 2014 Fall | *Lecturer*, Business Analytics (B6101–007, MBA Core) |
| 2014 Spring | *Lecturer*, Business Analytics (B6101–001, MBA Core) |
| 2014 Spring | *Lecturer*, Business Analytics (B6101–002, MBA Core) |
| 2014 Spring | *Lecturer*, Business Analytics (B6101–003, MBA Core) |
| 2013 Fall | *Lecturer*, Foundations of Optimization (B9118–001, PhD Core) |
| 2012 Fall | *Lecturer*, Foundations of Optimization (B9824–001, PhD Core) |
| 2012 Spring | *Lecturer*, Quantitative Finance: Models & Computation (B8835–001, MBA Elective) |
| 2012 Spring | *Lecturer*, Quantitative Finance: Models & Computation (B8835–002, MBA Elective) |
| 2011 Fall | *Lecturer*, Foundations of Optimization (B9824–001, PhD Core) |
| 2011 Spring | *Lecturer*, Security Pricing: Models & Computation (B8835–001, MBA Elective) |
| 2011 Spring | *Lecturer*, Security Pricing: Models & Computation (B8835–002, MBA Elective) |
| 2010 Fall | *Lecturer*, Foundations of Optimization (B9824–001, PhD Core) |
| 2010 Spring | *Lecturer*, Security Pricing: Models & Computation (B8835–001, MBA Elective) |
| 2010 Spring | *Lecturer*, Security Pricing: Models & Computation (B8835–002, MBA Elective) |
| 2009 Fall | *Lecturer*, Foundations of Optimization (B9824–001, PhD Core) |
| 2009 Spring | *Lecturer*, Security Pricing: Models & Computation (B8835–001, MBA Elective) |
| 2009 Spring | *Lecturer*, Security Pricing: Models & Computation (B8835–002, MBA Elective) |
| 2008 Fall | *Lecturer*, Foundations of Optimization (B9824–001, PhD Core) |
| 2008 Summer | *Lecturer*, Decision Models (B6015–002, MBA Core) |
| 2008 Summer | *Lecturer*, Decision Models (B6015–003, MBA Core) |
| 2008 Spring | *Lecturer*, Security Pricing: Models & Computation (B8835–002, MBA Elective) |

## Outside Activities (2015–present)

Columbia Business School requires its faculty members to disclose any activities that might present a real or apparent conflict of interest. The list below complies with this requirement.

2021–present    **Compass Lexecon Inc**       Chicago, IL
*Senior Consultant.*

2014–present    **Bourbaki LLC**       New York, NY
*Managing Member.*

2020–2021    **EverQuote Inc**       Cambridge, MA
*Member, Advisory Board.*

2020    **TGS Management Company**       Irvine, CA
*Invited Speaker.*

2019    **UBS Investment Bank**       New York, NY
*Invited Speaker.*

2019    **Engineers Gate LP**       New York, NY
*Invited Speaker.*

## Personal

- Male; Citizenship: USA; Year of Birth: 1975

# APPENDIX F

Raymond P. Keenan

██████████████

| | |
|---|---|
| **2010 to Present** | Retired, Governors Club Country Club, Chapel Hill, NC, Board of Director |

**2006 - 2010**   **Prudential Financial – New York, New York**

Global Head of precious metals. Responsible for managing institutional futures clearing, financing and proprietary trading.

**1997-2006**   **Prudential Financial – New York, New York**
Senior Vice President responsible for creating and managing derivative products in precious metals and currencies for institutional clients.

**1995 – 1997**   **Dresdner Bank – Metals Group – New York, New York**
**Dresdner Bank AG – New York Branch**

Senior Vice President and Global Head of Precious Metals, responsible for metals trade and finance business for Dresdner Bank AG worldwide, with a global client base comprised of central banks, mining companies, and industrial consumers of metals.

**1994 – 1995**   **Deutsche Bank Sharps Piley, Inc. – New York, New York**
**Deutsche Bank AG – New York Branch**

As President and CEO of both Deutsche Bank, Sharps Pixley, Inc. and Sharps Pixley Bankers Inc., manage the precious metals trade and finance business and the base metals trading and brokerage business of Deutsche Bank AG in New York. Served board customer base, including, central banks, mining companies, jewelry manufacturers, and industrial consumers of metals. Trading products included spot, forward options and proprietary trading on behalf of the firm. Corporate finance products included project finance, financial advisory services, and commodity price risk management.

**1976 - 1994**   **Sharps Pixley Inc. – New York, New York**
**Kleinwort Benson Ltd.**

Joined firm as junior trader upon graduation from university. In 1980, appointed Senior Trader reporting directly to CEO. In 1985, promoted to Executive Vice President. In 1992, appointed by the Board of Directors as President and CEO of both Sharps Pixley, Inc. and Sharps Pixley Brokers Inc. As President, executed business strategy to develop the firm's presence in the corporate market with mining companies in addition to the existing commercial trading and central bank franchise.

**Professional Associations**

Commodity Exchange Inc. – Served as an elected Governor on the Board of the Exchange and was Vice Chairman from 1992 to 1994, representing the Metal Trade Groups. Also served on the Margin Committee and the Merger Committee responsible for the merger with the New York Mercantile Exchange.

**Education**

St. Francis College, New York
Bachelor of Arts