**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

UNITED STATES OF AMERICA

  v.

GREGG SMITH, and
MICHAEL NOWAK

     Defendants.

Case No. 19-cr-00669

Hon. Edmond E. Chang

**GREGG SMITH'S MEMORANDUM OF LAW IN SUPPORT OF**
**HIS MOTION FOR A JUDGMENT OF ACQUITTAL**

Jonathan D. Cogan
Sean S. Buckley
Kelly Spatola (*Pro Hac Vice* pending)
KOBRE & KIM LLP
800 Third Avenue
New York, NY 10022

Matthew I. Menchel
KOBRE & KIM LLP
201 South Biscayne Boulevard, Suite 1900
Miami, FL 33131

Leanne A. Bortner
KOBRE & KIM LLP
1919 M Street NW
Washington, DC 20036

*Counsel for Gregg Smith*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

LEGAL STANDARD ............................................................................................................... 3

ARGUMENT ............................................................................................................................ 4

   I.   THE GOVERNMENT FAILED TO OFFER SUFFICIENT EVIDENCE TO ALLOW A
RATIONAL JUROR TO CONCLUDE THAT MR. SMITH ENTERED ORDERS WITH AN
UNCONDITIONAL INTENT TO CANCEL BEFORE EXECUTION ................................... 4

     A.   The Government's Four-Step "Spoofing" Pattern Is Insufficient To Support An
Inference, Beyond a Reasonable Doubt, that Mr. Smith Possessed the Requisite Unlawful
Intent ...................................................................................................................................... 5

       1.   The Government's Own Witnesses Testified that the Four-Step Pattern is Insufficient
to Infer Intent ........................................................................................................................ 5

       2.   Uncorroborated Opinion Testimony Concerning the Four-Step Pattern is Insufficient
to Support a Finding Beyond a Reasonable Doubt that Mr. Smith Acted with the Requisite
Unlawful Intent ..................................................................................................................... 6

         a.   The Government's Cooperating Witnesses ........................................................... 8

         b.   The Government's Expert ..................................................................................... 10

       3.   None of the Other Recent Spoofing-Related Convictions Were Based Solely on
Uncorroborated Opinion Testimony Interpreting Trade Data ........................................... 12

     B.   The Only Reasonable Inference to Be Drawn from the Evidence is that Mr. Smith
Intended to Cancel His Orders Only Following a Condition Subsequent ............................ 13

   II.   THE GOVERNMENT FAILED TO OFFER SUFFICIENT EVIDENCE WHICH
WOULD ALLOW A RATIONAL JUROR TO CONCLUDE THAT MR. SMITH
INTENDED TO CREATE AN ARTIFICIAL PRICE ........................................................... 17

CONCLUSION ....................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**                                                                              **Page(s)**

*CFTC v. Wilson*,
  2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018)......................................................17, 18, 19, 20

*In re Amaranth*
  587 F. Supp. 2d 513 (S.D.N.Y. 2008)........................................................................19

*In re Amaranth*,
  730 F.3d 170 (2d Cir. 2013)....................................................................................19

*In re DiPlacido*,
  CFTC No. 01-23, 2008 WL 4831204 (C.F.T.C. Nov. 5, 2008)................................18

*Jackson v. Virginia*,
  443 U.S. 307 (1975).................................................................................................4

*Ploss v. Kraft Foods Grp., Inc.*,
  197 F. Supp. 3d 1037 (N.D. Ill. 2016)....................................................................17

*U.S. v. Sette*,
  334 F.2d 267 (2d Cir. 1964)....................................................................................19

*United States v. Allen*,
  383 F.3d 644 (7th Cir. 2004)....................................................................................3

*United States v. Bases*,
  18 CR 48, 2022 WL 3586142 (N.D. Ill. Aug. 22, 2022).........................................12

*United States v. Coscia*,
  100 F. Supp. 3d 653 (N.D. Ill. 2015).....................................................................16

*United States v. Coscia*,
  866 F.3d 782 (7th Cir. 2017)........................................................................12, 13, 16

*United States v. Eiland*,
  738 F.3d 338 (D.C. Cir. 2013).................................................................................19

*United States v. Garcia*,
  919 F.3d 489 (7th Cir. 2019)................................................................3, 4, 7, 9, 10, 11

*United States v. Johnson*,
  26 F.3d 669 (7th Cir. 1994)......................................................................................9

*United States v. Jones*,
  713 F.3d 336 (7th Cir. 2013)....................................................................3, 4, 10, 19

*United States v. Smith*,
  555 F. Supp. 3d 563 (N.D. Ill. 2021)........................................................................5

*United States v. Vorley*,
   2021 WL 1057903 (N.D. Ill. Mar. 18, 2021)........................................................................12

*United States v. Whyte*,
   2018 WL 521593, n.10 (W.D. Va. Jan. 23, 2018)..................................................................6

*United States v. Young*,
   745 F.2d 733 (2d Cir. 1984)...................................................................................................11

**Rules**

Fed. R. Crim. P. 29……..........................................................................................................1, 3

Defendant Gregg Smith respectfully submits this memorandum of law in support of his motion under Federal Rule of Criminal Procedure 29 to set aside the verdict and enter a judgment of acquittal on Counts 3, 5 through 12, 24, and 26 of the Second Superseding Indictment.

## PRELIMINARY STATEMENT

The Government's theory in this case is that Mr. Smith, frustrated by algorithmic traders constantly jumping in front of his orders, concocted a scheme to take advantage of them. The scheme, according to the Government, followed a four-step pattern: (1) Mr. Smith would put a "legitimate" order on one side of the market; (2) he would place scaled, or layered, "spoof" orders on the other side to push the market into his "legitimate" one; (3) his "legitimate" order would get hit; and (4) he would cancel his "spoof" orders. Viewed in a light most favorable to the Government, the evidence may have been sufficient to prove that Mr. Smith engaged in this conduct. The problem for the Government, however, is that this conduct itself is not a crime and the evidence on which the jury relied certainly is not sufficient to prove spoofing, fraud or attempted manipulation.

*First*, as it relates to the spoofing charge for which Mr. Smith was convicted (as well as the manipulation and fraud charges, per the Government's theories of the case), the Government was required to prove, among other things, that Mr. Smith placed orders with the unconditional intent to cancel them before they could be executed. But even if Mr. Smith intended to cause the algorithmic traders to front run his scaled orders so that they would transact with his "genuine" orders, it does not automatically follow that he unconditionally intended to cancel his scaled orders before execution. And the evidence adduced at trial on this critical question of Mr. Smith's intent to cancel was insufficient to support a conviction.

*Second*, as it relates to attempted manipulation, the Government was required to prove that

Mr. Smith intended to create an *artificial* price. While the Government's evidence might have been sufficient to prove that Mr. Smith intended for his scaled orders to move the market into his "genuine" orders thereby "affecting" price, it fell short of showing that he intended to create an artificial price. This is because the Government's evidence failed to address whether the alleged spoof orders were placed at non-economic prices. In fact, all the evidence adduced at trial on this topic demonstrated the opposite (*i.e.*, that Mr. Smith's alleged spoof orders were placed at economically rational, or "good," prices).

*Finally*, as it relates to the commodities and wire fraud counts, the Government was required to prove that Mr. Smith misrepresented an essential element of his "legitimate" orders. At trial, however, the Government did not even attempt to do that. Instead, it argued that Mr. Smith represented an essential element of the alleged "spoof" orders, namely his subjective desire to transact. However, courts have distinguished between *non*fraudulent schemes in which a defendant tricks another party into entering into a transaction they otherwise would not have and a fraudulent scheme in which the defendant tricks another party by misrepresenting an essential element of the bargain between them. And here, the Government offered no evidence of any misrepresentations regarding the terms of the "legitimate" orders; the counterparties to the "legitimate" orders received everything they bargained for. Further, a trader's subjective intent to cancel an order before execution does not convey a materially false or fraudulent representation required to support a fraud conviction, and the prosecution of Defendants' purported spoofing as fraud deprived Mr. Smith of his constitutional right to due process because he was not provided notice that open market orders conveyed any such implied representations. Accordingly, as set forth in detail below, the Court should grant Mr. Smith's motion for a judgment of acquittal.

**LEGAL STANDARD**

A trial court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a), (c). In deciding whether to do so, the Court examines the evidence "in the light most favorable to the government to determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt." *United States v. Garcia*, 919 F.3d 489, 496 (7th Cir. 2019). Although this can be a difficult standard to satisfy, "the height of the hurdle depends directly on the strength of the government's evidence," and "a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt." *Id.* at 496-97.

While, in resolving a Rule 29 motion, determinations of credibility and the "choices among reasonable inferences from the evidence" must be left to the jury, "the judge is still responsible for enforcing outer limits on reasonable inferences, guided by the relevant standard of proof." *Id.* at 497. In other words, particularly where, as here, the Government's case is entirely circumstantial, the Court must "carefully consider each inference necessary to prove all elements of the offense" and disregard any inferences that are not supported by sufficiently strong evidence. *United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013) ("The government may not prove its case . . . with conjecture camouflaged as evidence."). Once the Court has identified which inferences are reasonable and which are improper speculation, it must then determine, "not whether a logical set of inferences could show the charge was possibly or even likely true, but whether it could be inferred *beyond a reasonable doubt* that the defendant was guilty as charged." *Garcia*, 919 F.3d at 501 (citing *United States v. Allen*, 383 F.3d 644, 649 (7th Cir. 2004)). The Seventh Circuit has regularly overturned jury verdicts that were based on impermissibly speculative inferences because even a "strong suspicion that someone is involved in a criminal activity is no substitute of guilt

beyond a reasonable doubt." *Jones*, 713 F.3d at 347; *see also Garcia*, 919 F.3d at 499-503 (collecting cases); *cf. Jackson v. Virginia*, 443 U.S. 307, 315 (1975) (requiring a "state of near certitude of the guilt of the accused" to support a conviction beyond a reasonable doubt).

## ARGUMENT

As described below, the Government failed to produce any evidence beyond impermissible speculation that would allow a rational juror to conclude beyond a reasonable doubt that Mr. Smith: (I) entered orders with an unconditional intent to cancel before execution; and (II) intended to create an artificial price. Further, for the reasons described in detail in Michael Nowak's contemporaneously filed motion for a judgment of acquittal, which Mr. Smith joins and respectfully incorporates herein, the Government failed to produce any evidence that would allow a rational juror to conclude beyond a reasonable doubt that Mr. Smith made any materially false or fraudulent statements regarding the terms of his "legitimate" orders and, regardless, the Government's attempt to prosecute alleged spoofing as fraud violated due process. *See* Nowak Rule 29 Mot. §§ II.B, C.

## I. THE GOVERNMENT FAILED TO OFFER SUFFICIENT EVIDENCE TO ALLOW A RATIONAL JUROR TO CONCLUDE THAT MR. SMITH ENTERED ORDERS WITH AN UNCONDITIONAL INTENT TO CANCEL BEFORE EXECUTION

As the Court explained, to find Mr. Smith guilty of spoofing, the Government had to prove "beyond a reasonable doubt that, at the time the defendant entered the bids or offers specified in the count, he had the unconditional purpose to cancel the entire bid or offer before it was executed." (Tr. 3893:4-8.) No rational jury could have found that the Government met its burden here. *First*, the Government's case amounted to nothing more than evidence that Mr. Smith's at-issue orders followed the Government's four-step pattern; however, the pattern is insufficient to establish an intent to cancel before execution. *Second*, the only reasonable inference that can be drawn from

the evidence is that Mr. Smith intended to cancel his bids or offers only after the occurrence of a condition subsequent. In other words, the Government failed to offer sufficient evidence to allow a rational juror to conclude that Mr. Smith's intent to cancel before execution was unconditional.

Because the wire fraud, commodities fraud, and attempted market manipulation charges are all based on the same conduct, a failure to establish that Mr. Smith entered bids or offers with the unconditional intent to cancel before execution requires a judgment of acquittal on those claims as well. *See United States v. Smith*, 555 F. Supp. 3d 563, 573-576 (N.D. Ill. 2021).

### A. <u>The Government's Four-Step "Spoofing" Pattern Is Insufficient To Support An Inference, Beyond a Reasonable Doubt, that Mr. Smith Possessed the Requisite Unlawful Intent</u>

While the trial record is replete with evidence from which the jury could infer that Mr. Smith implemented the Government's four-step pattern, as detailed below: (1) this pattern, without more, is insufficient to support a finding beyond a reasonable doubt that Mr. Smith entered orders with an unconditional intent to cancel before execution; (2) the Government's case relied almost exclusively on that pattern and related speculation about it; and (3) recent spoofing-related convictions, which were based on a similar pattern, were all affirmed based, in part, on additional, direct evidence of the defendants' intent in those cases that is not present here.

### 1. <u>The Government's Own Witnesses Testified that the Four-Step Pattern Is Insufficient to Infer Intent</u>

The Government's own witnesses testified that the pattern alone "tells you nothing" about a trader's intent. Robert Sniegowski, the Executive Director of the CME's Rules and Regulatory Outreach Group responsible for drafting the CME's anti-spoofing rule, testified as follows:

> Q. Okay. This exact same pattern that we're looking at, small order, large order, . . . execution of the small order, cancellation of the large order can be a perfectly legitimate trading strategy so long as when you place both orders, you intended to execute?

A. Yes.

(Tr. 687:13-23 (Sniegowski) (confirming that "the pattern alone tells you nothing about what's in the trader's head").) Brian Wika, a CME investigator, similarly testified that the Government's four-step pattern can be perfectly legitimate depending on a trader's intent when placing the orders (Tr. 2169:3-14), and the legitimacy of the pattern is reflected in the CME's rules which expressly permit the use of scales "with the intent to cancel those orders as the market changes," as well as making a two-sided market that results in market imbalance (GX409 at 5; Tr. 673:4-674:23, 681:1-682:17 (Sniegowski)). Cooperating witness, John Edmonds, and Government expert, Professor Kumar Venkataraman, also testified that the strategies employed by Mr. Smith—using scales and making an imbalanced two-sided market—are permissible, facially legitimate, and commonplace. (Tr. 1563:10-16, 1575:24-1578:8 (Edmonds); Tr. 2951:7-12 (Venkataraman).) On a Rule 29 motion, this testimony is presumed to be credible. *See, e.g.*, *United States v. Whyte*, No. 12-cr-21, 2018 WL 521593, at *5 n.10 (W.D. Va. Jan. 23, 2018). Thus, *per the Government's own witnesses*, the pattern alone is insufficient; some other evidence of intent is required.

Thus, no reasonable jury could conclude beyond a reasonable doubt that Mr. Smith had the requisite unconditional intent to cancel prior to execution based solely on this pattern.

### 2. Uncorroborated Opinion Testimony Concerning the Four-Step Pattern Is Insufficient to Support a Finding Beyond a Reasonable Doubt that Mr. Smith Acted with the Requisite Unlawful Intent

The Government failed to offer any evidence of Mr. Smith's intent other than cherry-picked excerpts of his trade data that purport to follow the Government's four-step pattern, which, as explained above are insufficient, and the opinions of witnesses who inferred from that same data that Mr. Smith was spoofing. As explained below, however, these opinions and evidence are no more indicative of Mr. Smith's intent than the pattern itself, and, per the Seventh Circuit, are

insufficient to support a conviction.

In *United States v. Garcia*, 919 F.3d 489 (7th Cir. 2019), the Seventh Circuit reversed a conviction for possession of cocaine with intent to distribute where the government's case consisted solely of opinion testimony purporting to interpret cryptic and highly suspicious (but not facially incriminating) telephone calls between the defendant and a known drug dealer. In *Garcia*, there was no direct evidence that the defendant ever possessed or distributed cocaine, or even that he possessed drug paraphernalia or large quantities of cash. The Circuit found that "[w]ithout corroborating evidence, the agent's opinion testimony regarding the meaning of [the defendant]'s allegedly incriminating conversations amounted to educated speculation rather than proof beyond a reasonable doubt." *Id.* at 496.[1] While recognizing that the agent's interpretations may have been correct and that it was "possible, perhaps even likely, that [the defendant] was guilty," the Circuit ultimately concluded that the agent's opinion that the defendant was discussing drug trafficking with a known trafficker "fell well short of proof beyond a reasonable doubt," because the agent's opinions were based on uncorroborated speculation and inferences of guilt by association with the known drug dealer with whom he was conversing. *Id.* at 504.

Much like the *Garcia* defendant's telephone call, Mr. Smith's use of the Government's four-step pattern is not itself unlawful, and there is no direct evidence that Mr. Smith possessed the requisite unlawful intent. He made no admissions of guilt and neither sent nor received incriminating written communications. To the contrary, the only statements in the record from Mr. Smith concerning his trading strategy are the ones he made to the CME and CFTC that he intended to trade every order he entered. (*See, e.g.*, DX624 ("[I]s your intention to trade these orders[?]

---

[1] For example, the agent testified that the phrase "two-four" meant that defendant would get paid $24,000 for one kilogram of cocaine, but the government failed to offer any evidence to corroborate that $24,000 was a reasonable price for cocaine at the time. *Id.* at 504.

GREGG SMITH: Yeah. Absolutely."); Tr. 2263:3-7 (Bowden) (reading Mr. Smith's CFTC deposition testimony, in which he testified that he told JPMorgan that "I absolutely enter all my trades with the intent to execute").) So, to fill this evidentiary gap, the Government offered speculative, uncorroborated (and highly repetitive) opinions:

### a. The Government's Cooperating Witnesses

The Government offered the opinions of its cooperating witnesses, Mr. Edmonds, Mr. Trunz, and Corey Flaum, who each concluded that Mr. Smith was spoofing based on: (i) watching Mr. Smith trade using the Government's four-step pattern in real time; (ii) comparing charts of cherry-picked excerpts of his trade data to their own orders which they admitted were spoofs; and (iii) a handful of facially non-incriminating statements Mr. Smith allegedly made to, or within earshot of, the witnesses. None of these bases, either alone or collectively, support an inference beyond a reasonable doubt that Mr. Smith entered orders with the intent to cancel before execution.

*First*, watching Mr. Smith trade in real time is no different than reviewing the trade data after the fact. Thus, their observations that certain of Mr. Smith's trading followed the Government's four-step pattern is not sufficient to infer he acted with unlawful intent. (*See, e.g.*, Tr. 687:13-23 (Sniegowski testifying that the pattern itself is perfectly legitimate.).)[2]

*Second*, it is not reasonable to infer that Mr. Smith acted with unlawful intent simply because charts depicting excerpts of his trade data looked similar to cherry-picked excerpts of the cooperating witnesses' trade data without any contextualization. Indeed, in each instance, the

---

[2] The chats in which individuals who observed Mr. Smith trade in real time attempt to explain his mental state—*e.g.*, that he was "offer[ing] to buy" or "bidding up on the futures trying to get some off" (GX86, GX37)—are no different. These are opinions about Mr. Smith's intent based on nothing more than a facially legitimate trading strategy. Further, even if such opinions were sufficiently corroborated, they suggest nothing more than trading with an intent to affect prices, which, as explained *infra*, is neither unlawful nor evidence of an intent to cancel before execution.

witnesses conceded that they had reviewed no evidence underlying or otherwise related to the trading beyond the Government's charts. They did not testify that they observed any of the orders in real time, and they relied solely on the Government's depictions of hand-selected snippets of data that did not reflect anything close to a complete picture of what was occurring in the market at the time of the challenged conduct. Further, that Mr. Smith and a convicted felon may have both used the Government's four-step pattern is not proof of Mr. Smith's intent, because the pattern itself is legitimate and, without more, insufficient to infer intent. (*Id.*) Not only is such an inference not supported by the factual record here (and the jury seemed to agree, as Mr. Smith was acquitted of conspiring with Mr. Edmonds and Mr. Trunz), but such an inference is in fact prohibited. The Seventh Circuit has held that inferences which are focused on a defendant's "association with criminals or their criminal activity" fail to carry the Government's burden, *Garcia*, 919 F.3d at 503, and a co-conspirator's admission of guilt "may not be used as substantive evidence of another defendant's guilt," *United States v. Johnson*, 26 F.3d 669, 676 (7th Cir. 1994).

*Finally*, nothing Mr. Smith allegedly said gives rise to a reasonable inference that he entered the at-issue orders with an intent to cancel before execution:

- Showing size moves the market: Mr. Edmonds testified that Mr. Smith told him that "showing size moves the market." (Tr. 1043:3.) On its face, this statement has nothing to do with whether Mr. Smith had an intent to cancel before execution. And even if the statement could be reasonably interpreted to suggest that Mr. Smith intended to *move the market*, entering orders with an intent to affect prices is not the same as placing orders with the intent to cancel them before execution.

- Anger when certain orders were hit: The cooperators testified that they observed Mr. Smith get angry when certain of his orders were hit. However, the only reasonable inference to be drawn from this testimony is that Mr. Smith did not want his orders to get hit *at that time.* As these same witnesses testified, the market was extremely volatile, even chaotic, and prone to rapid and drastic price swings (*see, e.g.*, Tr. 1466:22-1467:22 (Edmonds); Tr. 2464:13-2465:1 (Trunz)), and it was risky to leave orders open for too long (*see, e.g.*, Tr. 1958:7-9 (Flaum)). In such a market, it simply does not follow from the fact that Mr. Smith may have been angry when certain orders were ultimately executed upon that he must have intended, at the earlier point in time when they were placed, to cancel them.

9

- "There goes the business": Mr. Edmonds testified that Mr. Smith said this to Mr. Ruffo after a compliance meeting, and he assumed that this was because compliance just told them (among other things) that they could not engage in spoofing. (Tr. 1033:20-1034:21.) But the Seventh Circuit has repeatedly been troubled "by the extent to which a possible interpretation or over-interpretation of an ambiguous statement is being used with little support to show guilt beyond a reasonable doubt." *Jones*, 713 F.3d at 350 (7th Cir. 2013). Here, Mr. Edmonds was not a party to the conversation, but merely overheard the statement out-of-context, and he does not even recall when it occurred (and, thus, what else may have been discussed by compliance at the meeting). (Tr. 1034:9-21, 1488:9-1489:19.) Such speculation about the meaning of a facially innocuous statement is insufficient to support a verdict beyond a reasonable doubt. *See Garcia*, 919 F.3d at 500 ("A jury cannot speculate its way out of reasonable doubt.").

Accordingly, the uncorroborated opinions of Messrs. Edmonds, Trunz, and Flaum do not support an inference that Mr. Smith placed orders with an intent to cancel before execution.

### b. The Government's Expert

Professor Venkataraman offered his opinion that the Government's pattern, as reflected in charts of Mr. Smith's trade data, "appears to be designed to not fill the red ['spoof'] orders but, instead, use these red orders *to push the price* to get fills on the green ['genuine'] orders which are on the opposite side." (Tr. 2725:8-12 (emphasis added).) However, as explained above, whether Mr. Smith entered orders with an intent "to push the price," is irrelevant to whether he entered those orders with the unconditional conscious desire to avoid execution. In other words, a trader could place a scale of orders with the intent to push the market into his "legitimate" order on the other side but also be perfectly happy to have that scale get executed. Thus, the jury could not reasonably infer from this conclusion that Mr. Smith acted with the requisite unlawful intent.

Nor do the bases for Professor Venkataraman's opinion support an inference that Mr. Smith entered orders with an unconditional intent to cancel before execution. He arrived at his conclusion, in part, by comparing Mr. Smith's trade data to that of Mr. Trunz and Mr. Edmonds testifying that "[t]he patterns are similar." (*See, e.g.*, Tr. 2983:9-12.) However, as explained above,

it is neither factually reasonable nor legally permissible to infer Mr. Smith's intent based on comparisons to the cooperating witnesses. While Professor Venkataraman's opinion was also based on inferences drawn from Mr. Smith's trade data separate and apart from its similarities to the cooperators' data—specifically, that the allegedly unlawful orders were (i) "very large," (ii) cancelled "quickly," (iii) and resulted in low execution rates (Tr. 2874:8-14)—"each link in the chain of inferences must be sufficiently strong to avoid a lapse into speculation." *Garcia*, 919 F.3d at 503. Here, the Government failed to offer any corroboration in support of these inferences:

(i) That Mr. Smith's "spoof" orders were "large". However, he relied on the Government to define what constitutes "large" and provided no justification for what was included or excluded from that definition. (*See, e.g.*, Tr. 2875:14-2876:10, 2880:3-18 (explaining that for gold, it was 7 lots and 10 lots but not 8 lots, and that he "had nothing to do with which of these episodes were selected, what the large orders were, what the small orders were, what was gray orders").)

(ii) That Mr. Smith's "spoof" orders were "quickly" cancelled. However, he did not compare Mr. Smith's cancellation speed with the market average, and he offered no definition of what constitutes "quick," even testifying that he has never done research in this area and is not an expert on "what is a reasonable response time." (Tr. 2851:2-22, 2929:1-6.)

(iii) That Mr. Smith's "spoof" orders had "low fill ratios" compared to his small-side orders. However, he did not analyze market-wide data to determine whether Mr. Smith cancelled his orders more than the average market participant (Tr. 2859:9-23, 2863:15-22), nor did he calculate fill rates or the total number of executions on his "large" orders with no opposite side order because "it's not consistent with the DOJ patterns" (Tr. 2798:17-23).

Neither the cooperators nor Mr. Wika—whose opinion regarding Mr. Smith's intent was also based on the trade data—provided any of the corroboration required for a reasonable jury to draw these inferences. "A jury cannot speculate its way out of reasonable doubt." *Garcia*, 919 F.3d at 500 (internal quotation marks omitted); *see also, e.g.*, *United States v. Young*, 745 F.2d 733, 766 (2d Cir. 1984) ("If the observed actions of a defendant do not establish a prima facie case, I do not believe that an expert's opinion that his actions are criminal may carry the prosecution's proof above the requisite line. It is one thing to permit a jury to weigh that opinion in considering an

11

otherwise adequate case; it is quite another matter to let that opinion salvage an insufficient case.").

### 3. None of the Other Recent Spoofing-Related Convictions Were Based Solely on Uncorroborated Opinion Testimony Interpreting Trade Data

The recent convictions in both *United States v. Vorley* and *United States v. Bases* were affirmed by Judge Tharp and Judge Lee, *inter alia*, because the inference that the Government asked the jury to draw—that defendants entered orders with an intent to cancel before execution—was corroborated in part by defendants' own chats.[3] *United States v. Vorley*, No. 18 CR 35, 2021 WL 1057903, at *12-13 (N.D. Ill. Mar. 18, 2021) (finding sufficient evidence of unlawful intent because the inference that the alleged spoof orders were being placed "for some purpose other than to be filled" was corroborated by, among other things, defendants' own chats, including a chat in which Defendant Vorley says he is "spoofing it up, ahem ahem" to explain why he is placing buy orders when needed to sell), *aff'd*, 40 F.4th 528 (7th Cir. 2022); *United States v. Bases*, No. 18 CR 48, 2022 WL 3586142, at *7 (N.D. Ill. Aug. 22, 2022) (finding sufficient evidence of unlawful intent because there was, among other things, "evidence that Defendants themselves understood that their scheme was fraudulent," including a chat in which a defendant said he "f…k[s] the mkt around a lot" and that the market is "easy . . . to manipulate"). Similarly, in *United States v. Coscia*, 866 F.3d 782, 796 (7th Cir. 2017), which involved an algorithmic trader, not a manual trader like Mr. Smith, the Circuit upheld a spoofing conviction, where, in addition to the trade data and inferences drawn therefrom, there was direct evidence of intent in the form of testimony from the individual who programmed the algorithm that it was "designed to avoid large orders being filled."

Accordingly, the lack of any direct evidence that Mr. Smith had the unconditional intent to cancel his at-issue orders, coupled with a facially legitimate pattern of trading and uncorroborated

---

[3] Additionally, in neither *Bases* nor *Vorley* was evidence elicited that the at-issue trading pattern was facially legitimate, like the pattern here.

opinion testimony, is insufficient for a jury to find beyond a reasonable doubt that Mr. Smith acted with the requisite intent.

### B. The Only Reasonable Inference to Be Drawn from the Evidence Is that Mr. Smith Intended to Cancel His Orders Only Following a Condition Subsequent

As this Court instructed, to be guilty of spoofing, Mr. Smith's intent to cancel had to be *unconditional*. (Tr. 3893:4-8.) As the Seventh Circuit has held, the "fundamental difference" between legal trades and spoofing is that "legal trades are cancelled only following a condition subsequent to placing the order, whereas orders placed in a spoofing scheme are never intended to be filled at all." *Coscia*, 866 F.3d at 795. Here, the only reasonable inference to be drawn from the evidence is not that Mr. Smith had an unconditional intent to cancel at the time the at-issue orders were placed, but rather he only intended to cancel following a subsequent event.

*First*, even according to the four-step pattern on which the Government's entire case is based, the alleged "spoof" orders are only cancelled following a condition subsequent—the execution of the "genuine" order:

1. "[S]tep one . . . is that defendant places an order . . . that he really actually wants to trade, and he wants to trade it at a very specific price."

2. "The second step is that defendant floods the market with a bunch of these deceptive orders, and he puts them in the other side of the market."

3. "[S]omebody in the market trades with defendant at that price."

4. "The fourth step is that . . . *as soon as that genuine order is filled*, defendant immediately cancels all of those red deceptive orders."

(Tr. 395:6-397:15 (Gov't Opening) (emphasis added); *see also, e.g.*, Tr. 644:4-6 (Sniegowski) ("[T]he pattern is that once you've executed on the order that you intended to trade, you cancel the order that you didn't intend to trade."); Tr. 2718:14-18 (Venkataraman) ("[O]nce the spoof order elicits the reaction that it desires from other market participants, the spoofer would quickly cancel

13

the order because the objective of the spoof order is to elicit that reaction.").) According to Professor Venkataraman, the Government's cherry-picked episodes all follow this pattern. (Tr. 2761:9-2762:17.) In other words, Mr. Smith's cancellation of the at-issue large-side orders is, according to the Government, conditioned on the execution of the small-side orders.[4] This is an inference *the Government* asked the jury to draw, and it requires a judgment of acquittal.

*Second*, as Professor Venkataraman testified, the trade data shows that Mr. Smith began cancelling the at-issue orders only after they were joined or front-run by an algorithm. (Tr. 2857:11-18 (Venkataraman).) The frontrunning is thus an undisputed condition subsequent, and the Government failed to offer any evidence from which the jury could infer that Mr. Smith's cancellations were not in response to the front running—a necessity to find guilt beyond a reasonable doubt.

Instead, the evidence elicited at trial, often from the Government's own witnesses, supports the inference that Mr. Smith entered his orders, not with an unconditional intent to cancel, but with an intent to cancel if they were front run. According to the Government's expert, front running is a legitimate reason for cancelling:

> Q. And what a free option is . . . if a front runner gets ahead of the first trader's placement of a limit order and the market reverses direction, the front-runner has the option, the free option of selling it back to the other trader. Is that a fair explanation?
>
> A. It is.
> . . .
> Q. And if the market goes down and the front-runner thinks that it's going to continue to go down, the front-runner can sell back the contract so long as the original contract is still on the book; is that correct?
>
> A. That's the concept of a free option, that's right.

---

[4] For the reasons articulated in Section I.A. above, this is not a reasonable inference of Mr. Smith's intent based on the facts in evidence. However, for the purposes of this argument, it is assumed that the inference that the Government has asked the jury to draw here is a reasonable one.

> Q. Okay. And that would explain a reason why if you've been front run you don't want to just be sitting out there to be a free option for the other trader, true?
> . . .
> A. So you have the option to cancel. If you cancel, then you're removing the option, that's right.

(Tr. 2844:16-2846:8 (Venkataraman); *see also* Tr. 3450:23-3451:1 (Fischel) ("[A] rational response to front-running is to cancel the order that you originally placed because you now are much less likely to execute and you face the risk of providing insurance to the front-runner.").) As Professor Daniel Fischel testified, quick cancellations are often required to avoid becoming a "victim" of a free option—specifically, he provided uncontroverted testimony that, if a trader's order is jumped or front-run by an algorithm: (i) it is unlikely that the original order will be hit, because the frontrunning algorithm's order is at a better price; and (ii) "if the market moves in the opposite direction then [the trader] can, in effect . . . become a victim because their offer is still present at a price which is no longer attractive to buy if the market has turned down." (Tr. 3449:10-21.) That Mr. Smith was cancelling his large-side scales to avoid becoming a "victim" of an algorithm's free option is corroborated by the anger the cooperators alleged he expressed on occasion when those orders were hit. This inference is further corroborated by, among other things: (i) Mr. Smith's own emails in which he questions the legality of the algorithms' conduct (DX317, DX319); and (ii) the testimony of the Government's witnesses who understood that Mr. Smith was complaining about the algorithms because he thought the conduct was improper and he wanted it to stop (Tr. 1499:2-1500:9 (Edmonds); Tr. 2481:10-2482:19 (Trunz)).

*Finally*, the only reasonable inference to be drawn from Mr. Smith's "quick" cancellation speed is an intent to cancel the orders if not immediately filled. Mr. Sniegowski testified that there is no minimum time an order has to stay open in the market before cancelling. (Tr. 674:24-675:1.) And Professor Venkataraman, Mr. Sniegowski, and the CME's Senior Director of Global

15

Operations, John Scheerer, all testified about the legitimacy of a "fill or kill" order—an order that is cancelled if not filled immediately. (Tr. 2913:6-19 (Venkataraman); Tr. 698:8-14 (Sniegowski); Tr. 557:16-558:13 (Scheerer).) In fact, the Seventh Circuit has held an intent to cancel an order if not hit immediately does not constitute spoofing. *Coscia*, 866 F.3d at 795 ("[A]n order that must be executed in full immediately, or the entire order is cancelled" is not spoofing because it is dependent on the occurrence of a subsequent event—here, the order not being immediately executed.); *cf. United States v. Coscia*, 100 F. Supp. 3d 653, 659 (N.D. Ill. 2015) ("[A]lthough Fill or Kill orders must be filled immediately or the entire order is cancelled, they are not entered with the intent to cancel."). And, here too, the Government's witnesses testified that market prices change rapidly (*see, e.g.*, Tr. 1466:22-1467:22 (Edmonds)), which is one of the reasons why "fill or kill" orders are utilized (*see, e.g.*, Tr. 2928:11-25 (Venkataraman) (testifying that a "fill or kill" order that is not executed is not evidence of an intent to cancel before execution, but rather is evidence of changing market conditions)).

Because: (i) the Government's theory is that Mr. Smith only cancelled the alleged "spoof" orders after a condition was met—namely, the execution of his opposite side order; (ii) its own expert confirmed that in each of the 100 alleged "spoofing" episodes identified by the Government, Mr. Smith cancelled his large-side "spoof" orders only following an intervening act—namely, an order being front run; and (iii) the Seventh Circuit has held, and Professor Venkataraman confirmed, that wanting to cancel an order that is not immediately filled is not spoofing, the only reasonable inference is that Mr. Smith cancelled his orders only upon the occurrence of a condition subsequent. In light of this, no reasonable jury could conclude beyond a reasonable doubt that Mr. Smith entered the at-issue orders with an unconditional intent to cancel them before execution.

As all counts against Mr. Smith require proof beyond a reasonable doubt of an intent to

16

cancel before execution, he is entitled to the entry of a judgment of acquittal on all counts.

## II. THE GOVERNMENT FAILED TO OFFER SUFFICIENT EVIDENCE WHICH WOULD ALLOW A RATIONAL JUROR TO CONCLUDE THAT MR. SMITH INTENDED TO CREATE AN ARTIFICIAL PRICE

As the Court explained to the jury, to find Mr. Smith guilty of attempted price manipulation, the Government had to prove beyond a reasonable doubt that Mr. Smith "intended to create an artificial price." (Jury Charge, Tr. 3882:1-9.) In other words, as this Court charged the jury and as others have held, "[t]he mere intent to *affect a price* is not sufficient standing alone to satisfy this intent requirement." (Tr. 3882:22-3883:3.) *See, e.g.*, *CFTC v. Wilson*, No. 13 Civ. 7884, 2018 WL 6322024, at *15 (S.D.N.Y. Nov. 30, 2018) ("[T]he mere intent to *affect prices* is not enough; rather, the [government] must show that Defendants intended to cause *artificial* prices." (emphasis added)). This means the Government had to establish that Mr. Smith entered his spoof orders without any legitimate economic rationale. *See, e.g.*, *Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1055 (N.D. Ill. 2016) ("If a trading pattern is supported by a legitimate economic rationale, it cannot be the basis for liability under the CEA . . . .").

Here, the Government failed to present any evidence that Mr. Smith's use of scaled orders (*i.e.*, the alleged spoof orders) was not supported by a legitimate economic rationale.

*First*, Mr. Edmonds and Mr. Trunz both conceded on cross-examination that there is, in fact, a legitimate economic rationale that would support Mr. Smith's trading. Mr. Edmonds testified that placing orders in scales (which he noted is "normal market practice") makes "good economic sense" because scales can capture rapid price swings in the market and, if hit, result in executions at better prices. (Tr. 1563:5-1564:22.) Mr. Trunz similarly testified that if orders scaled near the best bid or offer are all hit, the executions would be at a "good price." (Tr. 2505:3-24.) In other words, the evidence established that Mr. Smith's alleged "spoof" orders—the orders the

Government alleges were entered with an intent to create an artificial price—were at good, economically rational prices. (*See also, e.g.*, Tr. 3562:6-22, 3566:18-3567:15 (Cusimano) (scales allow a trader to "capture short-term market volatility" and "end up with [an] average price that's better than what the markets might be before that price move").) In contrast, the Government offered no evidence that Mr. Smith's alleged "spoof orders" were at prices that would have been uneconomic or unprofitable for Mr. Smith. This failure requires a judgment of acquittal on the attempted manipulation count. *Compare Wilson*, 2018 WL 6322024, at *18 (entering judgment in favor of defendants because the at-issue bids were reflective of defendants' assessment of fair market value of the at-issue product); *with In re DiPlacido*, CFTC No. 01-23, 2008 WL 4831204, at *28 (C.F.T.C. Nov. 5, 2008) (finding "uneconomic trading" in the form of violating bids and offers sufficient to show manipulative intent), *aff'd*, 364 F. App'x 657 (2d Cir. 2009).

*Second*, Professor Venkataraman testified that he did not rule out legitimate trading strategies when analyzing Mr. Smith's trade data (Tr. 2811:1-4) and thus could not offer an opinion as to whether his use of scales would have been profitable or economically rational if executed. Rather, he opined that Mr. Smith's orders were "consistent with" an intent to affect market prices, which is not itself unlawful, and he conceded that this was not necessarily the only reason Mr. Smith was entering these orders. (Tr. 2798:9-14). Similarly, Mr. Flaum testified that "you would need to know 100 percent of the information available" in the market to determine whether a trade had a legitimate economic purpose. (Tr. 1933:3-12.) Yet none of the witnesses who offered opinions on Mr. Smith's trading reviewed market-wide data (and, in fact, Mr. Edmonds, Mr. Trunz, and Mr. Flaum did not even review Mr. Smith's trade data, just the Government's summaries). (*See, e.g.*, Tr. 2721:9-21 (Venkataraman); Tr. 1070:4-10 (Edmonds); Tr. 2317:21-25 (Trunz); Tr. 1873:9-17 (Flaum).) The Government cannot fill this clear gap in evidence—whether

there was a legitimate economic rationale for Mr. Smith's trading strategy—"with conjecture camouflaged as evidence." *Jones*, 713 F.3d at 340; *see, e.g.*, *U.S. v. Sette*, 334 F.2d 267, 269 (2d Cir. 1964) (reversing conviction because sole evidence against defendant was two agents' opinion testimony based on their personal observations of the defendant and their general knowledge; the agents "had the opportunity" to engage in additional evidence-gathering efforts to prove the offense, but "[h]aving utterly failed to do so, they could not remedy this obvious defect in proof by assuming the role of experts and stating their opinions on what they had to prove"); *In re Amaranth*, 587 F. Supp. 2d 513, 534-35 (S.D.N.Y. 2008) ("In close cases, there should be no liability," because "[t]he laws that forbid market manipulation should not encroach on legitimate economic decisions lest they discourage the very activity that underlies the integrity of the markets they seek to protect."), *aff'd*, *In re Amaranth*, 730 F.3d 170 (2d Cir. 2013).

*Finally*, although various Government witnesses testified that they could not think of any economic rationale that supported Mr. Smith's trading strategy, these opinions are to be given "no more weight than the facts upon which [they are] based," and, here, as explained below, there are insufficient facts to support those conclusions so they must be disregarded. *United States v. Eiland*, 738 F.3d 338, 357 (D.C. Cir. 2013) (disregarding conclusory opinion testimony that was not supported by sufficient facts in assessing Rule 29 motion).

Mr. Trunz and Mr. Flaum both testified that there was no legitimate reason for Mr. Smith's use of scales because they were designed to move the market. However, as this Court instructed the jury, trading with a specific intent to affect price is not unlawful and does not constitute manipulative intent. (Tr. 3882:22-3883:3.) *See also Wilson*, 2018 WL 6322024, at *17 (finding that the government failed to prove manipulative intent: although the record was "clear" that

defendants were "determined" to have their bids affect the settlement price, this "says nothing about whether they understood those bids to be artificially high").

Mr. Edmonds and Professor Venkataraman testified that Mr. Smith's use of scales was not economically rational because the resulting market imbalance would make it unlikely that those orders would get hit. (*See, e.g.*, Tr. 2739:21-2740:2 (Venkataraman); Tr. 991:3-12 (Edmonds).) But this is neither legally relevant nor factually correct. As one court has held, "the hindsight observation that none of [defendant]'s electronic bids resulted in a consummated trade is not enough to demonstrate an intent to manipulate the market," and here, as explained above, many of Mr. Smith's allegedly unlawful orders did result in consummated trades. *Wilson*, 2018 WL 6322024, at *19 (the defendant submitted over 2,500 bids over eight months without consummating a single trade). And while Mr. Smith's scales in the episodes cherry-picked by the Government may have resulted in lower execution rates compared to his small-side orders, the total number of executed contracts on his scaled orders during the same period in fact exceeded the total number of executed contracts on his small-side orders. (Tr. 3469:20-3470:14 (Fischel) (538,117 executions on large-side scaled orders versus 478,575 executions on small-side orders).)

Thus, as the Government has failed to offer any evidence that Mr. Smith's alleged spoof orders were at uneconomic prices (and, in fact, the record establishes the opposite) and the only reasonable inference to be drawn is that Mr. Smith intended to affect prices (which is not unlawful), there was insufficient evidence at trial that Mr. Smith entered the orders with an intent to create an artificial price, and the conviction on Count 3 must be vacated and a judgment of acquittal entered.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Mr. Smith's motion, vacate his judgment of conviction, and enter a judgment of acquittal on all counts.

20

Dated: October 11, 2022

/s/ Jonathan D. Cogan
Jonathan D. Cogan
Sean S. Buckley
Kelly Spatola (*Pro Hac Vice* pending)
KOBRE & KIM LLP
800 Third Avenue
New York, NY 10022
(212) 488-1200

Matthew I. Menchel
KOBRE & KIM LLP
201 South Biscayne Boulevard, Suite 1900
Miami, FL 33131
(305) 967-6108

Leanne A. Bortner
KOBRE & KIM LLP
1919 M Street NW
Washington, DC 20036
(202) 664-1935

*Counsel for Defendant Gregg Smith*