THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GREGG SMITH, and<br>MICHAEL NOWAK<br><br>Defendants. | Case No. 19-cr-00669<br><br>Hon. Edmond E. Chang |

**GREGG SMITH'S REPLY IN SUPPORT OF**
**HIS MOTION FOR A JUDGMENT OF ACQUITTAL**

Jonathan D. Cogan
Sean S. Buckley
Kelly Spatola
KOBRE & KIM LLP
800 Third Avenue
New York, NY 10022

Matthew I. Menchel
KOBRE & KIM LLP
201 South Biscayne Boulevard, Suite 1900
Miami, FL 33131

Leanne A. Bortner
KOBRE & KIM LLP
1919 M Street, NW
Washington, DC 20036

*Counsel for Gregg Smith*

**TABLE OF CONTENTS**

ARGUMENT .................................................................................................................................. 1

    I.    NO REASONABLE JURY COULD HAVE FOUND THAT MR. SMITH ENTERED THE AT-ISSUE ORDERS WITH AN UNCONDITIONAL INTENT TO CANCEL BEFORE EXECUTION .................................................................................................................... 3

        A.    The Evidence Does Not Support the Inference that Mr. Smith Entered Orders with an Unconditional Intent to Cancel Before Execution ..................................................... 4

        B.    At Most, the Evidence Supports an Inference That Mr. Smith's Intent to Cancel Was Conditional ................................................................................................................. 9

    II.    NO REASONABLE JURY COULD HAVE FOUND THAT DEFENDANTS INTENDED TO CREATE AN ARTIFICIAL PRICE ........................................................... 12

CONCLUSION ............................................................................................................................. 15

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ploss v. Kraft Foods Group*
   197 F. Supp. 3d 1037 (N.D. Ill. 2016) .................................................................................. 13

*Bonte v. U.S. Bank, N.A.*,
   624 F.3d 461 (7th Cir. 2010) ................................................................................................ 4

*CFTC v. Wilson*,
   2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018) ............................................................ 6, 14, 15

*In re Amaranth Nat'l Gas Commodities Litig.*,
   587 F. Supp. 2d 513 (S.D.N.Y. 2008) ................................................................................. 13

*In re Ind. Farm Bureau Coop. Ass'n*,
   1982 WL 30249, CFTC No. 75-14, Comm. Fut. L. Rep. P 21796 (C.F.T.C. Dec. 17, 1982) .. 15

*Jackson v. Virginia*,
   443 U.S. 307 (1979) ..................................................................................................... 1, 2, 8

*MCI WorldCom Net. Servs., Inc. v. Atlas Excavating, Inc.*,
   2006 WL 3542332 (N.D. Ill. Dec. 6, 2006) ........................................................................... 4

*Piaskowski v. Brett*,
   256 F.3d 687 (7th Cir. 2001) ................................................................................................ 2

*Transnor (Bermuda) Ltd. v. BP N. Am. Petroleum*,
   738 F. Supp. 1472 (S.D.N.Y. 1990) .................................................................................... 13

*Troy Mertz v. CME Grp., Inc. Market Reg. Dep't*,
   CFTC No. 13-E-01, Comm. Fut. L. Rep. P 33744 (CFTC May 9, 2016) ................................ 7

*United States v. Bases*,
   18 CR 48, 2022 WL 3586142 (N.D. Ill. Aug. 22, 2022) ........................................................ 4

*United States v. Boissoneault*,
   926 F.2d 230 (2d Cir. 1991) ................................................................................................. 3

*United States v. Coscia*,
   100 F. Supp. 3d 653 (ND. Ill. 2015) ................................................................................... 10

*United States v. Coscia*,
   866 F.3d 782 (7th Cir. 2017) ........................................................................................ 4, 10

*United States v. Garcia*,
   919 F.3d 489 (7th Cir. 2019) ............................................................................... 1, 2, 5, 6, 8

*United States v. Johnson*,
   26 F.3d 669 (7th Cir. 1994) ............................................................................................ 5, 15

*United States v. Jones*,
   713 F.3d 336 (7th Cir. 2013) ........................................................................... 1, 4, 5, 8, 14

*United States v. Morales*,
   910 F.2d 467 (7th Cir. 1990) ................................................................................................ 2

*United States v. Vorley*,
   2021 WL 1057903 (N.D. Ill. Mar. 18, 2021) ............................................................................. 4
*United States v. Young*,
   745 F.2d 733 (2d Cir. 1984) ..................................................................................................... 2

**Rules**

Federal Rule of Criminal Procedure 29 ........................................................................................ 1

Defendant Gregg Smith respectfully submits this reply in support of his motion under Federal Rule of Criminal Procedure 29 to set aside the verdict and enter a judgment of acquittal on Counts 3, 5 through 12, 24, and 26 of the Second Superseding Indictment. Mr. Smith also joins and respectfully incorporates herein the arguments raised by Defendant Michael Nowak in his contemporaneously filed reply in support of his Rule 29 motion ("Nowak Reply").

## ARGUMENT

The Government's opposition to Mr. Smith's motion for judgment of acquittal is based on a faulty premise: namely that, in resolving a motion for a judgment of acquittal under Rule 29, the Court is required to "draw *all* inferences in favor of the government." (*See, e.g.*, "Opp. Br." at 21 (emphasis added).) But this is not the standard. As detailed in Mr. Smith's moving brief (Smith Rule 29 Br. at 3-4), where, as here, the Government's evidence of Mr. Smith's intent is entirely circumstantial, the Court must consider each inference the Government has asked the jury to draw "in isolation," to "distinguish between reasonable inferences and speculation," and then "evaluate the cumulative effect of the inferential chain." *United States v. Jones*, 713 F.3d 336, 340, 347 (7th Cir. 2013) (explaining how the "line between reasonable and speculative inferences" drawn from circumstantial evidence "is by no means a sharp one"); *see also United States v. Garcia*, 919 F.3d 489, 497 (7th Cir. 2019) (While "determinations of credibility and the choices among reasonable inferences from the evidence are left to the jury[,] the judge is still responsible for enforcing outer limits of reasonable inferences."). A conviction will be upheld only if the *reasonable* inferences support a finding of guilt "to a state of near certitude." *Jones*, 713 F.3d at 347 (quoting *Jackson v. Virginia*, 443 U.S. 307 (1979)); *see also Garcia*, 919 F.3d at 501 (The question is "not whether a logical set of inferences could show the charge was possibly or even likely true, but whether it could be inferred *beyond a reasonable doubt* that the defendant was guilty as charged.").

The Court must isolate and evaluate the reasonableness not only of inferences that the Government asks the jury to draw from the facts, but also inferences drawn by the Government's witnesses, as "[t]he government may not prove its case . . . with 'conjecture camouflaged as evidence.'" *Id.* at 340 (quoting *Piaskowski v. Brett*, 256 F.3d 687, 693 (7th Cir. 2001)). Courts, including the Seventh Circuit, have reversed convictions under Rule 29 that were based largely on unreasonable (*i.e.*, uncorroborated or speculative) inferences drawn by the Government's witnesses. *See, e.g.*, *Garcia*, 919 F.3d at 504 (finding that although the FBI agent's experience let him offer "informed and perhaps accurate speculation" regarding defendant's "suspicious" conduct and that it was "possible, perhaps even likely" that the defendant was guilty, such uncorroborated speculation was insufficient to support a conviction); *cf. United States v. Young*, 745 F.2d 733, 766 (2d Cir. 1984) (Newman, J., concurring) (stating that courts must be cautious in assessing the sufficiency of a case based heavily on an expert's opinion that a defendant's ambiguous conduct is criminal: "If the observed actions of a defendant do not establish a prima facie case, I do not believe that an expert's opinion that his actions are criminal may carry the prosecution's proof above the requisite line.").

Yet, the Government's opposition failed even to mention the requirement that the Court filter out unreasonable inferences in its opposition, let alone defend the reasonableness of its witnesses' uncorroborated and speculative inferences, instead dismissing Mr. Smith's arguments as rehashing issues that the Court previously rejected. Courts have made clear, however, that the admissibility of an inference on an ultimate issue (here, Mr. Smith's intent) is a separate analysis from whether such opinion is sufficient to support a conviction. *See id.* at 766 (noting that "even though it was not error" to admit testimony interpreting ambiguous conduct as unlawful, "the question remains" whether that opinion was sufficient to support a guilty verdict); *cf. United States*

*v. Morales*, 910 F.2d 467, 468 (7th Cir. 1990) ("Evidence may be admissible without establishing a proposition to a degree of certainty required of the prosecution in a criminal case."); *United States v. Boissoneault*, 926 F.2d 230, 234 (2d Cir. 1991) (endorsing Judge Newman's concurrence in *Young* and holding that expert testimony that defendants' ambiguous conduct was unlawful, though admissible, should be given little weight).

For the reasons articulated below, the inferences raised by the Government in its opposition, when viewed in the light most favorable to the Government, do not support a finding beyond a reasonable doubt that either (I) Mr. Smith entered the at-issue orders with an unconditional intent to cancel before execution; or (II) Mr. Smith intended to create an artificial price. Further, for the reasons articulated in the Nowak Reply, the inferences also failed to support a finding beyond a reasonable doubt that Mr. Smith acted with a specific intent to defraud.

### I. NO REASONABLE JURY COULD HAVE FOUND THAT MR. SMITH ENTERED THE AT-ISSUE ORDERS WITH AN UNCONDITIONAL INTENT TO CANCEL BEFORE EXECUTION

As Mr. Smith explained in his moving brief, although the evidence at trial did, in fact, establish that certain of his trading "episodes," as defined and hand-selected by the Government, followed the Government's four-step "spoofing" pattern—(1) he would place what the Government characterized as a "legitimate" order on one side of the market, (2) he would scale or layer orders on the other side of the market, (3) his "legitimate" orders would get hit, and (4) he would then cancel his scale—use of this pattern alone is insufficient for a reasonable jury to find that Mr. Smith entered orders with an unconditional intent to cancel before execution. This is because various Government witnesses, including, former CME Executive Director, Robert Sniegowski, who literally drafted the CME's anti-spoofing rule, confirmed that this trading pattern "tells you nothing" about a trader's intent. (Tr. 687:13-23 (Sniegowski); *see also* Tr. 2169:3-14 (Wika).) In other words, the trading pattern itself is not unlawful, and, as detailed in Mr. Smith's

3

moving brief, recent courts have confirmed that more is needed to support a conviction for spoofing. (Smith Rule 29 Br. § I.B (citing *United States v. Vorley*, No. 18 CR 35, 2021 WL 1057903, at *12-13 (N.D. Ill. Mar. 18, 2021), *aff'd*, *United States v. Chanu*, 40 F.4th 528 (7th Cir. 2022); *United States v. Bases*, No. 18 CR 48, 2022 WL 3586142, at *7 (N.D. Ill. Aug. 22, 2022); *United States v. Coscia*, 866 F.3d 782, 796 (7th Cir. 2017)).) But the Government ignores all of this: it does not mention Mr. Sniegowski's or others' testimony regarding the legitimacy of the pattern, nor does it address the holdings of Judge Lee in *Bases*, Judge Tharp in *Vorley*, or the Seventh Circuit in *Coscia*, all of which relied on more than just a trading pattern to uphold a conviction.[1] Instead, it continues to parrot in its brief the same unreasonable inferences it asked the jury to draw. Further, the Government has failed to refute the incontrovertible evidence that Mr. Smith's intent to cancel was conditioned on a subsequent event.

### A. The Evidence Does Not Support the Inference that Mr. Smith Entered Orders with an Unconditional Intent to Cancel Before Execution

The evidence that the Government highlights in its opposition that allegedly supports a spoofing conviction beyond a reasonable doubt amounts to nothing more than "conjecture camouflaged as evidence" and is thus insufficient as a matter of law to support a guilty verdict beyond a reasonable doubt. *Jones*, 713 F.3d at 340.

The Government's case is based almost entirely on the admitted guilt of its cooperating witnesses—*i.e.*, Mr. Flaum, Mr. Edmonds, and Mr. Trunz admitted to having unlawful intent while entering orders in the otherwise legitimate four-step pattern, therefore, according to the

---

[1] This failure is deemed a concession by the Government that the pattern alone is insufficient to support a conviction. *See, e.g.*, *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver," and "silence leaves us to conclude" a concession.); *MCI WorldCom Net. Servs., Inc. v. Atlas Excavating, Inc.*, No. 02 C 4394, 2006 WL 3542332, at *3 (N.D. Ill. Dec. 6, 2006).

4

Government, it is fair to infer Mr. Smith had unlawful intent while entering orders that followed a similar pattern. (Opp. Br. at 4 (noting that the cooperators' testimony about their own intent "alone" was sufficient to support a conviction).) But the Seventh Circuit has repeatedly held that a witness's admission of guilt may not be used as substantive evidence of a defendant's guilt. *See, e.g.*, *United States v. Johnson*, 26 F.3d 669. 677 (7th Cir. 1994). Thus, it is not only unreasonable, but legally impermissible, for the jury to infer Mr. Smith's guilt from the cooperators' guilt. *See, e.g.*, *Jones*, 713 F.3d at 347 (noting that every inference "must be examined closely to ensure that mere presence or association with criminal activity is not being used to infer guilt"). Whether this unreasonable inference is left for the jury to draw or volunteered by Professor Venkataraman or another witness is irrelevant; unreasonable inferences are insufficient to support a verdict beyond a reasonable doubt. *See Garcia*, 919 F.3d at 504 (speculative inference from Government witness that defendant's suspicious conduct was in fact unlawful was insufficient to support a conviction).

Without the legally impermissible comparisons to the cooperators, what is left of the Government's case fails to support a finding of unlawful intent beyond a reasonable doubt:

*First*, the Government argues that the fact that the cooperating witnesses "personally observed" Mr. Smith engage in spoofing and learned to spoof from watching him is evidence of his unlawful intent. (Opp. Br. at 4-5.) But, as the Government's witnesses conceded, one cannot observe what is inside someone's mind; you cannot physically see whether someone unconditionally intends to cancel before execution. (*See, e.g.*, Tr. 2481:9 (Trunz) ("I do not know what's inside people's minds.").) At best, the cooperating witnesses *inferred* that Mr. Smith unconditionally intended to cancel before execution based on watching him trade in the Government's four-step pattern. But inferring intent based solely on a legitimate pattern of trading is not supported by the record and cannot support a guilty verdict.

*Second*, the Government asserts that the inference that Mr. Smith acted with unlawful intent is corroborated by Professor Venkataraman's testimony that "repeating the same strategy that does not work over months, over periods, over years, this makes me reach my opinion that the intent of this trading strategy, the objective of this trading strategy is not to fill the [large side/red] orders"; instead, "it's designed to do something else, which is to push the price to get fills on the [small-side/green] orders on the opposite side." (Opp. Br. at 8 (quoting Tr. 2726:23-2727:5).) Even if this inference was sufficiently corroborated, which it is not,[2] Professor Venkataraman's conclusion that Mr. Smith was trying to affect prices is irrelevant to whether he entered bids and offers with an unconditional intent to cancel before execution. As at least one court has found, a trader can lawfully enter orders with *both* an intent to affect price *and* "an honest desire to transact at those posted prices." *CFTC v. Wilson*, No. 13 CV 7884, 2018 WL 6322024, at *17, 20 (S.D.N.Y. Nov. 30, 2018). And entering orders with intent to affect price is not spoofing and is not otherwise unlawful. (Tr. 3882:22-3883:3 (Jury Charge) ("The mere intent to affect a price is not sufficient standing alone to satisfy [the manipulative] intent requirement.").) In other words, even if Mr. Smith intended to "push prices" by placing alleged spoof orders, that does not mean that he had an unconditional intent to cancel those orders before execution. Rather, it is possible to place an order with the desire to move the market in the opposite direction but also be perfectly happy if,

---

[2] The Government does not address in its opposition the detailed analysis in Mr. Smith's moving brief regarding the uncorroborated nature of the inferences that Professor Venkataram drew in his testimony (Smith Rule 29 Br. at 10-11), stating that "[w]hether or not such evidence was probative of Defendant Smith's intent with respect to his spoof order was a matter for the jury to decide" (Opp. Br. at 9). However, this ignores the Court's gatekeeping function to "enforc[e] outer limits on reasonable inferences, guided by the relevant standard of proof." *Garcia*, 919 F.3d at 497. As explained above, the admissibility of evidence and whether such evidence supports a reasonable inference sufficient to establish guilt beyond a reasonable doubt are distinct legal issues requiring separate analyses.

instead, the order gets executed. Indeed, Mr. Smith was successful in executing more than 500,000 lots on his large side orders. *See* Tr. 3268:16-19 (Ross).

*Finally*, the Government alleges that it is reasonable to infer that Mr. Smith had unlawful intent because he had a "historical pattern" of using the otherwise legitimate four-step pattern. (Opp. Br. at 10-11.) But this inference is not supported by the record.

Mr. Sniegowski testified that the Advisory Notice published by the CME regarding its Rule 575 states that whether there is a pattern of using a particular trading strategy "is one of the factors" that the CME may consider "in determining whether or not the conduct violates the [CME's] rule." (Tr. 711:4-6; *see also* GX409 at 3.) Specifically, the Advisory Notice states that the CME "*may* consider a variety of factors in assessing whether conduct violates Rule 575," and then sets forth a non-exhaustive list, including "the market participant's historical pattern of activity" and additional innocuous topics such as "the market participant's order entry and cancellation activity" and "the market participant's activity in related markets." (GX409 (emphasis added).) In other words, in assessing whether a market participant violates Rule 575, the CME may consider the at-issue order activity, the market participant's trading history, and his activity in any related markets, among other things. The Advisory Notice does *not* state that a "historical pattern" of using an otherwise lawful trading strategy violates CME Rule 575, as the Government suggests, nor was this Mr. Sniegowski's testimony. Further, Rule 575 is not synonymous with the anti-spoofing statute as it prohibits more than just spoofing, and, as the Court instructed the jury, a violation of Rule 575 does not necessarily support a finding of guilt beyond a reasonable doubt. (GX409 at 2; Tr. 3870:1-21 (Jury Charge) (instructing the jury that the CME rules are not necessarily the same as the applicable federal law and that a violation of CME's rules is not sufficient to convict).) *See also Troy Mertz v. CME Grp., Inc. Market Reg. Dep't*, CFTC No. 13-E-01, Comm. Fut. L. Rep. P

7

33744 (CFTC May 9, 2016) (noting CME's preponderance of the evidence standard). It is thus not reasonable to infer from Rule 575's Advisory Notice, or Mr. Sniegowski's testimony regarding the Notice, that the repeated use of an otherwise lawful pattern of trading is evidence of spoofing, let alone that it is sufficient to establish that Mr. Smith acted with an unconditional intent to cancel before execution beyond a reasonable doubt. While Mr. Wika testified to finding a "larger pattern" of the Government's four-step pattern in Mr. Smith's trade data (Opp. Br. at 10-11), this is irrelevant. The fact remains that the pattern itself, without more, is not unlawful.[3]

The Government has not pointed to *any* evidence to support a reasonable inference that Mr. Smith possessed the requisite intent, let alone sufficient evidence for the jury to reach a subjective "state of near certitude" of guilt.[4] *Jones*, 713 F.3d at 347 (quoting *Jackson v. Virginia*, 443 U.S. 307, 315 (1979)). Accordingly, the Court should enter a judgment of acquittal.

---

[3] Even assuming that it is reasonable to infer that a "larger pattern" of conduct can transform otherwise lawful conduct into spoofing (which, as explained above, it is not), neither Mr. Wika nor Mr. Sniegowski define what constitutes "large." How many times does an otherwise lawful pattern need to repeat to be considered unlawful? Here, as the Government highlights in its brief, Mr. Wika testified that there were approximately 3,000 instances of Mr. Smith following the Government's pattern and cancelling his scaled orders after an opposite side order was filled in the data set that he reviewed, and this was apparently "large" enough to infer an intent to cancel scaled orders before execution. (Opp. Br. at 10.) Yet, he also testified that there were more than **14,000 instances** of Mr. Smith executing a scaled order during that same time frame. (Tr. 2183:1-13.) Thus, the record does not support the inference that there was even a "large" pattern of Mr. Smith using the Government's four-step pattern relative to his other trading activity, let alone an inference that he never intended to transact on his scaled orders. *See Garcia*, 919 F.3d at 501, 503-504 (reversing a conviction under Rule 29 that was based on uncorroborated inferences by a government witness).

[4] The Government also mentions in passing that "defendants' statements to investigators also supported the jury's finding with respect to the defendants' intent to cancel based on the fact that such statements had the effect of concealing the nature of the defendants' trading." (Opp. Br. at 4.) The Government does not cite to any portion of the record in support of this assertion, nor could it, as Mr. Smith unequivocally maintained his innocence in all interactions with investigators. (*See, e.g.*, GX 164 (an audio recording of Mr. Smith telling CME investigators that he "absolutely" wanted to trade his scaled orders).)

8

### B. At Most, the Evidence Supports an Inference That Mr. Smith's Intent to Cancel Was Conditional

Not only has the Government failed to offer evidence from which a reasonable jury could conclude beyond a reasonable doubt that Mr. Smith had an *unconditional* intent to cancel the at-issue bids and offers at the time of execution, but the evidence in fact permits only the opposite inference—that any intent to cancel was conditioned on an intervening event. The Government's arguments in opposition are unavailing.

*First*, the Government argues that Mr. Smith is rearguing how the jury should have viewed the evidence at trial. (Opp. Br. at 12.) This reflects a misunderstanding of Mr. Smith's argument. Again, as detailed in Mr. Smith's moving brief and repeated above, the Court has a duty to filter out unreasonable inferences—here, the inference that Mr. Smith possessed the requisite unlawful intent merely because his trade data reflects the repeated use of a facially legitimate pattern of trading. The Government's failure to offer any other evidence from which a reasonable jury could conclude that the intent to cancel before execution was unconditional requires a judgment of acquittal. While Mr. Smith does not have the burden here and thus is not required to prove that his intent to cancel was conditioned on any specific subsequent event, the only reasonable inferences from the record (and thus the only *permissible* inferences) are that Mr. Smith's intent to cancel was conditioned on: (i) not being hit immediately; (ii) being front run or joined by an algorithm; and/or (iii) the execution of an opposite side "genuine" order. However, regardless of whether it is reasonable to infer that Mr. Smith's intent to cancel was conditioned on any specific subsequent event, it does not relieve the Government of its burden of establishing that Mr. Smith's intent to cancel was unconditional, which, as explained above, it has failed to do.

*Second*, the Government argues that it is reasonable to infer that Mr. Smith's intent to cancel could not have been reactionary or conditional because Mr. Edmonds and Mr. Trunz

9

testified that they could not personally react to new information in the market fast enough to cancel their bids and offers at the speed at which Mr. Smith transacted. (Opp. Br. at 13.) Putting aside whether this inference is reasonable, it is not probative of and thus irrelevant to whether Mr. Smith's intent to cancel was conditioned on not being hit immediately. As detailed in Mr. Smith's moving brief, the record viewed in the light most favorable to the Government supports an inference that Mr. Smith was essentially placing manual "fill-or-kill" orders in an effort to avoid becoming a victim of the algorithms frontrunning his orders. (Smith Rule 29 Br. at 15-16.) This is not spoofing, as the Government's own witnesses concede. *See, e.g.*, *Coscia*, 866 F.3d at 795 ("[A]n order that must be executed in full immediately, or the entire order is canceled" is not spoofing because it is dependent on the occurrence of a subsequent event—namely, the order not being immediately executed (internal quotation marks omitted)); *United States v. Coscia*, 100 F. Supp. 3d 653, 659 (ND. Ill. 2015) ("[A]lthough Fill or Kill orders 'must be filled immediately or the entire order is cancelled', they are not entered with the intent to cancel." (internal citation omitted)). (*See also* Tr. 2913:6-19 (Venkataraman) (testifying about the legitimacy of fill-or-kill orders); Tr. 698:8-14 (Sniegowski) (same); Tr. 557:16-558:12 (Scheerer) (same).) Thus, it cannot be reasonably inferred from the speed at which Mr. Smith cancelled his orders that his intent to cancel was unconditional.

*Finally*, despite spending three weeks inundating the jury with examples of how Mr. Smith's trade data followed a clear four-step "spoofing" pattern—a pattern in which the alleged spoof orders are only cancelled following a condition subsequent, namely, the execution of the "genuine" order—the Government now incredibly claims that there was sufficient evidence in the record for the jury to convict Mr. Smith of spoofing using different trading patterns. (Opp. Br. at 13-14.) This is entirely unsupportable. The Government instructed the jury to look specifically for

10

the four-step pattern in determining whether Mr. Smith acted with the requisite intent, stating that the pattern, which "we've seen over and over and over again with the same intention, . . . leads you to the same conclusion" with respect to Mr. Smith: he "always unconditionally intended to cancel before execution" in the Government-selected episodes. (Tr. 3911:10-15 (Gov't Closing).) As the Government told the jury:

> In Government's Exhibit 450, you see the 100 episodes of Mr. Smith's trading that follows the four-step spoofing pattern. You heard from Professor Venkataraman that these 100 episodes, these are like the Michael Jordan highlight reel of Gregg Smith's spoofing across tens of thousands of instances over the relevant time period. And here's just one example. This is Government's Exhibit 450, episode No. 55. Mr. Smith has his genuine order to buy right there in green. That's step one. He then places 19 orders for 10 lots each. These are the red orders, the spoof orders. That's step two. Mr. Smith, he layers on his spoofs and gets his genuine order filled. That's step three. And finally, step four, cancel all the spoofs.

(*Id.* at 3907:6-19.) And the record supports this: every single one of Mr. Smith's episodes in GX450, contains orders that follow the four-step pattern (which, again, is not enough to convict).

And while the Government raises two other alleged spoofing patterns in its opposition that the cooperators admitted to using—namely, placing and cancelling an alleged spoof order before any "genuine" order is placed (Steps 2 and 4, but not 1 or 3) and cancelling the alleged spoof orders before the "genuine" order is filled (Steps 1, 2, and 4, but not 3) (Opp. Br. at 13-14)—none of the four episodes on which the jury could convict Mr. Smith of spoofing followed either of these alternate patterns. (GX450 at Nos. 95, 96, 99, 100; Tr. 3912:7-16.) Each *solely* shows: Step 1, the entry of a "genuine" order; followed by Step 2, the entry of an opposite side scale; then, Step 3, the "genuine" order is hit; and, Step 4, the scale cancelled after the "genuine" order is filled—nothing else. The Government did not cite to any episodes in which Mr. Smith allegedly spoofed without an opposite side "genuine" order. And, while, as the Government notes, certain other episodes involved Mr. Smith entering and cancelling scales before the "genuine" order was hit

11

(Opp. Br. at 14), these orders are *always* followed by the full four-step pattern. (GX450; GX451.) In other words, every *episode*, every chart, contained orders that followed the complete four-step pattern, and the Government specifically told the jury to look for the full four-step pattern in each *episode* in determining guilt:

> Now, as Judge Chang instructed you, you must unanimously agree on which particular sequence is the basis for your guilty verdict, but that will be easy. As you review the specific episodes [related to the spoofing counts], you'll see the familiar four-step pattern in each one, and you'll see why these specific episodes are the same as every other spoofing episode that you've seen.

(Tr. 3912:17-23 (Gov't Closing).)

Accordingly, the Government has failed to point to evidence from which a reasonable jury could infer beyond a reasonable doubt that Defendants acted with the requisite unlawful intent.

## II. NO REASONABLE JURY COULD HAVE FOUND THAT DEFENDANTS INTENDED TO CREATE AN ARTIFICIAL PRICE

The Government's responses to Mr. Smith's arguments in support of a judgment of acquittal on the attempted price manipulation counts are equally unavailing.

*First*, the Government argues that because attempted manipulation has legal elements distinct from spoofing, the charge is not "legally reliant" on the Government establishing that Defendants entered orders with an unconditional intent to cancel before execution. (Opp. Br. at 3 n.1.) We agree: Spoofing is not an element of attempted price manipulation. However, here, the Government's theory of liability is that Mr. Smith's alleged spoof orders were not a legitimate force of supply and demand **because** they were spoof orders. (*See, e.g.*, Tr. 390:3-6 (Gov't Opening) (explaining how Defendants manipulated the market by "placing deceptive orders for gold and silver, orders that they never intended to trade"); Tr. 927:6-13 (Edmonds) ("By entering in those fake or spoof orders, we were trying to elicit . . . a false demand in the market."). Indeed, the Government reiterates this exact position in its opposition. (Opp. Br. at 16 (stating that "[t]he

12

purpose of defendants' spoof trades is the key element that the jury was required to address in order to arrive at a verdict on the attempted manipulation claims").) Accordingly, the Government's failure to establish that Mr. Smith was spoofing is fatal to its attempted manipulation claim.[5]

*Second*, the Government argues that whether there was a legitimate economic rationale for Mr. Smith's trading strategies is irrelevant to whether Mr. Smith acted with manipulative intent. (Opp. Br. at 15-16.) But this is a distortion of the applicable law, including this Court's own description of the standard in *Ploss v. Kraft Foods Group*:

> Just as with securities, commodities manipulation deceives traders as to the market's true judgment of the ***worth*** of the commodities. . . . [For this reason], entering into futures contracts or swaps, without more, cannot constitute commodities manipulation. That is, **if a trading pattern is supported by a *legitimate economic rationale*, it cannot be the basis for liability under the CEA** because it does not send a false signal.

197 F. Supp. 3d 1037, 1055 (N.D. Ill. 2016) (Chang, J.) (cleaned up) (emphasis added). Courts have regularly defined manipulative intent as lacking a legitimate economic purpose. *See, e.g.*, *In re Amaranth Nat'l Gas Commodities Litig.*, 587 F. Supp. 2d 513, 534 (S.D.N.Y. 2008) (distinguishing "a transaction made for legitimate economic purposes from an attempted manipulation," and stating that "[b]ecause every transaction signals that the buyer and seller have legitimate economic motives for the transaction, if either party lacks that motivation, the signal is inaccurate"); *Transnor (Bermuda) Ltd. v. BP N. Am. Petroleum*, 738 F. Supp. 1472, 1495

---

[5] It is also fatal to its fraud claims because they too are dependent on the Government establishing that Mr. Smith intended to cancel before execution. *See, e.g.*, Trial Tr. 4216:5-7 (Gov't Rebuttal Closing) ("If these defendants didn't intend in good faith to trade, they're guilty of every single offense charged, all or nothing. Spoofing, manipulation, fraud . . . ."); *id.* at 3921:8-9, 3922:8-12 (Gov't Closing) ("[T]he four-step spoofing pattern is a scheme to defraud that is intended to deceive the marketplace . . . The bids are real orders in the marketplace but are fake because they don't represent genuine buying interest but are meant to deceive others in the market to make them think there's a real buyer when there's not. They're just spoof orders.").

13

(S.D.N.Y. 1990) ("Where a trader acts with a legitimate investment or commercial purpose, no manipulative intent can be found."); *CFTC v. Wilson*, No. 12-CV-7884, 2018 WL 6322024, at *15 (S.D.N.Y. Nov. 30, 2018) (finding that the CFTC's market manipulation claim failed because "Defendants have articulated and demonstrated a rationale and a formula that supports the pricing strategy carried out in this case").[6]

*Finally*, the Government asserts that the jury was presented with "ample evidence" from which it could infer that Mr. Smith acted with manipulative intent. Specifically, the Government points to the testimony of its cooperating witnesses and Professor Venkataraman that spoofing creates an artificial price "because the process, when successful, moves the price artificially higher or lower." (Gov't Opp'n at 17 (quoting Tr. 1855:9-20 (Flaum)); *see also id.* (noting that Mr. Trunz testified that that the purpose of spoof orders was to "move the price" to where they wanted it to be); *id.* at 18 (noting that Mr. Edmonds testified that he manipulated the market by "mov[ing] prices to where we wanted to put them"); *id.* (noting that Professor Venkataraman's testimony that Defendants' trading strategy is "going to push the price away from [that] order" supports a finding of intent to create an artificial price). As explained above, though, the Court "must carefully consider each inference necessary to prove all elements of the offense," and distinguish between those that are reasonable and those that are conjecture or speculation. *Jones*, 713 F.3d at 340. Here, it is not reasonable to infer that Mr. Smith intended to create an *artificial* price from conjecture that he intended to "move the price," not least because, as this Court instructed the jury, trading

---

[6] The Government also wrongly states in a footnote that Mr. Smith conflated the elements of manipulation and attempted manipulation when arguing that the Government failed to offer any evidence that the alleged spoof orders were at uneconomic prices, because the Government is only required to prove that Mr. Smith intended to create an artificial price, not that he actually succeeded in doing so. (Opp. Br. at 15 n.3.) Whether Mr. Smith's orders were at economic prices, however, is relevant to whether he had a profit motive and, thus, to whether he acted with the intent to create a price that did not reflect the legitimate forces of supply and demand.

with a specific intent to affect price is not unlawful and does not constitute manipulative intent. (Tr. 3882:22-3883:3.) *See also Wilson*, 2018 WL 6322024, at *17 (finding no manipulative intent where defendants were "determined" to have their bids impact price, because this "says nothing about whether they understood those bids to be artificially high").[7]

There was, in fact, no non-speculative, non-conclusory evidence offered from which the jury could reasonably infer that Mr. Smith acted without a legitimate economic motive. To the contrary, Mr. Trunz testified that the alleged spoof orders, if all executed, would result in trades at a "good price," and Mr. Edmonds testified that the use of scales makes "good economic sense" and would result in executions at better prices. (Tr. 2505:3-24, 1563:5-19.) *Cf. In re Ind. Farm Bureau Coop. Ass'n*, CFTC No. 75-14, Comm. Fut. L. Rep. P 21796, 1982 WL 30249, at *9 (C.F.T.C. Dec. 17, 1982) ("seeking the best price for one's commodity is a legitimate, indeed critical price-creating force in the futures markets," and thus, it "cannot be the basis for an inference of manipulative intent"). And the Government's expert conceded, while he opined that Mr. Smith's trade data was "consistent with" an intent to affect prices (which, again, is not unlawful or evidence of manipulative intent), this was not the only possible motive behind the orders. (Tr. 2798:9-14.) Yet, Professor Venkataraman did not even consider, let alone rule out, legitimate trading strategies when analyzing the trade data. (Tr. 2811:1-4.)

## **CONCLUSION**

For the foregoing reasons, and those in Mr. Smith's opening brief, the Court should enter a judgment of acquittal as to Mr. Smith on all counts.

---

[7] The Government also suggests that it is proper to infer from the cooperators' admissions that they themselves acted with manipulative intent that Mr. Smith must have also acted with manipulative intent, as it quotes the cooperators' testimony concerning their own trading motives when arguing that it was proper for the jury to infer Mr. Smith's trading motives. As explained above, this is a legally impermissible inference. *See supra* at 4-5; *see also Johnson*, 26 F.3d at 676.

15

| | |
|---|---|
| Dated: December 6, 2022 | /s/ Jonathan D. Cogan |

Jonathan D. Cogan
Sean S. Buckley
Kelly Spatola
KOBRE & KIM LLP
800 Third Avenue
New York, NY 10022
(212) 488-1200

Matthew I. Menchel
KOBRE & KIM LLP
201 South Biscayne Boulevard, Suite 1900
Miami, FL 33131
(305) 967-6108

Leanne A. Bortner
KOBRE & KIM LLP
1919 M Street, NW
Washington, DC 20036
(202) 664-1935

*Counsel for Defendant Gregg Smith*