IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GREGG SMITH and<br>MICHAEL NOWAK,<br><br>Defendants. | Case No. 19-cr-00669<br><br>Hon. Edmond E. Chang |

**MICHAEL NOWAK'S REPLY IN SUPPORT OF**
**HIS MOTION FOR JUDGMENTS OF ACQUITTAL**

Michael Nowak respectfully submits this reply in support of his motion for judgments of acquittal on all counts of conviction pursuant to Fed R. Crim P. 29 (ECF No. 706) (the "Motion").

The government's opposition (ECF No. 759), which responds both to the Motion and to Gregg Smith's separate motion for judgments of acquittal, lays bare the lack of reliable evidence against Mr. Nowak. On page after page, the government lumps together "the defendants," but ultimately marshals only three unavailing points of evidence against Mr. Nowak: (i) his trading in the four-step pattern that the government's own witnesses repeatedly testified is not necessarily indicative of spoofing; (ii) the government cooperators' testimony that they themselves were spoofing when they traded in that pattern; and (iii) Prof. Kumar Venkataraman's unsupported, say-so inferences as to a trader's intent based on the pattern, despite his admission that it is "impossible" to determine a trader's intent from empirical analysis.

The government's other claims—that cooperators John Edmonds and Christian Trunz testified that they "learned to spoof [] from defendants Smith and Nowak," and that "the defendants[] [made] statements to investigators" that evinced "[their] intent to cancel," Opp. Br.

1

at 3–4—are entirely unsupported as to Mr. Nowak. The government cites no such evidence, because there was none. In fact, the *only other evidence that the government quotes* as to Mr. Nowak's state of mind—testimony by Mr. Trunz regarding one alleged trading episode, *see* Opp. Br. at 17—*was stricken by the Court* for crossing the line that the Court had set regarding cooperators' lay opinion testimony.

Accordingly, as argued below and in the Motion, no rational juror could conclude beyond a reasonable doubt that Mr. Nowak placed any orders with the unconditional intent to cancel them before execution (which, contrary to the government's contention, defeats each and every count); nor that he fraudulently misrepresented an essential element of any transaction (which the government ignores); nor that he had the requisite intent for attempted price manipulation and spoofing in the only two sequences within the applicable limitations periods (and the government contradicts itself in arguing otherwise, pointing to the four-step pattern but acknowledging "variations"). We respectfully submit that the Court must therefore enter judgments of acquittal on all counts of conviction.

## I. ARGUMENT

### A. The Evidence Was Insufficient to Prove That Mr. Nowak Placed Orders with the Unconditional Intent to Cancel Them Before Execution, Which Defeats Every Count

At trial, the government argued that "[i]f these defendants didn't intend in good faith to trade, they're guilty of every single offense charged, all or nothing: Spoofing, manipulation, fraud, . . . ," Trial Tr. at 4216:5–7—so it is surprising that the government now suggests (in a footnote) that Mr. Nowak could be convicted of fraud or attempted price manipulation even if the evidence did not show that he had an unconditional intent to cancel before execution (i.e., that he spoofed). *See* Opp. Br. at 3 n.1. Without an unconditional intent to cancel, there could be no attempted price manipulation here, because that unconditional intent (goes the theory) is what transforms otherwise

2

standard futures orders into illegitimate forces of supply and demand. Nor could there be fraud, because that same intent is what gives rise to the purported implied misrepresentation of an intent to execute. The government has never articulated a fraud or attempted manipulation theory other than one grounded in spoofing. *See* Trial Tr. at 3916:22–3917:1 (government summation: "And again, the spoofing, this is the substantial step towards creating these artificial prices. And the price is moving because Mr. Nowak's spoof orders make it look like there's a surge in supply or demand, but his spoof orders don't represent actual supply or demand . . ."); *id.* at 3921:8–9, 3922:8–12 (government summation: "[T]he four-step spoofing pattern is a scheme to defraud that is intended to deceive the marketplace . . . The bids are real orders in the marketplace but are fake because they don't represent genuine buying interest but are meant to deceive others in the market to make them think there's a real buyer when there's not. They're just spoof orders.").[1]

And indeed, as argued in the Motion, the evidence here fell short: No rational juror could conclude beyond a reasonable doubt that Mr. Nowak placed orders with the unconditional intent to cancel them before execution, so each and every count of conviction must fall. The unsupported claims and bits of evidence that the government strings together in its opposition are insufficient because they collectively go no further than the three unavailing points outlined above.

For starters, the government argues that, even taken alone, the cooperators' testimony "that they engaged in the four-step pattern when they were spoofing" would be "sufficient" to support

---

[1] As noted in the Motion, the government's fraud theory hinges on the claim that a passive order resting in the orderbook makes a representation regarding the trader's subjective intent—i.e., that the trader is not merely "willing" to trade, but affirmatively "intends" to, *see* Trial Tr. at 4210:15 (government rebuttal summation: "[W]illingness doesn't matter. Intent matters.")—which is untrue, as was apparent from the conflicting testimony regarding the state of mind that would render the purported representation false. *See* Mot. at 8 n.3. There was no dispute that Mr. Nowak was willing to be executed on his alleged "deceptive orders," each of which was fully executable, and some of which were in fact executed, resulting in real trades with counterparties that received exactly what they transacted for. And two CME witnesses conceded, in conflict with their earlier testimony, that the orderbook reflects just that: prices and quantities that traders are "willing" to transact—so no rational factfinder could have concluded beyond a reasonable doubt that there was any misrepresentation here. *See id.*

3

a conclusion that "the defendants were spoofing when they engaged in the four-step pattern." Opp. Br. at 4. But saying so does not make it so. In the face of repeated, overwhelming, and unrebutted testimony from multiple government witnesses that the four-step pattern is not necessarily indicative of spoofing, *see* Mot. at 3–5, no *rational* factfinder could infer beyond a reasonable doubt what Mr. Nowak intended when *he* was trading based on what Messrs. Edmonds and Trunz intended when *they*, individually, were trading. Viewing the evidence "in [the] light most favorable to the government," Opp. Br. at 7, as required, does not somehow open the door to irrational inferences. *See United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013) (jurors may reasonably infer facts, but government cannot prove its case with "'conjecture camouflaged as evidence'") (citation omitted).

The same goes for Prof. Venkataraman's entirely cumulative observation that "defendants' trading mirrored the trading of Edmonds and Trunz," Opp. Br. at 8, which amounts to no more than the recognition that Mr. Nowak's trading generally followed the four-step pattern in the government-selected sequences and in certain of his "broader" activity, *id.* at 8. As the government acknowledges, Prof. Venkataraman "compar[ed] the trading *patterns*," *id.* at 9 (emphasis added), and there was no dispute that Mr. Nowak generally traded in the same pattern in the government-selected sequences. No rational juror could infer Mr. Nowak's intent beyond a reasonable doubt from the ambiguous similarity between his trading and Messrs. Edmonds and Trunz's trading, as Prof. Venkataraman effectively conceded in testifying that it would be "impossible" to draw a definitive conclusion regarding intent from empirical analysis. *See* Mot. at 4–6.

Likewise, Mr. Edmonds's testimony that he "saw [Mr. Nowak] use the same spoofing strategy that he, defendant Smith, and Trunz used," and Mr. Trunz's testimony that he "saw defendant Nowak spoof at least 'weekly,'" Opp. Br. at 5, add nothing. They *never spoke* with Mr.

4

Nowak about his trading in the four-step pattern—so all they could have observed was Mr. Nowak's undisputed trading in that pattern, which is not indicative of spoofing. *See* Mot. at 5.[2]

Moreover, without any factual basis whatsoever, the government claims that Messrs. Edmonds and Trunz "learned to spoof [] from defendants Smith *and Nowak*." Opp. Br. at 4 (emphasis added). But there was no evidence that Mr. Nowak ever taught anyone to spoof, let alone spoke with anyone about spoofing. Mr. Edmonds's testimony that he "learned mostly the spoofing from [Christopher] Jordan and from Mr. Smith, but [] saw Mr. Nowak do it" means no more than that he saw Mr. Nowak trading in the four-step pattern. Trial Tr. at 1411:3–7; *accord id.* at 2108:24–2109:4 (THE COURT: "I think what's fair is that if [Trunz's] testimony comes out that, 'I learned from' whoever it is that he's going to say he learned it from, that it be followed up by, 'You don't mean that whoever it is sat down and taught you?' And it sounds like he'll say no . . ."). And Mr. Trunz's testimony "that he learned to *options* trade from defendant Nowak" does not fill the gap. *Id.* at 5 (emphasis added).

The government also contends, incorrectly, that its CME Group witnesses' testimony indicated that the presence of "a 'historical pattern of activity' [] *demonstrates* [that] the trading activity is not bona fide," which "alone was sufficient" to support a conclusion that Mr. Nowak spoofed. Opp. Br. at 10–11 (emphasis). But the very testimony that the government quotes confirms otherwise. Robert Sniegowski, formerly of the CME, testified that "if you can show a historical pattern of activity that looks the same and it basically follows the same pattern, that *lends more credence* to the *department's* [i.e., the CME's] view that the activity was not bona fide."

---

[2] This is beside the fact that the specific Edmonds testimony that the government cites concerned his claim that he occasionally observed Mr. Nowak "enter[ing] and rapidly cancel[ing] orders on the buy side of the market while he was trying to execute [a] *client order* on the sell side," Trial Tr. at 1147:10–14 (emphasis added)—which his subsequent testimony made clear that he could not possibly have observed, because Mr. Nowak was the "third-string backup" for Mr. Smith's client orders, when both Mr. Trunz (the "first-string backup") and Mr. Edmonds himself (the "second-string backup") were out of the office, *see id.* at 1411:8–1412:21.

5

Trial Tr. at 712:4–8. In other words, far from suggesting that a pattern "alone" can "demonstrate" the trader's intent *beyond a reasonable doubt*, Mr. Sniegowski identified patterns as one factor that his former employer would consider ("lends more credence") in deciding how to enforce its private rules. He himself confirmed in his testimony that the four-step pattern can be "perfectly legitimate," *id.* at 687:13–20, and there was overwhelming testimony, including from Mr. Sniegowski and Brian Wika, that the pattern alone does not and cannot reveal a trader's intent, *see* Mot. at 3–4.

Finally, the government claims that "the defendants' statements to investigators also supported the jury's findings with respect to the defendants' intent to cancel" because "such statements had the effect of concealing the nature of the defendants' trading." Opp. Br. at 4. Respectfully, that makes no sense. The government does not explain itself or point to any such supposed statements by Mr. Nowak, but clearly any denial of spoofing does not prove spoofing.[3]

On this record, no rational juror could conclude beyond a reasonable doubt that Mr. Nowak unconditionally intended to cancel orders before execution. We urge the Court to enter judgments of acquittal on all counts of conviction.

---

[3] As to Mr. Nowak, the government presumably means to allude to his testimony before the U.S. Commodity Futures Trading Commission more than a decade ago in an unrelated investigation concerning entirely different conduct, where he was asked, briefly, at the end of two days of testimony, whether "[t]o [his] knowledge . . . traders at J.P. Morgan in the metals group put up bids or offers to the market which they didn't intend to execute and then pulled them before they got hit or lifted," and answered no. GX 370, at 442:8–13. The government appears not to appreciate that Mr. Nowak's answer is entirely consistent with him not having the requisite intent to spoof. But even setting that aside, the question, in context, concerned a different form of spoofing than the one alleged here, involving "flashing" a single large order, not scales of multiple small orders. *See id.* at 440:2–5 (Q. "Have you ever noticed any flash orders on GLOBEX, and what I mean by that is a large order or offer or bid that's on GLOBEX and gets pulled pretty quickly?"), 442:3–6 (Q. "Have you heard talk about any particular market participants sort of flashing large orders like that as a signal to other traders?").

B.  **The Government Presented No Evidence That Mr. Nowak Fraudulently Misrepresented An Essential Element of Any Transaction, nor Evidence Sufficient to Prove That Any Purported Implied Misrepresentations Regarding Intent Were Material**

The government does not (and cannot) argue that Mr. Nowak's purported implied misrepresentations concerned an essential element of any transaction, because there was no such evidence. Instead, the government points to *United States v. Chanu*, 40 F.4th 528 (7th Cir. 2022)—where the Seventh Circuit held that placing spoof orders while hiding the unconditional intent to cancel them can constitute a scheme to defraud within the meaning of the fraud statutes, *see* Opp. Br. at 21—but makes no attempt to square *Chanu* with other recent Seventh Circuit authority in a long line of cases confirming that a scheme like the one alleged here, involving no misrepresentation as to an essential element of a transaction, is not fraudulent. *See, e.g.*, *United States v. Kelerchian*, 937 F.3d 895, 912–13 (7th Cir. 2019) ("schemes that do no more than *cause their victims to enter into transactions they would otherwise avoid . . . do not violate* the mail or wire fraud statutes[, while] schemes that depend for their completion on a misrepresentation of an essential element of the bargain . . . do violate the mail and wire fraud statutes") (emphasis added); *see also* Mot. at 7–10. Indeed, in recent oral argument in another fraud case, the Supreme Court signaled skepticism about a fraud theory based on "a deprivation of economically valuable information," and the government resorted to argument that "one of the reasons why this is fraud is because it was an essential element of the bargain." Oral Arg. Tr. at 52:9–19, 47:15–17, *Ciminelli v. United States*, No. 21-1170 (S. Ct. Nov. 28, 2022); *see also id.* at 19:22–24 ("The government [now] offers a new materiality theory that says that the misrepresentations have to go to the essence of the bargain.").

The premise of this prosecution was that Messrs. Nowak and Smith's alleged "deceptive" orders led other market participants to trade with them on their "genuine" orders when those market participants otherwise "likely would not have traded." 2d Superseding Indict., ECF No.

448, ¶ 26(e). There was no allegation (let alone evidence) of any misrepresentation as to the contract, price, or quantity of any "genuine" orders—the only terms of the transactions in which counterparties were purportedly defrauded. *See* Mot. at 9. We submit that the evidence at trial therefore showed, at most, a *non*fraudulent scheme to induce others into executing transactions that they otherwise might not have executed, where the counterparties received exactly what they bargained for—which no rational juror could conclude beyond a reasonable doubt involved any misrepresentation as to an essential element of any transaction, as fraud requires.

Moreover, even if such implied misrepresentations were actionable, the evidence in the record was insufficient to establish their materiality here—notwithstanding the *Chanu* court's conclusion that such misrepresentations *can* be material, *see* 40 F.4th at 541–42 ("[t]he record clearly establishe[d]" materiality). In its opposition, the government repeatedly cites testimony that Mr. Nowak's "spoof *orders* were material," Opp. Br. at 27 (emphasis added), underscoring the absence of any evidence that the purported *implied misrepresentations* were material, and offering no explanation of its erroneous conflation of the two. *See* Mot. at 12. As discussed in the Motion, David Pettey, the only purported victim to testify at trial, said that the Susquehanna trading algorithm that he oversaw was "*not* trying to determine whether or not an individual order has genuine interest to buy or sell," so any potential impact on Susquehanna's algorithm necessarily stemmed from the prices and quantities of the orders, not the nonexistent (mis)representations as to subjective intent. *Id.* at 11; *see supra*, 3 n.1; *see also* Opp. Br. at 26 ("main input" for Pettey's algorithm was "'*how many contracts* were bid versus how many contracts were offered'"; "Pettey explained that a larger group of *orders* at the top price levels would 'absolutely' be capable of influencing his trading strategy's decisions"; "Pettey testified that [Mr. Nowak's] *orders* 'were certainly capable of influencing'"; "Pettey confirmed that [he believed that] defendant Nowak's

8

buy *orders* triggered his decision to trade") (emphasis added). There was no evidence to the contrary, so no rational juror could conclude otherwise.

Accordingly, we respectfully ask the Court to enter judgments of acquittal on all fraud counts as to Mr. Nowak.

**C. The Government Failed to Prove Beyond a Reasonable Doubt That Mr. Nowak Had the Requisite Intent for Attempted Price Manipulation and Spoofing in the Only Two Trading Sequences Within the Applicable Limitations Periods**

The government presented almost no evidence as to the two February 7, 2014 sequences, which were the only two sequences within the applicable limitations periods for attempted price manipulation and spoofing: just (i) three overlapping charts depicting Mr. Nowak's trading in the four-step pattern in those two sequences; (ii) Mr. Edmonds's testimony that Mr. Nowak's trading in the first of the two sequences had no legitimate hedging rationale and therefore constituted spoofing, which he then recanted as a "mistake" when he recognized that the documentary basis for that view was in fact irrelevant to the day in question; and (iii) Prof. Venkataraman's general opinion, not specific to these two episodes, that the four-step pattern in the government-selected sequences appeared designed to "push the price." *See* Mot. at 12–13. The government identifies no other evidence. Instead, it argues again that the four-step pattern—to which the two February 7 sequences do not conform—is sufficient (it is not, *see supra*, Part A), and that Mr. Edmonds's testimony confirming the existence of a legitimate hedging rationale should be ignored as a "competing inference" that the Court cannot "weigh." Opp. Br. at 19–20 and n.6. Neither point should sway the Court.

There is no question of "competing inferences" here. Mr. Edmonds corroborated the plausibility of a legitimate, non-spoofing explanation for the two February 7 sequences. *See* Mot. 13 n.5. He then testified that the earlier of the two sequences constituted spoofing, based on a "delta ladder" that the government showed him, which he said indicated that Mr. Nowak would

9

have "wanted to sell to delta hedge," leading him to conclude that "the buy orders that were placed into the system were to move the price up to where he wanted to sell," not to hedge. Trial Tr. at 1748:7–1749:2. But when shown that the delta ladder in fact reflected Mr. Nowak's hedging needs on a different day—February 10, not February 7—he admitted that he had made a "mistake" regarding the "hedging," while maintaining, baselessly, that "the trading itself was not a mistake; that was spoofing," without any explanation. *Id.* at 1768:3–19.

In short, what is left is Mr. Edmonds's original, unrebutted testimony that there could be a legitimate hedging explanation for Mr. Nowak's trading on February 7, alongside his general claim that Mr. Nowak's broader trading in the four-step pattern, like his own, was spoofing. But that general claim is inapposite here because the two February 7 sequences *do not conform to the pattern*. In these two sequences, there was no large set of scaled orders placed opposite a small, generally iceberged order, and no large imbalance between the two sides; rather, Mr. Nowak placed scaled orders on *both* sides, all fully visible, with hardly any imbalance between the sides (nor any evidence of an ensuing imbalance *in the market*):



10

GX 451, at 99b (annotated to identify the two sequences); *see also* Mot. at 14. In its opposition, the government generalizes the four-step pattern to exclude these parameters (which its own expert, Prof. Venkataraman, deemed significant, *see id.*), in an attempt to argue that the two February 7 sequences *do* somehow conform—but then argues in the same breath that "while spoofing generally follows a four-step pattern," there are "variations." Opp. Br. at 20–21. Which is it? And what is the evidentiary basis for the government's bald assertion that "the rapid placement and cancelling of the bids" in these two sequences "did provide a 'shock' to the market"? *Id.* at 20 n.5. There is none.

In sum, no rational juror could conclude beyond a reasonable doubt, on this meager record, that Mr. Nowak had the requisite intent for spoofing or attempted price manipulation in either sequence, because the "pattern" evidence is inapplicable to Mr. Nowak's trading on the day in question and insufficient to establish his intent in any event. Moreover, we respectfully submit that no rational person could have come away from Mr. Edmonds's testimony with anything *but* doubt as to these two sequences, given the confirmed possibility that Mr. Nowak was engaging in legitimate hedging. *Cf. Jones*, 713 F.3d at 340.

Finally, as the Court instructed the jury, attempted price manipulation requires proof beyond a reasonable doubt of an intent to create "a price or price trend in the market that did not reflect the actual forces of supply and demand," ECF No. 654, at 39, but there was insufficient evidence that the prices that Mr. Nowak purportedly sought to create (i.e., his "genuine" orders in the two February 7 sequences) did not reflect actual supply and demand, or that his competitively priced and plausibly hedge-related "deceptive" orders were inconsistent with actual supply and demand. *See* Mot. at 14–15. The government points to Mr. Trunz's testimony that his own spoofing "got the market to move to the price that I wanted," Opp. Br. at 17, and Mr. Edmonds's testimony

11

that he "wanted to drive the price to where I wanted it to go," *id.* at 18, but that is plainly insufficient to establish that *Mr. Nowak* intended to move the market to an *artificial* price on February 7. The government's attempt to plug this hole with stricken testimony cannot be countenanced. *See* Opp. Br. at 17 ("When reviewing a trading episode from defendant Nowak, Trunz explained that he believed the purpose of the red (spoof) orders was 'to be deceptive and to elicit a response from the algorithms and move the price of gold in this case up to the desired area where [Nowak] wants to sell.' Tr. 2393:15–20."); Trial Tr. at 2393:15–2394:2 (Court striking "the last phrase in the last answer").

## II. CONCLUSION

For the foregoing reasons, and for the reasons discussed in the Motion, we respectfully urge the Court to enter judgments of acquittal on all counts of conviction as to Mr. Nowak.

Dated: December 6, 2022

                                                      Respectfully submitted,

                                                      /s/ David Meister
                                                   David Meister
                                                   Chad E. Silverman
                                                   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                                                   One Manhattan West
                                                   New York, NY 10001
                                                   (212) 735-2100

                                                   William E. Ridgway
                                                   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                                                   155 North Wacker Drive
                                                   Chicago, IL 60606
                                                   (312) 407-0449

                                                   *Counsel for Michael Nowak*