# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

CHRISTOPHER JORDAN

Case No. 19-cr-00669

Hon. Edmond E. Chang

## DEFENDANT CHRISTOPHER JORDAN'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR A NEW TRIAL UNDER RULE 33

James J. Benjamin, Jr.
Parvin D. Moyne
Anne M. Evans
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
(212) 872-1000

Megan Cunniff Church
MOLOLAMKEN LLP
300 N. LaSalle Drive
Suite 5350
Chicago, Illinois 60654
(312) 450-6700

*Counsel for Christopher Jordan*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..............................................................................1

BACKGROUND ..............................................................................................2
    1.    The Post-Dodd-Frank Compliance and CME Materials...............2
    2.    Mr. Jordan's Statement to Agent Luca.........................................4
    3.    The Request for a Good Faith Instruction and Response to Jury Question ............5

LEGAL STANDARD .......................................................................................7

ARGUMENT ..................................................................................................7
    I.    The Court Erred by Excluding the Post-Dodd-Frank Compliance and CME Evidence ............7
    II.    The Court's Ruling on the Defense's Rule 106 Motion Regarding Mr. Jordan's Statements to the FBI Was Erroneous and Highly Prejudicial ...............14
    III.    Mr. Jordan Was Significantly Prejudiced by the Court's Decisions Regarding Jury Instructions ...............19
        A.    The Court Erred by Denying Mr. Jordan's Request for the Good Faith Jury Instructions..................19
        B.    The Court Erred by Providing the Response to the Jury Note..................21

CONCLUSION ...............................................................................................23

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Gov't of Virgin Islands v. Harris*,
    938 F.2d 401 (3d Cir. 1991)......................................................................17

*Hill v. Coppleson*,
    627 F.3d 601 (7th Cir. 2009) ..................................................................18

*Pub. Serv. Co. of Ind., Inc. v. Bath Iron Works Corp.*,
    773 F.2d 783 (7th Cir. 1985) ..................................................................12

*United States v. Berry*,
    92 F.3d 597 (7th Cir. 1996) ......................................................................7

*United States v. Chanu*,
    40 F.4th 528 (7th Cir. 2022) ..................................................................19

*United States v. Faruki*,
    803 F.3d 847 (7th Cir. 2015) ..................................................................15

*United States v. Finis P. Ernest, Inc.*,
    509 F.2d 1256 (7th Cir. 1975) ................................................................12

*United States v. Gilbertson*,
    435 F.3d 790 (7th Cir. 2006) ............................................................17, 18

*United States v. Glover*,
    101 F.3d 1183 (7th Cir. 1996) ....................................................14, 15, 19

*United States v. Haddad*,
    10 F.3d 1252 (7th Cir. 1993) ............................................................14, 15

*United States v. Hamdan*,
    910 F.3d 351 (7th Cir. 2018) ....................................................................7

*United States v. He*,
    245 F.3d 954 (7th Cir. 2001) ..................................................................22

*United States v. Kuzniar*,
    881 F.2d 466 (7th Cir. 1989) ....................................................................7

*United States v. LeFevour*,
    798 F.2d 977 (7th Cir. 1986) ..................................................................15

*United States v. Martel*,
    792 F.2d 630 (7th Cir. 1986) ..................................................................12

*United States v. Mealy*,
    851 F.2d 890 (7th Cir. 1988) ............................................... 22

*United States v. Paladino*,
    401 F.3d 471 (7th Cir. 2005) ............................................... 15

*United States v. Span*,
    170 F.3d 798 (7th Cir. 1999) ............................................... 22

*United States v. Van Eyl*,
    468 F.3d 428 (7th Cir. 2006) ...................................... 7, 19, 23

*United States v. Velasco*,
    953 F.2d 1467 (7th Cir. 1992) ......................................... 14, 15

*United States v. Walker*,
    652 F.2d 708 (7th Cir. 1981) ......................................... 14, 15

*United States v. Washington*,
    184 F.3d 653 (7th Cir. 1999) ................................................. 7

*United States v. Yarrington*,
    640 F.3d 772 (7th Cir. 2011) ............................................... 14

**Statutes**

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-
    203, 124 Stat. 1376 (July 21, 2010) ......................................... 2

**Other Authorities**

Black's Law Dictionary 317 (8th ed. 2004) ................................. 17

Fed. R. Crim. P. 33 ............................................... 1, 2, 7, 23

Fed. R. Evid. 106 ................................................... *passim*

21 Wright & Graham, Federal Practice & Procedure § 5072 (1977) ........... 15

# PRELIMINARY STATEMENT

On behalf of our client, Christopher Jordan, we respectfully submit this motion for a new trial pursuant to Fed. R. Crim. P. 33.  As set forth below, Mr. Jordan was substantially prejudiced by three distinct but related trial errors that individually and collectively deprived him of a fair trial.[1]

*First*, the Court erred in excluding evidence that the policies, rules, and training materials of JPMorgan, Credit Suisse, and the CME all changed materially after the effective date of the Dodd-Frank Act.  This exclusion was highly prejudicial and prevented Mr. Jordan's counsel from adequately cross-examining the government's compliance and CME witnesses.  These witnesses pointed to a set of generalized, "principles-based" policies and rules from 2008 to 2010 that, they claimed, put Mr. Jordan on notice that spoofing was prohibited.  To rebut this testimony, the defense sought to introduce a limited set of later-in-time compliance and CME documents to show that, in fact, traders were not put on notice that spoofing was a prohibited trading practice until years later.  The exclusion of this evidence blocked the defense from pursuing a key line of cross-examination and left the jury with a one-sided and prejudicial view of the evidence.

*Second*, Mr. Jordan was prejudiced by the government's selective and misleading presentation of his 2018 interview with FBI Special Agent Jonathan Luca, and the Court's denial of the defense motion, under the rule of completeness, to admit closely related statements from the interview to contextualize the government's cherry-picked portions.  At trial, the government repeatedly mischaracterized Mr. Jordan's interview with Agent Luca as a "confession," going so far as to urge the jury to convict Mr. Jordan *solely* on the basis of the truncated portions of Mr.

---

[1] In this memorandum of law, "DX" refers to defense exhibits that were either received or excluded at trial; "Evans Decl." refers to the declaration of Anne M. Evans, filed together with this memorandum of law; and "[date] Tr." refers to proceedings at the pretrial conference or the trial in this case.

Jordan's statement that it chose to present. The government's presentation of the FBI interview omitted tightly interwoven, exculpatory statements in which Mr. Jordan stated that he did not believe he was doing anything wrong by engaging in the practice of spoofing; that all of his orders were at risk in the market; and that he did not receive training or guidance about proper trading from JPMorgan in the era when the markets transitioned to electronic trading.

*Third*, Mr. Jordan was significantly prejudiced by two related aspects of the jury instructions. In denying Mr. Jordan's request to include a good faith instruction, the Court impeded the presentation of one of our key theories of defense—that because Mr. Jordan believed his conduct to be permissible under market rules at the time of his trading, he did not knowingly make a materially false representation to his counterparties and did not possess the criminal intent to defraud. Had the jury been instructed on the inarguably correct statement of law embodied in the good faith instruction, it is likely that they would have accepted the defense theory and acquitted Mr. Jordan. Later, during jury deliberations, the Court's response to the jury's note unnecessarily injected a mistake of law defense into the case, resulting in significant prejudice for Mr. Jordan. For these reasons, as detailed below, we respectfully submit that the Court should order a new trial pursuant to Rule 33.

## BACKGROUND

### 1. The Post-Dodd-Frank Compliance and CME Materials

In July 2011, the Dodd-Frank Act's anti-spoofing provision became effective. *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111- 203, § 747, 124 Stat. 1376, 1739 (July 21, 2010). Thereafter, JPMorgan, Credit Suisse, and the CME revised their respective policies, rules, and training materials to state—clearly and without ambiguity—that spoofing was a prohibited trading practice. At trial, the defense sought to admit a limited set of

nine compliance and CME documents, all of which post-dated the effective date of Dodd-Frank, to use in cross-examination of the government's witnesses and establish that the pre-existing policies and training materials *had not* clearly informed traders that spoofing was prohibited. As described below, four of these documents were from JPMorgan; three were from Credit Suisse; and two were from the CME.

- **JPMorgan Compliance Materials (*DX 21, 22, 25, 92*)**. DX 21 was the first JPMorgan policy to explicitly prohibit spoofing. It was adopted in September 2012, *nearly three years* after Mr. Jordan stopped trading at the bank in November 2009. DX 22 was a JPMorgan compliance bulletin from November 2012 in which JPMorgan informed its traders about the new policy contained in DX 21. DX 25 was a compliance bulletin from July 2013 in which JPMorgan informed its traders about recent CFTC interpretive guidance on spoofing. DX 92 was a December 2013 compliance training in which JPMorgan informed its traders about the 2013 CFTC interpretive guidance. *See* Evans Decl., Ex. A–D. The defense intended to use these exhibits to impeach Mark Catana, the government's compliance witness from JPMorgan, who testified that JPMorgan's policies and training materials clearly prohibited spoofing in 2008 and 2009, during Mr. Jordan's period of employment.

- **Credit Suisse Compliance Materials (*DX 34-36*)**. DX 34, a Credit Suisse annual compliance training deck from 2011, was the bank's first training document to discuss spoofing, which the deck characterized as a "new" prohibition. This training was provided a year *after* Mr. Jordan stopped trading at Credit Suisse in July 2010. DX 35 was the first version of the Credit Suisse compliance manual to explicitly prohibit spoofing. It was adopted in August 2012, more than two years after Mr. Jordan stopped trading at Credit Suisse. DX 36, a compliance training deck from April 2012, was another Credit Suisse compliance deck that explicitly discussed spoofing and that was issued well after Mr. Jordan's departure. *See* Evans Decl., Ex. E–G. The defense intended to use these exhibits to impeach David King, the government's compliance witness from Credit Suisse, who testified that Credit Suisse's policies clearly prohibited spoofing in 2010, during Mr. Jordan's tenure at the bank.

- **CME Training and Rules (*DX 37, 42*)**. DX 37 was a June 2012 training deck prepared by Robert Sniegowski, a CME official, for delivery to traders at Credit Suisse. DX 37, which referenced the CFTC's "new" prohibition against spoofing, was delivered two years after Mr. Jordan's departure from Credit Suisse. DX 42 was a Market Regulation Advisory Notice from the CME Group dated August 29, 2014—more than four years after Mr. Jordan's departure from Credit Suisse—that announced the adoption of new Rule 575. Rule 575 was the first CME rule to explicitly prohibit spoofing and, of particular relevance, the *first time* that a CME rule required that all orders be "bona fide." *See* Evans Decl., Ex. H–I. The defense sought to use these exhibits to impeach Erin Middleton, the CME's head of Rules and Regulatory Outreach, who testified that CME rules clearly prohibited

spoofing and required that all orders be "bona fide" (which she defined as placed with an intent to trade) in 2009 and 2010, during the period of Mr. Jordan's charged trading.

At the pretrial conference on October 26, 2022, the Court excluded these exhibits on grounds that "after the fact" changes to policies, rules, and training materials could confuse the jury and inject a mistake of law defense that the Court viewed as "a serious specter in this case." 10/26/22 Tr. 46-49, 52, 63. This ruling prevented the defense from effectively impeaching the government's witnesses when they testified that their institution's policies and rules clearly prohibited spoofing from 2008 to 2010.

### 2. Mr. Jordan's Statement to Agent Luca

Shortly after 6:00 a.m. on November 5, 2018, two FBI agents knocked on the door of Mr. Jordan's parents' home in New Jersey to conduct a surprise interview. *See* Evans Decl., Ex. J at DOJ-0017116830. After being woken up by the FBI agents, Mr. Jordan voluntarily submitted to a lengthy interview that took place over two different sessions. *Id.* During the interview, FBI agents showed Mr. Jordan detailed charts purporting to represent episodes of trading activity from his tenure at JPMorgan and pressed Mr. Jordan to explain the episodes and the reasons that he had traded in such a manner. Mr. Jordan provided truthful and nuanced responses in which he admitted that he had engaged in spoofing and explained that he had done so to outperform algorithms and obtain good execution for his boss at JPMorgan; that he was adapting to new circumstances in the early days of electronic trading, without guidance from JPMorgan; that all of his large orders were at risk in the market; and that he did not think what he was doing was wrong. *Id.* at DOJ-0017116833-34. In short, Mr. Jordan admitted to the conduct that constitutes spoofing, but he denied acting with bad intent. At page 5 of the Form FD-302, these two ideas are presented in immediate proximity to one another:

> Therefore, Jordan had to place orders out in the market with the intent to cancel in order to outperform the algorithms all the time. Jordan did not think what he was doing was wrong.

*Id.* at DOJ-0017116834.[2]

The defense initially sought to offer extensive portions of Mr. Jordan's FBI statement pursuant to Fed. R. Evid. 106, the rule of completeness. *See* ECF No. 230. After the Court denied that initial motion, *see* ECF No. 395, the defense brought a narrower motion to admit the limited statement that Mr. Jordan "did not think what he was doing was wrong." *See* ECF No. 754.[3] The Court denied the second motion, holding that Mr. Jordan's offered statement did not satisfy the requirements of Rule 106 and was thus inadmissible hearsay. *See* ECF No. 787. At trial, Agent Luca testified at length about the interview of Mr. Jordan, without facing cross-examination regarding the interview's exculpatory portions. In its opening statement and closing argument, the government compounded the unfairness by repeatedly and prejudicially characterizing Mr. Jordan's statement to the FBI as a "confession."

### 3. The Request for a Good Faith Instruction and Response to Jury Question

In the Proposed Jury Instructions, the defense requested that the Court include a "good faith" instruction, consistent with the Seventh Circuit's Pattern Jury Instructions. *See* ECF No.

---

[2] In the same paragraph of the FD-302, and as part of his explanation for why he did not think spoofing was wrong, Mr. Jordan "explained that when he placed an order with market, he was taking a risk of the order being executed regardless of the intention behind the order. Jordan took a risk to put those orders in the market out there and sometimes got picked off by other traders." Evans Decl., Ex. J at DOJ-0017116834. Two paragraphs prior, in explaining the context in which he traded at JPMorgan, Mr. Jordan stated "when the precious metal market moved to electronic trading, no one knew anything and there was no tutorial. Jordan stated JPMorgan never coached on the proper way to trade metals." *Id.* at DOJ-0017116833.

[3] In the second Rule 106 motion, the defense made clear that if the Court granted the motion, the defense reserved the right to seek to offer additional portions of Mr. Jordan's statement, depending on the government's presentation of evidence. *See* ECF No. 754 at 10. At trial, the defense intended to offer the additional statements that Mr. Jordan's orders were at risk and that he never received guidance from JPMorgan, but the Court mooted the issue when it rejected the Rule 106 motion in its entirety. *See* 12/2/22 Tr. 540-41.

739 at 30. The Court denied the request on grounds that it posed "the risk of misleading jurors into thinking that a defense along the lines of 'mistake of law' is viable, when it is not." *See* ECF No. 802 at 2.

During deliberations, after the jury had been out for a day and a half, the jurors asked a question regarding the definition of "knowingly." Their note read: "We need a clarification of 'is aware of the nature of his conduct,'" and included a citation to page 19 of the jury instructions. Page 19, in turn, contained the Seventh Circuit Pattern Jury Instructions' definition of "knowingly":

> A person acts "knowingly" if he realizes what he is doing and is aware of the nature of his conduct, and does not act through ignorance, mistake, or accident. In deciding whether the defendant acted knowingly, you may consider all of the evidence, including what the defendant did or said.

ECF No. 804 at 19; *see also* ECF No. 739 at 23 (citing 7th Cir. Crim. Pattern Jury Instr. 4.10 – Definition of Knowingly (2020)). In response, the defense requested that no further instruction be given to the jury beyond the general instruction that the jury should consider the instructions as a whole. *See* ECF No. 813.

The government, however, suggested that the jury's note raised the issue of mistake of law, even though the Court and the parties had gone to great lengths to ensure that mistake of law was not part of the trial. *See* ECF No. 814. The Court determined that the jury was "most likely asking whether the Defendant must know that his alleged conduct was in violation of federal law or, indeed, even in violation of bank compliance polices or CME Rule 432," and provided the following response over a defense objection:

> Dear Jury:
> In response to your question, I will clarify that the definition of "knowingly" on page 19 of the jury instructions does not mean that the defendant must be aware of whether his alleged conduct violated federal law. Having said that, I remind you that the government must prove beyond a reasonable

doubt all of the elements of wire fraud affecting a financial institution, including (1) that the defendant knowingly devised or participated in a scheme to defraud, which is defined on pages 20–21 of the instructions; and (2) that he acted with the intent to defraud, which is defined on page 22 of the instructions and requires that he act "knowingly with the intent to deceive or cheat the alleged victim in order to obtain money or property from the alleged victim or to cause the potential loss of money or property to the alleged victim." I also remind you that you should consider the jury instructions as a whole.

ECF No. 815. Within an hour, the jury returned a guilty verdict.

## LEGAL STANDARD

Upon motion by a defendant, a court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Courts have interpreted Rule 33(a) to require a new trial "in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Hamdan*, 910 F.3d 351, 357 (7th Cir. 2018) (quoting *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989)). Under Rule 33, a "defendant is entitled to a new trial if there is a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict." *United States v. Van Eyl*, 468 F.3d 428, 436 (7th Cir. 2006) (affirming the district court's decision to order a new trial); *see also United States v. Berry*, 92 F.3d 597, 600 (7th Cir. 1996) (same). In determining whether a new trial is warranted, a court should not "view all evidence in the light most favorable to the prosecution," and should instead "grant a new trial if the verdict is so contrary to the weight of the evidence that a new trial is required in the interest of justice." *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999).

## ARGUMENT

### I. The Court Erred by Excluding the Post-Dodd-Frank Compliance and CME Evidence

At trial, the government featured the testimony of three compliance and CME witnesses, all of whom asserted that traders such as Mr. Jordan were placed on notice that spoofing was a

prohibited trading practice in the period 2008 to 2010. By excluding the post-Dodd-Frank compliance and CME exhibits that Mr. Jordan sought to offer, the Court prevented the defense from adequately impeaching this testimony, resulting in a distorted presentation of evidence to the jury.

With respect to bank compliance policies, both Mark Catana and David King testified that JPMorgan and Credit Suisse policies clearly prohibited spoofing throughout the period of Mr. Jordan's trading. Mr. King testified that although Credit Suisse's compliance policies from 2010 contained no language explicitly related to spoofing, traders were put on notice by generalized prohibitions on "manipulative or deceitful market conduct" and "publishing fictitious quotations." *See, e.g.*, 12/2/22 Tr. 703-04 ("A. CSFB personnel may not engage in or assist a client in manipulative or deceitful market conduct . . . Q. And what is meant here by 'deceitful market conduct'? A. That would mean conduct in the marketplace that is not bona fide, that is not truthful and may mislead other market participants."); *id*. 706-07 ("Q. So how can a policy prohibit spoofing if it doesn't actually use that word? A. There are components of spoofing that would be covered under the prohibitions in this procedure. Q. And would those be the components like placing a non-bona fide order? A. Yes. Q. And is that because it's deceitful conduct? A. Yes."); *id*. 707 ("A. 'Publishing fictitious quotations: Disseminating (orally, in writing or by entry of a bid or offer into any quotation medium) any bid or offer that is not bona fide.' Q. Does this policy prohibit placing an order with the intent to cancel? A. Yes. Q. And why is that? A. An order that is placed into a market with the intent to cancel is not bona fide. Q. And that would include spoofing, correct? A. Yes, that's correct.").

For his part, Mr. Catana described JPMorgan's 2009 market manipulation policy as a "principles-based document that sets forth the general rules that traders should observe." 12/5/22

Tr. 831.  Mr. Catana pointed to specific examples of prohibited conduct in the JPMorgan policy that were unrelated to spoofing, but that he nevertheless testified would have informed traders that spoofing was not allowed.  *See, e.g.*, 12/2/22 Tr. 763 ("I would highlight in there particularly the section on fictitious trades which says, 'Painting the tape or rigged sales. Do not create an artificial appearance of trading activity, e.g., on a tape or screen.' . . . [S]poofing would be covered here because an exchange would be functionally the same as a screen.").

Cross-examination by the defense elicited that the Credit Suisse and JPMorgan policies in effect during Mr. Jordan's employment provided traders with explicit notice of *other* prohibited trading practices, but that there was no mention of spoofing anywhere in the policies throughout the entire period of Mr. Jordan's charged trading.  *See id*. 795 ("Q. In 2008 and 2009, the word 'spoofing' did not appear in JPMorgan's compliance policies and training manuals, correct?  A. It's not in any of the materials we reviewed today. I don't believe it was in others as well, but I haven't reviewed all of them . . . Q. To the best of your knowledge, in 2008 and 2009, there was no language in JPMorgan's compliance policies and training materials to explain what spoofing was, correct?  A. Not using -- correct, not using the -- defining the specific term 'spoofing.'"); 12/5/22 Tr. 844-47 ("Q. So this phrase 'painting the tape' and the ticker tape, this has nothing to do with electronic trading, correct? . . .  A. The specific term, using the title 'painting the tape' does not.").  Counsel for Mr. Jordan also elicited from the compliance witnesses that their banks' policies *could* have included specific language prohibiting spoofing at the time of Mr. Jordan's trading.  *See, e.g.*, 12/2/22 Tr. 734-35 (King) ("Q. In 2010, that team, the people on that team, they could have drafted the policies to include clear language in plain English about spoofing, correct?  A. I suppose."); 12/5/22 Tr. 848 (Catana) ("Q. If someone wanted to include a bullet point on spoofing, it would have been easy to do so, correct?  A. I would assume, yes.").

But Mr. Jordan was prevented from eliciting the most critical point—that the banks *did* in fact update their policies to explicitly prohibit spoofing after the passage of Dodd-Frank, the obvious inference from which is that the policies did not clearly inform traders about a prohibition on spoofing in earlier years, when Mr. Jordan was trading. We respectfully submit that the Court erred by precluding the post-Dodd-Frank compliance evidence, and that this evidentiary ruling left the jury with a distorted understanding of the critical question of the *time frame* in which banks and the CME informed traders that spoofing was prohibited. This error was not harmless, as the jury would likely have returned a verdict of not guilty had they determined that Mr. Jordan did not have the intent to defraud based on his understanding of the applicable policies at the time of his trading, in light of how the policies changed over time.

For her part, CME employee Erin Middleton testified that the text of CME Rule 432 prohibited spoofing for the entire period of Mr. Jordan's trading by pointing to generalized language banning market manipulation, fraud, conduct "inconsistent with just and equitable principles of trade," and similar open-ended provisions. *See, e.g.*, 12/5/22 Tr. 926-27 ("Q. Can you please read the subsection [B-1] for the jury? . . . Does this rule prohibit spoofing? A. It does. Q. How so? A. Because submitting non-bona fide orders would be considered bad faith and potentially fraudulent in the deceptive nature of submitting those orders."); *id*. 930 ("Q. So, Ms. Middleton, turning back your attention to subsection H…does spoofing violate this rule? A. Yes. Q. How so? A. So in the description of spoofing, right, you're entering the orders with the intent to cancel prior to execution and in doing so, creating the appearance of an imbalance in market interest, pushing prices towards the order that you intend to trade and, therefore, is a manipulation of prices."); *id*. 934-35 ("Q. So would it be fair to say that from 2008 to 2010, precious metals

traders trading futures contracts on NYMEX and COMEX were always prohibited from placing an order with the intent to cancel? A. Yes.").

On cross-examination, the defense established that none of the cited language in Rule 432 used the term "spoofing" or defined or described it as the practice of placing a bid or offer with the intent to cancel the bid or offer before execution. 12/5/22 Tr. 955-56.[4] In addition, the defense established that the CME Group did not publicly express the view that spoofing violated Rule 432 until its notice of disciplinary action against Charles Martell in January 2012—more than a year and a half after Mr. Jordan's departure from Credit Suisse. *See* DX 40; 12/5/22 Tr. 973-81 ("Q. You have no specific knowledge of any statement before the Martell case was issued [in January 2012] that the conduct we now know as spoofing violated Rule 432, correct? A. Public statement[?] Q. Correct. A. Yeah."). But the cross-examination would have been much more straightforward and effective if the defense had been permitted to offer evidence that the CME did not actually train traders on spoofing until 2012, as evidenced by DX 37.

In her direct examination, Ms. Middleton also testified that orders placed on the CME were always required to be "bona fide," meaning (according to her) that they were placed with the "true intent to buy or sell a particular price or quantity." 12/5/22 Tr. 920 ("Q. Okay. So what [are] the CME's rules with respect to the purpose of orders to buy and sell in the 2008 to 2010 time period? . . . A. They need to represent a true intent to buy or sell a particular price or quantity. Q. And is that often referred to as bona fide? A. Correct."); *id*. 923-24 ("Q. There's no box that the trader is required to check that says this is bona fide? A. No. Q. And why is that? A. Because all orders

---

[4] Ms. Middleton also acknowledged on cross-examination that the two sub-provisions of Rule 432 she cited that reference "fraud" and "manipulation" have *never* been used by the CME to penalize traders for spoofing. 12/5/22 Tr. 983-85 ("Q. Sitting here today, in 2022, you cannot identify a single notice of disciplinary action under Rule 432 for spoofing conduct in which the business conduct committee found a violation of [B-]1 or H under Rule 432, correct? A. Not off the top of my head, no.").

have to be bona fide.").  But as the defense explained at the pretrial conference, Rule 575 was "the first time there is any reference in . . .  the CME's rules requiring that all orders be bona fide." 10/26/22 Tr. 61.  DX 42 would have directly rebutted Ms. Middleton's contention that the CME's rules always required orders to be "bona fide" and would have supported a jury determination that the government *did not* prove Mr. Jordan's criminal intent beyond a reasonable doubt.[5]

The post-Dodd-Frank compliance and CME exhibits proffered by the defense were highly relevant to a key issue in this case—Mr. Jordan's state of mind—and were necessary to allow the defense a fair chance to respond to the government's case.  "Rebuttal evidence can properly be offered in order to 'explain, repel, counteract or disprove the evidence of the adverse party.'" *United States v. Martel*, 792 F.2d 630, 636 (7th Cir. 1986) (quoting *United States v. Finis P. Ernest, Inc.*, 509 F.2d 1256, 1263 (7th Cir. 1975)); *Pub. Serv. Co. of Ind., Inc. v. Bath Iron Works Corp.*, 773 F.2d 783, 790 (7th Cir. 1985) (holding that district court prejudiced the defendant's substantial rights by allowing plaintiffs to present evidence about a key issue while preventing the defendant "from presenting its version of that issue in any cohesive and complete fashion").  Mr. Jordan should have been afforded broad scope to cross-examine the government's witnesses to rebut their testimony about what was and was not conveyed to traders about spoofing during the time period of Mr. Jordan's charged trading.  The defense's compliance and CME exhibits were

---

[5] DX 42 would also have been the foundation for effective cross-examination of the government's sole victim witness, Quantlab Financial's Travis Varner, when he provided erroneous and prejudicial testimony about CME rules later in the trial.  *See* 12/5/22 Tr. 1010 ("Q. Did the algorithm assume that that order was bona fide? A. Yes . . .  Q. Was that based in part on the fact that CME requires all trades to be bona fide?  A. Yes.").  Varner acknowledged on cross-examination that he was unaware of a CME rule in place in 2009 and 2010 stating the requirement that orders be bona fide, but defense counsel was prohibited from eliciting that the requirement was first codified in 2014 with the introduction of Rule 575.  *Id*. 1037-38 ("Q. And you testified that there was a CME rule that required all orders to be, quote, 'bona fide.' Do you recall that testimony?  A. Yes.  Q. And to be clear, are you testifying that such a rule existed in 2009 and 2010?  A. I'm not a rule expert . . .  Q. So are you aware -- I take it then that you're not aware that the Rule 432 does not include the phrase 'bona fide,' correct?  A. I don't know what the Rule 403 says or 40 -- I don't know the rule.").

unquestionably relevant and would have materially aided the jury in arriving at a fair and accurate understanding of the evidence. By excluding the evidence, the Court hamstrung the defense and gave the government license to present a misleading picture of the evidence on a central issue in the case.

The error of excluding the post Dodd-Frank compliance and CME exhibits is particularly unfair in Mr. Jordan's case, as he was the first and only individual to be charged with wire fraud based on spoofing conduct that *entirely* preceded the Dodd-Frank Act. In the three other criminal spoofing cases against manual traders in this District, the government presented evidence of post-Dodd-Frank bank compliance policies and trainings because, although the government argued that spoofing was always prohibited, such evidence showed that the defendants in the other cases acted with bad intent by violating explicit anti-spoofing policies that were spelled out in black and white.[6] Similarly, in *Bases* and *Smith*, the government presented evidence about CME Rule 575.[7] Here, by contrast, the government was permitted to gain an advantage by taking the opposite position and suppressing the same post-Dodd-Frank evidence on which it relied in other trials. Because the government was able to keep the jury in the dark as to the post-Dodd-Frank changes in bank policies and CME rules, it could argue that spoofing was *always* prohibited by generalized compliance policies and exchange rules, without having to take account of contradictory evidence.

The Court excluded the post-Dodd-Frank compliance exhibits under Fed. R. Evid. 403 because of a concern that the jury would incorrectly infer a mistake of law defense. 10/26/22 Tr.

---

[6] *See, e.g.*, Evans Decl., Ex. K, Trial Tr. 1216-1224, *United States v. Vorley*, No. 18 CR 35 (N.D. Ill. Sept. 17, 2020) (2012 compliance deck); *id.*, Ex. L, Trial Tr. 1293-1294, *United States v. Bases*, No. 18 CR 48 (N.D. Ill. July 28, 2021) (2011 compliance email); *id.*, Ex. M, Trial Tr. 3084-3087, *United States v. Smith*, 19 CR 669 (N.D. Ill. July 22, 2022) (compliance bulletins from 2011, 2012, 2013, and 2014).

[7] *See, e.g.*, Evans Decl., Ex. L, *Bases*, Trial Tr. 243-250; *id.*, Ex. M, *Smith*, Trial Tr. 659-667.

46-48. But as the defense pointed out, *see id*. 47, any risk of juror confusion regarding a mistake of law defense could have been handled by a jury instruction on the subject. Indeed, the Court ultimately issued such an instruction. *See infra*, Section III.B.

## II. The Court's Ruling on the Defense's Rule 106 Motion Regarding Mr. Jordan's Statements to the FBI Was Erroneous and Highly Prejudicial

We respectfully submit that the Court erred in denying Mr. Jordan's Rule 106 Motion, ECF No. 754. The Court's exclusion of the portions of Mr. Jordan's statements to the FBI in which Mr. Jordan denied acting wrongfully was erroneous and highly prejudicial. As a result, the government put Mr. Jordan's incomplete statements at the heart of its case, misleadingly framing Mr. Jordan's statements as a "confession" and giving the jury a distorted version of Mr. Jordan's state of mind.

Pursuant to Fed. R. Evid. 106, "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." Although the text of Rule 106 is limited to written or recorded statements, the Seventh Circuit has applied the rule to oral statements and testimonial proof. *See, e.g.*, *United States v. Yarrington,* 640 F.3d 772, 780 (7th Cir. 2011); *United States v. Haddad*, 10 F.3d 1252, 1258 (7th Cir. 1993).

Under longstanding Seventh Circuit precedent, "the test of admissibility under Rule 106 is conjunctive." *United States v. Glover*, 101 F.3d 1183, 1190 (7th Cir. 1996); *see also United States v. Velasco*, 953 F.2d 1467, 1474-75 (7th Cir. 1992); *United States v. Walker*, 652 F.2d 708, 710 (7th Cir. 1981). First, the proponent must establish that the proffered additional statements are relevant to an issue in the case. *Id*. Second, if there is a showing of relevance, the trial court applies a four-part test by asking: "(1) whether the additional evidence explains the evidence already admitted; (2) whether it places the admitted evidence in its proper context; (3) whether its admission will serve to avoid misleading the trier of fact; and (4) whether its admission will 'insure a fair and

impartial understanding of all of the evidence.'" *Glover*, 101 F.3d at 1190 (quoting *Velasco*, 953 F.2d at 1475); *see also Haddad*, 10 F.3d at 1259. Courts have held that omitted evidence is relevant if it bears on an aspect of the defendant's mental state that is at issue in the case. *See, e.g.*, *Walker*, 652 F.2d at 711-12; *Haddad*, 10 F.3d at 1259; *United States v. Paladino*, 401 F.3d 471, 476 (7th Cir. 2005).

The Seventh Circuit has held that omitted statements should be allowed when they are temporally and contextually interconnected with the included statements, such that exclusion would result in a misleading and unfair portrayal of the statement as a whole. *See, e.g.*, *United States v. LeFevour*, 798 F.2d 977, 981 (7th Cir. 1986); *Paladino*, 401 F.3d at 476; *Haddad*, 10 F.3d at 1258-59. Rule 106 does not create an exception to the rule against hearsay. *See, e.g.*, *United States v. Faruki*, 803 F.3d 847, 856 (7th Cir. 2015). However, otherwise inadmissible hearsay may nevertheless be offered under Rule 106 if it meets the requirements of the rule:

> If otherwise inadmissible evidence is necessary to correct a misleading impression, then either it is admissible for this limited purpose by force of Rule 106, the view taken in 21 Wright & Graham, Federal Practice & Procedure § 5072, at p. 344 (1977), or, if it is inadmissible (maybe because of privilege), the misleading evidence must be excluded too.

*LeFevour*, 798 F.2d at 981.

In applying Rule 106 in criminal cases, the Seventh Circuit has noted the difficulty that a defendant will face if he is forced to confront "the dilemma of allowing the jury to hear an incomplete picture of the evidence, or of waiving his Fifth Amendment privilege not to testify in order to correct the mistaken impression created by the incomplete evidence." *Glover*, 101 F.3d at 1192 (citing *Walker*, 652 F.2d at 713). This was the case for Mr. Jordan, who chose not to testify, as was his right, and as a result was significantly prejudiced by the distorted and incomplete picture of his statements to the FBI presented by the government at trial.

The portion of Mr. Jordan's statement proffered by the defense—that he did not think that what he was doing was wrong—clearly satisfied all four prongs described by the Seventh Circuit and should have been admitted: (i) Mr. Jordan's denial of bad intent was immediately proximate and interconnected with his admission that he placed orders with the intent to cancel them before execution in order to outperform the algorithms; (ii) the denial of bad intent explained the admission of spoofing and placed it into its proper context by making clear that the spoofing was not undertaken with bad intent; (iii) the admission of the denial of bad intent was critical to avoid misleading the jury, which may have wrongly inferred that Mr. Jordan admitted to behavior that amounted to a fraud; and (iv) the admission of the denial of bad intent would have ensured that the jury arrived at a fair and impartial understanding of Mr. Jordan's 2018 interview with the FBI.[8]

In our Rule 106 motion, we explained that the omitted portion of Mr. Jordan's statement provided essential context for the rest of Mr. Jordan's statement that the government planned to offer. We raised the concern that a severe misimpression would be created if the jury were to hear that Mr. Jordan admitted to spoofing without also hearing his contemporaneous statement that he did not think there was anything wrong with the practice. As we feared, that is exactly what happened at trial.

Throughout the trial, the government repeatedly mischaracterized Mr. Jordan's statements to Agent Luca as a "confession." The government framed its case around the purported "confession" in its opening statement, telling the jury three times that Mr. Jordan had "confessed to the FBI." 12/1/22 Tr. 234; *id*. 242; *id*. 245. During the trial, when Mr. Jordan renewed his Rule 106 motion, the government averred that it had been "very careful to argue that the confession is

---

[8] If the Court grants our motion for a new trial, we expect to seek leave at the retrial to admit the two other portions of Mr. Jordan's statements to the FBI discussed above: (1) that Mr. Jordan understood that his orders were fully at risk; and (2) that Mr. Jordan did not receive guidance from JPMorgan in the period at issue in this case, when the markets had recently shifted to electronic trading. *See supra* at n.2.

that [Mr. Jordan] spoofed to mislead the market." 12/2/22 Tr. 541. But in its summation and rebuttal arguments, the government abandoned all pretense of caution, using the words "confessed" and "confession" a total of seventeen times in a number of different formulations. *See, e.g.*, 12/7/22 Tr. 1313 ("Mr. Jordan confessed that he used the four-step strategy to mislead the market to trick other traders in the marketplace and to make money for his boss."); *id.* 1319-20 ("[Y]ou've heard the defendant's own statements in the form of a confession. This is direct evidence of the defendant's intent."); *id.* 1333 ("[T]he evidence that Mr. Jordan intended to deceive and cheat others is proven beyond a reasonable doubt by Mr. Jordan's confession[.]"); *id.* 1334 ("The evidence that Mr. Jordan made a material misrepresentation is proven beyond a reasonable doubt by[,] again[,] his confession[.]"). Indeed, the government told the jury that they should convict Mr. Jordan *solely* on the basis of the purported "confession" to Agent Luca:

> [I]f you believe Agent Luca, this case, it's over. He told you that when confronted -- when confronting the defendant with specific examples of his trading, the defendant confessed. He admitted that he engaged in this four-step pattern to deceive the market. He told him that he spoofed to mislead the market. That's the case. He engaged in a spoofing scheme to mislead the market to make money for himself and the bank. That's fraud.

*Id.* 1383.

Greater prejudice can scarcely be imagined. Had the jury been able to hear Mr. Jordan's denial of *mens rea*, it would have been obvious to them that Mr. Jordan did not "confess" to the crime with which he was charged. In *United States v. Gilbertson*, the Seventh Circuit defined a "confession" as a "criminal suspect's oral . . . acknowledgment of guilt, often including details about the crime." 435 F.3d 790, 798 (7th Cir. 2006) (citing Black's Law Dictionary 317 (8th ed. 2004)); *see also Gov't of Virgin Islands v. Harris*, 938 F.2d 401, 409 n.5 (3d Cir. 1991) (defining "confession" as "a statement admitting or acknowledging all facts necessary for conviction of the crime"). At most, Mr. Jordan "confessed that he had used the four-step strategy now known as

spoofing." 12/7/22 Tr. 1314. But Mr. Jordan was not charged with spoofing; he was charged with wire fraud affecting a financial institution. Mr. Jordan did *not* provide an "acknowledgment of guilt," nor did he "confess" to the two key elements of the wire fraud charge against him: that he "made a material misrepresentation" to market participants and that he specifically "intended to deceive and cheat others" when he traded in the spoofing pattern. *Gilbertson*, 435 F.3d at 798; 12/7/22 Tr. 1333-34. Indeed, the omitted portions of Mr. Jordan's statement established that he *did not* believe his trading to be wrongful or fraudulent. *Gilbertson*, 435 F.3d at 798; *Hill v. Coppleson,* 627 F.3d 601, 606 n.2 (7th Cir. 2009).

Moreover, the excluded portion would have appropriately contextualized the rest of Mr. Jordan's statements, consistent with his central theory of defense, that he spoofed in an open and transparent manner, believing it was a permitted trading practice under the applicable exchange rules and bank compliance policies in place at the time. *See, e.g.*, 12/7/22 Tr. 1350-51 ("Now, during this trial, the government has repeatedly characterized Chris' statements to Mr. Luca as a confession. That is not correct. A confession is to a crime. Chris did not confess to a crime. He admitted spoofing. He did not admit fraud . . . As long as you're within the rules, it's fair game. It's a strategy."). Allowing the defense to cross-examine Agent Luca about the excluded portion of Mr. Jordan's statement would have re-balanced the distorted, one-sided picture of the evidence regarding Mr. Jordan's FBI interview that the government fed to the jury, and would have helped "insure a fair and impartial understanding of all of the evidence." *Glover*, 101 F.3d at 1190.

The Court justified its decision to deny Mr. Jordan's Rule 106 motion in part by reasoning that "mistake of law is *not* a defense to a wire fraud charge." ECF No. 787 at 2-3. But, as noted above, the parties studiously avoided raising a mistake of law defense at trial, and there was no risk of jury confusion about Mr. Jordan's understanding of the legal landscape at the time. In any

event, as with the compliance policies and CME rules discussed above, the Court could have cured any risk of jury confusion regarding a mistake of law defense with a jury instruction. *See* ECF No. 815 at 3. We respectfully submit that the Court's error in denying Mr. Jordan's Rule 106 Motion had a prejudicial effect upon the jury's verdict which should entitle Mr. Jordan to a new trial. *Van Eyl*, 468 F.3d at 436.

### III. Mr. Jordan Was Significantly Prejudiced by the Court's Decisions Regarding Jury Instructions

Mr. Jordan was significantly prejudiced by two related aspects of the jury instructions: (1) the denial of a good faith instruction; and (2) the Court's response to the jury note during deliberations. Together with the evidentiary rulings discussed above, these instructional errors undermine confidence in the verdict and warrant a new trial.

### A. The Court Erred by Denying Mr. Jordan's Request for the Good Faith Jury Instructions

Before trial, in the Proposed Jury Instructions, the defense requested a good faith instruction in light of the defense that Mr. Jordan spoofed but did not think what he was doing was wrong; *i.e.*, that he acted in good faith. ECF No. 739 at 30. As the defense noted, the good faith instruction is included in the Seventh Circuit's Pattern Jury Instructions, and was given in at least two prior spoofing trials. *See* 7th Cir. Crim. Pattern Jury Instr. 6.10 (2020); *United States v. Bases*, 18 CR 48 (N.D. Ill. Aug. 2, 2021) (ECF No. 623); *United States v. Flotron*, 17 CR 220 (D. Conn. Apr. 24, 2018) (ECF No. 234). And while the Seventh Circuit affirmed the district court's decision not to give the good faith instruction in another spoofing trial, the Court of Appeals took pains to state that its decision "should not be read to preclude the inclusion of such an instruction in a future case." *United States v. Chanu*, 40 F.4th 528, 543 (7th Cir. 2022), *cert. denied*, 2023 WL 350010 (U.S. Jan. 23, 2023). We also submitted that Mr. Jordan's anticipated defense was different than

that presented in the trial of his co-defendants, at which the Court declined to give the good faith instruction. *See United States v. Smith*, 19 CR 669 (N.D. Ill. July 26, 2022) (ECF No. 648) (evaluating the "facts of this case" in determining not to include a good faith instruction). Indeed, the facts alleged against Mr. Jordan were different than those of his co-defendants in many respects, including that—unlike his co-defendants—he aggressively challenged the testimony from the government's compliance and CME witnesses that the rules and policies actually prohibited spoofing in 2008 to 2010.

One of the key issues of this case was whether Mr. Jordan understood, based on the rules and policies in place in 2009 and 2010, that he was doing anything wrong when he was spoofing. Given that both the government's case and Mr. Jordan's defense turned on that understanding, it is difficult to think of a case where the good faith instruction would be *more* appropriate than this one. The evidence adduced at trial supported the key principle of the good faith instruction that if Mr. Jordan "honestly believed [his] actions did not involve a materially false or fraudulent pretense, representation, or promise," he lacked the intent to defraud. ECF No. 739 at 30. For example, the evidence showed that Mr. Jordan's orders were real and at risk of execution. *See, e.g.*, 12/5/22 Tr. 1043 ("Q. And the red order is a real order that can be found in the CME's data, correct? A. Correct. Q. And the red order was open for just over 1 second. It says, 'Active for 1.099 seconds,' correct? A. Yes. Q. And again, over 1 -- 1.099 seconds is plenty of time for a Quantlab algorithm to execute a trade if the algorithm chose to do so? A. Yes, it could."); 12/6/22 Tr. 1113-14 ("Q. During the time that Chris' red orders were resting in the order book, they were available for execution, correct? A. That's right. Q. Immediate execution, correct? A. Yes. Q. If someone else in the market had wanted to trade against any of Chris' red orders, they were able to do so, correct? A. That's right."). The evidence also showed that Mr. Jordan never made any

statements to other market participants about his intent to trade, given that the exchange was anonymous. *See, e.g.*, 12/5/22 Tr. 1036 ("Q. Trading on the CME is anonymous, correct?  A. Yes. Q. You don't know who your counterparty is, correct?  A. Correct.  Q. It's not like buying a house where you can know. You don't know, correct?  A. Correct."); *id.* 1045-46 ("Q. And Chris did not make any statements to Quantlab about his orders beyond the information he provided to the CME when he placed the orders, correct?   A. Correct."); 12/6/22 Tr. 1108 ("Q. Nowhere in that spreadsheet was there a cell or a row or a column that contained a narrative statement by Chris Jordan about the intent behind any of his orders, correct?  A. That's right.").

All of this was evidence that a reasonable juror could have found to be inconsistent with knowingly false representations and a specific intent to defraud.  The government's case was built on the theory that Mr. Jordan's orders carried implied misrepresentations to other market participants.  *See, e.g.*, 12/7/22 Tr. 1334-35 ("The evidence that Mr. Jordan made a material misrepresentation is proven beyond a reasonable doubt . . . by testimony from numerous witnesses about how the four-step strategy uses real trades to send false signals to the market to fraudulently induce other traders to trade.").  There is a substantial likelihood that if the jury had received the good faith instruction and accepted our theory of defense—that if Mr. Jordan honestly believed that his orders were real and did not involve a false representation, then he did not have intent to defraud—Mr. Jordan would have been acquitted.  Based on the facts of this case, we respectfully submit that the Court erred in declining to give the good faith instruction.

### B.  The Court Erred by Providing the Response to the Jury Note

At trial, the parties and the Court took pains to avoid a mistake of law argument. Nevertheless, during deliberations the Court provided a supplemental instruction that affirmatively and unnecessarily injected mistake of law into the case and significantly prejudiced Mr. Jordan.

For the reasons articulated in our written objection during trial, ECF No. 813, we respectfully submit that the Court erred by providing the supplemental instruction to the jury.

Based on the language of the jury note, it was not clear what the jury was asking about. The government took the position that the note reflected confusion "about whether the defendant needs to be aware of the criminal nature of his conduct." 12/8/22 Tr. 1395. We submitted that the more likely interpretation of the note was that there was some question about whether the government was required to prove that Mr. Jordan knew that his conduct involved a scheme to make statements that were false and fraudulent (i.e., the first element of wire fraud affecting a financial institution), or that he had the intent to deceive or cheat in order to obtain money or property from the alleged victim (i.e., the second element). There was no indication that the jury was confused about a mistake of law defense, and the Court had excluded evidence specifically to avoid the risk of jury confusion on the subject. 10/26/22 Tr. 46-47. In short, mistake of law was not part of the trial.

Rather than provide a supplemental instruction, it was well within the Court's discretion to simply refer the jury back to the original instructions regarding "knowingly." *United States v. Span*, 170 F.3d 798, 802 (7th Cir. 1999) ("if the original jury charge clearly and correctly states the applicable law, the judge may properly answer the jury's question by instructing the jury to reread the instructions"); *United States v. Mealy*, 851 F.2d 890, 902 (7th Cir. 1988) (same). A supplemental instruction is appropriate only when it answers "the jury's specific question correctly." *United States v. He*, 245 F.3d 954, 960 (7th Cir. 2001). Here, the jury instructions fairly and adequately explained the meaning of "knowingly," and it was entirely speculative that the jury note related to confusion regarding the viability of a mistake of law defense, as opposed to a more general question about the first and second elements of the offense.

Notwithstanding the foregoing, the Court administered a supplemental instruction that told the jury that Mr. Jordan did not need to be aware of whether his alleged conduct violated federal law. ECF No. 815. This supplemental instruction was unnecessary and unfairly tipped the scale in favor of the government. That the jury returned its guilty verdict so quickly after receiving the Court's response underscores that there is more than a "reasonable possibility" that these errors "had a prejudicial effect upon the jury's verdict," entitling Mr. Jordan to a new trial. *Van Eyl*, 468 F.3d at 436.

## CONCLUSION

For the reasons set forth above, the Court should order a new trial pursuant to Fed. R. Crim. P. 33(a).

Dated: January 30, 2022

Respectfully submitted,

 */s/ James J. Benjamin, Jr.*
James J. Benjamin, Jr.
Parvin D. Moyne
Anne M. Evans
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
(212) 872-1000

Megan Cunniff Church
MOLOLAMKEN LLP
300 N. LaSalle Drive
Suite 5350
Chicago, Illinois 60654
(312) 450-6700

*Counsel for Christopher Jordan*