UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 19 CR 669 |
| CHRISTOPHER JORDAN, | Judge Edmond E. Chang |
| Defendant. | |

**UNITED STATES' OPPOSITION TO DEFENDANT
JORDAN'S MOTION FOR A JUDGMENT OF ACQUITTAL UNDER RULE 29**

The United States respectfully submits this memorandum in opposition to

Defendant Christopher Jordan's Motion for a Judgment of Acquittal Under Rule 29

(ECF Nos. 834, 835) ("Motion" or "Mot."). As set forth below, the Court should deny

the Motion.

**I.     Legal Framework**

In considering a Rule 29 motion, the Court views the evidence in the light most

favorable to the United States. *See, e.g., Jackson v. Virginia*, 443 U.S. 307, 319 (1979);

*United States v. Genova*, 333 F.3d 750, 757 (7th Cir. 2003). A guilty verdict should be

overturned only if no rational trier of fact could have found beyond a reasonable doubt

that the defendant committed the essential elements of the crime. *Id*. The Seventh

Circuit has deemed a criminal defendant's hurdle to overturn a verdict with a Rule 29

motion as "nearly insurmountable." *United States v. Jones*, 713 F.3d 336, 339 (7th

Cir. 2013) (cleaned up); *see also United States v. Schlyer*, No. 17 CR 30, 2018 WL

620057, at *1 (N.D. Ill. Jan. 30, 2018) (noting that defendants "bear[] a heavy, indeed,

nearly insurmountable burden" when presenting a Rule 29 motion challenging the sufficiency of the evidence and collecting cases (cleaned up)); *cf. United States v. Garcia*, 919 F.3d 489, 497-98 (7th Cir. 2019) (noting successful Rule 29 motions are "relatively rare"); *United States v. Weimert*, 819 F.3d 351, 354 (7th Cir. 2016) ("Given our deference to jury determinations on evidentiary matters, we rarely reverse a conviction of mail or wire fraud due to insufficient evidence.").

## II.  The Government's Evidence Demonstrated Jordan Knowingly Participated in a Scheme to Defraud

Jordan claims there was insufficient evidence to prove he engaged in a scheme to defraud other market participants within the meaning of the wire fraud statute. Specifically, he claims that the evidence was insufficient to show that his deceptive scheme deprived counterparties of any money or property and that they "got exactly what they bargained for" because they bought or sold futures contracts at a given price for a given quantity. Mot. at 2. His argument lacks merit for several reasons.

*First*, the Seventh Circuit has explained that "placing orders on opposite sides of the commodities market with the intent to cancel amounts to a 'deceitful' scheme, aiming 'to manipulate the market for [the trader's] own financial gain.'" *United States v. Coscia*, 866 F.3d 782, 797 (7th Cir. 2017); *see also United States v. Smith*, 555 F. Supp. 3d 563, 574 (N.D. Ill. 2021) ("In this Circuit, under *Coscia*, spoofing can be prosecuted as a fraud."). More specifically, in *Chanu*, the Seventh Circuit confirmed that manual spoofing in the precious metals futures markets—conduct substantially similar to Jordan's deceptive trading activity in this case—is a "pattern of trading conduct [that] is deceitful and aligns with the plain meaning of 'scheme to defraud.'"

*United States v. Chanu*, 40 F.4th 528, 541 (7th Cir. 2022). Jordan's Motion fails to address or distinguish this reasoning in *Chanu* or *Coscia,* which places his manipulative trading activity squarely within the definition of a "scheme to defraud" under the wire fraud statute.

*Second*, Jordan's deceptive trading activity consisted of a scheme to defraud even if, as Jordan argues, his counterparty victims received "exactly what they bargain for." Mot. at 2. *See Shaw v. United States*, 580 U.S. 63, 67 (2016) (remarking that "a man is none the less cheated out of his property, when he is induced to part with it by fraud, even if he gets a quid pro quo of equal value" (quotations omitted); *United States v. Leahy*, 464 F.3d 773, 788-89 (7th Cir. 2006) (finding wire and mail fraud charges properly alleged where defendants falsely represented qualifications in order to obtain government contracts, despite defendants' argument that the victim received "a service worth every dime in the contracts"). At trial, the evidence overwhelmingly demonstrated that Jordan engaged in a scheme to defraud other market participants.[1] The fact that Jordan's counterparties purportedly received the

---

[1] For example, Jordan told the FBI that he engaged in spoofing in order to mislead other market participants. Tr. 506:08-25, 516:10-16. Specifically, Jordan "was placing fake trades with the intent to cancel them in order to mislead the market into believing there was a false sense of supply or demand" so that he could get his genuine orders filled. Tr. 507:01-08; *see also* Tr. 526:12-14 (Jordan used the term "fake" to describe his spoof orders). In addition, Jordan told FBI agents that his spoofing was meant to help him "outperform the algorithms" that were trading in the market, Tr. 507:09-16, and Jordan's electronic chat communications showed him describing how he would spoof to get the algorithms to fill his genuine iceberg orders. *See* Tr. 537:05-25, 538:16-25; *see also* Tr. 539:16-540:09 (explaining Jordan's statement in a chat, "they take my hidden offer every time as I bid in front of it," described how he placed a large bid on one side of the market to push the market into and fill his iceberg order on the opposite side).

"benefit of the bargain," therefore, is beside the point of whether he engaged in a scheme to defraud.

*Third*, Jordan asserts there was no evidence that any of his "counterparties ever lost money as a result of his spoof orders." Mot. at 4. The wire fraud statute, however, "do[es] not require the government to prove either contemplated harm to the victim or any loss." *United States v. Leahy*, 464 F.3d 773, 786-87 (7th Cir. 2006); *see also Smith*, 555 F. Supp. 3d at 574 ("It is also well established that a scheme to defraud need not actually succeed to warrant a conviction." (collecting cases)). Similarly, Jordan claims that the trades with his counterparties "were the result of the independent judgment of [his] sophisticated transaction counterparties." Mot. at 4. But this argument ignores the evidence that those "independent judgments" were influenced by the false supply or demand that Jordan's spoof orders injected into the market as part of his deceptive trading. *See* Tr. 1009:02-10 (Varner explaining that Jordan's spoof order influenced Quantlab's decision to trade), 1013:02-10 (same).

*Finally*, Jordan claims that "at most" his counterparties were deprived of "information—his subjective intention to cancel the orders—that could have informed their economic decision-making about whether to buy or sell futures contracts, and at what price." Mot. at 4. Not so. Jordan's manipulative trading created a false appearance of supply and demand such that the victims in this case were deprived of their money (when they bought) or property (when they sold)—not just information— because they transacted at artificial prices created by Jordan's spoof orders. Moreover, Jordan attempts to re-brand this case as asserting a "right-to-control"

-4-

theory and to tether his conviction to the outcome of a case currently pending before the Supreme Court, *Ciminelli v. United States*, No. 21-2270 (argued Nov. 28, 2022). Jordan was *not* charged or convicted under a right-to-control theory, and the Supreme Court's resolution of *Ciminelli*, therefore, has no bearing on the merits of Jordan's Motion.[2] Therefore, the debate whether the "right-to-control" theory is "currently living on borrowed time," Mot. at 4, has no bearing on the fact that, when the evidence is viewed in the light most favorable to the government, a rational jury could have found beyond a reasonable doubt that Jordan knowingly engaged in a scheme to defraud under the wire fraud statute.

## III. The Government's Evidence Proved that Jordan Made Material Misrepresentations to Other Market Participants

The evidence presented at trial was more than sufficient for a reasonable juror to conclude that Jordan made material misrepresentations to other market participants. In his Motion, Jordan claims the government failed to establish that, "in 2009 and 2010, the CME required traders to place orders with a genuine intent to trade," and argues that without evidence of such a rule that "was widely understood in the market," it was not "rational for a counterparty to have assumed that an order placed on the CME implicitly reflected a genuine interest to trade." Mot. at 7-8. As detailed below, this argument fails for two reasons: (1) in *Chanu*, the Seventh Circuit rejected this argument and held that spoof orders can be implied misrepresentations,

---

[2] Even still, Jordan's spoofing scheme would constitute fraud even under the *Ciminelli* Petitioner's definition. *See, e.g.*, Pet. Br. at 46, *Ciminelli* (No. 21-1170) (recognizing that "deception about price, quality, or performance" is "traditional property fraud").

as did this Court when denying Jordan's motion to dismiss; and (2) when viewed in the light most favorable to the government, the evidence overwhelmingly showed that during the relevant time period, all orders placed were supposed to be *bona fide*, and other market participants relied on this rule when making trading decisions.

In *Chanu*, the Seventh Circuit explained that an "order placement signals a trader's intent to buy or sell" and "[b]y obscuring their intent to cancel, through an orchestrated approach, [the defendants] advanced a quintessential 'half-truth' or implied misrepresentation—the public perception of an intent to trade and a private intent to cancel in hopes of financial gain." *Chanu*, 40 F.4th at 541. Notably, Jordan mentions *Chanu* only in a footnote, where he acknowledges that, under *Chanu*, spoof orders can be implied misrepresentations for purposes of wire fraud, but claims he is preserving the argument that *Chanu* was "wrongly decided." Mot. at 7 n.2. In essence, Jordan concedes that *Chanu* is dispositive of his argument and shows that his position has no merit. Further, in this case itself, the Court already rejected this argument in the defendants' first motion to dismiss by explaining that under *Coscia*, "spoofing can constitute misrepresentation by creating illusory market movement through the injection of false information into the market," Order at 10 (ECF No. 374), and that, as alleged, placing deceptive orders into the market involved implied misrepresentations because it "falsely implied that [the defendants] intended to trade in the quantities and the prices reflected by those orders." *Id.* at 12 (citing *United States v. Vorley*, 420 F. Supp. 3d 784, 801 (N.D. Ill. 2019). Nothing that transpired during Jordan's trial calls the Court's reasoning into question.

Further, when viewed in the light most favorable to the government, the evidence presented at trial clearly supported the jury's conclusion that Jordan's trading in 2009 and 2010 involved implied misrepresentations. As highlighted below, the jury heard testimony from which they could reasonably have concluded that orders implicitly represent a genuine intent to trade, that this was a rule in the marketplace during the relevant period, and, as a result, an order placed without such genuine intent constituted an implied misrepresentation.[3]

*First*, Erin Middleton testified the CME's rules required that all orders be entered for the purpose of executing a *bona fide* transaction. For example, Middleton explained that orders "need to be intended to trade," which meant that the orders "need to represent a true intent to buy or sell a particular price or quantity." Tr. 638:22-23. She added that "every order needs to be *bona fide*." Tr. 920:07-11. When the district court in *Vorley* rejected a similar post-trial argument, it explained that "such testimony even standing along, would be sufficient to support a jury's conclusion that orders therefore carried an implied representation that the order reflected a *bona fide* interest in executing the trade on the stated terms." *Vorley,* 18 CR 35, 2021 WL 1057903, at *4 (N.D. Ill. Mar. 18, 2021). Also, importantly, Middleton made clear that this rule applied during the relevant period, confirming that "from 2008 to 2010, precious metals traders trading futures contracts on NYMEX and

---

[3] Indeed, Jordan's Motion, itself, points to various excerpts from the testimony of the government's witnesses from which a rational juror could find that traders knew, and were required to place, orders with a genuine intent to trade. *See* Mot. 8-9.

COMEX were always prohibited from placing an order with the intent to cancel." Tr. 934:24-935:03.

*Second*, testimony from the banks' compliance officers, David King and Mark Catana, reinforced the point that traders at those banks, like Jordan, were put on notice that such trading violated the banks' policies during the 2008 to 2010 time period. For example, King testified that Credit Suisse's policies at the time of Jordan's employment prohibited a trader from placing a non-*bona fide* order, which included "placing an order with the intent to cancel." Tr. 705:15-23. Similarly, Catana explained that JPMorgan's policies in 2008 and 2009 prohibited the trading practice known as spoofing "because it would have been deceptive and manipulative and, on the basis of the terms of [the bank's] policy, would have been prohibited." Tr. 760:08-15.

*Third*, Prof. Venkataraman provided expert testimony that orders convey implicit information to other market participants; for example, with a buy order, "the investor is conveying their intent or their interest to buy the commodity under the terms of the order." Tr. 1055:12-16. He made clear that implicit representations are built into the market because "orders are expected to convey genuine trading interest." Tr. 1056:11-16. To the extent Jordan claims that Prof. Venkataraman's testimony did not relate specifically to the 2009-2010 time period, Jordan ignores the fact that Prof. Venkataraman reviewed Jordan's trading from September 2009 to May 2010, Tr. 1061:18-23, and when testifying about his analysis of Jordan's trading, Prof. Venkataraman explained that "there's an expectation in the market that [Jordan's]

orders which are placed have been placed with the intent to execute them," Tr. 1067:04-05.[4]

*Fourth,* Travis Varner's testimony further supported the inference that futures orders on the CME contained an implied representation that the order was placed with an intent to execute. Varner told the jury that Quantlab's trading algorithm had a "baseline assumption" that assumed "all the orders are bona fide in the market." Tr. 1001:08-19. With respect to an example involving Jordan's spoof orders, Varner testified that Jordan's spoof order could have influenced Quantlab's algorithm because "it's a large selling order" and he believed Jordan's spoof order triggered Quantlab's decision to trade. Tr. 1009:02-10,17-20.

*Fifth*, Jordan's own statements to the CFTC in 2010 was evidence that he—as a market participant—understood that this type of manipulative trading was prohibited because he denied ever placing orders to influence the price or without the intent to execute. *See* GX 56 at 151:22-152:03 ("Q: While you were working at J.P. Morgan, did you ever engage in trading for the purpose of influencing the price on COMEX? A: No."), 156:16-20 ("Q: Did you ever show a bid or offer on Globex that you didn't intend to execute? A: Only if it, I would only cancel something if I changed my mind or it was put in in error, but, no.").

In sum, Jordan's argument with respect to implied misrepresentations should be rejected because it is foreclosed by the Seventh Circuit's decision in *Chanu* and the

---

[4] Further, when viewed in the light most favorable to the government, it was reasonable for the jury to infer that Prof. Venkataraman's discussion of what information an order conveyed to the market related to the time period of Jordan's trading that he analyzed.

government introduced overwhelming evidence from which a reasonable jury could have found that, in 2009 and 2010, Jordan's trading activity involved implied misrepresentations to other market participants about his intent to trade.

## IV. The Government Presented Ample Evidence that Jordan Acted with an Intent to Defraud

The evidence at trial was sufficient for a rational jury to find beyond a reasonable doubt that Jordan acted with an intent to defraud other market participants when he placed orders that he intended to cancel before execution. In his Motion, Jordan argues to the contrary by relying heavily on his own characterizations of the evidence and by providing his own credibility determinations for certain witness testimony. But that is not a proper basis for relief under Rule 29. *See, e.g., United States v. Severson*, 569 F.3d 683, 688 (7th Cir. 2009) ("In this inquiry, we do not weigh the evidence or second-guess the jury's credibility determinations."); *United States v. Mukovsky*, 863 F.2d 1319, 1322 (7th Cir. 1988) ("Matters of witness credibility, absent extraordinary circumstances, are solely for the jury to evaluate.") Further, as detailed below, Jordan's criminal intent was proven by ample evidence, including: (1) his statements to the FBI; (2) his lies to the CFTC; (3) his contemporaneous email and chat communications; and (4) numerous witnesses who explained how his trading strategy was inherently deceptive.

*First*, evidence of Jordan's intent to defraud included statements that he made to FBI Supervisory Special Agent ("SSA") Jonathan Luca after Jordan was confronted

with charts (*see* GX 83) of his deceptive trading activity.[5] Specifically, Jordan confessed to SSA Luca that the purpose of placing orders he intended to cancel was to "mislead the market," which is a fact that SSA Luca repeated numerous times during his direct, cross-examination, and re-direct. *See* Tr. 506:23-25, 507:01-05, 507:25-508:06, 555:17-21, 560:19-25, 566:03-08, 567:01-13, 568:05-09, 689:03-05, 689:12-14.[6] The jury clearly credited this testimony from SSA Luca—which, alone, was sufficient to support the jury's finding that Jordan acted with fraudulent intent— and such a determination should not be disturbed on a Rule 29 motion.[7]

*Second*, the government also presented evidence showing that Jordan lied to the CFTC in 2010 when he was asked about his trading strategy under oath. Specifically, Jordan falsely denied placing orders that he did not intend to execute; falsely denied engaging in trading for the purpose of influencing price; and falsely denied knowing who was placing "flash orders" in the market. *See* GX 56 at 151:22-152:03; 153:10-17; 156:16-20; Tr. 521:13-522:11, 525:15-526:14. In addition, when the

---

[5] SSA Luca confronted Jordan with charts showing his trading on a single day (October 15, 2009) in which he employed the same deceptive trading strategy at least 18 times. At trial, the government presented evidence showing that on this same day, Jordan privately alerted some of his associates that he would be using his "lead pipe" to "whack[]" the market and cautions one to "go easy." *See* GX 9, 10. In the light most favorable to the government, a rational jury could have found that Jordan use of "lead pipe" was a reference to his deceptive strategy of placing large orders he intended to cancel in order to mislead the market.

[6] Jordan mistakenly claims that SSA Luca's testimony—that Jordan stated he spoofed to "mislead the market"—was uncorroborated by the FBI's contemporaneous notes from the interview. Mot. at 12. However, SSA Luca explained to the jury on re-direct that the notes did include the purpose of Jordan's spoofing was to mislead the market. *See* Tr. 689:06-08.

[7] Jordan's claim that his confession was insufficient because "misleading the market" is not equivalent to "fraudulent intent," Mot. at 12, ignores that when viewed in the light most favorable to the government, his statement clearly would allow a rational jury to conclude he admitted to deceiving other traders when he said he intended to "mislead the market."

CFTC asked Jordan whether he would be surprised to see orders for 100 silver contracts, he responded in the affirmative. *See* GX 56 at 154:08-11; Tr. 526:19-25. This answer was false because the government showed the jury dozens of examples where Jordan placed spoof orders for 100 or more silver contracts throughout 2009 and 2010. *See* GX 75 (2009 examples), 76 (2010 examples). As well, in SSA Luca's testimony, he discussed Jordan's statements to the CFTC and explained that they were inconsistent with what Jordan had told the FBI during his interview. *See* Tr. 521:19-24, 522:06-11.[8] This evidence of Jordan's repeated lies to the CFTC certainly provided a basis for the jury to conclude that Jordan concealed his trading strategy from the CFTC because he knew it was deceptive.[9]

*Third*, the government presented additional evidence of Jordan's fraudulent intent through private chats in which Jordan explained how his spoof orders misled others and moved the market toward the price at which he actually wanted to trade. *See, e.g.*, GX 5 ("every time it looks bid i offer 300 lots and it comes off"); GX 7 ("every order i do is iceberged it funny actualy i show 1 lot then when i need to get filled i will bid or offer size infront of it then boom"); GX 8 ("they take my hidden offer every time,

---

[8] Jordan mistakenly asserts that SSA Luca "acknowledged" that "the CFTC never asked Mr. Jordan whether he engaged in spoofing, whether he entered bids or offers with the intent to cancel them before execution, or whether he engaged in the government's four-step pattern." Mot. at 13. To the contrary, however, SSA Luca repeatedly testified that he believed the CFTC had indeed asked Jordan whether he ever spoofed. *See* Tr. 654:01-13. When viewed in context, therefore, SSA Luca clearly disagreed with defense counsel's mischaracterization of the CFTC's questions and sought to correct it. *See* Tr. 521-527; 641-656.

[9] Jordan claims that some of the CFTC's questions were unclear or confusing, and that some of Jordan's answers could be viewed as truthful, Mot. at 13, but when viewed in the light most favorable to the government, this evidence allowed a reasonable jury to conclude that Jordan lied to the CFTC to conceal his deceptive trading strategy.

as i bid in front of it."). SSA Luca confirmed these chats described the mechanics of how Jordan's spoofing worked to deceive other market participants. *See* Tr. 532:06-13 (explaining GX 5), Tr. 538:24-25. (explaining GX 7); Tr. 539:01-09 (explaining GX 8). Jordan's Motion seeks to inject his own credibility determination and ignores that the jury's verdict demonstrates it credited SSA Luca's explanations.

*Fourth*, the government presented testimony from numerous witnesses who explained that Jordan's trading strategy—spoofing—was inherently deceptive in nature. *See, e.g.*, Tr. 759:05-09 (Catana) ("it's inherently deceptive"); 710:08-15 (King) ("Placing an order with the intent to cancel . . . would deceive other market participants into believing that the order that was placed that may affect a price was meant to be executed and filled."); 1057:02-05 (Prof. Venkataraman) ("A spoof order is an order that is submitted to an exchange without the intention of execution in order to mislead investors by injecting misleading information about demand and supply in the market."); 1004:08-13 (Varner) ("The model works on supply and demand, so . . . [a spoof order] could cause us to create orders we didn't intend to send or it could cause us to trade at prices we wouldn't trade at normally."). The government also presented evidence that showed both JPMorgan and Credit Suisse had specifically trained their precious metals traders that they could not trade for the purpose of misleading the market. Notably, these trainings echoed the same words that Jordan used to describe his own deceptive trading strategy to SSA Luca.[10]

---

[10] *See, e.g.,* GX 33 at 3 ("Employees may not engage in transactions or other activities to: create a false or misleading appearance of active trading . . . or of depth or liquidity of the

In addition to the banks' policies, the CME Rules—which Jordan certified in writing that he read, understood, and agreed to comply with, *see* GX 46—prohibited engaging in fraud. *See* GX 63 (CME Rule 432). Erin Middleton, the CME witness, explained that spoofing conveyed false information to the market "[b]ecause [a trader is] submitting an order that [he] intend[s] to cancel or modify before execution or [he] [does not] intend to trade, so it's not a true interest in that price or quantity." Tr. 927:17-21. Middleton further explained that precious metals traders were "always prohibited from placing an order with the intent to cancel," including from 2008 to 2010.[11] Tr. 934:24-935:03.

In his Motion, Jordan claims that the government failed to prove fraudulent intent because it did not establish that spoofing was clearly prohibited by CME rules or bank compliance policies because they did not use the word "spoofing." *See* Mot. at 9-11. When viewed in the light most favorable to the government, the evidence at trial provided a sufficient basis to infer that, regardless of how the conduct was labeled at the time, both the CME rules and the bank's compliance policies prohibited placing orders with the intent to mislead and deceive others in the market. To the extent Jordan argues that there was no direct evidence that he understood the rules and policies to prohibit placing orders with the intent to cancel them, *see* Mot. at 10,

---

market. . . . Employees should not disseminate false or misleading information to the effect that the price . . . will or is likely to rise or fall."); Tr. 719:06-11 (King) (explaining that GX 33 was "one of the first things that Mr. Jordan was trained on when he joined Credit Suisse").

[11] At trial, Jordan admitted evidence showing that the CME had prosecuted another trader under Rule 432 for employing the same deceptive trading strategy as Jordan, during the same time period, and that the reason CME considered that trading strategy to be deceptive was because it "misled other market participants." *See* DX 40; *see also* Tr. 988:04-989:10.

first, direct evidence is not necessarily required. *See* Direct & Circumstantial Evidence, Court Set 2—Revised Jury Instructions at 6, (ECF No. 804) (instructing the jury that they "[were] to consider both direct and circumstantial evidence"). In any event, the government did introduce direct evidence, namely Jordan's admission that his spoofing was intended to "mislead the market." *See* Tr. 506:23-25, 507:01-05, 507:25-508:6, 555:17-21, 560:19-25, 566:03-08, 567:01-13, 568:05-09, 689:03-05, 689:12-14.[12] For all of these reasons, Jordan's claim that the government failed to offer sufficient evidence of Jordan's intent to defraud has no merit.

## V.    Conclusion

For the foregoing reasons, the Court should deny the defendant's Motion.

Dated: February 27, 2023            Respectfully submitted,

/s/ *Matthew F. Sullivan*
Matthew F. Sullivan
Lucy B. Jennings
Christopher Fenton
U.S. Department of Justice
Criminal Division, Fraud Section
(202) 578-6583 (Sullivan)
matthew.sullivan2@usdoj.gov

---

[12] Jordan's Motion also mischaracterizes and impermissibly draws inferences in his favor with respect to other evidence. For example, he claims it was commonplace and acceptable for traders to "camouflage their intentions and strategies." Mot. at 12. The examples he points include: (i) a trading firm's non-disclosure of a proprietary trading algorithm (which it has no duty to disclose); and (ii) CME-sponsored execution tools generally available to all market participants. Neither involve injecting false information into the market to mislead others. Jordan also claims he was "open[] and transparen[t]" about his trading because he discussed it with his boss, *see* Mot. at 12, but he fails to mention they were communicating privately about a trading strategy that financially benefited them both.

## CERTIFICATE OF SERVICE

I, Matthew F. Sullivan, hereby certify that on February 27, 2023, I caused the foregoing filing to be electronically filed with the Clerk of Court by using the Court's electronic filing system, which will automatically send a notice of electronic filing to the parties who have entered an appearance in this case.

 /s/ *Matthew F. Sullivan*
 Matthew F. Sullivan