UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CHRISTOPHER JORDAN | Case No. 19-cr-00669<br><br>Hon. Edmond E. Chang |

# DEFENDANT CHRISTOPHER JORDAN'S REPLY MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR A JUDGMENT OF ACQUITTAL UNDER RULE 29

James J. Benjamin, Jr.
Parvin D. Moyne
Anne M. Evans
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
(212) 872-1000

Megan Cunniff Church
MOLOLAMKEN LLP
300 N. LaSalle Drive
Suite 5350
Chicago, IL 60654
(312) 450-6700

*Counsel for Christopher Jordan*

On behalf of our client, Christopher Jordan, we respectfully submit this reply memorandum of law in support of our motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29 (ECF No. 834).[1]

## ARGUMENT

I. **The Government Failed to Prove that Mr. Jordan Knowingly Participated in a "Scheme to Defraud" Within the Meaning of the Wire Fraud Statute**

In its opposition, the government relies heavily on the fact that the Seventh Circuit previously held, in *United States v. Coscia*, 866 F.3d 782 (7th Cir. 2017), and *United States v. Chanu*, 40 F.4th 528 (7th Cir. 2022), that spoofing can constitute federal property fraud. However, both *Coscia* and *Chanu* were decided before the government confessed error in *Ciminelli*, at a time when there was no reason to question the validity of Seventh Circuit precedent upholding the right-to-control theory of property fraud. *See United States v. Kelerchian*, 937 F.3d 895, 909-14 (7th Cir. 2019); *United States v. Leahy*, 464 F.3d 773, 788-89 (7th Cir. 2006). As outlined in our moving papers, *Ciminelli* portends a significant reorientation of federal property fraud law to require proof of an intent to cause tangible economic harm, as opposed to the mere deprivation of information that could affect the alleged victim's economic decision-making.

In *Ciminelli*, the defendant owned a construction company in upstate New York and wished to participate in a state-funded economic development program known as the "Buffalo Billion" plan. After negotiations, the defendant's company was awarded a $750 million contract to build a high-tech facility in Buffalo. *United States v. Percoco*, 13 F.4th 158, 165, 168 (2d Cir. 2021). In the pre-contract period, an executive of the company conspired with a board member of an

---

[1] "Mot." refers to our memorandum of law in support of Mr. Jordan's motion for a judgment of acquittal pursuant to Rule 29 (ECF No. 835); "Opp." refers to the government's opposition to our Rule 29 motion (ECF No. 847); "Rule 33 Mot." refers to our memorandum of law in support of Mr. Jordan's motion for a new trial pursuant to Rule 33 (ECF No. 838); and "[date] Tr." refers to trial proceedings.

1

economic development entity to skew the contracting requirements to favor the company and disfavor its competitors. *Id*. at 166. However, the contract itself was negotiated at arms-length and there was no proof that the state could have obtained a better price from another contractor or that the state received inferior quality in return for the contract proceeds. *See id*. at 172. On these facts, a jury convicted the company owner of wire fraud, and the Second Circuit affirmed.

In proceedings before the Supreme Court, the Solicitor General confessed error and acknowledged that the "right to control" theory of fraud, under which Ciminelli's case was prosecuted, was "incorrect." Brief for Resp't, *United States v. Ciminelli*, No. 21-1170, at 24 (U.S. Oct. 2022). The transcript of the oral argument in *Ciminelli* strongly suggests that the Supreme Court will reverse the conviction and provide further clarification regarding the need for proof of intent to cause economic harm as a predicate for federal property fraud. *See* Mot. at 5. Based on the government's confession of error, we anticipate that *Ciminelli* will be the latest in a series of decisions, going back to *McNally v. United States*, 483 U.S. 359 (1987) and including *Cleveland v. United States*, 531 U.S. 12 (2000), *Skilling v. United States*, 561 U.S. 358 (2010), and *Kelly v. United States*, 140 S. Ct. 1565 (2020), in which the Supreme Court has pared back overly-expansive constructions of federal fraud statutes that seek to criminalize mere deception or unethical behavior. In its opposition to our Rule 29 motion, the government focuses on prior circuit precedent such as *Coscia*, *Chanu*, and *Leahy*. *See* Opp. at 2-4.[2] However, to the extent these precedents can be read to support a theory of fraud that does not require proof of intent to cause tangible economic harm, we respectfully submit that they are unlikely to survive *Ciminelli*.

The government's only substantive response to our lack-of-economic-harm argument is to assert that "the victims in this case were deprived of their money (when they bought) or property

---

[2] The government also cites *Shaw v. United States*, 580 U.S. 63 (2016), but in that case the economic harm was obvious because the defendant stole money from someone else's bank account. *Id*. at 65.

2

(when they sold) . . . because they transacted at *artificial prices* created by Jordan's spoof orders." Opp. at 4 (emphasis added). But there is no citation to the record for this claim, and for good reason. Unlike his co-defendants in the *Smith* case, Mr. Jordan was not charged with price manipulation, which requires proof of an artificial price, *see* ECF No. 647 at 37-39, and at Mr. Jordan's trial, unlike in the *Smith* trial, there was no contention and no evidence that any of Mr. Jordan's trading counterparties ever transacted at an artificial price.[3] The evidence at Mr. Jordan's trial established that algorithms made their own independent trading decisions and that when they traded with Mr. Jordan, they got exactly what they bargained for. *See* Mot. at 2-4. In short, the evidence was insufficient to establish that Mr. Jordan knowingly participated in a "scheme to defraud" within the meaning of the wire fraud statute.

## II. The Government Failed to Prove That Mr. Jordan Made a False Statement to Trading Counterparties

The government relies on *Chanu* for the proposition that "spoof orders can be implied misrepresentations." Opp. at 5. However, the factual predicate underpinning *Chanu* was meaningfully different than the evidence in Mr. Jordan's case. In *Chanu*, the charged trading extended past the effective date of Dodd-Frank and, as a result, the defendants did not argue that there were no clear policies and exchange rules against spoofing at the time of the trading. *See Chanu*, 40 F.4th at 532-33 (summarizing unchallenged evidence that Deutsche Bank policies and CME rules "prohibited" spoofing at the time the defendants were trading).

---

[3] On direct examination, Professor Venkataraman testified that Mr. Jordan's spoof orders "shock[ed] the market," *see* 12/5/22 Tr. 1064, 1082-83, 1085, but on cross-examination, he acknowledged that: (a) after Mr. Jordan placed his spoof orders, the market moved by only a minuscule amount of one tick or less, 12/6/22 Tr. 1146-50; (b) during the trading day it was "common and routine for market prices to go up and down . . . all day long as market participants place bids and offers and as they transact with each other," *id*. 1153; and (c) he considers *all* up-and-down movements in the market price to be "shocks" to the market, *id*. 1153-54. In short, the "shock-the-market" testimony was exposed as empty rhetoric that is insufficient to sustain Mr. Jordan's conviction.

3

Here, by contrast, the defense vigorously challenged the government's theory that bank compliance policies and exchange rules clearly prohibited spoofing in 2009 and 2010, when Mr. Jordan was trading on behalf of financial institutions. *See* Mot. at 7-8. In the absence of such clear policies and rules, in turn, there would be no predicate for a counterparty to have assumed that an order placed on the CME implicitly reflected a genuine desire to trade, as opposed to a willingness to transact at the price, and in the quantity, reflected in the order. *See* Mot. at 7. As stated in our Rule 33 motion, we respectfully submit that the Court's exclusion of post-Dodd-Frank compliance and CME exhibits unfairly prevented the defense from adequately cross-examining the compliance and CME witnesses on this critical point. *See* Rule 33 Mot. at 7-14. On the evidence that was presented at trial, and notwithstanding the government's arguments to the contrary, *see* Opp. at 7-9, we respectfully submit that the evidence was insufficient to establish that Mr. Jordan made a materially false statement when he placed valid and executable orders to buy or sell precious metals futures contracts.

### III. The Government Failed to Prove Beyond a Reasonable Doubt That Mr. Jordan Acted with the Requisite Intent to Defraud

The government argues that Mr. Jordan's "criminal intent was proven by ample evidence," including: (a) his statements to Agent Luca during the November 2018 interview; (b) snippets of his testimony in a 2010 CFTC deposition; (c) contemporaneous chats and emails; and (d) after-the-fact opinion testimony from compliance and CME witnesses. *See* Opp. at 10. As argued in our opening memorandum, however, none of this evidence was sufficient to sustain the government's burden of proving Mr. Jordan's criminal intent beyond a reasonable doubt.

As was the case during its closing argument to the jury, the government relies principally on the sanitized and incomplete version of Mr. Jordan's statement to Agent Luca that it was permitted to present to the jury over a defense objection. *Id.* at 10-11. As stated in our Rule 33

motion, we respectfully submit that the denial of our Rule 106 motion was erroneous and highly prejudicial, because it allowed the government to transmogrify Mr. Jordan's statement from a statement of innocence to a confession of guilt. *See* Rule 33 Mot. at 14-19. We firmly believe that if the jury had heard Mr. Jordan's actual words—instead of the misleading half-truth that the government chose to present—the outcome of the trial would have been different. For purposes of this Rule 29 motion, however, we maintain our position that even on the testimony that was presented to the jury, the so-called "confession" was inadequate to support a jury finding that Mr. Jordan acted with criminal intent. *See* Mot. at 11-12. We likewise maintain and preserve our arguments that the other evidence cited by the government—the snippets of CFTC testimony, the contemporaneous chats and emails, and the after-the-fact opinion testimony of compliance and CME witnesses, two of whom never even laid eyes on Mr. Jordan until they saw him in the courtroom—was inadequate to support the verdict. *Id*. at 9-13.

## CONCLUSION

For the foregoing reasons, the Court should grant Mr. Jordan's motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29.

Dated: March 15, 2023

                Respectfully submitted,

                */s/ James J. Benjamin, Jr.*
                James J. Benjamin, Jr.
                Parvin D. Moyne
                Anne M. Evans
                AKIN GUMP STRAUSS HAUER & FELD LLP
                One Bryant Park
                New York, NY 10036
                (212) 872-1000

                Megan Cunniff Church
                MOLOLAMKEN LLP
                300 N. LaSalle Drive
                Suite 5350
                Chicago, IL 60654
                (312) 450-6700

                *Counsel for Christopher Jordan*