# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
| --- | --- |
| UNITED STATES OF AMERICA | |
| v. | Case No. 19-cr-00669 |
| GREGG SMITH and MICHAEL NOWAK, | Hon. Edmond E. Chang |
| Defendants. | |

## SENTENCING MEMORANDUM ON BEHALF OF MICHAEL NOWAK

April 10, 2023

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
David Meister
Chad E. Silverman
One Manhattan West
New York, NY 10001
(212) 735-2100

William E. Ridgway
155 N. Wacker Drive
Chicago, IL 60606
(312) 407-0449

*Counsel for Michael Nowak*

**TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT ................................................................................1

II. MIKE'S PERSONAL HISTORY ........................................................................3

    A.    Childhood and Education ....................................................................4

    B.    Career ...................................................................................................5

    C.    Family and Community........................................................................9

    D.    Character and Good Works ................................................................13

III. SENTENCING CONSIDERATIONS ................................................................17

    A.    The Offense Conduct ........................................................................17

        1.    Mike's Offense Conduct Does Not Include the Conduct of Others..........19

        2.    Mike's Two Questions to Trunz Are Not a Basis for a Higher Sentence ................................................................................25

            a. "Coaching" Trunz ........................................................25

            b. "Pressuring" Trunz........................................................26

        3.    Mike's Single Answer to the CFTC Is Not a Basis for a Longer Sentence ................................................................27

    B.    The Sentencing Guidelines................................................................28

        1.    The Government's Loss Calculation Is Fatally Flawed ..........................30

            a. There Is No Basis to Saddle Mike with Purported Losses from Others' Spoofing........................................................31

            b. There Is No Evidence of Unlawfulness in the Thousands of Additional, Varied Snippets of Mike's Trading Activity............32

            c. The Government's Loss Methodology Is Seriously Flawed ...............40

        2.    The PSR's Loss Estimate Is Not Supported ............................................50

        3.    There Should Be No Adjustment for Number of Victims........................51

        4.    There Should Be No Adjustment for Sophisticated Means.....................53

        5.    There Should Be No Adjustment for Role in the Offense........................54

6. There Should Be No Adjustment for Special Skill ...................................58

7. There Should Be No Adjustment for Obstruction of Justice ...................59

8. A Downward Departure Is Warranted.......................................................60

C. The Court Should Impose a Noncustodial Sentence...............................................61

1. The Nature and Circumstances of the Offense .........................................62

2. Mike's Good Character and Works and Unblemished Prior Record ........64

3. A Custodial Sentence Would Create Unwarranted Disparities ...............65

4. Incarceration Is Not Necessary ...............................................................71

IV. CONCLUSION.......................................................................................................................73

**EXHIBITS**

| Exhibit A | Letters of Support |
|-----------|--------------------|
| Exhibit B | Declaration of Jeremy Cusimano dated April 10, 2023 |
| Exhibit C | List of traders penalized by CFTC for Spoofing Activity |

# TABLE OF AUTHORITIES

Page(s)

## CASES

*CFTC v. Oystacher,*
  No. 15-CV-9196, 2016 WL 3693429 (N.D. Ill. July 12, 2016) .............................................39

*Dean v. United States,*
  581 U.S. 62 (2017) ..............................................................................................................17

*Dura Pharmaceuticals, Inc. v. Broudo,*
  544 U.S. 336 (2005) .....................................................................................................40, 42

*United States v. Bases,*
  slip op. (N.D. Ill. filed Mar. 6, 2023), ECF No. 734............................................ 53, 54, 56, 57

*United States v. Beler,*
  20 F.3d 1428 (7th Cir. 1994) ...............................................................................................31

*United States v. Brown,*
  732 F.3d 781 (7th Cir. 2013) ...............................................................................................29

*United States v. Burns,*
  843 F.3d 679 (7th Cir. 2016) ...............................................................................................41

*United States v. Carter,*
  538 F.3d 784 (7th Cir. 2008) ...............................................................................................69

*United States v. Catalfo,*
  64 F.3d 1070 (7th Cir. 1995) .........................................................................................31, 32

*United States v. Chube II,*
  538 F.3d 693 (7th Cir. 2008) .........................................................................................32, 40

*United States v. Coscia,*
  866 F.3d 782 (7th Cir. 2017) ...............................................................................................68

*United States v. Daoud*, 989 F.3d 610 (7th Cir. 2021)...............................................................62

*United States v. Ghaddar,*
  678 F.3d 600 (7th Cir. 2012) .........................................................................................52, 53

*United States v. Grigsby,*
  692 F.3d 778 (7th Cir. 2012) ...............................................................................................55

*United States v. Jackson,*
  547 F.3d 786 (7th Cir. 2008) ...............................................................................................62

*United States v. Jordan*,
   991 F.3d 818 (7th Cir. 2021) ...........................................................................17

*United States v. Katora*,
   981 F.2d 1398 (3d Cir. 1992) ...........................................................................57

*United States v. Kuhrt*,
   788 F.3d 403 (5th Cir. 2015) ...........................................................................50

*United States v. Laws*,
   819 F.3d 388 (8th Cir. 2016) ...........................................................................53

*United States v. Litchfield*,
   959 F.2d 1514 (10th Cir. 1992) ........................................................................55

*United States v. McClinton*,
   23 F.4th 732 (7th Cir. 2022), *petition for cert. docketed*, No. 21-1557 (U.S. June 14, 2022) ..24

*United States v. Pankow*,
   884 F.3d 785 (7th Cir. 2018) ...........................................................................29

*United States v. Rosenberg*,
   585 F.3d 355 (7th Cir. 2009) ...........................................................................32

*United States v. Skys*,
   637 F.3d 146 (2d Cir. 2011) ............................................................................52

*United States v. Soto-Piedra*,
   525 F.3d 527 (7th Cir. 2008) ......................................................................31, 32

*United States v. Warner*,
   792 F.3d 847 (7th Cir. 2015) ...........................................................................64

*United States v. Watts*,
   519 U.S. 148 (1997) ......................................................................................24

*United States v. Whiting*,
   471 F.3d 792 (7th Cir. 2006) ...........................................................................42

## STATUTES

18 U.S.C. § 1343 ............................................................................................18

18 U.S.C. § 1348(1) ........................................................................................18

18 U.S.C. § 1962(d) ........................................................................................19

18 U.S.C. § 3553(a) ...............................................................................3, 17, 62

18 U.S.C. § 3553(a)(1) ............................................................................................47, 64

18 U.S.C. § 3553(a)(6) ..................................................................................................65

18 U.S.C. § 371 ..............................................................................................................19

7 U.S.C. § 13(a)(2) .........................................................................................................18

7 U.S.C. § 6c(a)(5)(C) ....................................................................................................18

**RULES**

U.S.S.G. § 1B1.3.......................................................................................................31, 32

U.S.S.G. § 2B1.1 ........................................................................................ 41, 51, 52, 60

U.S.S.G. § 2B1.1(b)(10)(C)...........................................................................................52

U.S.S.G. § 3B1.3............................................................................................................58

U.S.S.G. § 3C1.1......................................................................................................27, 59

U.S.S.G. § 3D1.2............................................................................................................29

**OTHER AUTHORITIES**

Decl. of Kumar Venkataraman, *United States v. Bases*, 18-cr-48 (N.D. Ill. Jan. 6, 2023), ECF No. 725-1 ........................................................................................................37, 38

Decl. of Kumar Venkataraman, *United States v. Vorley*, 18-cr-35 (N.D. Ill. May 21, 2021), ECF No. 383-1 ...............................................................................................................38

Deferred Prosecution Agreement, *United States v. JPMorgan Chase & Co.*, 20-cr-175, ECF No. 11 (D. Conn. Sept. 29, 2020) ...............................................................................50

Gov't Mem., *United States v. Wang*, No. 22-cr-10123, ECF No. 114 (D. Mass. Nov. 23, 2022) ..........................................................................................................................66, 69

Information, *United States v. Milrud*, 15-cr-455, ECF No. 21 (D.N.J. Sept. 10, 2015) ..............70

Information, *United States v. Wang*, 22-cr-10123, ECF No. 104 (D. Mass. July 29, 2022).........69

Judgment, *United States v. Milrud*, 15-cr-455, ECF No. 45 (D.N.J. Apr. 24, 2020) ..................70

Judgment, *United States v. Wang*, 22-cr-10123, ECF No. 125 (D. Mass. Dec. 8, 2022) ............69

Order, *United States v. Bases*, 18-cr-48 (N.D. Ill. Mar. 6, 2023), ECF No. 734.........................43

Plea Agreement, *United States v. Milrud*, 15-cr-455, ECF No. 25 (D.N.J. Sept. 10, 2015).........70

Plea Agreement, *United States v. Wang*, 22-cr-10123, ECF No. 105 (D. Mass. Aug. 1, 2022) ...69

Sentencing Tr. 55–58, *United States v. Bases*, 18-cr-48, ECF No. 741 (N.D. Ill. March 9, 2023) .........................................................................................................................................67

Sentencing Tr., *United States v. Bases*, 18-cr-48, ECF No. 740 (N.D. Ill. March 9, 2023) ...67, 68

Sentencing Tr., *United States v. Coscia*, 14-cr-551, ECF No. 162 (N.D. Ill. July 13, 2016).52, 68, 69

Sentencing Tr., *United States v. Vorley*, 18-cr-35, ECF No. 400 (N.D. Ill. June 21, 2021) ...66, 67

Sentencing Tr., *United States v. Vorley*, 18-cr-35, ECF No. 403 (N.D. Ill. June 28, 2021) .........66

Trial Tr., *United States v. Vorley*, 18-cr-35, ECF No. 345 (N.D. Ill. Sept. 21, 2020) .................67

U.S. Sentencing Comm'n, "Acquitted Conduct," Proposed Amendments to the Sentencing Guidelines (Prelim.) (Jan. 12, 2023), available at www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20230112_prelim_RF.pdf ..................................................................................24

U.S. Sentencing Comm'n, Amendments to the Sentencing Guidelines (Prelim.) (April 5, 2023), available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20230405_prelim-RF.pdf ..................................................................................61

United States Sentencing Commission, News Release (April 5, 2023), https://www.ussc.gov/about/news/press-releases/april-5-2023 ..............................................24

We respectfully submit this memorandum and the accompanying exhibits on behalf of Michael Nowak with respect to his sentencing. For the reasons discussed below, we respectfully request that the Court impose a noncustodial sentence.

## I. PRELIMINARY STATEMENT

Ever since the government announced this case as a RICO prosecution, it has tried mightily to paint Mike as a greedy and calculating Wall Street villain, a racketeer no less. The government doubles down on this theme in its sentencing memorandum, going so far as to cast Mike as lording over the world's gold market while secretly undermining the economy by spoofing. Even accepting the jury's verdict, none of that is even close to true. The government's assertion that Mike is responsible for $55 million of losses in pursuit of enormous personal gain as the leader of a conspiracy hinges on its grossly distorted—and at points misleading—rendition of the trial record and its refusal to accept the conspiracy acquittals. Respectfully, we urge the Court to reject the government's unfounded characterizations of Mike and his conduct, which are no more than a troubling attempt to incarcerate Mike for far longer than could conceivably be warranted by any just weighing of the facts.

This is not a typical white-collar case. Far from it. There is no evidence that Mike gained anything personally, and the government never once challenged the indisputable truth that any theoretical profit to JPMorgan from Mike's trades was immaterial to his options portfolio (averaging more than $30 million per year, *see* DX 2900). And there is no reliable evidence that any market participant sustained any loss whatsoever as a result of Mike's trading. Nor can any (unproven) losses caused by others be attributed to Mike, as he was rightly acquitted on both conspiracy counts, an unsurprising result given the absence of evidence of him agreeing to commit—or so much as discussing—any joint scheme to defraud, manipulate, or spoof.

1

The fundamental truth about Mike is that he is an exceptionally good and decent man, down to his core. The accompanying letters to the Court from family, close friends and former colleagues tell the real story of Mike and reveal the tragedy of this case: that a man known for his integrity, for hard work, for dedication to his loved ones and community, for his humility and down-to-earth manner, for proactively *giving up* potential profit opportunities to do the right thing, for asking whether the bank's internal guidance was sufficiently *conservative*—that such a man faces sentencing on a conviction driven by two confessed spoofers and a professor who say they know what was in his mind when he clicked a mouse ten years ago.

Mike's life as he knew it is over, and he has paid a heavy price. He has lost his livelihood. A CFTC enforcement action, stayed by this case, still looms. His good name and reputation have been destroyed. His wife and teenage children—who had to witness his arrest in 2019, by a group of federal agents in raid jackets who barged to the second floor of his home at six a.m., after the government declined our prior offers to self-surrender—have endured enormous strain from that day forward.

The Presentence Investigation Report, ECF No. 844 ("PSR") recommends a sentence of 30 months' imprisonment based on an unsupported loss calculation and inapplicable Guidelines enhancements for number of victims, special skill, and obstruction of justice. The even more disproportionate 60-month sentence sought by the government is based on a separate, more grossly inflated loss amount and additional inappropriate enhancements for sophisticated means and role in the offense—all of which the PSR rejects. Indeed, on this record, the fact that the government can even suggest that the Guidelines call for a sentence of at least 21½ years' imprisonment, and that a sentence of five years is appropriate, should, respectfully, offend any sense of justice.

For the reasons discussed below, we urge the Court to impose a noncustodial sentence, whether by application of the Guidelines or by variance from the final offense level. The government has failed to establish an evidentiary basis for losses or for any of the other Guidelines enhancements it seeks, which means the Court would be justified in concluding that the final Guidelines offense level is seven (the base level). If the Court were to conclude that Mike caused losses, the figure would range from $59,927 to $70,452, which would result in a final Guidelines offense level of 13.

As reflected in the Sentencing Commission's recent amendment to the Guidelines that encourages noncustodial sentences for first-time offenders, a noncustodial sentence would balance the seriousness of the jury's verdict with Mike's admirable character and commitment to the betterment of his community, and thus would satisfy the 18 U.S.C. § 3553(a) requirement of a sentence that is sufficient but not greater than necessary to provide just punishment, afford adequate deterrence, and protect the public.

## II.  MIKE'S PERSONAL HISTORY

Mike is a humble, kind, and honest person for whom breaking (or even bending) rules is completely out of character. The dozens of accompanying letters written by those close to him tell the story of a man whose life has been defined, above all else, by steadfast devotion to his friends and family—particularly to Heather, his wife of 21 years, and their three teenage children. Through all the success he achieved in his career, Mike maintained the values of fairness, hard work, and thoughtfulness that he has held since childhood. And that is still who he is today. Despite the stress and uncertainty that he has weathered over the last four and a half years, Mike has remained the same caring friend and committed husband and father he has always been. Rather than succumb to frustration or self-pity, he has spent the time since his arrest bettering himself and his

community—for example, by earning a master's degree in applied economics from Johns Hopkins University, and volunteering with a local tutoring program for children in need. To those who know Mike, this is no surprise. As their letters attest, he is a profoundly good person and an indispensable asset to his family, friends, and community.

## A. **Childhood and Education**

Mike was born in 1974 in Niskayuna, a small town in upstate New York. In his early childhood, his family moved to nearby Altamont, a village of fewer than 2,000 people, where his parents, Tom and Mary Beth, still live today. He is the eldest of three siblings: two years older than his sister, Amy, and eight years older than his brother, Chris. Their father immigrated to the United States from Poland as an infant after his family was displaced during the Second World War. Throughout Mike's childhood, Tom worked in the technology department of a local supermarket company. Mike's mother, Mary Beth, was a homemaker until Mike was in high school, when she earned her nursing degree and began working as a school nurse in a residential home for at-risk teenage boys.

Mike's childhood was modest financially but rich with love, support, and morals. His brother writes that "the biggest things instilled in us growing up were honesty, and always thinking of others." Exhibit A to Declaration of David Meister ("Ex. A") at 29 (Letter of Chris Nowak). Mike's father, having seen his own parents work hard to build their new life in the United States, writes, "I tried to instill the importance of education, fairness, integrity and hard work in my children because these were traits that I had been exposed to and saw were essential in building a good life. Michael certainly took these things to heart." Ex. A at 23–24 (Letter of Tom Nowak). These values became the bedrock of Mike's personality. Mike often credits his father's background with giving him "his work ethic and devotion to his schooling and family." Ex. A at 26 (Letter of Amy Nowak). As his wife, Heather, writes, "[i]t's not that Mike remembers where

he came from—it's that Mike *is still* where he came from. His heart and mind haven't changed. . . . He came from people who work hard and treat people well—and that is still who he strives to be." Ex. A at 2 (Letter of Heather Nowak).

From an early age, Mike demonstrated his commitment to hard work and integrity. As a child, he helped his father on home-improvement projects, eager to learn; and in high school, he worked in the accounting department of the supermarket company where his father worked. Ex. A at 24 (Letter of Tom Nowak). Even as a teenager, Mike was honest to a fault—someone who takes the "harder right" rather than the "easier wrong." Ex. A at 32 (Letter of Greg Fairbank). One close friend recalls that Mike once sent himself to the high school principal's office when he felt he had disrupted a class. *Id.* Another friend and retired New York State Police Investigator describes how, during a high school road trip, Mike risked the ire of his friends by refusing to let more people in his car than his mother permitted: he "refused to break the rules, even when no one was watching." Ex. A at 40 (Letter of Keith Ryan). His former guidance counselor writes that "[i]n my 30+ years in secondary education and in my 48 years as a parent, I can honestly say that Mike Nowak stands apart as one of the most ethical, loyal, honest, fair, and reliable individuals with whom I've worked and have known." Ex. A at 44 (Letter of Ann Fairbank).

Self-motivated and intelligent, Mike thrived in school. Friends remember him as a "driven student and athlete who wanted to excel but wouldn't cut corners to get there." Ex. A at 40 (Letter of Keith Ryan). He ultimately graduated high school as salutatorian and attended college at Duke University. In 1996, Mike graduated from Duke, 11th in his class, with a degree in mechanical engineering and a minor in economics.

## B.  Career

Mike joined JPMorgan straight out of college and remained there until he was let go in 2019 following his indictment in this case. He joined the bank as a junior trader on the natural gas

desk. He soon transitioned to the precious-metals desk, where he stayed for the rest of his tenure. For most of his career, Mike was the New York desk's gold options trader. In that capacity, he bought and sold gold options and managed the constantly changing risk associated with a portfolio of thousands of different options contracts. Unlike a spot trader, Mike did not trade futures contracts to fill customer orders or obtain better pricing for spot customers. Rather, he traded futures to keep his options book appropriately hedged, and, as a hedger, was less sensitive to futures prices as compared to traders who speculate on spot.[1] The profitability of his options book depended largely on profits and losses generated from the spread between buying and selling options, and not from trading futures contracts.

Managing the gold options book was a complex and difficult role, but, true to form, Mike worked hard and became successful on the desk. In 2005, after almost ten years at JPMorgan, he was promoted to head of the precious-metals desk, which was one desk among many within the bank's commodities business. Trading gold options remained his primary responsibility, but as desk head he was also responsible for high-level strategy and managing the desk's administrative and personnel functions. Though he oversaw the performance of the desk at a macro level and had administrative responsibilities for roughly 10–12 people, he was not responsible for (nor would he have been capable of) monitoring the real-time trading of the other traders on the desk. In this role, he steered the desk through the delicate task of merging with a handful of Bear Stearns metals traders following JPMorgan's acquisition of Bear Stearns in 2008, and through the challenging period following the financial crisis. He earned a reputation as a caring and respected manager. In

---

[1]   Hedgers are less sensitive to price movement because the more aligned the hedge, the more closely one position's gains offset the other position's losses.

mid-2014, Mike was promoted again, to head of both precious metals and base metals (e.g., copper and aluminum). At that point, he stopped trading entirely.

Following the example of his parents, who stayed with the same employers until they retired, Mike was a loyal JPMorgan employee for more than 23 years. Unlike many others in comparable Wall Street roles, Mike never sought higher paychecks or signing bonuses elsewhere, such as at a hedge fund where he would share in trading profits. Norbert Lou, who has known Mike since they were summer interns together at the bank, writes,

> It's extremely rare nowadays for someone to remain loyal to one company over decades throughout their entire career. This loyalty is a core part of Mike's identity. If instead Mike were motivated by greed, he could easily have become a coveted free agent in the financial industry. Mike is all about loyalty, not money.

Ex. A at 68 (Letter of Norbert Lou).

The people who worked with Mike describe him as a person of tremendous integrity who was committed to doing things the right way and working proactively with the bank's compliance team. As Norbert Lou puts it, "even when the lines are gray, I trust Mike to always advocate for doing the right thing." Ex. A at 69 (Letter of Norbert Lou). Neil Clift, one of Mike's former bosses, writes,

> Mike and I worked closely together—he took on responsibility for trading the derivatives books (swaps and options) and reported to me. The options books were globally run, meaning the book was passed around the globe from London to New York and then to Sydney/Singapore before returning to be traded in London. Mike was an integral part of this global team. His attention to detail and his commitment to ensuring the bank's policies were followed was exemplary. From my personal vantage point, Mike always operated within the rules of our regulator and consistently followed the bank's own guidelines and policies; he was also well trusted by our compliance team.

Ex. A at 63 (Letter of Neil Clift). Blythe Masters, a former high-ranking executive at JPMorgan who was senior to Mike, writes,

> On many occasions I saw [Mike] put the interests of clients and those of the firm ahead of his own profit. As a rule he was conservative, calm, proactive, transparent

and mature. He raised to management issues that he felt could damage the reputation of the firm or the business, on occasion taking these to the [investment bank] or firmwide risk committees for discussion. On at least two occasions, he very specifically sacrificed profit opportunities that would have benefited his books and potentially his compensation for these reasons. Those decisions were transparently syndicated by Mike and received management support.

Ex. A at 61 (Letter of Blythe Masters). Echoing these sentiments, Mike's longtime colleague, Robin Wemyss, writes,

I have always had a huge amount of trust in Mike - he was one of the few people at JP Morgan I was comfortable discussing business challenges with - he was an open book and always provided me with honest counsel. I can honestly say I have never at any point questioned Mike's integrity nor his moral compass . . . . When we had internal compliance training on market conduct, Mike would always grab me after and question if the guidelines were conservative or stringent enough. . . . Another example was our end of year people reviews where we ranked all the traders - his input was always thoughtful and balanced - he tried to present people in the best light possible and was very supportive of junior colleagues. . . . I'm frankly flabbergasted that he is in this position at all.

Ex. A at 58 (Letter of Robin Wemyss). Another former colleague recounts that "Mike would go above and beyond what was required to abide by the rules of the exchange" and was "instrumental in setting several new [internal] rules and policies." Ex. A at 65 (Letter of Sonny McNess). This opinion is not limited to his former JPMorgan colleagues. Stephen Clark, a former precious metals broker who has known Mike since the early 2000s, writes that of the hundreds of people he interacted with over a 31-year career, Mike stands apart for his "honesty, integrity and overall decency." Ex. A at 66 (Email from Stephen Clark). Mr. Clark explains,

Most other traders would yell and try to get their broker to do whatever they could to execute a trade, honestly or not. Mike was different. . . . In all our years working together there would have been thousands of times where he could have asked or wanted me to do something against the rules. That never happened. . . . Mike is an honest man.

*Id.*[2] Simply put, Mike was the last person anyone would have expected to violate the law. The people who worked with him saw that, in addition to being a skilled trader, he brought his integrity and commitment to fairness to the office each and every day.

## C.  **Family and Community**

The paramount priority in Mike's life is his family, as is evident from the fact that nearly every person who wrote to the Court gave testament to his devotion to his wife, Heather, and their children.

Heather, a former public school teacher, met Mike on a blind date. They married in 2001. They have three children: ███████████████████████████ Despite long work hours and the bus commute between his home in New Jersey and JPMorgan's New York office, being a dad took priority. Heather recalls, for instance, that during the tumultuous period of the Bear Sterns merger and the financial crisis—when all three of their children were under four years old—Mike "would literally sprint across the city to catch the bus so that he could be home by 7:00 to bathe his kids and see them before bed." Ex. A at 3 (Letter of Heather Nowak).

As his kids grew up Mike remained an active and enthusiastic father. His former neighbor describes frequently seeing Mike at the end of the work day immediately transitioning to "'full-on' dad mode," playing with his kids on the lawn or in the park. Ex. A at 48 (Letter of Russell Grimaldi). He has always been committed to passing down the same love and values of hard work and kindness that Mike and his siblings received and learned from their parents. Mike's sister writes,

> I also see the love that we received in the love that Mike gives to his family. . . .
> Support in whatever activities or adventures [my nieces and nephew] choose to seek

---

[2]  Notably, Mr. Clark wrote to Mike's family after the conviction, *sua sponte*. Although he had never met Mike's family, he simply wanted to give them comfort that even in the face of the jury's verdict, Mike is, and is known to be, a good person.

> out. They are expected to work hard, practice empathy, and understand that their
> lives are extremely privileged. Even with all they have had to experience over the
> past three years, they seem to understand that they still have a foundation that many
> would envy. . . . My nieces and nephew are wonderful people. As a teacher and
> their aunt, I am excited to watch them better the world. I know that having Mike as
> a parent is why I feel this way.

Ex. A at 27 (Letter of Amy Nowak). Throughout his career Mike spent what little free time he had

with his children, teaching them to read, bringing them to their various weekend activities, taking

them to church, and teaching Sunday school. Ex. A at 7–8 (Letter of Heather Nowak). As the

letters from his children demonstrate, he is an endlessly caring father. Ex A. 12–18 (Letters of

███████████████████████████. They depend on him for the things all children their age need

from a parent: patient help with schoolwork and learning to drive, positive encouragement, support

and advice in difficult moments, and steady guidance as they navigate their adolescences. ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████.

For Mike, the most difficult part of this case has been the pain and stress it has brought

upon his family, who "would be absolutely devasted should Mike receive prison time." Ex. A at

28 (Letter of Chris Nowak). Through these difficulties, his family has rallied around him. His

mother writes,

> He's a wonderful son, a loving husband, and a hands on caring dad. We couldn't
> be prouder of him. These past three years have been difficult. Our extended family,
> and friends who know him, were shocked when he was arrested and then convicted
> but all still love and support him because they know the kind of person he is.

Ex. A at 21–22 (Letter of Mary Beth Nowak). His parents and siblings, already tight-knit, say the

experience has brought them even closer together. And Mike has made the most of his time at

home with his family. His father writes,

> Looking at Michael as a father, I am proud of him. I feel he has built a close knit family around him, a wife that supports him and children that respect him and are close to him. In fact, as difficult as the last few years have been, I feel that they have given Michael a unique opportunity to get closer to his family than ever. He is now the family bus driver which gives him quality time with the kids every day. We've talked about the way they open up to him in the car and how supportive they are. He has not taken this for granted.

Ex. A at 25 (Letter of Tom Nowak). The prospect of being separated from his children, particularly during the last years that his two daughters will be living at home, is Mike and his family's greatest fear now. His daughters' anxiety at this possibility is palpable in their words: ███████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████ It is difficult to overstate the pain and anguish his absence would cause his family.

In addition to his family, Mike is fortunate to have a large community of friends who steadfastly support him. These friends, many of whom he has known for decades, admire Mike for his enduring kindness, humility, and hardworking nature. "I can honestly say that Mike has basically remained the same honorable open-book person throughout the years. He has always been honest, disciplined, hard-working, caring, and loyal through thick and thin—in a word, a good man." Ex. A at 43 (Letter of Barry Feno). One of his oldest friends writes,

> Of all people I've known in my life, among the smartest and most honest and sincere is Mike Nowak. . . . I work for government and believe in a strong government and rule of law. But I struggle with how this could have possibly unfolded against my friend. Mike would never cheat to get ahead. I sincerely believe Mike would have been wildly successful in whatever career or industry he chose based on his intelligence, work ethic and integrity.

Ex. A at 37 (Letter of Matt Preisser). Success in his career did not change Mike's nature:

> Knowing Mike so well, it was with a degree of surprise, then, that I learned from the news coverage of his trial that he had been considered such an important figure

11

in the world of finance. Mike's life goals were never to accrue wealth, exercise power, or claim status—and so we never talked about such things over the years when we would gather at college reunions or for weekend trips with several other close friends. Instead we talked about our families, our partners, music, sports, and our expanding list of shared experiences. Which is all to say that Mike is likely the most unassuming and humble person one could imagine occupying the position that he did in his professional life.

Ex. A at 51 (Letter of Dr. Robert Widell Jr.). A long-time friend and Deputy Commander in the U.S. Air Force writes,

Mike was always Mike. He's the same caring person who befriended me decades ago, a small-town guy who never outgrew his roots. Duke didn't change him, and neither did New York or London or the high-pressure world of finance. He is simply one of the most fundamentally decent people I know, and he always has been.

Ex. A at 34 (Letter of Matt Doberman). Another friend writes,

Mike Nowak is a genuine person. Soft-spoken at times, a leader in other contexts, he is not someone to misconstrue or spin a situation. Whether we are talking about our kids (or years ago, being single and then falling in love with our wives), our tennis games, the Giants' chances for the Super Bowl, or our plans for retirement, Mike is not prone to exaggeration or self-serving talk.

Ex. A at 55 (Letter of Jason Parsley). Mike's friends trust him implicitly: "I . . . consider[] [Mike] one of my closest friends. When I say this, I don't mean the kind of friend that stands in your wedding (which we both did for each other) or that you love 'hanging out with' (which I do), but the kind of friend that you would trust to raise your children if something happened to you." Ex. A at 57 (Letter of Tony Alvarez); "[Mike] is one of a small group of people to whom I could reach out about most anything." Ex. A at 51 (Letter of Dr. Robert Widell Jr.); "If I ever need someone to manage my estate on my behalf for my family, Mike is one of the only people in the world who I would completely trust." Ex. A at 69 (Letter of Norbert Lou).

### D. **Character and Good Works**

As one of his oldest friends, a U.S. Army Colonel, aptly puts it, "Mike is an individual of unquestionable character, earnestness and honesty." Ex. A at 32 (Letter of Greg Fairbank). Writing with the "strongest possible support" of Mike, he goes on to say,

> I know Mike to be one of the most honest, decent and fair individuals I have had the honor of knowing in my life. . . . I am extremely sensitive to the company and friends I keep in life and how they may reflect and impact on my status and integrity as a senior military officer. . . . I have never felt Mike to be anything but an asset in my life and I am sure he will be until the end of our days.

*Id*. "Mike didn't come from wealth or connections. He got where he was in his life and career through incredibly hard work and good, positive choices." Ex. A at 2 (Letter of Heather Nowak). Many friends and former colleagues have noted that his kind and humble nature makes him a far cry from the stereotype of a Wall Street banker: "Over the course of a very long career I have encountered traders who fit the cultural stereotypes for which Wall Street is infamous. Mike, simply put, was not one of them." Ex. A at 61 (Letter of Blythe Masters). Another former colleague was "shocked to say the least" upon learning of the charges against Mike, writing, "[i]n the world of trading, I am more than aware of certain unsavory characters. Mike is not one of them. He is honest, incredibly ethical, extraordinarily bright, and has never cut corners to get ahead." Ex. A at 71 (Letter of Brian Finn). Mike's brother writes, "I know that someone in his position charged with these types of crimes would sound like someone who thrives on money or power, thinks only of themselves and lives a flashy lifestyle going out and partying. This just could not be further from Mike in reality." Ex. A at 28 (Letter of Chris Nowak). Comparing him to the typical banker, Russell Grimaldi writes,

> [O]ur neighborhood had a large contingent of bankers and financiers and I never found Mike to fit the phenotype (which, I found to be more extroverted, more assertive—more alpha). In the most positive of ways, I found Mike to be very different. I found him to have a gentleness about him, a warmth . . . a spirit of

sincerity, an incredibly affable way of being and a diligent listener with the most genuine sense of curiosity, compassion and interest in the others.

Ex. A at 47 (Letter of Russell Grimaldi).

Mike is a "sincerely *caring* individual." Ex. A at 56 (Letter of Jason Parsley). One friend from college writes,

> Mike is polite, generous, honest and kind. In a way that only our closest friends can, Mike conveys a non-judgmental openness that fosters trust and comfort. We talk candidly and supportively about the worries and triumphs in our lives—in our work, our families and our friendships. . . . Above all, I wish to convey my deep feeling that Mike is a fine human being, which much to share with all who will have the benefit of his love and his friendship in the years to come. . . . As I write this on the day following Thanksgiving, my eyes well as I consider my gratitude for Mike Nowak's friendship and his character.

Ex. A at 53–54 (Letter of Jonathan Kaden). Mike is someone who goes out of his way to support the people around him. While one of his friends from childhood was serving in the Peace Corps in Bulgaria,

> Mike was only one of the two friends who took the time and had the curiosity to come visit me there in my little mountain village in the middle of nowhere. Besides giving me his full moral support through regular phone calls throughout my assignment in Bulgaria, Mike also embraced my side project at the orphanage and brought supplies for the kids when he came to visit and made sure to spend time at the orphanage, teaching them sports and just being a patient object of their curiosity. At the time when Mike came to visit me in Bulgaria, he was already working for J.P. Morgan but he impressed me with how easily he was able to adapt to the second-world environment and was able to seamlessly blend in with the locals, which exemplified his down-to-earth character and values. . . . In full honesty, I have to admit that the past two years have been very difficult emotionally for me, knowing that such a stellar guy has had to go through the legal difficulties that he has encountered.

Ex. A at 41–42 (Letter of Barry Feno). During his time in the competitive JPMorgan training program, he spent hours tutoring a fellow intern who was struggling when preparing for the options exam, even though they were competing against one another for the full-time jobs being offered.

Ex. A at 70 (Letter of Brian Finn). ███████████████████████████████████

███████████████



The supporting letters are full of other examples of ways, both large and small, in which Mike supports and comforts his friends and family. In short,

> Mike is the kind of person you want as a friend, he's the kind of person you want in your life. He is an uncommonly good person who has made a difference in my life and many others, and who has already felt tremendous emotional pain from these legal proceedings, in large part because of his integrity of character.

Ex. A at 35 (Letter of Matthew Doberman).

One of Mike's strongest qualities is his consummate fairness, a characteristic borne out even in his spare time, when he sometimes plays tennis. Mike has been an avid player since he was young, and he is as fair and kind on the court as he is in all areas of his life. As Heather puts it, Mike "prioritizes relationships over winning." Ex. A at 9 (Letter of Heather Nowak). Though a passionate competitor, he is always encouraging of those less skilled than he is. He plays hard "while exhibiting the same generosity, fairness and integrity on the court as he d[oes] off the court"—and in this sport where players themselves act as referee, "Mike never looks to obtain an advantage through questionable line calls or any similarly dubious tactic." Ex. A at 78–79 (Letter of Larry Miller).

It is a testament to Mike's strength of character that, since being let go from JPMorgan in 2019, he has sought to use his time productively, bettering himself and his community.

> It is easy to be a good guy when you have everything going for you, but remaining kind and level-headed when you are at your most vulnerable is where Mike has truly been able to shine. Instead of sinking into despair and denial, Mike decided to devote himself even more deeply to his family and to bettering himself.

Ex. A at 42 (Letter of Barry Feno). "Mike has a love of life and learning, a compassion for those less fortunate, and a desire to help colleagues, friends, and the community around him." Ex. A at 71 (Letter of Brian Finn). Mike has channeled these interests into his volunteer work with Succeed2Gether, a nonprofit organization in his town that offers one-on-one tutoring to children in need. The organization's Education Director describes Mike as an enthusiastic and exemplary tutor:

> Michael threw everything he had into coaching a reluctant student with some unusual learning difficulties—and succeeded in supporting a floundering boy in holding on through Covid-era middle school. The man's patience seems infinite. Michael seems congenial in the most exasperating situations, and brings his strong background in finance to the table for a middle-school math student with apparent ease.

Ex. A at 72 (Letter of Toni Martin). The mother of this student explains that Mike stands out among other tutors for his patience, dependability, understanding, and ability to keep her son on task despite his difficulty focusing. Ex. A at 73 (Letter of Michele Heinrich). After trying a different tutoring program organized through the student's school, they decided to stay with Mike because of the quality of his tutoring. *Id.*

In addition to tutoring, Mike enrolled in a master's program at Johns Hopkins University and earned a degree in applied economics in 2021. He hopes that he might one day be able to teach. He and Heather have also started the process of becoming foster parents, which they very much hope will not be impacted by this case. Ex. A at 3 (Letter of Heather Nowak).

Mike has a relentless drive to be productive and helpful. If given the opportunity to stay out of prison, there is no doubt that he would spend the next chapter of his life taking care of his family and helping his community. As Heather movingly writes, "[t]he world is a worse place with

[Mike] in jail. My children are worse off. I am worse off. The world is a better place with Mike out in it." Ex. A at 11 (Letter of Heather Nowak).

### III. SENTENCING CONSIDERATIONS

A sentence "must always . . . be 'sufficient, but not greater than necessary,'" *United States v. Jordan*, 991 F.3d 818, 822 (7th Cir. 2021) (citation omitted), to satisfy four goals: "just punishment, deterrence, the protection of the public, and rehabilitation." *Dean v. United States*, 581 U.S. 62, 67 (2017). As Your Honor is aware, a court imposing a sentence must consider the kinds of sentences available, the nature and circumstances of the offense, the relevant Sentencing Guidelines, the history and characteristics of the defendant, the need to avoid unwarranted sentencing disparities, the goals of sentencing, and, where applicable, the need for restitution to victims. 18 U.S.C. § 3553(a). We respectfully submit that a balancing of these factors should result in a noncustodial sentence, because any term of imprisonment would be far "greater than necessary" to punish and rehabilitate Mike, protect the public, and deter spoofing.

This section of our memorandum is divided into three parts: First, we address the relevant offense conduct. Second, we address the Sentencing Guidelines, setting forth our objections to certain of the government's and Probation Office's proposed adjustments to the offense level. And third, we provide bases for a noncustodial sentence.

### A. __The Offense Conduct__

The offense conduct consists of Mike's order activity in the specific trading sequences underlying the counts of conviction, which the government opted to charge repetitively under four different statutes. The sequences were based on a total of 211 seconds of sporadic futures trading

activity over five years, on 14 dates from September 22, 2009, to February 7, 2014.[3] Accepting the verdict means the jury found that Mike, acting alone and not in concert with anyone else, placed orders in those particular snippets of time with the unconditional intent to cancel before execution.

The government describes Mike's offense conduct as far more extensive and egregious, repeatedly making three assertions born from its distorted view of the evidence: First, that Mike is criminally responsible for violative futures trading of others on the JPMorgan precious-metals desk.[4] Second, that Mike's questions to Christian Trunz before Trunz's JPMorgan compliance interview, and regarding a potential decision to plead guilty, were integral to Mike's offense and warrant a substantial increase in the sentence. And third, that Mike's one-word answer to a single question in the CFTC's unrelated silver investigation amounted to obstruction of justice. And the government inflames these assertions with unproved rhetoric of Mike's "power," even going so far as to label him "the most powerful figure in the world's gold market" based on a news article,[5] and asserting four times that the case involves purported spoof orders totaling $1.5 trillion in notional value.[6] But as much as the government tries, its mischaracterization of Mike and the offense are not supported by the evidence, as detailed below.

---

[3]  Mike's orders during those 211 seconds were specifically alleged in the counts of conviction, for spoofing (Count 27; 7 U.S.C. §§ 6c(a)(5)(C), 13(a)(2)), attempted price manipulation (Count 4; 7 U.S.C. § 13(a)(2)), wire fraud affecting a financial institution (Counts 13–22; 18 U.S.C. § 1343), and commodities fraud (Count 25; 18 U.S.C. § 1348(1)). *See* 2d Superseding Indict., ECF No. 448, ¶¶ 31(a)–(o) (variously incorporated by reference in the counts of conviction). The broader set of episodes that the government presented at trial but did not separately charge (GX 451) total less than an hour of trading. Even including all of the sequences in Prof. Venkataraman's flawed loss analysis, the duration of trading is a matter of hours over the course of more than five years.

[4]  It should come as no surprise that the government clings to its conspiracy theory because, as discussed below, a number of the government's upward adjustments to the Guidelines offense level depend on a finding that Mike engaged in jointly undertaken activity.

[5]  As support for this claim, the government points to a post-verdict Bloomberg article with a pro-government headline about the government's "toppling" of Mike. The article is essentially a puff piece that contains revelations about the inner workings of the DOJ Fraud Section's investigation. *See* Gov't Sentencing Mem. at 36, ECF No. 856 ("Gov't Mem.").

[6]  As the evidence reflects, notional value bears no direct relevance to price movement or the issues in this case, and does not refer to actual gold changing hands. What *could* be relevant—but is never mentioned in the government's

*– cont.*

18

### 1. Mike's Offense Conduct Does Not Include the Conduct of Others

Undaunted by the jury's across-the-board conspiracy acquittals,[7] the government argues that the evidence established that Mike was "part of a single scheme carried out by members of JPMorgan's precious metals desk," Gov't Sentencing Mem. at 5, ECF No. 856 ("Gov't Mem.") and that Mike's relevant offense conduct includes trading by Smith, Edmonds, and Trunz, *id.* at 5–6, repeatedly lumping Mike's conduct with the others' in support of the misleading assertion that they acted as one criminal unit. *See, e.g.*, *id.* at 1–2; 5–8; 12–16; 21–22; 33–34 (conflating "defendants").

The evidence and the jury's verdict show otherwise. Mike never agreed with anyone to spoof, never jointly spoofed with anyone, never "indoctrinated" or "taught" anyone to spoof, and never spoke with anyone on the JPMorgan desk about spoofing *except to instruct them not to do it.* We recognize that the law permits courts to consider acquitted conduct at sentencing (although changes to this principle are afoot, as discussed below). But even accepting the lower burden of proof for sentencing, the evidence as to Mike falls far short of a preponderance, and we doubt that the jury's decision to acquit was a close one. The Court should—as Probation did—reject the government's sweeping contention that Mike's offense conduct for purposes of sentencing includes other traders' conduct and purported losses (which dwarf Mike's own). *See* PSR at ¶ 59 (noting "the absence of any specific evidence establishing Mr. Nowak's involvement in the spoofing practice of other traders.").

---

memorandum—is that each price tick of movement for a gold futures contract amounts to just ten dollars ($10), even though the notional value of the contract is $100,000. Trial Tr. 547:13–548:3 (Scheerer testimony that profit associated with selling one gold contract one tick higher will always be just $10).

[7] Mike and his codefendants were acquitted of racketeering conspiracy (Count 1; 18 U.S.C. § 1962(d)) and of § 371 conspiracy (Count 2; 18 U.S.C. § 371).

Given the fanfare of the government's September 2019 public announcement of a "massive" racketeering conspiracy, the utter lack of support for the conspiracy charges against Mike was striking, a reality highlighted by the testimony of Edmonds and Trunz. For years, they sat within feet of Mike on the trading desk. Yet they acknowledged that in all the years that Mike was trading, they never spoke with him about their spoofing, much less agreed with him to spoof. As to Mike, Edmonds and Trunz claimed only that they "saw" Mike place orders in the government's four-step pattern and somehow divined, from that alone, that he placed orders with the intent to cancel, just as they did.[8]

The only evidence of any conversation with Mike about spoofing in all the years that Mike was trading came from Edmonds's recollection that, in 2014, Mike called him and other purported coconspirators into his office in New York to *confront* them about whether anyone was spoofing and, if so, *to stop and come forward* immediately. *See* Trial Tr. 1481:5–9 (Q. "And at the meeting with Mr. Nowak, he asks 'has anyone been spoofing and if you are, you got to stop'?" A. "You got to stop and you have to, you know, tell, you know, say you did it, like you have to raise your hand and say you did it, yes, that's correct."). Edmonds's testimony about that meeting shined a light on the absence of a conspiracy with Mike. Edmonds confirmed that only alleged conspirators were present, yet no one mentioned their supposed yearslong scheme to spoof together. And he said he was "afraid" Mike would have "fired [him] probably immediately" if he had said anything about the purported conspiracy, in a room full of supposed partners in crime. Trial Tr. 1037:4–8; 1481:13–1484:19; 1485:15–23. This is evidence of the absence of conspiracy, and the jury agreed.

---

[8]    In fact, Trunz originally told the government that he saw Mike spoof *only once*. Trunz noted that he "had a specific memory of seeing Nowak trading like Smith one time. It stuck out to Trunz because Nowak was not a flow [meaning spot] trader. This was not a strategy used by options guys, even with Nowak having gamma it did not work like that. An options trader would not be looking to adjust for .10 increments nor to move quickly." FBI 302 of Christian Trunz interview dated August 19, 2019. By the time of the trial, Trunz changed his story and claimed to have seen Mike trade in that manner "weekly." Trial Tr. 2291:22–2292:1.

That meeting in Mike's office happened after JPMorgan compliance personnel approached Mike in 2014 with concerns that Michel Simonian, a London-based trader on the desk, was spoofing. Mike reviewed the trade data—which revealed that Simonian had been flashing single large orders (not scales of smaller orders), far larger than anything he could have had a legitimate business reason to trade. *See* GX 177. Mike told the internal investigators he believed Simonian, his supposed conspirator, was spoofing, *id*, and Simonian was thereafter fired.

The jury properly rejected the government's arguments that it should find a conspiracy based on Edmonds' and Trunz's testimony that they "saw" Mike spoof, and similarities across the government's charts, just as they rejected Trunz's "yes" answer to the government's leading question, "[w]as there an agreement and an understanding between you and each of these three defendants [to spoof]." That answer was undercut not only by the lack of any testimony that Mike discussed spoofing, but also by Edmonds's testimony resisting the idea that there was an agreement or conspiracy to spoof on the desk. *See* Trial Tr. 1482:22–1483:20; 1780:22–1781:14 (Edmonds's testimony to Smith's counsel, "[conspiracy] was your word, but it wasn't mine.").

The absence of jointly undertaken activity was also underscored by the sheer lack of communication, coordination, and shared knowledge among alleged conspirators, which was remarkable in a federal conspiracy case. *See* PSR ¶ 28 ("the investigation of the defendant's conduct did not yield any communications which established that the defendant was directing other traders to spoof."). Edmonds said he was not aware that Trunz, his close friend on the desk, was spoofing, *see* Trial Tr. 1386:6–13, and Trunz testified that he could not recall whether, at the time, he was aware of how Edmonds spoofed, *see id* 2560:18–21. Edmonds and Trunz both testified that they were unaware that Simonian, their colleague and alleged coconspirator, had been spoofing until Mike told the desk that he had been fired for spoofing. *Id.* 1485:8–11; 2561:18–22. The

government itself acknowledged in court that the absence of "coordinated spoofing" is "a distinguishing factor from the previous [spoofing] cases" brought by the same prosecution team in this District. *Id.* 220:19–21.

Despite this, the government refuses to back away from its original publicly announced theme of a grand RICO conspiracy, and has gone all in against Mike, straining to find support where none exists. For example:

- The government claims that "defendants" "indoctrinate[d]" and "taught" others on the desk to spoof, Gov't Mem. at 2, 34, which is flatly false for Mike. There is no evidence that Mike "taught" anyone to spoof, much less "indoctrinated" them into the practice. If these representations are based on the testimony that Edmonds and Trunz "saw" Mike spoof, the argument is specious and should be rejected.

- The government represents that "the trial evidence showed that the defendants . . . discussed and joked about spoofing with others[.]" Gov't Mem. at 6. But it cites only Trunz's testimony that he joked with others on the *Bear Stearns* desk (where Mike never worked)—before joining JPMorgan—about Gregg Smith's rapid clicking. Trial Tr. 2274:8–2275:25.

- The government argues that "the existence of a conspiracy was shown by . . . chats about spoofing," Gov't Mem. at 7, citing two chats, GX 37 and 62. GX 37, however, is a chat between Trunz and Oliver Beane (on the London desk) about Mr. Smith and says nothing about Mike. GX 62 is a chat between Mike and his London colleague Stu Piller about Mike buying gold futures. Presumably the chat was cited because, at the time of the chat, Mike was allegedly placing spoof orders to sell. But contrary to the government's assertion, the chat is not "about spoofing" and does not show the existence of a conspiracy. Mike and Piller said nothing in the chat about spoofing or even about entering orders on the sell side. And the government certainly seems to have withdrawn its claim that Piller was a member of the alleged conspiracy. Trial Tr. 3141:11–3142:4 (government withdrew Piller's trading charts from evidence after noting "the defense made the point that we hadn't established [Piller] as a member of the conspiracy").

- The government argues that "the existence of a conspiracy was shown by . . . the fact that traders on the desk engaged in spoofing to get better fills and prices for the precious metals desk's lucrative hedge fund clients." Gov't Mem. at 7. Even if that were true, it does not tie Mike to a conspiracy and in fact undercuts the government's theory. Mike was an options trader who did not have the job to trade futures on behalf of hedge fund clients.

- The government argues that "the trial evidence showed that the defendants . . . had a shared interest in the desk's profitability and wanted to keep their clients happy by spoofing," citing Trunz's testimony that the desk was "a for-profit business," the common goal of which was "to make money." Gov't Mem. at 6; Trial Tr. 2282:7–22. The self-evident fact that a trading desk seeks to turn a profit is not evidence of a conspiracy (or of Mike belonging to a conspiracy), nor is Trunz's contention that the desk "spoof[ed] to make money," given that at most Trunz's claim as to Mike is that he "saw" him spoof.

- The government asserts that "[t]here also was testimony that traders' discretionary compensation (i.e., annual bonus) was based in part on the success of the desk as a whole, such that traders collectively benefitted from better fills and prices resulting from each other's spoofing." Gov't Mem. at 7–8. But the government made no attempt at trial to prove that purported gains from spoofing affected any trader's compensation, likely because they understood that such gains could not have moved the needle on the desk's overall trading profits. In fact, profitability of the precious metals desk *increased* after the purported spoofing on the desk stopped. Trial Tr. 1389:18–21 (Q. "Okay. So when the spoofing stopped on the Precious Metals Desk, profits went up. Do you see that? A. [Edmonds:] I see that, yes."); DX 2364. In any event, these speculative assertions are not evidence of a spoofing conspiracy or Mike's membership in one.

- The government argues that "the existence of a conspiracy was shown by . . . Nowak's efforts to help Trunz avoid discipline and 'protect the narrative.'" Gov't Mem. at 7. As explained below, this assertion is based entirely on Trunz's strained and subjective interpretation of two questions Mike posed to him and is contradicted by other evidence.

In fact, the government appeared to acknowledge the deficiencies in its conspiracy theory when, following the acquittals, it abandoned the racketeering and conspiracy charges in its prosecution of severed codefendant Christopher Jordan. *See* United States' Mot. to Dismiss Counts One and Two of the 2d Superseding Indict. Against Def. Christopher Jordan, ECF No. 704. While the government may try to claim that it dismissed its top charges against Jordan merely for the sake of efficiency, actions speak louder than words. That unusual step—a DOJ dismissal of top counts before trial—shows that even the government recognizes that there really was no conspiracy on the JPMorgan precious-metals desk.

23

Even if not for the lack of evidence of jointly undertaken, reasonably foreseeable activity, there is good reason to disregard acquitted conduct at this stage—and we do not make this argument in a vacuum. Recent developments suggest that the practice of considering acquitted conduct will soon be barred by the Guidelines. To be sure, while a district court is not currently *prohibited* from considering conduct underlying an acquittal at sentencing if it was proven unlawful by a preponderance of the evidence, *United States v. Watts*, 519 U.S. 148 (1997), the Seventh Circuit does not appear to be encouraging the practice. The Circuit recently recognized the "increasing support among many circuit court judges and Supreme Court Justices, who in dissenting and concurring opinions, have questioned the fairness and constitutionality of allowing courts to factor acquitted conduct into sentencing calculations." *United States v. McClinton*, 23 F.4th 732, 735 (7th Cir. 2022), *petition for cert. docketed*, No. 21-1557 (U.S. June 14, 2022) (collecting cases). And the U.S. Sentencing Commission has formally proposed to amend the Guidelines to provide that "*acquitted conduct shall not be considered* relevant conduct for purposes of determining the guideline range." U.S. Sentencing Comm'n, "Acquitted Conduct," Proposed Amendments to the Sentencing Guidelines (Prelim.), at *1–4 (Jan. 12, 2023), available at www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20230112_prelim_RF.pdf (emphasis added).[9] We urge the Court to exercise its discretion and decline the invitation to consider acquitted conduct when it appears that the practice may soon, for good reason, be prohibited.

---

[9] *See* U.S. Sentencing Comm'n, News Release (April 5, 2023) https://www.ussc.gov/about/news/press-releases/april-5-2023 ("In the year to come, the Commissioners will continue to study a number of proposed policies, including those regarding how the guidelines treat acquitted conduct.").

### 2.     Mike's Two Questions to Trunz Are Not a Basis for a Higher Sentence

Relying solely on the uncorroborated recollection of cooperator Trunz, the government draws unsupported inferences from two questions Mike posed to Trunz to argue that Mike deserves additional years in jail. There is no indication in the PSR that Probation adopts the government's views in this respect.

#### a.   "Coaching" Trunz

First, the government contends that Mike improperly "coached" Trunz to lie to JPMorgan Compliance interviewers, citing only Trunz's interpretation of a single question he says Mike posed to him in advance of the interview that would focus on Trunz's trading. *See, e.g.*, Gov't Mem. at 25. According to Trunz, Mike "advis[ed] him to be humble and apologetic and ask[ed] . . . 'everything he had placed was intended to trade, right?'" FBI 302 of August 19, 2019 at 16 (Date of entry 10/7/2019). At trial, Trunz conceded that Mike's words were "framed as a question," Trial Tr. 2699:7–21, consistent with what he told the FBI when he began cooperating. *Id.* 2618:24–2619:12. But by the time of trial, Trunz offered a new interpretation of Mike's question, claiming Mike's words were "not an ask" and he believed Mike was advising him to falsely tell JPMorgan Compliance he intended to trade all his orders. *Id.* 2416:1–17.

The other relevant evidence, however, undercuts Trunz's interpretation of Mike's question. Trunz testified that: (i) Mike cautioned him that Michel Simonian had been fired partly for lying to Compliance, Trial Tr. 2415:19–22, 2613:7–9, which would be ludicrous for Mike to say if he were coaching Trunz to lie; and (ii) Trunz should *apologize* for his trading, *id.* 2613:2–6, which would make sense only if Trunz was going to acknowledge to Compliance that he had done something wrong that warranted an apology. The notion that Mike tried to fabricate a defense for Trunz also cannot be squared with the uncontroverted evidence that Mike alerted his own boss, Jeff Katz, as soon as he learned Trunz's trading been flagged, DX 579, 604, informed JPMorgan

HR that Trunz's trading may have been improper, DX 501, 502, and docked Trunz's bonus, Trial Tr. 2614:7–11. None of those facts supports Trunz's interpretation that Mike's question was not in fact a question.

In sum, even crediting Trunz's recollection of the words Mike spoke, his subjective interpretation of Mike's question is undercut by other evidence and cannot justly form a basis to grant the government's request for additional time in jail.

### b. "Pressuring" Trunz

Second, and similarly, the government argues for a higher sentence based on Trunz's interpretation of a question Mike purportedly posed after they both had learned of the government's investigation and were represented by counsel, but before either had been charged. In his interviews with the FBI and at trial, Trunz said that he and Mike spoke often about the investigation in this period, during Mike's regular trips to the London office. Although apparently never mentioned during the course of his pretrial interviews, Trunz said for the first time at trial that Mike asked him, "We've done a ton of work, you're not going to turn around and plea now, are you?" Trial Tr. 2436:19–21, which Trunz said he interpreted as Mike trying to protect him and keep him from doing "exactly what [he] did and tell the truth," *id.* 2437:18–24. Based solely on Trunz's interpretation, the government repeatedly contends that Mike's question was a form of "pressure" on Trunz not to plead guilty and cooperate with the government (although Trunz did not testify that Mike mentioned cooperation).

Here again, the other evidence undercuts the government's post-hoc sinister spin. Trunz testified that Mike was lending support when they discussed the government's investigation, which he appreciated, *id.* 2625:18–25, and perhaps most importantly, that at the time of that discussion, *Trunz had denied to Mike that he had done anything wrong*, *id.* 2625:15–17, which reasonably would have prompted the question Mike supposedly asked: *Then why plead guilty*? If Trunz's

testimony about the words he and Mike exchanged is true, the government's argument is nothing more than a claim that it is somehow improper to discourage a friend from pleading guilty to a crime he says he did not commit.[10] The government's attempt to twist Trunz's testimony into a baseless accusation of improper pressure to justify a higher prison sentence is offensive, and, respectfully, we urge the Court to reject it.

### 3. Mike's Single Answer to the CFTC Is Not a Basis for a Longer Sentence

Mike testified more than a decade ago in a sprawling CFTC investigation into complaints of suspected long-term suppression of silver prices—an inquiry the CFTC closed without bringing any charges, after conducting a thorough investigation that was unrelated to the current matter.[11] At the very end of his two-day CFTC testimony, Mike responded "no" to a tangential question about his knowledge of what appears to be "flashing large orders" on the desk. The indictment charged Mike's single answer as an act in furtherance of the racketeering conspiracy, which the jury rejected.

Nevertheless, the PSR suggests, and the government presses, that Mike's answer constituted a willful obstruction of justice "with respect to the investigation, prosecution, or sentencing of the instant offense of conviction," U.S.S.G. § 3C1.1. *See* PSR ¶ 73. There is no basis for an obstruction enhancement, both because Mike's response was truthful and because the substance of his answer did not overlap with the offense of conviction.

---

[10]   As counsel informed the Court, Trunz also told the government pretrial that in discussing the investigation, Mike mentioned the acquittal of Andre Flotron, a trader who had been indicted for spoofing conspiracy by the same prosecutor who at the time was investigating Mike and Trunz, which suggests a perfectly appropriate discussion of how people can be vindicated at trial. Trial Tr. 2117:25–2118:15.

[11]   There has never been any suggestion that Mike was the focus of the CFTC's investigation; rather, it appears the CFTC took his testimony because he was the head of JPMorgan's precious-metals desk, and JPMorgan had a substantial presence in the silver market. Indeed, we moved for a new trial on the basis that the prosecutor told the jury in summation that Mike was "under investigation" in the CFTC matter, which was not true. *See* ECF No. 711 at 31 (citing Trial Tr. 3942:17–22).

First, Mike did not lie. The question at issue came right after the CFTC lawyer asked him a series of questions about market participants "flashing large orders." *See* GX 370, at 440:2–5 (Q. "Have you ever noticed any flash orders on GLOBEX, and what I mean by that is a large order or offer or bid that's on GLOBEX and gets pulled pretty quickly?"); 442:3–6 (Q. "Have you heard talk about any particular market participants sort of flashing large orders like that as a signal to other traders?"). Without any hint of transitioning from "flashing," the lawyer then asked him, "[t]o your knowledge, have traders at J.P. Morgan in the metals group put up bids or offers to the market which they didn't intend to execute and then pulled them before they got hit or lifted," and Mike answered, "[n]o." GX 370, at 442:8–13. There was no follow-up.

The evidence established that there are two distinct forms of spoofing: "flashing" large orders one at a time (which Mike is not alleged to have done), and "layering" multiple smaller orders (the instant offense conduct). Contrary to the assertion that Mike's response constituted denial of knowledge of behavior that he himself has been convicted of engaging in, PSR ¶ 73, Mike's response to the CFTC lawyer's question was truthful. Mike never flashed orders himself, so the only way his testimony could be deemed untruthful would be if there was evidence that Mike was aware in August 2010 of someone else flashing orders on the desk. But particularly given the absence of proof of conspiracy as discussed above, there is no evidence that Mike knew of *anyone* on the desk flashing orders until four years later, in 2014, when Simonian was investigated and ultimately fired for it.

On this record, the Court should decline the government's request to include in the offense conduct Mike's CFTC testimony and to use it to justify a longer sentence.

## B. The Sentencing Guidelines

As the Court is aware, the Sentencing Guidelines are only "advisory and cannot mandate a strict decision-making sequence" in determining a defendant's sentence. *United States v. Pankow*,

884 F.3d 785, 793 (7th Cir. 2018). In imposing a sentence, "the district court's obligation is simply to calculate the guidelines range correctly and arrive at a reasonable sentence after weighing the sentencing factors in [18 U.S.C.] § 3553(a), varying upward or downward from the guidelines range in its discretion." *United States v. Brown*, 732 F.3d 781, 786 (7th Cir. 2013).

Holding the government to its burden of proof, the final offense level for Mike should be the same as the base offense level of seven because (i) the government has not established that Mike caused any loss (and has not even tried to show that he personally gained), let alone on the scale that Prof. Venkataraman suggests, and (ii) the other adjustments pressed by the government—some but not all of which the Probation Office accepted—are not supported by a preponderance of the evidence.[12]

Below are our objections to the government-proposed adjustments for (1) loss, because the government's "analysis" improperly saddles Mike with other traders' conduct notwithstanding the lack of evidence that he jointly spoofed with others or that others' conduct was reasonably foreseeable, and uses a flawed methodology to calculate loss; (2) number of victims, because there are no proven victims given that there are no proven pecuniary losses; (3) role in the offense, because, under the law, and as Probation appears to agree, Mike's job as the supervisor of the trading desk did not make him an organizer of criminal activity, particularly given the lack of evidence of conspiracy here; (4) special skill, because trading in the futures market is a skill possessed by vast numbers of people in the general public; (5) sophisticated means, because, as Probation appears to agree, the spoofing of which Mike was convicted (whether labeled as

---

[12] Though we and the government stated in our respective versions of the offense that the 2018 version of the Sentencing Guidelines apply, we agree with Probation that the 2021 version (which is identical to 2018 in all relevant respects) applies here. We, the government, and Probation agree that the counts of conviction comprise one group under U.S.S.G. § 3D1.2; that the base offense level is seven; and that Mike's criminal history category is I (zero points).

spoofing, fraud, or attempted manipulation) involved the same basic means as any other spoofing by a manual trader; and (6) obstruction of justice based on the CFTC testimony, for the reasons discussed above.[13]

To the extent that the Court determines that the final offense level is higher than the final offense level that we propose, we also provide bases for a downward departure under U.S.S.G. section 2B1.1, cmt. n. 21(C), and/or under section 5K2.0(a)(1).

### 1. The Government's Loss Calculation Is Fatally Flawed

We object to the government's proposed 22-level upward adjustment for a purported loss of $55 million. The enhancement is based only on Prof. Venkataraman's flawed, assumption-laden "analysis," which obligingly (a) attributes other traders' conduct to Mike, (b) lumps in thousands of additional trading sequences with very broad parameters that sweep in lawful trading, and (c) includes purported losses accrued during the entirety of Mike's alleged spoofing sequences (up to 82.3 seconds). To level-set on just how impactful the flaws in Prof. Venkataraman's methodology are, if he merely applied selection criteria that were more consistent with his trial testimony (for example, the criteria he applied in *Bases*), Mike's alleged spoofing sequences would be cut in *half*. And, separately, if Prof. Venkataraman only assessed losses accrued while the market might actually be reacting to Mike's orders, Mike's adjusted loss would drop by 60%.

---

[13] We object to the PSR to the extent it recommends any of these adjustments. We also object to the following portions of the PSR:

- Paragraphs 4, 8–9: We object to references to "barrier running" or "barrier defending," as the government dropped all allegations related to barrier options prior to trial. *See* ECF Nos. 582, 593.
- Paragraph 40: In describing David Pettey's testimony about the impact of Mike's trading, the PSR quotes from testimony in which Pettey described Mr. Smith's trading, not Mike's. *See* Trial Tr. 3005:20–3006:7.
- Paragraphs 18–31, 40–48: We object to the summary of the government's version of the offense and the opinions and characterizations of Agent Marc Troiano included in these paragraphs, because they contain numerous inaccuracies and are inconsistent with or unsupported by the evidence presented at trial.
- Page 35–36: We object to discretionary conditions of supervised release numbered 5, 6, 7, and 14, which Probation recommends.

Flaws this obvious and significant are fatal to the government's loss calculation. *See United States v. Beler*, 20 F.3d 1428, 1432–34 (7th Cir. 1994) (under U.S.S.G. § 6A3.1(a), information considered at sentencing must have "sufficient indicia of reliability to support its probable accuracy," and "unreliable allegations *must not* be considered," so "the sentencing court must carefully scrutinize the government's proof to ensure that its estimates are supported by a preponderance of the evidence").

At the outset, we submit that the question of purported loss here is no typical battle of the experts. A professor he may be—but despite his CV, Prof. Venkataraman has signed his name to a methodology with fundamental flaws that deviates significantly from the methodologies he has applied in similar cases, most recently *United States v. Bases*, No. 18-cr-48 (N.D. Ill.), which ought to call his credibility into question. Prof. Venkataraman's new "analysis" does not belong in a criminal sentencing proceeding, and we urge the Court to reject it.

### a. There Is No Basis to Saddle Mike with Purported Losses from Others' Spoofing

The government seeks to lump Mike together with others on the desk and hold him criminally accountable for their trading, which increases the loss figure that the government attributes to Mike more than tenfold (as approximately 93% of the government's total purported loss figure stems from others' trading sequences). For the reasons discussed in Section III.A.1 above, the government cannot meet its burden to establish that the spoofing of others constitutes jointly undertaken activity as to Mike, so the conduct of others is not attributable to him for purposes of the Guidelines. "In order to be held accountable for the conduct of others, that conduct must have been both in furtherance of the jointly undertaken criminal activity and reasonably foreseeable in connection with that criminal activity." *United States v. Soto-Piedra*, 525 F.3d 527, 531–32 (7th Cir. 2008) (quoting *United States v. Edwards*, 115 F.3d 1322, 1327 (7th Cir. 1997); U.S.S.G. § 1B1.3, cmt. n.3; *United States v. Catalfo*, 64 F.3d 1070, 1082 (7th Cir. 1995)

31

("[D]istrict courts should 'set[ ] forth the reasons why the particular amount of [loss] was reasonably foreseeable to [the defendant].'" (alternations in original) (citations omitted)). The government has not even established Mike's membership in a conspiracy, much less that he engaged in any jointly undertaken criminal activity and that the spoofing of others was reasonably foreseeable to him. "Actions of coconspirators that a particular defendant *does not assist or agree to promote* are generally not within the scope of that defendant's jointly undertaken activity." *Soto-Piedra*, 525 F.3d at 533 (emphasis added). No evidence exists that Mike assisted or promoted the spoofing of others, so the loss calculation cannot include that conduct.[14]

### b. There Is No Evidence of Unlawfulness in the Thousands of Additional, Varied Snippets of Mike's Trading Activity

The Court should reject the government's contention that Mike's offense conduct was vast, to include thousands of trading sequences and tens of thousands of orders.

At sentencing, only "unlawful" conduct is relevant to the Guidelines calculation, *United States v. Chube II*, 538 F.3d 693, 702 (7th Cir. 2008), and the burden rests with the government to establish conduct as unlawful, *see id.* at 705 (government must show that a "particular prescription was dispensed with no legitimate medical purpose" to establish relevant drug quantity at sentencing). A court cannot "extrapolate" that, because some of a defendant's conduct was unlawful, other similar conduct was also unlawful, *United States v. Rosenberg*, 585 F.3d 355, 357–58 (7th Cir. 2009)—but that is precisely what the government seeks to do in saddling Mike with thousands of varied, *unproven* sequences, based on little more than Prof. Venkataraman's say-so.

---

[14] The amount of alleged losses caused by others is, again, based solely on Prof. Venkataraman's flawed analysis. As a result, even if there were a basis to attribute to Mike losses caused by others (there is not), the government has failed to establish the amount of such losses by a preponderance of the evidence, for the reasons discussed below. Nor has the government even tried to establish (nor can it) how much such losses caused by others were "reasonably foreseeable" to Mike, as required. *See* U.S.S.G. § 1B1.3, cmt. n.1&3; *Catalfo*, 64 F.3d at 1082.

To be clear, far from contesting the verdict by exposing these failures, we are urging the Court to hold true to it. We contest the post-trial attempt to inflate the purported loss figure by casting a net over tens of thousands of Mike's orders and arguing—without any reference to characteristics the government argued at trial are key indicators of spoofing—that those orders were criminal.

        i.   *Prof. Venkataraman's Selection Criteria Capture Order Activity That Bears No Characteristics of Spoofing*

At trial, Prof. Venkataraman based his opinion that Mike was spoofing on several factors—significant order imbalance, *see* Trial Tr. 2747:23–2748:14, market imbalance, *id.* 2785:7–21, order duration, *id.* 2745:16–2746:17, the four-step pattern (though now he claims the first two steps alone are enough), *id.* 2718:7–18, low fill ratios, *id.* 2787:12–23, and quick cancellation, *id.* 2739:10–14; 2765:6–12, among others—and highlighted those factors in the hundred government-selected sequences. Yet now, for purposes of sentencing, rather than develop criteria based on those apparently important factors, Prof. Venkataraman has essentially applied the same broad, loose criteria that he had used *to select activity to analyze for spoofing in the first place*, which he designed to be expansive. *Compare* Trial Tr. 2976:18–2977:6 (in developing criteria for the analysis that resulted in GX 499, "I want[ed] the design to be where I can see whether the large red orders cause a fill or not. . . . So I wanted it to be as open-minded as possible in terms of what you would find . . . . So my approach, I believe, is conservative . . .") *with* Venkataraman Decl. at 7 n.12 (starting point for loss analysis was "Spoofing Sequences summarized in GX 499," excluding, with respect to Mike, only sequences with scales of fewer than 30 lots in gold futures and sequences lasting more than 82.3 seconds); Exhibit B to Declaration of David Meister ("Ex. B") (Cusimano Decl.) at ¶¶ 19–27.

There is no evidence that these extremely broad criteria, designed to select trading snippets for analysis from among Mike's and others' full order activity, are reliable for classifying orders as spoofs. To the contrary, the activity includes lawful trading, a significant amount of which is *indisputably* lawful, such as instances where there was no quick cancellation, or, remarkably, for some of Prof. Venkataraman's alleged spoof orders, *no cancellation at all*, and instances where there was no market imbalance in the top five levels of the order book following the alleged spoof order. Trial Tr. 2725:2–7 (Prof. Venkataraman conceding that he merely parsed the data for "very large visible . . . orders on one side, and on the opposite side . . . a [smaller] order"). His contention that these are all "spoofing sequences" is squarely contradicted by his own testimony and, at best, is based only on suspicion and conjecture.

In his declaration, expert Jeremy Cusimano, former Economic Advisor to the Director of Enforcement at the CFTC, explains that Prof. Venkataraman's broad selection criteria capture lawful trading and scenarios that are plainly incompatible with spoofing. Ex. B (Cusimano Decl.) at ¶¶ 31–35. For example, in Sequence Nowak_GC_B_427 from July 1, 2010, Mike placed seven scaled ten-lot orders in the top five price levels of the order book (i.e., the purported spoof orders), and an opposite order that was at least *110 price levels* (ticks) away from the scale (in a market where, as established at trial, only the top ten ticks are visible on each side). There is no basis in finance theory or common sense—nor has Prof. Venkataraman provided one—for the inference that a scale placed this far away from an opposite order was placed to cause the execution of the opposite order. And this lack of support is unsurprising, as Prof. Venkataraman never acknowledges or seeks to justify the extreme overbreadth of his approach. What is more, this opposite order was also placed over 37 minutes before the start of this sequence, making it even

more incredible that Prof. Venkataraman's screening criteria linked the two as a purported spoofing sequence. Ex. B (Cusimano Decl.) at ¶ 33.

*Figure 1 – Nowak_GC_B_427 Activity*



As another example, Prof. Venkataraman's criteria identified Sequence Nowak_GC_S_861 from December 17, 2010 as a spoofing sequence, even though Mike was actively trading and using aggressive orders on both sides of the market, and some of Mike's scaled orders, identified as spoofs, were aggressive (i.e., executed against resting orders on the other side) or rested in the market for at least 20 seconds, all of which undercuts any inference of an intent to cancel. Prof. Venkataraman's "spoofing sequences" are riddled with examples like these that are incompatible with spoofing, look nothing like the trial sequences, and thereby reveal the fundamental unreliability of his selection criteria. Ex. B (Cusimano Decl.) at ¶ 34.

*Figure 2 – Nowak_GC_S_861 Activity*



The black line that moves throughout the plot shows Mr. Nowak's daily position and indicates purchases when it moves higher and sales when it moves lower

These extremely broad selection criteria not only capture a significant volume of plainly non-spoofing trading, but also encompass many legitimate, non-spoofing trading strategies.[15] As the government's own witnesses confirmed, *see* Trial Tr. 687:21–23, it is impossible to tell whether a series of scaled orders was placed with impermissible, unconditional intent to cancel (i.e., "I intend to cancel no matter what") or with perfectly permissible conditional intent (e.g., "I intend to cancel *if* another order of mine is executed," with the understanding that orders can be executed in milliseconds). And Mr. Cusimano explained that Mike's placement of scaled orders was consistent with standard trading tactics, such as hedging an options book, protecting against a quick price change or "sweep," and offering liquidity to algorithms, none of which involves

---

[15] The government flips this issue on its head, contending that the use of scaled orders is somehow evidence of a spoofer's attempt to avoid detection, Gov't Mem. at 21–22, without acknowledging that a *reason why* it is harder to determine whether an instance of scaled order activity constitutes spoofing is because scales are commonly used for legitimate purposes (and thus evince nothing at all).

placing orders with the unconditional intent to cancel. Trial Tr. 3562:6–22. In his declaration, Mr. Cusimano also explains that much of Mike's trading activity is consistent with a strategy aimed at maintaining delta neutrality. Ex. B (Cusimano Decl.) at ¶ 29. Several government witnesses confirmed that a comparatively large set of orders placed on one side of the market, with smaller orders placed on the other side, can be consistent with legitimate forms of trading. *See, e.g.*, *id.* at 696:25–697:12 (according to Robert Sniegowski of the CME, a trader may "place[] imbalanced orders on both sides of the market . . . prefer[ing] one side over the other").

  ii. *Prof. Venkataraman's Selection Criteria Are Not Consistent with His Criteria in Prior Cases*

The government has tried to assure the Court that it can rely on Prof. Venkataraman's analysis because he "applies parameters that are consistent with the approach applied to identify the scope of relevant conduct in the *Vorley* and *Bases* cases," which were accepted by the sentencing judges in those cases. Gov't Mem. 11–12. The government also urges a longer sentence for Mike by comparing the loss calculation here with those Prof. Venkataraman calculated in *Vorley* and *Bases*. The government fails to mention, however, that Prof. Venkataraman inexplicably removed key selection criteria that he used in *Vorley* and *Bases*, and that applying the *Bases* criteria here would result in only 3,130 of Mike's 6,063 alleged spoofing sequences being identified as spoofing. Ex. B (Cusimano Decl.) at ¶ 25.

In his *Bases* loss estimate, Prof. Venkataraman defined a "spoof order" as an order "placed within the top five levels of the order book, canceled within five seconds of placement, and for at least ten contracts at placement," and with an aggregate volume of 25 total contracts active at the same time. Decl. of Kumar Venkataraman at ¶ 15, *United States v. Bases*, 18-cr-48 (N.D. Ill. Jan. 6, 2023), ECF No. 725-1. He defined opposite orders as iceberg limit orders placed in the top five levels of the order book. *Id.* Prof. Venkataraman also excluded from his analysis sequences with

fully displayed orders placed on the same side of the market within five ticks of the opposite order and sequences in which the defendants placed spread-crossing orders on the same side of the market as the alleged spoof orders. *Id.* These requirements would reduce Mike's sequences to a population that, while still overinclusive, at least reflects two of the criteria the government told the jury were key indicators of spoofing: (i) relatively short duration of alleged spoof orders (Prof. Venkataraman says Mike's spoof orders can rest for up to 82.3 seconds, a far cry from the 5-second maximum he used in *Bases*), and (ii) the alleged spoof and opposite orders being placed in the top five levels of the order book (here, Prof. Venkataraman's loosens the net to allow alleged spoof and opposite orders to be in the top ten levels of the order book).[16] Because Prof. Venkataraman did not apply these narrower criteria here (for reasons neither he nor the government explains), his analysis includes many more sequences—and therefore generates a much higher loss amount— than if he had applied the *Bases* criteria.

Even in *Vorley*, where he applied broader selection criteria than in *Bases*, Prof. Venkataraman at least required that alleged spoof and opposite orders be placed in the top five levels of the order book, *twice* as high in the order book as the criteria he applies in this case. Decl. of Kumar Venkataraman at ¶ 13, *Vorley*, 18-cr-35 (N.D. Ill. May 21, 2021), ECF No. 383-1. This requirement makes sense because orders placed deeper in the order book (for example, at levels 6–10) are less likely to influence the market and thus less likely to be placed as part of a spoofing strategy than orders closer to the top. The expansion from top five to top 10 levels is particularly significant for Mike, whose options book routinely required him to place two way markets $1.5–

---

[16]    Prof. Venkataraman told the jury that "in particular, market participants pay a lot of attention to the top five levels of the" order book, Trial Tr. 2714:12–15, from which it follows that spoofers looking to induce market participants to act are more likely to place their orders in these higher levels of the order book. *See* Trial Tr. 688:13–16 (Sniegowski testified that "typically a spoof order would be close to the best."); Trial. Tr. at 643:14–15 (traders place "the spoofing order . . . at or near the current offer price").

$2 (15–20 ticks) apart depending on the delta profile of his options book. Much more of this trading is swept in by Prof. Venkataraman's new, broader criterion.

The government also claims that Mr. Cusimano acknowledged using Prof. Venkataraman's approach in the *Moncada* case. Gov't Mem. at 11–12. We have no idea how the government can make this representation—it is simply not true. In the portion of Mr. Cusimano's trial testimony cited by the government, he acknowledged working on the *Moncada* case and generally recalling his work on it. He certainly did not testify about applying an approach similar to Prof. Venkataraman's, with no spoofing identification requirements for quick cancellation (or cancellation at all) or significant order book imbalance, among other relevant factors. *See* Trial Tr. 3669:2–13. The government's claim that the *Moncada* analysis tracked Prof. Venkataraman's parameters is even more confounding, because the documents cited by the government do not describe the identification parameters applied in *Moncada*. In fact, it is absolutely false that Mr. Cusimano applied criteria similar to Prof. Venkataraman's here in *Moncada*, as Mr. Cusimano is unaware of any context in which criteria as overinclusive as those Prof. Venkataraman applies to Mike's trading would be used to reliably identify spoofing. Ex. B (Cusimano Decl.) at ¶¶ 19; 22.

Finally, as support for the claim that "there is more than a sufficient basis for the Court to adopt Prof. Venkataraman's" definition of spoofing, the government cites *CFTC v. Oystacher*, No. 15-CV-9196, 2016 WL 3693429, at *22–23 (N.D. Ill. July 12, 2016). Gov't Mem. at 12. This citation is puzzling, as the "narrowing criteria" accepted by the court in *Oystacher* provided that the alleged spoof orders had to be placed and canceled *in less than one second*, had to be placed at an existing price (i.e., did not establish a new best bid or offer), and had to double the volume already in the limit order book at the relevant price levels (i.e., tending to ensure a sizable market imbalance), none of which is included in Prof. Venkataraman's selection criteria. *Id.*

In sum, Prof. Venkataraman's novel, expansive screening method appears designed to maximize loss while disregarding the characteristics of spoofing the government harped on at trial, and thus cannot be used to reliably conclude that each of the thousands of flagged trading sequences is unlawful. *See Chube II*, 538 F.3d at 705 ("For a prescription to be included in relevant conduct, the court must evaluate the facts surrounding that particular prescription and explain why those facts render it unlawful. Generalizing from 'numerous' files will not suffice.").

### c. The Government's Loss Methodology Is Seriously Flawed

Even if Prof. Venkataraman were to limit his analysis to an appropriate set of trading sequences, his methodology would remain incapable of calculating actual loss. His analysis involves three calculations of purported loss, each critically flawed:

- An "unadjusted" calculation—the starting point for his other two calculations—in which he treats as a loss each and every trade in the market on the side opposite the purported spoof orders, without any evidence of causation, and contrary to the Supreme Court's recognition that the purchase of an asset at an inflated price is not in itself a loss, *see Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005);

- An "adjusted" calculation, in which he reduces the (already invalid) unadjusted figure by a purported "but-for cost of trading" based on an aggregate comparison of trading activity during the alleged spoofing sequences and activity during "control periods"—not random or generic periods of actual scientific control, but rather the periods of time immediately preceding each sequence, as confounding a factor as that may be; and

- An "alternative" calculation—the "conservative" calculation that the government would have the Court adopt—in which he reduces the (invalid) unadjusted figure *in the aggregate* by applying a percentage multiplier derived overwhelmingly from *other traders'* sequences, again based on so-called spread-crossing activity in the so-called control periods.

In his declaration, Mr. Cusimano provides a detailed analysis of the many errors in Prof. Venkataraman's methodology. *See* Ex. B (Cusimano Decl.) at ¶¶ 36–54. We will briefly highlight the most significant, which plainly show that the government's loss calculation is not reliable and has not been reliably applied.

### i.  *There Is No Evidence of Causation in Any Sequence*

Without proof of causation, there is no basis to attribute a purported loss to a particular defendant's offense conduct—yet the government has provided no evidence of causation. *United States v. Burns*, 843 F.3d 679, 688 (7th Cir. 2016) (loss assessment requires "causation analysis"). This is an evidentiary failure twice over. First, the government has no reliable evidence (and Prof. Venkataraman's assumptions are not evidence) that Mike's trading *caused* any market participant to do anything at all.[17] And second, there is no evidence that Mike's trading thereby *caused actual loss* to anyone.

On the first point, Prof. Venkataraman's assumption that Mike's alleged spoof orders caused market participants to trade in certain directions is undercut by the fact that in a significant number of Prof. Venkataraman's selected spoofing sequences, market participants gained when Prof. Venkataraman's theory would predict they should have lost.

On the second point, under the Guidelines, "actual loss" means "reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1, cmt. n.3(A)(i). But Prof. Venkataraman has not shown that any purported victim in any sequence suffered such harm. He fails even to consider the trades and positions of purported victims before or after each sequence.

For example, David Pettey acknowledged that when the Susquehanna algorithm bought gold futures from Mike during an alleged spoofing sequence, it did so at a lower price than it had bought just a few minutes earlier. Trial Tr. 3068:7–23. In this scenario, Susquehanna improved its

---

[17]  Prof. Venkataraman does not even account for the potential effect of trading *by other traders in this case*. For instance, he simply buckets Mike's sequences together with Smith's or Trunz's or Edmonds's in the few dozen times when they happen to overlap in time and metal and market side—because putting such sequences in a separate "Gregg Smith & Michael Nowak" bucket is easier than grappling with how to determine who caused what share of the supposed loss. He has not done the work. He *assumes* causation.

position by trading with Mike's alleged spoof order, and, what is more, Susquehanna could have sold out of that position at a profit given the price trend thereafter, as the price rose within three seconds of the transaction between Pettey and Mike, and, from that point, his algorithm could have traded at a better price for approximately 30 seconds, an eternity for a high frequency trading algorithm. *See* DX 630. The government has provided no evidence that Pettey or any other market participant who traded during alleged spoofing sequences actually did worse as a result of their activity during those windows.

This lack of evidence that Mike's orders caused any pecuniary harm is fatal to Prof. Venkataraman's analysis. *See United States v. Whiting*, 471 F.3d 792, 802 (7th Cir. 2006) (district court erred in determining loss despite lack of evidence of causation of pecuniary harm, because "[t]o determine [a] loss figure . . . [the Guidelines] required a finding that the false statements were a cause-in-fact" of pecuniary harm to victims). Indeed, in a civil securities-fraud context, the Supreme Court has recognized that mere proof of causation of an inflated purchase price cannot establish causation of actual loss, because "at the moment [a] transaction takes place" at the inflated price, the supposed victim "has suffered no loss," as it receives "ownership of a share that *at that instant* possesses equivalent value." *Dura*, 544 U.S. at 342. As the Court reasoned, if the purported victim sells the asset before the inflated price recedes, then "the misrepresentation will not have led to any loss," *id.*; and if it sells after the price recedes, then that "*might* mean a later loss," but not necessarily, because the lower price could have been caused by any number of other factors, such as "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events." *Id.* at 342–43. That logic applies with equal force here, where, even if one were to *assume* that Mike's orders caused inflated or deflated

prices, the government has done nothing to establish that any purported victims had offsetting trades at less favorable prices, and nothing to exclude intervening causes of such prices.

      ii.   *Prof. Venkataraman Calculates Losses for the Full Duration of the Alleged Spoof Orders, an Extreme and Unreliable Approach as Shown by the Data*

Another fundamental flaw in Prof. Venkataraman's approach is that he attributes losses to Mike during *the entire duration* of the alleged spoofing sequences, including purported losses that occurred before Mike's alleged spoof order reached Prof. Venkataraman's 30-lot threshold and losses that occurred well after any market response to Mike's orders had dissipated. Ex. B (Cusimano Decl.) at ¶¶ 47–54. Mr. Cusimano proves that this approach drastically overestimates loss, as the excess spread-crossing theoretically caused by an imbalance in the gold futures market dissipates within approximately two seconds, meaning that any "losses" calculated beyond that point should not be attributed to Mike. Ex. B (Cusimano Decl.) at ¶¶ 48–49. Prof. Venkataraman offers absolutely no evidence to support his inclusion of losses stemming from the full duration of the alleged spoof orders, which under his broad selection criteria can be *up to 82.3 seconds*. We are just supposed to take his word for it.

In response to a similar critique offered by the defense in *Bases*, Judge Lee was persuaded by the government's argument that using the market-wide rate of response to imbalances likely understates the harm caused specifically by the defendants' large spoof orders. Order at 31–32, *Bases*, 18-cr-48 (N.D. Ill. Mar. 6, 2023), ECF No. 734 ("*Bases* Order"). But here, unlike in *Bases*, Mr. Cusimano analyzed Mike's alleged spoofing sequences, in particular, to assess how quickly the market reverted to ordinary rates of spread-crossing after imbalances that followed the placement of his alleged spoof orders. The market returned to normal rates of spread-crossing within 3.2 seconds of Mike's alleged spoof order reaching the government's 30-lot threshold and within 0.9 seconds of his last alleged spoof order being canceled, so there is truly no basis for

calculating losses for up to 82.3 seconds. Ex. B (Cusimano Decl.) at ¶¶ 50–54. And given the expansive screening criteria Prof. Venkataraman adopted here, which removed the five-second threshold for spoofing sequences, long trading sequences (which never should have been included) disproportionately drive the loss figure, as reflected in Mr. Cusimano's alternative loss calculation below, with approximately 60% of Mike's unadjusted loss number coming from trades that occurred either before or after Mike's alleged spoof order could reasonably have impacted the market. Ex. B (Cusimano Decl.) at ¶ 54.

### iii.  *Prof. Venkataraman Uses Imaginary "But-For" Prices*

In his "unadjusted" calculation of supposed loss—which is the starting point for his other two calculations—Prof. Venkataraman purports to measure loss in each sequence by comparing (a) "the price[s] at which market participants traded" during the sequence with (b) "the price at which they *would have been able to trade*" otherwise, which he claims is "the last observed best bid price for buy-side Spoof Orders and the last observed best offer price for sell-side Spoof Orders." Venkataraman Decl. ¶ 25 (emphasis added). Despite the government's outlandish claim that this method "allowed him to measure with precision at least some of the concrete effects of" Mike's alleged spoofing, Gov't Mem. at 13, this profoundly wrong and hugely impactful assumption infects his entire analysis and underscores his unreliability as an expert.

Prof. Venkataraman's assumption means that if a market participant bought at 30¢ during a sequence in which Mike purportedly drove the price up, and the last-observed bid–offer spread before the start of the sequence was 10¢ (bid) – 20¢ (offer), then the difference between 30¢ (purchase price) and 10¢ (prior best bid) would be treated as a loss. But that is preposterous. In this scenario, 10¢ was the *best bid*—the price at which orders to buy were resting in the order book, *unexecuted*, *waiting for sellers* to hit them. There is no basis whatsoever to think (and good reason to disbelieve) that a market participant "would have been able to" buy at 10¢, when in fact

44

there were resting, unexecuted orders to buy at 10¢ (with priority in the order book queue, no less). In the real world, if homeowners choose to list their house for $300,000 (matching the best-priced listing in the neighborhood), they might, or might not, find a willing buyer at that price. But in Prof. Venkataraman's world, $300,000 is a done deal. In his world, to sell for anything less would be a "loss," because, according to the professor, the homeowners "would have been able to" sell for $300,000. This straightforward error contributes significantly to Mike's loss amount.

iv. *Prof. Venkataraman's "Adjusted Loss" Figures Rely on Comparison with Deeply Flawed "Control Periods"*

As discussed above, Prof. Venkataraman "adjusted" his unadjusted loss figure in two different ways, one supposedly more "conservative" than the other. Both, however, rely on comparing activity during the alleged spoofing sequences to activity in "control periods." The problem is that these "control periods," and Prof. Venkataraman's methods for comparing them to their associated spoofing sequences—the foundation for the loss calculation the government would like the Court to adopt—are so flawed that they are incapable of fulfilling their claimed function of "account[ing] for idiosyncratic market conditions." Venkataraman Decl. at ¶ 34.

For example, Prof. Venkataraman's spread-crossing loss adjustment, which the government ultimately asks the Court to accept, purports to estimate the loss caused by Mike's trading by comparing the rate of spread-crossing during the control periods and the alleged spoofing sequences. This *should* mean that where the control period exhibits a rate of spread-crossing that is *higher or equal to* the rate in the corresponding alleged spoofing sequence, there will be no loss assessed, because Mike's orders are clearly not causing excess spread-crossing as compared with the control period. Nevertheless, as Mr. Cusimano points out, Prof. Venkataraman calculates a total of $2,926,222 in alternative adjusted loss for Defendants and cooperating

witnesses ($193,712 for Mike alone) during alleged spoofing sequences whose control periods exhibited *greater or equal* levels of spread-crossing. Ex. B (Cusimano Decl.) at ¶ 43b.

Moreover, Prof. Venkataraman selected his "control periods" based only on proximity in time to the alleged spoofing sequences (i.e., he simply selected a period of similar duration that occurred right before the alleged spoofing sequence). But merely controlling for proximity in time is, as Mr. Cusimano points out, insufficient to have any comparative or predictive value in the gold futures market, which is highly volatile and experiences major fluctuations from one minute to the next. Ex. B (Cusimano Decl.) at ¶ 43d. In fact, Prof. Venkataraman's selection of control periods all but *ensures* that market volatility in the control periods that has nothing to do with Mike's alleged spoofing—including dramatic price sweeps, or trading lulls—will dramatically skew the results of his loss calculations, because the so-called control periods that he selected do not actually control for factors like market conditions, price sweeps, or trading volume. Ex. B (Cusimano Decl.) at ¶ 43d.[18]

To illustrate how Prof. Venkataraman's "control periods" lead to artificially inflated estimates of loss during the alleged spoofing sequences, Mr. Cusimano points to Nowak_GC_B_2559. Ex. B (Cusimano Decl.) at ¶ 43d. During this sequence, Mike placed a scale, waited 14 seconds, partially canceled that scale, and then placed additional scaled orders at *improved prices*, before ultimately canceling them. By the way, the characteristics of this sequence—the 14 second duration of the alleged spoof orders and the placement of a second scale at prices *more likely to be executed*—are inconsistent with the theory that Mike was spoofing here.

---

[18] As Mukarram Attari, expert for Mr. Smith, explains in his declaration, the disproportionate impact of fluctuations in control period conditions leads to substantial amounts of calculated loss that are primarily driven by trading during the control period, rather than the alleged spoofing sequence. We have no doubt that the same is true for Mike's sequences. Ex. B to Declaration of Jonathan Cogan at ¶¶ 64–68 (Attari Decl.).

Yet, two seconds after he canceled the last orders in his scale, another trader, James Vorley, entered an aggressive order to buy 100 lots. Following the placement of *Mr. Vorley's* order, the market moved up $1.90, or 190 ticks. The price volatility in this sequence is clearly unrelated to Mike's trading, and yet Prof. Venkataraman attributed $42,932 of adjusted market loss to Mike, because Prof. Venkataraman did not select a control period that exhibited similar price volatility "but-for" Mike's trading. This is only one example of how Prof. Venkataraman's "control periods" fail to actually control for the key variables.

*Figure 3 - Nowak_GC_B_2559*



Finally, any predictive or comparative value that might have been gained by selecting control periods that occurred right before the alleged spoofing sequences is completely lost because Prof. Venkataraman *aggregates* his results, meaning that he analyzed all the control periods collectively and across all traders, rather than comparing each control period with its corresponding alleged spoofing sequence. Ex. B (Cusimano Decl.) at ¶ 43e.

v. *Even Assuming Causation, the Theoretical Loss Could Not Exceed $70,452*

Because the government has failed to carry its burden of proving loss, there should be no offense-level adjustment based on loss. But to evaluate the true nature of the offense conduct under 18 U.S.C. § 3553(a)(1)—and to highlight the impact of Prof. Venkatraman's flaws—we offer an alternative methodology developed by Mr. Cusimano. If the Court is persuaded that loss is calculable on this record, it should adopt Mr. Cusimano's method for measuring it, because it is better grounded in established industry practice and economic principles. *See* Ex. B (Cusimano Decl.) at ¶¶ 55–70.

Mr. Cusimano's loss calculation methodology is explained in detail in Section V of his declaration and summarized here. First, Mr. Cusimano responsibly identified the universe of trades to be considered. In doing so, he selected only sequences where *Mike himself* traded, consistent with the jury's conspiracy acquittals, the Probation Officer's conclusion, and the trial evidence, which showed that Mike never jointly undertook with anyone to spoof. Then, Mr. Cusimano took Prof. Venkataraman's obviously overinclusive population of Mike's alleged spoofing sequences and narrowed it to those that at least arguably exhibit characteristics that are consistent with spoofing. Using his years of expertise in investigating spoofing, Mr. Cusimano applied criteria that anyone legitimately interested in identifying spoofing would agree with, such as only including sequences where the alleged spoof orders were placed within the top five levels of the order book and canceled within five seconds of being placed, criteria that Prof. Venkataraman and the government endorsed as reliable selection criteria for spoofing in *Bases* but have inexplicably abandoned here. *See* Ex. B (Cusimano Decl.) at ¶ 55.

Second, Mr. Cusimano addressed the challenging question of causation. He did not, as Prof. Venkataraman did, simply assume that every fill during the entire alleged spoofing sequence was caused by Mike's trading, a vastly overinclusive approach. Rather, he included fills that: (i)

48

occurred within one of two alternative time periods,[19] both of which recognize that the impact of imbalances in the gold futures market dissipates after two seconds; (ii) occurred when the ratio of Mike's large-side to small-side orders was at least 2:1; (iii) resulted from a spread-crossing on the side of the alleged spoof order; and (iv) occurred during sequences with market-level order book imbalances. Ex. B (Cusimano Decl.) at ¶ 56–58.

To calculate possible market loss from this population of fills, Mr. Cusimano followed Prof. Venkataraman's approach of comparing the price the alleged victim received to a price that an alleged victim could have received in the absence of Mike's orders. But unlike Prof. Venkataraman, who selected imaginary "but-for" prices, Mr. Cusimano used the best bid or offer on the *opposite* side of the market from Mike's alleged spoof order (i.e., if the alleged spoof order was a bid, Mr. Cusimano used the best offer in the market; if the alleged spoof order was an offer, Mr. Cusimano used the best bid in the market). This method is rational, because the best bid or offer on the *opposite* side of the market represents an open order that the alleged victim could have chosen to trade with. Mr. Cusimano calculated an initial unadjusted loss value on that basis. Ex. B (Cusimano Decl.) at ¶ 59.

Mr. Cusimano and Prof. Venkataraman appear to agree that some amount of spread-crossing would have occurred regardless of any market imbalance created by Mike's alleged spoof orders, but Prof. Venkataraman disregards the well-established and verified market principle that the rates of spread-crossing originating from each side of the market are around 50/50 (i.e., within a given period, about 50% of trades result from spread-crossing emanating from each side of the

---

[19]  For the first approach, Mr. Cusimano included only the fills that occurred within two seconds after Mike's large-side depth in the top five price levels reached Prof. Venkataraman's 30-lot threshold. For the second approach, he started counting fills at the same point in time but kept counting until two seconds after the placement of the last order in Mike's scaled order group.

market). Mr. Cusimano calculated the excess spread-crossing that occurred after Mike placed his alleged spoof orders, consistent with the spread-crossing dissipation analysis described above, compared it with the market equilibrium for spread-crossing, and found that:

> In the 3.2 seconds after the large side size threshold is reached, 66.4% of the fills resulted from spread-crossing from the side of the alleged spoof orders. In the 0.9 seconds after the last order in Mr. Nowak's scaled order was placed, 69.6% of the fills resulted from spread-crossing from the side of the alleged spoof orders. In other words, compared to the expected rate of 50%, only 16.4% (if using 3.2 seconds) and 19.6% (if using 0.9 seconds) of the spread-crossing activity may be theoretically attributed to the scaled orders. Ex. B (Cusimano Decl.) at ¶ 66.

Applying this methodology results in an adjusted market loss of $59,927 to $70,452, meaning that the government's loss calculation overstates the loss associated with Mike's orders by 5,289%. Ex. B (Cusimano Decl.) at ¶ 68.

### 2. The PSR's Loss Estimate Is Not Supported

The PSR appears to disregard Prof. Venkataraman's loss calculation. But the loss estimate the PSR does adopt is also unsupported, as it appears to be based solely on the government's say-so. *See* PSR ¶¶ 59–60. In September 2020—roughly two years before the trial in this case—JPMorgan entered into a deferred prosecution agreement with the government that required it to pay roughly $312 million as a "Victim Compensation Amount." Deferred Prosecution Agreement ¶ 15, *United States v. JPMorgan Chase & Co.*, 20-cr-175, ECF No. 11 (D. Conn. Sept. 29, 2020). JPMorgan paid this money to the government, which has "sole discretion to determine how the Victim Compensation Amount will be disbursed." *Id.* ¶ 16. As of the date of the PSR, the government represented to Probation that it had disbursed $1,088,600 of the Victim Compensation

Amount to "victim traders" in connection with "spoofing conduct" by Mike. PSR ¶ 59. The PSR adopts this amount as the loss estimate to calculate the offense level.[20]

Restitution is not an appropriate substitute for estimating loss. *United States v. Kuhrt*, 788 F.3d 403, 423 (5th Cir. 2015) (calculating loss and restitution are "wholly distinct questions"). The amount of restitution the government has elected to pay to self-claimed victims cannot prove loss by a preponderance of the evidence. The government has provided no information about how the total amount of restitution was calculated or how that restitution was apportioned to Mike. There is simply no basis to determine that this unsubstantiated number—unrelated to any evidence presented at trial—is reliable, and the Court should reject it.

### 3. There Should Be No Adjustment for Number of Victims

We object to the government's request for, and the PSR's application of, a two-level enhancement for the purported involvement of ten or more victims.

The PSR's application relies on the government's representation (as of the date of the PSR) that it has elected to pay restitution to 48 self-claimed victims of purported spoofing by members of the JPMorgan precious-metals desk. PSR ¶ 62. The government has sole discretion over the number of victims who receive compensation and has provided no information to support the identification of such victims. Accordingly, this number is no more reliable than the PSR's loss estimate—which is to say, not at all. Nor does the PSR identify the number of victims attributable to Mike specifically. Despite correctly finding that other traders' spoofing cannot be attributed to Mike, the PSR uses the total number of firms to whom the government has paid compensation as

---

[20] Although we object to the PSR's loss estimate, the PSR correctly seeks to exclude any losses purportedly caused by traders other than Mike, noting "the absence of any specific evidence establishing Mike's involvement in the spoofing practice of other traders." PSR ¶ 59.

a result of *all* purported spoofing on the desk. There is no evidence that more than one, much less more than ten, of these 48 firms received restitution in connection with activity attributed to *Mike*.

The government's request for the adjustment, by contrast, is based on its contention that Prof. Venkataraman's "analysis" should be sufficient to establish that there were ten or more victims of Mike's trading. But there are no "victims" here for purposes of Section 2B1.1(b)(2)(A), let alone ten or more, because, as discussed above, *see supra*, Section III.B.1, the Court has not been presented with reliable evidence that any person or entity sustained actual loss as a result of Mike's trading within the meaning of the Guidelines.[21] *See* U.S.S.G. § 2B1.1 cmt. n.1 ("Victim" means "any person who sustained any part of the actual loss"); U.S.S.G. § 2B1.1 cmt. n.3(A)(i) ("'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense.").[22]

The "thousands" of purported spoofing sequences have not been shown to be unlawful conduct, so there is no basis to apply an enhancement for the supposed victims in those sequences, nor has the government provided evidence that any of these supposed victims sustained actual loss. *United States v. Skys*, 637 F.3d 146, 154 (2d Cir. 2011) ("Without any determined amount of actual loss to the financial institutions, the district court inappropriately included the institution as victims under § 2B1.1(b)(2)."). Again, the government has provided no evidence on the trading positions and activity of any purported victims, making it impossible to determine whether they suffered

---

[21] Likewise, Mr. Cusimano's loss calculation does not prove that any alleged victim sustained actual loss, because, as Mr. Cusimano points out, he adopts Prof. Venkataraman's conflation of spread-crossing and financial harm. But, in reality, traders who cross the bid-ask spread do not necessarily suffer a loss. Ex. B (Cusimano Decl.) at ¶ 70. Neither does Mr. Cusimano's analysis demonstrate what happened to the positions of alleged victims after their trading during the alleged spoofing sequences, which is a necessary showing for calculating loss, a point that the prosecutors in *Coscia* acknowledged. Sentencing Tr. at 13:18–14:2, *United States v. Coscia*, 14-cr-551 (N.D. Ill. Jul. 15, 2017). As a result of these limitations, neither Prof. Venkataraman's nor Mr. Cusimano's loss calculations are capable of proving that alleged victims sustained actual loss.

[22] At most, the government introduced evidence as to a single victim, Susquehanna, which did not trade with Mike during any of the sequences underlying the counts of conviction.

any financial loss and, if so, how much; and no evidence about their trading strategies or operative algorithms to demonstrate that they could have even been impacted by Mike's orders.

Absent these showings, there is no basis for application of the enhancement here.

### 4. There Should Be No Adjustment for Sophisticated Means

We object to the government's request for a two-level enhancement for sophisticated means under U.S.S.G. § 2B1.1(b)(10)(C). As Probation agrees, there is not an adequate basis to apply the enhancement. *See* PSR ¶ 64. Rather, "the adjustment for sophisticated means is warranted only 'when the conduct shows a greater level of planning or concealment than a typical fraud of its kind.'" *United States v. Ghaddar*, 678 F.3d 600, 602 (7th Cir. 2012) (citing *United States v. Green*, 648 F.3d 569, 576 (7th Cir. 2011)). "The question is not whether the offense is generally considered a sophisticated one—for instance, securities fraud as compared to simple assault. Rather, the question is whether the particular offense conduct was more than usually sophisticated when compared to the offense in its basic form." *United States v. Laws*, 819 F.3d 388, 393 (8th Cir. 2016). The government does not credibly explain how Mike's conduct was "more than usually sophisticated" when compared with the offense of spoofing "in its basic form"—and indeed there is no evidence that it was. *See Bases* Order at 43 (holding that "plac[ing] false orders with the intent not to execute them" and "cancel[ing] the false orders before they were filled" is "spoofing defined" and involves "no remarkable complexity").

The conduct at issue amounts to Mike sitting at his computer, clicking his mouse to place orders, and clicking his mouse to cancel orders. *See* PSR ¶ 64 ("because the defendant engaged in such conduct manually, as opposed to through the use of an algorithm, and did not coordinate trading with other participants . . . such conduct is not complex or intricate."). If Mike's conduct qualifies for this enhancement, it is hard to imagine any spoofing offense that would not, which means that this enhancement should not apply. *See Ghaddar*, 678 F.3d at 602. The government

argues the enhancement should apply because Mike placed scaled orders rather than single large orders. Gov't Mem. at 21–22. Judge Lee rejected this argument, *Bases* Order at 43 ("the mere fact that Defendants did not engage in the most obvious form of spoofing possible (placing a single large order) does not mean that the method they chose can fairly be called 'sophisticated'"), and with good reason: The difference between these two methods of spoofing, for a manual trader, is a few more clicks of a mouse.

Contrary to the government's arguments, neither the duration of Mike's conduct nor the sophistication of his purported victims justifies the application of this enhancement. Gov't Mem. at 22–23. Regardless of duration, the conduct was the same: manually clicking a mouse to enter and cancel orders. And in a market dominated by algorithms, the fact that some of Mike's counterparties were algorithms is not surprising and does not render his conduct more sophisticated. On the contrary, in a market dominated by lightning-fast algorithms that can spoof using computer code, the suggestion that Mike's manual trading was "sophisticated" should not persuade the Court. *Bases* Order at 44 ("The fact that Defendant did not employ [the] more sophisticated [algorithmic] method of spoofing weighs against application of the [sophisticated means] enhancement.").

### 5. There Should Be No Adjustment for Role in the Offense

We agree with Probation and object to the government's request for a four-level enhancement pursuant to Section 3B1.1 based on the claim that Mike was an "organizer or leader of a criminal activity that involved five or more participants." *See* PSR ¶ 69. First, and as discussed above, no evidence suggests that the relevant offense conduct involved any participants other than Mike himself, which is why he was acquitted of conspiracy.

Even if the government had presented evidence that five or more participants were involved in the same conduct as Mike, the government has provided no evidence that Mike was a "leader

or organizer" of any criminal conduct.[23] Instead, the government relies on the fact that Mike was head of the desk, but ignores that an enhancement under Section 3B1.1 requires proof that the individual was a leader or organizer *of the criminal activity*, not merely in a position of leadership in the organization in which that criminal activity occurred. *See Bases* Order at 40–41 ("[T]he mere fact that Bases and Pacilio were senior to [a co-conspirator] in their company's legitimate business dealings does not support an inference that this same organizational relationship existed in their criminal [spoofing] scheme."); *United States v. Litchfield*, 959 F.2d 1514, 1523 (10th Cir. 1992) ("Although defendant might be termed an organizer or leader of [a mining company], that operation was not itself criminal activity. The fraudulent marketing scheme and the conspiracy are the relevant criminal activity," and there was no evidence that he was a leader or organizer of that activity); *accord United States v. Grigsby*, 692 F.3d 778, 790 (7th Cir. 2012) ("manager or supervisor" under the Guidelines "should be straightforwardly understood as simply someone who helps manage or supervise *a criminal scheme*."). The government has provided no evidence that Mike led or organized the alleged criminal activity. *See* PSR ¶ 69 ("[E]ven if the defendant was the senior trader and, at times Managing Director, on the precious metals desk, the available information in this case does not establish by a preponderance of the evidence that the defendant oversaw spoofing of his confederates or supervised their trading activities.").

The government tries to distract from the lack of evidence that Mike was a leader of jointly undertaken activity by pointing to its claim that he "coached" Trunz to lie to Compliance and

---

[23] Despite the government's claim that "[a]t least five traders working under Nowak engaged in spoofing: defendant Smith, Edmonds, Trunz, Jordan and Simonian," Gov't Mem. at 25, as a baseline matter, there is absolutely no evidence that Jordan or Simonian ever engaged in criminal conduct with Mike or the others. Edmonds and Trunz both testified that they were not aware that Simonian had spoofed until after he was fired. See Trial Tr. 1485:8–14; 2498:12–15. There is likewise no evidence that Mike knew that Simonian had spoofed until it was brought to his attention by JPMorgan compliance personnel. And notably, the government abandoned the conspiracy charges against Jordan after the acquittals of the three codefendants.

"pressured" Trunz not to plead guilty. As explained in Section III.A.2, *supra*, these allegations are not supported by a preponderance of the evidence and turn entirely on Trunz's subjective interpretation of two isolated questions posed by Mike.

The lack of evidence supporting this enhancement is underscored by reference to the factors that the Guidelines provide in Application Note 4 to Section 3B1.1(a), to distinguish leaders and organizers from general participants when that determination is not self-evident:

    i.    *Decision-making authority*: There was no evidence Mike exercised any authority over (or had any role in) other traders' individual decisions to spoof. *See Bases* Order at 38 (according no weight to the "decision-making authority" factor where the government identified only one instance of possible decision-making authority over another trader's spoofing activities). Neither of the government's cooperating witnesses testified that Mike directed them to spoof or even spoke to them about spoofing, other than to *ask them if they were spoofing* and, if so, *to stop and come forward*, after Simonian's spoofing came to light.

    ii.    *Nature of participation in commission of the offense*: Mike's engagement in the offense conduct consisted of sitting in front of his computer screens and clicking a mouse, by himself. There was no evidence that Mike participated in any other trader's spoofing, or that anyone else participated in Mike's alleged spoofing, for that matter.

    iii.    *Recruitment of accomplices*: There was no evidence that Mike ever recruited anyone to spoof. To the contrary, the government's whole theory is that Smith and Trunz had been spoofing ever since their time at Bear Stearns, before they joined the JPMorgan desk where Mike worked, and that Edmonds began spoofing after Smith and Trunz joined the desk, not as a result of anything Mike ever said or did. Moreover, Mike, as the head of the desk, supported JPMorgan's disciplinary process against (and ultimately termination of) Simonian, opining that Simonian was "clearly guilty of the allegations" against him.

    iv.    *Claim of right to a larger share of the fruits of the crime*: There is no evidence that Mike made such a claim, or that he even knew of anyone else's spoofing, as reflected in the racketeering and conspiracy acquittals. Mike was paid an annual salary and discretionary bonus set by JPMorgan, based on a variety of factors, including, primarily, Mike's own trading profits, and, secondarily, the profits of the desk. He was not paid on commission. There was no evidence that any trader's spoofing could have had any impact on Mike's substantial compensation as desk head and as lead trader of a profitable gold options

book.[24] Under any calculation, the profits that Mike generated for the bank from his options trading dwarfed any theoretical gain to the bank from spoofing.

    v.    *Degree of participation in planning or organizing*: There was no evidence that Mike planned or organized others' separate spoofing. The only evidence that he knew about others' spoofing was the testimony of the cooperators, Edmonds and Trunz, who said that they inferred that Mike was aware of their spoofing even though it was never discussed. But even these cooperators did not claim that Mike planned or organized their spoofing or anyone else's.

    vi.    *Nature and scope of the illegal activity*: The jury acquitted Mike and his codefendants on the racketeering and conspiracy charges. The scope of his offense conduct is limited to his own trading, in the narrow set of sequences underlying the counts of conviction. *See Bases* Order at 40 (describing defendants' spoofing scheme as "not exactly breathtaking in its scope").

    vii.    *Degree of control or authority exercised over others*: Although he was the head of the desk, Mike did not exercise control over the real-time trading decisions of others on the desk, which occurred in seconds while he was managing his own options book. There was no evidence that Mike ever directed anyone to spoof. *See Bases* Order at 40 (finding that the defendants who held senior positions on the trading desk did not exercise control and authority over anyone on the desk in the realm of spoofing).

Examination of these factors and the government's evidence at trial make clear that each individual trader was responsible for his own actions and decisions. There was no conspiracy to spoof and no coordinated spoofing. *See supra*, Section III.A.1. That said, even if there *had* been jointly undertaken criminal conduct, this enhancement is not applicable when a defendant played no greater "role in the offense" than any of the other participants, as would be true here. *United States v. Katora*, 981 F.2d 1398, 1402–03 (3d Cir. 1992) (enhancement for "organizer, leader, manager, or supervisor" under Section 3B1.1(c) is inappropriate where two defendants "shared responsibility for creating and carrying out the fraud," but where "they bear equal responsibility for 'organizing' their own commission of a crime" and where neither defendant "organized the

---

[24]    The fact that Mike's total compensation was greater than that of other members of the desks does not suggest that he claimed the right to a larger share of the fruits of the crime. As in *Bases*, Mike's "larger compensation was attributable to [his] legitimate position[] at the company" and does not show that he claimed the right to a larger share of the proceeds. *Bases* Order at 39–40.

other"). The government has not produced a single piece of evidence, let alone a preponderance of evidence, to show that Mike organized the criminal conduct of any other trader on the desk. So, as Probation agrees, there is no basis for applying this enhancement.

### 6. There Should Be No Adjustment for Special Skill

We object to Probation's application of a two-level enhancement for use of a special skill pursuant to Section 3B1.3. PSR ¶ 70.[25] Trading futures is a skill possessed by vast numbers of people in the general public all around the world, whereas "special skill" in the Guidelines "refers to a skill *not* possessed by members of the general public and usually requiring substantial education, training or licensing," e.g., "pilots, lawyers, doctors, accountants, chemists, and demolition experts," U.S.S.G. § 3B1.3 cmt. n.4 (emphasis added), which is not true of futures trading. Indeed, many institutions at which individuals commonly hold brokerage accounts also allow members of the general public to open futures trading accounts, which allow them to log onto trading platforms from their personal computers or phones and trade futures online. Laypeople can trade futures, and all it takes to spoof is a click of a mouse, no special skill.

Moreover, if futures trading in itself were a special skill, then every spoof would involve special skill. This fallacy is also present in Probation's opinion that Mike's "skills in affecting market prices through layering and spoofing constitute special skills." PSR ¶ 70. Such reasoning dictates that all spoofing involves the use of a special skill, rendering meaningless the distinction between those who do possess a special skill in this context (such as algorithmic traders) and those who do not.

---

[25]    The government does not argue in its memorandum that an adjustment for use of a special skill applies to Mike.

### 7.   There Should Be No Adjustment for Obstruction of Justice

Finally, we object to Probation's application of and the government's request for a two-level enhancement under Section 3C1.1 for alleged willful obstruction of justice based on Mike's "no" answer to the CFTC.

For the obstruction enhancement to apply, the defendant must have "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the *investigation, prosecution, or sentencing of the instant offense of conviction*," <u>and</u> "the obstructive conduct [must have] *related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense.*" U.S.S.G. § 3C1.1 (emphases added). As discussed in Section III.A.3., *supra*, Mike's testimony cannot serve as the basis for this enhancement because the government has not established that his testimony was untruthful, given the context of the CFTC's question and Mike's response. It would be unfair in the extreme to punish him based on the government's out-of-context interpretation of the question he was asked because, even if that were the questioner's intent, "the court should be cognizant that inaccurate testimony or statements sometimes may result from *confusion [or] mistake*," which would not constitute "a willful attempt to obstruct justice." *See* U.S.S.G. § 3C1.1 cmt. n.2 (emphasis added). Consistent with that caution, and given the ambiguity about the scope of the question, there is no basis to impose an obstruction enhancement when the straightforward interpretation of the relevant line of questioning indicates that he answered truthfully.

In addition, the Guidelines recognize that a "denial of guilt" that does not constitute perjury "is not a basis for application of this provision." *Id.* While the question at issue concerned Mike's "knowledge" regarding "traders" on the desk, there is no reliable evidence that Mike knew of any other traders on the desk spoofing in 2010. Again, he was acquitted of conspiracy given the striking

paucity of evidence of any such knowledge, let alone coordination. At most, then, his response was a personal denial of guilt, and there is no basis to conclude that he willfully lied.

### 8. A Downward Departure Is Warranted

If the Court concludes that the final offense level is in Zone D (advising a custodial sentence), we respectfully submit that there are several bases to depart downward to an offense level corresponding to a Guidelines range that provides for a noncustodial sentence.

First, the Guidelines (and the government) recognize that where an offense causes small losses to a large number of victims, the resulting offense level may overstate the seriousness of the offense such that a downward departure may be appropriate:

> For example, a securities fraud . . . may produce an aggregate loss amount that is substantial but diffuse, with relatively small loss amounts suffered by a relatively large number of victims. In such a case, the loss table in subsection (b)(1) and the victims table in subsection (b)(2) may combine to produce an offense level that substantially overstates the seriousness of the offense. If so, a downward departure may be warranted.

U.S.S.G. § 2B1.1, cmt. n.21(C); *see also* Gov't Mem. at 32. The government's proposed loss amount and victim count are entirely consistent with this scenario. Any loss suffered by purported victims—and, as discussed above, there is no evidence of "victims" within the meaning of the Guidelines here—would necessarily be "diffuse." In these circumstances, attempting to calculate a loss would risk "substantially overstat[ing] the seriousness of the offense," U.S.S.G. § 2B1.1, cmt. n.21(C), which the government's calculation here plainly does. The government suggests without any support that such a departure is never appropriate in "market manipulation" cases that involve diffuse losses. Gov't Mem. at 32–33. The government's contention is undercut by the example the Guidelines provide as meriting a downward departure, namely a "securities fraud involving a fraudulent statement made publicly to the market," U.S.S.G. § 2B1.1, cmt. n.21(C)— which mirrors the theory of fraud the government put forth in this case.

Second, we respectfully submit that spoofing is outside the heartland of fraud or attempted manipulation cases, and was not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines, such that a downward departure is warranted pursuant to Section 5K2.0(a)(1).

Finally, the recent amendment to the Guidelines suggests that a person with no criminal history—like Mike—is a candidate for a noncustodial sentence. *See* U.S. Sentencing Comm'n, Amendments to the Sentencing Guidelines (Prelim.) at *80–84 (April 5, 2023), available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20230405_prelim-RF.pdf. In recognition of the low risk of recidivism among defendants with zero criminal history points, the amended Section 4C1.1 provides that such defendants should receive a two-level downward adjustment of offense level where, as here, the defendant was not an organizer of others in the offense, did not personally cause substantial financial hardship, and does not meet certain other criteria. *Id.* The amended application notes to Section 5C1.1 provide that "a sentence other than a sentence of imprisonment" is "generally appropriate" for defendants who receive such a downward adjustment and whose Guidelines level is 11 or less, and that such a sentence "may be appropriate" if "the applicable guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense." *Id.* at *84. The amendment clearly recognizes that imprisonment is not necessary to achieve the goals of sentencing for a defendant like Mike.

## C.  **The Court Should Impose a Noncustodial Sentence**

We are very mindful of the difficult burden that a sentencing judge faces in balancing the legitimate interests of society in deterrence and punishment with fairness and justice to the person who has been convicted of a crime. Respectfully, we believe that when the relevant factors are weighed, the balance here appropriately tips in favor of a noncustodial sentence. We reject the

government's suggestion that we are seeking special treatment for Mike because he is a white-collar defendant. Gov't Mem. at 36. We simply seek a just sentence.

When considering the factors set forth in 18 U.S.C. § 3553(a), a district judge is given broad discretion, "for good reason," to consider the facts, circumstances, and impacts of the sentence, including "the demeanor of the defendant, the sincerity of his remorse, incentives that he had to change his path, the demeanor of those speaking in mitigation and the support they might add to rehabilitation efforts," and other such aspects that may not be evident from the "cold, entombed, inflectionless record." *United States v. Daoud*, 989 F.3d 610, 611 (7th Cir. 2021). Thus, while district courts have taken a range of approaches to weighing the 18 U.S.C. § 3553(a) factors, there is wide agreement that the post-*Booker* sentencing regime gives district judges "considerable discretion to individualize the sentence to the offense and offender as long as the judge's reasoning is consistent with § 3553(a)." *United States v. Jackson*, 547 F.3d 786, 792 (7th Cir. 2008) (quoting *United States v. Wachowiak*, 496 F.3d 744, 748 (7th Cir. 2007)).

We respectfully urge the Court to consider the following when deciding the sentence to impose on Mike.

### 1. The Nature and Circumstances of the Offense

The Court should not be persuaded by the government's attempt to exaggerate Mike's conduct through its grossly inflated loss estimate, misleading claims that Mike taught and indoctrinated others, suggestion that Mike was the most powerful gold market participant on the planet who essentially undermined the entire economy, and inflammatory references to more than a *trillion* of dollars of notional value—a metric that has no relevance here.

The conduct underlying Mike's conviction is nowhere near the $55 million fraud that the government portrays. The reality is that Mike was an options trader who manually traded in the

futures market to hedge (not for clients) and, when doing so, was competing in a market dominated by billionaire algorithmic trading firms.[26] Mike's conduct amounts to placing orders for scant minutes over five years. It was manual, sporadic, purely solo trading activity that did not cause a demonstrated loss to the purportedly victimized algorithmic traders or anyone else. Contrary to the government's baseless assertions, there is absolutely no evidence that Mike ever encouraged or taught or indoctrinated anyone to spoof.

While a defendant's offense conduct in a financial-crime case usually focuses on his personal gain, explaining why he did it, here, the government offered no evidence of personal gain to Mike from spoofing, or even of attempted personal gain. Of course, the government made repeated references at trial to Mike's compensation, but never even tried to link it to spoofing— because there is no link. The government now calls spoofing profitable to Mike without providing any meaningful analysis, and despite the fact that profits on the desk went up after the alleged spoofing stopped. Gov't Mem. at 33; Trial Tr. 1389:18–21. It cites to vague testimony that "some" on the desk shared in spoofing profits more than others without any link to Mike. Gov't Mem. at 33. It cites nothing for its assertion that "the trial evidence showed clearly" that defendants were motivated to spoof to boost profits and keep their lucrative jobs. *Id.* The only motive the government tried to establish at trial—spoofing for the benefit of hedge-fund clients—is not applicable to Mike, who did not trade futures for hedge fund clients. Mike was well paid because he was indisputably an extremely successful options trader,[27] earning options profits for JPMorgan

---

[26]   The complaints the government cites as launching the CME's investigation of Mr. Smith—in which the complainant threatened to leave the futures markets as a result of market manipulation, Gov't Mem. at 18, 31, 37—were made by a representative of an algorithmic hedge fund that was, itself, sanctioned by the CME in 2014 for engaging in wash trading.

[27]   Mike's options profits were driven by successfully buying and selling options at a profit "over the counter," not on an exchange.

in excess of $200 million over the time period—options profits that dwarf any conceivable incremental profits that spoof orders in futures might generate, $10 per tick at a time. Indeed, the only evidence at trial on this topic was an analysis performed by Mr. Cusimano, which the government did not even challenge. That analysis confirms the truth that, even if one adopted Prof. Venkataraman's flawed method for identifying spoofing, the theoretical gain to JPMorgan from Mike's trades would have had only a trivial impact on Mike's profits from his options portfolio. Trial Tr. 3621:21–3624:20; DX 546 at 13.

Simply put, the conduct here is unlike a typical white-collar fraud motivated by greed to the material detriment of victims. Incarceration is not necessary or justified under these circumstances.

### 2. Mike's Good Character and Works and Unblemished Prior Record

In determining an appropriate sentence, the Court must consider the "history and characteristics of [a] defendant." 18 U.S.C. § 3553(a)(1). Such factors need not be "extraordinary" to warrant a downward variance from the applicable Guidelines range. *United States v. Warner*, 792 F.3d 847, 857 (7th Cir. 2015) (citing *Gall v. United States*, 552 U.S. 38, 47 (2007)). We urge the Court to consider Mike's life and character in its entirety, including the dozens of letters of support written by Mike's family, friends, and former colleagues. *See supra*, Part II.

Mike's life has been defined by honesty, hard work, and commitment to friends and family. Accepting the jury's verdict, the conduct for which Mike was convicted—a minuscule percentage of the trading he did in his career—reflects an aberration in an otherwise law-abiding life. His life has been defined by honesty, hard work, and commitment to friends and family. His former colleagues describe him as a man of unimpeachable integrity who sought to follow and strengthen JPMorgan's compliance policies. As his friends and family attest, Mike is a thoroughly kind, caring, and responsible person. He is a husband, father, son, brother, and dear friend to people who

64

depend on him for love and support. During this difficult time, he has managed to maintain a positive attitude and to double down on dedicating himself to his family and to his community: tutoring an under-resourced child, earning a master's degree in the hope of one day teaching, and beginning the process of becoming a foster parent. Mike has continued to give of himself during this most difficult period of his life, which, we submit, speaks volumes about his character and about the positive impact that he will continue to have on his community if afforded a noncustodial sentence.

### 3. A Custodial Sentence Would Create Unwarranted Disparities

A noncustodial sentence would ensure avoidance of "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

The Court should assess disparity by comparing this case to other spoofing cases, because, no matter how packaged, this is a spoofing case, pure and simple. While the counts of conviction stem from four charged offenses, all the charges rest on the same underlying alleged spoofing activity. Indeed, the government itself embraced this point at trial. *See, e.g.*, Trial Tr. 394:19–23 (opening statement) ("[T]his scam, it's referred to by a number of names. . . . It is called clicking, layering, spoofing, and non-economic trading. But no matter what it is called, the scheme . . . follows the same four steps."). To be sure, the government's theory here turns all spoofing into fraud and attempted manipulation.

Almost all spoofing is not criminally charged, but rather pursued through civil enforcement actions. The government ignores this fact, focusing only on criminal spoofing prosecutions, Gov't Mem. at 38–41, which are exceedingly rare. In those cases that *have* involved criminal charges, many defendants have received non-Guidelines sentences, including noncustodial sentences. The government has recognized this pattern, but urges the Court to ignore the sound decisions of other

courts. *See, e.g.*, *United States v. Wang*, No. 22-cr-10123, ECF No. 114 (D. Mass. Nov. 23, 2022) ("[T]here are numerous instances in recent years in which cases involving similar market manipulation conduct has been charged only by the SEC and not criminally. And those cases that have resolved criminally have[] . . . often included sentences significantly below the guidelines sentencing ra[n]ge.").

*Vorley* offers a comparison to this case. There, Cedric Chanu and James Vorley were convicted of seven and three counts of wire fraud affecting a financial institution, respectively (as here, all grounded in purported spoofing activity), for conduct stemming from an alleged five-year spoofing scheme. Each was acquitted of conspiracy. Chanu and Vorley were each sentenced to one year and one day in custody with no fine. Sentencing Tr. 82–84, *United States v. Vorley*, 18-cr-35, ECF No. 400 (N.D. Ill. June 21, 2021) ("Vorley Sentencing"); Sentencing Tr. 51, *id.*, ECF No. 403 (N.D. Ill. June 28, 2021) ("Chanu Sentencing").

As in *Vorley*, it is essential to consider the collateral consequences that Mike already faces as a result of his conviction, including the loss of a decades-long career. Vorley Sentencing at 70–71 (citing *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009)) (affirming finding that defendant's "conviction made it doubtful" that he "could pursue his career as an academic or translator, and therefore that the need for further deterrence and protection of the public [wa]s lessened because the conviction itself already visit[ed] substantial punishment" (citation and quotations omitted)). Mike's prosecution likewise has been "unusually long" and accordingly has "exacted[] . . . an unusually severe strain and uncertainty on [him] and his family." *Id.* at 82.

Mike's sentence should not be as harsh as those in *Vorley* because certain aggravating facts in that case—evidenced by chats and a cooperating witness's testimony—are not present here. For example, Chanu's sentence was intended to "send the message that the proper response to someone

66

who engages in market manipulation is not 'teach me how to do that,'" as Chanu had replied to Edward Bases, another trader convicted of spoofing, when Bases referenced market manipulation in a chat. Chanu Sentencing at 36–37, 40. Vorley's chats showed similar enthusiasm. *See, e.g.*, Trial Tr. 1905, *United States v. Vorley*, 18-cr-35, ECF No. 345 (N.D. Ill. Sept. 21, 2020) (Agent Luca testified regarding a chat excerpt in which Vorley stated, "99.56 spoofing it up, ahem, ahem"); *id.* at 700 (cooperating witness testified about a chat in which Vorley stated "It was classic. Jam it. W000000000000" and "bif it up"). By contrast, the government has not identified a single piece of evidence suggesting any such cavalier attitude or embrace of spoofing on Mike's part. His sentence should properly reflect his reduced culpability relative to Chanu and Vorley.[28]

*Bases* provides another good point of comparison. Edward Bases was convicted of nine counts of wire fraud, John Pacilio was convicted of seven counts of wire fraud and one count of commodities fraud, and both were convicted of conspiracy to commit wire fraud. Bases and Pacilio were each sentenced to one year and one day in custody and a $50,000 fine. Sentencing Tr. 62–64, *United States v. Bases*, 18-cr-48, ECF No. 740 (N.D. Ill. March 9, 2023) ("Bases Sentencing"); Sentencing Tr. 55–58, *id.*, ECF No. 741 (N.D. Ill. March 9, 2023) ("Pacilio Sentencing").

In addition to their conspiracy convictions, Bases's and Pacilio's conduct involved numerous aggravating factors that are not present here. In particular, Judge Lee found it to be a "distinguishing factor" that Bases and Pacilio were engaged "in teaching and encouraging others to implement and effectuate the spoofing scheme." Bases Sentencing at 63:21–24; Pacilio Sentencing at 57:12–14 ("Mr. Pacilio . . . oversaw and taught Mr. Lakhan in carrying out the spoofing scheme."). Whereas here, the evidence at trial showed that Mike never so much as *spoke*

---

[28] After applying enhancements for loss, sophisticated means, and number of victims, the *Vorley* court nevertheless found that a substantial downward variance to a sentence of one year and a day was appropriate. *See* Vorley Sentencing at 81–83 (finding that the Guidelines range was "significantly greater than necessary to promote [sentencing] objectives").

to his alleged coconspirators about spoofing, apart from telling them not to do it, the *opposite* of encouragement. Bases's conduct also appeared to be purposely malicious, as he "bragg[ed] openly to his colleagues about how he F's the market and manipulates the market a lot," Bases Sentencing 31:23–32:1. Mike's conduct was nothing of the sort.

The *Coscia* case further underscores that a sentence anywhere near the 30 months recommended by the PSR (let alone the 60 months sought by the government) would be wildly disproportionate. Coscia was sentenced to 36 months based on misconduct far more egregious than that alleged here, by any measure: He commissioned two computer programs to "act like a decoy" and "pump the market" (i.e., to do nothing but spoof) full time, *United States v. Coscia*, 866 F.3d 782, 789 (7th Cir. 2017) (quotations omitted), which the court found went "well beyond . . . sophisticated means," Sentencing Tr. 19:20–23, *United States v. Coscia*, 14 CR 551, ECF No. 162 (N.D. Ill. July 13, 2016) ("Coscia Sentencing"), and he used those computer programs to reap personal profits. He was also found to have perjured himself during his testimony at trial. Coscia Sentencing at 21:22–22:6 ("And the jury obviously . . . would have had to conclude that he was not testifying truthfully . . . ."). The government acknowledges that the *Coscia* court determined that loss was not reasonably calculable and instead considered the $1.4 million that Coscia personally gained, yet it misleadingly compares Coscia's *gains* to its inflated *loss* amount to argue that Mike's conduct is worse than Coscia's. Gov't Mem. at 39. This is not an appropriate comparison, and the Court should disregard it. And while the government tries to make much of the difference between the five-year time span covering Mike's conduct (first trade to last trade) and the ten weeks in *Coscia*, that's a false comparison. Mike was convicted on manual orders that amounted to minutes of activity over five years. Coscia's algorithm was programmed to spoof 100% of the time for ten weeks straight, which amounts to well over a thousand hours of spoofing.

68

Notably, the jury took less than an hour to convict him on all twelve fraud counts. *Coscia Sentencing* at 47.

And even under those circumstances—including factors justifying enhancements for use of a special skill, use of sophisticated means, and obstruction of justice—the *Coscia* court found that the case did not "warrant[] anywhere near the sentence [of 70–87 months] that the guidelines would prescribe," and instead imposed a sentence of 36 months. *Id.* at 49–50. In accordance with "the need to avoid unwarranted *similarities* among other [defendants] who were not similarly situated," Mike's sentence should be substantially less than Coscia's, just as Vorley's, Chanu's, Bases's and Pacilio's were. *See United States v. Carter*, 538 F.3d 784, 795 (7th Cir. 2008) (quoting *Gall v. United States*, 552 U.S. 38, 55 (2007)) (cleaned up). Far from seeking out and implementing advanced computer programming designed to manipulate the market 24/7, Mike engaged in manual trading; there is no allegation, let alone proof, of personal profit; and he did not testify at trial.

Certain other cases targeting spoofing conduct with criminal charges in recent years have resulted in noncustodial sentences or sentences of time served for relatively short periods in custody. Jiali Wang, for example, pled guilty to conspiring to commit securities fraud over the course of close to six years, including by participating in and overseeing coconspirators' manipulative trading. He was sentenced to time served (for roughly three and a half months in custody).[29] Information, *United States v. Wang*, 22-cr-10123, ECF No. 104 (D. Mass. July 29,

---

[29] Despite the government's assertions that Wang "led" a scheme involving "at least eight co-conspirators, all of whom he hired," that "illicit profits generated from the scheme—which profits the defendant controlled and distributed, including to himself—were at least $8,191,874.80," and that the guidelines range called for 78–97 months in custody, the government advocated for time served and nine months of supervised release. Gov't Sentencing Mem. at 2, 6, 11, *Wang*, ECF No. 114. Even accounting for acceptance of responsibility, the sentence that the PSR recommends for Mike is unreasonably inconsistent with the sentence that the government sought (and for the most part received) for Wang.

2022); Plea Agreement, *id.*, ECF No. 105 (Aug. 1, 2022); Gov't Sentencing Memorandum at 1, *id.*, ECF No. 114 (Nov. 23, 2022); Judgment, *id.,* ECF No. 125 (Dec. 8, 2022). Aleksandr Milrud pled guilty to conspiring to commit securities fraud over the course of one year, including by "orchestrat[ing]" a spoofing scheme, recruiting and managing other traders in furtherance of the scheme along with his co-conspirators, and attempting to conceal the scheme by, for instance, conducting manipulative trading across multiple accounts. Information ¶ 2, *United States v. Milrud*, 15 CR 455, ECF No. 21 (D.N.J. Sept. 10, 2015); Judgment at 1, *Id.*, ECF No. 45 (Apr. 24, 2020). Milrud conceded that he had gained between $1 million and $2.5 million, and that enhancements for sophisticated means and his role as a supervisor or manager applied. Plea Agreement at 8, *Milrud*, *id.*, ECF No. 25 (Sept. 10, 2015). He was sentenced to five years' probation and a $10,000 fine. Judgment at 2, 5, *Id.*, ECF No. 45. A comparable sentence for Mike—who played no part in overseeing, orchestrating, or recruiting traders to facilitate manipulative trading—would be appropriate here.

As compared with all of the defendants above, the government suggests that Mike stands as one of the worst spoofers in history. But no matter how hard the government tries to paint that picture, it's not what the proof and verdict have shown. Just because the government seriously overcharged this case does not mean that Mike deserves a longer sentence than that imposed on similarly situated defendants.

Indeed, the fact that he has been subjected to criminal prosecution at all puts Mike in a small minority among traders accused of spoofing. Most individuals who have been charged for spoofing—including within the same period in which Mike was alleged to have spoofed—have faced civil enforcement, not criminal actions, resolved with monetary penalties and (typically short-lived) trading bans. The accompanying chart identifies 23 traders who all were penalized by

the CFTC for spoofing activity. Exhibit C to Declaration of David Meister. Though many engaged in yearslong misconduct, most faced only civil monetary penalties and brief trading suspensions. Only three were permanently barred from trading. None faced criminal charges.

In undergoing the harrowing ordeals of his arrest, a lengthy and highly publicized criminal prosecution, convictions of federal felonies, and a permanent bar on pursuing his livelihood, Mike has already faced far more severe consequences than most other traders accused of spoofing. In short, a custodial sentence for Mike would create unjustifiable similarities with others who are far more culpable, whereas a noncustodial sentence would avoid unwarranted disparities with others who are more similarly situated.

### 4. Incarceration Is Not Necessary

Incarceration is not necessary to afford just punishment, protect the public, or deter others from future misconduct in these circumstances. The government concedes, as it must, that specific deterrence is not an issue in this case. Gov't Mem. at 36. No one would think that Mike presents a danger of committing future crimes.

As for general deterrence, the message necessary to deter spoofing has been sent and received. The investigations across the industry, the settlements, the wide-ranging criminal indictments, the pleas and convictions of Smith, Jordan, Trunz, Edmonds, and Corey Flaum, and Mike's own well publicized trial and conviction all have made clear that such conduct carries serious consequences. We respectfully submit that it is simply not necessary to send Mike to jail to deter the next trader from spoofing.

Additionally, while there is no minimizing the severity of jail time, Mike has been substantially punished already. The process of going through a protracted and high-profile prosecution has caused considerable pain and anguish to him and his family. Mike was publicly fired from the job he held his entire adult life. He will never again be able to work in his chosen

field. He has spent the past four years embroiled in the criminal process, enduring the onslaught of the media, being found guilty before a jury, and watching his family and friends suffer as a result. His once sterling reputation for honesty and integrity has been replaced by the lifelong stigma of being a convicted felon. As his wife, Heather, writes, "For someone like Mike, that is the most psychologically damaging punishment that there is—and no matter what happens from this day forward, it is one he will never be able to escape." Ex. A at 11 (Letter of Heather Nowak).

Finally, while we recognize the collateral damage to all criminal defendants, we do point out that, for Mike's wife and children, watching him endure this prosecution and dreading the prospect that he might be sent to prison has been particularly punishing. They have lived for five years under a cloud of fear and uncertainty. Ex. A at 10–11 (Letter of Heather Nowak). In 2019 Mike was arrested in front of his three children, who were then ages 15, 13, and 11. During their already delicate adolescent years, his children have been plagued by the anxiety of possibly losing their father and have borne the stigma caused by media coverage of Mike's case. *Id.* Heather writes that "this conviction and the threat of further punishment to their Dad—and by extrapolation to them—has changed them in ways that I can only begin to grieve." *Id.* at 11. Sentencing Mike to prison would compound their suffering substantially. ████████████████████

████████████████████████████████████████

███████████

In sum, we respectfully submit that a noncustodial sentence would be sufficient but not greater than necessary to provide just punishment, protect the public, and afford adequate deterrence. Justice requires nothing more.

## IV. CONCLUSION

For all these reasons, we urge the Court to impose a noncustodial sentence, which we submit is sufficient but not greater than necessary to meet the objectives of sentencing.

Dated: April 10, 2023

Respectfully submitted,

 /s/ David Meister
David Meister
Chad E. Silverman
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
(212) 735-2100

William E. Ridgway
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, IL 60606
(312) 407-0449

*Counsel for Michael Nowak*