# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

CHRISTOPHER JORDAN

Case No. 19-cr-00669

Hon. Edmond E. Chang

## DEFENDANT CHRISTOPHER JORDAN'S SENTENCING MEMORANDUM

James J. Benjamin, Jr.
Parvin D. Moyne
Anne M. Evans
Sean M. Nolan
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
(212) 872-1000

Megan Cunniff Church
MOLOLAMKEN LLP
300 N. LaSalle Drive
Suite 5350
Chicago, Illinois 60654
(312) 450-6700

*Counsel for Christopher Jordan*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT.................................................................................1

FACTUAL BACKGROUND ..................................................................................4

    A.    Childhood and Upbringing ..........................................................4

    B.    ██████████████.................................................5

    C.    College, Career on Wall Street, and Early Family Life ................8

    D.    BrawlHouse and ████████████████....................11

    E.    Divorce, Finances, and Struggles with Employment.................18

    F.    Devotion to Family and Hopes for the Future ......................19

OFFENSE CONDUCT ........................................................................................21

APPLICATION OF THE SENTENCING GUIDELINES ..............................22

    A.    Base Offense and Enhancement for 10 or More Victims............22

    B.    Loss Amount .............................................................................22

    C.    Sophisticated Means ..................................................................25

    D.    Special Skill ...............................................................................26

    E.    Obstruction of Justice ...............................................................26

        1.    Chris did not commit perjury..................................................27

        2.    The CFTC testimony was not "purposefully calculated" or "likely" to obstruct the subsequent criminal investigation.....................30

DISCUSSION OF § 3553(a) FACTORS ............................................................32

    A.    Nature and Circumstance of the Offense ..................................33

    B.    History and Characteristics of the Defendant, and the Need for Medical Care ......................................................................................35

    C.    Deterrence, Just Punishment, and Respect for the Law............37

    D.    Avoiding Unwarranted Sentencing Disparities......................38

CONCLUSION.................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Dean v. United States*,
　581 U.S. 62 (2017)................................................................................32

*Gall v. United States*,
　552 U.S. 38 (2007)............................................................................32, 33

*Kisor* v. *Wilkie*,
　139 S. Ct. 2400 (2019)...........................................................................24

*United States* v. *Banks*,
　55 F.4th 246 (3d Cir. 2022) ...................................................................24

*United States v. Brown*,
　732 F.3d 781 (7th Cir. 2013) ................................................................32

*United States v. Dunnigan*,
　507 U.S. 87 (1993).............................................................................27, 28

*United States v. Frith*,
　461 F.3d 914 (7th Cir. 2006) ................................................................23

*United States v. Ghaddar*,
　678 F.3d 600 (7th Cir. 2012) ................................................................25

*United States v. Green*,
　648 F.3d 569 (7th Cir. 2011) ................................................................25

*United States v. Johnson*,
　612 F.3d 889 (7th Cir. 2010) ................................................................28

*United States v. Lundberg*,
　990 F.3d 1087 (7th Cir. 2021) ..............................................................25

*United States v. Swank*,
　37 F.4th 1331 (7th Cir. 2022) ...............................................................32

*United States v. Wachowiak*,
　496 F.3d 744 (7th Cir. 2007) ................................................................33

*United States v. Warner*,
　792 F.3d 847 (7th Cir. 2015) .............................................32, 33, 38, 39

*United States v. Zagari,*
   111 F.3d 307 (2d Cir. 1997).................................................................29

**Statutes**

18 U.S.C. § 20..........................................................................................10

18 U.S.C. § 1343......................................................................................21

18 U.S.C. § 3553................................................................32, 37, 38, 39

**Other Authorities**

75 Fed. Reg. 67301 (Nov. 2, 2010)........................................................31

76 Fed. Reg. 14943 (Mar. 18, 2011)......................................................31

78 Fed. Reg. 31890 (May 28, 2013).......................................................31

CME Rule 432..........................................................................................34

U.S.S.G. § 2B1.1...............................................................22, 23, 24, 25

U.S.S.G. § 3B1.3.....................................................................................26

U.S.S.G. § 3C1.1..........................................................................26, 27, 30

We respectfully submit this memorandum and the accompanying exhibits on behalf of our client, Christopher Jordan, in advance of his sentencing on September 8, 2023. For the reasons discussed below, we respectfully request that the Court impose a sentence of time served, with a period of supervised release that will incorporate ████████████████████ ███████████████████████.[1]

## **PRELIMINARY STATEMENT**

In a few weeks' time, Chris Jordan will stand before this Court to be sentenced for his trading activity from more than a dozen years ago. During that period, Chris often used a trading strategy in which he placed large orders that were at risk of execution onto a CME exchange, in almost all cases at the top of the order book. Chris was willing and able to execute these large orders, and this happened 9.4% of the time (*see* DX 95), but he did not want to do so. Instead, he hoped that the large orders would induce other market participants to hit smaller orders he had placed on the opposite side of the market – orders he wanted to trade – at which point he would cancel the large orders. In short, Chris spoofed.

Back in 2008 through 2010, when Chris was a Wall Street trader, the world was a very different place. Trading had just recently moved from manual trading, in which human beings verbally placed orders with brokers on trading floors, to anonymous electronic exchanges increasingly dominated by computer algorithms able to place and cancel trades within

---

[1] In this memorandum, "DX" and "GX" refer to defense and government exhibits, respectively, that were either received or excluded at trial; "[date] Tr." refers to proceedings at trial; "PSR" refers to the Presentence Investigation Report dated April 5, 2023, ECF No. 857; "Gov't Version of Offense" refers to the government's memorandum to Probation dated December 23, 2022, and attached to the PSR; "Venkataraman Decl." refers to the Declaration of Kumar Venkataraman dated March 30, 2023, and attached to the PSR; "Evans Decl." refers to the Declaration of Annie Evans, filed together with this memorandum; "*Vorley*" refers to court filings and transcripts of proceedings in *United States v. James Vorley and Cedric Chanu*, No. 18 Cr. 0035 (N.D. Ill.); "*Bases*" refers to court filings and transcripts of proceedings in *United States v. Edward Bases and John Pacilio*, No. 18 Cr. 0048 (N.D. Ill.); "*Coscia*" refers to court filings and transcripts of proceedings in *United States v. Michael Coscia*, No. 14 Cr. 551 (N.D. Ill.); and "*Smith*" refers to court filings and transcripts of proceedings in *United States v. Gregg Smith and Michael Nowak*, No. 19 Cr 0669 (N.D. Ill.).

milliseconds. Human traders struggled to keep up and some of them spoofed to get their trades executed. This was new territory for traders, regulators, and compliance professionals. In 2008 through 2010, neither the CME nor the CFTC had rules that spoke about spoofing. Financial institutions and trading firms did not have policies or training that explained to traders that spoofing was prohibited. In this environment, Chris used the spoofing strategy as a means to get good execution in a market increasingly dominated by high-speed computers.

In 2008 through 2010, Chris might have appeared to be on top of the world. He was a relatively successful trader working at some of the world's most prestigious financial institutions. He was married to his high school sweetheart and had three young boys, whom he adored. But underneath the surface, █████████████████████████████████████████████████ ████████████████████. And in the years that followed, his life unraveled. Chris was fired from his jobs on Wall Street, he lost his life savings in a failed business venture, ██████████ ████, his wife divorced him, ████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████.

By 2019, Chris was destitute, living with his parents, ██████████████████████ ███████████████████████████. Wall Street might as well have been in another galaxy. And then, in August 2019 – nearly ten years after Chris was terminated from JPMorgan – the Department of Justice chose to indict Chris with a battery of offenses, including RICO conspiracy, for his spoofing activity many years earlier. We do not question the government's authority to make this prosecutive decision, but we believe it was unnecessary and unjust.

In the three years after he was indicted, Chris endured a lengthy period of pre-trial stress and anxiety during which the Covid pandemic raged across the country: Chris's father passed

away; ███████████████████████████; and Chris found himself repeatedly turned down for jobs due to the pending criminal charges. On the legal front, as time elapsed our severance motion was granted and the government's case against Chris shrank, as all but one of the charges were dismissed. And then, in December 2022, Chris went to trial before this Court.

As Your Honor is aware, Chris freely admitted that he engaged in spoofing. At trial, the main disputed issue was whether he possessed the necessary *mens rea* to be guilty of federal wire fraud because all of his trading occurred before Dodd-Frank, at a time when banks and the CME had not yet adopted policies or training directed at spoofing. In the run-up to trial and in connection with jury deliberations, the Court made several disputed rulings that, in our view, severely hampered our ability to present our defense. *See* ECF No. 838 (Rule 33 motion based on inability to impeach government witnesses with post-Dodd-Frank compliance materials, denial of Rule 106 motion, denial of good-faith instruction, and response to jury note). And now, following the jury's verdict of guilty, Chris will stand before Your Honor for sentencing.

We respectfully submit that a just and reasonable sentence in this case would be time served, with a period of supervised release that will incorporate ████████████████████ ███████████████████████████████. Chris has suffered enormously over the last dozen years, and none of the purposes of sentencing would be served by incarcerating him. At a time when our country is grappling with the reality of over-incarceration, it makes no sense to send this man to prison based on long-ago conduct that was not clearly understood to be wrongful – much less illegal – at the time it occurred, when Chris battles each day to keep his life from going completely off the rails. Incarcerating Chris for any amount of time would ████████████, exacerbate the risks to his health and well-being, and be yet another brutal setback for a good man who has the capacity to make a positive contribution to his

family and the community ████████████████████████████████████████████████
██████████████ .

## **FACTUAL BACKGROUND**

### **A. Childhood and Upbringing**

In many ways, Chris had a traditional childhood. He grew up in a suburban town in northern New Jersey with his parents, William and Elizabeth Jordan, and two younger siblings, Paul and Caitlin. PSR ¶¶ 84, 88. His family life revolved around academics, religion, and sports. The family attended Catholic church every Sunday, sitting in the front row. Evans Decl. Ex. G. Chris's father, William, had been on the Notre Dame basketball team and encouraged his children's love of sports. Chris was a star wrestler and later in life was inducted into the Westfield (New Jersey) High School Athletic Hall of Fame for his achievements; his brother Paul was also a wrestler, and Caitlin swam. *Id.* Ex. A, I.

Chris's family was generous. In middle school, Chris befriended Marcus Elias, ████ ████████████████████████████████████████████████████████████████ . *Id*. Ex. B. Chris's family took Marcus in – he lived with the Jordans for stretches of time and they fed him, took him to wrestling tournaments, and supported him emotionally. *See id.* Chris and Marcus have remained lifelong friends, and Marcus traveled to Chicago to attend Chris's trial.

But notwithstanding all of this, Chris faced significant challenges beneath the surface. Chris's father William loved his children but was "very strict." PSR ¶ 86. William expected his children to work hard, get good grades, and always exhibit strength and "show a brave face." *Id.* ¶ 84. Despite placing heavy expectations on his children, William did not have a successful career. In 1990, when Chris was 19 years old and in college, William lost his job and never worked again. *Id.* ¶ 86. Going forward, William drank alcohol on a daily basis. *Id.*

When William stopped working, the Jordan family fell under significant financial stress. Evans Decl. Ex. G. Chris's mother Betty, who had left the workforce decades earlier to raise the children, had to step in and support the family financially. Over the years, she held a series of jobs as a dance instructor, babysitter, and school lunch aide. *See* PSR ¶¶ 86-87. These jobs did not pay well, and the Jordans were forced to downsize their home several times and went into debt. Evans Decl. Ex. G. In 1998, when Chris was working as a trader on Wall Street, he bought his parents a house in Mountainside, New Jersey as a way to relieve their financial stress. *Id.*

Nineteen years later, after Chris's own life had imploded, he moved into this house himself.[2] When Chris was living at home with his parents during the pandemic, William suffered from dementia and was incapacitated. Despite dealing with his own struggles, Chris became his father's caregiver during the final months of his life, helping with meals, hygiene, and companionship. *Id.* Ex. D, G, L. William passed away on October 21, 2021. PSR ¶ 84. Chris delivered the eulogy. Evans Decl. Ex. J, L.



---

[2] As the Court is aware, Chris's mother is in the process of selling the home in Mountainside and moving into an assisted living facility. *See* ECF No. 893; *see also* PSR ¶ 138.





████████████████████████████

███████████████

**C. College, Career on Wall Street, and Early Family Life**

In 1990, after graduating from high school, Chris enrolled at the University of Virginia, where he had been recruited as a member of the varsity wrestling team. PSR ¶¶ 93, 126; Evans Decl. Ex. K. Chris's time at UVA kicked off a period of success and happiness. In college, he studied hard and did well academically, graduating with a degree in economics. PSR ¶ 127; Evans Decl. Ex. H, K. Chris was a star athlete and served as captain of UVA's wrestling team. *See* Evans Decl. Ex. H, I; *see also* PSR ¶ 101. He developed close friendships, including with Doug Smith, a member of the UVA varsity basketball team who attended Chris's trial in Chicago, and Taylor and Sargent McGowan, both of whom have written letters in support of Chris. Evans Decl. Ex. H, I, K. In college, Chris was gregarious and fun-loving, generous with his friends and those less fortunate than himself. *Id*. Ex. K, H. He encouraged both of his siblings to follow him to UVA and mentored (and helped financially support) a local Charlottesville student through the Big Brother Program. *Id*. Ex. G, L.

After graduating from UVA in 1994, Chris moved to New York City and worked as a precious metals trader at Republic National Bank, Morgan Stanley, and JPMorgan. In the 1990s and early 2000s, Chris excelled at his job. *Id*. Ex. B. It was the era when commodity futures were exchanged on trading floors called "pits," with brokers shouting and using complicated hand signals to place orders. It depended on instinct, people skills, and having a competitive fire. Chris was a natural. However, by the mid-2000s, commodities markets moved to electronic platforms and Chris increasingly struggled. To put it mildly, he was not a computer guy. It was hard for him to compete with the algorithms and their ability to process information and place

and cancel orders at lightning speed. *See, e.g.*, DX 58, 59 (videos of TT trading ladder played for the jury at trial).

At JPMorgan, Chris joked with his colleagues about his technological shortcomings, and he proactively contacted bank compliance officers after making mistakes on the TT platform. *See* Evans Decl. Ex. R at DOJ-0009385483 (responding to a colleague's comment "Christopher Jordan. . . on Blooomberg? / noooooo / nooooo," and another colleague's comment "its a sad day .. CJ bows to modern technology," Chris wrote "yes indeed, u know my computer skills are legendary, i just got the fish on my screen saver down yesterday as well some moving into the 21st century look out"); *id*. Ex. S at DOJ-0012596227 ("i will be an administrative asst one day the way im going . . . . with mym organization skills, i will be top notch. actually I can barely turn on my computer most of the time"); *id*. Ex. Q at 55:18-21 ("You know, I was spilling coffee on a keyboard four times a day. I still had a pad and paper to write down my positions, and I was generally like a lunatic."); DX 70 ("I recently got the TT platform and just traded with myself in 20 lots or so because I clicked the red field rather than the blue field. I am getting much better at this but these little mistakes happen from time to time."); DX 71 ("oops, I was never good at video games, an trading gold is similar recently sorry buddy"); DX 72 ("this is getting really annoying I was bidding 17.44 for tay for 100 lots, and I went to cancel it by hitting the blue field, and instead I hit the red field, trading w/ myself. I am so angry.").

Another blow came in 2008, when JPMorgan merged with Bear Stearns and Gregg Smith joined the firm doing the same job as Chris. Smith, who was legendarily fast at trading electronically, was given primary responsibility for trading gold – by far the most important metal – and Chris was relegated to the less important job of trading silver. Chris resented this demotion, and over time the climate on the desk grew increasingly tense. The situation was

exacerbated by personality clashes between Chris and Smith, as well as accusations by Smith that Chris had engaged in improper "front-running" of Smith's transactions. *See* ECF No. 151. Chris denied the accusations, and there were never any findings that Chris engaged in improper conduct (*see* GX 37, 39), but in November 2009, Chris was let go from JPMorgan. *See id.*

After being unemployed for several months, Chris joined Credit Suisse in March of 2010. PSR ¶¶ 17, 135; GX 47. His tenure there was short and unsuccessful. He lost millions of dollars and was let go after just over three months of trading. *See* Evans Decl. Ex. T at DOJ-0008283616, DOJ-0008284182; DX 95 (Credit Suisse trading dates). Having been made obsolete by computers and a more tech-savvy generation of manual traders, Chris never worked on Wall Street again. In the summer of 2011, he had a "last stand" as a day trader at a firm called First New York Securities, but he lost money and was let go after just three and a half months. PSR ¶ 135.[13]

All of this was humiliating and stressful for Chris. In June 2001, he had married his high school sweetheart, Samantha Jordan (née Nichols), and by 2011, they had three young boys at home. *Id.* ¶¶ 89-90. And yet, as of the fall of 2011, Chris was unemployed and tapped out as a trader. His post-college professional identity had been vaporized.

As Chris's career on Wall Street was unraveling, ████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████

<hr>

[13] Chris's dates of trading at First New York were June 23, 2011 through October 7, 2011. Although Chris continued to spoof at First New York, the PSR properly does not incorporate any alleged losses from the First New York trading. Before trial, the Court granted our motion to exclude evidence of trading that post-dated Credit Suisse on statute of limitations grounds, because First New York is not a "financial institution" under 18 U.S.C. § 20. ECF No. 744 at 3-4. Moreover, even though a portion of Chris's trading at First New York post-dated the effective date of Dodd-Frank, the record makes clear that First New York did not adopt any policies or compliance training regarding spoofing during Chris's brief tenure at the firm. *See* ECF No. 693 at 7 (discussing GX 48-54).

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

**D. BrawlHouse and** ███████████████████████████

In 2012, with Wall Street in the rear-view mirror, Chris decided to pursue a different path. Together with a business partner, he opened BrawlHouse, a gym focusing on mixed martial arts, CrossFit, and yoga.  PSR ¶ 135.  This fit with Chris's love of competitive sports and coaching. For Chris, BrawlHouse was also a way to bring his community together and to offer resources to those in need; Chris let kids who could not afford a gym use the facility.  Evans Decl. Ex. C.

Chris invested most of his savings in BrawlHouse and worked hard to make the business a success.  BrawlHouse was a first-rate facility with a boxing ring, yoga studios, and top of the line equipment.  Chris hired elite athletes and coaches, including former world class boxer Gerry Cooney ████████████████████.  *See* ECF No. 349 at 3-6.  But sadly, the business failed.  Chris's partner left in 2016 and BrawlHouse's doors closed for good in 2017.  Altogether, Chris lost between $1 and $2 million and was left with nothing to fall back on.  PSR ¶ 135.

In 2017, Samantha filed for divorce and Chris moved into his parents' house.  ███

████████████████████████████████████████████████████



- 

- 

- 

- 

- 

_____

[14]



- [REDACTED]

- [REDACTED]

- [REDACTED]

- [REDACTED]

- [REDACTED]

- [REDACTED]

- [REDACTED]

---

[15] On November 5, 2018, in the middle of this [REDACTED] [REDACTED], the FBI showed up, unannounced, at 6:00 a.m. at the front door of Chris's parents' home. As the Court will recall from the trial, Chris's father let the agents into the house, whereupon they walked upstairs to Chris's bedroom, knocked on his door, got him out of bed, and spent a number of hours asking him detailed questions about his experiences at JPMorgan more than nine years earlier. Chris was courteous, cooperative, and truthful during his FBI interview.

- 







[black redaction bars]

### E. Divorce, Finances, and Struggles with Employment

As mentioned above, Chris's marriage fell apart in 2017. *See* PSR ¶ 89. In addition to the emotional fallout, this was a financial disaster for Chris. When Samantha filed for divorce, Chris failed to respond and the court entered a default judgment on October 13, 2017. Based on Chris's earning history during his career on Wall Street – which went unrebutted because Chris did not hire a lawyer – the court ordered Chris to pay $45,000 per year in alimony, $300 per week in child support, 60% of the children's extracurricular activities and unreimbursed medical expenses, and $14,400 in child support (retroactive to the commencement of the divorce case).[16]

Given Chris's ███████████████████████, as well as his challenges finding and maintaining employment (as outlined below), these financial obligations have been completely unrealistic for him. In 2020, Chris liquidated his Morgan Stanley retirement account and paid $65,637 to Samantha. At times, Chris's mother has paid child support on Chris's behalf. *Id.* ¶ 139. Nevertheless, by April 2023, Chris's arrears had grown to approximately $224,000. On April 19, 2023, Chris and Samantha agreed to a consent order which terminated Chris's alimony obligation retroactive to October 2021 and decreased his arrears by $67,500. Today, Chris owes more than $160,000.

---

[16] Information about the terms of the Jordan divorce, including the April 2023 consent order and Chris's arrearage, is drawn from court records. *See Jordan v. Jordan*, Superior Court of New Jersey, Chancery Division, Family Part, Union County, Dkt. No. FM-20-1925-17.

In the years since the demise of BrawlHouse, Chris has struggled to maintain steady employment. From June 2020 to February 2021, he worked as a sales representative for Momentum Solar in South Plainfield, New Jersey, but the job was unfulfilling and Chris found it impossible to continue after he developed doubts about the company's products. *Id.* ¶ 133. From December 2021 through May 2022, Chris worked as a sales representative at Retro Fitness in Kenilworth, New Jersey, where he received strong performance evaluations from his manager, but he decided to leave the job so that he could ████████████████ *Id.* ¶ 131. From February 2023 until ████████ April 2023, Chris worked as a salesperson for Premier Martial Arts in Livingston, New Jersey, but he found the work unsatisfying and left the job after ████████████ ████. *Id.* ¶ 129.

Chris's current career goal is to work as a substitute teacher and coach at a school in New Jersey. *See id.* ¶ 129. With his passion for sports and his formidable intellect, he would be great at this job, for which he has applied repeatedly. However, due to the pending criminal charges, Chris was consistently refused employment. *See* Evans Decl. Ex. A, D. The charges in this case have also prevented Chris from getting jobs as a car salesman (offer at a Honda dealership was retracted after background check) and as a life insurance salesman (soft offer was not formalized because of failed background check). In recent months, Chris has met with a career services agency, applied for a job with New Jersey Transit, and sought front-office or receptionist jobs at gyms and fitness centers. None of these efforts has panned out to date, but Chris remains committed to seeking and maintaining employment.

### F. Devotion to Family and Hopes for the Future

Chris is a troubled soul who carries a heavy burden. ████████████████████ ██████████████████████████████████████████████████████ ████████████████████ He is in chronic financial distress and has struggled to find and maintain

meaningful employment. When Chris spoke to the Probation Office, he was brutally honest about the misfortunes that he has suffered. "████████████████████████████████████ ███, the defendant stated, 'I lost everything: home, marriage, my business.'" PSR ¶ 124; *see also* Evans Decl. Ex. B, D, G, H, I, L. ████████████████████████████████████ ████████████████████████████████████████████████████████

But even with all of these setbacks, Chris has a generous spirit that comes through in the attached letters. *See id.* ¶ 110; Evans Decl. Ex. A ("[O]ne could not help but notice his witty personality, enthusiasm for life, and drive to excel"); Evans Decl. Ex. C ("Whether it is family, friends, or strangers he never struggles to put a smile on their faces"); *id*. Ex. F ("Chris Jordan is the most empathetic and affectionate person I have ever met"); *id*. Ex. H ("His magnetic personality put him at the center of our group of friends, and he was inclusive and generous with us all"); *id*. Ex. I ("Chris went from being a dear friend to being part of our family during this period and I will never forget it"); *id*. Ex. K ("CJ had an incredible personality and always loved making his friends our friends and vice versa. He was also incredibly giving to those around him"); *id*. Ex. L ("He is so motivating. Before his gym closed and when Chris would coach his sons' teams, this is what I would always hear: that he was bringing out the best in everyone around him. He only wants the best for others and knows how to instill it.").



Chris is intensely focused on redeeming himself in the eyes of his sons, and they, in turn, are filled with love and compassion toward their

father.  Evans Decl. Ex. B, C, D, E, F, G.  All three boys are gifted athletes, and Chris has derived joy and satisfaction from coaching them in youth sports and watching them excel in high school sports.  *Id*. Ex. A, C, F, L.[17] ████████████████████████████████████████ ████████████████████████████████████████████████████ They, in turn, have shown courage and emotional maturity in writing to the Court to express their love and compassion for their father.  *See id*. Ex. C, E, F.

Chris also is devoted to his mother and hopes that she will be able to enjoy a period of peace and contentment in her retirement.  *See id*. Ex. D.  His objective is ████████████████████ ██████████████ that will allow him to launch a new chapter with independent living, gainful employment, and a solid contribution to the community.  *See* PSR ¶ 92; Evans Decl. Ex. A, G, H.

## OFFENSE CONDUCT

At trial, Chris was charged with a single count of wire fraud affecting a financial institution, in violation of 18 U.S.C. § 1343, based on his spoofing at JPMorgan and Credit Suisse between 2008 and 2010.  On December 9, 2022, after more than two days of jury deliberations, the jury returned a guilty verdict.  We respectfully disagree with the verdict and plan to appeal based principally on the issues identified in our Rule 33 and Rule 29 motions (*see* ECF No. 838, 835).  However, we wish to emphasize that Chris has always accepted responsibility for his spoofing conduct.  During the trial, we readily conceded that Chris spoofed at JPMorgan and Credit Suisse.  As the trial evidence made clear, Chris engaged in simple "large order" spoofing, which is obvious and easy to detect; he spoke about spoofing openly and transparently while he worked at JPMorgan, including with the global head of commodities

---

[17] Chris was compassionate to other children as well.  As relayed by his Aunt Patricia, "[w]hen he was coaching his son's baseball team, Chris took one of the teammate's brother's, who has Down syndrome, under his wing.  He made a fuss over the boy and carved out his personal time to play one on one ball with him when they met at the field.  He knew how to put the young man at ease and makes him laugh."  Ex. A.

trading (*see* GX 5, 6, 7, 8); and he readily admitted spoofing when FBI agents showed up, unannounced, and started asking him questions more than nine years after he left JPMorgan.[18] Our specific objections and proposed additions to the PSR's statement of the offense are attached to the Evans Declaration as Exhibit N.

## APPLICATION OF THE SENTENCING GUIDELINES

For the reasons set forth below, we respectfully submit that the total offense level is 13, which reflects a 4-level increase for a loss amount between $15,000-$40,000, and a two-level increase for 10 or more victims, but does not include enhancements for sophisticated means, special skills, or obstruction of justice. Because Chris is in Criminal History Category II as a result of his two DUI convictions, the resulting Guidelines range is 15-21 months' imprisonment.

### A. Base Offense and Enhancement for 10 or More Victims

As a starting point, the parties agree that the base offense level is 7 under U.S.S.G. § 2B1.1(a)(1) because the offense of conviction (wire fraud affecting a financial institution) has a statutory maximum of 20 years' or more imprisonment. The parties also agree that a two-level increase is warranted pursuant to § 2B1.1(b)(2)(A)(i) because the offense involved 10 or more victims. But this is where the agreement ends.

### B. Loss Amount

Relying on Professor Venkataraman's declaration, the government posits that the loss amount from Chris's trading is "approximately $300,000," which would result in a 12-level enhancement to the base offense level. *See* PSR ¶ 25; *see also* Venkataraman Decl. ¶ 13

---

[18] In its opening statement and closing argument, the government characterized Chris's statements to Agent Luca as a "confession." However, in the FBI interview, Chris also said that he did not think what he was doing was wrong; that all of his orders were at risk in the marketplace; and that JPMorgan never provided guidance on the proper way to trade metals during the time that markets were transitioning from pit trading to electronic trading. *See* ECF No. 754 (Rule 106 motion). Because of the Court's denial of our Rule 106 motion, the jury never heard these critical, exculpatory portions.

(estimating loss amount at between $337,332 and $349,381). Probation instead concluded that the loss amount caused by Chris's trading was $28,920, which is the amount of money JPMorgan paid to compensate victim traders under its Deferred Prosecution Agreement ("DPA") with the government, based on Chris's trading. PSR ¶ 46. We agree with Probation's analysis and the resulting conclusion that the enhancement for loss is four levels under U.S.S.G. § 2B1.1(b)(1)(C).

As explained in the declaration of Aaron Dolgoff, Professor Venkataraman's calculation of the loss amount attributable to Chris's trading is speculative and unsupported. Dolgoff Decl. ¶¶ 7, 24. In particular, Professor Venkataraman's assumption that, but-for Chris's trading, market participants wishing to buy gold or silver futures contracts would have been able to execute at the best bid price (and market participants wishing to sell gold or silver futures contracts would have been able to execute at the best offer price), lacks any empirical basis. *Id*. ¶¶ 10-12. CME data for the period of Chris's trading examined by Professor Venkataraman indicates that only 15% of passive silver orders placed at the best price and 23.5% of gold orders place at the best price have at least one execution. *Id*. ¶ 13. Accordingly, there is no foundation for Professor Venkataraman's assertion that but-for Chris's trading activity, market participants would have filled their orders at the resting prices.

The reality is that any reasonable estimate of another market participant's "but-for" transaction price may be impossible to determine. In this case, however, there is an alternative. As recommended by Probation, a reliable estimate of loss attributable to Chris's trading is the $28,920 that JPMorgan actually paid to compensate victims in connection with Chris's trading. PSR ¶ 46; *see United States v. Frith*, 461 F.3d 914, 917-18 (7th Cir. 2006) (approving use of insurance payouts as basis for loss calculation). As Probation explained, JPMorgan's payments

under the DPA to counterparties who traded opposite Chris are "a direct and tangible metric for the actual losses inflicted on other market participants" and thus provide an adequate basis for determining the loss under Section 2B1.1(b)(1). PSR ¶ 46.

We suspect the government will object to this approach on the grounds that the amount paid out by JPMorgan reflects only *actual* losses, but Application Note 3(A) to U.S.S.G. § 2B1.1(b)(1) provides that "loss is the greater of actual loss or *intended* loss." (emphasis added). The government raised a similar objection in its reply brief for the sentencing of Smith and Nowak, seeming to suggest that its calculation could pass muster as a measure of intended loss even if the victims' actual losses were lower, or if they were able to mitigate the losses with offsetting gains. *See* ECF No. 873 at 6-7.

On the facts of this case, there is no basis to conclude that Chris "intended" any counterparty to suffer a loss. He placed valid orders on the CME and, in all cases, followed through with the transaction if a counterparty chose to execute against his resting orders. Furthermore, although the Seventh Circuit has not ruled on the issue, we respectfully submit that, in light of *Kisor* v. *Wilkie*, 139 S. Ct. 2400, 2414-16 (2019), which held that courts should not extend *Auer* deference to administrative interpretations of agency regulations that are not "genuinely ambiguous" or otherwise are not entitled to "controlling weight," Application Note 3(A) should be given no legal effect. *See United States* v. *Banks*, 55 F.4th 246, 258 (3d Cir. 2022) (applying *Kisor* and holding that because the plain language of the Guideline speaks to actual loss and not intended loss, Application Note 3(A) is entitled to "no weight"). For these reasons, we respectfully submit that the loss amount is $28,902, which would result in a four-level enhancement to the offense level.

### C. Sophisticated Means

The government seeks a two-level enhancement under U.S.S.G. § 2B1.1(b)(10) because Chris purportedly employed sophisticated means, namely a "strategy that was designed to trick algorithmic traders." PSR ¶ 49. In contrast, Probation believes the enhancement is unsupported because Chris's trading involved "simple dishonesty" and was conducted "manually, as opposed to through the use of an algorithm," did not involve coordinated trading with other market participants, and was "not complex or intricate." *Id.* ¶ 50. We agree with Probation. The government's position is unsupported by law and inconsistent with the position the government has taken in other spoofing cases.

Section 2B1.1(b)(10)(C) of the Sentencing Guidelines provides for a two-level enhancement if "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." The Seventh Circuit has explained that "the adjustment for sophisticated means is warranted only 'when the conduct shows a greater level of planning or concealment than a typical fraud of its kind.'" *United States v. Ghaddar*, 678 F.3d 600, 602 (7th Cir. 2012) (quoting *United States v. Green*, 648 F.3d 569, 576 (7th Cir. 2011)); *see also United States v. Lundberg*, 990 F.3d 1087, 1097 (7th Cir. 2021). Here, Chris's spoofing strategy was plain vanilla, large order spoofing – it did not involve algorithms, coordination among traders, or layering. To our knowledge, no court has ever imposed the sophisticated means enhancement for this type of spoofing, nor has the government previously advocated for it.[19] We respectfully submit that the Court should adopt Probation's recommendation and not apply an enhancement for sophisticated means.

---

[19] In past spoofing cases where the government has sought this enhancement, the government has pointed to layering or, in *Coscia*, the fact that the defendant programmed two computer algorithms specifically to spoof. *See, e.g.*, *Smith*, ECF No. 856 at 21-22; *Bases*, ECF No. 725. at 30; *Vorley*, ECF No. 383 at 21; *Coscia*, ECF No. 157 at 10-11.

### D. Special Skill

The government seeks a two-level enhancement under U.S.S.G. § 3B1.3 because "Jordan used a special skill, mainly sophisticated trading in futures markets, in a manner that significantly facilitated the commission of the offense." Gov't Version of Offense at 6.  Probation agrees and recommends application of the enhancement because Chris's "skills in affecting market prices through spoofing constitute special skills not possessed by members of the general public."  PSR ¶ 54.  We disagree.

As explained in Application Note 4 to U.S.S.G. § 3B1.3, "'Special skill' refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing," with examples including "pilots, lawyers, doctors, accountants, chemists, and demolition experts."  Chris had no special training or licensing to trade precious metals futures, and his spoofing conduct did not rely on any special skill.  He simply placed and cancelled orders on a CME exchange, as countless professional and day traders do every day.  To date, only one prior spoofing defendant has received a special skill enhancement:  Michael Coscia.  As noted above, Coscia built two computerized trading algorithms to engage in spoofing.  The government did not seek, nor did the courts impose, a special skill enhancement against James Vorley, Cedric Chanu, Edward Bases, or John Pacilio.[20]  For the foregoing reasons, we respectfully submit that the Court should not adopt an enhancement for use of a special skill.

### E. Obstruction of Justice

The government seeks a two-level enhancement under U.S.S.G. § 3C1.1, on grounds that Chris committed perjury in response to two brief and ambiguous questions in a September 2010 CFTC deposition:

---

[20] The government is seeking the special skill enhancement for Gregg Smith but not Michael Nowak, neither of whom have been sentenced as of the date of this memorandum.  ECF No. 856.

Q: While you were working at J.P. Morgan, did you ever engage in
trading for the purpose of influencing the price on COMEX?

A: No

*********

Q: Did you ever show a bid or offer on Globex that you didn't intend to
execute?

A: Only if it, I would only cancel something if I changed my mind or it
was put in in error, but no.

*See* Gov't Version of Offense at 5 (quoting GX 56); *see also* PSR ¶¶ 39, 55.  Probation concurs.

*See* PSR ¶ 56 (citing Application Note 4(B), which provides that the obstruction adjustment

should be imposed if the defendant is found to have committed perjury, "including during the

course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense

of conviction.").  We strongly disagree.  On the facts of this case, the obstruction adjustment is

inapplicable for two independent reasons:  (1) the evidence is insufficient to show that Chris

committed perjury; and (2) Chris's CFTC testimony – which occurred at a time when the

existence of the subsequent criminal investigation was neither known nor foreseeable – was not

"purposefully calculated" or "likely" to "thwart the investigation or prosecution of the offense of

conviction."  *See* U.S.S.G. § 3C1.1, App. Note 1.

    1.  *Chris did not commit perjury*

    To impose an obstruction enhancement based on perjury, the government must prove that

a defendant provided "false testimony concerning a material matter with the willful intent to

provide false testimony, rather than a result of confusion, mistake, or faulty memory."  *United*

*States v. Dunnigan*, 507 U.S. 87, 94 (1993).  As this Court is well aware, not all inaccurate

testimony rises to the level of perjury.  *See id*. at 95 ("an accused may give inaccurate testimony

due to confusion, mistake, or faulty memory").  If the defendant objects to an obstruction

adjustment, the sentencing court cannot impose the adjustment unless it reviews the record and makes "independent findings" that the evidence supports a finding of perjury. *Id*.; *see also United States v. Johnson*, 612 F.3d 889, 893 (7th Cir. 2010) (factual predicates for perjury are "false testimony, materiality, and willful intent"). "When doing so, it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding." *Dunnigan*, 507 U.S. at 95.

Here, the record does not support a finding that Chris committed perjury. As Agent Luca acknowledged, the CFTC never asked Chris whether he engaged in spoofing, whether he entered bids or offers with the intent to cancel them before execution, or whether he engaged in the government's four-step pattern, *see* 12/2/22 Tr. 642, 652, and the two brief snippets cited by the government do not prove a willful and material false statement by Chris. As to the first question, which asked whether Chris ever traded "for the purpose of influencing the price" on the exchange, Chris's one-word negative answer was consistent with other testimony during the same deposition that he traded for the purpose of getting good fills for his boss, Ray Eyles. *See* GX 55 at 72:3-9; Evans Decl. Ex. Q (Day One) at 65:2-17, 71:18-74:13, 102:18-103:17; *id*. (Day Two) at 144:4-145:12, 147:21-148:9, 149:8-16, 150:15-151:11.

As to the second question, which asked whether Chris ever showed a bid or offer on Globex that he "didn't intend to execute," the CFTC's imprecise question could have been understood as asking whether Chris ever entered orders with an intent to back away from the transaction if a counterparty's order matched against his order. *See* 12/2/22 Tr. at 653-56. The ambiguity is heightened because the question was posed in isolation, without any context or follow up to make clear that the CFTC was actually asking about spoofing (if that in fact was the case). Chris's halting answer suggests that he was confused about what the CFTC was getting at.

And he was right to be confused, because the CFTC had just spent two full days of testimony

asking him about unrelated topics. *See* Evans Decl. Ex. Q (full transcript of the two-day CFTC

deposition); *see also id*. Ex. U (CFTC press release with information on the origins, scope, and

outcome of the Silver Investigation). As a final point, we would add that the allegation of

perjury is discordant and improbable given Chris's candor and honesty about spoofing internally

at JPMorgan – as evidenced by his contemporaneous Bloomberg chats – and to the FBI, many

years later, when Agent Luca rousted him out of bed and started asking him questions that were

clear and focused.

A further problem for the government is that even assuming *arguendo* that the two cited

snippets of deposition testimony were willfully false, they were not "material" as required for a

finding of perjury. In *United States v. Zagari*, 111 F.3d 307, 329 (2d Cir. 1997), the Second

Circuit vacated an obstruction adjustment that was premised on the defendant's allegedly false

testimony in a prior civil deposition, because the district court did not make sufficient findings of

materiality. In *Zagari*, the Second Circuit undertook a detailed analysis of the applicable

materiality standard and concluded as follows:

> [W]hen false testimony in a related but separate judicial proceeding is
> raised as the basis for a § 3C1.1 obstruction of justice enhancement, a
> sentencing court may only apply the enhancement upon making specific
> findings that the defendant intentionally gave false testimony which was
> material to the proceeding in which it was given, that the testimony was
> made willfully, i.e. with the specific purpose of obstructing justice, and
> that the testimony was material to the instant offense.

*Id.* at 329. Under this standard, the sentencing court is required to find that the allegedly false

testimony was material to two different proceedings: "the proceeding in which it was given" and

"the instant action." *Id*. Here, the evidence is insufficient to establish materiality in *either* the

CFTC Silver Investigation – which had a different focus – *or* the instant offense of conviction,

given Chris's candid and straightforward admission to the FBI during the November 2018 interview that he had engaged in spoofing at JPMorgan. In short, the evidence does not support a finding of perjury.

> 2. *The CFTC testimony was not "purposefully calculated" or "likely" to obstruct the subsequent criminal investigation*

Under the plain language of § 3C1.1, the obstruction enhancement only applies if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the *instant offense of conviction*." U.S.S.G. § 3C1.1 (emphasis added). Here, the Court instructed the jury that the CFTC Silver Investigation was "separate" and "not part of the Department of Justice's investigation that led to the prosecution in this case." ECF No. 804 at 28. Accordingly, even if the Court were to find that Chris committed perjury, there would be no basis for the enhancement because the CFTC deposition did not occur "with respect to . . . the instant offense of conviction," as required under § 3C1.1, but rather with respect to a "separate" investigation that predated the criminal investigation and "was not part of" it. *Id.*

Under Application Note 1 to § 3C1.1, obstructive conduct that occurred "prior to the start of the investigation of the instant offense of conviction" may be a basis for the obstruction enhancement, but only if the perjury "was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction." U.S.S.G. § 3C1.1, App. Note 1. Here, that is not the case. At the time of the deposition – September 2010 – the criminal investigation was neither known nor foreseeable to Chris. Indeed, as of September 2010, there is no basis to believe that Chris was at all familiar with the provisions of the Dodd-Frank Act, which did not become effective until July 16, 2011, and as to which the CFTC had not yet issued any

administrative pronouncements.[21]  Even less plausible is that Chris actually foresaw, in September 2010, that he himself would someday come under criminal investigation for spoofing and that he willfully and intentionally gave false testimony, in the two brief answers upon which the government relies, as part of a "purposeful calculation" to "thwart" this hypothetical future criminal investigation.  The first criminal charge for spoofing was not brought until *four years* after Chris's CFTC deposition, when the U.S. Attorney's Office in the Northern District of Illinois indicted Michael Coscia.  *See* DOJ, *High-Frequency Trader Indicted for Manipulating Commodity Futures Markets in First Federal Prosecution for 'Spoofing'*, (Oct. 2, 2014), https://www.justice.gov/usao-ndil/pr/high-frequency-trader-indicted-manipulating-commodities-futures-markets-first-federal.  That case, as previously discussed, was based on entirely different facts.  In later years, when the DOJ Fraud Section eventually launched its criminal investigation of JPMorgan's precious metals desk, there is no basis to conclude that Chris's CFTC deposition actually "thwarted" the investigation.  During the Fraud Section's investigation, the government developed numerous charts demonstrating that Chris spoofed.  During the November 2018 interview, Chris admitted that he spoofed.  Tellingly, throughout the multi-hour interview, Luca asked no questions about the CFTC deposition.  In short, there was no obstruction of justice.

---

[21] On November 2, 2010 – about a month and a half *after* Chris's deposition – the CFTC issued its first Federal Register notice regarding Dodd-Frank § 747, which contains the anti-spoofing provision.  *See* 75 Fed. Reg. 67301 (Nov. 2, 2010).  In this document, the CFTC solicited comments on "all aspects of Dodd-Frank section 747" and asked no less than 19 questions, including "How should the Commission distinguish 'spoofing,' as articulated in paragraph (C), from legitimate trading activity where an individual enters an order larger than necessary with the intention to cancel part of the order to ensure that his or her order is filled?" and "Are there ways to more clearly distinguish the practice of spoofing from the submission, modification, and cancellation of orders that may occur in the normal course of business?"  *See id*. at 67302.  These 19 questions "formed the basis for a December 2, 2010, roundtable held by Commission staff in Washington, D.C."  *See* 76 Fed. Reg. 14943, 14944 (Mar. 18, 2011).  This was a full-day event, with three panels.  *Id*.  On top of the input provided from the roundtable participants, the CFTC received 28 comments in response to the 19 questions.  *Id*.  It was not until May 28, 2013 – some two and a half years after Chris's CFTC testimony – that the CFTC ultimately issued its interpretive guidance and policy statement regarding the Dodd-Frank anti-spoofing provision.  *See* 78 Fed. Reg. 31890 (May 28, 2013).  There is no evidence that Chris was aware of any of these events when they occurred, much less that he actually foresaw them in September 2010, at the time of his CFTC deposition.

# DISCUSSION OF § 3553(a) FACTORS

Pursuant to 18 U.S.C. § 3553(a), a court must impose a sentence that is "sufficient, but not greater than necessary" to satisfy the purposes of sentencing as set forth in § 3553(a)(2). "This provision is known as the 'parsimony principle.'" *United States v. Swank*, 37 F.4th 1331, 1334 (7th Cir. 2022); *see also Dean v. United States*, 581 U.S. 62, 67 (2017). In determining an appropriate sentence that meets this statutory requirement, a sentencing court is required give "meaningful consideration," *Swank*, 37 F.4th at 1334, to a series of enumerated factors, the most pertinent of which are the following:

- The nature and circumstances of the offense, 18 U.S.C. § 3553(a)(1);

- The history and characteristics of the defendant, *id.*;

- The need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, and to afford adequate deterrence, 18 U.S.C. § 3553(a)(2)(A) and (B);

- The need for the sentence to provide the defendant with needed medical care in the most effective manner, 18 U.S.C. § 3553(a)(2)(D);

- The applicable Sentencing Guidelines range, 18 U.S.C. § 3553(a)(4)(A); and

- The need to avoid unwarranted sentencing disparities, 18 U.S.C. § 3553(a)(6).

As this Court is well aware, the Sentencing Guidelines are no longer mandatory and are just one of the § 3553(a) factors. *United States v. Brown*, 732 F.3d 781, 786 (7th Cir. 2013) ("the only boundaries on the court's *Booker* discretion are the more capacious § 3553(a) factors"). "If, after weighing the § 3553(a) factors, a district court determines that a sentence below the Guidelines range is sufficient, but not greater than necessary, to accomplish the goals of sentencing, it should give the below-Guidelines sentence." *Swank*, 37 F.4th at 1334; *see also United States v. Warner*, 792 F.3d 847, 855 (7th Cir. 2015) (the Guidelines supply "'the starting point and the initial benchmark,' but nothing more") (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)).

"Ultimately, it falls on the district court to weigh and balance the various factors and to 'make an individualized assessment based on the factors presented.'" *Warner*, 792 F.3d at 855 (quoting *Gall*, 552 U.S. at 50)). As the Seventh Circuit has made clear, "[t]he open-endedness of the § 3553(a) factors leaves ample room for the court's discretion." *Warner*, 792 F.3d at 855. On appellate review, the Court of Appeals "will not substitute our judgment for that of the district court." *Id*. at 856. "A variant sentence is most likely to pass muster if it is based on considerations particular to the defendant or the case, as opposed to 'normal incidents of the offense or the judge's wholesale disagreement with the guidelines.'" *Id*. (quoting *United States v. Wachowiak*, 496 F.3d 744, 750 (7th Cir. 2007)).

## A. Nature and Circumstance of the Offense

In its submission to Probation, the government characterized the offense conduct as involving an unlawful trading practice that was "designed to manipulate prices" for the benefit of Chris and his employers. PSR ¶ 18. According to the government, spoofing allowed Chris to "profit off other traders' reactions to the false and misleading information" that he "inserted into the market." *Id*. The government cited trial evidence that Chris placed "thousands of spoof orders" that impacted "dozens of victims." *Id*. ¶¶ 21, 25.

Chris was not charged with market manipulation, and we dispute that he committed this offense. That being said, as noted above – and as we made crystal clear to the jury – we admit that Chris engaged in spoofing and that he did so in an effort to induce computer algorithms to cross the bid-offer spread and hit his resting iceberg order on the other side of the market. Chris did this as a technique to achieve good execution in an environment in which it had become difficult to succeed as a manual trader in light of the enormous speed advantages possessed by computerized trading programs. With respect to the nature and circumstances of the offense, we wish to highlight two important mitigating factors.

The first is the *time period* in which Chris spoofed at JPMorgan and Credit Suisse. If Chris had engaged in spoofing after being placed on notice of the Dodd-Frank anti-spoofing provision, or after receiving clear and unambiguous compliance training that talked about spoofing as a prohibited trade practice, then there would be a basis to criticize him for knowingly doing something wrong. But that is not the situation.

From 2008 through 2010, when Chris was trading at JPMorgan and Credit Suisse, there were no clear, unambiguous CME rules or bank compliance policies that prohibited spoofing. At trial, the parties debated whether the general language in CME Rule 432 (e.g., prohibiting conduct "inconsistent with just and equitable principles of trade"), or generalized bank policies prohibiting market manipulation, were understood to apply to spoofing in 2008 through 2010. Government witnesses Erin Middleton, David King, and Mark Catana testified that, in their opinion, the language of Rule 432 and the applicable bank policies *was* broad enough to encompass spoofing. We attempted (while being hamstrung by an adverse evidentiary ruling) to impeach this testimony. But regardless, none of the government witnesses testified that Chris *actually was informed* about rules against spoofing. Nor could they have done so: the CME's first spoofing enforcement case did not become public until January 2012; Middleton and Catana never laid eyes on Chris until they saw him in the courtroom; and King, though purporting to recall sitting in on Chris's compliance onboarding training at Credit Suisse in March 2010, could not identify Chris in the courtroom and conceded that he never discussed spoofing with Chris and had no knowledge of whether Chris actually understood that spoofing was against the rules in 2010. *See* 12/2/22 Tr. 720:4-21, 733:6-734:12.

Assuming *arguendo* that the lack of clear rules or compliance policies against spoofing does not amount to a legal defense to the charge of wire fraud affecting a financial institution, we

respectfully submit that it is nevertheless highly relevant to the appropriate sentence to be imposed.  If a person were to receive compliance training that spelled out the rules against spoofing in black and white, and then that same person continued spoofing in knowing violation of the rules, then a sentencing court should rightly assign greater severity to the offense.  By contrast, we submit that there should be far less moral opprobrium for a trader like Chris Jordan, who *did not* receive training that clearly talked about spoofing, and for whom the whole exercise feels like a game of "gotcha," with hindsight being wielded against him.

The second mitigating factor is the *manner* in which Chris spoofed.  In contrast to many other individuals who have been prosecuted for spoofing, Chris engaged in simple, large order spoofing.  His orders were at the top of the order book and were fully at risk of execution.  He did not use the more sophisticated technique of layering.  In short, Chris's spoofing was transparent and obvious.[22]  And as another point of contrast with other spoofing defendants, Chris acted alone.  He did not coordinate his spoofing with anyone else, nor did he teach junior traders to spoof.  His behavior was simply an effort to get his orders filled in an environment where computerized traders were reaping enormous profits and it was increasingly difficult for human beings to compete.  We respectfully submit that the level of moral condemnation for this conduct should be low, especially as compared to other individuals who have been prosecuted criminally for spoofing.

**B.  History and Characteristics of the Defendant, and the Need for Medical Care**

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

---

[22] By the same token, Chris openly spoke about his spoofing, in Bloomberg chats to a senior member of JPMorgan's commodities team and with a person who worked for another trading firm.  *See* GX 5, 6, 7, 8.  He was open and honest with the FBI agents when they entered his parents' home at a time of great tribulation, woke him up, and asked him detailed questions about events from nine years earlier.





█████████████████████████████████████████████████

████████  ████████████████████████████████████████████

████████████████████████████████████████████ In short,

Chris's history and characteristics, and the need for providing him with medical care in the "most

effective manner," 18 U.S.C. § 3553(a)(2)(D), overwhelmingly support a non-custodial sentence.

## C. Deterrence, Just Punishment, and Respect for the Law

Specific deterrence is obviously irrelevant here, because Chris left Wall Street in 2010

and will never return.  We respectfully submit that, due to the passage of time and the nature of

the offense and Chris's personal circumstances, considerations of general deterrence and just

punishment are equally insubstantial.   After Chris left Credit Suisse, Congress determined that

spoofing should be made illegal, whereupon banks and the CME adopted rules and policies to

prohibit this behavior.  Some traders nevertheless persisted, and they have been prosecuted and

sentenced.  As we sit here in the summer of 2023 – some twelve years after the effective date of

Dodd-Frank – the "message" that spoofing is not allowed, and that traders who knowingly

violate the rules will be held to account, has been repeatedly driven home.

Sending Chris Jordan to jail would not further that message.  It would not promote

respect for the law or the criminal justice system.  Indeed, we respectfully submit that any



informed layperson who knew the full facts and circumstances of Chris's case would be moved to pity and compassion, rather than moral outrage. *See Warner*, 792 F.3d at 861 (ascribing little weight to general deterrence in tax-evasion case because of the defendant's individualized circumstances and the consequences that he already suffered). This is especially true as our nation confronts the twin scourges of over-incarceration and ███████████████████ ███████████████████████████. Sending Chris to prison would add to the wrong side of the ledger on both accounts, without meaningfully advancing any of the legitimate purposes of sentencing as set forth in § 3553(a).

### D. Avoiding Unwarranted Sentencing Disparities

To date, four individuals have been sentenced after a jury conviction for spoofing based on manual trading: James Vorley, Cedric Chanu, Edward Bases, and John Pacilio. In each case, the principal sentence was a year and a day of imprisonment.[26] At first blush, this might suggest that Chris, too, should be sentenced to serve a year and a day in prison, to avoid "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *See* 18 U.S.C. § 3553(a)(6). But the other cases are different:

- All four defendants were specifically trained on the prohibition against spoofing (*Vorley*, 9/17/20 Tr. at 1216-1224 (2012 Deutsche Bank compliance deck); *Bases*, 7/28/21 Tr. at 1375-78 (2014 Bank of America compliance training); *Bases*, 7/29/21 Tr. at 1623 (2011 Morgan Stanley compliance email);

- All four defendants continued to spoof after Dodd-Frank (*Vorley*, ECF No. 383 at 3-5 & Ex. A at 6-10; *Bases*, ECF No. 725 at 3, 6-7 & Ex. A at 6-7);

- All four defendants used the layering technique (*Vorley*, ECF No. 383 at 21; *Bases*, ECF No. 725 at 31);

- All four of the defendants taught more junior traders to spoof (*Vorley*, ECF No. 383 at 19 n.8; *Bases*, ECF No. 725 at 33);

---

[26] Michael Coscia received a three-year sentence, but as noted above, the facts of his case were materially different from any of the manual spoofers who have been subject to prosecution.

- All four defendants engaged in coordinated spoofing (*Vorley*, ECF No. 383 at 18 & n.8; *Bases*, ECF No. 725 at 31); and

- None of the four defendants admitted their spoofing to law enforcement.

And, of course, each of the other defendants had their own unique personal circumstances, which are different from those of Chris Jordan.

As the Seventh Circuit made clear in *United States v. Warner*, "Section 3553(a)(6) forbids not all sentencing disparities, but only 'unwarranted' ones 'among defendants with similar records who have been found guilty of similar conduct.'" 792 F.3d at 862 (quoting 18 U.S.C. § 3553(a)(6)). If a particular case is outside the "mine run," then a disparity may be justified. *See id*. Here, based on the nature of Chris's offense and Chris's unique characteristics and history, we respectfully submit that his case stands apart from those of the other manual traders who have been convicted of spoofing, and that a non-custodial sentence is just and reasonable.

If the Court is looking for an analogous precedent, we respectfully submit that a good candidate is the case of Charles Martell, which was the subject of testimony at Chris's trial. As evidenced by the CME Notice of Disciplinary Action against Martell dated January 20, 2012 (DX 40), during a one-month period in October 2009, Martell placed more than 3,000 large spoof orders on the CME, "without the intent to trade those orders" and in order to "induce other market participants to trade." The CME's Business Conduct Committee found that Martell "entered into a trading strategy that misled other market participants, including algorithmic trading strategies employed by other firms, and exploited that deception for Martell's benefit." *Id*. Based on these facts, the Committee found that Martell violated CME Rules 432.T (prohibiting dishonorable or uncommercial conduct) and 432.Q (prohibiting acts that are detrimental to the interest or welfare of the exchange). *Id*. The CME fined Martell $80,000 and suspended him from trading on the CME for an 18-month period. *Id*.

There are many parallels between Martell's case and Chris's case.  In both cases, the spoofing conduct occurred before Dodd-Frank came into effect, and before banks or the CME had clear policies or rules against spoofing.  The magnitude of the conduct appears comparable in both cases (if anything, Martell appears to have spoofed more frequently than Chris).  In both cases, the motive of the spoofing was to induce algorithms to execute.  And yet Chris, unlike Martell, was subject to criminal prosecution as opposed to exchange discipline.  Chris, unlike Martell, was charged with federal wire fraud as opposed to "dishonorable or uncommercial conduct."  Chris, unlike Martell, was subject to enforcement more than nine years after the fact, on the eve of the expiration of the (extended) statute of limitations.  Using Martell as a comparator, the Court should sentence Chris to a non-custodial sentence.

## CONCLUSION

For the foregoing reasons, the Court should sentence Christopher Jordan to time served, with a period of supervised release ███████████████████████████████ ████████████████████████████████████████.

Dated:  July 25, 2023

Respectfully submitted,

  /s/ James J. Benjamin, Jr.
James J. Benjamin, Jr.
Parvin D. Moyne
Anne M. Evans
Sean M. Nolan
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
(212) 872-1000

Megan Cunniff Church
MOLOLAMKEN LLP
300 N. LaSalle Drive
Suite 5350

Chicago, Illinois 60654
(312) 450-6700

*Counsel for Christopher Jordan*