**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | No. 1:19-CR-00669-1, 2 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| | ) | |
| | ) | |
| GREGG SMITH and MICHAEL NOWAK | ) | |
| | ) | |

**ORDER**

A jury found Gregg Smith and Michael Nowak guilty of attempted price manipulation, wire fraud affecting a financial institution, commodities fraud, and spoofing. R. 673.[1] The jury acquitted Smith and Nowak on Count 1 (RICO conspiracy) and Count 2 (conspiracy). *Id.* The jury acquitted their alleged co-conspirator, Jeffery Ruffo, on all counts. *Id.* Smith and Nowak move for acquittal under Criminal Rule 29 and for a new trial under Criminal Rule 33. R. 706, Smith Mot. Judgment of Acquittal; R. 707, Nowak Mot. Judgment of Acquittal; R. 710, Defs.' Mot. for New Trial. For the reasons discussed in this Opinion, their motions are denied.

---

[1]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

## I. Rule 29–Motions for Acquittal

### A. Legal Standard

At the close of evidence in a federal criminal jury trial, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). A defendant can file or renew a motion for acquittal after a guilty verdict. Fed. R. Crim. P. 29(c). To prevail on a motion for acquittal, a defendant "must show that when viewing all the evidence in the light most favorable to the government, no rational jury could have found the essential elements of the offense[ ] beyond a reasonable doubt." *United States v. Ghilarducci*, 480 F.3d 542, 546 (7th Cir. 2007). A jury verdict may be reversed "only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013) (cleaned up)[2]. The Seventh Circuit has described this stringent standard as "a nearly insurmountable hurdle" to obtaining a judgment of acquittal. *United States v. Miller*, 782 F.3d 793, 797 (7th Cir. 2015) (cleaned up).

The Seventh Circuit has also held, under limited circumstances, that "where the evidence as to an element of a crime is equally consistent with a theory of innocence as a theory of guilt, that evidence necessarily fails to establish guilt beyond a reasonable doubt." *United States v. Harris*, 942 F.2d 1125, 1129–30 (7th Cir. 1991)

---

[2]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

(cleaned up). This principle "applies when the evidence is woefully inadequate to establish an element of the offense." *United States v. Persfull*, 660 F.3d 286, 294 (7th Cir. 2011) (cleaned up). If there is evidence in the record, either direct or circumstantial, to support each element of a crime, then the principle does not apply. *Id.*

## B. Analysis

The charged crimes in this case arose out of the Defendants' commodity-contracts trades when they worked for JPMorgan. Smith and Nowak were found guilty of attempted price manipulation (Counts 3 and 4), which required the government to prove:

> 1. The defendant intended to create an artificial price for a commodity or for a contract for a commodity for future delivery; and
>
> 2. The defendant knowingly took a substantial step towards creating an artificial price for a commodity or for a contract for a commodity for future delivery.

R. 654, Court Set 2–Revised Jury Instructions at 38. On Counts 5 through 12 and 13 through 22, Smith and Nowak were found guilty of wire fraud affecting a financial institution, which required the government to prove:

> 1. The defendant knowingly devised or participated in a scheme to defraud, as charged in the particular indictment;
>
> 2. The defendant did so with the intent to defraud;
>
> 3. The scheme to defraud involved a materially false or fraudulent pretense, representation, or promise;
>
> 4. For the purpose of carrying out the scheme or attempting to do so, the defendant caused interstate or international wire communications to take place in the manner charged in the particular count; and
>
> 5. The scheme affected a financial institution.

3

Court Set 2–Revised Jury Instructions at 42. On Counts 24 and 25, the Defendants were found guilty of commodities fraud, which has the following elements:

> 1. The defendant knowingly devised or participated in a scheme to defraud, as described in the particular count of the indictment; and
>
> 2. The Defendant did so with the intent to defraud; and
>
> 3. The scheme to defraud involved a materially false or fraudulent pretense, representation, or promise; and
>
> 4. The scheme to defraud was in connection with a commodity for future delivery.

Court Set 2–Revised Jury Instructions at 51. For the final set of convictions, on Counts 26 and 27, the Defendants were found guilty of spoofing, which has these elements:

> 1. The defendant engaged in any trading, practice, or conduct, on and subject to the rules of CME Group's Commodities Exchanges (that is, COMEX and NYMEX), that was spoofing; and
>
> 2. The defendant acted knowingly.

Court Set 2–Revised Jury Instructions at 58.

The Defendants move for acquittal against each of the convictions. In seeking a judgment of acquittal, Smith and Nowak both present several of the same arguments as to why (1) the evidence would not permit a rational juror to conclude that the Defendants entered orders with an unconditional intent to cancel before execution and (2) there was insufficient evidence for a rational juror to conclude that the defendants intended to create an artificial price. R. 708, Def. Smith's Br. at 4; Nowak's Mot. for Judgment of Acquittal at 1. For Nowak, the defense makes the additional

arguments that there was no evidence that (1) he fraudulently misrepresented an essential element of any transaction; (2) these misrepresentations were material; and (3) Nowak had the required intent for attempted price manipulation and spoofing. Def. Nowak's Mot. for Judgment of Acquittal at 6, 11–12.

In addressing each of these arguments, the Court will also evaluate the weight of the main categories of evidence presented at trial: (1) Smith's and Nowak's trading patterns; (2) the cooperators' testimony; and (3) the expert testimony of Professor Kumar Venkataraman. Because the convictions for wire fraud, commodities fraud, attempted market manipulation, and spoofing are all based on the same conduct, they can be addressed together. When viewing the evidence in the light most favorable to the guilty verdicts, the evidence at trial was more than sufficient for a rational jury to find, beyond a reasonable doubt, that Smith and Nowak were guilty of those charges.

## 1. Smith's and Nowak's Trading Patterns

A central piece of evidence at trial was the Defendants' trading patterns, which provided solid circumstantial evidence that Smith and Nowak placed orders with an unconditional intent to cancel before execution. The most prevalent pattern took four steps. The first step involved the Defendants placing a genuine order on one side of the market; second, the Defendants placed deceptive orders on the other side of the market; third, the genuine orders were filled; and fourth and finally, the Defendants cancelled the deceptive orders. R. 775, Trial. Tr. At 687:13–20 (Robert Sniegowski), 2169:3–14 (Brian Wika). The government identified 100 episodes of this trading

5

pattern within the relevant time period, and Professor Venkataraman, who was qualified as an expert in financial-market structure, electronic-trading strategies, and market manipulation, identified a much larger number of episodes following this same pattern over the same period of time. Trial Tr. 2721:22–2722:3, 2722:21–2723:3 (Prof. Venkataraman); R. 759, United States Resp. at 3–4. The sheer volume of trading sequences following this pattern and consistency of this pattern readily supported the inference that the Defendants intended to cancel their orders before execution.

In addition to the sheer repetition of this pattern, the allegedly deceptive orders stayed open for only an average of two seconds before the Defendants canceled the orders. Trial Tr. 2764:2–12, 2781:18–24, 2786:13–21. It blinks reality that anything happened in those two seconds to cause Smith or Nowak to cancel the deceptive orders again and again and again. Instead, the reasonable (and strong) inference is that going into the trading pattern, the Defendants already (and unconditionally) intended to cancel the allegedly deceptive orders.

Indeed, one of the arguments that the defense presented at trial further emphasizes this point. The defense showed how quickly the Trading Technology ladder (the training software platform) moves, demonstrating the speed at which the market can move at any given moment. R. 779, Trial Tr. 2588:24–3589:6 (Jeremy Cusimano); *see also* R. 765, Trial Tr. 444:1–2 ("you're going to learn that there's no waiting in algo land."), Trial Tr. 444:5–10, ("whatever was going to happen after Mike first placed his second set of orders, it was going to happen within milliseconds … nearly a thousand times faster than a human could cancel his orders  one by one on a TT screen.")

6

The suggestion by the defense was that traders, like Smith and Nowak, were up against a fast-moving market, emphasizing the impact that algorithms had on contributing to the fast-paced market. But that point also shored up the government's contention that the rapid cancellation of the allegedly deceptive orders showed that the Defendants already intended to cancel the deceptive orders, without condition, when placing them. The Defendants were *not* reacting in real-time to how the market moved in deciding to cancel the orders. The unconditional intent was already in place.

The defense also argues that CME compliance personnel, Wika, and Professor Venkataraman all conceded that the four-step trading pattern *could be* a legitimate trading strategy. Def. Smith's Br. at 5–6; Def. Nowak Mot. for Judgment of Acquittal at 3. Yes, in the abstract that is true. But when giving the guilty verdicts the benefit of reasonable inferences, the jury rationally arrived at the opposite conclusion given the otherwise unexplainable cancellation of the orders and the repeat in the pattern. This defense argument also overlooks how the fraud intent underlying the trading was corroborated by the cooperators' testimony, which the Court turns to next.

## 2. Cooperators' Testimony

The government offered testimony from three cooperating witnesses: John Edmonds, Christian Trunz, and Corey Flaum. Nowak argues that Edmonds and Trunz never spoke with Nowak about the alleged spoofing, but rather only saw Nowak trade in the four-step pattern. Def. Nowak Mot. for Judgment of Acquittal at 5. Smith also discredits the cooperators' testimony because, as he argues, the fact that the cooperators observed Smith's trades is no different than reviewing Smith's trading data

after the fact. Def. Smith's Br. at 8. According to Smith, unlawful intent cannot be inferred "without any contextualization," unlawful intent cannot be inferred from the government's "cherry-picked excerpts" of the cooperators' trade data, and Smith's statements to the cooperators do not show that he entered orders with an unconditional intent to cancel before execution. Smith Br. at 8–9.

But when viewed in the light most favorable to the guilty verdicts, the testimony of the cooperators' testimony was highly probative. The three cooperators admitted to placing orders with an intent to cancel them—indeed, Edmonds and Trunz specifically admitted to the four-step pattern as their spoofing strategy. R. 767, Trial Tr. 916:15–9191:10 (John Edmonds); R. 772, Trial Tr. 2293:18–21; 2295:20–25 (Christian Trunz). That traders in the same commodities-trading group as the Defendants engaged in the scheme in the same way that the Defendants allegedly did was probative of the fraudulent intent of the Defendants. As discussed in the *Santiago* order, Flaum testified that he witnessed Smith spoof while they worked together at Bear Stearns. R. 771, Trial Tr. 1891:18–23. Edmonds, along with Smith, joined JPMorgan in the company's merger with Bear Sterns. Santiago Order at 3 citing Santiago Proffer at 5. At trial, Edmonds explained that he learned how to engage in the clicking (that is, the rapid placement and cancelling of orders) at issue and he watched Nowak do the very same thing. R. 768, Trial Tr. 1069:5–10. Trunz also worked alongside the Defendants, and Smith took Trunz "under his wing," which allowed Trunz to closely observe Smith's trading. *Id.* Both the physical proximity between Trunz and Edmonds to Smith and Nowak confirms that they were able to see

8

and hear orders and trades the Defendants placed. It can also be reasonably inferred from Smith's mentor-mentee relationship with Trunz that Smith taught his mentee how to execute the scheme. And Trunz testified that he saw Smith engage in the four-step trading strategy. Trial Tr. 2278:15–21.

With regard to the cooperating witnesses' testimony about trading sequences and patterns based on government-prepared charts and government-selected data, the Court deemed this admissible because the cooperators learned to trade in this way by observing the Defendants. The Court did put safeguards in place, however, given the cooperators' lack of personal knowledge about the Defendants' specific trades which the government presented at trial. And the cooperators' testimony on the charts reflecting Smith's and Nowak's trades were confined to describing what was on the *charts*, rather than directly saying, for example, "Smith had or did not have an intent to trade here." Trial Tr. 1079:11–24, 1088:22–1089:1; Trial Tr. 1066:10–16; Trial Tr. 2316:12–22.

### 3. Professor Venkataraman Testimony

Professor Kumar Venkataraman's testimony also helped prove that Smith and Nowak placed orders with an unconditional intent to cancel before execution. Venkataraman reviewed the 100 selected episodes, as well as a broader selection of the Defendants' trading strategies, over the relevant period. Trial Tr. 2764:24–2765:14. He explained that this trading strategy did not make economic rational sense because it was ineffective in getting the allegedly deceptive orders filled. Trial Tr. 2765:06–12, *see also* Trial Tr. 2726:23–2727:05, 2735:22–2736:02, 2787:12–23. Because this four-

step trading strategy was not effective in getting those orders filled, Venkataraman concluded that the strategy was to push the price towards the initial group of orders that the Defendants' placed in Step One of the strategy. US Resp. at 8, Trial Tr. 2726:23–2727:05. Venkataraman also opined that Smith and Nowak's trading data was (1) similar to Trunz' trading data and (2) Edmonds' trading outcomes were "generally consistent" with the outcomes for Trunz, Smith, and Nowak. Trial Tr. 2790:12–2791:07, 2792:23–2793:05.

The combined weight of the evidence of the four-step trading strategy, the traders who worked with the Defendants, and Venkataraman's expert testimony all readily support the guilty verdicts. Indeed, even if the evidence was not viewed in the light most favorable to the guilty verdicts, the weight of the evidence solidly supported the convictions given the circumstantial evidence of the unconditional intent to cancel.

### B. Nowak's Hedging

Nowak also makes the argument that the two trading sequences that fell within the statute of limitations, specifically the trades that happened on February 7, 2014 (depicted in GX 451), do not reflect the requisite intent for attempted price manipulation or for spoofing. Def. Nowak's Mot. for Judgment of Acquittal at 12. Nowak argues that the charts for those sequences do not fit Professor Venkataraman's testimony about the spoofing pattern because they contained scaled orders on both sides of the market with "minimal imbalance." Def. Nowak's Mot. for Judgment of Acquittal at 14. These trading sequences, according to Nowak, are consistent

10

with a legitimate economic rationale: hedging. Def. Nowak's Mot. for Judgment of Acquittal at 15.

The government counters, however, that these two sequences are consistent with fraudulent intent because they still followed the four-step pattern. United States Resp. at 20. Even though these sequences involved scaled orders, that evidence was presented to the jury, which had the task of weighing whether Nowak's pattern of spoofing aligned with the specific trading sequences on February 7, 2014. Trial Tr. 2737:12 – 2738:6. In reviewing GX 451, the two referenced trading sequences do follow the four-step pattern. The counter evidence of a hedging strategy falls well short of rendering the jury verdict irrational. Indeed, the pattern evidence, combined with the testimony of the cooperators and Venkataraman, not only supports the low bar of showing that the jury's verdicts are rational, but also refutes any argument that the convictions are against the manifest weight of the evidence.

## IV. Rule 33 - Motion for New Trial

### A. Legal Standard

The standard for granting a new trial is more lenient than the one for granting a motion for an outright acquittal. Federal Rule of Criminal Procedure 33 permits a court to "vacate any judgment and grant a new trial if the interest of justice so requires." But the standard is still high: "A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly." *United States v. Morales*, 902 F.2d 604, 605–06 (7th Cir. 1990) (cleaned up). Motions for a new trial should be granted only in exceptional circumstances: "[I]f the judge believes

11

there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted—he has the power to set the verdict aside even if he does not think that he made any erroneous rulings at the trial." *Id. See also United States v. Hagler*, 700 F.3d 1091, 1101 (7thCir. 2012) (Rule 33 is "reserved for only the most extreme cases, and we approach such motions with great caution." (cleaned up)).

## B. Analysis

### 1. Evidentiary Decisions

The defense targets a number of evidentiary decisions that the Court made during the pretrial conferences and during the trial itself. R. 711, Defs.' Mot. for New Trial Br. at 6.

### a. Lay Opinion Testimony

First, the Defendants challenge the lay opinion testimony of cooperators Edmonds, Trunz, and Flaum. But the testimony was not improper lay opinion testimony, nor was it cumulative in violation of Rule 403. A lay witness may provide opinion testimony when the testimony is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701; *United States v. Malagon*, 964 F.3d 657, 662 (7th Cir. 2020).

Brian Wika's testimony was proper because it directly related to his participation in the CME's investigation of Smith's trading in 2013. With regard to the cooperators, as the Court previously explained in its *Santiago* order and subsequent order

on the cooperators' testimony, R. 602, the cooperators were permitted to testify to that which they had firsthand knowledge. That firsthand knowledge included what they accumulated through their own trading, through observing Smith and Nowak spoof, and through learning how to spoof from Smith (and from Nowak, at least as to Edmonds). Flaum also testified that he learned to spoof from Smith and also witnessed Smith spoof when they worked together at Bear Stearns. Trial Tr. 1891:18–23. All of that is sufficient personal perception from which the cooperators could then base an opinion on orders in which they did not personally participate.

Though the cooperators may not have been able to independently remember the particular trading sequences identified in the government exhibit charts some 12 years later, they did have personal knowledge of the particular trading pattern because of their time working closely with and learning from Smith and Nowak. Rule 701's text does not strictly confine a lay opinion to testimony that describes a witness's direct perception. Instead, the text authorizes a lay opinion that is rationally "based on" the witness's perception. Fed. R. Evid. 701(a). An opinion can be "based on" a witness's perception without the witness having directly participated in whatever event, conduct, or set of facts that is being characterized by the opinion.

This is consistent with *United States v. Saulter*, 60 F.3d 270, 276 (7th Cir. 1995), which explained that "'Rationally based' requires that the witness's opinion be grounded in his personal knowledge," *id.* at 276 (emphasis added). That is not the same as requiring that the opinion be grounded on direct participation. *Saulter* affirmed the testimony of a drug dealer who opined on the meaning of certain drug-

13

trade phrases even in conversations in which he was not a participant. *Id.* ("Rule 701 does not require that the witness actually have participated in the recorded conversations.") The drug dealer was a member of the same organization as the defendant in that case, and had personal knowledge of the defendant's conduct and use of drug terms, thus giving the witness the necessary experience on which to base the interpretations— even interpretations of conversations in which the witness did not participate. *Id.*

In an abundance of caution, the Court did offer to order that the lay-opinion witnesses offer their opinions in a clearly divided shift from fact testimony to opinion testimony, which was to be preceded by an instruction to the jury that the witnesses were turning to offering opinions rather than testifying from direct participation in a particular order. But when the time came for this instruction at trial, the defense declined to have it read, so the instruction was not given. Trial Tr. 1017:6–19. This instruction too would have mitigated the defense's argument that the cooperators were offering improper testimony on the Defendants' state of mind. The cooperators' opinions were based on the conduct that they observed by the Defendants leading up to and during the relevant time period.

Finally, the Court was cautious and mindful of potential Rule 403 concerns throughout trial, such as cumulativeness. But there was nothing wrong with adding cooperator testimony to the government's retained-expert testimony. There is a significant difference between a retained expert who offers Rule 702 testimony versus the lay-opinion testimony of alleged spoofing participants. Given the starkly different

14

nature of the source of knowledge, some jurors could reasonably give less credence to an expert or a cooperator (or vice-versa), while other jurors might reasonably conclude that the retained expert's credibility is impaired because the expert is paid to offer an opinion. The inclusion of the cooperators' testimony was also not duplicative of Wika's testimony because his testimony specifically covered the CME's investigation of Smith's trading from 2013. In sum, the rules of evidence and the offered safeguards on lay-opinion testimony justified the admission of the cooperator testimony.

### b. Government Exhibit 228

Government Exhibit 228 is an investigation report from June 1, 2015, prepared by CME Investigator Brian Wika based on his investigation of Smith's trading. Wika was able to lay the foundation on his memory of the investigation. Trial Tr. 2014:2–13. The Court also found that the business-records exception, Rule 803(6), applies to this report, and the government in any event did obtain the required 902(11) certificate. R. 548, US Position Paper Exh. 228 at 2.

Also, Wika's testimony did not offer an opinion on the ultimate issue: whether Smith had an intent to defraud. Rather, Wika opined on whether Smith was placing orders without the orders reflecting an intent to execute them. The Court also instructed the government to redact the following part of Paragraph 34 of GX 228, because it did come too close to opining on whether Smith had an intent to defraud.

> "…but with the purpose of misleading market participants and exploiting this deception for the benefit of his positions."

15

GX 228 ¶ 34. The admission of the redacted report coupled with the Court's instruction that CME rules are *not* the same as federal criminal law, removed any significant risk of jury confusion about the relevant legal standards or about the government's burden of proof. Revised Jury Instructions–Court Set 2 at 22. The admission of the investigation report was not so substantially and unfairly prejudicial to Smith to warrant a new trial.

### c. Corey Flaum

Flaum's testimony, along with the corresponding exhibits GX 84 and 463, were properly admitted. Contrary to the defense's argument, Rule 404(b) was not applicable to Flaum's testimony about the January 2008 events predating the charged conspiracy period. The government was permitted to elicit testimony of a January 2008 trading sequence because it directly related to the overall scheme. The operative indictment identified the scheme beginning in January 2008 and thus did evidence of trading sequences within this time period was not Rule 404(b) evidence. Trial Tr. 251:12–19. For this same reason, Flaum's testimony regarding a March 5, 2008, chat between Ruffo and a Bear Stearns customer, a part of Smith's trading activity that correlated with that same customer order, and his opinion that Smith spoofed to fill this order, was not Rule 404(b) evidence. What's more, for the reasons addressed in the previous subsection, Flaum's testimony was not improper lay opinion testimony.

### d. Co-Conspirator Statements

The defense argues that because the government failed to establish the existence of a conspiracy, that it was improper to admit out-of-court statements by the

16

Defendants' alleged co-conspirators. Defs.' Mot. for New Trial at 15. It is true that the jury acquitted on the conspiracy charges. R. 673. But just because the jury did not find the existence of a conspiracy *beyond a reasonable doubt* does not mean that the proposed coconspirator statements were inadmissible under the lesser standard by a preponderance of the evidence.

"A Santiago proffer is a pretrial filing made when the government intends to introduce statements from co-conspirators under Federal Rule of Evidence 801(d)(2)(E)2." *United States v. DeKelaita*, 875 F.3d 855, 859 (7th Cir. 2017) (citing *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978)). The Court may admit a coconspirator statement if the government establishes, by a preponderance of the evidence, that (1) a conspiracy existed, (2) the defendant and the declarant were members of the conspiracy, and (3) the statement was made during the course and in furtherance of the conspiracy. *United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010).

The government offered evidence of two types of statements made by the Defendants and their co-conspirators: "(1) statements in electronic communication by and among the defendants and their co-conspirators; and (2) verbal statements by and among the defendants and their co-conspirators." R. 294, United States' Santiago Proffer at 1. The government introduced this evidence through two cooperating witnesses and alleged co-conspirators, John Edmonds and Christian Trunz. The government offered their statements as support for two conspiracies: spoofing and false statements. *Id.* at 3.

17

To satisfy the government's burden to show that a conspiracy existed, the government may rely on both direct and circumstantial evidence. *See United States v. Irorere*, 228 F.3d 816, 823 (7th Cir. 2000) ("[T]he government may establish the existence of a conspiracy…through circumstantial evidence and any reasonable inferences drawn therefrom involving the defendant's relationship, overt acts, and overall conduct.") (cleaned up). At the pretrial stage, the government met their burden by a preponderance of the evidence that a conspiracy existed to allow admission of these statements at trial.

The spoofing conspiracy, as the government alleges, involved the Defendants placing orders that they did not intend to execute. The orders allegedly "were meant to (and did) inject into the marketplace materially false and misleading information concerning supply and demand[.]" Santiago Proffer at 4. This fraud was intended to benefit the genuine orders that the Defendants placed, allowing those orders to either be filled more quickly or on more favorable terms. The false-statement conspiracy involved the Defendants hiding their unlawful trading activity by making false statements and misrepresentations to JPMorgan, the CME, and the CFTC about their trading practices. Santiago Proffer at 5; Trial Tr. 2310:05–13, Trial Tr. 990:08–24.

Edmonds worked at JPMorgan from July 2004 until August 2017. Santiago Proffer at 5. During his employment, a number of traders and salespeople joined JPMorgan, including Smith, Ruffo, Trunz, and Gottlieb. *Id.* Edmonds worked alongside his co-conspirators in the literal sense of working in close, physical proximity to the Defendants and other co-conspirators, so he was able to see and hear orders and

18

trades that they placed. *Id.* at 14–15. Similarly, Trunz too worked with the Defendants and other co-conspirators and was able to closely observe Smith's trading because Smith had taken Trunz "under his wing" and even referred to Trunz as "junior." *Id.* at 21; *see also id.* at 22 ("Trunz sat close to Smith, and he was able to see Smith's computer screen. Because of their informal mentor/mentee relationship, Smith also explained his trading strategy to Trunz.").

On top of what Edmonds and Trunz saw and heard, they were expected to testify, and did testify, that they too were a part of the conspiracy. Trial Tr. 2293:12–21, Trial Tr. 2293:13–21; Santiago Proffer at 22, 28. On spoofing, this means that they, along with the Defendants, placed orders that they intended to cancel. *See United States v. Coscia*, 866 F.3d 782, 795 (7th Cir. 2017) (describing spoofing as "knowingly enter[ing] bids or offers with the present intent to cancel the bid or offer prior to execution."); *see* Santiago Proffer at 16–19. Edmonds also was expected to testify—and did testify—about the co-conspirators' motive for spoofing, namely, that it was "something they had to do in order to be able to make a profit" and for "keeping clients happy." Santiago Proffer at 20; Trial Tr. 931:21-933:12. Even though Ruffo was acquitted, the conspiracy also allegedly included Ruffo, who had relationships with the Desk's best hedge-fund clients and paid close attention to Smith's trading when he executed orders for Ruffo's clients. Santiago Proffer at 21; Trial Tr. 931:21–933:12. This too supported a finding by a preponderance that a conspiracy existed.

The government also offered e-communications among the co-conspirators, which included Edmonds and Trunz, as further evidence of a conspiracy. *See, e.g.*, GX

19

28, 37. Based on the communications that the government proffered—and then presented at trial—it was reasonable to infer that the communications indeed did discuss the alleged co-conspirators' "successful exploits" and illegal trading activity to maximize their profits. Santiago Proffer at 84–85; *see, e.g.*, at 85 (Gottlieb writing to Nowak, "think sold 1 mm had another 1 mm sold 35 lots dropped 20 cents" followed by, "Gregg just bid it up to see."); *see id.* at 87 (communication from Jordan stating that "they take my hidden offer every time, as I bid in front of it"); *see id.* at 79 (Smith saying that "there goes the business" after a meeting in which JPMorgan compliance officers emphasized again the ban on spoofing and suggested that spoofing was subject to increased scrutiny). What's more, the government's elicited testimony explaining what certain phrases meant in these e-communications, such as "bid it up to sell," which also supported the existence of the alleged conspiracy. Santiago Proffer at 23; Trial Tr.1124:4–15. Based on the record evidence, the government readily met its preponderance burden to present the statements at trial. Although the jury acquitted on the conspiracy charges (which too was perfectly rational decision), it was not improper to admit the statements.

### e. Preclusion of Defense Exhibits 1037 and 1039

There was no error in precluding evidence of Smith's trading on June 19, 2008, which Smith argues did not align with the four-step trading pattern. First, it would not have been proper impeachment to introduce these exhibits to undermine Edmonds' obviously hyperbolic testimony that Smith spoofed "literally every time." Trial Tr. 958:24, Trial Tr. 2903:12–23, 2904:09–12, 2906:11. There was no dispute that

there were instances where Smith traded and of course did not spoof. And the defense did cross Edmonds vigorously to successfully drive the point home that Smith did not spoof every time that he traded. R. 770, Trial Tr.1641:2–1643:16.

For the first time in this motion, the Defendants argue that these exhibits were independently relevant and admissible because they refute the government's theory of the case. This argument is forfeited because it was not raised during the trial. *United States v. Wing*, 104 F.3d 986, 988 (7th Cir. 1997). But, even if the argument had been raised, the evidence would have been barred because it simply amounts to inadmissible good-conduct evidence. *See United States v. Reese*, 666 F.3d 1007, 1020 (7th Cir. 2012) ("Evidence that a defendant acted lawfully on other occasions is generally inadmissible to prove that he acted lawfully on the occasion alleged in the indictment.").

### f. David Pettey

David Pettey was an executive of the Susquehanna International Group. He testified during the trial as a victim. Pettey's testimony was neither irrelevant nor unfairly prejudicial. The Seventh Circuit has held, contrary to the Defendants' argument, that a trader's implied misrepresentations in this spoofing context may qualify as a material misrepresentation. *United States v. Chanu*, 40 F.4th 528, 542 (7th Cir. 2022). Pettey's testimony was relevant to materiality because his algorithm traded in the market at the same time as the Defendants traded and the algorithm was designed to recognize all orders in the market were bona fide. Trial Tr. 2995:20–1998:21. Because the Defendants intended to cancel from the outset, their spoof

orders materially misled the algorithm. Pettey's testimony as a victim-witness was clearly relevant and not unfairly prejudicial.

### g. Summary Trading Charts

The government's Rule 1006 summary charts (GX450–55 and 458) of the Defendants' trading activity were properly admitted. As already discussed during the pretrial conference, the defense's arguments about the color scheme of the charts and annotations on the charts based on the voluminous CME data do not warrant a new trial. Pretrial Conf. Vol. 2, 347:7–18. During the pretrial conference, the Court further explained that the defense would be welcome to cross-examine on how the government chose to display the charts, and the defense did extensively cross-examine the government's witness, Christopher Jackman, who introduced the summary charts into evidence at trial. Trial Tr. 816:10–818:19, 864:03–865:03, 844:23–846:19. There was no error on this point.

### h. Professor Venkataraman

As explained previously, Professor Kumar Venkataraman's testimony was admissible under Rule 702. Venkataraman was qualified as an expert given his doctorate degree in a pertinent field of finance (market microstructure), and his role as professor of finance at Southern Methodist University, where he teaches and has taught courses on investments and trading strategies. Trial Tr. 2706:22–2708:13. Despite the Defendants' argument about how Venkataraman analyzed the trading data, there is nothing unusual about an expert using the same characteristics that the government relied on in selecting the 489 trading sequences. And the defense cross-

examined Venkataraman extensively on this point. Trial Tr. 2815:20–2818:9. Also, as explained by Venkataraman, the sequences are sufficiently representative of the trading practices of the Defendants. Trial Tr. 2757:9–2758:9. The defense raises other various arguments with Venkataraman's testimony and analysis such as his failure to compare fill ratios of other traders to the fill ratios of the Defendants or the frequency with which the Defendants traded on their scaled group orders. Defs.' Mot. for New Trial at 27. All of these points were raised by the defense in their previous motion in limine, and now in their motion for a new trial, the arguments again bear on the weight of evidence rather than its admissibility. Given the qualification of Venkataraman as an expert and the defense's cross-examination of this witness, there was nothing unreliable about his testimony so as to warrant a new trial.

### i. Robert Sniegowski

Robert Sniegowski testified that, during at least the relevant time period (2008 through 2016), the CME required that orders be entered with the intent to buy or sell. This testimony was properly admitted. The defense argues that the government was able to improperly inject the prosecution theory through Sniegowski's testimony on CME Rule 432. Defs.' Mot. for New Trial at 28. But there is nothing improper, and certainly not unfairly prejudicial, with one party's theory being established through a witnesses' testimony. In any event, the jury was reminded that a violation of a CME rule does not necessarily amount to a violation of federal criminal law.

23

The defense also re-argues that they were improperly denied the opportunity to rebut this testimony through their proposed expert, Scott Earley, and that the Court erred in excluding DX 493 (the May 17, 2011 comment letter from the CME to the CFTC). *Id.* at 29. Earley's proposed testimony was not relevant. Earley's experience with the Board of Trade of the City of Chicago (from 1983 to 1994) was not during the pertinent period for this case (2008 to 2016). His testimony would have also been improper because this case concerns trading on COMEX and NYMEX; although CBOT eventually merged with the Chicago Mercantile Exchange, this was long after Earley's tenure at CBOT. US Mot. Limine at 10–11. For these reasons, Earley was not qualified to opine on what message was conveyed to the market by orders on COMEX and NYMEX during the pertinent period. The topic on which Earley was qualified to testify—historical practices of the CBOT—was not relevant to this case.

On the May 2011 comment letter, this proposed evidence was properly excluded because, without the proper foundation that Sniegowski played a role in writing the letter, it could not be used to impeach him. *See United States v. Flotron*, 2018 WL 1790828, at *2 (D. Conn. Apr. 15, 2018) ("[T]here is no reason to suppose that defendant would have been aware of legislative history or public comments submitted to the commission, and this evidence could be confusing and unfairly prejudicial for reasons stated by the Government."). On the defense's point that it would have been used to undermine Sniegowski's testimony that the CME had always viewed spoof orders as conveying false information, that would be an improper use of the letter. A legal advocacy paper by the CEO of the CME Group is not the same as an admission,

official, or final stance of the CME. Neither the introduction of Sniegowski's testimony not the exclusion of the defense's proposed evidence was error.

### j. CFTC Silver Investigation

As discussed before trial, it was proper to leave in the references to the CFTC silver investigation in the operative indictment and to permit testimony on the topic during trial, including through Government Exhibits 369 and 370. For one, the questions asked of Nowak during the silver investigation—whether he had engaged in spoofing—were relevant, as was his answer. As part of the government's burden to prove that Nowak engaged in spoofing, the false denials were relevant to proving Nowak's consciousness of guilt. This was particularly important because of the mental states required to convict on the various charges. The consciousness-of-guilt relevancy is also baked into the second superseding indictment, which alleged that the Defendants took steps to conceal the charged conspiracy. Second Sup. Indict. ¶ 28(3). And the silver-investigation questions did come from the relevant time period, because the charges reached back to 2008. Nowak answered questions as part of the CFTC investigation in 2010.

Again, the Court did guard against improper inferences arising from this evidence by instructing the jury twice that there was a separate civil investigation by the CFTC into complaints about silver prices and that this was *not* a part of the DOJ's investigation that led to the prosecution in this case. The Court further instructed the jury that the complaints about silver prices were not at issue in the current case. The instruction also informed the jury that the CFTC closed the inquiry without

25

bringing claims against any company or person, and that the jury must not otherwise consider the conclusion of the CFTC's investigation in their deliberations. Trial Tr. 2252:4–22, 3896:02–03.

On the argument that the government improperly stated during closing argument that Nowak was under investigation by the CFTC, the defense sought a curative instruction the following morning that Nowak was in fact not under investigation by the CFTC. R. 783, Trial Tr. 4046:23–4047:14. The Court declined to instruct the jury on this further, because it would give the impression that the Court was taking sides and making an outright factual finding. The Court did permit the defense to say that there is zero evidence that Nowak was under investigation by the CFTC and that the Court had given the jury an instruction both during trial and at the end of trial, and in none of those instances would the jury see anything about such an investigation. In these circumstances, the statement during closing argument did not pose a risk of unfair prejudice so as to justify ordering a new trial.

### k. JPMorgan Compliance Documents

As discussed in detail during the pretrial conferences, the Court allowed into evidence various JPMorgan compliance documents. A limiting instruction explained to the jury the distinction between compliance polices and federal criminal law to minimize the risk of misunderstanding. The introduction of these compliance policies was relevant because the Defendants' knowledge of these policies, their alleged violations of them, and the false denials of the violations, and the alleged cover-up of the violations were relevant to determining if the Defendants had the requisite mental

26

state for the charged crimes. The jury instruction appropriately balanced the legal principle (compliance polices are not the same as federal criminal law) without incorrectly cabining the evidence's relevancy or giving the Court's imprimatur to one side or the other. Revised Jury Instruction—Court Set 2 at 22.

> You are about to hear evidence of compliance policies issued by JPMorgan Chase. Evidence that a defendant violated bank-compliance policies are not, standing alone, sufficient to convict a Defendant. A bank's compliance policies are not necessarily the same as federal law, so even if you were to find that a Defendant violated a compliance policy, that does not necessarily mean that there was a violation of the law. I will explain federal law to you at the end of the trial. You must apply the law that I give you and the government must prove violations of federal law beyond a reasonable doubt.

The Court considered listing the specific relevancy topics (that is, alleged knowledge of compliance policies, alleged violation of them, alleged false denials of violations, alleged cover-up of the violations, and how those facts in turn show intent) but it ended up sounding more prejudicial to the Defendants than helpful. Instead, the Court left it to the parties to argue those relevancy points to the jury rather than listing them out. The defense's dissection of this instruction does not establish substantial unfair prejudice. It is true that the Court did not list out that different interpretations, definitions, and examples of federal law within the exhibits. Defs.' Mot. for New Trial at 32. But the point was that the limiting instruction was broad enough to encompass all of the compliance policies, and it was plain to the jury what they were. Also, the defense's arguments on some of the qualifiers used within this instruction do not rise to the level of substantial unfair prejudice. In fact, the defense's

proposed instruction on this point included the same phrasing that violation of a compliance policy "does not necessarily mean that there was a violation of a law." R. 289, Defs.' Mot. for Instruction on Compliance Policies. There was a consistent emphasis throughout trial about the federal criminal laws that the Court would provide to the jury at the conclusion of the trial. The evidence of the compliance policies does not warrant a new trial.

### l. Defense Exhibits 621–623

There was no error in excluding Smith's proposed demonstrative exhibits 621–623 because they were produced essentially on the eve of trial, well after the exhibits deadline, and it would have taken extensive time for the government to review the underlying data for accuracy. The exhibits comprised dozens and dozens of pages of trading activity data. Although the government already had the trade data in their possession, the government still would have had to verify its accuracy, which would have been unnecessarily burdensome so close to the start of trial. Nor was there any good cause offered for why the disclosure was so late. The demonstrative exhibits were properly excluded.

### m. Armand Nakkab

No error was committed in conditioning the introduction of Armand Nakkab's statements (in an email) by the defense on calling him as a witness. The document in question was an email dated April 29, 2011, from Nakkab to a lawyer regarding the Futures Industry Association reflecting, among other comments, statements about

28

algorithms and what traders will do to address the algorithms. Trial Tr. 2082:23–2083:7.

The Court properly conditioned admission of this document on Nakkab testifying, because the statements in the email did not bear a plain meaning without further explanation from Nakkab. The language that the defense focused on stated:

> When executing normal-sized orders, there are existing electronic algos that will automatically and instantly B/O … in front of an order by looking at size of volume on both sides of the market. In order to counteract this algo activities, it is sometimes necessary to put in orders on the other side of the market so they do not jump in front of orders and disrupt the normal trading day.

Trial Tr. 2086:11–18. This passage alone raises several questions that only Nakkab could explain, because he wrote the words. For example, what do "counteract," "sometimes," "necessary," or "disrupt the normal trading day" mean in this context? These terms do not speak for themselves. Although the defense asserts the meaning of these phrases are clear on their face, they are not. The email is not clear about what "counteract" means—for example, whether it refers to a particular trading strategy. R. 810, Defs.' Reply at 21. As for Nakkab's statement, "sometimes," it is not clear whether he means counteracting the algorithms is appropriate a few times in a trading day, a few times a week, or a few times a year. Whatever probative value the email had was substantially undermined by the lack of clarity and context. So conditioning the introduction of Nakkab's email on this explanatory testimony is not grounds for a new trial.

### 2. Alleged Interference with Nakkab

Though Armand Nakkab's testimony would have been relevant, there is no evidence that the government interfered with the defense's ability to call him as a witness, nor did the government put "undue pressure" on him. Defs.' Mot. for New Trial Br. at 39. The defense expected Nakkab to testify that in his 2013 review of Smith's trading, he determined that the trading was lawful and not spoofing. *Id.* at 40. That testimony, if it had come out that way, would have been favorable to Smith and thus "material and favorable to aiding him in his defense." *United States v. Linder*, 2012 WL 3264924, at *17 (N.D. Ill. Aug. 9, 2012).

But the defense's argument about the government's alleged undue pressure seems to be based on the change in Nakkab's position on the legitimacy of Smith's trading after he spoke with the FBI. Defs.' Mot. for New Trial Br. at 41–43. The defense infers that either Nakkab or the government is not being truthful about his knowledge on whether he was a subject of the investigation. But this was not raised during the trial after the government revealed that it was no longer calling Nakkab to testify. Trial Tr. 1820:21–1824:21. And the defense chose not to call him. The record does not bear out undue pressure from the government.

### 3. Privilege Assertions by CFTC and JPMorgan

The Court did not err in upholding the privilege assertions by the CFTC expert, Dr. Henrick Bessembinder, who reviewed Smith's trading activity and concluded it was not consistent with spoofing, and JPMorgan representative, which reviewed Smith's trading activity in 2013 and 2015 and concluded the same. Defs.' Mot. for

30

New Trial Br. at 45; R. 191, Order, R. 612, Order. The Court addresses these two categories in turn.

### a. Bessembinder

As to the CFTC, the Court properly concluded that the deliberative-process privilege applies to shield the records from disclosure. "The deliberative process privilege protects communications that are part of the decision-making process of a governmental agency." *United States v. Farley*, 11 F.3d 1385, 1389 (7th Cir. 1993) (citing *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 150-52 (1975)). The idea behind the deliberative-process privilege is that "frank discussion of legal and policy matters is essential to the decisionmaking process of a governmental agency," which means that "communications made prior to and as a part of an agency determination are protected from disclosure." *Farley*, 11 F.3d at 1389. On the flip side, "[c]ommunications made subsequent to an agency decision are, however, not similarly protected." *Id.* In other words, to qualify for protection, a communication must be both predecisional and deliberative." *Enviro Tech Int'l, Inc. v. U.S. E.P.A.*, 371 F.3d 370, 375 (7th Cir. 2004). Here, the relevant agency decision for purposes of the deliberative-process privilege analysis is the CFTC's September 2019 decision to bring a civil action against Smith. *See* R. 87, McDonald Decl. ¶ 11.

Turning first to the outside-consultant argument, it is true that Bessembinder was not an employee of the CFTC. Smith argues this is fatal to a finding of privilege because the deliberative process privilege only applies to "intra-agency communications." Defs.' Mot. for New Trial Br. at 45. But courts have extended the deliberative-

31

process privilege to apply to reports and communications by outside consultants retained by agencies. *See Ryan v. Dep't of Justice*, 617 F.2d 781, 790 (D.C. Cir. 1980) ("When an agency record is submitted by outside consultants as part of the deliberative process, and it was solicited by the agency, we find it entirely reasonable to deem the resulting document to be an 'intra-agency' memorandum"); *Tigue v. U.S. Dep't of Justice*, 312 F.3d 70, 77 (2d Cir. 2002) (noting that "agencies may require assistance from outside consultants in formulating policy" and that "nothing turns on the point that ... reports were prepared by outside consultants ... rather than agency staff") (cleaned up); *Pub. Employees for Envtl. Responsibility v. Bloch*, 532 F. Supp. 2d 19, 21-22 (D.D.C. 2008). Here, too, the fact that the communications came from an outside consultant is not, standing alone, dispositive.

It is true that Bessembinder was retained for the ostensibly narrow purpose of analyzing raw trade data. The emails between Bessembinder and the CFTC staff members do not literally contain discussions about whether or not to bring an enforcement action against Smith. But the record provides no reason to doubt that the CFTC considered and treated the communications with Bessembinder about the trade analyses as a genuine and confidential part of the broader deliberative process intended to inform the CFTC's decision on whether to pursue claims against Smith. *See* McDonald Decl. ¶¶ 7–10, 12. In a financial-markets case like this, the ultimate decision to bring or not to bring an enforcement action against an individual will almost always necessitate some form of data analysis, which will often require the help of an outside consultant. So there is no line between the CFTC's own discussions

32

about whether or not to bring an action and the CFTC's preliminary communications with an outside consultant about the data analyses underlying the broader decision. Indeed, the record (including the Court's earlier *in camera* review) suggests that even though Bessembinder was technically an outside consultant, the expectation of all the parties was that the documents and communications would be for "internal use only" and should be kept only within the ambit of the CFTC and Bessembinder himself. McDonald Decl. ¶ 9.

Similarly, the privilege log provided by the CFTC labels most of the documents as "confidential." R. 116-1, CFTC Privilege Log. Thus, Bessembinder was bound by a confidentiality agreement as to the work that he performed for the CFTC. To be clear, "materials are not to be withheld on the basis of deliberative process privilege simply because the agency deems them confidential and would prefer not to disclose them." *Stinson v. City of New York*, 304 F.R.D. 432, 435 (S.D.N.Y. 2015) (cleaned up). But the confidentiality expectation here matters because it further establishes that Bessembinder was fully enveloped in the deliberative process leading up to the CFTC's decision to bring an action against Smith.

In sum, these documents fell squarely within the deliberative-process privilege, contrary to the defense's assertion. Defs.' Mot. for New Trial at 46. It is true that Bessembinder ultimately came out with a conclusion ostensibly contrary to the CFTC's later decision to pursue a civil enforcement action against Smith. But that illustrates precisely why the deliberative-process privilege is so important in this context—to the extent that the goal of the privilege is to promote full and frank

33

deliberations within government agencies, then society as a whole wants the CFTC to seek out all sorts of expert opinions from outside consultants and to consider as many facets of a decision as possible in order to arrive at the most informed outcome. In contrast, forcing an agency to disclose this type of "contrary" analysis would potentially discourage the agency from even seeking out "contrary" opinions in the first place the next time that a decision needs to be made.

Nor did the CFTC waive privilege when it disclosed its conclusions to the government. A number of cases within this jurisdiction that address waiver in the context of the deliberative-process privilege reflect settings in which the privileged information was disclosed in some kind of *public* forum, *DeLeon-Reyes v. Guevara*, 2021 WL 3109662, at *5–7(N.D. Ill. 2021); *EEOC v. Continental Airlines, Inc.*, 395 F.Supp.2d 738, 743 (N.D. Ill. 2005), let alone to a sibling agency in the executive branch.

Finally, it is true that this privilege can be overcome "if there is a sufficient showing of a particularized need to outweigh the reasons for confidentiality." *Farley*, 11 F.3d 1385 at 1389. Courts consider the following factors when balancing the need for disclosure against the government's need for secrecy:

> (1) the relevance of the documents to the litigation; (2) the availability of other evidence that would serve the same purpose as the documents sought; (3) the government's role in the litigation; (4) the seriousness of the litigation and the issues involved in it; and (5) the degree to which disclosure of the documents sought would tend to chill future deliberations within government agencies, that is, would hinder

frank and independent discussion about government policies and decisions.

*Holmes v. Hernandez*, 221 F.Supp.3d 1011, 1018 (N.D. Ill. 2016) (citing *Ferrell v. U.S. Dep't of Hous. And Urban Dev.*, 177 F.R.D. 425, 429 (N.D. Ill. 1998)). Although the data analysis was relevant, because it concerns Smith's trading activity, there was other evidence available to serve the same purpose. Smith was able to elicit his points on what his trading activity showed through his own expert witness, Dr. Daniel Fischel. Trial Tr. 3405:13–3419:02, 4337:06–3485:24. In considering the government agency's role in the present case, the CFTC is not a party to this case and declined to bring charges against Smith. There is substantial concern that disclosure here would chill future deliberations within government agencies, which the Court has already discussed earlier. On these factors alone, Smith has failed to demonstrate a particularized need to warrant disclosure.

### b. JPMorgan Documents

Smith previously sought to compel two categories of JPMorgan Chase documents in response to a subpoena. He calls them the CME Debrief Documents and the Trade Analysis Documents. R. 519, Def. Smith Mot. to Compel at 4. On the first category of documents, following the Court's *in-camera* review of the records, the Court concluded that the records were properly withheld on the basis of attorney-client privilege. The two primary emails (the third is just an acknowledgment of one of them) reflect exactly the sort of communications a client would want to cc: to counsel in

order to ensure that counsel did not disagree from a legal-representation standpoint. R. 618, Minute Entry on JPMorgan Documents.

On the second category of documents, it is true that the law firm jointly represented Smith and JPMorgan at the pertinent time, so both Smith and the JPMorgan had the benefit of attorney-client privilege. R. 528-1, Katten Muchin Rosenman Engagement Letter to Smith at 1. But the engagement letter made clear that if a conflict arose between Smith and JPMorgan, the law firm would continue to represent JPMorgan and that the bank would retain the right to share or to waive attorney-client privilege. *See id.* at 2 ("you agree that JP Morgan retains the right to waive the attorney-client privilege with regards to any information we obtain during the course of this representation"). By retaining the right to waive the privilege, JPMorgan necessarily retained the right to invoke privilege.

The purpose of the attorney-client privilege is to encourage full disclosure by clients receiving legal representation. *See Ross v. City of Memphis*, 423 F.3d 596, 600 (6th Cir. 2005) (explaining that the primary purpose of the privilege is "to encourage full and frank communication between attorneys and their clients.") (cleaned up). In the not uncommon scenario in which an employer and employee start out with joint representation but then part ways, allowing the employee to break the employer's privilege might very well cause the employer to be more reluctant in what it discloses to the attorney. What's more, employers also would be discouraged from engaging in joint representation, which could leave employees out in the cold without a lawyer (or be required to retain one on their own dime). Against this, Smith's arguments are

36

based on restatements of general principles rather than on specific case law holding that the attorney-client privilege is inapplicable in these circumstances.

### 4. Jury Instructions

The Defendants take issue with three defense-proposed jury instructions that the Court rejected at trial: (1) a good-faith instruction; (2) an instruction saying that the Defendants believed they were permitted to place orders on both sides of the order book; and (3) an instruction that a Defendant's deception about negotiating a position is not material for purposes of wire fraud. Defs.' Mot. for New Trial at 49.

As previously explained, the Court properly rejected the proposed good-faith instruction, taking the same approach as the district court in *Vorley*, which was affirmed in *United States v. Chanu*, 40 F.4th 528, 542–43 (7th Cir. July 6, 2022). R. 648, Order Accompany Jury Instructions at 8. In this case, a good-faith instruction was unnecessary (providing no upside) and posed a substantial risk of jury confusion (creating a significant downside). First, the instruction was not needed because the defense could, and did, advance this argument through arguing an *absence* of an intent to defraud. Trial Tr. 3989:4–13, 3996:12–24, 4057:10–13, 4063:15–21, 4069:2–8, 4076:14–21. Second, the instruction posed the risk of misleading jurors into thinking that a defense along the lines of "mistake of law" is viable, which it is not. Put another way, it was proper to exclude the instruction because given the trial evidence and lines of questioning in this case, the jury may have misinterpreted the instruction as exculpating the Defendants if the Defendants did not understand what they did was in violation of the law. The given instructions were designed to avoid equating

37

whether the Defendant had an intent to defraud others with whether the Defendant knew he was acting in violation of the law.

Next, the Court properly excluded an instruction to the effect that the Defendants were permitted to have orders on both sides of the market. R. 781, Trial Tr. 3817:5–13, 3816:22–25. A theory of defense instruction is appropriate if "(1) the instruction represents an accurate statement of the law; (2) the instruction reflects a theory that is supported by the evidence; (3) the instruction reflects a theory which is not already part of the charge; and (4) the failure to include the instruction would deny the defendant a fair trial." *United States v. Cruse*, 805 F.3d 795, 814 (7th Cir. 2015). But it was not accurate to say in absolute terms that the Defendants could have orders on both sides of the market. If the Defendants had the unconditional intent to cancel orders, then in fact (and as a matter of applying the law) the jury could find that the Defendants had violated charged laws.

Also, the Court properly excluded the defense's proposed materiality instruction, which stated:

> A party's deception about his negotiating position or his preferences or the value that he attributes to contract is not material for purposes of wire fraud. Similarly, where a trader is not misled as to the nature of the asset he trades or the amount of money he paid or received, there is no fraud. Thus, schemes that do no more than cause their victims to enter into transactions they otherwise would have avoided are not sufficient.

Order Accompany Jury Instructions at 8. The Court's instruction on materiality was proper because it explained that a representation is material if "it has a natural tendency to influence the decision of the alleged victim to whom it was addressed." Court

Set 2–Revised Jury Instructions at 46, 47. That pattern instruction fit just as well in this case as in other fraud-scheme cases. As the testimony established at trial, other traders (and algorithms used by traders) would have been influenced by the misrepresentation of the genuineness of the orders. No instructional error happened here.

### 5. *Silvern* Instruction

Finally, the defense takes issue with the re-reading of the *Silvern* instruction to the jury during deliberations. Defs.' Mot. for New Trial at 52. On August 8, 2022, at 10:10 am, the jury sent a note saying, "At this point in time, we have not reached a unanimous decision for any of the defendants[] charged. Please advise." R. 674, Jury Notes at 10. After discussing the note with the parties, the Court brought the jury back into the courtroom and repeated the *Silvern* instruction (the first time that the jury heard the instruction was at the end of closing arguments). Trial Tr. 4227:10–4236:5. Later that day, at 11:20 am, the jury sent another note, this time explaining that they were having technical difficulties reviewing the exhibits, showing they were still attempting to deliberate at that point. Jury Notes at 12. The following day at 15:10, the jury sent the following note to the Judge:

> The jurors have concerns over comments made by a juror during deliberations yesterday afternoon. The juror claimed they made early decisions regarding the verdict for the defendants—made at the time of opening statements and 'saw everything through that lens.' The same juror made comments prior to yesterday and on three separate occasions where they expressed a desire to be dismissed from the jury. Today, the juror states they no longer which to be dismissed and yesterday's comments were taken out of context.

Jury Notes at 14. After discussion with the parties, the Court responded to the note by repeating a prior instruction, specifically that "lawyers' statements and arguments are not evidence. If what a lawyer said is different from evidence as you remember it, the evidence is what counts." R. 675, Resp. to Juror notes at 4.

The following day, August 10, 2022, at 1:08 p.m., the jury sent a note asking for a new copy of the verdict forms, Jury Notes at 16, which was provided to them. At 2:55 p.m. on that same day, the jury sent a note reporting that they had reached a unanimous decision on all charges for each of the Defendants. Jury Notes at 18.

Contrary to the defense contentions, it was not coercive to re-read the *Silvern* instruction. *See United States v. Fouse*, 578 F.3d 643, 653 (7th Cir. 2009); *United States v. Sanders*, 962 F.2d 660, 676–77 (7th Cir. 1992). If the jury has heard the *Silvern* instruction before, a repeat of the instruction—which is a balanced instruction on the need to deliberate with one another but to not surrender their views just for the sake of unanimity—does not generally have a coercive effect. Also, the jury did not deliberate for an unexpectedly long time—one week of deliberations is not a red flag for coercion in a fact-heavy and law-heavy case like this, which involved 14 days of testimony (including complex expert testimony) and extensive closing arguments. What's more, the jury rendered a split verdict, with Ruffo completely acquitted and Smith and Novak acquitted on the conspiracy charges. This is a solid signal that any juror or jurors who were holding out for an acquittal were coerced to convict.

On the defense's point about the juror who made up their mind early on, the Court's response was proper to highlight that attorney arguments and statements

40

were not evidence, because the note stated the juror viewed everything at trial through the lens of the Defendants' point of view after just hearing opening statements from their attorneys. R. 785, Trial Tr. 4243:10–22. That response did not have a coercive effect, and did not unduly admonish the juror in any way.

## IV. Conclusion

The motions for acquittal and new trial are denied.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: August 16, 2023