IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 19 CR 00669-4 |
| | ) | |
| CHRISTOPHER JORDAN, | ) | Chicago, Illinois |
| | ) | September 15, 2023 |
| Defendant. | ) | 10:33 a.m. |

TRANSCRIPT OF PROCEEDINGS - Sentencing hearing

BEFORE THE HONORABLE EDMOND E. CHANG

APPEARANCES:

For the Plaintiff: U.S. Department of Justice
Criminal Division, Fraud Section
BY: MR. MATTHEW F. SULLIVAN
MR. CHRISTOPHER FENTON
1400 New York Avenue, NW
Washington, D.C. 20530
(202) 353-6200
matthew.sullivan2@usdoj.gov
christopher.fenton@usdoj.gov

Court Reporter: Judith A. Walsh, CSR, RDR, F/CRR
Official Court Reporter
219 South Dearborn Street, Room 2342
Chicago, Illinois 60604
(312) 702-8865
judith_walsh@ilnd.uscourts.gov

For the Defendant:

MOLOLAMKEN, LLP
BY: MS. MEGAN C. CHURCH
300 North LaSalle Street
Suite 5350
Chicago, Illinois 60654
(312) 450-6716
mchurch@mololamken.com

AKIN GUMP STRAUSS HAUER & FELD, LLP
BY: MR. JAMES J. BENJAMIN, JR.
MS. PARVIN MOYNE
MS. ANNE M. EVANS
One Bryant Park, Suite 4100
New York, New York 10036
(212) 872-1000
jbenjamin@akingump.com
pmoyne@akingump.com
aevans@akingump.com

ALSO PRESENT:

MS. KELLY KWONG,

United States Probation Office

(Proceedings heard in open court:)

THE CLERK: 19 CR 669-4, USA versus Christopher Jordan.

THE COURT: All right. Let's get appearances.

MR. SULLIVAN: Good morning, your Honor. Matthew Sullivan and Christopher Fenton on behalf of the United States.

THE COURT: Okay.

MR. BENJAMIN: Good morning, your Honor. Jim Benjamin, Parvin Moyne, and Annie Evans from Akin Gump, and Megan Church from Mololamken on behalf of the defendant, Chris Jordan.

THE COURT: Good morning.

Good morning, Mr. Jordan.

THE DEFENDANT: Good morning.

THE COURT: And from the probation office.

THE PROBATION OFFICER: Good morning, your Honor. Kelly Kwong standing in for Jason Christensen on behalf of the probation office.

THE COURT: All right. Good morning to you as well.

All right. We are here for sentencing. Are both sides ready to proceed?

MR. SULLIVAN: Yes, your Honor.

MR. BENJAMIN: Yes.

THE COURT: All right. Okay. Mr. Jordan, I'm going

to start with you. I just want to make sure that you've had enough time to prepare for today's sentencing, that you've had a chance to review the myriad sentencing filings and discuss the sentencing with your attorneys. And then I'm also going to ask you whether you're still satisfied with their help and representation. So I'll be asking you some questions. You do need to be put under an oath to tell the truth.

So I'll ask the courtroom deputy to do that now.

THE CLERK: Please raise your right hand.

(Defendant sworn.)

THE DEFENDANT: Yes, I do.

THE CLERK: Thank you.

THE COURT: All right. So, Mr. Jordan, the first question is, have -- did you receive a copy of the presentence report in this case?

THE DEFENDANT: Yes, I did, your Honor.

THE COURT: And then in addition to the presentence report, the probation office also had a sentencing recommendation. You got a copy of that?

THE DEFENDANT: Yes, I did, your Honor.

THE COURT: Now, there are multiple, multiple filings that both your lawyers filed and the government filed as well. And so that includes a first round of briefing where your lawyers filed something and the government filed an opening memorandum at the same time, and then there were responses

traded between the -- again, your lawyers and the government. Also there were, although this is not as important, some redacted version of those filings as well.

Okay. Did you get all those filings?

THE DEFENDANT: Yes, I did, your Honor.

THE COURT: Okay. So with regard to all of the filings, have you had enough time to read through them?

THE DEFENDANT: Absolutely, your Honor.

THE COURT: Okay. And also have you had enough time to discuss the filings and prepare for sentencing with your attorneys?

THE DEFENDANT: Yes, your Honor.

THE COURT: And I know that they surround you at this moment, but just go ahead and tell me honestly and openly, are you still satisfied with their help in this case?

THE DEFENDANT: Yes, I am, your Honor.

THE COURT: All right. Does that include preparing for today's sentencing?

THE DEFENDANT: Yes. Yes, your Honor.

THE COURT: So they've, for example, spent enough time with you?

THE DEFENDANT: Absolutely, your Honor.

THE COURT: All right. And when you asked them questions, they at least tried to answer them?

THE DEFENDANT: Yes, your Honor.

THE COURT: Okay. All right. That's all I have for you for the moment.

All right. So yeah, let's talk about the presentence report then starting off with the guidelines disputes. On the loss amount, obviously there's been quite a bit of back and forth, and I made the findings with respect to the co-defendants Mr. Nowak and Mr. Smith a couple of weeks ago.

Does either side want to add or highlight anything with regard to their filings?

MR. SULLIVAN: Nothing further from the government, your Honor.

THE COURT: Okay. And what about the defense?

MR. BENJAMIN: Nothing further, your Honor.

THE COURT: All right. Yeah, so as I did find with respect to defendants -- co-defendants Smith and Nowak, I do find that Professor Kumar Venkataraman's general methodology is sound. As I explained in the sentencings and the order on loss amount with respect to the co-defendants, it was appropriate to adopt the methodology where Mr. Venkataraman would identify the spoofing sequences, and here defined as having small orders on one side, the genuine orders, and then on the large side, meaning orders that were twice the size of the small side at the same time in the market placed by Mr. Jordan and then the price was pushed either one way or the other to fill the genuine order and then the cancellation on

the large side.

Mr. Venkataraman also used 2.5 seconds as the maximum time for which the large-side orders were still in place, that is, the spoof orders. And that's a reasonable and actually quite short time to use as a parameter to define spoof orders.

And then with respect to the underlying methodology then to compare the but-for trade prices on the same side as the spoof orders, and the methodology here again is also reasonable notwithstanding the critique of the defense expert to use the best bid when there's a buy-side spoof and then the best offer when there's a sell-side spoof.

That is reasonable, and I think the example that the professor pointed out in both the initial declaration and then in the reply declaration do show that market participants reacted to the enormous large-side order and then at least in the examples, buyers, obviously on the other side it would be sellers, crossed the spread at a much greater rate than before the spoof. And it makes sense that the -- in the example that buyers are the ones that are harmed, and so it did make sense to use the best bid for buy-side spoofs and then, as I said, conversely the best offer for sell-side spoofs.

And then the professor's analysis then took into account the rate of spread crossing without spoofs and he, I think reasonably, chose the match control periods that he used in his analysis and arrived at the alternative adjusted market

loss number initially at $337,332, but the reply declaration does appropriately then take into account the finding that I made at Mr. Nowak and Mr. Smith's sentencing which is that the spoof orders ought to be confined to when they were placed in the top five levels.

Here, there was no layering, so there wasn't an issue about needing at least one of the spoof orders being within the top five. Mr. Venkataraman was able to quite readily place the limit for the top five versus the top ten just confined to the one big spoof order. That knocked the loss down a little bit to $332,704.

And I do find that that is the reasonable estimate, and it is superior to what I understand the probation office's and the PSR's attempt at something in calculating the loss, some alternative, but this is far superior to using the payments that JPMorgan has paid out in the Connecticut case. So this is much more accurate. That then coincides with the 12-level increase because the loss is between 250,000 and 550,000.

Okay. Two levels are added for number of victims. There was no disagreement on that. And Professor Venkataraman did find that there were 130 firms, setting aside the individual traders, just the firms overall as the victims, and that's obviously well more than 10. So that's, two levels are added there.

Consistent with the findings on sophisticated means and special skill, I do reject both of those as I did with regard to Mr. Nowak and Mr. Smith and probably even more so here because of the way that Mr. Jordan did not even layer the spoof orders and just placed the big large one. That's even less sophisticated and took even less skill, so neither of those apply.

All right. Now, on obstruction of justice, did you want to make any further argument on that, Mr. Benjamin?

MR. BENJAMIN: Yes, your Honor --

THE COURT: All right. Go ahead.

MR. BENJAMIN: -- with the Court's permission.

THE COURT: And you can remain seated.

MR. BENJAMIN: Okay. Thank you.

THE COURT: And just pull up the mike, please.

MR. BENJAMIN: Okay. So, your Honor, as the Court is aware that this adjustment is based on an allegation that Chris committed perjury in response to two questions at the CFTC deposition in September 2010. And we respectfully believe that the Court should not impose that adjustment.

I think as a starting point for us, an obstruction adjustment based on a defendant's alleged perjury in a prior proceeding is not something to be done lightly. Under the Supreme Court precedent in the *Dunnigan* case, the sentencing court is supposed to make specific findings that all of the

elements of perjury are satisfied. And on the record here, we don't believe the facts would support such a finding. And I'd like to just briefly amplify on some of the points we made in our papers.

With respect to the elements of falsity and willfulness which I think kind of run together, when there's an allegation of perjury, the traditional starting place is to look at and scrutinize the question that was asked. In order to support a finding of falsity and willfulness, it's generally required, and rightly so, that the question has to be clear and unambiguous. And here as we have argued in our papers, we believe that both of these questions had some ambiguity built into them. Neither one of them was clearly and unambiguously about spoofing.

We also think, again on the elements of falsity and willfulness, if you consider sort of the record as a whole, it really does -- does not support an inference that Chris intentionally gave false testimony in that deposition. That would be inconsistent with his behavior at other times including when he was at JPMorgan, when he spoofed openly, talked about it openly. And perhaps most pertinently, in November 2018 when the FBI asked him about it, and their questions were clear, they were clearly about spoofing, and Chris admitted it readily and straightforwardly.

So when you think about all of that and come back to

the isolated and what we believe, there is ambiguity in the questions, we don't think it makes sense to reach the conclusion that Chris willfully gave false testimony.

And on that, we're mindful that the Court did impose this adjustment in the sentencing of Mr. Nowak but we believe, first of all, the questions are different. And the Nowak question, I think, is much more clearly directed at spoofing. And frankly, there was evidence in the record that Mr. Nowak had coached another trader to give false information to Compliance. So that kind of lines up more with that inference.

With respect to materiality which is another element of perjury as the Court is aware, we believe again that the evidence just falls short of what would be required to make the necessary findings.

In the *Zagari* case which is a Second Circuit case, the court held that when there's a question of a guidelines adjustment for perjury and when the alleged perjury occurred in a regulatory investigation that's different from the criminal investigation, then the perjury needs to be material both to the regulatory investigation and to the criminal investigation.

Here, the government has not really made any showing or argument even about materiality. And in our view, the record shows that even if, you know, one were to draw the

inference that the answers were willfully false that they nevertheless were not material really to either of the investigations.

With respect to the CFTC investigation, the CFTC has made unusual and rather detailed public disclosures about that investigation and based on that, we know that the CFTC was investigating allegations of manipulation in the silver market following complaints from members of the public, primarily retail investors, who alleged that there was a disconnect between silver futures prices and the prices of retail products like coins. And there was a suggestion by these -- by these parties that traders at big banks were carrying short positions, you know, with a purpose of depressing silver futures prices, and that's what the CFTC focused on.

They did a lot of work, and they concluded that there was no evidence to support those allegations. It was not an investigation of spoofing. And so from that, we believe it logically follows that the answers to these questions were not material.

I would add there's another complication, and that's even if the CFTC had been investigating spoofing and even if Chris' answers were shown to be willfully false, they still would not have made any difference in the CFTC investigation, and that's because of the timeline.

As we know, Chris left JPMorgan in November 2009.

The deposition occurred in September of 2010. At that time Dodd-Frank had just recently been enacted but it had not yet become effective. Dodd-Frank did not become effective until July 2011. That's about 10 months after the deposition. And as the Court is aware, July 2011 is the first time that there was any provision in the Commodity Exchange Act that prohibited spoofing.

And so in light of that timeline, even if the CFTC had been investigating spoofing, which we believe they were not, they could not have pursued enforcement against Chris because all of his spoofing was from a time period when spoofing didn't violate the Commodity Exchange Act, and that's the statute that the CFTC enforces. So we think that the answers were not material.

And then if we shift our focus to the criminal investigation which, of course, didn't get going until many years later, once again we think the evidence is not sufficient to support a finding of materiality. Again, the government has not proffered facts or argument to show materiality, and but what we know from what is in the record is that Chris' testimony in response to those questions did not derail or compromise the criminal investigation.

We know that at some point, we believe in 2018, the government examined Chris' trading. They developed detailed charts showing clearly that he spoofed. We know that Agent

Luca testified about those charts. He testified that he showed them to Chris at the Starbucks and that Chris said, "Yeah, that's me, and that was spoofing. That happened." And then, you know, there was the admissions in the interview.

So there was no obstruction. There was no dissembling. The answers to this CFTC deposition that are now being discussed didn't even come up in the interview, so we really don't believe it was material.

I have two other quick points. I know I'm -- I appreciate the Court's indulgence. This is something we feel rather strongly about. One is a guidelines argument and one is just a broader argument. Application note 1 of Section 3C1.1 deals with the situation where the allegedly obstructive conduct occurred before the criminal investigation began, and that's the case here. Under that application note, even if there's a finding of perjury, that only can justify the enhancement if two criteria are met and that's, first, that the perjury was purposely calculated to thwart the criminal investigation and, second, that it was actually likely to thwart the investigation.

And here again, we don't believe either of those are satisfied really because of the timeline. It just doesn't make sense to conclude that Chris' answers in September 2010 were purposefully calculated to obstruct a subsequent criminal investigation that we believe he could not at all have

foreseen. Dodd-Frank was brand new. It was not yet effective. There were zero publicly disclosed investigations or enforcement cases for spoofing. Certainly, there were no criminal cases at that point.

And, you know, even with respect to regulatory enforcement, as we learned at the trial, the first CME case for spoofing was the Martel case, and that became public in January 2012. So we don't believe it makes sense to conclude that Chris made a purposeful calculation to lie, to shield himself from a future criminal investigation that he couldn't have foreseen.

And then finally, one last point which is not so much guidelines related but is a bit broader, and I guess at least for me thinking about conduct that could fall within the technical definition of obstruction under the guidelines, there's really a range of behavior. And certainly, at one end of that spectrum, there's aggravated conduct -- document destruction, witness tampering, offering false testimony from the witness stand in a grand jury or in a federal courtroom -- but not all obstruction allegations are the same.

And I would submit that in a case like this one where what we're talking about is answers to two questions in a regulatory deposition from 13 years ago and in light of all those other factors that I went through, even if this fits within the technical definition of obstruction under the

guidelines, it is on a much more -- a much different kind of obstruction than those aggravated examples I gave earlier.

In the criminal case, Chris conducted himself properly. He was truthful to the agents when they asked him about it, I might add, in contrast to the cooperators who lied. He didn't attempt in any way to interfere with or compromise these court proceedings. At the trial he authorized his legal team to admit that he spoofed because he did, and that's exactly what we did.

And so we think that putting all that together, even if the Court were to determine that Chris' answers to those two questions fit within the technical definition of obstruction, we submit that it should be given little weight as the Court goes through the process of applying the 3553(a) factors.

THE COURT: All right. Thank you.

Do you want to respond for the government?

MR. SULLIVAN: Yes, your Honor, briefly. We've addressed many of these points in our written submission, so I won't repeat them here but just two points to address what Mr. Benjamin said.

It is true that the deposition was in September of 2010 and that Dodd-Frank was not yet effective. However, it is not true that there was nothing the CFTC could have investigated in terms of the defendant's manipulative trading.

There's 7 USC 13(a)(2), attempted price manipulation or price manipulation, something that the defendant's co-defendants, Mr. Smith and Mr. Nowak, were convicted of at trial. And so there certainly was something that the CFTC could have investigated and brought charges against the defendant for when it was asking about his manipulative trading and his spoofing.

Second, I would also disagree that this is kind of a lesser obstruction. This was a very serious CFTC investigation. As Mr. Benjamin notes, there was a lot of public discussion of it by the CFTC given its importance. And the defendant was under oath, and he lied about his conduct. He lied about his manipulation of silver prices which was the focus of the investigation. And so I would disagree that this is somehow a lesser form of obstruction; that this was a serious misstatement during a serious proceeding by the CFTC into a matter that had brought a lot of public attention to it.

So unless the Court has any other questions, thank you.

THE COURT: All right. Thank you.

The government has established this enhancement by a preponderance of the evidence. First, with regard to the actual falsity and willfulness, as the defense argues they do go hand in hand, and I don't think these questions nor the

answers were ambiguous. And this was brought out at trial and obviously presented again for sentencing. Government Exhibit 56 at the trial, I reread the transcripts. The question, "Did you ever show a bid or offer on Globex that you didn't intend to execute?"

Now, the answer was -- so first, I don't think that's ambiguous, but it's also quite clear from the answer which was quite fulsome that the defendant knew the import of the question, and the answer was, "Only if it -- I would only cancel something if I changed my mind or it was put in error, but no."

And so that answer which focuses on whether he had an intent to cancel when he put it in, put the order in, does show that he understood what the import of the question was. And it's not surprising because earlier in the deposition, the other question that was asked which is also the basis for a perjury finding that defendant knowingly lied in response to a clear question was, "While you were working at JPMorgan, did you ever engage in trading for the purposes of influencing the price on COMEX?"

And the answer was, "No."

And we know that that's not true based on all the evidence at trial including what the defendant did admit to Agent Luca later as well as the trading patterns and the real admission that the defendant engaged in spoofing. So that's a

clear question and it's a broad one, and he gave a flat-out "no" to it, and that was a knowing falsehood as well.

And then in the -- this argument that, well, but look at the bookends. Earlier, he admitted to it. Later he admitted to it.

Well, earlier that was in the context of, like, private chats with work colleagues. And so he was now being asked by a regulator whether he had the intent to cancel when he put in these orders and did he ever try to influence the price, and that's quite a different scenario.

And the bookend, the other bookend on the FBI confrontation, that's also quite a different setting where the agent has the evidence to confront him with. And obviously, it is a confrontational interview, and he admitted it in that context. So it's not surprising that the lie was book-ended in those two different settings.

On materiality, as Mr. Sullivan just pointed out, price manipulation has always been something that the CFTC can -- has jurisdiction over and can regulate. So the absence of Dodd-Frank does not undermine the materiality of the Q and A, and also the answers need not actually end up derailing the investigations.

With regard to the timeline, that this was well before the criminal investigation, that certainly bears on the analysis, but at the same it's not surprising that CFTC

investigations sometimes lead to criminal law enforcement. And it would be quite risky for a trader in Mr. Jordan's shoes to tell the truth to the CFTC and admit to intending to cancel orders right when they were entered and also to engage in trading just for the purpose of influencing prices and that it's a very short hop, skip, and a jump to criminal law enforcement from admissions like that. So unfortunately, he lied.

And so the obstructive conduct, even though it happened well in advance, it is in a setting where someone answering a question at a deposition from the CFTC could anticipate and should anticipate that a criminal investigation would have followed had he told the truth. So the plus-two for the obstruction does apply.

Okay. I think that's it for the guidelines disputes.

MR. SULLIVAN: Yes, that's my understanding.

MR. BENJAMIN: Correct, your Honor.

THE COURT: Okay. And so then there's no dispute over the criminal history category based on the two DUI convictions. Those both pick up one point, so two points is category II.

All right. So the end result is a base offense level of 7, add 12 for the loss, add two for ten or more victims, add two for obstruction. That's a total offense level of 23, criminal history category II, so the advice is 51 to 63

months.

Okay. So based on the rulings, is that correct by the government?

MR. SULLIVAN: Yes, your Honor.

THE COURT: All right. And then based on the rulings?

MR. BENJAMIN: Yes, based on the rulings.

THE COURT: Okay. All right. Now, there was an exhibit, Exhibit N, in which the defendant had additional proposed corrections on the PSR. So let's pull that up, docket entry 897.

Okay. So first, any objection from the government to the proposals on Page 2 and Page 3?

MR. SULLIVAN: No, your Honor.

THE COURT: Okay. So, yeah, it is accurate that the defendant was arrested in New Jersey and not SDNY. And I'll ask the probation office to also change the current address.

THE PROBATION OFFICER: Yes, your Honor.

THE COURT: Okay. And then, okay, so the next series has to do with the fact that the redacted second superseding indictment that was provided to the jury and the basis for the trial itself was narrower than the second superseding indictment itself. So there were a number of proposals here in terms of adding and then sometimes removing references that were more based on the initial second superseding indictment

instead of the narrowed one.

Was there anything in this list that the government objected to?

MR. SULLIVAN: One moment, your Honor.

(Pause.)

THE COURT: And what I mean just specifically -- let's see. It's the proposals, obviously in Exhibit N, running from Paragraph 2 through 12. Some of it also is to substitute the fact that Credit Suisse was Bank C and so on. That came out at trial.

(Pause.)

MR. SULLIVAN: So in terms of paragraphs 2 through -- I think 13, the Court said?

THE COURT: Yes.

MR. SULLIVAN: No objection to those changes.

THE COURT: Okay. Well, technically, Paragraph 12 has to do with that category of the narrowed indictment. On 13, slightly separate but, yeah, just to update the fact that the defendant is now unemployed.

So any objection to 13?

MR. SULLIVAN: No, your Honor.

THE COURT: Okay. So actually, maybe what we do there is the current last sentence of Paragraph 13, let's change that to, "Officer Cullen related that the defendant was employed as of the preparation of the PSR," period, and then

the defendant's proposal which is, "Mr. Jordan is currently unemployed but is actively looking for employment."

Okay. Does that make sense?

THE PROBATION OFFICER: Yes, your Honor.

THE COURT: All right. Okay. Then under the subheading "The offense conduct," any objection from the government on 27, 28, and 29?

MR. SULLIVAN: So I think 27 expresses the government's view of the facts.

THE COURT: Yeah, and I understand. A lot of times the PSR says the government reports this or the indictment alleges X, but here it actually ends up not having any bearing, you know, whatsoever on the sentencing given what's happened.

So any objection to that? Or you can still object. I'm going to overrule it, though.

MR. SULLIVAN: No objection to removing that.

THE COURT: Okay. And then to preserve the numbering, Kelly, if you could -- Officer Kwong, if you could just put something like "stricken by the Court." But let's preserve the numbering. So in other words, don't remove 27 such that 28 becomes 27. I think it will be a little confusing.

Does that make sense?

THE PROBATION OFFICER: So I'm removing the entirety

of Paragraph 27?

THE COURT: Right, but it would be --

THE PROBATION OFFICER: But inserting a sentence that says, "The Court has stricken" --

THE COURT: "Struck Paragraph 27."

THE PROBATION OFFICER: -- "Paragraph 27."

So there's just one sentence for Paragraph 27.

THE COURT: Right.

THE PROBATION OFFICER: Got it. Thanks, your Honor.

THE COURT: And the same thing with -- no, I think that's the only one there. Yeah, I just don't want the paragraph numbering to change in the corrected PSR.

THE PROBATION OFFICER: Okay. Yes, your Honor.

THE COURT: Okay. Mr. Sullivan, on Paragraph 31 under "Victim impact" --

MR. SULLIVAN: Your Honor, just going back to Paragraph 28, I think the reference to the SEC, I believe, is a mistake. I believe the reference should be to the CFTC.

THE COURT: Ah.

MR. SULLIVAN: The Commodity Futures Trading Commission. So I believe that would be appropriate to include there and to keep that paragraph.

THE COURT: Okay. Mr. Benjamin, any objection to that?

MR. BENJAMIN: No objection.

THE COURT: All right. So for the probation office, instead of the Securities and Exchange Commission, it will be the Commodities Future and Trade Commission.

MR. SULLIVAN: Your Honor, just for the record, it's commodity singular, commodity.

THE COURT: Commodity, singular.

THE PROBATION OFFICER: Okay. Am I spelling that out, your Honor, or the acronym?

THE COURT: You can use the acronym.

THE PROBATION OFFICER: What was that acronym again?

THE COURT: CFTC.

THE PROBATION OFFICER: CFTC? Okay.

MR. SULLIVAN: And then in terms of Paragraph 29, again, I think that's relating information from Agent Luca who had interviewed the defendant in 2018. So in terms of a basis to strike it, I don't think there is one.

THE COURT: Okay. It might be the reference to "and others," but that is neither here nor there. So I think I will eliminate that second sentence of Paragraph 28 as proposed by the defendant.

MR. SULLIVAN: So the second sentence of Paragraph 29?

THE COURT: Oh, I'm sorry. You're -- okay. The second sentence of 29, why do you want this stricken?

MR. BENJAMIN: Your Honor, it seemed to us to be

getting at the idea of joint conduct. And again, for the same reasons we had objected to the other language that suggests some coordinated conduct or something in that nature.

THE COURT: Okay. I mean, it's actually kind of exculpatory on that. But that's fine given we are trying to eliminate as much as practicable, not possible, just practicable. So please eliminate the second sentence of Paragraph 29 in the corrected PSR.

THE PROBATION OFFICER: Yes, your Honor.

THE COURT: Okay. Paragraph 31 under "Victim impact," any objection from the government?

MR. SULLIVAN: Yes, your Honor. I don't know that it's necessary. I believe there may have been some testimony from Mr. Varner as related to Quantlab's participation in the markets if they did not know that all -- if they did not presume that all orders were bona fide orders. But again, going back to the need to include that sentence, I don't -- I believe it's describing the government's version.

THE COURT: Yeah, it's not that -- this does not seem necessary. I mean, the government is not arguing in aggravation that there were actual market participants that withdrew. I don't think Mr. Varner said that they withdrew, it's just that I think he did say that he and his firm rely on the orders being bona fide. So it might have had that impact, but he did not say that they reduced their trading. At the

same time, it's just not being aggravated -- added and argued in aggravation. There is no need to add that sentence.

The same thing with Paragraph 33, the proposal about notional value. That is an accurate fact, and it's not inflammatory to be in the PSR. There's no jury risk here that notional value is going to somehow warp the sentencing, so that objection is overruled.

And with regard to Paragraph 40, the proposal from the defendant -- did you want to say something more about this?

MR. BENJAMIN: No, your Honor.

THE COURT: Okay. This one, I reject too. It's not pertinent to 3, 1.1 which is the guidelines that governs acceptance of responsibility, and I do not credit it. So that objection is overruled.

We've dealt with special skill. We've dealt with obstruction. All right. Paragraph 93, I'll ask the probation office to reflect the current residency.

Okay. Any objection from the government to adding the reference to asthma and the specific allergen?

MR. SULLIVAN: No, your Honor.

THE COURT: Okay. So 97 and 99 will add that sentence.

And then any objection to the additions to 104 and 105?

MR. SULLIVAN: No objection.

THE COURT: Okay. That could help the medical staff.

And any objection to the corrections proposed under "Substance abuse" for 120, 121, and 122?

MR. SULLIVAN: No, your Honor.

THE COURT: Okay. Those will be added.

And then 122 will be stricken -- that particular phrase will be stricken.

Yes, Paragraph 129, we ought to make the change about the end of the employment at Premiere Martial Arts and the current unemployment and that he is seeking employment.

Okay. Any objection from the government to the proposals for 137 and 138?

MR. SULLIVAN: No objection.

THE COURT: Okay. Those will be adopted as well.

Okay. Any objection to letting Mr. Jordan add those sentences in 141 and 142?

MR. SULLIVAN: No, your Honor, no objection.

THE COURT: We'll add those in as well.

Okay. Then we can talk about the other components of sentencing later.

Okay. All right. Anything else, Mr. Benjamin?

MR. BENJAMIN: Not with respect to the PSR, your Honor.

THE COURT: All right. Okay. And anything for the

government?

MR. SULLIVAN: No, your Honor, although supervised release conditions?

THE COURT: Yeah, we will --

MR. SULLIVAN: Okay.

THE COURT: -- go over those after hearing -- well, I guess we can do them now. And obviously, I still have to determine the ultimate sentence and the applicability of supervised release but, yeah, that's fine. We can go through them now.

So Page 34 of the presentence report, and I know the defense specified just two conditions, but I just want to go through on the record. Mandatory conditions 1, 2, 5, and 6, any objection, Mr. Benjamin?

MR. BENJAMIN: No, your Honor.

THE COURT: Okay. And on No. 6, sometimes I do reduce the number of periodic tests. I think we ought not do that here. There's some information in Paragraph 114 that would justify that even though it is somewhat dated and given the other form of abuse from which Mr. Jordan suffers, it would be wise to allow the probation office that leeway.

Any objection to discretionary conditions 1 and 4?

MR. BENJAMIN: No, your Honor.

THE COURT: All right. Those will be imposed as authored. There is a child support arrears issue to justify

No. 1. And No. 4, of course, always has a rehabilitative effect from employment.

I'm inclined not to impose No. 5. I mean, it's rather broadly stated, and also I just -- yeah, I don't see the risk at this point. So any objection to -- from the government to not imposing 5?

MR. SULLIVAN: No, your Honor.

THE COURT: 5 won't be imposed.

No. 6, I propose adding the word "felony" in front of "criminal activity" given the breadth of federal, state, and local law. Any objection to that from the government?

MR. SULLIVAN: No objection.

THE COURT: Any objection to the condition with that edit from the defense?

MR. BENJAMIN: No, your Honor.

THE COURT: All right. Page 35, any objection from the defense as to 7, 8, and 9?

MR. BENJAMIN: Excuse me, your Honor. We did have an objection to the --

THE COURT: Oh, you're right. I'm sorry. There was a checkbox, right, so and I think decided not to impose this as to the other defendants as well.

So any objection from the government to not imposing the non-communication requirement?

MR. SULLIVAN: No objection.

THE COURT: So that, we will uncheck that box and not impose that.

All right. Now 7, 8, and 9, any objection, Mr. Benjamin?

MR. BENJAMIN: No, your Honor.

THE COURT: Those will be imposed as authored.

And then for 14, I think the proposal would be this. You can add a second sentence that says, "As an exception, you may travel without advance approval to New Jersey" -- we'll just add that in there -- "New York, Illinois, and Rhode Island. For those states, you must notify the probation office 24 hours in advance of travel."

So it's just notification. It's 24 hours. No approval needed for those four states. So any objection to that from the government?

MR. SULLIVAN: No objection.

THE COURT: All right. Does that cover it, Mr. Benjamin?

MR. BENJAMIN: I mean, the principle, your Honor, that is fine. I just, he lives in New Jersey, so just the way your Honor phrased that gave me pause.

THE COURT: Yeah, my only concern there was that his mother lives in New Jersey and that if he were to relocate to New York or something, he should be able to go to New Jersey.

MR. BENJAMIN: I see.

THE COURT: She lives in New Jersey, right?

MR. BENJAMIN: He lives in New Jersey, yes.

THE COURT: But she lives in New Jersey.

MR. BENJAMIN: That's also true.

THE COURT: Yeah, right. So if he were to relocate to New York, for example, then he ought to be able to go to New Jersey without approval.

MR. BENJAMIN: Understood.

THE COURT: Yeah, that's why I just threw that in there.

Okay. Skip 16 for the moment. Any objection to 17 --

THE PROBATION OFFICER: Your Honor, I'm sorry. Can you repeat that last part of 14 with the note? Was it 24-hour notice?

THE COURT: Yeah, 24 hours in advance of travel.

THE PROBATION OFFICER: Okay. Thank you, your Honor.

THE COURT: Okay. Any objection to 17 and 18?

MR. BENJAMIN: No, your Honor.

THE COURT: Those are monitoring conditions that help the probation office monitor compliance with all the other conditions.

16, I propose unchecking "community service location." Then everything else remains the same, add a seven-day objection period. So in other words, if the

defendant objects to a proposed location, then the defendant can file an objection within seven days of the proposal.

So any objection to that edit from the government?

MR. SULLIVAN: No objection.

THE COURT: And the defense?

MR. BENJAMIN: No, your Honor.

THE COURT: Page 37, yeah, I don't typically impose the community service default. It might quite be warranted when -- if and when it happens, but I just do prefer the probation office come back and ask me.

So any objection from the government to not checking that box?

MR. SULLIVAN: No objection.

THE COURT: Also, this was not a tax case and no other kind of concern over that. Any objection from the government to not imposing 8?

MR. SULLIVAN: No objection.

THE COURT: And then I think lastly, Page 39, any objection from the defense to 11?

MR. BENJAMIN: No, your Honor.

THE COURT: All right. And that's for the safety of the probation office.

Okay. Now let's hear 3553 arguments, and we'll start with the government.

MR. SULLIVAN: Thank you, your Honor. Your Honor,

the defendant manipulated the precious metals markets for several years while he was a trader at JPMorgan and Credit Suisse. And as he admitted to the FBI, he placed the spoof orders to mislead the market, to outperform the algorithms, and get the best fills and best prices on his orders.

And these spoof orders were fake orders to deceive the market about the existence of genuine supply and demand. And so in 2009 and 2010 and by his own admission into 2011, the defendant engaged in spoofing and really only stopped because he was fired from the industry. It wasn't due to the passage of Dodd-Frank. It wasn't due to some change of heart. And the seriousness of the defendant's crime is compounded by the false statements that he made to the CFTC in which he denied ever engaging in this type of trading.

You know, we've heard -- the defendant makes much in his cross-response about the fact that he -- you know, it was an open book that he admitted to the FBI that he engaged in spoofing, but that's not what he told the CFTC. And I think his lies to the CFTC show that he knew his spoofing was not permitted and needed to be covered up and so undermines the assertion that the defendant was unaware that he wasn't allowed to engage in spoofing.

And so, your Honor, market manipulation like the defendant's spoofing, it undermines the integrity of the precious metals markets in a way that erodes the public's

trust and confidence in the fairness of the financial system. Markets simply can't operate effectively without faith in its integrity. If people lose faith in the markets, they think it's rigged, they'll leave, and the economy will suffer.

So in this case, your Honor, the government is requesting a below-guidelines sentence but a sentence that does involve a term of incarceration because we believe that such a sentence would reflect the seriousness of the offense, would provide for just punishment, and would afford general deterrence.

As this Court noted when sentencing the co-defendants Mr. Smith and Mr. Nowak, in white collar cases in particular, general deterrence is of paramount concern and is best served by imposing a term of imprisonment as opposed to merely a probationary sentence, and this case is no different. In market manipulation cases in particular, there is a significant need for general deterrence. Those cases are hard to detect and prosecute, so when defendants are convicted, their sentences must be sufficient to deter others from trying to defraud the markets and gain an unfair advantage.

In the defendant's cross-response, he asserts that there is no more need to deter spoofing given the recent spate of government prosecutions, corporate resolutions, but I think that misses the point.

First, market manipulation has been and likely always

will be as long as there are financial markets a threat to the integrity of those markets. So there is clearly still a need to deter those who would manipulate the market for their gain and to the detriment of others.

But more pointedly, spoofing is still happening. If you Google "spoofing," just last week the CFTC brought an action against a trader for spoofing in the oil and natural gas futures markets in 2020. Just a year ago, the government prosecuted an individual trader who was spoofing in the U.S. Treasury markets in 2019, so not back in 2009, 2010. This is much more recent conduct, people still engaging in spoofing. So there's clearly a need for general deterrence, and a probationary sentence here would send the wrong message.

And a sentence that includes a term of imprisonment would also align with the sentences imposed in other spoofing cases in this district that involve similar loss amounts and relevant trading periods. I think most on point is the *Bases* and *Pacilio* case, the Bank of America Merrill Lynch traders who spoofed and resulted in a loss of approximately $300,000, so approximately the same amount that the defendant has here.

And substantially, a substantial amount of the spoofing in *Bases* and *Pacilio* occurred prior to or right around Dodd-Frank, so similar to the defendant here in terms of time period. And so in the *Bases* and *Pacilio* case, the defendants were sentenced to one year and one day of

imprisonment.

But also, a term of imprisonment would be greater than the non-custodial sentences that were imposed on the two cooperators in the government's case that have been sentenced so far, Mr. Edmonds and Mr. Trunz. Giving the defendant here a non-custodial sentence would create an unwarranted disparity between him, a more senior seasoned trader on the desk who was convicted at trial, and Mr. Edmonds and Mr. Trunz who accepted responsibility, pleaded guilty, provided exceptional cooperation over many years including testimony over multiple days at trial.

Now, the government acknowledges the discussion, the detailed discussion in the defendant's papers regarding his personal circumstances and his history, but we believe that those do not completely overcome the need for some term of incarceration. There is no evidence that the issues surrounding the defendant's physical and mental health stem from or were related to the offense conduct in this case.

So, your Honor, for those reasons and for the reasons set forth in our submissions, we submit that a sentence involving a term of imprisonment is appropriate here. Thank you.

THE COURT: All right. Thank you.

For the defense?

MR. BENJAMIN: Thank you, your Honor. As the Court

is well aware, it is the responsibility of your Honor to consider all of the factors that are set forth in 3553(a) and to impose a sentence that is sufficient but not greater than necessary to satisfy the purposes of sentencing. In weighing those factors, the Court has considerable discretion. And in this case as your Honor noted at the outset, the Court has received quite a lot of information about Mr. Jordan. Your Honor presided over the trial, so you're very familiar with the evidence, and there is extensive additional detail in the PSR and in the submissions of the parties.

We believe that in light of that record, a sentence that is faithful to the mandate of 3553(a), to impose a sentence that's sufficient but not greater than necessary to achieve the purposes of sentencing, would be a period -- excuse me, would be a sentence of time served with a period of supervised release, a multiyear period of supervised release so that Mr. Jordan can continue his process of treatment and monitoring and recovery. So I'll just address, if I may, some of the 3553(a) factors.

Starting with the nature and circumstances of the offense, you know, we've heard Mr. Sullivan's presentation. I'm mindful that the Court has been critical, very critical of the practice of spoofing but even so, there are important mitigating facts with respect to the offense that pertain to Chris Jordan and that differentiate him, we believe,

meaningfully from his co-defendants and from the other individuals who have been convicted of spoofing.

One of them is the time period in which Chris spoofed. All of the offense conduct in this case occurred prior to July 8th, 2010. That was well before Dodd-Frank. Dodd-Frank hadn't even been passed at that point, much less become effective. And at that point, neither JPMorgan nor Credit Suisse had adopted compliance policies or training materials that explicitly talked about spoofing and as a consequence, Chris was never informed that there was a specific prohibition on spoofing.

We are well aware of the Court's rulings and are not arguing this as -- for today's purposes as relevant to guilt or innocence. That ship has sailed, but we do believe it's relevant for sentencing. In all of the other spoofing trials, the government introduced evidence of compliance policies that explicitly described spoofing and said in black and white that it was a prohibited trading practice.

For Chris, there were no such policies. That's because they didn't exist. They hadn't yet been written in 2009 when Chris worked at JPMorgan or 2010 when he worked at Credit Suisse. And we do believe that that is relevant in terms of mitigation for sentencing.

A second point with respect to the nature and circumstances of the offense is Chris' manner of spoofing.

And the Court alluded to that earlier this morning. The way that Chris Jordan spoofed was different from his co-defendants and from all of the other individuals who have been convicted of spoofing. The other defendants used a layering technique which the government has characterized as being more sophisticated and is calculated to conceal the behavior.

That's not how Chris did it. He placed single large orders at the very top of the order book. They were available for execution. They were sometimes hit. There was no effort to conceal or camouflage what he was doing.

Third, and this is in relation to the co-defendants, Chris spoofed for a much shorter period of time, and his spoofing resulted in a much lower level of loss to other market participants. And that's assuming for -- in light of the Court's ruling about Professor Venkataraman's loss calculations.

And finally, your Honor, with respect to the offense conduct, Chris didn't spoof for his own personal gain. For Chris, and this is what he said to the agents, spoofing was a technique to try to compete with the algorithms to get good execution for his boss. He tried to compete with the algorithms. It didn't work. He failed as a trader. But his motives, we believe, ultimately were trying to do his job.

I'd like to turn to now two 3553(a) factors that I'd like to discuss together, and that's the history and

characteristics of the defendant and the need for medical care. In this case, your Honor, we submit that Chris' personal characteristics and his need for medical care are the most compelling of the 3553(a) factors and that they should be given great weight.

In our sentencing submission and in the presentence report, there was a lot of highly sensitive detail about Chris' life circumstances. It's not easy to read. It was not easy to write that submission. It's distressing, it's painful, and it's very real. I've known Chris for a number of years. In my own life experience, I can't think of anyone I know who has suffered like Chris with such severity and for such a long period of time and as we know, these issues go back decades.

Chris came from a modest background. When he was in college and early in his career, he worked hard and he achieved success but then, your Honor, it all unraveled. For Chris, the deep-seated problems that go back decades, those problems manifested when he was in his 40s, and in the ensuing years, Chris spiraled into a total life meltdown. For the last six or seven years in particular, it has been a daily struggle for sobriety and really for survival.

Your Honor, Chris Jordan is a good person. He's kind. He's warm. He's smart. He's witty. He actually has a fabulous sense of humor. Chris is a devoted father who loves

his three sons more than anything in this world.

I do want to say a brief word about Chris' sons. They have shared the pain and the burdens of Chris' struggles, but they love their father. They care for him. They are desperately hoping that he can conquer his demons and continue on his path to recovery. And, your Honor, the letters that those three young men wrote to the Court demonstrate courage, maturity, and strength of character. I know that Chris is so proud of his sons. He is committed to being there for them as a positive influence on their lives.

I believe that over time, Chris has the capacity to recover from his condition and to make a sustained and positive contribution to his family and to the community but, your Honor, saying all of that, it's precarious. This is a delicate situation. It is touch and go. Going forward, it's critical, it's critical that Chris retain uninterrupted access to his therapist, his support group, his medications, and his living arrangement. And more than that, it's critical that Chris have a reason to hope, a reason to believe that there is a viable path forward for him.

Your Honor, we urge you in imposing sentence not to disrupt the current treatment program which is working. We fear that if your Honor were to send Chris to prison, it would really just destroy all of those structures and the support that's so critical to his recovery, and it would be a severe

psychological blow as well. We urge the Court not to take away the hope that's keeping Chris going.

I would like to turn to some of the other 3553(a) factors: Deterrence, just punishment, and respect for the law. And obviously, those are all part of the mix. At the same time, in light of the parsimony principle and the mandate to balance all of these factors with respect to the particular facts and circumstances of the individual who's standing before the Court for sentencing, we believe that those -- in this case, those considerations do not support a prison sentence. Obviously, there's no question of specific deterrence, and in the circumstances here, we don't believe that there is a substantial interest in general deterrence.

Look, we know, I don't think there's any question that the government has devoted an enormous, enormous amount of investigative and prosecutorial resources to this crackdown on spoofing over the last seven years. Banks have paid well over a billion dollars as a whole. People have gone to prison.

Mr. Sullivan says, well, some people are still committing spoofing but, of course, there will always be people violating the law. That argument would suggest that every defendant should always go to prison to send a general deterrence message, and we know that's not right. It has to be balanced.

In this case as we sit here, there is a clear message that has been sent that spoofing is unacceptable and illegal. And the point here, we submit, is -- in thinking about deterrence is whether sending Chris Jordan to prison has any incremental -- makes any incremental difference in that message. Does sending Chris Jordan move the needle? We submit that it doesn't and that that consideration should not be given much, if any, weight on the unique facts here.

And then finally, with respect to the need to avoid unwarranted sentencing disparities which the government also addressed, if the Court were to accept our recommendation and sentence Chris to time served with an extended period of supervised release, there would indeed be a disparity between Chris' sentence and the sentences of the other individuals who have been convicted of spoofing, but it would not be an unwarranted disparity.

To the contrary, that disparity would make sense. We believe it would be fair and just and reasonable in light of the differences in the offense conduct and in the personal circumstances of Chris as compared to the other individuals who have been convicted of spoofing. We went through the details in our submission with respect to the other trial defendants.

It also, you know, encompasses the cooperators who the government spoke about. Obviously, it's important that

the sentence that's imposed on cooperators reflect and incentivize people to cooperate with the government. There's no argument about that. And in most cases, of course you would expect, all else equal, that the sentences that the cooperators receive would be lower than the sentences of a defendant who goes to trial, but that's not -- that's not a rigid rule. That doesn't necessarily apply in every single case.

And here, we have the unique compelling, individualized circumstances that pertain to Chris. And we also have again disparities in conduct between Chris and the cooperators. They spoofed for much longer than Chris did. They spoofed even though they, unlike Chris, received clear and unambiguous compliance training. And they lied. Edmonds lied to the FBI. Trunz lied to Compliance. They both lied in civil depositions. So all of that should be taken into account.

And then a final point on the subject of sentencing equivalencies or disparities is that Chris has been subjected to stringent oversight and restraints on his daily life for a number of years. It's been to his benefit for sure, but it has been intrusive. Chris went through two extended periods of inpatient treatment. The conditions were difficult, your Honor. I saw those places. They were grim. In many ways, aspects of that experience resembled prison. And since then,

Chris has been subject to close and exacting supervision. If the Court accepts our recommendation and sentences Chris to time served with supervised release, all of that will continue.

I make the point because it's yet another point of contrast between Chris and his co-defendants. And I'm not going to say, of course, that anyone who's been charged in these cases has had it easy, far from it. But the co-defendants have been living at home with their families, ample financial resources. When they get out of jail, that's what they're going to go back to. That's just not Chris Jordan's world at all. It hasn't been, and it won't be going forward.

Your Honor, thank you for allowing me to speak on behalf of Chris here today. Thank you for the care that I know you've devoted to all of the difficult issues in this case including this sentencing. And for the reasons that we've articulated in our papers and I've tried to amplify here today, we urge the Court to impose a sentence of time served with a period of supervised release so that Chris can continue his treatment, his monitoring, and his recovery. Thank you.

THE COURT: All right. Thank you.

Mr. Jordan, we've come to the part of the hearing where you may speak on your own behalf. Do you want a break? We've been going for about an hour and 15. It's up to you,

though.

THE DEFENDANT: No, I'm comfortable speaking now.

THE COURT: All right. Go ahead, Mr. Jordan.

THE DEFENDANT: Thank you, your Honor. I appreciate the opportunity to address the Court today.

First, I'm grateful to so many people I'd like to thank today, and then I'd like to speak briefly about my own struggles and my hopes for the future. I first want to thank you, your Honor, for all the time you've dedicated to my case and for the patience and compassion you've shown me throughout this process. I also want to thank the court staff and the jury for their time and attention and careful attention to this case.

I want to thank my legal team for their unwavering support and dedication to me over these last almost five years. I want to thank my friends including those who came out here to be with me during the trial, who have stood by me through all my ups and downs.

I want to thank my sponsor, Mike, who has helped me change my outlook on life.

I want to thank my mom who has loved me and supported me unconditionally my whole life and stayed by me even in my darkest moments.

And I want to thank my three boys, Jackson, Luke, and Brian. They have been with me on this journey which has been

so hard. And I just want them to know that they are my world and my reason for living.

Your Honor, this has been an incredibly challenging process, like nothing I could have imagined, but I've tried my best to approach this with integrity and in good faith. As your Honor knows, I have struggled many years battling a debilitating alcohol addiction. Alcoholism is a crippling, insidious disease. To put it bluntly, alcohol has annihilated everything worthwhile in my life. I lost my career on Wall Street. I lost my marriage. I lost my life savings in a business that failed. I lost my house, and I've strained my relationship with my young boys.

When I was indicted, I had already lost everything. Your Honor knows the details of what I've been through, and I was pretty much at rock bottom in September of 2019, but the support and structures we put in place over the last several years have been absolutely game changing for me and for my family, especially the years of treatment I have received from the professionals at Willow Tree who have helped me overcome my demons and my local AA -- my local AA group who helped keep me accountable and most recently my sponsor who checks in on me every day and has shown me what it looks like to be successful in recovery. All of this is keeping me together, and I'm terrified, you know, of what will happen to me and my family if I lose this network of support.

Every minute of every day is a struggle. And my road to recovery has not been linear, but I've learned that this is about progress, not perfection. Every time I've fallen down, I've picked myself up and tried again. And after so many years of despair, I can finally see light at the end of the tunnel.

Even with my sentence looming before me, I have hope for the first time in years. My happy place is coaching sports and teaching young kids, and with this case behind me and my sobriety in hand, I hope to find a career, find a second career in that field. And most importantly, with a second chance, I can be there for my boys. Judge, I'm so proud of them. And to watch them grow in their academic and athletic careers is what gives all of us more joy than anything else. And beyond that, you know, they're just great people.

As I've stumbled, my incredible network of support hasn't given up on me and has had hope in me that I didn't always have in myself. Your Honor has seen this and treated me with the same compassion and empathy. Thank you again for that. I'm ready to accept your sentence and hope that your Honor will have mercy on me.

THE COURT: All right. Thank you, Mr. Jordan.

All right. Mr. Jordan, federal law tells judges what we have to consider in picking a sentence. I do need to

consider the nature and circumstances of the offense you committed as well as your personal history and characteristics. And then there are certain goals of sentencing that we're supposed to try to achieve, and then I pick a sentence that is enough but not more than needed to achieve the goals.

And the goals of sentencing include providing for just punishment. The sentence must promote respect for the law. The sentence does have to reflect the seriousness of the offense. I must provide for the protection of the public. I have to also try to achieve deterrence, and that comes in two forms: Specific deterrence meaning sending a sentence that is high enough to deter specifically you, the specific defendant in the case; and then general deterrence which is sending a message out generally to the community to not commit these kinds of crimes.

I have to consider medical and rehabilitative, occupational needs. Those needs can only push a sentence down. That's never a reason to increase someone's sentence. I need to consider the advice of the sentencing guidelines. And I also have to avoid unwarranted disparity which in the law means I ought to treat you the same way I treat other defendants who have been found guilty of similar conduct and who have the same kind of history that you have. So those are all the goals and factors that are on balance here.

On the nature and circumstances of the offense, I said the same thing in Mr. Nowak and Mr. Smith's sentencing. This was a very serious offense. You did put out lies into the market in the form of those spoof orders. And the government is correct that market integrity is a paramount value to our economy here. This commodities market are an engine of economic productivity, and it benefits us all in a broader society. And unfortunately, for a sustained period of time, not as long as your co-defendants, but for a long time, not just a one-off behavior, you put hundreds of lies into the market.

And there's been a lot of back and forth on this issue of whether you knew what you were doing was wrong, and I absolutely believe that you knew what you were doing was wrong. I think the Seventh Circuit has made clear as a legal matter that this is fraud, pure and simple. It is putting out a lie in order to obtain a monetary advantage here and that there are real victims.

And we know this not just legally but factually that these lies moved the market. They moved the prices. The prices were manipulated. And that's because there is a fundamental assumption that when orders are put into the market, they're not put in there with the intent to just cancel them unconditionally, and it is -- this will tie into general deterrence later, but this idea that there had to be

some kind of explicit compliance policy that said spoofing is wrong, the compliance policies did say that manipulating prices is barred, and that's not surprising because, as I said, the fundamental assumption in the markets is that these orders are genuine orders.

So there was no need to spell out exactly what spoofing was because price manipulation was barred, and that's what this is, and I think it's -- the other question and answer that was put in from the CFTC deposition from 2010 shows that you also understood that when this large order comes in, then it's taken off, and the question was within 60 seconds. Even in that scenario, that you call those fake bids or offers because that's what they are. They're fake, and you did know it.

Unfortunately, you have not accepted responsibility in the way that's most important, which is admitting that you committed a crime. So you're not really situated in the same way as defendants who have accepted responsibility and pleaded guilty. And your motive, as you admitted, was to do better at your job, and it was a well-paying job. So it was a serious offense.

Now, your personal history and characteristics, it was difficult to read the trauma that's in the under-seal information, so to actually have lived through it is unimaginable and so I -- yeah, I do take Mr. Benjamin's point

that it's -- I'm glad you have the positivity right now that your sons wrote so eloquently about in their letters, and I hope you maintain that positivity. It's still, of course, true that your history has been a really difficult one. And the last unsuccessful venture, it's kind of a tragedy that that happened as well because that obviously would have given you something else to keep making progress on.

And, yes, it is disruptive to remove you from your network. Having said that, there are other factors of sentencing that I have to take into account and not just -- not just medical needs and personal history which are important but not the only factors. And I'm not really seeing how the mental health issues and that trauma connected to the crime itself which would be even more powerful mitigation. I don't actually think there is a connection there.

Having said that, again, I do take it into account. And your mental health condition does make prison harder. It's harder to be in prison with the diagnoses that are laid out in the presentence report, so I will take that into account.

And family separation and community separation, the most difficult part of any sentencing for the defendant. The letters written in support do show that you have contributed vastly to your family and your community and your sons in particular and, yeah, when a childhood friend says that he

wants you to be with him if there's a zombie apocalypse, that's a special kind of loyalty. So I acknowledge all of the contributions you've made to your family and friends, and that is to your credit, and I will consider that in mitigation.

With regard to unwarranted disparity, the government is correct that in terms of the sentenced defendants who went to trial -- as I said, you're already not well situated to be similar to those who pleaded guilty, but those who went to trial so far, Mr. Bases and Mr. Pacilio with the approximately $300,000 loss are quite similar and received a year and a day, both of them.

Mr. Vorley and Mr. Chanu were at the $1 million loss level, and then Mr. Coscia was sentenced, I think, based on gain so that it's much more difficult to tell, but he did lie on the witness stand as well, and that no doubt added to the 36-month sentence that he received.

I will say again as I mentioned a couple weeks ago in your co-defendants' sentencings that it can be difficult to sentence by anecdote where we don't have presentence reports for other than Mr. Nowak and Mr. Smith. And that lack of information can make it very difficult to draw a straight line between sentencings. So it's relevant, but it's just not dispositive when we look at these other defendants who went to trial.

Now, here in this case itself, Mr. Nowak and

Mr. Smith received sentences of a year and a day and 24 months respectively, and that's with the guidelines advice of 57 months on the low end for both of them. And the loss amounts were much greater, I mean, by multiples. So I do take that into account.

They did engage in the spoofing for longer time periods, and their jobs were even more lucrative and they spoofed in order to maintain those very lucrative jobs. So in terms of the level of culpability, you are south of them, and I will take that into account as well.

I'll note that although a guidelines sentence is not appropriate, the guidelines are -- they are important. They are a way of giving some minimizing of disparity, and for this case in particular, for frauds across the board. So there is some relevancy to the guidelines even though a guideline sentence is most certainly not warranted here.

On general deterrence, that is an important consideration in these kinds of white collar cases. And I do believe that prison is qualitatively different when it comes to sending a general deterrence message. It's true that I think spoofing as a form of price manipulation is now quite well-known, and although the cases are being brought recently, they are still for conduct that is -- even on the government's recitation of these recent cases, they were brought recently but the conduct is from 2019 to 2020. So it might be that

with regard to spoofing in particular, the message is out there.

Having said that, there's still two considerations for general deterrence here. One is that courts can't react so leniently to spoofing that it arises again. Like, that is one of those ebbs and flows where whatever the type of case, but in particular white collar cases if there's a specific type of crime and it starts being treated leniently, there is the concern that it will arise again.

And then more broadly, it's not -- general deterrence is not just on spoofing. I'm not just trying to deter generally spoofing. It's all frauds on the market. And there's going to be a next one. The human criminal mind is so fertile that there will be another form of fraud on the market, and it needs to be combatted, and there should be a general deterrence message on any kind of fraud on the market. So that is still a consideration that is important and I have to take into account.

And it's not individualized in the sense that that general deterrence message isn't being sent on you because I don't think a deterrence message is needed as to you. Your criminal history is tied to the alcoholism, and there's not any other reason to think that I need to send a specific deterrence message, but general deterrence is based on your individual conduct, which is to commit a fraud on the market

and to manipulate prices on the market. So that is how it is tied to you, so I do need to consider that in picking the sentence.

So on balance and picking a sentence that is enough but not more than needed to achieve all of those goals and consider those factors, I think the appropriate sentence is a sentence of six months of imprisonment. No fine will be imposed. There is not an ability to pay. Even after the liquidation of the home, it will not -- there is no ability to pay.

The supervised release term will be 18 months at this point. Usually for a defendant with no criminal history or very little criminal history, I set a shorter time, but the defendant, I do believe, needs the assistance of the probation office and the monitoring in order to integrate back successfully.

Restitution is not an issue because of the JPMorgan fund that was established.

I do have to impose a $100 special assessment for the felony conviction.

You do have 14 days from entry of judgment on the docket to file a notice of appeal. If you can't afford the costs or fees of appeal, then you can ask to have them waived and if you qualify, then you won't have to pay. And if you're not able to afford an attorney, one will be appointed free of

charge as well if you ask.

Is there a facility recommendation?

MR. BENJAMIN: Yes, your Honor. We'd request that your Honor recommend the federal facility in Otisville, New York.

THE COURT: All right.

Okay. Claire, let's give out a surrender date.

MR. BENJAMIN: May I be heard briefly on that, your Honor?

THE COURT: Yes.

MR. BENJAMIN: We would make an application for bail pending appeal. We do plan to appeal. So we -- I don't know if your Honor wants to receive briefing on that or have argument now, but we would make that application. And then in any event, we would request a surrender date in January assuming the bail pending appeal is denied.

THE COURT: Okay. Let's get the January date first.

THE CLERK: January 9th.

THE COURT: Okay. And then do you want to file written briefs on it?

MR. BENJAMIN: I mean, we do have -- yes, I think we would.

THE COURT: Okay. All right. Claire, let's give out a 14-day date.

THE CLERK: September 29.

THE COURT: And 14 after that, please.

THE CLERK: October 13.

THE COURT: That's the response.

And then October 20 for the reply.

I don't think I need oral argument on it. So I'm just going to track -- set one of these tracking status hearings where it's just going to appear in the calendar. Don't show up. Don't call in or anything. And I'll rule before then. And that will be November 17 at 8:30.

Okay. Anything else for the government?

MR. SULLIVAN: No, your Honor. Thank you.

THE COURT: Do you have to dismiss the original indictment? He was added with the superseding. Was there the first superseding or -- how about this. If he's named in any charges, it's dismissed without prejudice. Was he in the superseding?

MR. SULLIVAN: Yes. He was in all of the indictments.

THE COURT: Oh, he was in the -- he was in the first one?

MR. SULLIVAN: Yes.

THE COURT: Oh, okay.

MR. SULLIVAN: I don't have it on me, but I believe we did dismiss the --

THE COURT: Oh, did you?

THE CLERK: Counts 1 and 2.

THE COURT: Oh, that's right, yeah, after the other trial.

MR. SULLIVAN: So I believe they're dismissed but if they are not dismissed, we'd dismiss them at this time.

THE COURT: Okay. Whatever is left will be dismissed.

Okay. Anything else for the defense?

MR. BENJAMIN: Just one moment, your Honor.

(Pause.)

MR. BENJAMIN: No. Thank you, your Honor.

THE COURT: Okay. And the probation office?

THE PROBATION OFFICER: No, your Honor.

THE COURT: All right. Then we are adjourned.

(Proceedings adjourned at 12:04 p.m.)

C E R T I F I C A T E

I, Judith A. Walsh, do hereby certify that the foregoing is a complete, true, and accurate transcript of the proceedings had in the above-entitled case before the Honorable EDMOND E. CHANG, one of the judges of said court, at Chicago, Illinois, on September 15, 2023.

*/s/ Judith A. Walsh, CSR, RDR, F/CRR*______ September 18, 2023

Official Court Reporter
United States District Court
Northern District of Illinois
Eastern Division